UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | ) | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 14-10067-RWZ |
| | ) | |
| FATHALLA MASHALI | ) | |
| | ) | |

MEMORANDUM AND ORDER ON MOTION FOR DETENTION

May 6, 2014

SOROKIN, C.M.J.

      Defendant moves for reconsideration of the Order of Detention. The Court has before it (a) all the evidence submitted in the course of the original detention proceedings; (b) the additional evidence submitted by the parties prior to the further detention hearing on April 17, 2014; (c) the testimony and documents presented to the Court at the April 17th hearing; and (d) the additional evidence the parties submitted after the hearing. The Court has applied the legal standards and factors set forth in the Court's original order on detention (which is incorporated herein) to all of the evidence before the Court to resolve the reconsideration motion—which is to say that the Court has considered the question anew under the governing law. In light of the fuller record now before the Court, the Motion for Reconsideration is ALLOWED. Several issues bear mention.

      Several facts support a risk of flight concern—the alleged offense involved millions of dollars, the disposition of those funds remains unclear at this stage of the case, and Defendant, if convicted, faces both a lengthy recommended sentence under the Guidelines and, thereafter,

1

certain deportation from the United States.  Nonetheless, Defendant would likely present as a candidate for release pending trial subject to appropriate conditions—he has lived, lawfully, in the United States for many years as a legal permanent resident; he is married to a United States citizen; he has four children, ages three to sixteen, all of whom are United States citizens and have resided solely in the United States; he has no prior criminal record; and he faces serious, but non-violent charges.  However, Defendant's own words and deeds both before and after his arrest substantially heighten the risk of flight he presents.

First, Defendant was arrested at Logan Airport en route to Egypt.  He carried with him a letter of recommendation for medical jobs.  The letter specifically stated "I highly recommend Dr Mashali without reservation for consultant position in Anesthesia, Critical Care Medicine and Interventional Pain Management."  Exhibit 3 at 2.  Defendant's wife testified that Defendant was going to Egypt to retrieve funds owed to him by the government and that the letter was a supporting document.  She also said that the letter was needed to obtain some social security-type benefits in Egypt.  These explanations are wholly incredible and I reject them.  The letter is plainly a job reference letter.  No evidence or documents have been submitted to explain how or why the letter would be necessary for or assist with the recovery of funds from the Egyptian government or to obtain the described benefits.  In addition, the letter was signed by Defendant's nephew (a doctor in Michigan), but addressed from Medical Care Specialists in Hawaii.  Defendant's wife testified that the nephew has never lived nor worked in Hawaii.  She also testified that she and her husband discussed moving to Egypt in the fall of 2013, but decided not

to do so. In these circumstances, I find that Defendant attempted to go to Egypt in order to obtain employment overseas and twice pressed a contrary position before the Court.[1]

Second, Defendant, his wife, and/or various businesses they controlled transferred approximately $1.7 million to Egypt. Defendant contends that these transfers were made to pay for medical billing services provided to his businesses by a company in Egypt, to purchase land in Egypt which he later sold, and to pay for a house in Cyprus for a third party who could not remove his own funds from Egypt. Defendant's wife, the owner of one of his businesses, testified to this fact and that (excepting the $20,000 to $40,000 held by the Egyptian government referred to in the prior paragraph) they have no money in Egypt. Defendant's wife further testified that she was not a "numbers person," and that she was not involved in the details of Defendant's businesses and thus could only provide a general explanation regarding the money sent to Egypt. Defendant, however, on October 23, 2012, testified in a deposition in a federal civil suit as follows:

> Q: And what is her role, other than being a shareholder? Does she have any position in the –
>
> A: Yes.
>
> Q: What does she do?
>
> A: She runs all entire [sic] company.
>
> Q: Okay. And what does that entail?
>
> A: Administrative functions, payroll, payables, everything.
>
> Q: Okay. Does she do any of the medical work?
>
> A: No. She doesn't do medical work.

---

[1] Finally, after the Court raised some of these issues, Defendant took the position that the letter was a reference letter to obtain patients for an on-line videoconferencing medical consulting service he intended to operate from the United States to serve patients in Egypt.

3

> Q: Okay. So, she's more of an administrator?
>
> A: Yes.

Exhibit 4, Defendant's Deposition, at 15-16. The Court finds the testimony of Defendant incredible and presumably motivated by a desire to avoid responsibility or liability. This is not the only instance of such conduct by Defendant.

As of mid-March, Defendant's wife owned or recently disposed of the following cars: (1) a 1998 Infinity QX4 with 250,000 miles (fair market value (FMV) of $1,000, given away several months prior to March); (2) a 1998 Jaguar sedan with 200,000 miles (FMV of $1,000 to $2,000 slated for sale or gift); (3) a 2002 Porsche 911 turbo with 21,000 miles (FMV of approximately $30,000, not encumbered by a loan); (4) a 2011 Mercedes GL550 with 44,985 miles (FMV of approximately $46,000 with a loan balance of $42,496); (5) a 2012 Audi Q5 with 26,000 miles (FMV of $35,000 with a loan balance of $28,340); (6) a 2012 Porsche Cayenne with 14,300 miles (FMV of $83,000 with a loan balance of $60,770); (7) a 2013 Lexus LX 570 with 24,090 miles (FMV of $71,000 with a loan balance of $75,625).

In response to questioning about the cars, Defendant's wife testified that her husband "liked cars" or words to that effect. She also reported now possessing only two of these cars (his, hers) plus a brand new Jeep she recently purchased for her son. Notably, in the same deposition cited above, Defendant testified to the following:

> Q: So, do you own an automobile?
>
> A: I think the [bankruptcy] estate own one automobile, yes.
>
> Q: Is – how do you get around? What transportation do you use?
>
> A: I have a – I have a 1998 Infinity QX4. It has 275,000 miles on it. It still runs though.
>
> Q: Is that owned by –

> A: By my wife.
>
> Q: By your wife. Are there any other automobiles in the family that are not encumbered by the bankruptcy?
>
> A: I think this is the one car that I use.
>
> Q: Does she have a car, your wife?
>
> A: She have [sic] her own car, yes.
>
> Q: What does she have?
>
> A: A – she has a two year old car. I don't remember the model exactly.

Exhibit 4, Defendant's Deposition, at 27-28. The Court finds incredible this portion of Defendant's testimony. Plainly, Defendant knew exactly what type of car she drove. Defendant's answers were also evasive.

Third, the finances of Defendant and his wife are not transparent. He sent approximately $1.7 million to Egypt. While he has produced invoices from his medical billing company, these receipts do not match the annual transfers made to Egypt, although they do roughly match the total. Further, in two jailhouse recordings, Defendant's wife discusses with her husband the great financial strain she is enduring, which suggests neither Defendant nor his family have substantial funds here or elsewhere. Defendant's wife, however, remains current on her home mortgage of over $12,000 per month as well as the mortgage on her former (now rented) home which costs her an additional several thousand dollars per month, even after accounting for the rental income. She also just purchased a Jeep for her sixteen-year-old son. One financial point is clear—Defendant's family cannot sustain the lifestyle they led prior to this investigation on Defendant's wife's income, either her present income or even double her present income, assuming she is successful in growing her dental practice from a part-time to a full-time occupation.

Due to these risk factors, the only possible set of release conditions would be strict conditions and a secured bond. Defendant proposes posting both the family home (with $2 million or $2.25 million in equity) and a condominium in Florida with equity of approximately several hundred thousand dollars. Given the foregoing evidence, Defendant's offer is insufficient, mainly due to the uncertainty surrounding Defendant's finances and the risk that he would elect to flee to Egypt rather than serve a sentence prior to deportation if convicted. However, his strong roots in the United States and strong family ties suggest that the Court might be able to fashion conditions of release which would reasonably assure Defendant's appearance whenever his presence is required. Such conditions are as follows:

1. Defendant and his wife shall produce, under oath, as of April 30, 2014, a list of every piece of real estate, every stock, bond, retirement, savings, or investment account held in whole or in part in the name of Defendant, his wife, or any of their children;[2] or in which Defendant, his wife, or any of their children have any beneficial interest. Accounts with a value of less than $1,000 on April 30, 2014, need not be listed.

2. Defendant shall sign a $5 million bond secured by each item from paragraph one held in whole or in part in his name, the name of any of his children, or in which he or his children have any beneficial interest.[3]

3. Defendant's wife shall sign a $5 million bond secured by each item from paragraph one held in whole or in part in her name, the name of any of her children, or in which she or her children have any beneficial interest.

---

[2] The children's assets are relevant: the family home is held in a trust for the benefit of the children with Defendant's wife as trustee.
[3] By this condition and the condition in paragraph three, the Court does not necessarily intend to require the liquidation and deposit of the funds with the Court, but rather a restraint on the funds such that they are available to satisfy the bond, if called, unless released as security for an appropriate purpose upon approval of the Court.

4. Defendant, upon release, shall reside at the family home on home detention twenty-four hours per day, seven days per week, enforced by electronic monitoring paid for by Defendant.  He may leave only to attend Court, to meet with his lawyers, to attend religious services, or to receive medical treatment.  Any such departure from the home requires prior approval from the U.S. Probation Office.  In addition, Defendant must wear a GPS bracelet when he leaves the home.

5. Defendant, his wife, and their children shall surrender their United States passports, any Egyptian passports, and any other travel documents in their possession, custody, or control.  They may not obtain any such document while these conditions remain in effect.

6. Defendant's mother- and father-in-law, Dr. Ekbal Elkadry and Anan Elkadry, shall sign a $250,000 appearance bond as offered today.

7. Defendant shall comply with the other standard conditions of release.

Defense counsel shall notify the Clerk when the list required by paragraph one is complete and the paperwork for posting the real estate, in accord with the standard procedures of the Court, is complete to the satisfaction of the Assistant United States Attorney at which point the Court will schedule a release hearing.  The government's objection to the Court's decision is preserved and, without waiving that objection, the government may propose additional or different conditions at the release hearing or prior thereto.

SO ORDERED.

    /s / Leo T. Sorokin
Leo T. Sorokin
Chief United States Magistrate Judge