UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 14- 10067 RWZ MPK |
| v. | ) | VIOLATIONS: |
| FATHALLA MASHALI | ) | 18 U.S.C. § 1347 (health care fraud) |
| | ) | 18 U.S.C. § 2 (aiding and abetting) |
| | ) | 18 U.S.C. § 982(a)(7) (forfeiture) |

## FIRST SUPERSEDING INDICTMENT

The Grand Jury charges that:

### General Allegations

At all times pertinent to this Indictment:

### The Medicare Program

1. The Medicare program was a federally subsidized health insurance program for the elderly and for persons with certain disabilities pursuant to title XVIII of the Social Security Act. The program was administered by the Health Care Financing Administration of the United States Department of Health and Human Services, which, on July 1, 2001, became the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services (collectively referred to in this Indictment as "CMS").

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it was a public plan affecting commerce, under which medical benefits, items, and services were provided to individuals, and included individuals and entities who were providing medical benefits, items, and services for which payment could be made

1

under the plan. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

3. Medicare in the Commonwealth of Massachusetts and the state of Rhode Island was administered by the National Heritage Insurance Company ("NHIC"), a company that contracted with CMS to receive, adjudicate, and pay certain Medicare claims.

4. Once certified to practice, a health care provider obtained a National Provider Identifier ("NPI") number. The NPI number was a unique ten-digit identification number much like a social security number. With the NPI number, the health care provider enrolled with CMS to become eligible to bill Medicare for services rendered to Medicare beneficiaries. As part of the enrollment process, Medicare issued the health care provider a Provider Identification Number ("PIN"). All health care providers seeking a PIN had to certify to CMS that they would only bill Medicare for services that they actually rendered.

5. In order to receive Medicare funds, enrolled Medicare health care providers, together with their authorized agents, employees, and contractors, were required to abide by the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers were given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures, rules, and regulations.

6. In order to receive payment for services rendered, health care providers had to submit a Medicare claim form to CMS through a local carrier, such as the NHIC. The local carrier, in turn, received, processed, and authorized payment to health care providers for services covered under the Medicare program according to the established rules, regulations, and

procedures. A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services, and the name and NPI of the physician, physician assistant, or another health care provider who performed the services for the patient. Health care providers were not required to send the local carrier copies of medical records or other forms to justify the Medicare claim. The claim generally was all that was required to receive payment from Medicare. The claim forms could be submitted to the local carrier either electronically or through the mail.

7. The American Medical Association published a manual entitled Current Procedural Terminology Codes (the "CPT Code"), which contained the universally recognized billing codes used by health care providers and relied upon by CMS. This manual contained a list of CPT codes, a description of the corresponding services, and an explanation for billing the codes.

8. For some services, such as certain laboratory services, CMS also relied on the billing codes under the Healthcare Common Procedure Coding System ("HCPCS"), which also contained billing codes used by health care providers and which, in part, overlapped with CPT codes.

9. When bills were submitted to CMS for payment under the Medicare program, health care providers or persons billing on their behalf were expected to identify the proper CPT and HCPCS codes that corresponded to the service provided, as well as any appropriate modifiers to designate the specific personnel who performed the visit.

10. With respect to office visits of an established patient, a health care provider could submit a bill using one of five "evaluation and management" CPT codes: 99211, 99212, 99213,

99214, or 99215. Determination of the proper CPT code depended on the nature of the office visit. Specifically, the CPT Code described codes 99211 through 99214 as follows:

    a. 99211: Office or other outpatient visit for the evaluation and management of an established patient that may not require the presence of a physician. Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

    b. 99212: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 components: (1) a problem-focused history; (2) a problem-focused examination; (3) straightforward medical decision-making. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are self-limited or minor. Physicians typically spend 10 minutes face-to-face with the patient and/or family.

    c. 99213: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: (1) an expanded problem-focused history; (2) an expanded problem-focused examination; (3) medical decision-making of low complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of low to moderate severity. Physicians typically spend 15 minutes face-to-face with the patient and/or family.

    d. 99214: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: (1) a detailed history; (2) a detailed examination; (3) medical decision-making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Physicians typically spend 25 minutes face-to-face with the patient and/or family.

    11. Under the Clinical Laboratory Improvement Amendments of 1998 ("CLIA"), Pub.L. No. 100-578, § 2, 102 Stat. 2903 (1998), CMS also regulated all laboratory testing (except research) performed on human specimens in the United States. 42 U.S.C. § 263a; 42 C.F.R. § 493.1. The objective of the CLIA program was to ensure the quality of laboratory

4

testing. For laboratories participating in Medicare, sanctions for violating the CLIA included cancellation of approval, or suspension of Medicare payments. 42 C.F.R. §§ 493.1807(a)-(b), 493.1842(a).

12. The CLIA program established three categories of tests: waived, moderate complexity, and high complexity. 42 C.F.R. § 493.5(a). Waived tests were simple laboratory examinations and procedures, such as urine cup tests, that carried an insignificant risk of an erroneous result, and were exempt from virtually all CLIA rules, so long as testing was performed in strict compliance with all of the manufacturers' instructions. See 42 C.F.R. § 493.15(c) & (e). To conduct waived tests, a laboratory needed to obtain a CLIA Certificate of Waiver. 42 C.F.R. § 493.5(c).

13. To conduct tests of higher complexity, a laboratory had to obtain a CLIA Certificate of Registration by submitting an application and paying the application fee. See 42 C.F.R. §§ 493.20, 493.25, 493.43, 493.45. The Certificate of Registration allowed the laboratory to perform higher complexity tests, pending a CLIA inspection. 42 C.F.R. §§ 493.2(1), 493.45(e). Once the laboratory passed the inspection, it would receive a CLIA Certificate of Compliance, which allowed it to continue to operate as a higher complexity laboratory. 42 C.F.R. §§ 493.45(e) and 493.49(a).

14. To maintain good standing under the CLIA, the laboratory had to demonstrate its compliance with the CLIA; among various requirements, the laboratory had to demonstrate it minimized contamination of patient specimens, 42 C.F.R. § 493.1101(a)(2); maintained sufficient amounts of reagents for testing commensurate with the type and volume of testing the laboratory performed. 42 C.F.R. § 493.1101(b); retained test records for two years, 42 C.F.R.

§ 493.1105(a); established, and adhered to, written policies and procedures that ensured optimum integrity of a patient's specimen from the time of collection or receipt of the specimen through completion of testing and reporting results; 42 C.F.R. § 493.1232; established, and adhered to, written policies and procedures for specimen transportation, storage, preservation, acceptability, and rejection, 42 C.F.R. § 493.1242(a); maintained a written procedure manual for all tests, assays, and examinations performed by the laboratory, which, when applicable, incorporated manufacturers' test system instructions or operator manuals, 42 C.F.R. § 493.1251(a)-(c); and properly calibrated and validated laboratory instruments for accuracy and precision before reporting patient results, 42 C.F.R § 493.1253.

15. Among the tests conducted by health care providers and submitted to CMS for payment was the laboratory chemical analysis of urine specimens. Some health care providers, such as pain management physicians, had a patient's urine specimens chemically analyzed to check for the presence of drugs of abuse and/or to verify the patient's compliance with prescription medication.

16. Laboratory chemical analysis of urine specimens could be qualitative or quantitative. A qualitative drug test detected the presence of a specific drug or drug class, but not its concentration. A quantitative drug test discerned not only the presence of a specific drug or drug class, but also the concentration.

17. Typically, the initial drug test or screen of a urine specimen was qualitative. A health care provider had to maintain medical records indicating the medical necessity for performing a qualitative drug screen. A health care provider was to bill HCPCS code G0431, if the test was of high complexity, or HCPCS code G0434, if the test was of moderate or low

complexity, for the initial qualitative drug screen. HCPCS codes G0431 and G0434 could be billed only once per patient encounter, irrespective of the number of drugs or drug classes screened during the urine test that resulted from that patient encounter.

18. If the results of the qualitative screen were inconsistent with the patient's medical history, clinical presentation, or own statements, a health care provider could verify the results by conducting a second qualitative test, called a confirmatory test. The confirmatory test had to be performed by a chemical method different from that used in the first qualitative test. Common chemical methods of drug analysis included immunoassay, as well as chromatography, gas chromatography ("GC"), liquid chromatography ("LC"), and mass spectrometry ("MS").

19. For the qualitative confirmatory test, a health care provider had to bill CPT code 80102. A health care provider could bill separately for each drug or drug class tested during the confirmatory test, but only if the confirmation of each drug or drug class required a separate analysis or procedure. Thus, for example, if a health care provider confirmed in a confirmatory test three results of the initial drug screen that appeared inconsistent with the patient's medical history and/or presentation, the health care provider could bill three units of CPT code 80102. It was not considered medically necessary to routinely confirm all positive and negative results for every patient irrespective of the patient's medical history and presentation.

20. In certain cases, a health care provider could perform a quantitative drug test of a confirmed drug to determine its concentration. For example, when several opioids were present in the urine of a patient prescribed a single opioid, quantification could help a health care provider discern whether the other opioids were derived from the prescribed opioid or whether the patient was consuming an opioid outside of the prescribed medication. For a quantitative

drug test, a health care provider could bill CPT codes in the ranges 80150-80299 and 82000-84999, such as 83925 for opiates, 82520 for cocaine, 82145 for amphetamines, 82055 for alcohol/ethanol, and 80299 for certain drugs not specifically enumerated by the CPT Code, such as oxycodone, ecstasy, and marijuana. It was not considered medically necessary to routinely quantify all positive and negative results for every patient irrespective of the patient's medical history and presentation.

21. Medicare claim processors could reject a claim if, for example, the health care provider or beneficiary was not enrolled. Claim processors generally did not contact the beneficiary or health care provider before payment was made to confirm that the billed services were actually provided, however. They also did not typically review medical records or other underlying documentation to substantiate the billed services. Instead, Medicare presumed the truth of each claim, and generally paid health care providers for the services that they billed. In other words, Medicare entrusted their enrolled providers to only submit claims for the services that they actually performed.

22. Although Medicare did not generally scrutinize claims before payment, the program retained the right to audit health care providers after payment was made. As a result, health care providers were obligated to retain original source records, such as medical records, charts, and other documents, that tended to show the nature of the services actually rendered by the health care provider. In the event that Medicare agents, such as the NHIC, discovered that a claim was not supported by the underlying documentation, the Medicare program could recoup those funds from the health care provider, or impose sanctions.

8

## The Defendant FATHALLA MASHALI

23. FATHALLA MASHALI ("MASHALI") was a resident of Dover, MA, and a licensed physician who held two licenses issued by the U.S. Drug Enforcement Administration ("DEA") to prescribe controlled substances – DEA #BM4286375 (Massachusetts) and DEA #BM4415370 (Rhode Island).

24. MASHALI was the owner of New England Wellness & Pain Management, P.C., a/k/a New England Pain Associates, P.C., of Massachusetts and Rhode Island, a/k/a Greystone Pain Management, Inc., a/k/a New England Pain Institute, P.C. (hereinafter collectively referred to as "NEPA"). NEPA was a Massachusetts professional corporation, incorporated in April 2005. The Massachusetts Secretary of State identified MASHALI as NEPA's Resident Agent, President, Treasurer, Secretary, and Director. NEPA was also a registered professional corporation in Rhode Island until its corporate status was revoked on October 20, 2008, due to a failure to pay appropriate licensure fees.

25. NEPA operated three pain management clinics in Massachusetts and one in Rhode Island. NEPA pain clinics operated at the following locations in Massachusetts: (1) 169 North Franklin Street, Holbrook, MA, 02343; (2) 10 Converse Place, 4th Floor, Winchester, MA, 01890; and (3) 48 Elm Street, Worcester, MA, 02609. NEPA's Rhode Island pain clinic was located at 6 Blackstone Valley Place, Lincoln, RI, 02865.

26. MASHALI had operated a pain clinic in Weymouth, MA, until in or about the late spring or early summer of 2011, when he transferred his Weymouth practice (including all employees, equipment, and patients) to the location in Holbrook, MA. MASHALI also had previously operated a pain clinic in Woonsocket, RI. In or about February 2013, he transferred

9

his Woonsocket practice (including all employees, equipment, and patients) to the location in Lincoln, RI.

27. Among NEPA's patients were Medicare beneficiaries, for whom NEPA submitted claims for reimbursement to Medicare through the NHIC.

28. MASHALI, along with physician assistants working for NEPA under MASHALI's direction, prescribed NEPA's patients opiates and other medications to treat pain. MASHALI tested patients' urine specimens purportedly to monitor the patients' compliance with their prescription regimens, to evaluate whether they diverted their prescription medications, and to determine whether they consumed and abused drugs they were not prescribed, such as cocaine, methadone, amphetamines, and marijuana, among others.

29. From on or about March 2011 through on or about September 2012, MASHALI operated Dimension Xpand Plus, a chemical analyzer manufactured by Siemens, to test urine specimens of NEPA's patients. This chemical analyzer used the immunoassay method and provided a qualitative result. The Dimension Xpand Plus chemical analyzer's specifications stated that the test "provides only a preliminary analytical test result. A more specific alternate chemical method must be used in order to obtain a confirmed analytical result. Gas chromatography/mass spectrometry (GC/MS) is the preferred confirmatory method." The specifications for specimen collection and handling stated that if a urine specimen was not analyzed immediately it had to be refrigerated, but only for up to 24 hours; urine specimens had to be frozen for storage exceeding 24 hours. MASHALI operated the Dimension Xpand Plus at his laboratory at 169 North Franklin Street, Holbrook, MA, 02343 ("Holbrook laboratory").

30. On or about November 2011, MASHALI began to operate Biolis24i, a chemical analyzer manufactured by Carolina Liquid Chemistries, in conjunction with the Dimension Xpand Plus chemical analyzer, at his Holbrook laboratory. This chemical analyzer used the immunoassay method and provided a semi-quantitative result (which approximated, but did not precisely determine, drug concentration), which Medicare reimbursed at the same rate as a qualitative result. The Biolis24i chemical analyzer's specifications stated that the analysis "provides only a preliminary analytical result. A more specific alternative chemical method must be used in order to obtain a confirmed analytical result. Gas chromatography/mass spectrometry (GC/MS) is the preferred confirmatory method." The specifications for specimen collection and handling stated that if a urine specimen was not analyzed immediately it had to be refrigerated, but only for up to three days; urine specimens had to be frozen for storage exceeding three days.

31. MASHALI tested the urine specimen of every patient twice: once on the Dimension Xpand Plus and once on the Biolis24.

32. On or about November 2011, MASHALI obtained a CLIA Certificate of Registration for the Holbrook laboratory, which allowed it to perform higher complexity tests.

33. On or about April 2012, MASHALI began to operate a second Biolis24i chemical analyzer, identical to the first, again in conjunction with the Dimension Xpand Plus chemical analyzer, at his Holbrook laboratory. MASHALI continued to test urine specimens twice for each patient: once on the Dimension Xpand Plus and once on one of the Biolis24 chemical analyzers.

34. Between March 2011 and October 2012, MASHALI did not operate a chemical analyzer that used the LC/MS or GC/MS method, which could confirm the qualitative results of the Dimension Xpand Plus and Biolis24 chemical analyzers.

### The Scheme To Defraud

35. From on or about October 13, 2010 and continuing until on or about March 2, 2013, defendant FATHALLA MASHALI, with others known and unknown to the Grand Jury, devised a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United State Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, by causing the submission to Medicare of materially false and fraudulent claims for services that were not medically necessary and that were not provided.

### The Purpose of the Scheme and Artifice

36. It was the purpose of the scheme for MASHALI to unlawfully enrich himself and others and to defraud the Medicare program of money by causing the submission of materially false and fraudulent claims for services that were not medically necessary and that were not provided.

### Manner and Means

37. The manner and means by which MASHALI sought to accomplish the purpose of the scheme and artifice to defraud Medicare included, among other things, the following:

## CPT Codes 99213 and 99214

38. MASHALI trained NEPA employees, including physician assistants and registered nurses, to bill Medicare for patient visits using CPT codes 99213 and 99214 even though these CPT codes required provision of services that were not actually provided to the NEPA patients.

39. MASHALI overbooked patient appointments for himself and NEPA's physician assistants, sometimes with as many as four patients per one appointment slot, and arrived to work up to four hours late, causing significant overcrowding at NEPA's waiting rooms. The patient appointments often lasted less than ten minutes and sometimes as little as two to three minutes. Although the number of patients booked per day did not allow MASHALI or NEPA's physician assistants to conduct patient examinations of the scope and length required by CPT codes 99213 and 99214, MASHALI caused these CPT codes to be submitted to Medicare for reimbursement for these patient visits.

40. MASHALI often saw patients without performing physical examinations. With the exception of patients requiring injections, MASHALI conducted patient visits in a small office with a desk, resembling a business office, rather than in an examination room containing medical equipment. Although MASHALI did not conduct physical examinations during these patient visits, the medical records of the patients seen by MASHALI falsely documented extensive physical examinations and coded the visits under either CPT code 99213 or 99214, which MASHALI caused to be submitted to Medicare for reimbursement for services not provided to the patients.

## CPT Code 80102

41. From on or about November 2011 until on or about October 2012, MASHALI conducted two urine drug tests on each patient specimen, once on the Dimension Xpand Plus chemical analyzer and once on one of the Biolis24i analyzers, but submitted and caused to be submitted to Medicare claims for three tests.

   a. MASHALI routinely tested urine specimens of all patients for the same drugs and drug classes on the Dimension Xpand Plus and Biolis24i chemical analyzers. Both tests used the immunoassay method and were considered qualitative by Medicare. MASHALI billed HCPCS code G0431 for the test on the Dimension Xpand Plus and multiple quantitative CPT codes for the test on the Biolis24i.

   b. MASHALI routinely submitted and caused to be submitted to Medicare claims using confirmation CPT code 80102 for the third test, which he did not perform. MASHALI billed confirmation CPT code 80102 with six units for each urine specimen (i.e., confirming six results of the initial qualitative test) even though he did not perform confirmatory tests and irrespective of the results of the initial qualitative tests on these urine specimens.

   c. MASHALI routinely submitted and caused to be submitted to Medicare claims for confirmation CPT code 80102 before the initial qualitative tests were even run on the Dimension Xpand Plus and Biolis24i chemical analyzers, although the necessity of the confirmatory test depended on the results of the initial qualitative drug screen and the number of drugs to be confirmed depended on the outcome of the

14

initial qualitative drug screen evaluated in the context of the patient's medical history, presentation, and statements.

42. MASHALI submitted and caused to be submitted to Medicare claims for confirmation CPT code 80102, although the Holbrook laboratory was out of compliance with the CLIA.

   a. MASHALI submitted and caused to be submitted to Medicare confirmation CPT code 80102 for chemical analysis of urine specimens even though the only chemical analysis performed at the Holbrook laboratory was on the Dimension Xpand Plus and Biolis24i chemical analyzers that had not been properly validated for accuracy and precision.

   b. MASHALI submitted and caused to be submitted to Medicare confirmation CPT code 80102 for patient urine specimens that he tested and caused to be tested on the Dimension Xpland Plus and Biolis24i chemical analyzers weeks and sometimes three months after the urine specimens had been collected and stored unrefrigerated at the Holbrook laboratory in large plastic bags and containers. The delay in testing was due to the sheer volume of urine specimens MASHALI ordered to be tested and to MASHALI's failure, on occasion, to have reagents in stock for his chemical analyzers. Due to the age of urine and storage conditions, the smell of stale urine permeated the laboratory; urine leaked from collection cups; and some urine appeared discolored. This handling and storage of urine specimens was contrary to the Dimension Xpand Plus and Biolis 24i manufacturers' specimen collection and handling procedures, which required urine specimens that were not

tested immediately to be refrigerated for up to 24 hours and three days, respectively, and then frozen.

      c.      On or about February 7 and 8, 2012, a CLIA inspector visited the Holbrook laboratory to evaluate it for compliance with the CLIA and to ascertain the propriety of issuing the laboratory a CLIA Certificate of Compliance. Prior to the CLIA inspection, MASHALI caused the bags of unrefrigerated urine specimens to be moved out of the Holbrook laboratory to avoid their detection by the CLIA inspector. After the inspection, MASHALI again stored and caused to be stored unrefrigerated urine specimens at the Holbrook laboratory.

16

# COUNTS ONE THROUGH TWENTY-THREE
(Health Care Fraud, in violation of 18 U.S.C. §§ 1347 and 2)

43. The Grand Jury incorporates by reference Paragraphs 1 through 42 as if fully restated and alleged herein.

44. On or about the dates enumerated below, in Massachusetts and elsewhere,

## FATHALLA MASHALI,

the defendant herein, with others known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United State Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, by causing the submission to Medicare of materially false and fraudulent claims for services that were not medically necessary and that were not provided:

| Count | Date of Service | Beneficiary | CPT Code billed |
|---|---|---|---|
| 1 | February 10, 2011 | CB | CPT 99214 |
| 2 | January 29, 2013 | DC | CPT 99213 |
| 3 | November 14, 2012 | PC | CPT 99213 |
| 4 | October 13, 2010 | DsC | CPT 99214 |
| 5 | July 19, 2012 | JD | CPT 99213 |
| 6 | March 2, 2013 | JM | CPT 99213 |
| 7 | December 13, 2011 | DL | CPT 99214 |
| 8 | December 28, 2012 | MM | CPT 99213 |

| 9 | November 8, 2012 | DP | CPT 99213 |
|---|---|---|---|
| 10 | December 6, 2011 | DB | CPT 80102 |
| 11 | January 3, 2012 | DB | CPT 80102 |
| 12 | March 6, 2012 | DB | CPT 80102 |
| 13 | April 3, 2012 | DC | CPT 80102 |
| 14 | April 5, 2012 | DC | CPT 80102 |
| 15 | April 17, 2012 | DC | CPT 80102 |
| 16 | February 16, 2012 | CR | CPT 80102 |
| 17 | March 1, 2012 | CR | CPT 80102 |
| 18 | March 15, 2012 | CR | CPT 80102 |
| 19 | March 19, 2012 | CR | CPT 80102 |
| 20 | March 20, 2012 | RZ | CPT 80102 |
| 21 | April 7, 2012 | RZ | CPT 80102 |
| 22 | May 15, 2012 | RZ | CPT 80102 |
| 23 | July 17, 2012 | RZ | CPT 80102 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

# FORFEITURE ALLEGATIONS
## 18 U.S.C. § 982(a)(7)

1. The Grand Jury incorporates by reference Paragraphs 1 through 44 as if fully restated and alleged herein.

2. Upon conviction of the offenses alleged in Counts One through Twenty-Three of this Indictment, the defendant,

**FATHALLA MASHALI,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

3. If any of the property described in paragraph 2, as a result of any act or omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of this Court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. §982(b)(1), incorporating 21 U.S.C. § 853(p), to seek forfeiture of all other property of the defendant up to the value of the property described in subparagraphs (a) through (e) of this paragraph.

All pursuant to Title 18, United States Code, Section 982.

A TRUE BILL

_____
FOREPERSON OF THE GRAND JURY

_____
Maxim Grinberg
ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS; October 16, 2014

Returned into the District Court by the Grand Jurors and filed.

_____
DEPUTY CLERK

1:14 p.