UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 14-10067-RWZ |
| ) | |
| ) | VIOLATIONS: |
| ) | |
| v. ) | 18 U.S.C. § 1347 (health care fraud) |
| ) | 18 U.S.C. § 1349 (conspiracy to commit mail fraud) |
| ) | 18 U.S.C. § 1957 (money laundering) |
| FATHALLA MASHALI ) | 18 U.S.C. § 2 (aiding and abetting) |
| ) | 18 U.S.C. §§ 981, 982 and 28 U.S.C. § 2461(c) |
| ) | (criminal forfeiture) |

## SECOND SUPERSEDING INDICTMENT

The Grand Jury charges that:

### General Allegations

At all times pertinent to this Indictment:

### The Medicare Program

1.     The Medicare program was a federally subsidized health insurance program for the elderly and for persons with certain disabilities pursuant to title XVIII of the Social Security Act.   The program was administered by the Health Care Financing Administration of the United States Department of Health and Human Services, which, on July 1, 2001, became the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services (collectively referred to in this Indictment as "CMS").

2.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it was a public plan affecting commerce, under which medical benefits, items, and services were provided to individuals, and included individuals and entities who were providing medical benefits, items, and services for which payment could be made

1

under the plan. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

## UnitedHealthcare

3.      UnitedHealth Group was a health care company headquartered in Minnetonka, MN. It offered health coverage and benefits services, including Medicare Advantage Plans (Medicare Part C), through its operating division called UnitedHealthcare, with the regional office for New England located in Warwick, RI. A Medicare Advantage Plan was a type of Medicare health plan offered by a private insurance company that contracts with Medicare to provide Original Medicare (Parts A and B) benefits. Medicare Advantage Plans can combine hospital, doctor, and drug coverage in one plan, and may include extra benefits.

4.      UnitedHealthcare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it was a private plan affecting commerce, under which medical benefits, items, and services were provided to individuals, and included individuals and entities who were providing medical benefits, items, and services for which payment could be made under the plan.

## Evaluation and Management CPT Codes

5.      The American Medical Association published a manual entitled Current Procedural Terminology Codes (the "CPT Code"), which contained the universally recognized billing codes used by health care providers and relied upon by CMS, UnitedHealthcare, and other health care benefit programs. This manual contained a list of CPT codes, a description of the corresponding services, and an explanation for billing the codes.

6.     For some services, such as certain laboratory services, CMS and certain other health care benefit programs also relied on the billing codes under the Healthcare Common Procedure Coding System ("HCPCS"), which also contained billing codes used by health care providers and which, in part, overlapped with CPT codes.

7.     When submitting bills to health care benefit programs, such as Medicare or UnitedHealthcare, health care providers or persons billing on their behalf had to identify the proper CPT and HCPCS codes that corresponded to the services they provided.

8.     With respect to office visits of an established patient, a health care provider could submit a bill using one of five "evaluation and management" CPT codes:   99211, 99212, 99213, 99214, or 99215.   Determination of the proper CPT code depended on the nature of the office visit.   Specifically, the CPT Code described codes 99211 through 99214 as follows:

   a. 99211:     Office or other outpatient visit for the evaluation and management of an established patient that may not require the presence of a physician.   Usually, the presenting problem(s) are minimal. Typically, 5 minutes are spent performing or supervising these services.

   b. 99212:     Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 components: (1) a problem-focused history; (2) a problem-focused examination; (3) straightforward medical decision-making.   Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are self-limited or minor. Physicians typically spend 10 minutes face-to-face with the patient and/or family.

   c. 99213: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: (1) an expanded problem-focused history; (2) an expanded problem-focused examination; (3) medical decision-making of low complexity.   Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.   Usually, the presenting problem(s) are of low to moderate severity. Physicians typically spend 15 minutes face-to-face with the patient and/or family.

d. 99214: Office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: (1) a detailed history; (2) a detailed examination; (3) medical decision-making of moderate complexity. Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Physicians typically spend 25 minutes face-to-face with the patient and/or family.

## CLIA Regulations

9. Under the Clinical Laboratory Improvement Amendments of 1998 ("CLIA"), Pub.L. No. 100-578, § 2, 102 Stat. 2903 (1998), CMS regulated all laboratory testing (except research) performed on human specimens in the United States. 42 U.S.C. § 263a; 42 C.F.R. § 493.1. The objective of the CLIA program was to ensure the quality of laboratory testing. For laboratories participating in Medicare, sanctions for violating the CLIA included cancellation of approval, or suspension of, Medicare payments. 42 C.F.R. §§ 493.1807(a)-(b), 493.1842(a).

10. The CLIA program established three categories of tests: waived, moderate complexity, and high complexity. 42 C.F.R. § 493.5(a). Waived tests were simple laboratory examinations and procedures, such as urine cup tests, that carried an insignificant risk of an erroneous result, and were exempt from virtually all CLIA rules, so long as testing was performed in strict compliance with all of the manufacturers' instructions. *See* 42 C.F.R. § 493.15(c) & (e). To conduct waived tests, a laboratory needed to obtain a CLIA Certificate of Waiver. 42 C.F.R. § 493.5(c).

11. To conduct tests of higher complexity, a laboratory had to obtain a CLIA Certificate of Registration by submitting an application and paying the application fee. *See* 42 C.F.R. §§ 493.20, 493.25, 493.43, 493.45. The Certificate of Registration allowed the

4

laboratory to perform higher complexity tests, pending a CLIA inspection. 42 C.F.R. §§ 493.2, 493.45(e). Once the laboratory passed the inspection, it would receive a CLIA Certificate of Compliance, which allowed it to continue to operate as a higher complexity laboratory. 42 C.F.R. §§ 493.45(e) and 493.49(a).

12. To maintain good standing under the CLIA, the laboratory had to demonstrate its compliance with the CLIA. Among various requirements, the laboratory had to demonstrate that it minimized contamination of patient specimens, 42 C.F.R. § 493.1101(a)(2); maintained sufficient amounts of reagents for testing commensurate with the type and volume of testing the laboratory performed, 42 C.F.R. § 493.1101(b); retained test records for two years, 42 C.F.R. § 493.1105(a); established, and adhered to, written policies and procedures that ensured the optimum integrity of a patient's specimen from the time of collection or receipt of the specimen through completion of testing and reporting results; 42 C.F.R. § 493.1232; established, and adhered to, written policies and procedures for specimen transportation, storage, preservation, acceptability, and rejection, 42 C.F.R. § 493.1242(a); maintained a written procedure manual for all tests, assays, and examinations performed by the laboratory, which, when applicable, incorporated manufacturers' test system instructions or operator manuals, 42 C.F.R. § 493.1251(a)-(c); and properly calibrated and validated laboratory instruments for accuracy and precision before reporting patient results, 42 C.F.R § 493.1253.

**Urine Drug Analysis CPT Codes**

13. Among the tests conducted by health care providers and submitted to health care benefit programs for payment was the laboratory chemical analysis of urine specimens. Some health care providers, such as pain management physicians, had a patient's urine specimen

5

chemically analyzed to check for the presence of drugs of abuse and/or to verify the patient's compliance with prescription medication.

14.    Laboratory chemical analysis of urine specimens could be qualitative or quantitative.  A qualitative drug test detected the presence of a specific drug or drug class, but not the concentration.  A quantitative drug test discerned not only the presence of a specific drug or drug class, but also the concentration.

15.    Typically, the initial drug test or screen of a urine specimen was qualitative.  A health care provider had to maintain medical records indicating the medical necessity for performing a qualitative drug screen.  For a Medicare-related health care benefit program, a health care provider was to bill HCPCS code G0431, if the test was of high complexity, or HCPCS code G0434, if the test was of moderate or low complexity, for the initial qualitative drug screen.  HCPCS codes G0431 and G0434 could be billed only once per patient encounter, irrespective of the number of drugs or drug classes screened during the urine test that resulted from that patient encounter.

16.    If the results of the qualitative screen were inconsistent with the patient's medical history, clinical presentation, or own statements, a health care provider could verify the results by conducting a second qualitative test, called a confirmatory test.   The confirmatory test had to be performed by a chemical method different from that used in the first qualitative test.  Common chemical methods of drug analysis included immunoassay, as well as chromatography, gas chromatography ("GC"), liquid chromatography ("LC"), and mass spectrometry ("MS").

17.    For the qualitative confirmatory test, a health care provider had to bill CPT code 80102.  A health care provider could bill separately for each drug or drug class tested during the

6

confirmatory test, but only if the confirmation of each drug or drug class required a separate analysis or procedure. Thus, for example, if a health care provider confirmed in a confirmatory test three results of the initial drug screen that appeared inconsistent with the patient's medical history and/or presentation, the health care provider could bill three units of CPT code 80102. It was not considered medically necessary to routinely confirm all positive and negative results for every patient irrespective of the patient's medical history and presentation.

18. In certain cases, a health care provider could perform a quantitative drug test of a confirmed drug to determine its concentration. For example, when several opioids were present in the urine of a patient prescribed a single opioid, quantification could help a health care provider discern whether the other opioids were derived from the prescribed opioid or whether the patient was consuming an opioid outside of the prescribed medication. For a quantitative drug test, a health care provider could bill CPT codes in the ranges 80150-80299 and 82000-84999, such as 83925 for opiates, 82520 for cocaine, 82145 for amphetamines, 82055 for alcohol/ethanol, and 80299 for certain drugs not specifically enumerated by the CPT Code, such as oxycodone, ecstasy, and marijuana. It was not considered medically necessary to routinely quantify all positive and negative results for every patient irrespective of the patient's medical history and presentation.

### Post-Payment Audit of Claims by Health Care Benefit Programs

19. Although health care benefit programs did not generally scrutinize claims before payment, the program retained the right to audit health care providers after payment was made. As a result, health care providers were obligated to retain original source records, such as medical records, charts, and other documents, that tended to show the nature of the services

7

actually rendered by the health care provider. In the event that a health care benefit program or its agents discovered that a claim was not supported by the underlying documentation, the program could recoup those funds from the health care provider.

## The Defendant FATHALLA MASHALI

20. FATHALLA MASHALI ("MASHALI") was a resident of Dover, MA, and a licensed physician who held two licenses issued by the U.S. Drug Enforcement Administration ("DEA") to prescribe controlled substances – DEA #BM4286375 (Massachusetts) and DEA #BM4415370 (Rhode Island).

21. MASHALI was the owner of New England Wellness & Pain Management, P.C., a/k/a New England Pain Associates, P.C., of Massachusetts and Rhode Island, a/k/a Greystone Pain Management, Inc., a/k/a New England Pain Institute, P.C. (hereinafter collectively referred to as "NEPA"). NEPA was a Massachusetts professional corporation, incorporated in April 2005. The Massachusetts Secretary of State identified MASHALI as NEPA's Resident Agent, President, Treasurer, Secretary, and Director. NEPA was also a registered professional corporation in Rhode Island until its corporate status was revoked on October 20, 2008, due to a failure to pay appropriate licensure fees.

22. NEPA operated three pain management clinics in Massachusetts and one in Rhode Island. NEPA pain clinics operated at the following locations in Massachusetts: (1) 169 North Franklin Street, Holbrook, MA, 02343; (2) 10 Converse Place, 4th Floor, Winchester, MA, 01890; and (3) 48 Elm Street, Worcester, MA, 02609. NEPA's Rhode Island pain clinic was located at 6 Blackstone Valley Place, Lincoln, RI, 02865.

8

23. MASHALI had operated a pain clinic in Weymouth, MA, until in or about the late spring or early summer of 2011, when he transferred his Weymouth practice (including all employees, equipment, and patients) to the location in Holbrook, MA. MASHALI also had previously operated a pain clinic in Woonsocket, RI. In or about February 2013, he transferred his Woonsocket practice (including all employees, equipment, and patients) to the location in Lincoln, RI.

24. Among NEPA's patients were Medicare and UnitedHealthcare beneficiaries for whom NEPA submitted claims for reimbursement to Medicare and UnitedHealthcare, respectively. NEPA also had patients belonging to other health care benefit programs.

25. MASHALI, along with physician assistants working for NEPA under MASHALI's direction, prescribed NEPA's patients opiates and other medications to treat pain. MASHALI tested patients' urine specimens purportedly to monitor the patients' compliance with their prescription regimens, to evaluate whether they diverted their prescription medications, and to determine whether they consumed and abused drugs they were not prescribed, such as cocaine, methadone, amphetamines, and marijuana, among others.

26. From on or about March 2011 through on or about September 2012, MASHALI operated a Dimension Xpand Plus ("Dimension"), a chemical analyzer manufactured by Siemens, to test urine specimens of NEPA's patients. This chemical analyzer used the immunoassay method and provided a qualitative result. The Dimension chemical analyzer's specifications stated that the test "provides only a preliminary analytical test result. A more specific alternate chemical method must be used in order to obtain a confirmed analytical result. Gas chromatography/mass spectrometry (GC/MS) is the preferred confirmatory method." The

specifications for specimen collection and handling stated that if a urine specimen was not analyzed immediately it had to be refrigerated, but only for up to 24 hours; urine specimens had to be frozen for storage exceeding 24 hours.    MASHALI operated the Dimension at his laboratory at 169 North Franklin Street, Holbrook, MA, 02343 ("Holbrook laboratory").

27.    On or about November 2011, MASHALI began to operate a Biolis 24i ("Biolis"), a chemical analyzer manufactured by Carolina Liquid Chemistries, in conjunction with the Dimension chemical analyzer, at his Holbrook laboratory.    This chemical analyzer used the immunoassay method and provided a semi-quantitative result (which approximated, but did not precisely determine, drug concentration), reimbursable at the same rate as a qualitative result. The Biolis chemical analyzer's specifications stated that the analysis "provides only a preliminary analytical result.    A more specific alternative chemical method must be used in order to obtain a confirmed analytical result.    Gas chromatography/mass spectrometry (GC/MS) is the preferred confirmatory method."    The specifications for specimen collection and handling stated that if a urine specimen was not analyzed immediately it had to be refrigerated, but only for up to three days; urine specimens had to be frozen for storage exceeding three days.

28.    MASHALI tested the urine specimen of every patient twice: once on the Dimension and once on the Biolis.

29.    On or about November 2011, MASHALI obtained a CLIA Certificate of Registration for the Holbrook laboratory, which allowed it to perform higher complexity tests.

30.    On or about April 2012, MASHALI began to operate a second Biolis chemical analyzer, identical to the first, again in conjunction with the Dimension chemical analyzer, at his

Holbrook laboratory. MASHALI continued to test urine specimens twice for each patient: once on the Dimension and once on one of the Biolis chemical analyzers.

31. Between March 2011 and October 2012, MASHALI did not operate a chemical analyzer that used the LC/MS or GC/MS method, which could confirm the qualitative results of the Dimension and Biolis chemical analyzers.

## The Scheme to Defraud Health Care Benefit Programs with Respect to CPT Codes 99213, 99214, and 80102

32. From on or about October 13, 2010 and continuing until on or about March 2, 2013, defendant FATHALLA MASHALI, with others known and unknown to the Grand Jury, devised a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), among them Medicare and UnitedHealthcare, and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, by causing the submission to Medicare, UnitedHealthcare, and other health care benefit programs, of materially false and fraudulent claims for services that were not medically necessary and that were not provided.

## The Purpose of the Scheme and Artifice

33. It was the purpose of the scheme for MASHALI to unlawfully enrich himself and others and to defraud health care benefit programs, including Medicare and UnitedHealthcare, of money by causing the submission of materially false and fraudulent claims for services that were not medically necessary and that were not provided.

11

**Manner and Means**

34.     The manner and means by which MASHALI sought to accomplish the purpose of the scheme and artifice to defraud health care benefit programs, including Medicare and UnitedHealthcare, included, among other things, the following:

*CPT Codes 99213 and 99214*

35.     MASHALI trained NEPA employees, including physician assistants and registered nurses, to submit claims to health care benefit programs for patient visits using CPT codes 99213 and 99214 even though these CPT codes required providing services that were not actually provided to the NEPA patients.

36.     MASHALI overbooked patient appointments for himself and NEPA's physician assistants, sometimes with as many as four patients per one appointment slot, and arrived to work up to four hours late, causing significant overcrowding at NEPA's waiting rooms.    The patient appointments often lasted less than ten minutes and sometimes as little as two to three minutes.    Although the number of patients booked per day did not allow MASHALI or NEPA's physician assistants to conduct patient examinations of the scope and length required by CPT codes 99213 and 99214, MASHALI caused these CPT codes to be submitted to health care benefit programs for reimbursement for these patient visits.

37.     MASHALI often saw patients without performing physical examinations.    With the exception of patients requiring injections, MASHALI conducted patient visits in a small office with a desk, resembling a business office, rather than in an examination room containing medical equipment.    Although MASHALI did not conduct physical examinations during these patient visits, the medical records of the patients seen by MASHALI falsely documented

extensive physical examinations and coded the visits under either CPT code 99213 or 99214, which MASHALI caused to be submitted to health care benefit programs for reimbursement for services not provided to the patients.

*CPT Code 80102*

38.     From on or about November 2011 until on or about October 2012, MASHALI submitted and caused to be submitted to health care benefit programs, including Medicare and UnitedHealthcare, confirmatory CPT code 80102 for services that he did not perform and that were not medically necessary:

      a.     MASHALI routinely tested urine specimens of all patients for the same drugs and drug classes on the Dimension and Biolis chemical analyzers, which produced qualitative and semi-quantitative results, respectively.    MASHALI billed HCPCS code G0431 and multiple quantitative CPT codes for these tests.

      b.     The Dimension and Biolis analyzers did not provide confirmatory results billable under CPT code 80102 for at least two reasons.    First, the analyzers did not confirm each other's results because both tests relied on the immunoassay method. Nevertheless, MASHALI routinely submitted and caused to be submitted to health care benefit programs confirmation CPT code 80102, in addition to CPT code G0431 and quantitative CPT codes, for each urine specimen tested on these analyzers.    Second, MASHALI routinely submitted and caused to be submitted to health care benefit programs claims with confirmation CPT code 80102 before the tests on the Dimension and Biolis chemical analyzers were even run, although the necessity of the confirmatory test depended on the results of the initial qualitative drug screen and the number of drugs

13

to be confirmed depended on the outcome of the initial qualitative drug screen evaluated in the context of the patient's medical history, presentation, and statements.

39.     MASHALI submitted and caused to be submitted to health care benefit programs, among them Medicare and UnitedHealthcare, claims with confirmation CPT code 80102, although the Holbrook laboratory was out of compliance with the CLIA:

     a.     MASHALI submitted and caused to be submitted to health care benefit programs claims with confirmation CPT code 80102 for chemical analysis of urine specimens even though the only chemical analysis performed at the Holbrook laboratory was on the Dimension and Biolis chemical analyzers that had not been properly validated for accuracy and precision.

     b.     MASHALI submitted and caused to be submitted to health care benefit programs claims with confirmation CPT code 80102 for patient urine specimens that he tested and caused to be tested on the Dimension and Biolis chemical analyzers weeks and sometimes three months after the urine specimens had been collected and stored unrefrigerated at the Holbrook laboratory in large plastic bags and containers. The delay in testing was due to the sheer volume of urine specimens MASHALI ordered to be tested and to MASHALI's failure, on occasion, to have reagents in stock for his chemical analyzers. Due to the age of the urine and the storage conditions, the smell of stale urine permeated the laboratory; urine leaked from collection cups; and some urine appeared discolored. This handling and storage of urine specimens was contrary to the Dimension and Biolis manufacturers' specimen collection and handling procedures, which required urine specimens that were not

14

tested immediately to be refrigerated for up to 24 hours and three days, respectively, and then frozen.

c.     On or about February 7 and 8, 2012, a CLIA inspector visited the Holbrook laboratory to evaluate it for compliance with the CLIA and to ascertain the propriety of issuing the laboratory a CLIA Certificate of Compliance.   Prior to the CLIA inspection, MASHALI caused the bags of unrefrigerated urine specimens to be moved out of the Holbrook laboratory to avoid their detection by the CLIA inspector. After the inspection, MASHALI again stored and caused to be stored unrefrigerated urine specimens at the Holbrook laboratory.

## COUNTS 1-27
### Health Care Fraud
### (18 U.S.C. §§ 1347 and 2)

40.     The Grand Jury incorporates by reference Paragraphs 1 through 39 as if fully restated and alleged herein.

41.     On or about the dates enumerated below, in the District of Massachusetts and elsewhere,

**FATHALLA MASHALI,**

the defendant herein, with others known and unknown to the Grand Jury, knowingly and willfully executed and attempted to execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), including Medicare and UnitedHealthcare, and to obtain by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care

15

benefits, items, and services, by causing the submission to Medicare and UnitedHealthcare of materially false and fraudulent claims for services that were not medically necessary and that were not provided:

| Count | Date of Service | Beneficiary | Insurance | CPT Code billed |
|-------|-----------------|-------------|-----------|-----------------|
| 1 | February 10, 2011 | CB | Medicare | CPT 99214 |
| 2 | January 29, 2013 | DC | Medicare | CPT 99213 |
| 3 | November 14, 2012 | PC | Medicare | CPT 99213 |
| 4 | October 13, 2010 | DsC | Medicare | CPT 99214 |
| 5 | July 19, 2012 | JD | Medicare | CPT 99213 |
| 6 | March 2, 2013 | JM | Medicare | CPT 99213 |
| 7 | December 13, 2011 | DL | Medicare | CPT 99214 |
| 8 | December 28, 2012 | MM | Medicare | CPT 99213 |
| 9 | November 8, 2012 | DP | Medicare | CPT 99213 |
| 10 | December 6, 2011 | DB | Medicare | CPT 80102 |
| 11 | January 3, 2012 | DB | Medicare | CPT 80102 |
| 12 | March 6, 2012 | DB | Medicare | CPT 80102 |
| 13 | April 3, 2012 | DC | Medicare | CPT 80102 |
| 14 | April 5, 2012 | DC | Medicare | CPT 80102 |
| 15 | April 17, 2012 | DC | Medicare | CPT 80102 |
| 16 | February 16, 2012 | CR | Medicare | CPT 80102 |
| 17 | March 1, 2012 | CR | Medicare | CPT 80102 |
| 18 | March 15, 2012 | CR | Medicare | CPT 80102 |
| 19 | March 19, 2012 | CR | Medicare | CPT 80102 |

| 20 | March 20, 2012 | RZ | Medicare | CPT 80102 |
|----|----------------|----|----------|-----------|
| 21 | April 7, 2012 | RZ | Medicare | CPT 80102 |
| 22 | May 15, 2012 | RZ | Medicare | CPT 80102 |
| 23 | July 17, 2012 | RZ | Medicare | CPT 80102 |
| 24 | January 12, 2012 | JZ | UnitedHealthcare | CPT 80102 |
| 25 | March 8, 2012 | JZ | UnitedHealthcare | CPT 80102 |
| 26 | April 5, 2012 | JZ | UnitedHealthcare | CPT 80102 |
| 27 | May 3, 2012 | JZ | UnitedHealthcare | CPT 80102 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 28
### Conspiracy to Commit Mail Fraud
### (18 U.S.C. §§ 1349)

42.     The Grand Jury incorporates by reference Paragraphs 1 through 39 as if fully restated and alleged herein.

43.     In or about February and March 2013, CMS directed its contractor, StrategicHealthSolutions, LLC, located in Omaha, Nebraska, to audit NEPA's charges to Medicare for evaluation and management CPT codes 99214 and 99215.

44.     On or about March 8, 2013, StrategicHealthSolutions, acting on behalf of CMS, mailed a letter to MASHALI in Massachusetts informing him that CMS had retained StrategicHealthSolutions to conduct a post-payment medical review of the past claims he had submitted to Medicare for evaluation and management CPT codes 99214 and 99215. The letter identified 40 claims that MASHALI had submitted in the years 2011 and 2012 and requested that he submit supporting information for each requested claim, including "[m]edical records

17

documentation from the treating physician or nonphysician practitioner to support the evaluation and management services for the date of services billed" and "[a]ny and all other documentation to support the level of evaluation and management service billed (i.e. review of laboratory, radiology)." The letter informed MASHALI that "[f]ailure to comply with this request could result in potential denial and recoupment of payment previously issued."

### The Conspiracy

45. From in or about March 2013 and continuing in or about April 2013, in the District of Massachusetts and elsewhere,

### FATHALLA MASHALI,

the defendant herein, did knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury to commit mail fraud, that is, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, they would knowingly place in any post office and authorized depository for mail matters and things to be sent and delivered by the United States Postal Service and would cause to be deposited a matter and thing to be sent and delivered by private and commercial interstate carrier, to wit, purported medical records pertaining to the 40 claims requested by StrategicHealthSolutions, addressed from Winchester, MA to StrategicHealthSolutions, LLC, 11808 Grant St, 2nd Floor, Omaha, NE 68164, postmarked April 4, 2013, all in violation of 18 U.S.C. § 1349 (conspiracy to commit mail fraud).

## Purpose of the Conspiracy

46.     The purpose of the conspiracy was to unlawfully obtain money from Medicare.

## Manner and Means of the Conspiracy

47.     It was part of the conspiracy that the conspirators created false patient encounter notes and urine drug test reports for the Dimension and Biolis chemical analyzers for the claims that StrategicHealthSolutions had requested.

48.     It was part of the conspiracy that the conspirators included in the false encounter notes new information, such as the written memorialization of extensive patient physical examinations and treatment plans, which was material to support CPT codes 99214 and 99215, when such information was absent in the original encounter notes.

49.     It was part of the conspiracy that the conspirators included in the false urine drug test reports MASHALI's notations and signature that were not present in the original reports; false test results; and false dates on which the urine was tested on the Dimension and Biolis chemical analyzers, in order to suggest that MASHALI actually had reviewed the test results and to conceal from CMS the long delays in testing patients' urine specimens and the improper urine specimen storage conditions as described in Paragraph 39.   For example, for patient Da.P., date of service April 25, 2012, the original urine drug test results showed that the patient had tested negative for oxycodone, with the dates of collection and testing recorded as April 25, 2012 and June 14, 2012 (on both the Dimension and Biolis), respectively.   The false urine drug test results, however, showed that the urine had tested positive for oxycodone on the Biolis analyzer and listed the date of collection as April 25, 2012 and the dates of testing as April 27, 2012 (on

19

the Dimension) and April 30, 2012 (on the Biolis). The false urine drug test results bore MASHALI's signature and notations, while the originals did not.

50.    It was part of the conspiracy that on or about April 4, 2013, the conspirators caused the false patient encounter notes and urine drug test reports to be mailed from Winchester, MA to StrategicHealthSolutions via the United States Postal Service.

### COUNTS 29-44
### Money Laundering
### (18 U.S.C. §§ 1957 and 2)

51.    The Grand Jury incorporates by reference Paragraphs 1 through 39 as if fully restated and alleged herein.

52.    From or about November 2011 to or about November 2012, defendant MASHALI withdrew and/or transferred about $670,758.96 from the NEPA's operating account xxxxxxxx8135 at Bank of America, which contained at least $671,747.16 in proceeds from health care benefit program reimbursements for CPT code 80102. MASHALI spent part of the $670,758.96 sum on personal expenses, such as improvements to his residence in Dover, MA, and transferred the other part of the sum to his wife's bank account xxxxxxxx2404 at Bank of America, which was subsequently spent, in part, on mortgage and other payments for his residences in Dover, MA and Fort Lauderdale, FL, car loan payments, and other personal expenses.

53.    On or about the dates below, in the District of Massachusetts and elsewhere,

### FATHALLA MASHALI,

the defendant herein, did knowingly engage, and attempt to engage, in the following monetary transactions, by, through and to a financial institution, in and affecting interstate and

foreign commerce, in criminally derived property of a value greater than $10,000, the withdrawals

and transfers of funds and monetary instruments, the particulars of which are described below, and

which property was derived from specified unlawful activity, that is, health care fraud, in violation

of 18 U.S.C. § 1347:

| Count | Date | Monetary Transaction | Amount |
|-------|------|----------------------|--------|
| 29 | 04/09/2012 | Check # 2508 | $18,424.92 |
| 30 | 05/14/2012 | Transfer to Bank of America account xxxxxxxx2404 | $190,000.00 |
| 31 | 05/30/2012 | Transfer to Bank of America account xxxxxxxx2404 | $25,000.00 |
| 32 | 06/05/2012 | Check # 2563 | $55,000.00 |
| 33 | 06/11/2012 | Check # 2568 | $37,519.91 |
| 34 | 06/15/2012 | Transfer to Bank of America account xxxxxxxx2404 | $25,000.00 |
| 35 | 06/25/2012 | Check # 2579 | $50,000.00 |
| 36 | 07/05/2012 | Check # 2587 | $40,000.00 |
| 37 | 07/30/2012 | Transfer to Bank of America account xxxxxxxx2404 | $30,000.00 |
| 38 | 08/13/2012 | Check # 2611 | $15,745.98 |
| 39 | 08/15/2012 | Transfer to Bank of America account xxxxxxxx2404 | $30,000.00 |
| 40 | 09/04/2012 | Check # 2624 | $20,000.00 |
| 41 | 09/07/2012 | Check # 2627 | $34,510.00 |
| 42 | 10/01/2012 | Transfer to Bank of America account xxxxxxxx2404 | $25,000.00 |
| 43 | 10/29/2012 | Check # 2634 | $16,905.00 |
| 44 | 11/02/2012 | Check #2637 | $57,653.15 |

In violation of Title 18, United States Code, Sections 1957 and 2.

## FORFEITURE ALLEGATIONS
## 18 U.S.C. §§ 981, 982 and 28 U.S.C. § 2461(c)

54.     The Grand Jury incorporates by reference Paragraphs 1 through 53 as if fully restated and alleged herein.

55.     Upon conviction of any of the offenses alleged in Counts 1 through 27 of this Second Superseding Indictment, the defendant,

### FATHALLA MASHALI,

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, including but not limited to the following:

> (a)     the real property located at 153 Pine Street, Dover, Massachusetts, including all buildings, appurtenances and improvements thereon, more particularly described in a Quitclaim Deed recorded at Book 29458, Page 487 at the Norfolk County Registry of Deeds; and

> (b)     the real property located at 2011 N. Ocean Boulevard, Unit 1401 E, Fort Lauderdale, Florida, including all buildings, appurtenances and improvements thereon, more particularly described in a Special Warranty Deed recorded at Book 39648, Page 1174 and in a Corrective Special Warranty Deed recorded at Book 41458, Page 1089 at the Broward County Commission.

56.     Upon conviction of the offense alleged in Count 28 of this Second Superseding Indictment, the defendant,

### FATHALLA MASHALI,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offense, including but not limited to the following:

        (a)      the real property located at 153 Pine Street, Dover, Massachusetts, including all buildings, appurtenances and improvements thereon, more particularly described in a Quitclaim Deed recorded at Book 29458, Page 487 at the Norfolk County Registry of Deeds; and

        (b)      the real property located at 2011 N. Ocean Boulevard, Unit 1401 E, Fort Lauderdale, Florida, including all buildings, appurtenances and improvements thereon, more particularly described in a Special Warranty Deed recorded at Book 39648, Page 1174 and in a Corrective Special Warranty Deed recorded at Book 41458, Page 1089 at the Broward County Commission.

57.     Upon conviction of any of the offenses alleged in Counts 29 through 44 of this Second Superseding Indictment, the defendant,

**FATHALLA MASHALI,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in such offenses, or any property traceable to such property, including but not limited to the following:

        (a)      the real property located at 153 Pine Street, Dover, Massachusetts, including all buildings, appurtenances and improvements thereon, more particularly described in a Quitclaim Deed recorded at Book 29458, Page 487 at the Norfolk County Registry of Deeds; and

        (b)      the real property located at 2011 N. Ocean Boulevard, Unit 1401 E, Fort Lauderdale, Florida, including all buildings, appurtenances and improvements thereon, more particularly described in a Special Warranty Deed recorded at Book 39648, Page 1174 and in a Corrective Special Warranty Deed recorded at Book 41458, Page 1089 at the Broward County Commission.

58.     If any of the property described in paragraphs 55 through 57, as a result of any act or omission of the defendant:

        (a)      cannot be located upon the exercise of due diligence;

        (b)      has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of this Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of all other property of the defendant up to the value of the property described in subparagraphs (a) through (e) of this paragraph.

All pursuant to Title 18, United States Code, Sections 981 and 982 and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON OF THE GRAND JURY

Maxim Grinberg
ASSISTANT U.S. ATTORNEY

DISTRICT OF MASSACHUSETTS; April 16, 2015

Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

4/16/15 @
1:19 pm

25