# EXHIBIT A

## EXHIBIT A

## AFFIDAVIT OF ELIZABETH KEATING

I, Elizabeth Keating, being duly sworn, hereby depose and say:

1. I am a Special Agent with the Criminal Investigation Division of the Internal Revenue Service ("IRS-CI"). I have been so employed since October 2008. Prior to becoming a Special Agent with IRS-CI, I worked as a Revenue Agent for the Internal Revenue Service for approximately 3 years. As a Special Agent, I have conducted and assisted others in numerous tax, identity theft, and money laundering investigations. My responsibilities include the investigations of possible criminal violations of the Internal Revenue laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), the Money Laundering Control Act (Title 18, United States Code), and related offenses. During my employment as a Special Agent with IRS-CI, I have received extensive training in conducting financial investigations. I have also received training in money laundering and asset forfeiture.

2. I submit this affidavit in support of the application for warrants to seize the following assets:

   a. all funds on deposit in CollegeCounts 529 Fund account number 352-921-154, held in the name of Noha Elkadry Mashali;

   b. all funds on deposit in CollegeCounts 529 Fund account number 352-921-155, held in the name of Noha Elkadry Mashali;

   c. all funds on deposit in CollegeCounts 529 Fund account number 352-921-156, held in the name of Noha Elkadry Mashali; and

   d. all funds on deposit in CollegeCounts 529 Fund account number 352-921-157, held in the name of Noha Elkadry Mashali

(collectively, the "Accounts").

3. The information contained in this affidavit is based on information that I obtained through my own investigation, from other investigators/regulators, through witnesses, and through the review of documents. I submit this affidavit for the limited purpose of establishing probable cause in support of the application for seizure warrants and, as such, the affidavit does not necessarily contain every fact known to me with respect to this investigation.

4. As set forth in more detail below, I have probable cause to believe that (1) the deposits in the Accounts constitute or are derived, directly or indirectly, from gross proceeds traceable to the commission of healthcare fraud offenses, in violation of 18 U.S.C. § 1347, and are, therefore, subject to forfeiture to the United States pursuant to 18 U.S.C. § 982(a)(7); and that (2) said deposits have been involved in money laundering offenses, in violation of 18 U.S.C. § 1957, or constitute any property traceable to such property, and therefore are subject to forfeiture to the United States pursuant to 18 U.S.C. § 982(a)(1).

## PERTINENT STATUTES

5. Title 18, United States Code, Section 1347 proscribes knowingly and willfully executing or attempting to execute a scheme or artifice to defraud any health care benefit program and obtaining by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program in connection with the delivery of or payment for health care benefits, items, or services. The Medicare program, administered by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services ("CMS"), is a federally subsidized health insurance program for the elderly and for persons with certain disabilities pursuant to title XVIII of the Social Security Act, and is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), in that it is a public plan affecting commerce under which medical benefits, items, and services are provided to individuals, and

includes individuals and entities who are providing medical benefits, items, and services for which payment can be made under the plan.

6. Title 18, United States Code, Section 1957(a) proscribes knowingly engaging and attempting to engage in a monetary transaction, by, through and to a financial institution, in and affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, which property was derived from specified unlawful activity, including health care fraud offenses in violation of 18 U.S.C. § 1347.

7. Title 18, United States Code, Section 982(a)(7), makes forfeitable to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of a health care fraud offense under 18 U.S.C. § 1347.

8. Title 18, United States Code, Section 982(a)(1) makes forfeitable to the United States any property, real or personal, involved in a money laundering offense under 18 U.S.C. § 1957, or any property traceable to such property.

## THE INDICTMENT

9. On April 16, 2015, a federal grand jury returned a forty-four-count Second Superseding Indictment ("Indictment") charging Defendant Fathalla Mashali ("Mashali") with Health Care Fraud, in violation of 18 U.S.C. §§ 1347 and 2 (Counts One through Twenty-Seven), Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. §§ 1349 (Count 28), and Money Laundering, in violation 18 U.S.C. §§ 1957 and 2 (Counts Twenty-Nine through Forty-Four). The Indictment is attached hereto as Exhibit A, and incorporated herein by reference. The health care fraud and money laundering allegations within the Indictment are pertinent to this application seeking warrants to seize the Accounts.

10. The Indictment contained allegations that support a finding of probable cause that Mashali committed health care fraud offenses by fraudulently obtaining funds from Medicare, in violation of 18 U.S.C. § 1347, and money laundering offenses by engaging in monetary transactions with respect to those funds, in violation of 18 U.S.C. § 1957.

### *Health Care Fraud Offenses, 18 U.S.C. § 1347*

11. According to the Indictment, Mashali, then a licensed physician and a resident of Dover, Massachusetts, owned a pain management practice called New England Pain Associates ("NEPA"), which had three locations in Massachusetts and one in Rhode Island. Mashali, along with physician assistants working for NEPA under his direction, prescribed NEPA's patients opiates and other medications to treat pain. Mashali tested patients' urine specimens purportedly to monitor the patients' compliance with their prescription regimens, to evaluate whether they diverted their prescription medications, and to determine whether they consumed and abused drugs they were not prescribed, such as cocaine, methadone, amphetamines, and marijuana, among others.

12. From on or about November 2011 through September 2012, Mashali owned and used two types of chemical analyzers to test patients' urine for drugs. The first was a Dimension Xpand Plus ("Dimension"), manufactured by Siemens, which relied on a chemical method called immunoassay and provided qualitative results, registering whether the urine tested positive for a particular drug or drug class, but without providing the drug's concentration level in the urine. The second was a Biolis 24i ("Biolis"), manufactured by Carolina Liquid Chemistries, which also relied on the immunoassay method and provided what is commonly called a semi-quantitative result, which approximated, but did not provide exact, drug concentration. Medicare

treated and reimbursed for semi-qualitative tests as though they were qualitative and not quantitative. In April 2012, Mashali began to operate a second Biolis analyzer.

13. Mashali tested and directed his laboratory personnel to test every patient's urine sample once on the Dimension and once on one of the Biolis analyzers, regardless of the results from either test. Mashali billed Medicare for qualitative results with respect to the use of the Dimension and for quantitative results (not semi-quantitative results) in connection with the use of the Biolis. Mashali also billed Medicare for confirmatory tests, using billing code 80102, which he did not perform nor had the equipment to perform. A provider could perform a confirmatory test if the results of the initial qualitative test were inconsistent with the patient's medical history, clinical presentation, or own statements. The confirmatory test had to be performed by a chemical method different from that used in the first qualitative test. Mashali, however, billed Medicare for confirmatory tests even though he did not perform them and before he even ran the initial qualitative test on the Dimension and Biolis analyzers. Moreover, the Dimension and Biolis analyzers could not confirm each other's results because both relied on the same chemical method. Thus, Mashali billed Medicare for confirmatory tests that he did not do. Moreover, Mashali lacked the equipment to conduct confirmatory tests.

14. Mashali billed Medicare for confirmatory and other urine drug tests while his laboratory was out of compliance with the Clinical Laboratory Improvement Amendments of 1998 ("CLIA"), Pub.L. No. 100-578, § 2, 102 Stat. 2903 (1998), governing laboratory testing. For example, to be CLIA compliant, among many requirements, the laboratory had to minimize contamination of patient specimens, comply with the manufacturers' instructions for the laboratory equipment, and properly calibrate and validate laboratory instruments for accuracy and precision before reporting patient results. For laboratories participating in Medicare,

sanctions for violating the CLIA included cancellation of approval, or suspension of, Medicare payments. 42 C.F.R. §§ 493.1807(a)-(b), 493.1842(a).

15. Mashali operated, and reported the results on, the Dimension and Biolis analyzers before they were properly validated for accuracy and precision. *See* Docket No. 131, ¶ 39(a). Mashali tested urine specimens weeks and sometimes three months after they had been collected and stored unrefrigerated at his laboratory, in contravention of the manufacturers' instructions for the Dimension and Biolis analyzers for handling and storing urine specimens before testing. *See Id.* at ¶ 39(b). Finally, during a laboratory inspection for CLIA compliance, Mashali caused the bags of unrefrigerated urine specimens to be moved out of his laboratory to avoid their detection by the CLIA inspector. *See Id.* at ¶ 39(c).

16. The grand jury returned the Indictment against Mashali charging, in part, that from on or about November 2011 until on or about October 2012, he submitted and caused to be submitted to health care benefit programs, including Medicare, claims for confirmatory code 80102 for services that he did not perform and that were not medically necessary while his laboratory was out of compliance with CLIA, in violation of 18 U.S.C. §§ 1347 and 2. *See Id.* at ¶¶ 38-39 (Counts Ten through Twenty-Three). Thus, I have probable cause to believe that Mashali obtained funds from Medicare in connection with code 80102 in violation of 18 U.S.C. § 1347.

*Money Laundering Offenses, 18 U.S.C. § 1957 and the Accounts*

17. The Indictment also charges that between approximately April and November 2012, Mashali committed 16 money laundering offenses by engaging and attempting to engage in monetary transactions in criminally derived property of a value greater than $10,000, which property was derived from health care fraud offenses, in violation of 18 U.S.C. § 1957.

18. Based on my investigation, I am aware that from November 2011 through November 2012, Mashali regularly received electronic payments from Medicare. These payments were deposited into the NEPA operating account ending in 8135 at Bank of America (the "NEPA Account"). This account was opened on or about August 31, 2010, and is held in the names of Mashali and Noha Elkadry Mashali ("Noha"), Mashali's wife. Mashali and Noha are the only authorized users on the account. The payments deposited into the NEPA account included the fraudulently obtained funds for billing Medicare confirmatory code 80102. During this time period, Mashali received reimbursements from Medicare for code 80102 over 6,000 times, totaling at least $671,747.16.

19. Noha owned and maintained a personal bank account at Bank of America ending in 2404 (the "Noha Account"). The account was opened on or about December 7, 2007, and Noha is the only authorized user on the account. Based on a review of the account documents, from May 2012 through October 2012, the Noha Account had gross deposits totaling approximately $902,218.36. Of that amount, approximately $855,000 is directly traceable to the NEPA Account.

20. From May 2012 through October 2012, Mashali electronically transferred $325,000 in proceeds derived from healthcare fraud offenses described above from the NEPA Account into the Noha Account. Specifically, on or about May 14, 2012, Mashali transferred $190,000; on or about May 30 2012, June 15, 2012, and October 1, 2012, Mashali transferred $25,000; on or about July 30, 2012 and August 15, 2012, Mashali transferred $30,000. On September 4, 2012, Mashali transferred $20,000 by check to the Noha Account

21. On or about July 10, 2012, Noha opened a cash account at TD Ameritrade ending in 8914 (the "TD Ameritrade Account"). Noha is the only authorized user on the account. On or

about July 10, 2012, Noha signed an electronic funds transfer form. On this form, Noha requested that a $20,000 electronic transfer be made each month from the Noha Account to the TD Ameritrade Account. On or about July 17, August 16, September 18, and October 16, 2012, $20,000 was transferred from the Noha account to the TD Ameritrade Account. As of January 2013, these four transfers were the only deposits made into the TD Ameritrade Account.

22. On or about July 27, 2012, Noha opened the Accounts with CollegeCounts 529 Fund, an entity located in Lincoln, NE. The term "529 account" refers to a an education savings plan operated by a state or an educational institution that allows families to set aside funds for future college costs under Section 529 of the Internal Revenue Code. CollegeCounts 529 Fund offered 529 accounts through the state of Alabama.

23. During October 10, 2012 and October 22, 2012, all funds held in the TD Ameritrade Account, $80,000 in total, were transferred into the 529 Accounts, with each 529 Account receiving $20,000.

24. On or about October 15, 2012, each 529 Account received a rollover contribution from another 529 account held at John Hancock Freedom 529 though John Hancock Distributors, LLC in the name of Noha A. Elkadry. The 529 Account 352-921-154 received $28,298.24. The 529 Accounts 352-921-155, 352-921-156, and 352-921-157 received $28,170.62 each.

25. Records obtained through September 30, 2014 show that no other contributions or withdrawals were been made to and from the 529 Accounts.

## Forfeiture Allegation

26. The Indictment alleged, pursuant to 18 U.S.C § 982(a)(7), forfeiture with respect to health care fraud counts in violation of 18 U.S.C. § 1347, of any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the

commission of the offenses, including but not limited to two named real properties, one in Dover, Massachusetts and the other in Fort Lauderdale, Florida.

27. The Indictment further alleged, pursuant to 18 U.S.C. § 982(a)(1), forfeiture with respect to the money laundering counts in violation of 18 U.S.C. § 1957, of any property, real or personal, involved in such offenses, or any property traceable to such property, including but not limited to, said two named real properties, one in Dover, Massachusetts and the other in Fort Lauderdale, Florida.

28. The Indictment further alleged, pursuant to 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), that if any of the named real property cannot be located or has been transferred, diminished in value, or significantly comingled with other property, among other things, the Indictment provides for "forfeiture of all other property of the defendant up to the value of the [named] property" that cannot be forfeited for the aforementioned reasons.

29. Based on the information described above, I have probable cause to believe that Accounts constitute (1) any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of health care fraud offenses in violation of 18 U.S.C. § 1347, and (2) any property, real or personal, involved in money laundering offenses in violation of 18 U.S.C. § 1957 or any property traceable to such property.

Signed under the penalties of perjury this 14th day of April, 2016.

*Elizabeth A. Keating*

---
Elizabeth Keating
Special Agent
Internal Revenue Service, Criminal Investigation

9