UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　Plaintiff,<br><br>vs.<br><br>FATHALLA MASHALI,<br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Criminal Action<br>) No. 14-10067-RWZ<br>)<br>)<br>)<br>) |

**HEARING ON GOVERNMENT'S MOTION
FOR PRETRIAL DETENTION**

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
Boston, Massachusetts 02210
May 10, 2016
2:30 p.m.

\*   \*   \*   \*

CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

APPEARANCES:

3

4    For the Plaintiff:

5    UNITED STATES ATTORNEY'S OFFICE
      (By: AUSA Maxim Grinberg)
6            John J. Moakley Courthouse
             One Courthouse Way, Suite 9200
7            Boston, MA 02210

8

9    For the Defendant:

10
      DENNER PELLEGRINO LLP
11    (By: Jeffrey A. Denner, Esq.)
             Four Longfellow Place
12           Suite 3501, 35th Floor
             Boston, MA 02114
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3   before the Honorable Rya W. Zobel, United States District Judge,
 4   United States District Court, District of Massachusetts, at the
 5   John J. Moakley United States Courthouse, 1 Courthouse Way,
 6   Boston, Massachusetts, on May 10, 2016.
 7              The defendant has waived his presence.  Assistant
 8   United States Attorney Maxim Grinberg is present.)
 9              THE COURT:  Good afternoon.  Please be seated.
10              MR. DENNER:  Good afternoon, your Honor.
11              COURTROOM DEPUTY CLERK URSO:  This is the United
12   States versus Fathalla Mashali.  It's Criminal 14-10067.  If
13   counsel could please identify themselves for the record,
14   please.
15              MR. GRINBERG:  Yes.  Good afternoon, your Honor.  Max
16   Grinberg on behalf of the United States.
17              MR. DENNER:  Good afternoon, your Honor.  Jeffrey
18   Denner for Dr. Fathalla Mashali.
19              THE COURT:  You haven't quite recovered yet, have
20   you?
21              MR. DENNER:  Not quite.
22              THE COURT:  Now, please be seated.
23              I guess I'm somewhat confused about really where this
24   case is.  I do know that there are a couple of motions that at
25   some point need to be addressed.  I think of some immediacy is
```

1    the government's motion for pretrial detention and I think we

2    need to have a competency hearing, do we not?

3              MR. GRINBERG:  Agreed, your Honor.

4              MR. DENNER:  Yes, your Honor.  The other --

5              THE COURT:  Maybe that should go first.

6              MR. GRINBERG:  Yes.

7              MR. DENNER:  The other complicating factor is I have

8    been gone all last week.  I was not available.  I found out on

9    Friday, and I believe I notified the government, that while I

10   was still out myself, that Dr. Mashali had been found

11   unresponsive Thursday night at his home.

12             THE COURT:  He's been found what?

13             MR. DENNER:  He was found unresponsive at his home.

14   He collapsed on the floor where he usually stays in his home

15   and he was unconscious and unresponsive and he -- they rushed

16   him to the ICU at the Norwood Hospital.  He was unresponsive

17   over the weekend.  Over the weekend he became delirious and

18   then regained consciousness on Monday, and I just found this

19   out, but what I'm suggesting to the Court now, last night that

20   they -- that the same doctor who had dealt with him before the

21   Norwood Hospital, Dr. Taveroff, who I've never spoken to --

22             THE COURT:  How do you spell his name or her name?

23             MR. DENNER:  T-a-v-e-r-o-f -- T-a-v-e-r-o-f-f.

24             Dr. El-Khadry, who is a dental physician and Dr.

25   Mashali's wife, who is in court today, who could answer any

1    questions for the Court.

2            I have not corroborated any of this.  I have not

3    spoken to anyone other than Dr. El-Khadry.  I informed Dr.

4    El-Khadry that the psychiatrists at Norwood Hospital have

5    decided that he is -- they are moving to involuntarily commit

6    him yet one more time and have him under guard and will be

7    moving him to a locked facility as soon as a bed opens up in

8    one of the -- either their place or any locked facility.  This

9    is everything I know about the situation.  I just found out

10   about it last night.

11           MR. GRINBERG:  Your Honor, I think --

12           THE COURT:  Mr. Grinberg.

13           MR. GRINBERG:  -- what I'm hearing from Mr. Denner is

14   -- in reality, the big picture is not much changed in the past

15   year.  Mr. Mashali's health has been deteriorating, has been

16   in and out of hospitals and emergency rooms, and this is just

17   a pattern and we just keep doing the same thing over and over

18   again without resolving anything.

19           And one of the things that Dr. Fife found -- and I

20   think it's corroborated by the records from MGH -- is that Dr.

21   Mashali has been found to be malingering, and part of the

22   issue is that he's not -- at least according to them, that

23   he's not eating.  And so, if nothing changes, his status quo

24   remains the same, that this is what we'll continue to see over

25   time.

1          So, part of the government's motion to detain

2     Fathalla Mashali has simply to do with the fact that we need

3     to stop this cycle somehow, and that's one way to stop it

4     where he is monitored.  I mean, that's the only reason the

5     government filed its motion, that he's monitored 24/7.  They

6     know which medications he's taking.  They know what he's

7     eating to stop the -- because if we don't do anything, this

8     will go on forever.

9          MR. DENNER:  Your Honor, if I may.

10          I understand the government's thoughts and their

11     position on this.  Dr. El-Khadry has all of the -- he had a

12     toxicology screen and there was absolutely nothing other than

13     his medication on the toxicology screen, but it was on the

14     screen, nothing else that shouldn't have been there.

15          Dr. El-Khadry has Dr. Mashali's medicine.  She makes

16     sure he gets the correct amount at the right time, correct?

17     She has it.  He has no access to it.  Even if he could move to

18     get it, he can't get it.  She has it.

19          With regard to food, my understanding, he has been

20     eating.  He has gastroparesis, which I'm not exactly sure what

21     that is, but I know that you throw up a lot.  You can't eat

22     when you have gastroparesis and whatever --

23          THE COURT:  It's the stomach rebelling against not

24     getting any food, according to Google.

25          MR. DENNER:  Okay.  Well, he has gastroparesis and

1    I'm -- the two major core illnesses he has are that and

2    sarcoidosis, which he's had for some time and which, despite

3    the fact that I had Googled and read it, I still don't

4    understand exactly what it is or how one --

5             THE COURT:  Cells that are not where they're supposed

6    to be.

7             MR. DENNER:  Right.  I know it's some kind of

8    autoimmune response, and whatever, and it leads to a lot of

9    either -- other bad things as well.

10            I will tell this Court -- and this probably isn't the

11   proper day to do it -- that I believe that Dr. Mashali has

12   been -- has had a deteriorating mind for some period of time.

13   The Dr. Mashali I met a couple of years ago is so different

14   than the Dr. Mashali that exists today.  I actually believe

15   that Dr. Mashali makes stuff up sometimes and --

16            THE COURT:  He does what?

17            MR. DENNER:  Makes stuff up.  I mean, whether we call

18   it malingering, or whatever, and I think he doesn't even

19   realize something has happened, that that's driven by illness,

20   too, and how sick he is.  There are times when he is in such a

21   fixed delusional belief, that even when I try to speak to him,

22   I can't.

23            The notion of malingering somehow suggests that

24   somebody in some conscious way is trying to avoid something

25   happening and they're not really sick.  They're just

1    pretending to be sick.

2          In my 43 years of practice, I don't think I've -- and

3    I've -- respectfully, I've represented some incredibly sick

4    people in terms of psychiatric underlying psychopathologies,

5    and whatever, and I am telling this Court as an officer of

6    this Court that Dr. Mashali is right up there with them.

7          Now, he may think he's doing things at certain times,

8    but I have -- I have seen him go so far downhill over time.  I

9    know that the government believes that it is because he's not

10   eating and somehow the not eating is on purpose, and whatever.

11   I am telling this Court, and I will tell this Court at the

12   proper time if we get to that point, that whatever Dr. Mashali

13   is doing, I don't consider it voluntary.  I think he is a

14   deeply sick individual whose mind is just -- is just addled

15   and --

16          THE COURT:  Well, what do you suggest we do?

17          MR. DENNER:  I don't have a clue because -- I don't.

18   I don't have a clue.  This man is ill.  This man is very ill.

19   He's very physically ill.

20          They're trying to figure out right now if this is the

21   sarcoidosis doing this, is this his seizures, is his body just

22   rebelling and shutting down, and he was -- the first time it

23   happened he was on the -- he was on a breather, a ventilator,

24   for a long period of time in the ICU.  They had him on a liver

25   transplant list.  He came so close -- they thought he was

1    going to die.  He came so close to dying at that point.

2            I know from a competency perspective -- and I know

3    that's one of the things we have to -- we have to deal with --

4    is that he can't assist me, whether he has -- whatever the

5    capacity means.  Periodically when he's not ill like this, his

6    brain synopsis are in place and he would have this theoretical

7    capacity to help me.  There's a mental illness there.  Dr. --

8    and I've had long talks with Dr. Fife about it, too.  When she

9    says he has a capacity, we're also talking about somebody who

10   has some kind of mental illness that interferes with the

11   exercise of that capacity.

12           THE COURT:  Yes, but what do we do?

13           MR. GRINBERG:  May I make a suggestion, your Honor?

14           THE COURT:  If your motion were to be allowed, can we

15   choose the place where he goes?  I mean, for example, can we

16   say that he should go to Devens, which at least is within easy

17   reach of the doctors who have been taking care of him and,

18   presumably, one can take him away from there again.  I mean,

19   if he goes off to Missouri or to North Carolina, it's -- I

20   mean --

21           MR. GRINBERG:  So, I --

22           THE COURT:  First of all, he's not going to go first

23   class.

24           MR. GRINBERG:  Right.  I mean, a few weeks ago I did

25   have a conversation with a lawyer for the Bureau of Prisons

1    and somebody from Devens and I --

2         THE COURT:  Let me -- I'm sorry.  I'm sorry to

3    interrupt, but I guess the other question is what would be the

4    purpose of the detention?

5         MR. GRINBERG:  So, there are two -- I think there are

6    two issues.  I think the main one that Mr. Denner is focused

7    on is competence, and we'll get to it eventually.  You know, I

8    think we need to schedule a hearing independently and just

9    have a hearing and hear from Dr. Fife and see what she has to

10   say.  With respect to the --

11        THE COURT:  Well, that we should be able to do within

12   a week.

13        MR. GRINBERG:  That's right.  That's right.  I mean,

14   I think there's nothing preventing us from having that hearing

15   and I think if what -- frankly, Dr. Fife is very articulate

16   and, you know, she'll testify, and I think both of us would

17   rather have the Court hear from Dr. Fife directly, not from us

18   on that issue, because ultimately we're not experts on this.

19   So, that's the first step, is to schedule a hearing on

20   competency.

21        With respect to Dr. Mashali's, you know, potential

22   detention, my recollection is -- you know, I think what they

23   said was, you know, very serious condition that will

24   probably -- you know, they will try to find a bed at FMC

25   Devens.

1          Now, is it mandatory?  You know, if the Court can

2     literally direct them to place somebody in a particular

3     facility?  Frankly, I don't know the answer.  For sentencing

4     purposes, as the Court knows, you know, it only goes so far.

5     I'm not sure as far as this issue is concerned.

6          I mean, I would say that, in the meantime, you know,

7     if Dr. Mashali isn't voluntarily committed somewhere, that's

8     fine, but -- we're fine if he's somewhere where he's being

9     monitored 24/7.  The issue is when he is not.

10          And what Dr. Fife has said -- all these medical

11     conditions that Mr. Denner referred to, gastroparesis and

12     sarcoidosis, what she would say, I think, is that he's had

13     those conditions for a long time.  You know, this is not new.

14     What changed is the arrest.

15          Gastroparesis is a condition which results from --

16     it's a partial paralysis of the stomach, and what changed --

17     it happens and it certainly prevents, you know -- there's some

18     obstacles digesting food, but there are ways to deal with it

19     and eat meals six times a day.  When Dr. Mashali was at MHG,

20     he's monitored 24/7, he did gain a bit of weight.  And so,

21     what that suggests to us is that he should be monitored 24/7,

22     and if he is left to his own devices, his condition will

23     deteriorate.

24          THE COURT:  Who is paying for all of this?

25          MR. GRINBERG:  Right now Dr. Mashali is on his own.

1    The Probation Department is not paying for this.  So, to the

2    extent that he's in MGH's custody, I believe his insurance is

3    paying for it.  You can correct me if I'm mistaken.

4            MR. DENNER:  The government is not paying for it, but

5    I believe his insurance -- there's no free -- I know that, of

6    course, it's insurance because when they -- when he left

7    Massachusetts General recently, they -- I think the theory was

8    he really shouldn't have had to leave, but insurance was

9    unwilling to pay for any longer than he was there.  So, that's

10   when we got him back home again.

11           And, again, I will point out to this Court that I

12   have no great solutions, but I do know that he's being

13   monitored very carefully by his wife at home, and I know that

14   he is eating.  And what happened the other day, it was more

15   the nature of the seizure and --

16           THE COURT:  Well, I gather that you do not object to

17   some kind of an involuntary commitment, which, I gather, is

18   his current treating physician's recommendation; is that

19   correct, or not?

20           MR. DENNER:  No one has asked me if -- I'm not

21   representing him out there in the context of this.  He has a

22   court-appointed lawyer named -- at the last time this happened

23   named Paul McGuinness.  I spoke to Mr. McGuinness this morning

24   and Mr. McGuinness was calling up to find out if they were

25   going to appoint him to represent him again in this

1    involuntary commitment process.

2            THE COURT:  Well, is it correct that Dr. -- I'm

3    sorry.

4            MR. DENNER:  Dr. El-Khadry.

5            THE COURT:  -- El-Khadry is recommending an

6    involuntary commitment?

7            MR. DENNER:  I think an involuntary commitment to a

8    medical facility here where he gets really good treatment

9    would make the most sense.

10           THE COURT:  Is that what you think or is that what

11   the doctor recommends?

12           DR. EL-KHADRY:  The psychiatrist recommends --

13           MR. DENNER:  Would you stand.

14           DR. EL-KHADRY:  The psychiatrist recommended that.

15           MR. GRINBERG:  What I've been told now is that

16   Mashali actually objects to --

17           THE COURT:  Hold it.

18           It is being recommended by his treating psychiatrist

19   now?

20           DR. EL-KHADRY:  Yes.

21           MR. DENNER:  And I'm not objecting to it either, and

22   I -- and I'm going to make that --

23           THE COURT:  Well, then, the issue is how can -- thank

24   you.  How can we -- how can it be effected?

25           MR. DENNER:  As soon as they get a bed, it will be

1    effected.

2              THE COURT:  I mean, I think there are two things we

3    can do today.  One is to set a date for a hearing on

4    competency.  I see no reason why we can't do that next week,

5    right?

6              MR. DENNER:  If we're going to excuse Dr. Mashali

7    from that -- I haven't asked him if he wants to be here or

8    not, but --

9              THE COURT:  Well, you know, we will need to get him

10   to waive it.  You will waive it on his behalf, provided he

11   agrees with you.  If he does not agree, then we're in a

12   different position and then the detention may very well be the

13   only way it can be done.

14             MR. DENNER:  I believe that if he's -- it's kind of a

15   Catch 22.  If I -- and I don't think he's competent.  So, if

16   I'm asking him if he waives it or not, he's not competent to

17   waive it or not.  I don't know what effect that has.  I'll

18   waive it on his behalf, but I'm telling this Court that I

19   don't believe he's competent to advise me, but I think my

20   duties as an attorney go toward getting whatever help and

21   assistance for him and moving this case forward as fast as I

22   see fit.  I would be willing to waive that, but I tell this

23   Court that Mr. Mashali has not given me permission to waive

24   that, but I haven't been able to speak to him for the last

25   week, again, because he's been unresponsive and in ICU, but,

1      again, I am willing -- I am willing to set a competency

2      hearing and if he cannot be here, I'm willing on the record as

3      his attorney thinking I'm acting in his best interests to

4      waive his appearance.

5              THE COURT:  Okay.  Now, how long will it take to --

6      how long will this hearing take?

7              MR. GRINBERG:  My guess is probably no longer than a

8      couple of hours.

9              THE COURT:  So, when can we do this, Lisa?

10             MR. GRINBERG:  Your Honor, I do have Dr. Fife's

11     schedule.  I asked her availability.

12             THE COURT:  Let's find out when we can do it and get

13     a couple of dates and maybe you can get hold of her and let us

14     know --

15             MR. GRINBERG:  I have.

16             THE COURT:  Is she better in the morning or

17     afternoon?

18             MR. GRINBERG:  So, it depends.  It depends where, but

19     mostly it's afternoon.

20             COURTROOM DEPUTY CLERK URSO:  It's better --

21             MR. GRINBERG:  In the afternoon.

22             COURTROOM DEPUTY CLERK URSO:  Well, Judge, we have

23     May 25th and 26th.  We have no court either day on that

24     Wednesday or Thursday that we could do the afternoon.

25             THE COURT:  Is that next week?

1          COURTROOM DEPUTY CLERK URSO:  No, Judge.  It would be
2     the week after.
3          MR. GRINBERG:  She's away next week, but she's
4     available the 25th.
5          THE COURT:  Okay.
6          COURTROOM DEPUTY CLERK URSO:  So, the 25th is
7     available.
8          THE COURT:  So, May 25th would be the appropriate
9     day?
10          MR. DENNER:  Could it be the 26th if you have both of
11     them?
12          THE COURT:  We can do it Wednesday.
13          COURTROOM DEPUTY CLERK URSO:  He asked for the 26th,
14     if we could do it on that day, which we have available.
15          THE COURT:  Okay.  26th.
16          MR. GRINBERG:  I can't --
17          THE COURT:  2 o'clock on May 26th, subject to Dr.
18     Fife's --
19          COURTROOM DEPUTY CLERK URSO:  Judge, she isn't
20     available on the 26th.
21          THE COURT:  She is not?
22          MR. GRINBERG:  She sent me the schedule, so I have it.
23          THE COURT:  She's not available?
24          MR. GRINBERG:  She's not available.  She's available
25     -- I can give the dates to the Court.

1          THE COURT:  Can you make yourself available on the

2     25th?

3          MR. DENNER:  Could it be the morning of the 25th?

4          THE COURT:  She's not available in the morning.

5          MR. GRINBERG:  I can --

6          COURTROOM DEPUTY CLERK URSO:  We can't -- we have a

7     trial that day.  I mean, we have a trial starting that week.

8          MR. DENNER:  I can -- I have a doctor's appointment

9     longstanding, but I'll cancel it.  If that's the only date we

10    can come up with, yes, I'll cancel it.

11         THE COURT:  Maybe the doctor can do it in the

12    morning.

13         MR. DENNER:  Maybe.

14         THE COURT:  One doctor yielding to another.

15         MR. DENNER:  Maybe, but that's fine.

16         THE COURT:  Okay.  So, at 2 o'clock on May 25th,

17    Wednesday, is when we will have the competency hearing, and I

18    understand that the only witness will be Dr. Fife, unless Dr.

19    Mashali can get here and testify or present himself or

20    whatever you want to do.

21         MR. DENNER:  Well, I certainly wouldn't be calling

22    Dr. Mashali as a witness under any circumstances to this, but

23    there are people who have been taking care of him at Mass

24    General that we've been in touch with, whatever.

25         THE COURT:  Whatever.  It would be good if we could

1    finish that afternoon.

2         MR. DENNER:  We'll definitely finish it that

3    afternoon, but I may have one or two witnesses and I will let

4    everybody know.

5         THE COURT:  Okay.  That takes care of that.

6         Now, the other issue is what happens to Mr. Mashali

7    in between now and then?

8         MR. GRINBERG:  My understanding, your Honor -- and

9    this is just, again, from Mr. Denner -- is that while the

10   facility, Norwood Hospital, is moving, according to his wife,

11   to commit him, Dr. Mashali himself, to the extent that he's

12   lucid, is objecting to it, you know.  So, in this -- again, in

13   this --

14        THE COURT:  That would again require a hearing in

15   court.

16        MR. GRINBERG:  That's right.

17        THE COURT:  Not this Court.

18        MR. GRINBERG:  Not this Court, but the point is, you

19   know, I think to the extent we're postponing commitment to

20   custody, we'll be continuously monitoring this situation on a

21   daily basis, again, you know, where is he, what is he doing,

22   who is committing him, and we're not really solving the

23   problem.

24        MR. DENNER:  It makes absolutely no sense whatsoever

25   if we're having a competency hearing on the 25th to send him

1    anywhere other than -- I will report to the Court and to the

2    government as to whether -- he's going to be involuntarily

3    committed according to his wife.  It doesn't matter whether he

4    wants it or not.  It's going to happen.  Then he has a right

5    to a hearing at some point.

6              If he is not involuntarily committed, to say no,

7    you've not met the standard, which I find very unlikely, then

8    he will go home and I will notify the Court, but it would seem

9    to me that to send him to wherever he's going to go --

10             THE COURT:  I think he needs to understand, Mr.

11   Denner, that if he doesn't do what he's told to do, he's going

12   to end up at Devens or Buttner or the place in Missouri.

13             MR. DENNER:  Of course, your Honor, and --

14             THE COURT:  But he may not understand that.

15             MR. DENNER:  I understand, but his wife will do the

16   best to explain it to him, I'll do my best to explain it to

17   him, but certainly putting him in some kind of detention in

18   Missouri if we're going to have a hearing here and, you know --

19             THE COURT:  I'm not going to do anything like that

20   before any competency hearing.

21             MR. DENNER:  Okay.  Thank you.

22             THE COURT:  So, we will have the competency hearing.

23   It's now scheduled in a couple of weeks, and in between we all

24   devoutly hope that he will be involuntarily committed so that

25   he can be taken care of without running out on the care.

1          MR. DENNER:  That would be my intent, to make that

2     happen, if I can, your Honor.

3          THE COURT:  Okay.  And what happens after that -- I

4     mean, again, I will seek counsel's suggestions, because I sure

5     don't know.  If he is deemed to be competent -- and I will try

6     to get you a decision as quickly as possible -- then I think

7     we'll schedule a trial date, and that's what we have to do,

8     and we will schedule it as quickly as we can get there.  I

9     mean, is the case ready for trial other than the fact that the

10    defendant may not be?

11         MR. GRINBERG:  Well, it is and it's not, and this is

12    what I mean.  I mean, it's ready for trial in the sense that

13    the investigation is done and we have all the materials, we're

14    ready.  It's just that to the extent we haven't had a trial

15    date up until this point to -- where we may have 20, 30

16    witnesses, it's just going to take a bit of time to sort of

17    prep it for trial.  You know, it's not a --

18         THE COURT:  Start doing it, just in case.

19         MR. GRINBERG:  Okay, your Honor.

20         MR. DENNER:  Realistically, we would be talking

21    probably -- realistically.  What's realistic?  What you think

22    is realistic, respectfully, but --

23         THE COURT:  I would be thinking about a trial in

24    July.

25         MR. DENNER:  I was just going to say July.  I thought

1    July would be...

2          The other thing is that we have been also discussing,

3    were he to be competent, some alternative to a trial.

4          THE COURT:  Okay.

5          MR. DENNER:  So, it's not necessarily so that we end

6    up at trial.

7          THE COURT:  All right.  So, we have a date next week

8    -- two weeks from now for the competency hearing.  In the

9    meantime, I leave it to you to ensure that he is in good hands

10   and put on ice, in a sense, so that he can't do any further

11   harm to himself, and we are looking at a trial sometime in

12   July if he's competent.  If he's not, then, obviously,

13   everything changes and we will need to figure out what to do

14   at that point and, again, I crave your advice in that regard.

15         MR. DENNER:  Thank you, your Honor.

16         THE COURT:  Okay.  Is there anything else we can do

17   today?

18         MR. GRINBERG:  Yes, your Honor.  It's an issue with

19   respect to the college accounts motion.

20         THE COURT:  Yes.  You know, I did that sort of not

21   thinking about it.  Why can't the children have their

22   passports?

23         MR. GRINBERG:  I was thinking of something else, but

24   we can talk about the passports.  At the end of the day, your

25   Honor, that -- it's not a huge issue.  When Mashali was

released on bail by Judge Sorokin -- and initially Dr. Mashali

was in custody for a few months.  When he was eventually

released on bail, Dr. -- I'm sorry -- Judge Sorokin stated in

his order that he's doing it under the strictest conditions.

He's considering him to be a risk of flight.  He's most -- you

know, secure his bond, the most restrictive conditions, and

one of them was -- I understand that in this case millions of

dollars were actually wired to Egypt which we think are

connected to Medicare fraud, and to the extent that Dr.

Fathalla Mashali was arrested and apprehended at the airport,

with a letter suggesting he was going to -- which is what

Judge Sorokin found.

        THE COURT:  I remember all that.

        MR. GRINBERG:  So, one restriction was on the family,

you know, you cannot take children abroad.  You know, you

cannot --

        THE COURT:  How old are these children?

        MR. GRINBERG:  How old are they?

        DR. EL-KHADRY:  My oldest is 18, 16, 14 and 5.

        MR. GRINBERG:  But for the 18-year-old, we did

release the passport, I believe.  Once he reached the age of

18, we released that passport.

        THE COURT:  But is there a reason now why the

children's passports cannot be returned to them?

        MR. GRINBERG:  I think it strictly has to do with --

1          THE COURT:  Yes or no.

2          MR. GRINBERG:  -- preventing -- yes.  Preventing any

3     travel to Egypt with the children, your Honor, because there

4     is a --

5          THE COURT:  Well, the children wouldn't have anybody

6     to go with because everybody else's passport has been taken,

7     hasn't it?

8          MR. GRINBERG:  They have been, although it's not a

9     problem getting passports, even though they have been taken.

10    There are ways to do that.

11         THE COURT:  I understand why they want the money back

12    because it's, presumably, Dr. Mashali's money or it came from

13    him.  So, I will rescind the order which was --

14         MR. DENNER:  Your Honor, when we filed that motion,

15    of course, we had --

16         THE COURT:  234 and 235 were the motions that granted

17    -- I will rescind the order as to 26 -- no, wait a minute.

18    225, which pertains to the money, the college funds.

19         MR. GRINBERG:  Right.

20         THE COURT:  The restraining order as to those is

21    reinstated.

22         With respect to the passports, I'm not persuaded that

23    the children can't have their passports.  So that order

24    returning the passports to them remains.  So, that takes care

25    of that motion.

```
 1              MR. DENNER:  Your Honor, if I could be heard with
 2    regard to the college funds.
 3              THE COURT:  I'm sorry?
 4              MR. DENNER:  If I could be --
 5              THE COURT:  The college fund remains -- is back in
 6    the custody of the Court, or wherever it is.
 7              MR. DENNER:  I understand that.  I don't think that
 8    Dr. El-Khadry --
 9              THE COURT:  It's restrained.
10              MR. DENNER:  I don't think Dr. El-Khadry realizes
11    that a sealed secret forfeiture motion was filed last week
12    that --
13              THE COURT:  I haven't even seen that.
14              MR. DENNER:  Well, relative --
15              MR. GRINBERG:  No.  Your Honor, what happened was on
16    April -- I think about April 19th, a little prior to that, we
17    filed a motion restraining those assets with an affidavit
18    tying them to criminal activity under seal ex parte, and we
19    waited until the Court allowed it to unseal it.  In the
20    meantime, the defendant was not aware of that motion,
21    obviously, because it was under seal.
22              THE COURT:  Which motion is this, the college funds?
23              MR. GRINBERG:  Yes.  I can tell the Court the docket
24    number.  It was --
25              THE COURT:  I mean, we're talking about the college
```

1    funds?

2            MR. GRINBERG:  Yes.

3            THE COURT:  Well, the college fund motion I had

4    allowed to be returned to the children the college fund, and

5    then there was a motion to reverse that.

6            MR. GRINBERG:  No.  What happened -- so, that

7    happened.  On April 15th we filed a motion to restrain those

8    funds --

9            THE COURT:  Rescind the order.

10           MR. GRINBERG:  On April 18th the Court allowed that

11   motion.

12           THE COURT:  Right.  And on the 28th you filed a

13   motion to rescind the order.

14           MR. GRINBERG:  Right, but, in the meantime, they had

15   filed a motion to unrestrain those assets, but on a different

16   ground, because they thought the funds were restrained with

17   respect to bail conditions, which was true, but then we had

18   filed another motion restraining the -- pursuit to the

19   forfeiture provision, and that's what the Court had allowed.

20   Then the Court granted their motion unrestraining everything

21   and this is what we're asking to rescind.

22           THE COURT:  Is there any reason when things are filed

23   under seal, that they can't be given to the defense?

24           MR. GRINBERG:  Yes.  In this case, yes.  In this case

25   it was filed under seal and ex parte because we were seizing

1    assets tied to criminal activity and we wanted to seize them

2    or freeze them before the defense had an opportunity to --

3        THE COURT:  So, I shouldn't allow any motions until

4    they are unsealed and the defense has an opportunity to

5    respond.

6        MR. GRINBERG:  Well, no.

7        THE COURT:  The problem is that I don't know what's

8    going on.

9        MR. GRINBERG:  Well, no, because there are plenty of

10   cases, you know, like warrants, we file them under seal not to

11   give targets notice so they can destroy evidence, and here we

12   filed it under seal so that the money couldn't be moved.

13       THE COURT:  Are we finished with that now?

14       MR. GRINBERG:  Yes, your Honor.

15       THE COURT:  So, has everything been unsealed to the

16   defense?

17       MR. GRINBERG:  Oh, yes.

18       MR. DENNER:  Yes, we got it several days ago.

19       THE COURT:  I will adhere to the ruling that the

20   college fund, which I assume is a limited amount of money

21   designated for college, despite the forfeiture order, should

22   go -- no.  It will be -- the order releasing it is rescinded.

23       MR. GRINBERG:  Right.

24       THE COURT:  The Court fund remains where it is.

25   Passports go to the children.

1          With respect to forfeiture, I don't think I have to

2     rule on anything now and --

3          MR. GRINBERG:  No.

4          THE COURT:  -- I'm not prepared to rule on it now.

5     It's just there and will be there until such time as there is

6     a conviction or not.

7          MR. DENNER:  I just wanted the Court to understand

8     the sequence of events here.

9          THE COURT:  Okay.  So, what else do we need to do

10    today?  I don't think there were any other motions besides the

11    motion for pretrial detention, which we're now bypassing.  It

12    is not allowed or denied.  We're bypassing until we have the

13    competency hearing and know better where things are at that

14    point.

15         MR. GRINBERG:  There was a motion to exclude time.  I

16    understand that it's --

17         THE COURT:  It's allowed.

18         MR. GRINBERG:  Thank you.

19         THE COURT:  Yes, but I would like an order that I can

20    sign.

21         MR. GRINBERG:  Okay.  I filed a motion.  I'll file an

22    order separately.

23         COURTROOM DEPUTY CLERK URSO:  Judge, I can just do it

24    from here and then -- I can just do it.

25         THE COURT:  Except the order usually gives me some

1     reason.

2           MR. GRINBERG:  Well, it's stated in the motion.

3           MR. DENNER:  We're not objecting -- your Honor, we're

4     not objecting to it, anyway.

5           THE COURT:  Okay.  So, the request for excludable

6     time is allowed until when?

7           MR. GRINBERG:  Until today, although I would ask

8     until the competency hearing.

9           THE COURT:  So, we need to extend it until the

10    decision on competency.

11          MR. GRINBERG:  Yes.

12          THE COURT:  What else, Mr. Denner?

13          MR. DENNER:  Nothing, your Honor.  Thank you.

14          THE COURT:  Mr. Grinberg?

15          MR. GRINBERG:  Thank you, your Honor.  Nothing from

16    the government.

17          THE COURT:  Okay.  I'll see you in a couple of weeks.

18          (Adjourned, 3:03 p.m.)

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2            I, Catherine A. Handel, Official Court Reporter of the

3     United States District Court, do hereby certify that the

4     foregoing transcript, from Page 1 to Page 28, constitutes to the

5     best of my skill and ability a true and accurate transcription of

6     my stenotype notes taken in the matter of Criminal Action No.

7     14-10067-RWZ, United States of America versus Fathalla Mashali.

8

9

      May 15, 2016        /s/Catherine A. Handel
10    Date                Catherine A. Handel, RPR-CM, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25