# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA       . CRIMINAL NO. 14-10067-RMZ
                               .
                V.             . BOSTON, MASSACHUSETTS
                               . APRIL 17, 2014
FATHALLI MASHALI               .
  Defendant                    .
. . . . . . . . . . . . . . . .

### **PARTIAL** TRANSCRIPT OF HEARING
#### BEFORE THE HONORABLE LEO T. SOROKIN
#### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

ATTORNEY GENERAL'S OFFICE
Kimberly P. West, Esq.
One Ashburton Place, 18th Floor
Boston, MA 02108
617-727-2200
Email: kimberly.west@state.ma.us

DENNER PELLEGRINO LLP
Jeffrey A. Denner, Esq.
Four Longfellow Place,
Suite 3501, 35th Floor
Boston, MA 02114
617-227-2800
Jad@dennerlaw.com

DASILVA LAW GROUP
Joseph G. Keller, Jr., Esq.
4 Longfellow Place, 35th Floor
Boston, MA 02114
617-227-2800
jk3434@aol.com


Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.


***MARYANN V. YOUNG***
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

1                              I N D E X

2    WITNESS                DIRECT      CROSS      REDIRECT

3    Noha Elkadry Mashali     14         79          116

4    EXHIBITS             DESCRIPTION               PAGE

5                         Deposition                132

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Court called into session)

2   (11:05:16 AM)

3           THE CLERK:  The Honorable Leo T. Sorokin

4   presiding.  Today is April 17th, the case of the United

5   States v. Mashali.  Criminal Action 14-10067 will now be

6   heard before this Court.

7           Counsel; please identify yourselves for the

8   record.

9           MS. WEST:  Good morning, Your Honor.  Kim West

10  and Max Grinberg for the government please.

11          THE COURT:  Good morning.

12          MR. DENNER:  Good morning, sir.  Jeffrey Denner

13  along with Joe Keller for the defendant and the defendant

14  Dr. Mashali, himself.

15          THE COURT:  All right.

16          MR. DENNER:  Your Honor, could we approach the

17  bench for a moment?

18          THE COURT:  Sure.

19  SIDEBAR CONFERENCE BEGINS INAUDIBLE

20          THE COURT:  Do you want to do that now?

21          MR. DENNER:  Yes.

22          THE COURT:  All right so, Mr. Mashali?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Can you hear me?

25          THE DEFENDANT:  Yes.

4

1          THE COURT:  All right, so your lawyers have

2     told me that they're concerned about your medical

3     condition, and we're here today because they filed a

4     request with the Court to have you released, that,

5     essentially asking that I reconsider the decision that I

6     made earlier in the case to have you detained and they've

7     provided new evidence to support, additional evidence to

8     support that request, and the government's here.  The

9     government doesn't agree but they oppose that request, and

10    we're here for to have a hearing to, I think your lawyer

11    has some witnesses he wants to call, to hear that evidence

12    from those witnesses, whatever evidence your lawyers want

13    to submit, and hear whatever evidence the government wants

14    to offer and then the lawyers would argue to me or explain

15    to me why I should or should not release you.

16          Before we begin that, what your two lawyers have

17    said to me is they're very worried about your health, so

18    worried that they're not sure that you're capable right

19    now of participating in this hearing, that is, you're not

20    capable of having the physical strength to listen to the

21    witnesses testimony, hear what they have to say, talk to

22    your lawyers about it if you need to and so they want me

23    to ask you a few questions about that.

24          Do you understand, first of all what I've

25    explained?

5

1        THE DEFENDANT:  Yes, Your Honor.

2        THE COURT:  All right.  Do you think that you're

3  able to sit here over the next, it could be twenty

4  minutes, it could be two hours, I'm not sure, and, or for

5  some portion of that time and listen to the witnesses and

6  hear that and talk and confer with your lawyers about

7  whatever's going on that either you want to talk to them

8  about or they want to talk to you about?

9        THE DEFENDANT:  Yes, Your Honor.  I'm, I'm very

10  sick.  I lost like about 100 pounds in the last months but

11  and I've been very, very, very sick but this import, this

12  hearing is very important to me.  I have to pull my myself

13  together to whatever length of time I hold for me.

14        THE COURT:  All right, so you think that you can

15  concentrate enough while we're having the hearing to

16  assist your lawyers and to listen to what's happening?

17        THE DEFENDANT:  I'll do my best, Your Honor.

18        THE COURT:  All right, so why don't we do this,

19  all right, if at any point in time - there're two

20  different issues that I need to think about today.  One is

21  your lawyers request that you be released.  That's what

22  we're going to have the hearing about, all right.  The

23  second is what they explained to me when we were here and

24  which you've just talked about which is that your health

25  has deteriorated dramatically, your lawyers said over the

6

1  time that you've been in custody and they were, you said

2  100 pounds, they referred to 50 pounds.  I can certainly

3  see that you look different than you looked the last time

4  I saw you at the arraignment, and, so whatever happens on

5  the release or detention question, we're going to have

6  some more discussion, the lawyers with you participating

7  if you wish and myself over what's happening with your

8  medical treatment and that, some of that is going to

9  happen today.  All right?  But, we'll go forward unless,

10  Mr. Denner, you don't want to.  We'll go forward with the

11  hearing, but if at any point in time you feel that you

12  need a break because you can't, we either need to stop and

13  put it over for another day or take a break, then you need

14  to tell your lawyers who will be there with you, that's

15  why, one of the reasons you have them, that I can't

16  concentrate any longer.  I'm, I need to take a, I'm

17  physically unable to listen or assist or participate or

18  hear in any way and then you do that and then as soon as

19  you do that, I will take a break.  All right?

20        THE DEFENDANT:  Thank you, Your Honor.

21        THE COURT:  All right.  Do you want to go

22  forward on those terms, Mr. Denner?

23        MR. DENNER:  Yes, Your Honor.  I, I think that

24  makes sense as long as the, as long as Dr. Mashali feels

25  that he wants to give it a try, then certainly I, and if

1   at any point, Your Honor, I feel that his medical

2   condition is such that he is simply not able to

3   effectively assist us, I'm going to bring that to--

4           THE COURT:  Then you should bring it to my

5   attention even if he hasn't then I would suspend then as

6   well.

7           MR. DENNER:  Yes, sir.

8           THE COURT:  All right, do you have any objection

9   with that Ms. West?

10          MS. WEST:  I do not.

11          THE COURT:  All right, fine.  All right, then

12  with respect to release or detention, the hearing, we'll

13  proceed with that at when either we can conclude that or

14  suspend that then we'll have a little follow up about the

15  medical issues because I want to follow up on that today

16  and I'm concerned about what I've heard.  I'm concerned

17  about what I see and, all right.

18          So since it's your motion, Mr. Denner, do you

19  have witnesses?  So you have witnesses?

20          MR. DENNER:  I, I do, Your Honor--

21          THE COURT:  All right.

22          MR. DENNER:  --but basically historically we had

23  since, since the detention hearing--

24          THE COURT:  Mr. Mashali?

25          THE DEFENDANT:  Yes, sir?

8

1    THE COURT:  All right.  Are you able to listen?

2    THE DEFENDANT:  Yes, yes.  I'm listening.

3    THE COURT:  All right.

4    MR. DENNER:  Since the detention hearing, Your

5 Honor, we had, we had his fam--

6    THE COURT:  Hold on one second.  Maria?

7 PAUSE

8    THE COURT:  I'm sorry.  Go ahead, Mr. Denner.

9    MR. DENNER:  Yes, Your Honor.  We had,

10 subsequent to your memorandum and order we had filed a

11 notice of appeal--

12    THE COURT:  Yes.

13    MR. DENNER:  --with, with the district court and

14 the district court has remanded it.  Of course this, this

15 session presumably goes through as information, that, that

16 had not been presented to you, that had, we had managed

17 would compile later.

18    THE COURT:  Yes.

19    MR. DENNER:  I mean can, candidly I have read in

20 my, in my in my opponent's opposition to it that, that,

21 that shouldn't be considered.  I--

22    THE COURT:  So let me, I, I'll settle that

23 issue.  I'm, I've already read everything you submitted.

24 I'm not going to - I understand the argument and, but I'm

25 not likely to rule again, I'm not likely to spend a lot of

1  time or energy and neither of you need to spend a lot of

2  time or energy on whether you could, whether any

3  particular piece or all of this information, you could

4  have put in earlier and if you could have, absent some

5  reason why it would be too, had been too difficult

6  therefore I shouldn't consider it.  So I'm not, unlike say

7  in a civil case on a motion to reconsider after summary

8  judgment, if you came up with, if this had been summary

9  judgment, came all this after summary judgment, I think I

10  would fairly say, and there are even in criminal cases

11  other times I do that, but I'm inclined to look at it all

12  and just think about it.  I will, so you both understand,

13  to the extent that there's an inference to be drawn, I'm

14  not saying there is, but separate from whether you could

15  have brought it up or not, but that I should understand it

16  differently cause it wasn't brought up before and it is

17  brought up now, I'm not saying that applies here, but

18  sometimes you can imagine that kind of, I might draw that

19  inference if it were appropriate.  But what I'm not going

20  to do is say, for example, that your client's wife could

21  have written the affidavit before that much of what's in

22  the affidavit is information she knew on the date of the

23  detention hearing and so I'm not going to consi, and so

24  therefore don't consider.  I'm not going down that road.

25  You don't need to spend time on that.

10

1      MR. DENNER:  I, I won't spend long on it.  I

2  just do want to say there's a lot of information that she

3  knew on the day of the hearing that she, that she didn't

4  write a letter about or testify about because it

5  sometimes, particularly in a case such as this where the

6  cases that were cited in the brief talked about motions to

7  suppress where affidavits were, were put in, you know, a

8  month in advance, 21 days in advance and the civil cases

9  where--

10      THE COURT:  I'm just going to look at the

11  evidence and decide.

12      MR. DENNER:  Okay.  Fine, that's all I need to

13  hear.  Thank you, sir.

14      And, and just, just for the record also the, the

15  motion to reconfigure our earlier file notice appeal to

16  revoke your order was simply to make it, make more sense

17  in the context of what we are arguing today.

18      THE COURT:  To go to the, I don't take any

19  offense.  As I said to you at the arraignment, it's always

20  a little bit murky when someone files something as to

21  whether what they what they're doing is saying judge, A,

22  just reconsider on the record you had, which at the time

23  you filed that I wasn't sure if that's what you were

24  asking.  You could have been.  Or B, there's new

25  information and you're entitled to come back with new

1   information and your new information and you want me to

2   reconsider in light of new information, or C, you just

3   want to go to the district judge which who can consider

4   new information if she wants or on that record and any of

5   those are entitled to and I, it, it's your choice.  It

6   doesn't, I'm not offended if you come back to me.  I'm not

7   offended if you go the district judge, and it just is what

8   it is and so, you procedurally, you don't need to

9   reconfigure that document to now be something else.  I'm

10  looking at all this.  I'm considering everything I heard

11  before.  Everything that was in front of me last time is

12  before me now in my view.  That's part of the record, plus

13  the indictment cause he's been indicted since plus - you

14  all right, Mr. Mashali?

15          THE DEFENDANT:  Your Honor, I'm okay, I'm

16  listening.

17          THE COURT:  When you're resting though, you make

18  me feel like you might be taking a nap and if you're

19  taking a nap that makes me feel like you can't participate

20  and we should take a break.

21          THE DEFENDANT:  No, I'm trying.  I'm trying the

22  strength to hold as much as I can that's all.

23          THE COURT:  I'm not, I'm not upset with you.  I

24  want you to, if you feel at any point you need to take a

25  break, just tell me.  There's no shame in that and that's

1  fine and we'll take a break.

2          THE DEFENDANT:  I will, Your Honor.

3          THE COURT:  All right.  So--

4          MR. DENNER:  Your Honor, we have--

5          THE COURT:  --plus what you've given me, plus

6  what the government gave me, plus whatever witnesses or

7  other evidence you've tendered here, I'm going to look at

8  all that and I'm going to decide either the government

9  meets it's burden of proof beyond, by, it's a

10 preponderance here as to, cause this is just risk of

11 flight, so as to preponderance as to risk of flight, I

12 don't think they have moved on obstruction and it's not,

13 the government's not moving on danger in this case and so

14 it's just that.  I'm just going to decide it like that and

15 if somebody's unhappy then they'll go to Judge Zobel.

16         MR. DENNER:  Okay, and that's fine, Your Honor.

17 We are very content with that, just wanted to clarify it.

18 We have two witnesses, Your Honor.  One that we actually,

19 first of all we have the proffer we made and, and the new

20 memorandum with the exhibits that you have--

21         THE COURT:  Yes, I've read all that.  I have all

22 that.

23         MR. DENNER:  We, we're proffering that as part

24 of our case-in-chief.

25         THE COURT:  All right.

13

1    MR. DENNER:  Secondly, we have Dr. Elkadry,

2  who is the wife of Dr. Mashali and we're going to ask her

3  to testify, be subject to cross examination under oath.  I

4  had noted that that was one of the, the points correctly

5  pointed out by--

6    THE COURT:  Sure.

7    MR. DENNER:  --by the government.

8    THE COURT:  Why don't you just call her?

9    MR. DENNER:  Right, and there's another witness

10  here, named Bill Hanlon.  We also have an affidavit with

11  him.  We don't intend to call him, but I have mentioned to

12  the government that if they want to cross examine him and

13  clarify anything that might be unclear or whatever the

14  reason--

15    THE COURT:  You're essentially saying here's his

16  direct testimony, it's the affidavit and if they have

17  questions they can either put them up and they question

18  them and if they don't, fine.

19    MR. DENNER:  Exactly.

20    THE COURT:  Fine.  All right.

21    MR. DENNER:  Dr. Noha Elkadry please.

22    DEFENDANT'S WITNESS, DR. NOHA ELKADRY, SWORN

23    THE COURT:  All right, fine.  Have a seat.

24    When Ms. Simeone returns she'll get you a cup of

25  water and if you need them, any tissues.  All right, and

1   if you need to, if you want to stop at some moment--

2            THE WITNESS:  I'm okay.

3            THE COURT:  --then do that.  I understand it's

4   going to be difficult and if you pull that microphone

5   toward you, it doesn't amplify, no, no, yeah, or you can

6   also pull it down.  It bends.  There you go.  Just closer

7   to you so that, cause that records what we're saying and

8   you want it all to be recorded.

9            THE WITNESS:  Okay.

10           THE COURT:  Go ahead Mr. Denner.

11           MR. DENNER:  Thank you, sir.

12                     DIRECT EXAMINATION

13  BY MR. DENNER:

14  Q    Could you please state and spell your name for this

15  Court?

16  A    My name is Noha Elkadry Mashali, N-O-H-A,

17  E-L-K-A-D-R-Y, M-A-S-H-A-L-I.

18  Q    Okay, could you speak just a little bit louder?

19  A    Sure.

20  Q    Okay and, and Dr. Elkadry, what is your relation to

21  this case?

22  A    I'm, I'm, his, I'm Fathalla Mashali's wife.

23  Q    Fathalla Mashali the defendant--

24  A    Yes.

25  Q    --at the counsel table, yes?

1    A    Yes.

2    Q    And how long have you been married?

3    A    Twenty-one years.

4    Q    And why don't you tell us a little bit about

5    yourself?  Where were you born?

6    A    I was born in Cairo, Egypt.  I came to America when I

7    was eight years old.  I lived in England two years before

8    that.  My father was studying.  Came at eight years old.

9    I did all my schooling here.  I want, I went to Boston

10   University School, College of Liberal Arts.  I then went

11   to Tufts Dental School and then I went to Tufts University

12   Periodontal Program at Tufts Dental School as well.  I

13   have a practice.  I've been practicing as a periodontist

14   since--

15   Q    Why, why don't you talk in that direction because--

16   A    Sure.  Sorry.

17   Q    --rather, rather that the Judge hears it.

18        THE COURT:  That's okay.

19   A    All right, so I'm, I'm a periodontist.  I've been

20   practicing.  I graduated in 1997.  I start, I started my

21   own practice about 11 years ago and I'm in private

22   practice.  I taught at Tufts University for 15 years.

23        THE COURT:  In the dental periodontal program?

24        THE WITNESS:  In the periodontal program at

25   Tufts University.

1    BY MR. DENNER:

2    Q    Are you a naturalized United States citizen?

3    A    Yes, I was naturalized at the age of 26.

4    Q    And at some point you met Dr. Mashali, Dr. Mashali

5    and you married him, correct?

6    A    Yes, I, we got married when I was 24 years old.

7    Q    Okay, and do you have a family with him?

8    A    Yes, I have four children.  My oldest is Dean.  He is

9    16 years old.  My daughter is Mira.  She's 14 years old.

10   My other son is Emir.  He's 12 years old, and my daughter

11   Jenna just turned three years old last week.

12   Q    It would be fair to say that they live with you and

13   your husband when you husband's at home?

14   A    Yes, yes.

15   Q    Also fair to say that they are United States

16   Citizens, born here in the United States?

17   A    Yes, they were all born here in Boston.  I've been in

18   Boston all my life.

19   Q    And they have been schooled in the United States as

20   well?

21   A    Yes, we haven't lived anywhere else except Boston all

22   our lives.

23   Q    And with regard to your children, what languages to

24   they speak?

25   A    They speak English.  I've tried to teach them Arabic,

17

1    but it hasn't been very successful so I'm going to try,

2    but they speak English.

3    Q    They speak, cannon speak Arabic?

4    A    They don't speak Arabic.

5    Q    Can they read Arabic?

6    A    They don't read.  They don't write.  They don't

7    really understand.  My oldest one understands a little

8    bit, but my three younger ones don't, don't understand

9    Arabic.

10   Q    Can you read Arabic?

11   A    No, I don't read or write.  I speak the informal

12   Arabic which is the spoken dialect cause I've been here so

13   long.

14   Q    And were you ever educated anywhere outside other

15   than England for a couple of years, anywhere outside the

16   United States?

17   A    No, I've lived in Massachusetts my whole life.

18   Q    And in terms of your education, you mentioned briefly

19   what you had done.  What is your work history of your, of

20   work?

21   A    When I graduated from my periodontal program, I

22   worked in several offices as a periodontist.  My practice

23   is limited purely to periodontics.  I, I started a

24   practice 11 years ago and the practice is for periodontics

25   and implant dentistry.  I still work in a practice in

18

1   Quincy.  It's actually my mother's practice.  My

2   mother's a dentist as well.  That's why, how I got

3   interested in dentistry and I practice there as well.

4          THE COURT:  Two different places?

5          THE WITNESS:  Yeah, one is my own and one I work

6   as the periodontist in a group practice--

7          THE COURT:  I see.

8          THE WITNESS:  --that's owned by my mother.

9          THE COURT:  Okay.

10  BY MR. DENNER:

11  Q    And when you say your mother and your dad make

12  reference to your father as well, do they live in the

13  United States?

14  A    Yes.  We came we all came together as a family when I

15  was eight years old.

16  Q    And, and they're here?

17  A    Yes, they are.  My whole family is here.

18  Q    And they maintain an active presence in your family

19  life?

20  A    Always.

21  Q    And they're grandparents to your children interacting

22  with them a good deal of the--

23  A    Always, we see them on a weekly basis if not more.

24  Q    And at some point, did you stop practicing dentistry?

25  A    Um.

19

1  Q    Or largely stop practicing dentistry?

2  A    No, I've always practiced.  I was on maternity leave

3  just for my children but at various times I was part time.

4  Q    So you've worked part time over the past decade be

5  fair to say?

6  A    Easily--

7  Q    Or, or longer?

8  A    --yeah, come, yeah.

9  Q    Okay and at some point you learned that your husband

10 was under some kind of federal investigation?  Is that

11 correct?

12 A    Yes.

13 Q    And what did you learn and when did you learn it?

14 A    The one clear thing that happened is when the FBI

15 came to the office September 25th with a search warrant,

16 but there had been subpoenas for--

17 Q    September 25th of which year?

18 A    Of 2013, but there had been indications of

19 investigations before that because there had been

20 subpoenas previously.

21 Q    Subpoena's that had been served on different entities

22 dealing with your husband?

23 A    Related to my husband, yes.

24 Q    Do, do you know which places that, that were that

25 were served subpoenas?

1 A    Not specifically, no, but I think, I'm not sure but

2 I think to insurance companies.  I'm not sure.  I don't

3 know.

4 Q    And it'd be fair to say it became somewhat clear to

5 you at that point that there was a massive investigation

6 going on?

7 A    Yes, it became very clear that--

8 Q    And what, when would that have been approximately?

9 A    That was this, September 25, 2013, when they--

10 Q    That, that was the search warrant, but when were the

11 subpoenas served on these insurance companies?

12 A    The search warra, the subpoenas I believe had been

13 over the last year or so.  I'm not exactly sure of the

14 dates.

15 Q    But it was certainly prior to the search warrant

16 being issued?

17 A    Yes, yes.  It had been ongoing, yes, for at least, at

18 least a year prior to that.

19 Q    And you, can you describe your husband's medical

20 practice in the year 2000?  Strike that.

21      Please describe the, the, the progression of your

22 husband's medical practice since the year 2000 briefly.

23 A    From 2000 he worked as an anestesiologist.  He was

24 contracted to provide anesthesia services for many large

25 hospitals.  He then started opening chronic pain

21

1  management clinics and about seven, six, seven years ago

2  the economy went bad.  He had financial problems and there

3  was a line of credit that was called in and he went into

4  bankruptcy.  After that he worked in chronic pain offices

5  and was in private practice.

6  Q    And you were here at the initial detention hearing,

7  correct?

8  A    Yes, I was.

9  Q    And you heard testimony relative to a variety of

10 things, did you not?

11 A    Yes, I did.

12 Q    About your asset base--

13 A    Yes.

14 Q    --about your liquidity--

15 A    Yes.

16 Q    --about your ties to this country, about your ties

17 out of the country.

18 A    Yes.

19 Q    Is that correct?

20 A    Yes, I did.

21 Q    Now with regard to your husband's medical practice,

22 after the bankruptcy, how did your husband's practice

23 change, if at all?

24 A    My husband's practice changed where it wasn't

25 hospital based anymore.  He was working a private practice

22

1  doing chronic pain management in private practice.

2  Q    And how many clinics did he have at that point?

3  A    He had--

4         THE COURT:  This is after the bankruptcy?

5         THE WITNESS:  This is after the bankruptcy, yes.

6  After the bankruptcy he lost the contracts for the, for

7  the hospital based contracts and he continued in private

8  practice and he had several pain clinics.  He had one, he

9  had one, two, three, he had I think maybe five offices,

10 four, four, five offices for chronic pain management.

11 BY MR. DENNER:

12 Q    At this point approximately how many employees did he

13 have if you know?

14 A    I don't know how many employees but it was a lot of

15 employees before it had, because the practice had been so

16 big.  It was very large.  When he went into private

17 practice he had at least two or three doctors working for

18 him and he had a very large staff, like nurses,

19 physician's assistants and front desk staff.

20 Q    And at some point offices started closing down and

21 staff was reduced dramatically, correct?

22 A    Yeah, I think what he was trying--

23 Q    Well what, what, why did that happen and when did

24 that happen?

25 A    Yeah, that happened gradually.  Part of it was to

23

1  consolidate offices, expenses so, to, that was that was

2  the main reason.  I think also, do you know, the doctors

3  who worked for him, the relationship wasn't so good so,

4  you now, so, so they had left.

5  Q    And, and at some point as the offices were reduced,

6  did he start offering some in-house laboratory services as

7  well?

8  A    Yeah, there was a couple of reas, he opened the lab

9  and there was a couple of reasons that he opened the lab.

10  Q    When, when, when you say he opened the lab, you're

11  talking about--

12  A    Dr. Mashali.

13  Q    Dr. Mashali and some corporate name?

14  A    It was part of New England Pain Associates where he

15  incorporated Lab Services and New England Pain.

16  Q    And do you recall when the Lab Services were first

17  offered by New England Pain?

18  A    I believe it was a couple of years ago.

19  Q    Okay, we're in 2014 now--

20  A    2011 I believe.

21  Q    Your hus--

22  A    2011.

23  Q    2011?

24  A    I believe.

25  Q    That was post-bankruptcy?

24

1  A     Yes, post-bankruptcy, yes.

2  Q     And what effect, if any, did that have on, on the

3  amount of money that was being generated in, in his

4  professional life?

5  A     Right, the lab was actually the main income.  It

6  boosted the income very much in terms of revenues, in

7  terms of the amount of revenues and the amount of work.

8  The reason the lab was opened, partly of course, you know,

9  it, it is a business venture but part of part of it was

10 also to monitor patients in terms of drug testing, urine

11 testing and monitoring patients as well.

12 Q     So at some point--

13 A     So he had in-house versus referring out.

14 Q     So at some point would it be fair to say that the

15 income, his professional income dramatically or even

16 exponentially rose--

17 A     Yes.

18 Q     --when he started offering the lab services?

19 A     Yes, he was doing very well financially.

20 Q     And your testimony is that that started in 2011?

21 A     I believe.

22 Q     And at some point - in the United States he did most

23 of his billing and transcription of records in house in

24 the United States, correct?

25 A     In the very beginning when he had his first hospital

25

1   based practice, the billing was, was in the states.  It

2   became very large with a huge staff and it was very

3   cumbersome and it had a lot of work and it was very

4   expensive so he established a medical billing office in

5   Cairo, Egypt as a way to almost, you know, outsource the

6   work and also have help in terms of managing it with

7   someone who has more time than he did cause he didn't have

8   a lot of time, and--

9   Q    And, and when did that occur?

10  A    I don't know the exact dates but it was early on and

11  that was before he filed for bankruptcy.  That's when he

12  had the multiple hospital contracts in the early 2000s.

13  Q    Would it be fair to say that from the time he

14  declared bankruptcy to the time in 2011 when he, he began

15  to utilize in- house laboratory services, would it be fair

16  to say that the amount of work that was sent over there

17  was relatively modest compared to later?

18  A    I'm sorry, can you repeat that?

19  Q    Would it be fair to say that before the labs actually

20  were put in place, the lab was put in place--

21  A    Yes.

22  Q    --the amount of work for transcription and for, for

23  billing purposes sent to the Egyptian company was a lot

24  less than it was at the lab it was produced, right?

25  A    Yes, yes.  The, the lab generated a lot more billing

26

1    and a lot more work so definitely in terms of the amount

2    of work that was actually being sent to, for medical

3    billing, that increased.  There was a big boost.  There

4    was, yes, for pur, exponentially with the work that was

5    being done in the practice.

6    Q    So it'd be fair to say--

7    A    It reflects the practice.

8    Q    Fair to say the amount of money that was wired over,

9    was money wired over to Egypt presumably to pay for these

10   services?

11   A    Yes, yes.  It was for the medical billing.

12           MS. WEST:  Your Honor, I don't have any problem

13   with moving through and doing this efficiently except

14   every question is a leading question so maybe if you could

15   just be a little bit more.

16   BY MR. DENNER:

17   Q    How, how did the, did your--

18           THE COURT:  Fair point.

19   BY MR. DENNER:

20   Q    Did your husband pay for the services?

21   A    Yes.

22           THE COURT:  That's not a, that's a lawyer's

23   issue--

24           THE WITNESS:  Okay.

25           THE COURT:  --between the lawyers. No, it

27

1    doesn't

2  have to do with your answers.

3              THE WITNESS:  Okay.

4  BY MR. DENNER:

5  Q    Did your husband pay for the services that were--

6  A    Yes.

7  Q    --rendered by the Egyptian company?

8  A    Yes.

9  Q    And how did he pay for them?

10 A    He wires money to Egypt, to the billing office.

11 Q    Okay, and the billing office, what's the name of the

12 company?

13 A    I don't know the exact name to be honest.

14 Q    If I suggested it was Northern Rhode Island, does

15 that refresh--

16 A    That was one of the entit, yeah.

17 Q    Okay and, and who was a proprietor in 2011 and 12 of

18 that company in Egypt?

19 A    My husband's brother, Asouf Mashali.

20 Q    Could you say his name a little bit louder please?

21 A    My husband's brother, Asouf Mashali, Asouf Fathalla

22 Mashali.

23 Q    And how would you compare the payments made prior to

24 the lab coming to exist since 2011 to the payments that

25 were made for billing and transcription services prior to

28

1  2011?

2  A    Well, when we had gone into bankruptcy, everything

3  had slowed down and stopped.  When the, when the lab

4  became up on its feet and, and profitable, the amount of

5  money and the amount of billing increased dramatically.

6  Q    I'm sorry, dramatically?

7  A    Yeah, it's, it's - yeah.

8  Q    And, and at some point did the lab lose its

9  accreditation and licensing?

10  A    Yes, it lost its license at the end of, I believe

11  December of 2012, the lab lost its license.

12  Q    And at that point was there any change in the amount

13  of work that was being billed to Medicare and other

14  providers?

15  A    Yes, yes, there was a dramatic drop in terms of the

16  income, so a dramatic drop in terms of what was being

17  billed and a dramatic drop in what was sent for the

18  medical billing in Cairo.

19  Q    You have to speak up a little bit.

20  A    Yup.

21  Q    Dramatic drop was sent from--

22  A    In terms of the amount of billing, the amount of work

23  of course dropped because there wasn't the lab revenues

24  anymore so the amount of billing also dropped, so the

25  amount of money that was being monitored for medical

29

1  billing also dropped.  I didn't do that.

2          THE COURT:  No, I know.

3          THE CLERK:  I did.

4          THE WITNESS:  Oh, sorry.

5          THE COURT:  That's all right.  Maria, turned it

6  up.

7          THE WITNESS:  Okay.  Sorry.

8          THE COURT:  That's all right.  Maybe down a

9  little bit Maria.  I think it's, I can hear her testimony

10 fine so as long as, Maria, it's being picked up by the

11 recorder we don't need that--

12         THE WITNESS:  I'll try to talk louder.

13         THE CLERK:  No, that's perfect.

14         THE COURT:  That's fine.  You're doing fine.  Go

15 ahead.

16 BY MR. DENNER:

17 Q    So from the time that the lab ceased being credited

18 and ceased doing business, was there any change, any delta

19 in the amount of monies that were wired from the United

20 States to Egypt at that point for the transcription and

21 billing--

22 Q    Yes, it decreased.

23 Q    Decreased.  Can you characterize what sort of

24 decrease it was?

25 A    I don't know.  I'm not sure.

30

1  Q    Okay, and were there any, were there any other

2  monies to the best of your knowledge that were at any

3  point in time wired to Egypt as well for other than

4  transcriptions or billing services?

5  A    Yes.

6  Q    Yes or no?

7  A    Yes.

8  Q    Okay, and if you can tell the Court what that is, I

9  would appreciate that.

10 A    Sure.  There was about $400,000 that was sent, that

11 was wired from my bank account to Cairo to purchase two

12 pieces of land.  Each one slightly under $200,000.  It was

13 a deposit towards a purchase of lands, so that was the

14 $400,000 that was sent.

15 Q    And did, would it be fair to say that the land was

16 owned by you and your husband?

17 A    Yes.  Yes, one piece of land was--

18       THE COURT:  Who owned the land would be the non-

19 leading.

20 BY MR. DENNER:

21 Q    Who owned the land?  Who owned the land?

22 A    We both did.  One piece was in my name and one piece

23 was in my husband's name.

24 Q    And with regard to this particular land, what was the

25 purpose of the purchase?

31

1  A    The purpose of the, of the purchasing of the land

2  is, my husband had wanted to establish a franchise for a

3  company called Digital Ear.  Digital, can I say what it is

4  or?  Digital Ear.  I'm sorry.

5  Q    The Judge is in charge.

6         THE COURT:  Fine.  Go ahead.

7  A    Yeah, Digital Ear is a company.  It's a high end

8  luxury electronics company and my husband likes to do

9  business and had wanted to establish a franchise in Egypt.

10  BY MR. DENNER:

11  Q    And was there going to be any other franchise of

12  Digital Ear that your husband was involved with as well?

13  A    Yes, he had wanted to establish one in, in

14  Massachusetts because the company and the person we, he

15  was dealing with was in California and there wasn't a good

16  Digital Ear franchise here in Massachusetts so he had

17  wanted to establish one here.

18  Q    And again, just a little bit more specificity, what,

19  what services or products does Digital Ear offer?

20  A    It's high end luxury electronics, things that control

21  your household, whether it's the heat or the TVs.  It

22  basically it's, controls everything through your iPad and

23  there's a lot of video projections and things like that.

24  It's a high end luxury.

25  Q    And do you, are you familiar with this business plan

1   or the general business plan intentions that exist with

2   regard to the franchise in Egypt?

3   A    Yeah.  The plan had been that the two pieces of land,

4   there was going to be two showcase homes that were going

5   to be built, one for the residential and one for the

6   commercial, where it would showcase what was possible with

7   Digital Ear in terms of the extent of the electronics.

8   Q    An when you say showcase, what does that mean

9   showcase?

10  A    That means to, to actually demonstrate it in, in real

11  life, you know, build a home that shows the features and

12  have people come and look and see what's possible in their

13  home.

14        MR. DENNER:  Was it ever your intention to

15  physically move into either the residential or commercial

16  land there?

17  A    No, we have never had an intention to live in Egypt.

18  I've been here all my life.  My children have been here,

19  you know, they were born here.  We go on vacation only and

20  to live there is would be a huge shock, not only to my

21  children but to me.

22  Q    With regard to Digital Ear in Massachusetts---

23  A    Yeah.

24  Q    --where was that going to be situated?

25  A    My husband was going to use investment that he had,

33

1   the things that were done in our house.  He was

2   continued to have to showcase it and there was also a

3   carriage house that was going to feature the, he was going

4   to be home and entertainment theatre that was going to

5   part of the showcase where people can see what was

6   possible.  So it was the carriage house and our house.

7          THE COURT:  At your home on Pond Street?

8          THE WITNESS:  Yes, and yes and our residence.

9   BY MR. DENNER:

10  Q    Could you state, what was he dressed in that

11  residence?

12  A    153 Pine Street in Dover, Massachusetts.

13  Q    And how much if any of that project was ever

14  completed?

15  A    Once the lab closed, we ran out of funds so there was

16  work that was not complete in my actual residence and the

17  carriage house was never complete.  It's basically an

18  outside shell but it, it was never completed because the

19  lab closed and our financial resources declined.  We

20  didn't have enough money to continue.

21  Q    I think, I think you indicated that the Digital Ear

22  investment sent to Egypt was approximately $400,000?

23  A    Yes, it's a little bit under but almost.

24  Q    Do you know, do you know when that was sent there and

25  whether it was sent in one fell swoop or--

34

1    A    Yeah, it was sent in two wires from my bank

2    account, so it was in two lump sums of a little under

3    $200,000 each and I believe, I'm not 100% sure, but I

4    believe it was in 2000 in the spring I believe of 2012.

5    Q    And do you know where that money is now?

6    A    Yes, we sold the land.  We have, again, it was two

7    pieces of land.  We weren't able to continue with the

8    project.  So we sold the pieces of land and we've been

9    bringing the money back to here.

10   Q    And how much of it has been brought back at this

11   point?

12   A    Most of it has actually been brought back.

13   Q    Was there any difficulty or barriers, hindrances in

14   bringing it back here?

15   A    Yes, it's very difficult--

16   Q    What, what would that have been?

17   A    Yup, you can't transfer money out of Egypt very

18   easily.  You can't at all actually.  The only way we were

19   able to bring money from Egypt was through Western Union

20   in small amounts and that's the only way we could transfer

21   the money.  And that's why we, we did that because Egypt

22   has a lot of economic unrest and they want money coming

23   in.  They don't want money leaving the country, so they

24   block you.

25   Q    And do you know how much of that money has come back?

35

1  A    Most of the money.  There's a very small amount

2  that has not.  So most of the $400,000 has actually come

3  back.

4  Q    And how much if you know is still there?

5  A    I want to say, I'm not so good with numbers but maybe

6  20 to $40,000, maybe.

7  Q    Are you making any attempts to repatriate that?

8  A    We tried but for some for some reason I was, my

9  husband initially was blocked by Western Union so we could

10  not bring the funds in anymore and then I was also

11  blocked, so I was blocked from bringing the rest of the

12  money back and I don't know why?

13  Q    Was there a reason that you repatriated that money--

14         THE COURT:  Does that, well hold on, so does

15  that mean that the whatever amount it is, 20 to $40,000,

16  is in a bank account in Egypt or, but you were unable, you

17  were unsuccessful in attempts to wire it via Western Union

18  to the US?

19         THE WITNESS:  There's about 20 to 40, maybe 20

20      to 30

21  that I was not able to bring back.  It's in a bank account

22  in Egypt.

23         THE COURT:  I see and is that--

24         THE WITNESS:  That I was not able to bring back

25  because Western Union wouldn't allow me to--

36

1          THE COURT:  To, to send it?

2          THE WITNESS:  --to, to accept it.  They sent it

3   but they didn't let me accept it.

4          THE COURT:  You mean at the Western Union office

5   here?

6          THE WITNESS:  Yes.

7          THE COURT:  I see and is that, is there more of

8      the

9   400,000 left in Egypt?

10          THE WITNESS:  No.

11          THE COURT:  That's what's left?

12          THE WITNESS:  That's what's left.

13          THE COURT:  All the West--

14          THE WITNESS:  All the 400,000 is back.

15          THE COURT:  Except for that portion in the bank

16   account there?

17          THE WITNESS:  Small amount, yes.

18          THE COURT:  Right, okay.

19   BY MR. DENNER:

20   Q    And was there a reason that, that you and Dr. Mashali

21   brought that money back to the United States?  Yes or no?

22   A    Yes.

23   Q    And what was that reason?

24   A    For legal expenses, for accounting expenses, for

25   living expenses until I can build my practice up again.

37

1   Q    When you say legal expenses, what kind of--

2   A    Legal defense.

3   Q    What kind of legal difficulties are you and/or your

4   husband facing?

5   A    My husband's being accused of medical fraud which he,

6   we will, which is not true.

7         THE COURT:  You don't have to take a position on

8   that.  I understand it.

9         THE WITNESS:  Okay, I--

10         THE COURT:  He's been charged with that and I

11   understand it.

12         THE WITNESS:  He's, he's defending himself

13   against allegations of medical fraud.

14   BY MR. DENNER:

15   Q    And, and there's civil matters as well, correct?

16   A    Yes, there's various matters.  We have a lot of

17   properties that are encumbered and there's many

18   lienholders from the time of the bankruptcy, and so my

19   husband has been dealing with many, many attorneys to

20   settle those liens and to make settlements with the

21   creditors and so there's a lot of legal expenses, not only

22   for the criminal defense but for those aspects as well.

23   Q    Has your husband ever had any issues with the

24   Department of Labor?

25   A    Yes, after the bankruptcy, he was not able to, to

38

1  meet payroll and so, yes, and Bill Hanlon was actively

2  settling with them and I think they were very close to

3  coming to a settlement before all, all of this happened.

4  Q    And that's part of the legal expenses?

5  A    Yes.

6  Q    Are there, were there, are there, were there any

7  issues relating to use professional licensure?  Yes, or

8  no?

9  A    Yes.  He lost his license at the end of August of

10  2013.

11  Q    Did you say he lost his license?

12  A    It was taken out.

13  Q    Where, where was, where was he licensed?

14  A    He was licensed in Rhode Island and Rhode Island

15  suspended it.

16  Q    Do you know whether or not he voluntarily surrendered

17  it or was it actually taken from him in a disciplinary

18  hearing?  Do you know?

19  A    I think in Rhode Island it was an emergency hearing

20  to suspend it and then it was suggested at, not Mr. Denner

21  but the advice of another legal counsel at the time that

22  he has to surrender his, his Massachusetts one and so he

23  followed his attorney's advice.

24  Q    At this point he was not licensed in Massachusetts or

25  in Rhode Island, right?

39

1  A    No, during this time he hasn't had his medical

2  license.

3  Q    And, and with regard just to revisit for a moment the

4  monies that were wired over for the transcription and

5  billing services,--

6  A    Yes.

7  Q    --do you know over what period of time monies were

8  wired over there?  How many years?

9  A    In terms of going for the medical billing?

10  Q    In terms of billing, yes.

11  A    I, I believe it's from 2009.

12  Q    Okay, and do you know approximately how mu, if you do

13  know, approximately how much money was wired over?  What

14  was that five, four to five year period?

15  A    I don't know any particulars in terms of amounts so

16  no, I don't know.

17        MR. DENNER:  Okay.  May I have one second, Your

18  Honor?  Your Honor, could we have a five minute break for

19  Dr. Mashali?

20        THE COURT:  Sure.  All right, we'll take a five

21  minute break and then we'll resume.

22  (Court in recess)

23  (11:51:45 AM)

24  (Court is back in session)

25  (11:59:58 AM)

40

1        THE CLERK:  The Mashali matter is back in

2   session.

3        THE COURT:  Please be seated.

4        MR. DENNER:  Your Honor, our second witness has

5   to be somewhere at one and I've talked to Ms. West and she

6   has no problem with us--

7        THE COURT:  All right, well fine.

8        MR. DENNER:  --interrupting and letting her—

9        THE COURT:  All right.  Go ahead.

10        MR. DENNER:  And, and again as I earlier said,

11   Your Honor, I, I treat his, his affidavit as my direct

12   examination.

13        THE COURT:  Direct.  So why don't you just call

14   him and he'll just say that and then, so Mr. Hanlon?

15        THE COURT:  Would you take the witness stand.

16   Right there.

17   (WITNESS HANLON taken out of order)

18   (12:01:31-12:22:55, not transcribed per AUSA)

19   (Court in recess)

20   (12:22:55)

21   (Court back in session)

22   (1:18:00 PM)

23        THE CLERK:  The United States District Court for

24   the District of Massachusetts in now in session.  The

25   Mashali matter is back in session.

41

1         THE COURT:  Please be seated.  Dr. Mashali,

2  you don't have to get up if you're in a wheelchair.

3  That's fine.

4         All right, we ready to go?

5         MR. DENNER:  Yes, sir.

6         THE COURT:  I understand just for both of your

7  information that while, during the lunch break, that the

8  marshals had the nurse examine Dr. Mashali and found that

9  his vital signs were satisfactory and didn't, the nurse to

10  the marshals to Ms. Simeone to me, did not report any

11  other indications that warranted immediate intervention.

12  All right?  Ready to proceed?

13         MR. DENNER:  Yes, sir.

14         THE COURT:  All right.

15         MR. DENNER:  If Dr. Elkadry could retake the

16  stand?

17         THE COURT:  Yes.

18              DIRECT EXAMINATION, continued

19         THE COURT:  Yes.

20  BY MR. DENNER:

21  Q    Good afternoon, doctor.

22  A    Hi.

23  Q    You will recall that you're still under oath, yes?

24  A    Yes.

25  Q    Now I think at some point you indicated that you

42

1  became aware that Dr. Mashali, your husband, the

2  defendant in this case, had lost his medical license to

3  practice, correct?

4  A    Yes.

5  Q    And what did that mean to you economically?

6  A    Economically it was the main, he was the main

7  breadwinner.  He was the main source of income and that we

8  were going to have a financial issue.

9  Q    And at that point you were working part time?

10  A    Yes.

11  Q    And approximately how much were you making on an

12  annual basis?  Let's say what did you make for, first of

13  all when did this, when did he lose his license, just as a

14  reference?

15  A    Sure.  He lost his license at the end of August 2013.

16  Q    And at that point did you have any conversation about

17  what you might do with him, with him, about what you might

18  do as a family economical?

19  A    We had talked of different options in terms of what

20  we can do.  I was going to build up my practice, add more

21  hours, add more days.  See if I can add doctors to the

22  practice.  My practice had been pretty, pretty small

23  because of the kids, and I was going to do my best to

24  build it up, in eye doctors and build my practice.  We had

25  also talked about, you know, we had looked at all our

43

1    options in terms of what to do for Fathalla, and we

2    believed and hoped and still do believe and hope that he's

3    going to get his license back and he was going to work

4    again and I do believe that.  And then we just, you know,

5    have a hard time for a little while and get better.

6    Q    Did, did you consider moving anywhere away from

7    Massachusetts?  Yes or no?

8         Were those options that you discussed?

9    A    We, the options we have looked into things but we

10   ultimately could not move away, no.

11   Q    Well what did you look into doing?

12   A    We looked to see if it was going to be possible, you

13   know, to possibly go into the Middle East but it's not

14   option because Fathalla lost his license.  He can't work

15   as a doctor there, and again, I, we had talked about it

16   very briefly in the very beginning to see if that was

17   something feasible or not, and it was not, and again, the

18   reason it was not feasible is I've been here all my life.

19   My children have been here their whole lives.  My husband

20   cannot work as a doctor really anywhere because he lost

21   his license here and it's very easy to know when people

22   look up his references that he doesn't have a license, so

23   he can't work anywhere.  So that option was not possible,

24   and we decided that I will ramp up my practice and we will

25   fight the allegations and he would regain his license and

44

1   we would continue.

2   Q    Did, was it routine for you and your children to

3   visit Egypt over the past five years on any basis, regular

4   basis?

5   A    Yes, we, yes we usually go once a year.  Usually we

6   go in August.  A couple of times we've gone in the winter

7   and we go for about two or three weeks for a vacation.

8   Q    And in the calendar year 2013, did you take that

9   vacation with your children to Egypt?  Yes or no?

10  A    No.

11  Q    And was there a reason for that?

12  A    There was too much unrest in Egypt.  Egypt had gone

13  through a revolution.  There was a lot of violence

14  happening there, and I didn't want to expose the kids to

15  any kind of potential danger or political unrest.

16  Q    Do you think they would be in any particular danger

17  for any factor that you can identify?

18  A    There unfortunately--

19  Q    Yes or no.

20  A    Yes.

21  Q    And what would that be?

22  A    There's car bombings.  The crime was very high and

23  uncontrolled.  It wasn't safe in general so we decided not

24  to go last year.

25  Q    Do you, do you believe that Egypt at this point and

45

1   in 2013 was a great polarized society?

2   A    It was, there was definitely divided factions.   There

3   was a lot of political unrest which led to violence.

4   Q    Was one of these factions the radical Islamic

5   faction?

6   A    Of course, yes.   That was I think the ones who were

7   actually creating most of the violence.

8   Q    And did you have any thoughts about how that violent

9   Islamic faction would react to four American children of

10  Egyptian heritage who didn't even speak Arabic if they

11  were removed to Egypt or even visited Egypt?

12  A    Oh definitely.   We stick out like a sore thumb when

13  we go and it was not going to be safe generally, you no

14  even, and you know, in the past we stay in very safe

15  places and you know, in hotels and we don't, we don't go

16  into the general population.   We're usually in a resort

17  that's very protected.

18  Q    But you didn't go in 2013?

19  A    We did not because there was too much political

20  unrest and I was worried.

21  Q    Was it your, is it your intention to go in 2014 at

22  this point?

23  A    At this point no.   I'm hoping things settle down but

24  it's unclear.   There's too much unrest right now.

25  Q    And did you and Dr. Mashali specifically talk about,

1   you said Middle East.  Did you specifically talk about

2   the possibility after he'd lost his license of actually

3   moving to Egypt this summer?  Yes or no?

4   A    Not, not directly Egypt but a general conversation in

5   terms of possibly going overseas, yes.

6   Q    And did you reach an agreement with him about whether

7   that makes sense or not?

8   A    Yes.  It, it was very clear that it did not make

9   sense and the reason it did not make sense is again,

10  completely different culture.  He was not going to be able

11  to get a job.  I was not going to be able to get a job.

12  Economically it's not possible.  The children have grown

13  up here and their friends are here.  They're American.

14  I'm American, and although it was fun to travel to Egypt

15  on vacation, it's not a place I can live.

16  Q    In the past five years, putting your children aside

17  for a second, what travel have you made to Egypt yourself?

18  A    I only go with the children.  I'm, I, I pretty much

19  go on vacations with the children.  I don't, except for

20  the one trip I did in January of 2000--

21  Q    January of which year?

22  A    --of 2014.  I went for a brief weekend for a business

23  trip.  Otherwise, I don't travel anywhere without my

24  children.

25  Q    And what was the purpose of that business trip?

47

1  A    We had sold the land that we had referred to before

2  and I was going to have money released from the Egyptian

3  government to, to bring back to America.

4  Q    And that's the money you referred to earlier that you

5  were repatriating to the United States, right?

6  A    Yes, it, yes it was from the sale of the land.

7  Q    And at that point in January of 2014, were you aware

8  of the investigation that was going on surrounding your

9  husband, criminal investigation?

10 A    Yes, I was.

11 Q    And when you, when you bought your ticket that time,

12 were there any circumstances around buying that ticket in

13 terms of the timing of it that stick in your mind?

14 A    Yeah, I bought my ticket the day before I left.

15 Q    And, and why was that?

16 A    The reason is I didn't have a plan to travel and we

17 had been trying to release the funds from the government

18 for some time and it wasn't working, and my brother-in-law

19 had said that my presence would expedite the process and

20 if I could come then it would help things out.  It

21 happened to be a long weekend and I had three days in a

22 row that I wasn't working, so what I ended up doing is a I

23 took the opportunity.  I bought the ticket I believe on

24 Thursday.  I travelled Friday night and I came back Monday

25 and I went to work on Tuesday.

48

1   Q    At that point did you feel that you were an object,

2   a subject of any investigation yourself?

3   A    I wasn't sure.  I didn't think so but obviously from,

4   obviously I don't know.  I know my husband was being

5   investigated and I, I assumed I was being looked at as

6   well.

7   Q    At the time did you believe that you were being

8   investigated as well?

9   A    No.

10  Q    And in terms of the defendant, your husband's travel

11  history to Egypt over the past couple of years, do you

12  recall how frequent he went to Egypt?

13  A    Generally, except for a couple of times we travel

14  together as a family. I usually go ahead with the kids

15  for, go ahead like a week or two in advance and he usually

16  catches up with me and spent about a week with us just

17  because of his work schedule.  I take a little bit longer

18  vacation with the children.  There were a couple of times

19  that he did go on his own.  One of them was in November of

20  2012 for Thanksgiving, where he went to meet the person

21  for Digital Ear to talk about the franchise that was

22  there, and then again, he was going on a business trip in

23  February of 2014, and, but otherwise we travel together,

24  and that was when he was arrested.

25  Q    And in--

1  A    Excuse me.

2  Q    --in 2012 when he went there with, did he or did he

3  not know about the grand jury subpoena's that had been

4  issued at that point?

5  A    Yes, he was aware that there were investigations

6  going on.

7  Q    And he came back at that point obviously?

8  A    Yes, yeah, he went for I think a few days, maybe four

9  or five days.  Just for the long weekend.  A little under

10 a week.

11 Q    And he was attempting to go to Egypt in February of

12 2014 when he was in fact arrested at the airport, correct?

13 A    Yes.

14 Q    Was there a purpose for this trip?

15 A    Yes, it was a business trip.  He was going to I had

16 gone on my end.  I had tried to release the funds for my

17 piece of land and his piece of land with my trip, and I

18 was partially successful, but because the land was in his

19 name, again, it was, you know, recommended that he come to

20 expedite the release of funds for his particular piece of

21 land.  He was also going to do other business things.  One

22 of them was to get retirement funds that were available to

23 him in Egypt.

24 Q    And again, do you know what the timing of the

25 purchase of this ticket was at that point?  Did he have to

50

1   fly to Egypt?

2   A    He also, yeah, he also purchased it the day before he

3   traveled.

4   Q    And, and do you know what, was there a reason for

5   that?  If you know?

6   A    Yeah, I think the main reason for that again was in

7   terms of, very specific people handle, the offices in

8   Egypt there's very specific people who handle the release

9   of the money and so part of it was the timing of finding

10  those people available to him and having the offices open

11  and as well as, you know, I thought I had taken care of

12  the release of his money as well, and I thought I had

13  taken care of that with my trip and it was not and again,

14  it was recommended that he come down personally to, to

15  expedite the release of his share of the money.

16  Q    So it was not just the fact of finding offices open

17  but you also had to find the right person there at that

18  time?

19  A    Yes, it was both things, yes.

20  Q    Did you receive information from anyone in Egypt

21  about what was going on with office openings and, and the

22  presence of various people at these offices?

23  A    Yes, my brother-in-law is taking care of all that and

24  he's the one who's actually been dealing with all the

25  offices and he's the one who knows the contact people, and

1  many times for various reasons if there's protests in

2  the street, the people don't actually go to work so he

3  keeps in touch with them and knows when they're going in

4  and when they're not and so that was one of the incentives

5  for him because they were available during that time.

6  Q    To the best of your knowledge, was your husband

7  attempting to go to Egypt to get a job there and stay

8  there and live there?

9  A    Absolutely not.  He's not able to get a job there and

10  even if he hadn't lost his medical license which prevents

11  him from getting any kind of doctor's job really anywhere

12  in the world, never mind Egypt, the plan had been for him

13  to come back in one week.  He was going to do business and

14  he was coming back.

15  Q    And was that--

16  A    He was not planning to stay.  He was not planning to

17  leave us, and I was not planning to go and my children

18  were not going.

19  Q    Was that consistent with the agreement that you

20  testified earlier that you had reached?

21  A    Yes.

22  Q    Okay, now directing your attention to your asset

23  situation as it stands right now.  The house you're living

24  in right now, your residence,--

25  A    Yes.

52

1    Q    --do you know what the value of that house is?

2    A    The--

3    Q    At least what the tax value is?

4    A    The tax value I believe is about three, three and a

5    half million dollars.

6    Q    And have you had that house appraised anytime

7    recently?

8    A    No, but I had asked the real estate agent who sold it

9    to us what the value of the house was and we had the tax

10   people for the town come out several times because we had

11   done additions to the house to look at the value and that

12   is what they assessed the house to be based on the, the

13   additions.

14   Q    And do you know what the encumbrances on that house

15   are right now?

16   A    I believe it's about a million six, a million seven.

17   Q    It'd be fair to say—

18            THE COURT:  That's the mortgage or other

19   encumb--

20            THE WITNESS:  That's the mortgage on, on the

21   house that I'm in now.

22   BY MR. DENNER:

23   Q    It'd be fair to say doing some math—

24   A    What's left of the mortgage?  I'm sorry.

25   Q    --that provides about, about a $2 million equity?

53

1   A    Yes, roughly speaking, yeah.

2          THE COURT:  How much is a monthly payment?

3          THE WITNESS:  It's $12,400, it's about 12

4   something.

5          THE COURT:  That's for mortgage, insurance and

6   taxes?

7          THE WITNESS:  Not insurance but it does include

8   the taxes as well.  We got the house for a very good

9   price.

10         THE COURT:  And is that loan current?

11         THE WITNESS:  Excuse me?

12         THE COURT:  Is that loan, that bank is--

13         THE WITNESS:  Yes, yes, yes.

14         THE COURT:  They're not moving to--

15         THE WITNESS:  The bank, yeah, no, no, no, no,

16  no.  I'm keeping everything current at this point, yes,

17  yes.

18         THE COURT:  Okay.  Go ahead.

19  BY MR. DENNER:

20  Q    And so, so fair to say that there's approximately $2

21  million--

22  A    Yes.

23  Q    --equity in that house?

24  A    Yes.

25  Q    And is that the house, are you, are you the trustee

54

1  of the trust that owns that house?

2  A    Yes, the house is in a trust and I am the trustee.

3  Q    And who are the beneficiaries?

4  A    The beneficiaries are my children.

5  Q    And is that an irrevocable trust or a revocable

6  trust?

7  A    It turned out to be a irrevoca, revocable.  I'm

8  sorry.  Revocable trust.

9  Q    And, and are you intending as the trustee

10 understanding the implications to put that up as

11 collateral for any bond that your husband might be

12 granted?

13 A    Yes.

14 Q    And in terms of your other assets are there other

15 real estate that is still titled either in your name, your

16 husband names, both your names so that you constructively

17 have an ownership interested in?

18 A    Yes, we have two other houses in Dover.  One was our

19 old residence and one was a house we had bought for

20 investment and we had planned to remodel it and move

21 there, but economically we hadn't done well and so we have

22 those two houses and we have a house in Rhode Island as

23 well.

24 Q    And what is the, the state of financial affairs for

25 these houses in terms of net value or net, net or negative

55

1  value?

2  A     So the two houses--

3  Q     Could you give us the address of these houses?

4  A     Sure.  The first house, that was our old residence,

5  is 160 Dedham Street, Dover, Massachusetts.  That's where

6  we used to live.  We lived there for about 14 years before

7  we moved into the house we're in now.  At the time when my

8  husband's practice had been doing very well before, we had

9  bought a house at 120 Centre Street, that's also in Dover,

10 Massachusetts, and the intention had been to remodel it

11 and move there and there was potentially a sub-dividable

12 lot that was there but my husband at the time, at that

13 time, the economy dropped and we went into bankruptcy and

14 there was several liens--

15         THE COURT:  Both of you or just him?

16         THE WITNESS:  Just my husband but I feel it was

17 me too.

18         THE COURT:  All right, I underst—

19         THE WITNESS:  That's why I keep saying me.

20         THE COURT:  Yes.

21         THE WITNESS:  I did not go into bankruptcy but,

22 of course, I was, you know.

23         THE COURT:  Yes, I understand.

24         THE WITNESS:  That's why I keep saying me cause

25 it was me.  It was me too, but it was only my husband

1   officially who went into bankruptcy--

2           THE COURT:  Yes.

3           THE WITNESS:  --and his companies.  So there

4   were many liens.  The house for 120 Centre Street and the

5   house in one, when the mortgage was done for 120 Centre

6   Street, the bank did a cross-collateral on our primary

7   residence at 160 Dedham Street and we also had, it was a

8   construction loan because the plan had been to demolish

9   the house and build it, and when my husband went into

10  bankruptcy around that time, there were many liens that

11  were placed on all our properties including 120 Centre

12  Street, 160 Dedham Street and the house we have in Rhode

13  Island, and although my husband was discharged from the

14  bankruptcy, the liens continued being there.  We had had

15  forbearances for 120 Centre Street but the liens

16  outweighed the equity that we have at 120 Centre Street

17  and after my husband lost his medical license last year,

18  we stopped paying the mortgage with that and we are

19  currently in the process of foreclosure.  The problem with

20  the foreclosure is our house at 160 Dedham Street is, has

21  a cross collateral on it so the one at 160 Dedham Street

22  potentially also is going to get foreclosed on, and we

23  have liens on the house on, the same people have the liens

24  everywhere on our house.

25          THE COURT:  Is there a mortgage on 160 Dedham?

1          THE WITNESS:  Yes, there is.

2          THE COURT:  Is that--

3          THE WITNESS:  There's a mortgage on everything,

4    yes, and everything's, that's current, yes.

5          THE COURT:  So 160 Dedham, the mortgage is

6    current?

7          THE WITNESS:  Yes, I'm keeping it current.  I'm

8    renting the house now.

9          THE COURT:  And so if it goes into foreclosure,

10   it goes into foreclosure because 120 Centre Street is

11   under water and it not current on the mortgage--

12         THE WITNESS:  Yes.

13         THE COURT:  --and the bank then or the

14   lienholders will force the sale of 160 to satisfy

15   whatever's owed on 120?

16         THE WITNESS:  Yes.

17         THE COURT:  All right.  All right, go ahead, Mr.

18   Denner.

19   BY MR. DENNER:

20   Q    Based on your discussions with your financial

21   advisors, is it your expectation that you will ever

22   realize any money whatsoever out of any of these other

23   real estate assets you just referred to?

24   A    For 120 Centre Street, absolutely not because it's

25   very encumbered.  For the house in Rhode Island,

58

1  absolutely not because there's lienholders that we've

2  agreed once we sell the house because it's up for sale

3  that we will pay the creditors and that way we can pay

4  them back what we owe them.  For 160 Dedham Street, if

5  they foreclose, we will not have any equity, but I'm

6  trying very hard to negotiate with the bank so they don't

7  foreclose, but I, they are not being very nice so.

8  Q    If they do foreclose any equity--

9  A    I don't know.  I'm not going to have any equity in

10  the house.

11  Q    --you probably could have had will be squeezed out?

12  A    It will be gone.  I will lose the house and any

13  equity that I potentially had, but again the liens

14  outweigh the equity unless I can settle, unless we can

15  settle with the lienholders which we've been trying to do

16  for the last few years and we were actually, Bill Hanlon

17  was successfully doing it until my husband lost his

18  license, and until this investigation started, Bill Hanlon

19  was in the process of, of settling with the lienholders

20  but if the bank forecloses we will have no equity in, in

21  anything except for the house I'm in now.

22        THE COURT:  What's the income from 160 Dedham

23  Street?

24        THE WITNESS:  The income from 160 Dedham Street

25  I just started renting it recently and it's about $6,000.

1   It is $6,000 a month.

2        THE COURT:  A month, and how much are the

3   mortgage taxes and insurance on that house?

4        THE WITNESS:  The mortgage is a little over

5   $7,000.

6        THE COURT:  Per month.

7        THE WITNESS:  The taxes are not part of the

8   mortgage and those are $4,000, $4,000 I think is it

9   quarterly?  Usually it's quarterly so what is it 12,000,

10  16?

11       THE COURT:  16,000.  And what about the

12  insurance or is that part of the mortgage?

13       THE WITNESS:  No, the insurance we're paying

14  separately for that and that's billed out on a monthly

15  basis.

16       THE COURT:  Do you know how much that is?

17       THE WITNESS:  I just paid the bill so, I was a

18  little bit late.  I think it might be $1,000 a month, but

19  that includes all the properties because we still have the

20  homeowners--

21       THE COURT:  Oh, it's an umbrella.

22       THE WITNESS:  Yeah, we have homeowners insurance

23  for all our properties.  We're taking care of all the

24  properties including 120 Centre Street.  I'm trying as

25  much as possible, trying as much as possible, it's never a

60

1  friendly foreclosure, but I'm trying as much as possible

2  to negotiate with the bank.  That way I regain as much

3  equity as I can on 120 Centre Street so, so that they

4  don't take 160--

5          THE COURT:  So unless I'm missing something,

6  you're losing money every month on 160 Dedham Street?

7          THE WITNESS:  A little bit, yes.

8          THE COURT:  $2,500 a month by my math without

9  the insurance.

10          THE WITNESS:  Possibly, yes.

11          THE COURT:  All right.

12          THE WITNESS:  I'm trying to keep it afloat so I

13  don't lose the house.

14          THE COURT:  Go ahead, Mr. Denner.

15  BY MR. DENNER:

16  Q    Any other real estate assets that, that we have not

17  identified that you have any constructive interest in?

18  A    We have the house in Rhode Island which I've

19  mentioned which is also underwater and we have, my

20  husband, I, I, I'm, I don't have my name on it but my

21  husband has condo's in Florida and--

22  Q    Condo's in Florida?

23  A    A condo in Florida.

24  Q    A condo in Florida.

25  A    Yes.

61

1  Q    And what does the situation relative to the condo

2  in Florida?

3  A    The situation there is I'm paying the monthly

4  mortgage on that and we are renting it as well and if I'm

5  able to sell it, I, I'll sell it but the people who are

6  there now just, you know, they're renting and, you know.

7  Q    And, and if one were to sell it at a reasonable

8  market price would it, would it present, would it project

9  some, some return fee?

10  A    Not for me because my name is not on it.

11  Q    Or for whoever the owner is?

12  A    For my husband potentially, but my husband also owes

13  money for taxes so, you know, my hope was to--

14  Q    What is the value of the condo down there?

15  A    The value of the condo, I looked into it.  Comparable

16  condos were selling anywhere from $700,000 to $900,000.

17  When I had spoken with a real estate agent, she said the

18  value to sell it would be possibly 800, 850, but, you

19  know.

20  Q    What is, what is the, what are the encumbrances, a

21  mortgage and any other liens?

22  A    The mortgage is a little over 3,000 a month.  The

23  remaining mortgage is under, under $600,000.

24  Q    Okay, so there is some, and how much is owed in

25  taxes?

62

1    A    I'm not sure.  I don't know.

2         THE COURT:  Taxes on that property or taxes

3   elsewhere?

4         MR. DENNER:  Taxes on that property.

5         THE WITNESS:  I don't know how much the taxes

6   are.

7   BY MR. DENNER:

8   Q    When you said taxes were owed, I assumed you meant

9   taxes on the property.

10   A    Oh, no, no, no.

11   Q    No.

12   A    Talking about IRS taxes.

13        THE COURT:  I thought that property was owned by

14   your husband with a partner?

15        THE WITNESS:  Yes.

16        THE COURT:  So, it's worth seven to nine hundred

17   from what you looked at--

18        THE WITNESS:  It's just, yeah, that's how much,

19   yeah.

20        THE COURT:  But then that would be split after,

21   and is the other partner on the mortgage too?

22        THE WITNESS:  No, my husband is the only name.

23   Is he, I, I, I don't know.

24        THE COURT:  You don't know whether he, you don't

25   know whether the partner's on the mortgage or no?

63

1          THE WITNESS:  I thought my husband was the

2    only one on the, on the--

3          THE COURT:  As far as you know, you're the only

4    one paying the mortgage?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay, so the partner's not kicking

7    in every month to pay the $3,000 or--

8          THE WITNESS:  No, no, he stepped down--

9          THE COURT:  --kicking in another--

10          THE WITNESS:  --he stepped down some time ago.

11          THE COURT:  All right.  Okay.

12    BY MR. DENNER:

13    Q    So, so there's some equity in this property?

14    A    Excuse me?

15    Q    You said there's a mortgage of around how much,

16    $600,000?

17    A    It's under, it's about 560,000 I believe.

18    Q    And when you say that your husband owes taxes, are

19    you talking about generally to the state of Massachusetts,

20    the state of Rhode Island, Internal Revenue Service?

21    A    I think it's federal and state.  Federal and state

22    taxes.

23    Q    Is there a lien, a general lien on any of this

24    property?

25    A    There, I, I expect there to be a lien, yes.

64

1   Q    I see.  You've been advised that there will be?

2   A    I know that there were, while my husband has been in

3   custody, they were putting liens on everything.

4   Q    And do you know how much he owes in at least federal

5   taxes?

6   A    According to the, to the notice that came to the

7   house over the last couple of months, they're claiming

8   over a million dollars.

9         THE COURT:  What's the rental income on the

10  condo in Florida?

11        THE WITNESS:  $3,300.

12        THE COURT:  A month?

13        THE WITNESS:  Yes.

14  BY MR. DENNER:

15  Q    In terms of other assets, doctor, I heard some

16  testimony about a bunch of automobiles that you have?

17  A    Yes, they're all, we bought them but they all have

18  payments on them.  We didn't buy them outright.  We didn't

19  buy them cash.

20  Q    Was there, are you automobile collectors?  Were they

21  bought for collection purposes or?

22  A    My, no, my husband likes cars and he likes

23  electronics and that's what he likes.

24  Q    I see.  And you collect and look at the valuable of

25  the cars and collectively look at the encumbrances, liens,

65

1   money owed on all the cars, what does that picture look

2   like?

3   A    I have very little equity in the cars and I sold

4   actually two of them recently.

5   Q    And how many do got left?

6   A    I have one, two, three.  I have three left and I did

7   buy my son, I just bought my son a Jeep cause he's going

8   to start driving really soon.

9   Q    Are you making payments on all of the four cars you

10  just mentioned?

11  A    I am, I'm paying, yes.

12  Q    And do you happen to know what the total of those

13  four cars payments would be a month?

14  A    Well at the time my husband's practice was doing very

15  well.  We had paid in advance for two of the cars so right

16  now I'm not paying for two of the cars cause we've paid

17  well in advance.  They're still, we still have a good

18  amount owed on it, but I'm deferring it until we get back

19  on our feet and the other car is, is free and clear and my

20  son's car will be $400 a month.

21  Q    Are you looking, other than your son's car, are you

22  looking to sell the other cars?

23  A    Potentially, yes.

24  Q    Do you drive one of these cars as your family car?

25  A    Yes, yes.  This is our, yeah cause we are, we are six

1   on the family and so one of the cars is, it's, we buy

2   the cars because we have four to six people so it's a

3   seven seater and so that's the car I'm driving now and

4   there's a five seater Audi that my husband drives.  The

5   last--

6            THE COURT:  Two are paid up till when?  So you

7   paid in--

8            THE WITNESS:  Until for another six months.

9   Six, seven months.

10           THE COURT:  So you paid up a while ago, the,

11   just sort of--

12           THE WITNESS:  We paid in advance when my

13   husband's practice was doing very well.  We were paying in

14   advance, yes.

15   BY MR. DENNER:

16   Q    Will you be seeking to sell these cars at some point

17   as well?

18   A    I'm building up my practice.

19   Q    Do I take that as a no?

20   A    That's, that's, I don't know to be honest cause I

21   don't know.  If I, I will do what I need to do.

22   Q    There was some testimony before about you acquiring

23   the stock in, in your husband's medical company New

24   England Ear Pain from the bankruptcy court?

25   A    Yes.  At the time that my husband filed for

67

1  bankruptcy, the only company that had not gone into

2  bankruptcy was New England Pain, I believe and at the time

3  there were accounts receivable that were present and the

4  trustee had made an agreement through Bill Hanlon that I

5  acquire the shares of New England Pain Associates and pay

6  an additional $19,000 I believe, I don't remember the

7  exact amount, and they would take that money and accounts

8  receivable to pay creditors and so that, that's how I

9  acquired the shares of the company for New England Pain

10  Associates.

11  Q    And are you the president now of New England Pain

12  Associate, Pain Associates?  Are you any officer?  What is

13  your, what is your, your title, if any, at that company?

14  A    To be honest, I don't know.  I know I own shares but

15  I'm not really involved in the company.

16  Q    And you have any act--

17  A    I don't know if I--

18  Q    You have any active involvement in the company at

19  all?

20  A    No.  No.  Not really.  No.

21  Q    Okay.  What other company is left at this point?

22  A    The company's closed down.  When my husband lost his

23  license, his medical license, he tried to hire doctors to

24  run it until he can fight the allegations and get his

25  medical license back, but that didn't work and the company

68

1  I, I lent it a lot of money personally as well but the

2  company didn't do well.  The doctors didn't stay long.  Of

3  course any, any, anybody does not want to be associated

4  with someone who's potentially, there's allegations of

5  medical fraud so the doctors did not stay.  The company

6  was continu, continually losing money and we closed down

7  the offices.

8  Q    In the time period subsequent to you purchasing the

9  stock of the company from the bankruptcy court, and your

10  husband losing his licenses, did you have any active

11  involvement in the company?

12  A    No, no, I don't know about medical practices and

13  running medical practices, so no, no, I, I'm shareholder

14  but I left the running to com, the company to my husband.

15  Q    Apart from the medical aspects of the company from a

16  financial perspective books, money in and money out, did

17  you have any involvement in that?

18  A    No.

19  Q    None whatsoever?

20  A    No, no.

21  Q    And you're absolutely sure about that?

22  A    No, my husband took care of the finances for the

23  company and he ran the medical aspect.  There are, there

24  is obviously money that comes to me.  So.

25  Q    What would that be?

69

1   A    Money to pay expenses, money that comes into my

2   bank account.  I did, I believe I also was receiving a

3   salary.  Do you know?  Yes.

4   Q    That was back in the, the time after you purchased it

5   to--

6   A    Yes.

7   Q    --before the company closed down obviously?

8   A    Yes.  Yeah.

9   Q    You're not still receiving that are you?

10  A    No, there's no company.

11  Q    Do you know how much you received during that time

12  period?

13  A    To be honest, no.  I don't know.

14  Q    Has it come to your attention that at some point that

15  the company or your husband made some payments to, to

16  Cypress?  Yes or no?

17  A    Yes.  Recently, yes.

18  Q    And do you know the circumstances of that?

19  A    Yes, my husband was doing a favor for my brother-in-

20  law.  My brother-in-law has a friend and a colleague in

21  Egypt.

22  Q    May I interrupt, is this the brother-in-law that runs

23  the transcribing, transcription and the billing company

24  in, in Egypt or is this another brother-in-law?

25  A    It's actually a different brother-in-law.

70

1    Q    Okay and what is this brother-in-law's name?

2    A    His name is Maltez Abushadi (ph).

3    Q    And what did your husband do with regard to this

4    brother-in-law?

5    A    My, his brother in law had requested that his friend

6    and colleague who is the head of Cairo University in

7    Egypt, he wanted to buy a villa in Cypress, but it's very

8    hard or really, you can't transfer money out of Egypt so

9    he asked my husband to transfer money to Cypress and his

10   friend and colleague was going to give money to the

11   medical billing office in Cairo in exchange, in, in

12   repayment for the money that was transferred to Cypress.

13   Q    So, so basically the deal was that money was being

14   sent to Cypress that they couldn't get out of Egypt and

15   the billing company was being repaid in Cypress?

16   A    Yes.

17   Q    Do you know if that repayment occurred?

18   A    I assume it did.

19   Q    Yeah, but you don't know?

20   A    I don't know 100%, no.

21   Q    And do you know when this money was sent to Cypress?

22   A    No, I don't.  I think it's been in the last couple of

23   years.  I don't know exactly.  I wasn't aware of it at the

24   time.

25   Q    Now, you had mentioned earlier that the money that

71

1   was being repatriated to this country was generally

2   being used for legal accounting expenses?

3   A    Yes.

4   Q    Would it be fair to say some of that was used for

5   your living expenses as well when your husband was no

6   longer making money?

7   A    Yes.

8   Q    And, and do you anticipate that, that there are going

9   to be future legal accounting and other expenses going

10  forward?

11  A    Yes.

12  Q    And would it be fair to say, what, what is that

13  connection with?

14  A    The defense.  His defense for the legal, the criminal

15  charges that are against him and to regain his medical

16  license.

17  Q    And are there any other civil cases to the best of

18  your knowledge that Mr. Hanlon or other--

19  A    Yes.

20  Q    --Mr. Mark Adams that are still handling for your

21  family?

22  A    Yes, because my husband lost his license and his

23  practice wasn't working he has a couple of lawsuits about

24  these breach of contract for leases for a couple of their

25  locations where he was practicing because he was not able

1  to--

2           THE COURT:  The landlords are suing your

3  husband--

4           THE WITNESS:  Yes.

5           THE COURT:  --saying he breached the lease

6  because he walked away?

7           THE WITNESS:  Exactly, but he didn't have money.

8           THE COURT:  Right, I understand.

9           THE WITNESS:  Yup, but so yes, there's two cases

10  going on now and they're also putting liens on everything,

11  and I know there's a lot of outstanding bills also from

12  New England Pain, and so I would not be surprised if

13  there's additional cases that do come up.

14  BY MR. DENNER:

15  Q    And is it also accurate to say that there were

16  certain of his employees that at some point brought suit

17  against him?

18  A    Yes.

19  Q    And were these the same employees to the best of your

20  understanding who have come forward essentially accusing

21  him of wrongdoing?

22  A    Yes, my understand--

23  Q    And when is that litigation over?

24  A    That litigation, what happened, not this last summer

25  of 2013, but I believe in the summer of 2012, there was a

1  wage dispute from my understanding and from what I heard

2  from my husband, between my husband and physician

3  assistants who worked for him and they had been, their

4  contract had been a salaried employee.  My husband's

5  practice was very, very busy and so they were very long

6  hours and my understanding was they were asking to get

7  paid overtime and my husband had said the contract was to

8  be salaried, I believe, and so there was a wage dispute

9  and I believe that's, that was what was going on, and I

10  know that that physician's assistant had to, decided to

11  get together and do a trick on my husband and leave him

12  all at once so that he, he has problems with the practice

13  and that's what happened, I believe in the summer of 2012.

14  Q    And do you know if that litigation continues?

15  A    I'm not sure.  I think with my husband being

16  incarcerated it's not, I don't know.

17  Q    So at present he is, he is paying ongoing expenses to

18  myself and the lawyers that work with me, yes?

19  A    Yes.

20         THE COURT:  I get that, Mr. Denner.  He's paying

21  for his criminal defense?  I know that.  He's paying to

22  defend, or he or his wife is paying to defend the

23  foreclosure proceedings.  They're paying to defend the

24  employment litigation rising out of the employees that

25  have sued.  He's paying for the litigation involving the

74

1   property that is breached leases.  There may be other

2   litigation that arises out of the company going bust from

3   various creditors or others.  He's paying Mr. Hanlon.  How

4   much he's paying each of them and how quick they're going.

5   She doesn't know because the pace of those, the civil

6   litigation may have slowed given the criminal case or

7   given his detention and maybe this other relat, this

8   lienholder litigation and the like.

9   BY MR. DENNER:

10  Q    Okay, what observations have you made about your,

11  strike that.

12       Over the past three years, have you made any

13  observations about what, if any, medical conditions your

14  husband has suffered from?  Yes or no?

15  A    Yes, my husband has had very longstanding medical

16  issues.  He was diagnosed some time ago with sarcoidosis

17  and that's an autoimmune disease where it affects the lung

18  and he's been on steroids for that.  He was also--

19  Q    What is the effect, what is the symptomatology of

20  sarcoidosis?

21  A    Do you know for a very long time he had fever, he had

22  chills, general malaise, body aches.  He had a cough and

23  nobody could figure out why and he'd come home after work

24  and he'd lie down in bed, and it took them a very long

25  time and wasn't decid, it wasn't determined what it was

75

1  until a biopsy was done of the lung that he has

2  sarcoidosis.  It creates difficulty breathing.  Again,

3  before he was treated, just fever, chills, just felt bad,

4  looked bad and would go to sleep.

5  Q    Do the constant steroid and medication have any

6  effect on him?

7  A    Yeah, the steroids actually makes his sarcoidosis

8  much better, it makes it controllable, but steroids have a

9  lot of side effects as well and he has steroid induced

10  diabetes.  Being on steroids also decreases your immune

11  response so you're more prone to illness and sickness.  I

12  think it has issue also in terms of bone density, but

13  whenever he, you know, the doses of the steroids were

14  tapered off, his sarcoidosis would be reactivated so he's

15  been on steroids for many, many, many years.

16  Q    Any other illnesses?

17  A    Yeah, he has atrial fibrillation and I believe he's

18  taking medications because I think he has heart related

19  things as well.  He has, he has many things.  He's had and

20  I'm not sure if it's independent or related to the

21  steroids that he takes.  He has reflux and he has many GI

22  issues as well.  The most recent--

23  Q    You say GI, are you now, you're talking about stomach

24  intestinal issues.  The most recent thing is his PSA has

25  been rising and he's been seeing physician probably for

1  about a year and half.  He had biopsies done, I believe,

2  if I'm not mistaken about a year ago and it did not show

3  anything--

4  Q    When you say PSA of course you're referring to

5  prostate problems.

6  A    Prostate, prostate problem.

7  Q    Prostate specific antigen and prostate problems, yes?

8  A    Yes, and then he had another biopsy I believe in the

9  fall.  It was also negative even though his PSA numbers

10 continue rising and the conclusion, what the doctor had

11 said is we'd, we'd keep an eye on him and keep monitoring.

12 My husband's fear is his father had prostate cancer, so

13 he, he, he expects to have it as well but at this point to

14 be undiagnosed.

15 Q    Have there been any observations you've made of a

16 change in his condition since he's been incarcerated?

17 A    Yeah, he's lost a lot of weight.  He's become very

18 weak.  When I talk to him on the phone, he initially had

19 been in a cell where he was on the top bunk and he fell

20 several times trying to get up on top, and on the top

21 bunk, and he also, he is eating kosher food now because we

22 don't eat any pork or any pork byproducts.  I don't know

23 what's happening but his GI systems, it's very, very upset

24 and it seems to be getting worse.  For the last two or

25 three weeks, he's been telling me on the phone that he's

1  had pain and he's had pelvic pain and it's in the front

2  and the back, and recently he's been telling me he's also

3  getting chest pain and that he's very weak.  I saw him two

4  weeks ago.  I visited him on Sunday and within a matter of

5  a week there was a dramatic change, how he looked and I

6  called Mr. Denner, I said there's something wrong because

7  that was a very, that was a very - thank you so much.

8  That was a very fast deterioration and I think there's

9  something underlying it.  I don't know what's going on,

10  but he's not healthy, he's weak.  His voice was raspy.  He

11  said he, he's looking better to me today actually, and he

12  looked to me this Sunday which says something.  He says

13  he's drinking more water and initially he wasn't taking

14  his medication on a regular basis, but now he tells me he

15  goes morning and night, twice a day and they give him his

16  medications, but there's something wrong and I don't know

17  what it is.  I'm not sure what the cause is, but that's a

18  very fast change.

19  Q    Has he, has he indicated any difficulty in his

20  breathing to you?

21  A    Yes, he has difficulty breathing.  He says he has air

22  in his urine so he's worried there's something going on.

23  They told me maybe a perforation.  I, I don't know, I'm

24  not a physician.  I'm a periodontist.

25  Q    Did he indicate to you anything about the nature of

1  his stool recently?

2  A    He has a very, he has a lot of GI upset.

3  Q    Do you have conversation about blood in the stool?

4  Has that concerned you?

5  A    Yes.  Something's wrong.  There's something wrong.

6  There's something wrong.  There's some underlying systemic

7  problem.  I don't know what it is but again, he's looking

8  better to me now than he did a couple of weeks ago, and I

9  think it's cause he's trying to drink more water.  I

10  don't, I don't know what it is.  I don't know but there's

11  something wrong.

12  Q    Did he have physicians before he was incar, did he

13  have physicians--

14  A    The physician, yes.

15  Q    --at a local hospital that was maintaining him and

16  dealing with all these different issues?

17  A    He had been seeing his prostate doctor.  He's been on

18  the same medications for many, many, many years and

19  whatever is happening is something that's very recent.  I

20  know that in, in the prison, they did take him, I think a

21  couple of weeks ago cause he had lost so much weight, and

22  they did an exam and they said he was fine, but I can see

23  from seeing him that he's not fine.  There's something

24  wrong.

25  Q    Has there been any loss of cognitive function that

1  you have perceived in him?

2  A    Yes, he's very lethargic.  He tells me, before he was

3  calling me in the beginning he would call me at least

4  three times a day.  Now he calls me once a day.  He tells

5  me that he's sleeping in his, his own, he's sleeping in

6  the bed in his room except when he comes and talks to me

7  and he eats in his room.  Sometimes he doesn't call me and

8  I ask him how come, cause I get worried.  He doesn't call

9  me.  He says he was unable to get out of bed.  I know he

10  said that when he goes and takes a shower he feels better

11  so he goes and he sits in the shower because that makes

12  him feel better.

13          MR. DENNER:  No further questions, Your Honor.

14          THE COURT:  All right.  Cross examination?

15                  CROSS EXAMINATION

16  BY MS. WEST:

17  Q    Dr. Elkadry, I just want to confirm a couple of

18  things that--

19  A    Sure.

20  Q    --are in your letter.

21  A    Sure.

22  Q    On page two you have, you mentioned that it's your

23  husband's brother--

24  A    That's--

25  Q    --Ashraf Muhammed Fathalla Mashali who's the manager

80

1  and director of the billing office, is that right?

2  A    Yes.

3  Q    Also on--

4        THE COURT: I'm sorry.  I couldn't hear what you

5  said doctor.

6        THE WITNESS:  I'm sorry.

7        THE COURT:  That's all right.

8        THE WITNESS:  Yes, yes, Ashraf Fathalla Muhammed

9  Mashali's my husband's brother.

10  BY MS. WEST:

11  Q    Okay, and then on page five of the affidavit, you

12  mention another Ashraf and it's indicating that it's your

13  brother.  Do you have a brother named Ashraf?

14  A    No, the only Ashraf I was referring to was my

15  brother, Fathalla's--

16  Q    Your brother-in-law?

17  A    Yeah, my brother-in-law, yes.

18  Q    Okay, so here it says, "My husband and I provided

19  powers of attorney for my brother Ashraf".

20  A    I meant brother-in-law.

21  Q    Okay, thank you.

22  A    My, my, my brother passed away when he was, I don't

23  have a brother.

24  Q    All right.  Also, on page six, you said that the

25  funds sent previously, and now we're talking about the

81

1  funds that were sent to go to Egypt--

2  A    Yes.

3  Q    --where you used on the medical billing office in

4  Cairo and have been spent on expenses and employees.

5  A    Yes.

6  Q    So should we understand that all the money that was

7  sent there was fully spent on the business?

8  A    Yes.

9  Q    Okay, so when we see wires to your brother-in-law--

10 A    Yes.

11 Q    --and wires to Northern Rhode Island, that's money

12 that's going to the billing business?

13 A    Yes, that's my understanding.

14 Q    Okay.

15 A    Except for the $400,000 that went for the sale of the

16 land--

17 Q    Right.

18 A    --for the purchase of the land, yes.

19 Q    Okay, thank you.  Now there's been an argument made

20 in, in the papers, and I won't suspect you'll know this

21 but I'll tell you, that indicates that 1.3 million was

22 sent over to an Egypt, Egyptian company to pay for the

23 ongoing transcription and billing for the business--

24 A    Yes, that's what the company does.

25 Q    --for less money and using better educated quality

82

1  individuals.  Now I don't see this in your letter, but

2  can you tell us whether you know that the money was sent

3  for transcription and billing?

4  A    Yes.  The money that goes there went for the medical

5  billing.

6  Q    Um-hmmm.

7  A    It does transcription.  The employees there are

8  college educated people.

9  Q    Um-hmmm.

10  A    I think recently, when it became busy, there was even

11  some doctors who were working there, yes.

12  Q    What's a transcription?

13  A    Transcription is when a doctor, it's almost like

14  dictating--

15  Q    Um-hmmm.

16  A    --and they write their notes and he, they write it.

17  That's what my understanding of what transcription is.

18  Q    And that's your understanding of what's happening in

19  Cairo?

20  A    Mostly medical billing, yes.

21  Q    All right, so when you, so as regarding

22  transcription, then it's your understanding that there's

23  dictation that's done here in the United States at the

24  NEBA clinics and it's that dictation that is being

25  translated over there, transcribed over there?

83

1   A    It's medical billing.  I'm a periodontist so

2   transcription to me when I hear transcription and this is

3   what they were doing means like dictation so based on my

4   knowledge, yes.

5   Q    All right, and is it also your understanding that

6   they are paid a lesser salary than somebody doing billing

7   in the United States?

8   A    I don't know what they're paid.  I'm not I don't know

9   what their salaries are,--

10  Q    Okay.

11  A    --but the aim of having the medical billing office

12  there was two folds.  One to de, decrease costs because

13  there's no dental, there's no medical there, as far, you

14  know, as far as I know, and also to have the, the burden

15  of running that prac, the medical billing transferred to

16  someone else, so he's not directly dealing with it.  So to

17  remove the burden from him here as well so it's, it's

18  jointly, two things, that's why.

19  Q    When you say remove the burden from here, so that

20  there's no billing here?

21  A    No, there's billing here.  He continues having people

22  who bill here but to, there's a lot, high load of billing

23  that happens so in terms of managing the billing staff.

24  Q    Okay, so he continues to have billing here.

25  A    Yes.

84

1   Q    He has a full billing department here does he not?

2   A    Yes, he does.

3   Q    All right, and you know--

4   A    I don't know how many people are--

5   Q    Okay.  Are you familiar with the name Diane Pimental?

6   A    Yes, she's the main billing person, yes.

7   Q    All right, and she's been with the company for some

8   time, has she not?

9   A    She's probably been with the company from the

10  beginning I think.  I'm not sure.

11  Q    And she also has a staff, right?

12  A    I don't know how big, but I assume there is a staff

13  for medical billing.  I'm not sure how big it is though.

14  Q    All right.  I'm going to show you some documents.

15  They're W-2s.  One of them is for Diane Pimental.  The

16  other two are for other individuals I'll represent to you

17  were in the billing department in 2012.

18  A    Um-hmmm.

19  Q    So you see the, I think the first one you should have

20  is Chrystal Rizzo?

21  A    Um-hmmm.

22  Q    Yup, and that's looks, this is for 2012, looks like

23  her salary is $19,996?

24  A    Um-hmmm.

25  Q    The second one you have is Nancy Gorton?

85

1    A    Um-hmmm.

2    Q    That's for about 29,000 plus?

3    A    Um-hmmm.

4    Q    And the third is Diane Pimental, and you see that's

5    about 45,000?

6    A    Um-hmmm.  I do see them.

7    Q    Okay, so these are the three people who were in the

8    billing department here in the United States in 2012.  If

9    you add that up it's, it's about 95,000, correct?

10   A    Um-hmmm.

11   Q    Okay.  You say that you're not necessarily that

12   familiar with what has gone on with the business?

13   A    In terms of the TCLs, yes.

14   Q    Yes, okay, but you understand that there's a full

15   billing department and you understand - do you understand

16   where the billing department is located?

17          MR. DENNER:  Objection, Your Honor.  The

18   characterization is a whole billing department is

19   mischaracterizes the situation.  We don't know if they're

20   full time.  We don't know, there's three people, that

21   hardly seems like a whole billing department to me for the

22   kind of work that they were doing in 2011 or 12 of if they

23   have 15 or 20 people that they needed.  It does not sound

24   like a whole billing department to me.

25          THE COURT:  It's cross examination.  So I'm

1    going to overrule the objection.  She can answer the

2    question and explain her answer if she wishes.

3    BY MS. WEST:

4    Q    Do you know where the billing department was?

5    A    I'm going to--

6              MR. DENNER:  Also, Your Honor, just, just for

7    the record to clarify things, there's a confusion

8    occurring here between medical records and billing and

9    these, these are medical records people, at least two of

10   them are, not billing people.

11             THE COURT:  I know that.

12             MR. DENNER:  I'll do, I'll do it on redirect if

13   you'd like but--

14   A    I believe they're initially located out of Rhode

15   Island and then I think afterwards they may have moved to

16   Holbrook.

17   BY MS. WEST:

18   Q    Okay, and Holbrook is actually a functioning clinic,

19   correct?

20   A    Yes, all the locations are functioning clinics.

21   Q    All right, so the billing department was already put

22   into a place that you already had, your husband already

23   had to pay for electricity and overhead.  It was already

24   put into an existing office, correct?

25   A    Yes, before it had been a separate medical billing

87

1    office when my husband's practice was much bigger, but

2    when it became the chronic pain management, I believe it

3    became the, because there isn't obviously a lot of staff

4    in the same location as where the practice was, yes.

5    Q    And so in order to run that billing department he

6    didn't have to increase his overhead by any means?  He

7    already was paying for it, right?

8    A    No, but I think one of the things that's being missed

9    is most of the billing, these are the ones who had the

10   most, I know, I don't, I don't the other two but Diane

11   Pimental was the main billing person, but most of the work

12   was from my understanding being done in Egypt so they were

13   taking the full load.

14   Q    Okay, so I just put before you a spreadsheet--

15

16        MS. WEST:  For Your Honor, this is one of the

17   attachments in the government's opposition.

18   BY MS. WEST:

19   Q    --and this is the spreadsheet of the monies that

20   we've been talking about today in the last detention

21   hearing--

22   A    Um-hmmm.

23   Q    --regarding the 1.7 going over to Egypt, and what I

24   want to, want you to focus on is the year of 2012.  So I'm

25   not going to have you add this up but if you can go down

88

1    the list, you'll see that 2012 sort of starts on the

2    first page in the middle?

3    A    Um-hmmm.

4    Q    It starts in January and goes over to the second

5    page.

6    A    Um-hmmm.

7    Q    So if you'll, you can look at that and if you can

8    take this represent, representation for me that is equals

9    over $500,000--

10   A    Um-hmmm.

11   Q    --going to Ashraf Muhammed Fathalla?

12   A    Yes, that's my husband's--

13   Q    That's your brother-in-law, right?

14   A    That's my brother-in-law, yes.

15   Q    And he's the run who's, the one who's running the,

16   the department over there, correct?

17   A    Yes.

18   Q    So this looks like it's well over $500,000 going into

19   2012, correct?

20   A    Yes.

21   Q    And for 2012 here in the United States, he had three

22   people in his billing department and he was spending

23   $95,000, right?

24   A    It appears to be that way, yes.

25   Q    Okay, so you would agree with me that to do the

1  billing out of Cairo it was not necessarily cheaper?

2  A    I, I'm going, can I, I'm going to disagree with that.

3  Q    Yeah, please do.

4  A    I'm sorry--

5  Q    Go ahead.

6  A    Three people can't handle the load of the number of

7  patients and, and the labs and everything that was done.

8  Q    Right.

9  A    So most of the work from my understanding was done in

10  Cairo and these were supervising and they were in constant

11  communication.  So I would say the bulk of the actual

12  billing was not done here.  It was done in Cairo.

13  Q    And you testified earlier that in post the discharge,

14  which would have been the summer of 2011 and through 2012,

15  your husband had a lab, right?

16  A    Yes.

17  Q    And that was a urinalysis lab, correct?

18  A    I think I don't know the full range of what he did,

19  but from my understanding it was to analyze urine.  I

20  don't know if he did any other things with it or not.

21  Q    Okay, and that was actually located in one of his

22  clinics?

23  A    Yes, they were located because it's part of the

24  company, yes.

25  Q    Okay, and so you believe because he had that lab, it

1  created more work--

2  A    Definitely.

3  Q    --and thus, that's why in 2012 we see a lot more

4  money going to Egypt?

5  A    Yes, yeah, yes.

6  Q    Okay, now I under--

7  A    Definitely.

8  Q    Are you familiar with the way billing works?

9  A    I know my dental billing.  I am not familiar with

10  medical billing, no.  All I know is that the more work

11  that's being done, the more procedures that are being

12  done, the more there is to bill.

13  Q    Correct, but you're aware that when you bill for

14  patients, you bill everything per patient, correct?

15  A    I don't know to, I don't know.

16  Q    All right, are you aware that during 2012 the billing

17  department in Holbrook was billing up to 100 patients a

18  day?

19  A    I don't know.

20  Q    You spoke we'll just keep that there for now--

21  A    Sure.

22  Q    You spoke earlier about Digital Ear.

23  A    Yes.

24  Q    You remember talking about that?

25  A    Yes.

91

1   Q    And that company?

2   A    Yes.

3   Q    And you were aw, indicated in your affidavit that the

4   properties that were built or rather the land that was

5   bought in Egypt was bought as an investment?

6   A    Yes, it was.

7   Q    And one was actually going to be a home of Digital

8   Ear?

9   A    They, they were both going to be homes that were

10  going to be showcasing.  One is going to be commercial and

11  one was going to be residential.

12  Q    Okay, and you yourself has some experience with

13  Digital Ear because they did your work here in Dover?

14  A    They did some, yes, they had started the work, yes,

15  but they didn't finish it, yes.

16  Q    All right, but the plan in Dover had been that your

17  own property would also be a showcase?

18  A    Yes, in a sense, yes.

19  Q    Well in a sens, yes or no?

20  A    Yes.

21  Q    Okay, and of course this would be a showcase while

22  you're living in it?

23  A    Yes, but there isn't the same, it's not like a store.

24  The number of people who are able to actually do it are

25  very limited, so, so it would not be, it's not like a

1  retail store.  It would--

2  Q    Right, so--

3  A    --be if someone wanted to look.  Um-hmmm.

4  Q    Sorry.  You mean it's the number of people who would

5  be trouncing through your house would be less than the

6  people you put through--

7  A    No, it was going to be mostly the carriage house and

8  if they had wanted to look at our house as well to see

9  what was possible.

10  Q    Okay so, but, but my focus is this was all going to

11  go on during the period of time you were living there?

12  A    Yes.

13  Q    So can you agree with me that there's a possibility

14  you could have two residential houses or at least one in

15  Cairo that would be up and running like a normal house and

16  also have the same practice where people could just come

17  in, take a look, but it could still be used as a

18  residential house?

19  A    Everything is possible.

20  Q    All right, well it's more than possible because you

21  were going to do it here in the United States?

22  A    Yes.

23          THE COURT:  How much would it cost to do a house

24  with what's it called, Digital Ear?

25          THE WITNESS:  Well it depends what you actually

93

1    put into it.  Do you know?  I'm not exactly--

2           THE COURT:  How much if you were going to do

3    everything that you were going to do in the house in

4    Cairo?

5           THE WITNESS:  I, my, I'll tell you.  My husband

6    handles all that but I don't know how much it would be,

7    but I know it's, it's high end and it is expensive.

8           THE COURT:  Okay, go ahead.

9    BY MS. WEST:

10   Q    The properties in Cairo, you bought those in May

11   2012?

12   A    The land, yes.

13   Q    The land?  Yeah, okay.

14   A    Yes.

15   Q    When did you sell them?

16   A    We started get, there's a difference between when we

17   started getting money back and when we actually sold them.

18   I think we sold them, we started getting money back in,

19   right after my husband lost his license, so in the fall of

20   2013.  The actual sales, there was a lot of papers that we

21   were signing and they were in Arabic but, the sales

22   probably happened around December, January.  I'm not

23   exactly sure.  So it was after we started receiving land,

24   the money for it.

25   Q    All right, and on page five you write, "We paid to

94

1   purchase the land and they"--

2            THE COURT:  Excuse me.

3            THE WITNESS:  God bless you.

4   BY MS. WEST:

5   Q    --"the buyers would assume the remaining payments".

6   Is that right?

7   A    Yes, because this was a 35% deposit towards the land.

8   It was not payment in full for the land.

9   Q    All right, so let's start in the beginning.  When you

10  bought the, the properties, how much did you actually

11  spend?

12  A    Four hundred, a little bit under 400,000.  Each one

13  was a little bit under $200,000.

14  Q    And where did that money go?

15  A    To the land.  It went to the government.

16  Q    To the government?

17  A    Yeah, because the government is the one who is

18  selling the land.

19  Q    All right, so your, you had already paid for it in

20  full?

21  A    No, that was 35%.

22  Q    The 400,000 was 35% of the land?

23  A    Yes.

24  Q    So, okay, so in addition to the 400,000 then there

25  were continual payments for it?

1   A      There was going to be payments, yes.

2   Q      And that's what the buyers took over?

3   A      The buyer's, what ended up happening was the lands,

4   35% was down payment towards the lands.  There were two

5   pieces of land.  At the time it was 35%.  After that the

6   govern, and it's the government that who signed the land

7   because they want outside investors from America to invest

8   in Egypt.  After that, what ended up happening is they

9   said you don't have to put 35% of, deposit, you have to

10  put 25% only.  So the people we sold the land to said

11  we'll give you 25% and you need to get the last remaining

12  10% from the government.

13  Q      Okay.

14  A      That's, that's what happened and they were going to,

15  we signed the land.

16          THE COURT:  Well wait, I'm confused.  You bought

17  the property?

18          THE WITNESS:  We bought, we put a down--

19          THE COURT:  You paid 35% down?

20          THE WITNESS:  Exactly, yes.

21          THE COURT:  Later, but before you sold it, the

22  government said actually you only need to put 25% down--

23          THE WITNESS:  Yes.

24          THE COURT:  --but didn't return the 10%?

25          THE WITNESS:  No, it was an option for the new

1  buyers to only put 25%.  So unfortunately, the people

2  that we sold the land to said, we'll pay you 25%.  You

3  need to get your remaining 10% from the government because

4  now they changed the rules.

5           THE COURT:  In the course of owning the property

6  did you ever make any, you or husband make any payments on

7  the property to the government in Egypt?

8           THE WITNESS:  No, we had only put that money

9  down.

10          THE COURT:  So nev, never made any further

11 payments toward the other 65%?

12          THE WITNESS:  No, because we were having

13 financial difficulties.

14          THE COURT:  All right.

15          THE WITNESS:  So we had only put the $35,000--

16          THE COURT:  The 25%--

17          THE WITNESS:  35% down initially i s what we

18 did--

19          THE COURT:  So then you sold it to the other

20 buyers.  They took over the obligation to make the future

21 payments?

22          THE WITNESS:  Yes.

23          THE COURT:  They paid you or your husband--

24          THE WITNESS:  25%.

25          THE COURT:  --the 25%?

1           THE WITNESS:  Yes.

2           THE COURT:  And that money's already been--

3           THE WITNESS:  Yes.

4           THE COURT:  --taken back to the United States?

5           THE WITNESS:  Yes.

6           THE COURT:  The 10% on each one--

7           THE WITNESS:  They said you have to get it from

8    the government.

9           THE COURT:  --that you have to get from the

10   government.

11          THE WITNESS:  And that was, that was why I went

12   to Egypt in January and that's why my husband went to

13   Egypt as well.

14          THE COURT:  And when you went to Egypt in

15   January did you get the 10% on your lot?

16          THE WITNESS:  I had a release.  I had a power of

17   attorney for my husband.  I had a release for myself and I

18   signed for them to release it, but they only ended up

19   starting to release my money.  They didn't release my

20   husband's money.

21          THE COURT:  Did they give you as to the lot,

22   your money on your lot, your money, did they give you all

23   of it back?

24          THE WITNESS:  They did--

25          THE COURT:  Not that it comes to the United

1    States.  Did they give it to you in Egypt?

2              THE WITNESS:  They, they didn't when I was

3    there.  I had signed papers to allow them to release it

4    and yes, they did release it.

5              THE COURT:  And is it--

6              THE WITNESS:  And I signed for my husband as

7    well.

8              THE COURT:  All right, and as to yours, did that

9    money is it still in Egypt or has it come back to the

10   United States?

11             THE WITNESS:  It's come back.

12             THE COURT:  So all, your 10%, deal's closed.

13   You've gotten all your money back into the United States?

14             THE WITNESS:  Yes.

15             THE COURT:  As to your husband's, that 10% is

16   still in Egypt?

17             THE WITNESS:  No, but that was also released

18   after as well.  Most of that has come back.

19             THE COURT:  Most of that, so they've released,

20   the government and it's come back?

21             THE WITNESS:  They've released both.  At this

22   point they've released both, yes.

23             THE COURT:  I see.  All right, and it's the 20

24   or 30,000 you referred to before--

25             THE WITNESS:  Yes.

1          THE COURT:  --is what's his money that's left

2   still there?

3          THE WITNESS:  Yes.  Yeah, yes.

4          THE COURT:  I see.

5          THE WITNESS:  Part of it is I, I had opened a

6   bank account while I was there and they were putting his

7   share and my share in one bank account.

8          THE COURT:  I see.

9          THE WITNESS:  In, in, in my name.

10          THE COURT:  All right.

11          THE WITNESS:  And so that was part of the

12   confusion.

13          THE COURT:  Go ahead, Ms. West.

14   BY MS. WEST:

15   Q    Thank you, so the 25% that was coming back to you,

16   that's the Western Union money we see coming back, right?

17   A    Yes.

18   Q    And when did that start coming back?

19   A    It started in, in the fall of 2013.

20   Q    And at some point, earlier you said that there was an

21   issue that you couldn't receive it.  When did that happen?

22   A    When the people we sold the land to said you have to

23   get your 10%.  Oh, do you mean about Western Union or--

24   Q    No, I mean about Western Union.

25   A    Yeah, that happened, mine happened about I think two

100

1   or three weeks ago and I think, and my husbands

2   happened before he, he was going to travel.

3   Q    Okay so from last fall until--

4   A    From I think, yeah.  We've been receiving money from

5   last fall 2013.

6   Q    All the way up to two or three weeks ago?

7   A    Yes, I think so.  The time goes by very quickly.  It

8   might have been a month.

9   Q    Okay.

10  A    Might have been--

11  Q    And attached to the paperwork we have, we have a

12  number of receipts from Western Union.

13  A    Yes.

14  Q    You provided those receipts?

15  A    I provided what I had, yes.

16  Q    Okay, so those aren't all the receipts?

17  A    No, they're not.  I wasn't able to get them.

18  Initially they were sending me the actual receipts.

19  Q    Um-hmmm.

20  A    My brother-in-law was sending me the actual receipts

21  and then afterwards he only sent me them, the

22  authorization number in emails.

23  Q    So you still in front of you have the paperwork--

24  A    Yes.

25  Q    --with the wire and I want you to turn to the second

1  page.  You had earlier spoken about wires to Cypress

2  and you mentioned that this was a loan to your--

3  A    It wasn't a loan, but, sorry, it wasn't, it wasn't a

4  loan.

5  Q    Go ahead.

6  A    My husband was doing a favor for my brother-in-law's

7  colleague.  My brother-in-law wanted to buy a villa in

8  Cypress and--

9       THE COURT:  Your brother-in-law or the

10  colleague?

11       THE WITNESS:  The colleague, the colleague.  So

12  through my brother-in-law.  Not, not Ashraf, my other

13  brother-in-law and so he can't transfer money to Cypress

14  from Egypt.  So he asked my husband to transfer money here

15  to Cypress so he can buy the villa, and he was going to

16  repay my husband through the medical billing office in

17  Egypt.

18  BY MS. WEST:

19  Q    Okay, all right, so what we see on this is March

20  through May, about $170,000, right?  That's the money?

21  A    Yes.

22  Q    Yes, and you understand that that money was to be

23  repaid through the billing company in Cairo?

24  A    I know that the money that was paid in Cypress was

25  repaid by the, my brother-in-law's colleague and to the

102

1  medical billing office in Egypt, yes.

2  Q    Okay, so that 170 ends up in the--

3  A    I don't know how much it was that was sent to

4  Cypress.

5  Q    Okay, whatever that amount was it ends up in Cairo?

6  A    It was going to be repaid, yes, to the Cairo office,

7  yes.

8  Q    All right.  Now--

9        THE COURT:  I'm sorry.  Before we move on, one

10  question about that.  Is Hassam Mamoud (ph) is that a

11  different brother-in-law or is that--

12        THE WITNESS:  No, I think that's the person that

13  must be--

14        THE COURT:  That's the person who's buying--

15        THE WITNESS:  Yeah.

16        THE COURT:  --the property in Cypress who's the

17  friend?

18        THE WITNESS:  I think so, yeah.

19        THE COURT:  Okay.

20        THE WITNESS:  Yeah, cause #Ashaf Muhammed is--

21        THE COURT:  Your brother-in-law.

22        THE WITNESS:  --my brother-in-law and the other,

23  my other brother-in-law is Mustafa, is Maltez Abushadi.

24        THE COURT:  Right.

25        THE WITNESS:  So that name, that must be the

103

1  person who, who requested the money to be transferred

2  to Cypress.

3          THE COURT:  Okay, thank you.  Go ahead.

4          MS. WEST:  Thank you.

5  BY MS. WEST:

6  Q    The reason you've indicated that your husband flew so

7  abruptly was because he had to make sure he got there when

8  the government offices were open, right?

9  A    Yes.

10 Q    And he bought his ticket on Friday, February 7th,

11 correct?

12 A    I think so, yes.

13 Q    And the flight was for Saturday, February 8th, right?

14 A    Yes.

15 Q    And you had done the same thing three weeks earlier?

16 A    Yup, yeah.

17 Q    Yup, you bought your ticket on Friday, January 16th,

18 correct?

19 A    I think I traveled on Friday.

20 Q    Okay.

21 A    I had bought it I think, I traveled Friday night so

22 the ticket was purchased I think Thursday.

23 Q    All right, and then you traveled the next day and you

24 came back only a few days later, right?

25 A    I came back Monday cause I had work on Tuesday.

104

1   Q    All right, and Monday was January 20th, right?

2   A    I, yes, I guess.  I haven't looked at the dates.

3   Q    In your affidavit, you talk about your husband's

4   employment and on page two, it's a top paragraph--

5   A    Um-hmmm.

6   Q    You say that he worked at Woonsocket Rhode Island

7   Hospital.  He worked as an anesthesiologist?

8   A    Yes.

9   Q    Okay, and they offered him a contract, and it appears

10  that that led to him having a number of contracts with

11  different hospitals?

12  A    Yes.

13  Q    And so--

14  A    It's actually, I, made a mistake there.  It's

15  Landmark Medical Center.

16  Q    All right.

17  A    Yeah.

18  Q    All right, and those contracts with all these

19  hospitals, this is all prior to bankruptcy, correct?

20  A    Yes.  Yes.

21  Q    So this is all prior--

22  A    Yes.

23  Q    --December 2008?

24  A    Yes.

25  Q    However, I'm starting in at least 2009, he started

1   his own pain clinics, correct?

2   A    The pain clinics had actually started before

3   bankruptcy.

4   Q    Okay, when did they start?

5   A    I'm not exactly sure when they opened but it was pre-

6   bankruptcy and what he did is he hired physicians who did

7   chronic pain management and had satellite offices in each

8   location where he had a contract with the hospitals.  He

9   opened up Satellite chronic pain management to see

10  patients with chronic pain there.

11  Q    All right.

12  A    So that's how the off, that's why the offices are all

13  located in different places because they corresponded to

14  his locations where he had anesthesia contracts.

15  Q    So he has been working at New England Pain Institute

16  or Associations for a clinic even prior to the bankruptcy?

17  A    Yes.

18  Q    And all the way up until last year?

19  A    Yes, yes.

20  Q    I'm going to show you what's Exhibit 3 in the

21  original hearing.  This is a, it says Experience

22  Certificate on top.  Have you seen this letter before?

23  A    This is the first time I'm seeing it but I heard it

24  being referred.  Is this the one, I heard it referred

25  to in the last hearing--

106

1  Q    Okay.

2  A    --but I was not aware of the letter here.

3  Q    Who is Mustafa Abushadi?

4  A    It's my husband's nephew.

5  Q    And when did he come to the United States?

6  A    He came many, many years ago.  I think, I'm not sure

7  exact date, but I would say easily five or six years ago.

8  Q    What is Medical Care Specialists?

9  A    I'm not sure.

10  Q    You've never heard of that before?

11  A    I'm not familiar with the name, no.

12  Q    And you say on page six that this letter was used for

13  proof of employment?

14  A    Yes.

15  Q    Was it written for the, for that sole particular

16  purpose?

17  A    Again, I was not familiar with this letter before so

18  this is from my understanding that he was going to use it

19  for the retirement in terms of to prove that he was a

20  doctor and he was gainfully employed as well as do you

21  know, and again, I don't know about this letter, but I do

22  know that my husband when we had talked about you know,

23  what we were going to do and what options we have, he

24  cannot work as a doctor because he does not have his

25  medical license but some of the ideas he had in the past

1   when he had gone in, you know, after he had gone into

2   bankruptcy, was to open an online consultation service,

3   things like that.  So I can assume that this may be

4   something to help him with that--

5   Q    Okay.

6   A    --but it was going to be at a, based out of here in

7   America.  I'm not sure what this letter was for.

8   Q    All right, so, but you had some understanding of it.

9   Where are you getting your understanding?

10  A    From what my husband told me.

11  Q    Go to the second page, the last paragraph, for yours

12  truly.  "I highly recommend Dr. Mashali without

13  reservation for consultant position and an anesthesia

14  critical care medicine and interventional pain management.

15  For any questions, please do not hesitate to call me on my

16  mobile"--

17  A    Um-hmmm.

18  Q    --and then it gives a number.  Do you recognize that

19  number?

20  A    That's Mustafa Abushadi's, Shadi's mobile number,

21  telephone number.

22  Q    Okay.  So if this letter was just for proof of

23  employment, why does this last paragraph read as if it's a

24  letter of recommendation for a job.

25  A    Again, I can only assume--

1          MR. DENNER:  Objection, objection, Your

2    Honor.  She didn't write the letter.  She didn't solicit

3    the letter.  She is not in either what he discussed with

4    her and maybe perhaps was appropriate for argument, but I

5    don't think she has an understanding--

6          MS. WEST:  I'll withdraw, Your Honor.

7          THE COURT:  That's fine.

8          MS. WEST:  Thank you.

9    BY MS. WEST:

10   Q    The beginning of the letter indicates that from

11   December 2004 until the current he's looking at medical,

12   he worked at Medical Care Specialists.  Now, from your

13   understanding of your husband's employment, is that true

14   or not?

15   A    I'm not familiar with the name.

16   Q    Okay, but my question is, is that true or not?  Did

17   he ever work for something called the Medical Care

18   Specialists?

19   A    I don't know.  He has many, many companies.  My

20   husband has many companies and to be honest, I lost track

21   of the names.  That's why I can't give you a straight

22   answer because I don't know.

23   Q    And you, you've never heard of this name?

24   A    I'm not familiar with the name, no--

25   Q    Are you--

109

1   A    --but again, he has many businesses and he's

2   opened many companies and has many names, and I don't know

3   all the names of the companies.

4   Q    Are you familiar with that address, 500 Alimona

5   Boulevard?

6   A    No.

7   Q    Do you know if your husband's ever been to Hawaii?

8   A    Yes.

9           THE COURT:  I'm sorry, yes?

10          THE WITNESS:  Yes.

11          THE COURT:  Oh.

12   BY MS. WEST:

13   Q    For work?

14   A    He's licensed in he was licensed in Hawaii till he

15   lost his medical license.

16   Q    Okay, and when was the last time that he went to

17   Hawaii?

18   A    Last year.

19   Q    Last year when?

20   A    In, I think it was in March.

21   Q    For how long?

22   A    It was a vacation, for a week.

23   Q    For a week and who went with him?

24   A    It was all of us.  We went together.  We went you

25   know, so.

110

1   Q   So this is last year 2013?

2   A   2013, yes.

3   Q   And you were there for a week?

4   A   We were there for a week, yes.

5   Q   And where did you stay?

6   A   We stayed in Maui.

7   Q   I'm sorry?

8   A   Maui.

9   Q   And what did you fly?

10  A   Excuse me?

11  Q   What airline did you fly?

12  A   Um, United Airlines cause I didn't like them very

13  much.

14  Q   Is it possible you're mistaken about your dates as

15  last year going to Hawaii?

16  A   It's possible but I think we went, no, we, we went

17  last year.

18  Q   You went last year?

19  A   In March, cause we went to Ha, I believe it, we went

20  to, it was March vacation for the kids--

21  Q   Um-hmmm.

22  A   --and I believe we, we flew to Hawaii, then came back

23  to California and we went to Lake Tahoe.

24  Q   Okay, so you went from Boston or New York?

25  A   I believe Boston.

1  Q    To?

2  A    We went to Las Vegas.

3  Q    Yeah.

4  A    And then from Las Vegas I believe we went to Hawaii.

5  Q    Stayed how, for one week?

6  A    For a week, yes.

7  Q    And then flew back from Hawaii to where?

8  A    To California--

9  Q    Um-hmmm.

10 A    --and drove to Lake Tahoe--

11 Q    Um hmmm.

12 A    --and then came back home.

13 Q    So flew from Lake Tahoe to Boston?

14 A    I don't remember if we stopped on the way or not.

15 Q    All right, and this is March 2013?

16 A    I believe so, yes.

17 Q    And this would be you, your husband and four

18 children?

19 A    Yes.

20       THE COURT:  Do you know Mr. Abush, is Mr.

21 Abushadi a doctor?

22       THE WITNESS:  He's my, he's a doctor, yes.

23       THE COURT:  And does he work in Hawaii?

24       THE WITNESS:  No, he does not.

25       THE COURT:  Where does he live?

1          THE WITNESS:  He's in Michigan doing a sleep

2    residency.  He was here before working with my husband.

3    It's his nephew.

4          THE COURT:  Have you, so, have you ever known

5    him to be living and working in Hawaii?

6          THE WITNESS:  No.

7          THE COURT:  Lived and worked here and then moved

8    to Michigan--

9          THE WITNESS:  Yes.

10          THE COURT:  --to do his residency?

11          THE WITNESS:  Yes.

12          THE COURT:  What hospital?

13          THE WITNESS:  I don't know.

14          THE COURT:  Or what, and do you know if he's in

15    Detroit or Ann Arbor or?

16          THE WITNESS:  I think he's in Detroit, but I'm

17    not sure.

18          THE COURT:  Okay, thank you.

19    BY MS. WEST:

20    Q    When you flew in January as we already discussed--

21    A    Um-hmmm.

22    Q    --it was a very, it was, you bought the ticket one

23    day before and you left, right?

24    A    Yes.

25    Q    And when you returned, the, your return was not

113

1  unusual, was it?

2  A    No.

3  Q    So you weren't asked any questions when you arrived

4  in the United States?

5  A    Not at all.

6  Q    And when you returned on a Monday--

7  A    Yes.

8  Q    --that was the 20th, correct?  Or at least it was a

9  Monday?

10  A    It was a Monday.  It was President's Day weekend I

11  think, or is it Martin Luther King weekend?

12  Q    Okay.

13  A    Yes.

14  Q    If you turn to the second page of this letter--

15  A    Of--

16  Q    --you, you can--

17  A    --of, of this letter?

18  Q    Yup, the letter, the experience certificate?

19  A    Um-hmmm.

20  Q    You can see that it's notarized on the 24th of

21  January.  This is about four days after your return.  Do

22  you see that?

23  A    Mmmm.

24  Q    Do you have any knowledge as to why this letter was

25  written in January?

114

1   A    No, as I said, I was not aware of this letter.

2   Q    Okay.  You also spoke earlier about having

3   discussions with your husband about moving back, moving to

4   the Middle East?

5   A    Yes, briefly, early on.

6   Q    And when you say early on is--

7   A    The Fall 2013.

8   Q    2013.  Is that the time when, at the time when he

9   lost his license?

10  A    It was after he lost his license.

11  Q    It was after he lost his license?

12  A    Yes.

13  Q    So was it at the time when the, the businesses were

14  searched?

15  A    Yes, after.

16  Q    And what type of employment would he be looking for?

17  A    At the time we were just looking at options and, but

18  it was determined that he can't work as a doctor because

19  he had lost his license.

20  Q    And what, what, what do you base that on?  What makes

21  you think that he can't work as a doctor because he had

22  lost his license?

23  A    Because as soon as you Google it, it says in the

24  first thing in Google, he lost his license and he's in,

25  under investigation for medical fraud.  Nobody's going to

1  hire someone.  I think there's also Fathalla had

2  mentioned there was a physician's databank--

3  Q    Um-hmmm.

4  A    --that lists all disciplinary actions against doctors

5  and we've been receiving letters at home where, you know,

6  any place, whether, you know, that he has your license is,

7  investigating him because of the loss of his license.

8  It's a very well-known thing.

9  Q    Is that the National Practitioner's Databank that's

10  mentioned in the motion?

11  A    I assume, yeah, I assume that's what it is, yes.

12  Q    And are you aware that the databank only covers the

13  United States and its territories--

14  A    Yes.

15  Q    --and a foreign hospital could be registered in that

16  bank and find this information out?

17  A    It's very easy to find this information.  All you

18  have to do is Google his name.  My children unfortunately

19  did that.

20  Q    Okay.

21  A    So it's very easy to find.

22  Q    Your husband was schooled in Egypt, right?

23  A    He did his medical training in Egypt, yes, but he did

24  his residency and his critical care fellowship and

25  everything here.

116

1   Q    And he speaks Arab flu, fluently?

2   A    Yes, he does.

3   Q    And he writes and reads.

4   A    Yes.

5   Q    And even though he's been here for 30 years, he's

6   never become a United States citizen?

7   A    That was a mistake, but no, he has not. It took me a

8   long time to get my citizenship too.

9   Q    Yup, fair enough.

10       You have presently three cars in your house and at

11  your house right now, you only have two drivers, you and

12  your son living in your house at the moment?

13  A    Yes, but I'm hoping my husband will be coming out

14  soon.

15  Q    Okay, but considering all these circumstances, you

16  just went out and bought your, a new car for your son?

17  A    Yes, I did.

18           MS. WEST: I don't have anything further right

19       now.

20           THE COURT:  Any redirect?

21           MR. DENNER:  Yes, Your Honor, just briefly.

22           One moment, Your Honor, my mind was wondering.

23           THE COURT:  All right.

24                    REDIRECT EXAMINATION

25  BY MR. DENNER:

117

1  Q    There had been some discussion earlier about a

2  house and land in Egypt.  There never has been a house in

3  Egypt, correct?

4  A    No.

5  Q    This was simply land?

6  A    It was purely land that wasn't fully paid for.

7  Q    It was land you had a deposit down on?

8  A    Excuse me?

9  Q    It was land you had a deposit down on?

10  A    Yes.

11  Q    And this was land that you sold off in order to stay

12  here in this country and pay your bills, correct?

13  A    Yes.

14  Q    You own any other land or houses in Egypt?

15  A    No, there's only some family properties that are

16  owned, but they're jointly owned by family and they're not

17  ours exclusively.

18  Q    And have you ever look into building a residence in

19  any other land anywhere?

20  A    No, we don't.  When we, when we visit Egypt, we

21  actually, the last few times we've actually stayed in

22  hotels.  We stay in a resort.  My parents own a resort

23  that's there.  We stay there and we stay with my sister-

24  in-law, so we do--

25           THE COURT:  They own the resort or they own a

118

1   condominium or a property within the resort?

2          THE WITNESS:  It's like a little chalet in a

3   resort.  Yeah, and so we stay there.  We stay with my

4   sister-in-law.  The last few times we've stayed in hotels.

5          MR. DENNER:  No further questions, Your Honor.

6          THE COURT:  I just have one, one or two things

7   that I just want to try to figure out to clarify, and then

8   if you've, that occasions for questions for you to be fine

9   and if not fine.

10          So, I'm just trying to understand a little bit

11   the, the cash flow, not the cash flow in the years past

12   but just right now.  I recognize you were working part

13   time at the time your husband lost his license in 2013 and

14   then you began an effort to increase your income and your

15   practice to increase your income.  So my question is two

16   parts.  A, if you know, what was your income before taxes,

17   yours in 2013, and to the extent you think it's going to

18   be different in 2014 because you're trying to work more

19   fulltime, what do you anticipate it would be in 2014?

20          THE WITNESS:  I'm, I'll tell you.  I'll be very

21   honest, I'm so bad with numbers and I've always left the

22   numbers for my husband.  My gross before and that's before

23   expenses was $400,000.

24          THE COURT:  All right, so that's before paying

25   like your rent and other expenses for your practice?

1          THE WITNESS:  Yes.

2          THE COURT:  All right, that was for 2013?

3          THE WITNESS:  2013, I have not been on vacation

4     obviously, so I'm working through vacations, where before

5     I used to take all my children's vacations I would take,

6     so I would have two months off.  The year most likely that

7     they refer to where I made $150,000, was probably 2011,

8     and I took three months off for maternity leave for my

9     youngest.

10          THE COURT:  That was 150--

11          THE WITNESS:  Fifty--

12          THE COURT:  --after your expenses and

13     everything?

14          THE WITNESS:  Yes, yes, so I gross about 400.

15     I'm not taking the same vacations.  I'm increasing days

16     that I'm working.  I'm trying to add.  I'm trying to cut

17     down my expenses and look and see where there may be

18     waste.  I am looking to add doctors to the practice and

19     I'm working, I'm coming in for cases and trying to work

20     more.  That's what I'm doing now.

21          THE COURT:  So, would it be roughly fair to say

22     2013 probably your, what you took home was not a whole lot

23     different than the 150 from a couple of years before?

24     Might be a little more?  Might have been 160?

25          THE WITNESS:  I think it's probably a little

1  bit, yeah, I, I would say I probably would net about

2  200,000 is, is what I, what I--

3         THE COURT:  For last year?

4         THE WITNESS:  Yes.  That's what--

5         THE COURT:  And so this year--

6         THE WITNESS:  That's what I would estimate, yes.

7         THE COURT:  Estimate and then this year--

8         THE WITNESS:  I'm hoping to do a lot more than

9  that.

10         THE COURT:  --depends on how much more you make

11  based on less vacations, how many more patients you get,

12  whether you have enough patients to support another doctor

13  and the like?

14         THE WITNESS:  Yes, yes.

15         THE COURT:  Okay.

16         THE WITNESS:  That's, my aim is to grow my

17  practice.  I'm working more, not only in my practice but

18  the other group practice I'm in as well.

19         THE COURT:  And there's no more money now coming

20  back from Egypt?

21         THE WITNESS:  No.

22         THE COURT:  So, so it seems like, unless I'm

23  doing my math wrong, and this isn't a dispositive question

24  for release or detention, but in some way it bears in some

25  manner, is that or bears on the house I guess is what I'm

121

1  thinking about, but if I doing my math right, you're

2  paying $12,400 a month on the mortgage on your home?

3          THE WITNESS:  Yes.

4          THE COURT:  And on the old residence, you're

5  paying another $9,500 a month, but you're getting $6,000 a

6  month, so that leaves you spending $3,500 a month on that.

7  So you're spending $16,000 a month between those two

8  properties on mortgage, taxes, not counting insur,

9  whatever you pay for insurance for all your properties

10 which would be $192,000 a year of yielding some sort of

11 deduction on your income taxes out of your primary

12 residence in terms of the interest, depending on how much

13 of the payment is interest and the like but, that's

14 essentially, your whole income.  So I'm wondering, how to,

15 on a going forward basis, cause the house is being

16 proposed, how realistic is it you're going to have the

17 house or be able to hold onto the house because that

18 doesn't count paying the $400 a month for the Jeep.  It

19 doesn't count the other two cars which are coming soon,

20 not in six months, but, and it has nothing to do with your

21 belief about your husband getting his license back I

22 think, but unless I'm missing something about this case, I

23 don't anticipate and it's not up to me cause it's not my

24 case but I don't anticipate this case being over in three

25 months.  It doesn't look, from my sense from the lawyers

1 | is there's a lot of discovery--

2 | THE WITNESS:  There is.

3 | THE COURT:  --and so, am I missing some first,

4 | my question is the one we're on.  Am I missing some of the

5 | math?  Is, that is are you spending $16,000 a month

6 | between those two properties, not counting, after you get

7 | the benefit of the income from the other property?

8 | THE WITNESS:  My expenses are very high.  I'm

9 | trying to cut them.  My parents until I build up my

10 | practice are also helping me, and--

11 | THE COURT:  Okay.

12 | THE WITNESS:  --if I do need to sell other cars,

13 | I will sell the other cars.

14 | THE COURT:  All right, so the answer is to the

15 | extent you're not making enough money your parents are

16 | helping you?

17 | THE WITNESS:  But I'm growing my practice.  I'm

18 | covering most of it, yes.

19 | THE COURT:  Well I understand that.  But it's

20 | hard to double your practice in a month.

21 | THE WITNESS:  No, that's why they're helping me

22 | until I can.

23 | THE COURT:  Okay, no, there's no shame in that.

24 | I'm just trying to understand because there's, the reason

25 | I'm asking the question is, there's, there's--

123

1        THE WITNESS:  I'm cutting my expenses--

2        THE COURT:  No, no, the reason I ask is because

3   there's, there's clearly a lot of evidence of money that

4   went to Egypt.  There's money that came back from Egypt.

5   What Mr. Denner is telling me is that there is no more

6   money coming back from Egypt.  That that's all gone and

7   there is no money in Egypt, and what I'm looking at is how

8   are you living, buying a new car and living on $16,000 a

9   month a mortgage, never mind, I don't know if you're kids

10  are in private school now, but I saw you were going to

11  send them to private school.  Are they already in private

12  school?

13       THE WITNESS:  They are, have been, yes.

14       THE COURT:  All right, so that's another 60 to

15  $120,000 a year would be my guess.  Is that right?

16       THE WITNESS:  As I said, I'm building my

17  practice.  I'm cutting my expenses.

18       THE COURT:  I'm asking, I'm asking how much is

19  it in private school tuition?

20       THE WITNESS:  At private school, it's almost

21  40,000.

22       THE COURT:  Per child?

23       THE WITNESS:  Per child times three.

24       THE COURT:  For three?  Right, so that's 120,000

25  so last month you didn't make enough money to pay that

124

1  would be the conclusion I would draw from the evidence

2  so far.  I understand why you might be able to make that

3  and that's not my question as much as last month.

4          THE COURT:  I don't know how much I made last

5  month but I did, my parents did support me.

6          THE COURT:  All right, so the answer is to the

7  extent that you're not making enough money, well, two

8  parts.  A, you're not drawing any more money from Egypt?

9          THE WITNESS:  No, there's no more money.

10         THE COURT:  All right.

11         THE WITNESS:  The money went--

12         THE COURT:  When is--

13         THE WITNESS:  --the expenses, everything she

14  went, went to the medical billing office.

15         THE COURT:  But you're not being able to get any

16  more money from Egypt?

17         THE WITNESS:  No.

18         THE COURT:  So to the extent you don't have

19  enough money to cover all these various expenses at least

20  so far, your parents have been willing and able to give

21  you money to help you?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.  That was my question.

24         All right, and your mother is a dentist?

25         THE WITNESS:  Yes.

125

1          THE COURT:  And your father?

2          THE WITNESS:  He is, well he is a professor of

3  Nautical Science, but he's retired from that and he does

4  the business management for my mother's dental practice.

5          THE COURT:  Uh-huh and where was he a professor?

6          THE WITNESS:  He was a professor in Egypt.

7          THE COURT:  Oh, and retired when you he came

8  here when you were eight?

9          THE WITNESS:  Yes.

10          THE COURT:  So has he, and has he since--

11          THE WITNESS:  He's been working in my mother, as

12  the business manager for my mother's practice.

13          THE COURT:  Since you came here?

14          THE WITNESS:  Yes.

15          THE COURT:  All right, and how big is your

16  mother's practice?  How many people work there?

17          THE WITNESS:  It's a very large practice.  It's

18  a group practice and she's had it since 19, 1980 and she

19  has six operatories.

20          THE COURT:  Six what?

21          THE WITNESS:  Dental rooms.

22          THE COURT:  Oh, I see.

23          THE WITNESS:  And she has endodontist, I'm the

24  periodontist and has an orthodontist and she has a couple

25  of doctors working for her, so it's a large office.

126

1          THE COURT:  And where do they live?

2          THE WITNESS:  In Quincy, Massachusetts.

3          THE COURT:  And you mentioned one brother who'd

4  passed away.

5          THE WITNESS:  Yes.

6          THE COURT:  Do you have any other siblings?

7          THE WITNESS:  I have one sister who's here in

8  Quincy.

9          THE COURT:  In Quincy, all right.  Okay.  I

10  don't have any other questions for this witness.  Does

11  what I ask occasion, either of you want to ask more

12  questions in light of that?

13          MR. DENNER:  No, sir.  I was actually going to

14  ask her about her parent's house or the fact that they

15  were helping, but--

16          THE COURT:  All right.

17          MR. DENNER:  --you got to that.

18          THE COURT:  Anything else you want to ask Ms.

19  West?

20          MS. WEST:  No.

21          THE COURT:  All right, thank you very much.  You

22  can step down.

23          THE WITNESS:  Thank you.

24      WITNESS, excused.

25          THE COURT:  Any other evidence or witnesses from

1  you, Mr. Denner?

2          MR. DENNER:  No, sir.

3          THE COURT:  From you, Ms. West?

4          MS. WEST:  Your Honor, just one thing.  It was

5  mentioned earlier.  It's the deposition that was taken in

6  October 2012.  It's a deposition from the Department of

7  Labor.  The attorney looked at this and we spoke about it.

8  I would ask that this be admitted, and in particular I

9  would ask that the Court go to certain pages that are

10 relevant to this and the first page is page 94--

11         THE COURT:  Hold on.  Let me look at this.  You

12 telling me I should look at page 94?

13         MS. WEST:  Yup, in which the defendant testified

14 that fif--

15         THE COURT:  Do you object to the deposition

16 coming into evidence?

17         MR. DENNER:  I have not had an opportunity to

18 look at this yet.  Given the relaxed standards here, I

19 don't know if I have, you know, standing to object to

20 this, but I would, I would like to take a quick look and

21 take a look at relevance.  I guess the answer is yes, I do

22 object to it.

23         THE COURT:  All right, well as a practical

24 matter I'll take both.  I'm going to have to take it under

25 advisement to read it if, if it's submitted because I'm

1   assuming I'm going to be able to read it right here.

2   So, it would, I will give you the chance to think about

3   what your objection will be.  I would tell you that it

4   would strike me A, as a statement not at, there wouldn't

5   be a hearsay issue because it's a statement of a party

6   opponent and it's a statement of a party opponent made

7   under oath and a statement of a party made under oath

8   while he was represented by counsel.  So it seems like it

9   has substantially more reasons to be admitted than what I

10  would typically see at a detention hearing which is the

11  statement the defendant made to the agents, either upon

12  arrest, in the car, at the station,--

13             MR. DENNER:  And--

14             THE COURT:  --but if you want to think about

15  it--

16             MR. DENNER:  You may be quite right.  If I can

17  have even five minutes to look at it?

18             THE COURT:  Yes, absolutely.

19             MR. DENNER:  That's all I need.

20             THE COURT:  Let me just take a list at the page

21  numbers that Ms. West would want me to look at.

22             MS. WEST:  Thank you, Your Honor.  Page 94.

23             THE COURT:  Yes.

24             MS. WEST:  And on page 94 there the defendant

25  says that 50 people in Egypt or 50 employees should cost

129

1    about $300 to $400,000 a year.  Page 97.

2              THE COURT:  Yes.

3              MS. WEST:  In which she indicates at the time,

4    so this would be October 2012, he had 10 employees working

5    in Egypt, and you will recall that 2012 as the height of

6    his income.  And lastly page 128 through 129, and there he

7    says in 2006, he had 50 people working in Cairo and then

8    he refers to an attached exhibit which is at the end.

9    It's Exhibit 14.  Had 50 people working there and the cost

10   for that was $229.  Excuse me, $229,543.

11             THE COURT:  For the year?

12             MS. WEST:  For the year.  So you should also be

13   looking at Exhibit 14 which is attached to the back.

14             MR. DENNER:  Your Honor, I think if I may,

15   rather than object to this, which I will not, I would ask

16   that I have an opportunity to consider it--

17             THE COURT:  Absolutely.

18             MR. DENNER:  --is rather than make final

19   argument now, perhaps we could just have 72 hours to write

20   a--

21             THE COURT:  Yes, that makes sense cause,

22   although I have some questions for both of you. I think

23   I'd rather read the deposition and look at it first and

24   then come back and then it gives you the chance to think

25   about this somehow if what you want to do is come back

130

1  after I've read the deposition, then I'll do that and

2  we'll just have argument.  Then if there's something else-

3  -

4             MR. DENNER:  If we could do that, yes.

5             THE COURT:  All right, so how long do you want

6  to consider whether there's anything else you want to

7  submit?

8             MR. DENNER:  I, as soon as I read this.  I need

9  48 hours to make--

10             THE COURT:  Fine.

11             MR. DENNER:  Today is, if I could have by

12  Tuesday at five?

13             THE COURT:  Fine, so if you're going to submit

14  anything else, then submit it by Tuesday at five.  You can

15  certainly submit - if there's anything else you want to

16  submit, Ms. West, you can do it by Tuesday at five

17  o'clock.  Is that enough time for you to?

18             MS. WEST:  Um-hmmm.

19             THE COURT:  All right, if I'm in the middle of,

20  what's the schedule like, or are all of you, both of you

21  around next week?

22             MR. DENNER:  I am, Your Honor.

23             THE COURT:  All right.

24             MR. DENNER:  Obviously we have, we feel some

25  urgency to deal with the situation--

1          THE COURT:  Yes, no I'd rather do it next

2    week but I just wanted to, sometimes people take that week

3    off.

4          MR. DENNER:  Your Honor, I don't know what

5    Wednesday is like for this Court, but that is by far the

6    best date for me.  I have to go back in for some dental

7    surgery on Thursday, and I'd much rather do it before then

8    if we could.

9          THE COURT:  Seems like there might be a very

10   good dental surgeon right nearby.  I'd bet she'd

11   accommodate your schedule.

12         MR. DENNER:  She actually has helped me.

13         THE COURT:  I can do Wednesday afternoon.

14         MS. WEST:  Your Honor, if we could do late

15   afternoon, that would be fine.

16         THE COURT:  It's just the more you file on

17   Tuesday the, you know, if--

18         MR. DENNER:  I'm not anticipating that we're

19   even going to file anything with Your Honor.

20         THE COURT:  All right.

21         MR. DENNER:  I just want an opportunity to, to

22   read through that.

23         THE COURT:  How about three o'clock on

24   Wednesday?

25         MR. DENNER:  Could we do two o'clock or is that

132

1   an impossibility?

2          MS. WEST:  It's a, I'm sorry, but it's a problem

3   for me, the later the better.

4          THE COURT:  Okay.  Why don't we do three

5   o'clock?

6          MS. WEST:  Three o'clock.

7          THE COURT:  So three o'clock on Wednesday for

8   further hearing.  If one of you decides that because of

9   something, if either of you, maybe you're both filing

10  nothing, but if one of you files something on Tuesday and

11  as a result the other one thinks I want to file something

12  in response and I'm not going to have it filed by

13  Wednesday, Tuesday night, whenever, then, and needs more

14  time, then let the other know and let Ms. Simeone know so

15  that then maybe I'd push it back to Thursday.

16         MR. DENNER:  Okay.

17         THE COURT:  But I'll do it on Wednesday unless

18  that happens.

19         All right, I'll admit the deposition as the next

20  exhibit.

21         GOVERNMENT'S EXHIBIT, ADMITTED

22         THE COURT:  Is there anything else, oh, so

23  anything else with respect to the detention motion?

24         MS. WEST:  No.

25         MR. DENNER:  No.

1          THE COURT:  All right, so with respect to Mr.

2   Dr. Mashali's health issues, what I'm going to do is this,

3   I told you that marshals had the nurse examine him today.

4   I'm going to inquire.  I asked Ms. Simeone to let the

5   marshals know that I wanted to hear about this, the status

6   of his medical condition and treatment at Plymouth.  I

7   think I'm going to ask them to bring him downstairs, just

8   make sure they don't put him on the van and send him back

9   yet cause I'm going to, I'll talk to the person who

10  ordinarily deals with this is Allison, Allison and she's

11  not here today, but I'll find out who looked into it and

12  I'll either get some more information and maybe we'll

13  reconvene just to talk about that and so Dr. Mashali will

14  be entitled to be here for that.  I'm not going to have

15  him sent back until that happens, and in the meantime,

16  whatever the resolution of that is, if there's more

17  information with respect to things that ought be happening

18  for his care that you think should be happening that

19  aren't happening, you can bring that, you know, file it or

20  let me know on Tuesday and we can then further address it

21  on Wednesday.

22          MR. DENNER:  Yes, sir.

23          THE COURT:  It does sound at least that from Dr.

24  Mashali's wife's observation both in Court and from what

25  she's observed by talking and visiting him that, while

1  he's not all better, that there's been some improvement

2  in the last several weeks I think is what she testified to

3  so that is positive and so at least so far and unless

4  someone tells me I was not of the view that this is

5  something that is so urgent that I want to get more

6  information about it today but not so urgent that it has

7  to be resolved at this minute.

8         Do you agree with me on that?

9         MR. DENNER:  It seemed a lot more urgent to me

10  this morning.  Perhaps Dr. Mashali can address that.  Do

11  you have any thoughts about that Dr. Mashali?  There are

12  times when think he's going to be dead in two days, and I

13  don't mean to make light of this and there are times where

14  he seems to regain himself for a while.  I think there's

15  something deeply systemically wrong.  I've probably seen

16  him a bit more and so has Mr. Keller over the past couple

17  of weeks than even his wife has.  There are times when,

18  the last couple of days he has been violently

19  regurgitating constantly.  He has had dark--

20         THE COURT:  Then I'm going to, I'll, then we

21  will, before Dr. Mashali is sent back to Plymouth, I'll

22  hear from the marshals and recon, likely reconvene in some

23  form or another.

24         Dr. Mashali, you may say something if you wish

25  to, but before you do, I'll just caution you, it's not a

1  caution specific to you, but you, as you remember you

2  have a right to remain silent under the United States

3  Constitution.  You don't have to make any statement but

4  and you're not, if anything you say, you're not required

5  to say anymore, but if you start to make a statement,

6  first of all you can stop at any point, but once you start

7  speaking, anything you say can be used against you in a

8  court of law and that's, you have two lawyers.  They can

9  speak for you.  You don't have to say.  You can talk to

10  them and have them speak for you, but if you, but I'm not

11  going to prevent you from speaking given that you have two

12  lawyers if you wish to and you've talked to them.

13           THE DEFENDANT:  No.

14           MR. DENNER:  If we could have, just 10 seconds.

15  (Mr. Denner speaks with Dr. Mashali)

16           MR. DENNER:  I, I think the doctor is concerned

17  that he has not gotten a proper evaluation of his health,

18  a diagnostic work up.  He, he was hopeful that he could be

19  sent, not back to Plymouth but he could go to a hospital

20  with the marshals or however that is done in terms of

21  custody cause he despite the fact that his wife has

22  testified that he appeared better than perhaps he did a

23  week ago, I don't think he feels better than he did a week

24  ago and I think he's very scared.

25           THE COURT:  All right, so then I'm going to do

1    is I'm - Dr. Mashali, the United States Marshal Service

2    is responsible for the care, health and wellbeing of every

3    person who's in custody, who's in custody of the Court

4    like yourself at this moment, and I'm first going to

5    inquire of them as to what's been going on with your

6    treatment to find that out and that's the first step and

7    anything that happens, and then once I get that

8    information, I'll get some information today then I'll in

9    some form report back or reconvene with counsel and with

10   you.

11           As to, if there's something specific you want me

12   to do, if someone wants me to do, then they need to make a

13   motion.  It doesn't necessarily have to be in writing but

14   they need to make a motion, tell me what it is that you

15   want me to do.

16           At the moment, insofar as you're asking me under

17   that provision of 3142(i) to direct the Marshal's to take

18   him now to Brigham and Women's or Mass General or some

19   other facility in custody for some evaluation or to the

20   emergency room, I'm not prepared at this moment right now

21   to do that.  That's not to say that at an appropriate

22   evidence at the appropriate time I wouldn't but what I've

23   seen so far and the report of the nurse who's examined

24   him, albeit through several different people it was

25   reported to me, and the testimony I heard today, I'm not

137

1  yet of a mind to do that.  In the first instance, the

2  responsibility of the medical care is the marshal service.

3  My experience has been they're attentive to people's

4  medical care and that when issues have arisen at Plymouth

5  or elsewhere that they intervene and they're on top of it,

6  so I'm going to find out but we'll get more information

7  and then we'll see before day is done.

8        MR. DENNER:  I think he has just indicated to me

9  that it would be his preference for the Court to make a

10  recommendation because I understand the Bureau of Prisons,

11  decides where people go when they age, whatever, that,

12  that he be going, sent to Fort Devens for some further

13  more comprehensive medical work up cause he doesn't feel

14  he has --

15        THE COURT:  All right, well let's get the report

16  about what's what from the marshals first and then we can

17  talk about that.

18        All right, so we'll suspend for now.  Ms.

19  Simeone will let you know if and when we're getting back

20  together.

21        Thank you.

22  (Court adjourned)

23  (2:59:13 PM)

24

25

138

1                        CERTIFICATION

2         I, Maryann V. Young, court approved transcriber,

3    certify that the foregoing is a correct transcript from

4    the official digital sound recording of the proceedings in

5    the above-entitled matter.

6

7    /s/ Maryann V. Young               May 20, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                      *MARYANN V. YOUNG*
                 **Certified Court Transcriber**
                      **(508) 384-2003**