UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,      )
      Plaintiff,               )
                              )
vs.                            )
                              ) Criminal Action
FATHALLA MASHALI,              ) No. 14-10067-RWZ
      Defendant.               )
                              )
                              )
                              )
```

**EVIDENTIARY HEARING**

BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE

UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
Boston, Massachusetts 02210
June 30, 2016
9:00 a.m.

\*   \*   \*   \*

CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5205
Boston, MA 02210
(617) 261-0555

APPEARANCES:


For the Plaintiff:

UNITED STATES ATTORNEY'S OFFICE
 (By: AUSA Maxim Grinberg)
       John J. Moakley Courthouse
       One Courthouse Way, Suite 9200
       Boston, MA 02210


For the Defendant:

DENNER PELLEGRINO LLP
 (By: Jeffrey A. Denner, Esq.)
       Four Longfellow Place
       Suite 3501, 35th Floor
       Boston, MA 02114

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Alison Fife, M.D. | | | | |
| By Mr. Grinberg: | 11 | | | |
| By Mr. Denner: | | 76 | | |
| STUART BECK, M.D. | | | | |
| By Mr. Grinberg: | 122 | | | |
| By Mr. Denner: | | 139 | | |
| NOHA EL-KHADRY, M.D. | | | | |
| By Mr. Denner: | 142 | | | |
| By Mr. Grinberg: | | 176 | | |

Government rests. . . . . . . . . . . . . Page 141

```
 1              P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3   before the Honorable Rya W. Zobel, United States District Judge,
 4   United States District Court, District of Massachusetts, at the
 5   John J. Moakley United States Courthouse, 1 Courthouse Way,
 6   Boston, Massachusetts, on June 30, 2016.
 7              The defendant, Fathalla Mashali, is present with
 8   counsel.  Assistant United States Attorney, Maxim Grinberg, is
 9   present.)
10              THE COURT:  Good morning.  Please be seated.
11              COURTROOM DEPUTY CLERK URSO:  This is the United
12   States versus Fathalla Mashali.  It's Criminal 14-10067.  If
13   counsel could please identify themselves for the record,
14   please.
15              MR. GRINBERG:  Yes, your Honor.  Max Grinberg on
16   behalf of the United States.
17              MR. DENNER:  Good morning, your Honor.  Jeff Denner
18   for Dr. Mashali.
19              THE COURT:  Okay.  Now, as I understand it, we are
20   here on defendant's motion to determine competency to stand
21   trial, correct?
22              MR. DENNER:  That's correct, your Honor.
23              THE COURT:  I guess maybe I would ask you to make an
24   opening statement.  I think you have the burden of proving --
25   I'm not exactly sure what.
```

1          MR. DENNER:  Yes, your Honor.  I would agree with

2     that.  I'm happy to make a brief opening statement and if we

3     go first, I would be calling Noha Mashali as the first

4     witness.

5          THE COURT:  I'm sorry?

6          MR. DENNER:  Is it your intention that I would open

7     and then I would begin to call witnesses at that point since

8     we have the burden?

9          MR. GRINBERG:  So, our understanding was that -- I'm

10    flexible, but I thought I would call Dr. Fife first because

11    she's sort of the key witness.  She's going to give us the

12    crux of things and give us an opinion, and then we would call

13    Dr. Stuart Beck who treated Dr. Mashali at MGH, and then we

14    could call the defendant's wife or --

15         THE COURT:  Well, maybe Mr. Denner has the same

16    order.  I don't know.

17         MR. GRINBERG:  That's fine.

18         THE COURT:  Did you not talk to each other?

19         MR. GRINBERG:  We did.  That was my understanding.

20         MR. DENNER:  Well, we didn't actually discuss who had

21    the burden and who was going first.  I am happy to go first.

22    I am happy to have a brief opening and I am happy to call -- I

23    would not be calling Dr. Fife first.  I would be calling Noha

24    Mashali first, if I could, but I -- the agreement we had was

25    -- the agreement.  The conversation we had was that Dr. Fife

1    would go first and Dr. Beck would go second and --

2         THE COURT:  Well, then why don't you stick to the

3    conversation you had.  I don't have a problem with that.

4         MR. DENNER:  And Noha El-Khadry, Dr. Noha El-Khadry

5    will go third.

6         The only thing I would do, respectfully -- I don't

7    want to belabor this.  I don't think there's any key witness

8    in this case.  I think that all the witnesses are what they

9    are and your Honor will, obviously, hear what your Honor

10   hears.  I think they all have very valuable things to say.  If

11   your Honor would like me to open -- I hadn't intended to open,

12   but I would be happy to open.

13        THE COURT:  I'm perfectly content to do whatever

14   counsel have agreed should be done.  So, if the order is Dr.

15   Fife, Dr. Beck, and then Dr. Mashali, is that what you had --

16        MR. DENNER:  Dr. El-Khadry, yes, Dr. Mashali's wife.

17        MR. GRINBERG:  Yes, your Honor.

18        THE COURT:  No problem with that?

19        MR. GRINBERG:  No.

20        THE COURT:  And you can figure out who is to call the

21   witness for purposes of --

22        MR. GRINBERG:  We had a conversation about that.

23   We're not in agreement, but we did talk about it and my --

24        THE COURT:  You've worked it out and I needn't worry

25   about it, right?

1          MR. GRINBERG:  That's right.

2          MR. DENNER:  Yes, your Honor.

3          THE COURT:  Okay.  Well, that is good.

4          Now, I have one other question.  It's not all

5    together clear to me.  Since we are here on the defendant's

6    motion, I guess the burden of proof matters.

7          MR. DENNER:  I think --

8          THE COURT:  It's not clear to me what -- to the

9    extent that under the statute, it's the defendant's motion

10   and, presumably, the defendant's burden, does the defendant

11   want to show competence or incompetence?

12         MR. DENNER:  In this particular case, your Honor, the

13   defendant is wanting to show incompetence, lack of competency,

14   because we don't believe that he is able to effectively assist

15   me and --

16         THE COURT:  Well, that has consequences, you know?

17         MR. DENNER:  I do.

18         THE COURT:  Okay.

19         MR. DENNER:  The other thing, your Honor -- and your

20   Honor, of course, remembers we've discussed this at different

21   times -- is that -- I understand under the statute what it

22   says.  I also feel that it is always on another level the

23   burden of the government to prove competency in any

24   proceeding.  I understand that the criminal -- the Insanity

25   Defense Reform Act of 1984 changed that with respect to

1    insanity, criminal responsibility to defend, but I would also

2    take the position that it is a little unclear to me as to

3    whose burden it ultimately is to establish competency.  I'm

4    not sure it's up to us to establish --

5           THE COURT:  Well, it doesn't talk about sanity or

6    insanity.  The statute talks about incompetence.

7           MR. DENNER:  No.  I understand.  I'm not talking

8    about this statute.  I'm just saying normally it's the

9    government's burden to establish any of the essential elements

10   of the case, and I think competency is one of those elements.

11   I got turned around from the insanity defense by another

12   statute.  If your Honor is taking the position that it turns

13   around here as well and it's my burden by whatever standard,

14   preponderance of the evidence --

15          THE COURT:  Actually, I said that was my

16   understanding.  I wasn't saying that it is a holding.  I mean,

17   this is a --

18          MR. DENNER:  No.

19          THE COURT:  -- different kind of case.

20          MR. DENNER:  What I would like to do, if it's

21   possible, is when we finish taking the evidence, to give us

22   perhaps one week to put in post hearing arguments that would

23   address everything from the burden of proof to --

24          THE COURT:  That's fine.  So, we'll proceed with what

25   counsel had worked out about the order of witnesses and who

1    will conduct the direct and the cross.

2         MR. DENNER:  And, if I may, your Honor, I don't think

3    that Dr. Fife is anyone's witness but the Court's witness, and

4    I have no difficulty with relaxing, if that is the correct

5    term --

6         THE COURT:  Fine.

7         MR. DENNER:  -- his ability to cross-examine her and

8    my ability to cross-examine and not treat her as --

9         MR. GRINBERG:  That's fine.

10        THE COURT:  We have her report, which is, in a sense,

11   the direct.  So, we will proceed along these lines, more or

12   less.

13        MR. DENNER:  Yes, your Honor.  And I would waive any

14   opening that I have and I would reserve my argument to what we

15   put in our post hearing memoranda.  I'd love to be able to

16   come back at one time and argue that to the Court.

17        THE COURT:  And, Mr. Grinberg, do you wish to make a

18   brief opening or do you want to directly proceed?

19        MR. GRINBERG:  No.  I think I would rather directly

20   proceed.  I just wanted to say that Dr. Stuart Beck's counsel

21   is here in the courtroom and --

22        THE COURT:  I'm sorry.  I didn't hear you when you

23   turned your back.

24        MR. GRINBERG:  Dr. Stuart Beck's --

25        THE COURT:  Okay.

1           MR. GRINBERG:  -- our second witness' counsel is in

2   the courtroom.  To the extent that the defense wanted to

3   sequester witnesses, I just wanted to give you the --

4           THE COURT:  Nobody has asked for that.

5           MR. DENNER:  I'm not asking for sequestration, your

6   Honor.

7           THE COURT:  Dr. Beck, you're welcome to say.

8           MR. GRINBERG:  This is counsel for Dr. Beck.

9           THE COURT:  Okay.

10           MR. GRINBERG:  Dr. Beck will be here around 10:00.

11   The government calls Dr. Alison Fife.

12           COURTROOM DEPUTY CLERK URSO:  Can I just swear you

13   in, please.

14           ALLISON FIFE, M.D., SWORN.

15           COURTROOM DEPUTY CLERK URSO:  Could you please step

16   into the box please and speak into the microphone and please

17   state your name for the record, please.

18           DR. FIFE:  My name is Alison Fife, A-l-i-s-o-n

19   F-i-f-e.

20           MR. GRINBERG:  Your Honor, may I approach the witness

21   with the exhibits?

22           THE COURT:  Yes.  I have a copy of her April 25

23   report and a letter dated April 27 from Dr. Fife to me.

24           MR. GRINBERG:  I believe that's the only submissions

25   that Dr. Fife provided the Court.

1           THE COURT:  Okay.

2           MR. GRINBERG:  At this juncture, may I approach the

3   witness with exhibits?  And I'll provide them to the Court as

4   well.

5           (Dr. Fife handed exhibits.)

6           MR. GRINBERG:  A copy for the Clerk.

7           COURTROOM DEPUTY CLERK URSO:  I'll give it to the Law

8   Clerks.

9           THE COURT:  So, whatever I already have, I should

10  simply put aside because you've assembled it all?

11          MR. GRINBERG:  That's correct, your Honor.  It's part

12  of the packages.

13          THE COURT:  Okay.  You may proceed.

14                       DIRECT EXAMINATION

15   BY MR. GRINBERG:

16   Q.   Dr. Fife, good morning.

17   A.   Good morning.

18   Q.   What task were you assigned in this federal criminal

19  case?

20   A.   I was assigned the task of evaluating Dr. Mashali's

21  competency to stand trial.

22   Q.   And what is your understanding as to who retained or

23  appointed you to evaluate Fathalla Mashali?

24   A.   My understanding is that I'm court appointed, retained

25  by the -- by you, the U.S. Attorney's Office, and that my

1     appointment was also agreed upon by Attorney Denner.

2       Q.   And do you understand that you're neither the government

3     nor the defense's witness?

4       A.   Correct.

5       Q.   Prior to your appointment, can you tell the Court

6     whether the parties, the government and the opposing counsel,

7     Mr. Denner, had an opportunity to interview you during the

8     conference call and talk about your background and experience

9     in competency evaluations?

10      A.   Yes.

11      Q.   And did you perform a competency evaluation in this

12    case?

13      A.   I did.

14      Q.   And during your competency evaluation process itself,

15    did you speak to both the defense and the government about the

16    progress of the competency evaluation process?

17      A.   I did.

18      Q.   And would you say whether you spent minutes during those

19    conversations talking to counsel or hours?  How much time did

20    you spend with us?

21      A.   I think it was at least a couple of hours.

22      Q.   And during those conversations, did counsel for the

23    government and the defense have an opportunity to ask you

24    follow-up questions about your evaluation?

25      A.   Yes.

1    Q.   And did you provide answers?

2    A.   Yes.

3    Q.   Would you please take a look -- I have exhibits in front

4    of you.  There's a package of exhibits and there's Tab 1.  Is

5    that your CV?  Is that your résumé?

6         MR. DENNER:  Your Honor, if it's helpful, we will

7    stipulate to the expertise of this particular witness for

8    purposes of rendering expert opinion.

9         THE COURT:  Okay.  These exhibits are all to be

10   admitted by agreement?

11        MR. DENNER:  Yes, your Honor.  We have an agreement,

12   not only the exhibits that my brother has --

13        THE COURT:  But her qualifications?

14        MR. DENNER:  -- but her qualifications as well as any

15   of the medical records that we got by subpoena, which are

16   basically all of them, we have agreed they will go in for what

17   they're worth, whether I present them or he presents them.

18        THE COURT:  Okay.  So, we can agree that proposed

19   Exhibit 1 through 18 are in evidence?

20        MR. GRINBERG:  Yes, your Honor.

21        THE COURT:  Okay.

22        MR. GRINBERG:  So, I'll move those into evidence.

23   And we, obviously, stipulate, both of us, that Dr. Fife is

24   qualified to conduct a competency examination in this case.

25   We selected her.  And maybe it doesn't make too, too much

1    sense going through the CV itself and reading it --

2            THE COURT:  You're right, we can skip to the --

3            MR. GRINBERG:  There may be a few things -- I just

4    want to ask a few background questions about Dr. Fife's

5    experience, which I think will put the evaluation into

6    context.

7    Q.   Now, Dr. Fife, before this case did you have any

8    experience evaluating criminal defendants for competency to

9    stand trial?

10   A.   Yes, I have.

11   Q.   And what are the general steps to evaluate somebody for

12   competency to stand trial?

13   A.   General steps are to review any available materials

14   which may be relative -- relevant to the case, examination --

15   psychiatric evaluation examination of the individual,

16   reflection on that material, sometimes psychological or

17   neuropsychiatric testing, and then kind of a synthesis of all

18   that material and production of a report for the Court if it's

19   required.

20   Q.   And how long have you been performing evaluations of

21   criminal defendants to stand trial?

22   A.   About 26 years, now.

23   Q.   Do you think you can estimate how many competency

24   evaluations you have performed in your career?

25           (Pause.)

1        THE COURT:  A lot.

2    A.   A lot.  I want to say a couple hundred, but I don't have

3    an exact number for you.

4    Q.   More than a hundred?

5    A.   I believe so.

6        THE COURT:  I find her to be qualified, based both on

7    the parties' agreement and on her testimony and the CV that is

8    in the record.

9    Q.   Is the person you evaluated in the courtroom today?

10   A.   Yes, he is.

11       MR. DENNER:  We stipulate to the identity of the

12   gentleman sitting next to me, the defendant, as the person she

13   evaluated.

14       THE COURT:  And the record may so reflect.

15   Q.   Did you write a report with your conclusions and the

16   basis for those conclusions?

17   A.   Yes, I did.

18   Q.   And would you please take a look at Tab 2 of your

19   exhibits.  Is that your competency report?

20   A.   It is.

21   Q.   And on Page 2 there is a section called, "Legal

22   criteria," do you see that?

23   A.   Yes, I do.

24   Q.   Would you elaborate on that?  What does that mean to

25   you?

A.   That is -- whenever I'm asked to evaluate a case, it's

important that I understand what the standard is that I'm

asked to look at so that I understand the question I'm being

asked.  In this particular case, it's around the federal

standard for competency to stand trial.

Q.   And so, how do you understand that standard?

A.   I understand that the defendant needs to have a thorough

understanding of the nature of the charges against him and

also the consequences of the charges and the proceedings and

how things -- everything that's involved in the proceedings,

and it's also important to be able to assist in his own

defense with his attorney.

Q.   The next paragraph talks about sources of information.

Generally what does that refer to?

A.   So, that refers to all of the documents that I've been

provided in relation to this case and my evaluation, medical,

any records regarding charges, hospital records.  In this case

there were insurance records --

Q.   Was there --

A.   -- things of that nature.

Q.   Parts of the docket were provided to you as well?

A.   Yes.

Q.   Defendant's motion to seek a competency hearing was

provided to you as well?

A.   Yes.

1    Q.   Let me turn to Exhibit No. -- it's Tab No. 3, Exhibit

2    No. 3.  Are you familiar with these documents?

3    A.   Yes, I am.

4    Q.   What are they?

5    A.   This is the Massachusetts Rehabilitation Commission,

6    Disability Determination Services report.

7    Q.   Do you understand that the documents under Tab 3 are the

8    exhibits that the defense attached to their motion to seek a

9    competency hearing?

10   A.   Yes.

11   Q.   Okay.  But the first exhibit is the Social Security

12   Administration determination for the defendant, Dr. Fathalla

13   Mashali, in this case?

14   A.   Yes.

15   Q.   And did you review this document?

16   A.   I did.

17   Q.   And this document is dated May of 2015, correct?

18   A.   Yes, May 21st, 2015.

19   Q.   So, this is over a year after the defendant was first

20   arrested in this case, correct?

21   A.   Correct.

22   Q.   I'll direct you to look -- to the first page of this

23   document, the last paragraph, which begins with vocational

24   history.  Do you see that?

25   A.   Yes.

1    Q.   And it talks about, "The claimant last worked in 2013,

2    stopping because of his increasing problems with memory,

3    depression, and general function."  Do you see that?

4    A.   I do.

5    Q.   And you read this in the past so there's no reason to

6    read it, correct?

7    A.   Yes.

8    Q.   Now, in this -- by the way, what type of document is it?

9    Who would write something like this?

10   A.   They are -- well, depending on what the reason is for

11   the referral, a psychologist or a psychiatrist.  If the

12   referral was for disability based on mental health, it could

13   be another type of doctor, depending on the issue at hand.

14          MR. DENNER:  Your Honor, I respectfully would object

15   to generally what these mean.  If this particular witness

16   knows what this was written for, then I would not object to

17   that.

18          THE COURT:  Okay.

19   Q.   Do you know -- well, let me ask you this.  Having read

20   this, did Fathalla Mashali provide any information to the

21   evaluator about the fact that his license was suspended in the

22   fall of 2013?

23          MR. DENNER:  Objection, your Honor.

24          THE COURT:  What's the objection?

25          MR. DENNER:  The objection is that we would have to,

1    respectfully, talk to the individual to find out where he got

2    that information.  It would be, I think, absolutely --

3          THE COURT:  Well, he can certainly use the

4    information that is here.

5          MR. DENNER:  Absolutely.

6          MR. GRINBERG:  I can rephrase, your Honor.

7    Q.  Does this document state -- does this document make any

8    reference to Dr. Mashali's medical license being suspended in

9    the fall of 2013?

10   A.  It does not.

11   Q.  Does it make any reference to the pending criminal

12   charge in this case?

13   A.  No.

14   Q.  And did the -- you having reviewed this document, did

15   the SSA determine -- make a determination whether Fathalla

16   Mashali was disabled?

17   A.  My impression reading this was that, yes, he diagnosed

18   Dr. Mashali with a number of disorders, and his assessment

19   that he was unable to work at that time.

20   Q.  Do you know from your experience whether doing these

21   types of determinations, Social Security Administration

22   evaluates applicants for malingering?

23         MR. DENNER:  Your Honor, I object to that question.

24         THE COURT:  The objection is sustained.  It is what

25   it is.

1    Q.   All right.  For the sources of documents, you mentioned

2    there were a number of records from hospitals, correct?

3    A.   Yes.

4    Q.   Is it fair to say that these records go to thousands of

5    pages?

6    A.   Yes.

7    Q.   And is it typical or atypical for you to review this

8    volume of medical records prior to a competency hearing?

9         MR. DENNER:  Objection, your Honor.

10        THE COURT:  She can answer that.

11   A.   I think it's both typical and -- it varies.  Cases can

12   vary from a few documents to thousands of pages of documents,

13   depending on the case.

14   Q.   All right.  And having reviewed this information and

15   evaluated Fathalla Mashali, have you determined with a degree

16   of medical certainty whether Fathalla Mashali is competent to

17   stand trial?

18   A.   I have.

19   Q.   And what is your opinion?

20   A.   My opinion is that he is competent to stand trial.

21   Q.   What is the basis for your opinion?

22   A.   The basis for my opinion is my review of the medical

23   records, my three interviews with Dr. Mashali, my review of

24   materials after my interviews, and my own -- what I came to as

25   my own understanding of Dr. Mashali's difficulties and why he

1    has had the difficulties he's had psychologically.

2    Q.   So, would you summarize the basis for your opinion for

3    the Court?

4    A.   Sure.   So, Dr. -- I first saw Dr. Mashali in March of

5    this year.   It was a very brief visit.   I had already received

6    a number of documents at that point and had reviewed them.

7         THE COURT:   Where did you see him?

8         THE WITNESS:   I saw him in my office, my private

9    office, which is in Wellesley, Massachusetts, and it's a

10   single office with just a small waiting area, my inner office.

11   It's very private.

12   A.   (Continuing) Dr. Mashali presented with his attorney,

13   Mr. Denner.   He came into the office and he was at that time

14   walking with a walker, the assistance of a walker.   He came

15   into the office and was really not able to participate in the

16   interview.   I wasn't sure at that point how much he was not

17   able to and how much he, for whatever reasons, didn't have

18   motivation to participate in the interview.

19        I asked a few questions, just very general questions,

20   did he know why he was here to see me, introduced myself, that

21   sort of thing, and didn't get really any answers.   Dr. Mashali

22   was -- appeared to me to be very tired.   I wasn't sure of the

23   reason for him being tired.   I was concerned about his

24   condition.   He was closing his eyes and appeared to be going

25   to sleep.   He looked very sedated and, you know, I pretty

1    quickly realized that that wasn't going to be a -- I wasn't

2    going to be able to do a reasonable interview.

3         I invited Attorney Denner to come in and talk about

4    this, and we did, and I told him my concerns.  During that

5    time I asked permission to call Dr. Mashali's wife, and I

6    called her and was able to reach her, and she expressed her

7    concern about her husband's health, and I then accompanied Dr.

8    Mashali and Attorney Denner out to their car.  I just thought

9    I could get a sense of sort of how he was ambulating and how

10   he was doing outside of the office when he wasn't being asked

11   these direct questions, and he did a little bit -- quite a bit

12   better than I expected based on how sleepy and drowsy he

13   appeared in the chair, in that he was able to negotiate the

14   walker and had reasonable balance, got in the elevator, went

15   down to the ground floor, went out the back of the building,

16   got himself into Mr. Denner's car, was able to buckle his seat

17   belt, and that was the end of that interaction.

18        I was concerned enough -- would you like me to continue?

19   Q.   Yes.  I can just ask you follow-up questions.  What were

20   your concerns exactly?

21   A.   Well, I didn't really know what was going on with Dr.

22   Mashali at that point.  I knew that he had an extensive

23   medical history.  I was concerned about his mental status and

24   what else -- what might be affecting it that I didn't know

25   about and any substances might be involved, any neurologic

1    problem that was going on, and I didn't think it was wise to

2    proceed.

3    Q.   And did you recommend any steps to Dr. Mashali, his

4    attorney and the wife that should be taken?

5    A.   I recommended an inpatient hospitalization, psychiatric

6    to do a diagnostic evaluation.

7    Q.   Prior to meeting Fathalla Mashali for the first time,

8    did you review any medical records for him?

9    A.   I did.

10   Q.   Did anything stand out there?

11   A.   Well, his medical history -- I was aware that he had a

12   previous diagnosis of pulmonary sarcoidosis, that he had a

13   history of hypertension, prostatic hypotrophy, intermittent

14   atrial fibrillation, things of that nature, also diabetes

15   thought due to steroid use for the sarcoidosis, and he had a

16   myopathy which affected his strength and ability to walk well.

17       I also knew that he had difficulties with eating.  It

18   wasn't completely clear why that was.  Combination of

19   gastroparesis, which is a delayed gastric emptying syndrome,

20   but there were also questions about Dr. Mashali's compliance

21   or adherence to his nutritional regimen and withholding of

22   food, fluids and medication on his own volition while he had

23   been incarcerated at Plymouth and at other times since then.

24   That was back in 2014.

25       So, with all of that and how poorly he looked in my

1    office, I thought it would be the best course of action to

2    have a -- really kind of the best we could do a

3    neuropsychiatric evaluation in the hospital and I specifically

4    requested, if we could get him there, at that point to be

5    admitted to Blake 11 at Massachusetts General Hospital.

6    Q.   Did you make any observations about tox screens in the

7    medical records?

8    A.   Yes.  He had had a couple of screens positive for

9    substances that he wasn't prescribed, and I did ask about that

10   and --

11              MR. DENNER:  Your Honor, respectfully, can we get

12   some timeframes of when --

13              THE COURT:  The timeframe when she looked at or the

14   timeframe on what she looked at?

15              MR. DENNER:  The timeframe when she looked at it,

16   when that happened.

17              THE COURT:  Do you understand, Dr. Fife?

18              THE WITNESS:  I do, yes.  I looked at it before I saw

19   him.

20   Q.   The question is when were the tox screens done?

21   A.   Oh, when were they done.

22   Q.   When were these positives, approximately, do you recall?

23   A.   I would have to look at the record.  I'm not recalling

24   right now.

25   Q.   Do you have it in front of you?

1    A.   I do.

2    Q.   You can take your time and take a look at it.

3    A.   Okay.

4         (Pause.)

5         MR. DENNER:  Your Honor, respectfully, if the doctor

6    could indicate what records she is looking at.

7         THE COURT:  She will.

8    A.   Well, I'm first looking at my report to see if I

9    recorded when they were done, and I may or may not have.

10        THE COURT:  Mr. Grinberg, are all of these records

11   that Dr. Fife is referring to part of this record that you

12   have given me?

13        MR. GRINBERG:  So, your Honor, these -- on the

14   counsel's table these are all of the medical records that the

15   government has obtained and provided to Dr. Fife and have been

16   provided to the defense.  For the purposes of -- but they're

17   huge.  So, for the purposes of just focusing on issues that

18   matter, I've identified, you know, a dozen or so exhibits for

19   the Court.

20        THE COURT:  My question was relatively simply

21   motivated.  It is simply to assist Dr. Fife to find what it is

22   that she's looking for, particularly the dates of the

23   document, what documents and the dates, and I was wondering

24   whether the documents she's now referring to are part of the

25   record.  That is, the record in evidence.

1          MR. GRINBERG:  No.

2          THE COURT:  Okay.

3     A.   So, I found it in my report, but I don't document in my

4     report when those were done.  So, I would need, perhaps, a

5     fair amount of time to find out for you when they were done.

6          THE COURT:  What period of time is covered by this

7     big record that you have there, Mr. Grinberg?

8          MR. GRINBERG:  It's approximately 2014 and on.

9          THE COURT:  So, it's all within the last two years or

10    so?

11         MR. GRINBERG:  It's the last two years or so.

12         THE COURT:  Okay.  Well, that sort of fixes --

13         MR. GRINBERG:  Yes.

14    Q.   Was there reference to a Tylenol overdose in the medical

15    records?

16    A.   Yes.

17    Q.   What was that reference?

18    A.   Dr. Mashali was admitted to -- I believe it was Norwood

19    Hospital with a -- it wasn't an overdose in the sense of the

20    word of an attempt to take his life overdose.  It was an

21    overuse and a high overuse of Tylenol that Dr. Mashali had

22    been taking to treat his chronic pain, and over the course of

23    time Tylenol in high enough doses is toxic to the liver and

24    it, in fact, produced liver failure for Dr. Mashali so that he

25    was admitted to the hospital, treated for that and,

1    fortunately, fully recovered from that.

2      Q.   Were there references to CT scans of the brain, a

3    variety type tests as well?

4      A.   There were during those admissions --

5           MR. DENNER:  Your Honor, even though we -- this is

6    everybody's witness, if we could perhaps have more open-ended

7    questions without leading, like the overdose thing, that

8    troubled me and I should have jumped up sooner and said

9    something --

10          THE COURT:  Well, she --

11          MR. DENNER:  -- but going forward, if we could ask

12   her what she observed, what the basis of her opinions were,

13   rather than leading her in that direction, I would appreciate

14   that.

15     Q.   Did you see lab results in the medical records?

16     A.   Yes.

17     Q.   In your report you stated they weren't remarkable.  What

18   does that mean?

19     A.   His lab -- his laboratory studies were a reflection of

20   how his body is functioning.  His liver, his kidneys, his

21   blood work returned -- his liver function returned to normal.

22   His kidney function returned to very close to normal.  His

23   blood counts have shown over this entire period of time that

24   he runs -- that's a medical term, runs -- that he has a lower

25   than normal hematocrit.  That's the amount of red blood cells

1    that are circulating, and that has been thought to be due, in

2    part, to malnutrition, perhaps in part due to the sarcoid and

3    chronic medical illness.  It's not completely clear.  It's

4    been relatively stable over time.

5      Q.   In your report you mention also that, "At many times

6    various doctors evaluating and treating Dr. Mashali did not

7    have complete information about his situation, and incomplete

8    diagnoses were made."  What did you mean by that?

9      A.   So, Dr. Mashali has had a lot of medical care over the

10   last couple of years since around 2014.  He was followed at

11   the Brigham & Women's Hospital for quite a while by primary

12   care, pulmonologist, cardiologist, rheumatologist.  I believe

13   also gastroenterologist, and there may have been others, who

14   worked together, and also a psychiatrist at the Brigham, in

15   trying to understand all of Dr. Mashali's medical issues.

16        As often happens in a big medical system, some of -- the

17   lack of all the doctors having all the information may have

18   been due to that.  My impression and my opinion reading the

19   medical records, that the other piece of the doctors not

20   having all the information was also, in part, due to Dr.

21   Mashali presenting -- not so much presenting differently to

22   different providers, but giving different information to

23   different providers.  So, not all of the providers necessarily

24   had the same history consistently.

25        Dr. Mashali then got frustrated with the Brigham &

1    Women's Hospital, feeling that he wasn't getting reasonable

2    care there in certain types of ways and transferred his care

3    to the Beth Israel Hospital and the Massachusetts General

4    Hospital, Beth Israel for his pulmonary and rheumatology care

5    related to his sarcoid, and the Mass General for psychiatric

6    care.

7    Q.   Let's talk about your second meeting with Fathalla

8    Mashali.  When did that take place?

9    A.   That took place -- may I just look at my notes for a

10   minute?  I need to make sure it's the right date.

11   Q.   Sure.

12   A.   (Examining).  The second meeting took place on March

13   26th, 2016, and that was at Blake 11.

14   Q.   What is Blake 11?

15   A.   Blake 11 is the inpatient psychiatric unit at Mass

16   General.

17   Q.   Why was Fathalla Mashali at Blake 11 at that time?

18   A.   I had requested that he be admitted there and that was

19   -- my understanding is that was approved by the Court, and my

20   recommendation was thought to be a reasonable next step.

21   Q.   Do you know whether or not Fathalla Mashali was

22   experiencing a medical condition at that time that also

23   brought him to MGH?

24   A.   He had been -- he had just had a pulmonary biopsy at the

25   Beth Israel Hospital to determine whether or not some areas in

1    his lungs that were looking prominent were, in fact, sarcoid

2    and not something else, like a cancer or an undiagnosed

3    problem.  So, he went from the Beth Israel Hospital to the

4    Mass General.

5        Q.   Do you recall anything about a seizure?

6        A.   About what?

7        Q.   Do you recall anything about Mashali's experiencing a

8    seizure?

9        A.   Oh, yes.  He had -- he's had a couple of episodes where

10   he has apparently lost consciousness, some witnessed, some not

11   clearly witnessed.  He was treated for seizure

12   prophylactically with a medication called Keppra.  That was

13   eventually discontinued.  The seizure was -- my understanding

14   is that the seizure was thought to be due to a medication

15   called Wellbutrin, which is for depression, but it's not --

16           MR. DENNER:  Your Honor, if we might, respectfully,

17   we're talking about competency in 2016.  Could we get just a

18   bit more -- there's a lot of hospitals.  If we could just have

19   some timeframes, which hospital she's talking about, who

20   observed --

21           THE COURT:  I think she explained to us he left Beth

22   Israel, went to MGH.  That's where she saw him, and it was at

23   Beth Israel where he had the lung biopsy.

24           MR. DENNER:  And he's been seen a couple of times at

25   each of these hospitals.  So, if we could just --

1          THE COURT:  Well, this is all pertaining to her March

2    26th visit with Dr. Mashali.

3          MR. DENNER:  Okay.

4          MR. GRINBERG:  I can rephrase the question and just

5    focus it on one issue.

6    Q.   Was he at MGH experiencing a seizure, if you know?

7    A.   He had had one.

8    Q.   Okay.

9    A.   But that was not an acute problem at that time.

10   Q.   Okay.  Would you describe your meeting with Fathalla

11   Mashali on March --

12         THE COURT:  You were talking earlier about his

13   appearing to have -- you didn't call it a seizure initially.

14   You called it that he lost consciousness.  Is that the same as

15   a seizure?

16         THE WITNESS:  It's not.  There was -- to the best of

17   my knowledge, there was one episode that was witnessed at home

18   that was reported as a grand mal seizure, and then there was

19   an episode witnessed at Norwood Hospital that was also

20   described by doctors as a grand mal seizure.

21         THE COURT:  This was all before March 16th?

22         THE WITNESS:  Correct.  There have been other times,

23   however, where Dr. Mashali has been found less than

24   responsive, breathing, but less than responsive to voice or to

25   commands.

1          THE COURT:  These are all pre-March 26?

2          THE WITNESS:  All pre.

3          THE COURT:  Are they relevant to your determination?

4          THE WITNESS:  They are in terms of where I ultimately

5   conclude that Dr. Mashali's malnutrition has had a profound

6   effect on his health and well-being.

7   Q.   Would you describe your meeting with Fathalla Mashali on

8   March 26, 2016, at MGH?

9   A.   Sure.  I met with him for -- just a little over two

10  hours.  I met with him on Blake 11, and I spoke briefly with

11  his nurse just to introduce myself and why I was there.  I

12  then -- she then introduced me to Dr. Mashali, who was in his

13  room.  Dr. Mashali left his room, was able to get out of bed

14  on his own.  He used a walker.  He took direction from the

15  nurse in terms of which room we were going to, and I remember

16  she said, turn left and then turn right into this very small

17  little interview room, and he was able to do that and I

18  followed him there, and I did that both to see if he could

19  follow cognitively what was happening and also just to see how

20  he was walking and how steady he was on his feet.

21          So, he walked with ease.  He actually managed the door.

22  It was a pretty heavy door going into the conference room and

23  he kind of managed to push that open and get through that.

24  Then I held it open most of the way because it was really a

25  very small space.

1    So, the interview room was very small, just two chairs,

2    table much smaller than this, and we sat across from one

3    another mand he put his walker to the side.  Dr. Mashali was,

4    I would say overall, passive during the interview in terms of

5    his approach to me and my questions.  He seemed disinterested

6    in questions.  I would say disinterested and bothered and

7    irritated by questions that had to do specifically with what I

8    was charged with, which is understanding his capacities to

9    stand trial, understand the charges against him, understand

10    the potential consequences, understanding the participants in

11    the courtroom, the roles of the attorneys and the Judge, and

12    things of that nature, and around working with his attorneys.

13    So, those questions, I would say, without fail -- I mean, he

14    may -- he was able to tell me the name of his attorney, but

15    then if I answered a follow-up question -- if I asked a

16    follow-up question, it would be met with pretty much an "I

17    don't know" kind of answer, and he would put his hand in his

18    head and kind of close his eyes and not -- not be

19    participating.

20    In contrast, because I didn't -- you know, I wasn't

21    making the assumption at that point about what that was, I

22    asked some questions that weren't about competency to stand

23    trial, and just sort of broad questions that have to do with

24    mental status, anyways, who is the president, do you know

25    anything that's going on in the world, things of that nature,

1    and with those questions Dr. Mashali noticeably was -- you

2    know, would not have his head in his hands, would open his

3    eyes, would look right at me and would answer very clearly.

4         From there I tried to broaden the conversation even more

5    to get a better sense, if I could, of Dr. Mashali's general

6    vocabulary, you know, things that go into understanding

7    someone's cognitive capacity.  So, their vocabulary, their

8    ability to process language, to produce language, to process

9    information, to hold things in memory, and then give

10   responses, all of the analytical thinking skills that are

11   required to be able to participate in one's own defense.

12        And when the topic was not on anything to do with Dr.

13   Mashali's predicament, charges, history related to that -- for

14   example, I brought up -- I don't exactly remember how I

15   brought it up -- actually, I do know.  In answer to some of my

16   questions, Dr. Mashali would answer things that sounded --

17   that gave his view about what was happening to him, that he

18   was being persecuted by the Federal Government, the United

19   States, that -- when I asked, "Do you know what a prosecutor

20   is," he answered, "Prosecutors are people who are just trying

21   to advance themselves, everybody is found guilty," a general

22   sense of things are very unfair and biased toward him.

23        When I tried to take that a little step around again to

24   just have a conversation with him and understand his cognitive

25   capacities and say is it like this -- I had said something

1    like, you know, is it like this just in the United States, is

2    it like this in other parts of the world, Dr. Mashali

3    answered, "Only in the United States."  The United States is,

4    you know, the most kind of criminal -- we have the most

5    incarcerated people, and other parts of the world, he

6    specifically named Europe, as being much more civilized and

7    had significantly better human rights for their citizens.

8         I asked a little bit more about that and asked what he

9    thought about China, just, again -- that wasn't meant to be a

10   political discussion, but to understand his intellectual

11   capacities, and he was able to talk about that.  He had

12   different opinions that were his own, but he was able to

13   express them in a clear and coherent way.  So, that was the

14   tenor of the interview.

15        I have my notes with me.  I'm happy to share any

16   specific questions and answers that I wrote down, but the

17   overall tenor was to stay away from anything that had to do

18   with the question at hand and he would be very sleepy and

19   passive and non-participatory, but then when it was away from

20   that topic, it was a -- it was really like talking to a

21   different person.

22   Q.   Would you describe his mood during the interview,

23   whether his mood changed depending on the topic, whether he

24   expressed his mood in any way to you?

25   A.   Yes.  I would say his mood and affect both varied during

the interview.  So, mood is what -- when you ask somebody how

their mood is, how they describe how they're feeling, and

affect is how people project with their facial expressions or

other things how they might sort of really be feeling.  So,

it's more what we observe in somebody's affect.

So, Dr. Mashali described his mood as kind of just okay.

He would sometimes say depressed, sometimes okay, discouraged,

but didn't talk much about it, really.  His affect when we

were -- when we were having a conversation about things other

than to do with his situation around the competency issue was

brighter.  I wouldn't say it was completely bright.  It wasn't

the most engaging, but it was noticeably brighter.  Meaning,

his eyes were more open.  He was able to smile a little bit.

He used a little bit of humor.  There were a couple of times

where we had a little banter back and forth, not that this was

necessarily so clinical again.  It was just for me to

understand his capacities.

So, for example, when he said that he thought there were

no problems with human rights abuses in China, I said, Gee,

you know -- something like, Gee, I'm not sure that's the case.

And he would, you know, get a little bit irritated with me if

I didn't agree.  So, his affect varied.  I would say when it

wasn't kind of tired and not participating, it was more on the

irritable, little bit of an angry tinge.

He also, I would say, you know, looked at times sad and

1    very discouraged, and when I would ask him about that, then he

2    would focus on his medical conditions and feeling that he

3    couldn't eat and that he had what he considers -- or

4    considered a terminal illness and wanted pain medication and

5    just wanted to be left alone.

6    Q.   Did you ask him whether he understood the charges

7    against him?

8    A.   I did.

9    Q.   And what was the response?

10   A.   He answered me -- it's in my report.  It was something

11   to the effect of, "I didn't overbill Medicare anything."  I

12   hadn't specifically said Medicare, and that's about as much as

13   he would say, and then he would say, you know, "I didn't do

14   this," and I -- when he would say things like that, I would

15   explain to him, as I had started the interview, that I wasn't

16   -- the purpose of my evaluation was not to determine whether

17   he had or hadn't done anything, but was to understand his

18   capacities.

19          THE COURT:  How much more do you have?

20          MR. GRINBERG:  Probably another half an hour, your

21   Honor.

22          THE COURT:  Let's stretch.

23          (Stretch break.)

24          THE COURT:  Okay.  You may proceed.

25          THE WITNESS:  Thank you.

1          THE COURT:  You laugh about the stretching, but when

2    we have a jury, we usually do this about every half an hour.

3          THE WITNESS:  It was very nice.  Thank you.

4          THE COURT:  As time goes by, it's noticeable how they

5    become irritable because they haven't stretched.

6          THE WITNESS:  I appreciate it.  My laugh was

7    appreciation.

8    Q.  This theme of Fathalla Mashali being -- feeling

9    pessimistic and just seeking comfort care, is this something

10   that you saw just during this meeting with Fathalla Mashali or

11   was that something that you've seen sort of in other records

12   or talking to other providers or was Fathalla Mashali not

13   okay --

14   A.  It's been in the record and it's something that other

15   providers -- he's talked with other providers about.  When I

16   reviewed the Plymouth County House of Corrections medical

17   records from 2014, very early on while he was there, he was at

18   times refusing fluids, refusing food, refusing to take his

19   medications, saying to the doctors or people watching him -- I

20   remember one instance where he said, "If I don't drink, I'll

21   be acidotic.  I'll die by morning."  Or another time, "I'll go

22   into renal failure and I'll die."

23          So, there was -- there were a number of references in

24   those records about not taking in adequate food nutrition or

25   medication to sustain himself.  Those references were also

1    made in Mass General.  He actually asked for palliative care

2    consult.  Palliative care team is a team that comes in when a

3    patient has a terminal illness and takes care of that patient

4    when there's a reasonable assumption that no viable treatment

5    is left for the patient, and then palliative care is a way of

6    keeping people comfortable with pain medications and fluids or

7    whatever they choose.

8         Dr. Mashali asked for palliative care consult while he

9    was on Blake 11 and the palliative care team actually declined

10   the consult because he did say he did not have a terminal

11   illness and it would be inappropriate.  So, they did not see

12   him.

13   Q.   You mentioned that Fathalla Mashali has been diagnosed

14   with a condition called gastroparesis, if I'm pronouncing it

15   right?

16             THE COURT:  Called what?

17             MR. GRINBERG:  Gastroparesis.

18   A.   Gastroparesis, yes.

19   Q.   So, can you describe that?  Are you familiar with that

20   condition?

21   A.   Yes.

22   Q.   What is that condition?

23   A.   So, gastro refers to the stomach, gastric, and paresis

24   to paralysis.  So, Dr. Mashali has been -- he's had some

25   studies that have shown gastroparesis and he's had fewer that

1    have shown that he doesn't have it, but more have diagnosed

2    gastroparesis than have not.  It's a matter of degree.  There

3    is mild, moderate, severe, and probably everything in between.

4    It's a slowing down -- the stomach when it accepts food from

5    the mouth and the esophagus and then into the stomach, part of

6    the digestive system, it provides its own function in churning

7    the food around and then moves the food through muscles,

8    smooth muscle action, into the small intestine.

9         So, when gastroparesis is present, something has

10   interfered with that muscular function of the stomach and it's

11   slowed down to some degree.  And so, the food stays in the

12   stomach longer, making it difficult for the patient to eat

13   large amounts of food at a time.  Typically, people who have

14   gastroparesis have to be prescribed, and Dr. Mashali has been

15   prescribed multiple small meals a day rather than large

16   quantities of food at one time so that the stomach doesn't

17   have so much food to deal with to be able to move it along.

18   Q.   Are there other ways to cope with that condition?

19   A.   Yes.

20   Q.   What are some of those ways?

21   A.   Things like antacid medications, because if food stays

22   in the stomach too long, it can reflux, come back up into the

23   esophagus, and that is prescribed to Dr. Mashali.  Sometimes

24   people are prescribed medications, antibiotics, erythromycin

25   being a common one, and people who are taking it for

antibiotic reasons might get diarrhea from it, but in

gastroparesis patients, it helps things move along.  I don't

think that that would -- to the best of my knowledge, that was

not prescribed at the Mass General.  The GI gastroenterology

team saw Dr. Mashali in consultation at Mass General and they

recommended six small meals a day for treatment of his

gastroparesis.

Q.   Do you know if Fathalla Mashali followed up with that

treatment?

A.   He did not.

Q.   And what makes you say that?

A.   I reviewed all the records and I spoke with the nurses

taking care of him on both times that I visited, and he would

often just push his food tray away, wouldn't eat it.  He would

say that he was on a clear liquid diet when he wasn't.  He was

on six small meals a day.

When I saw him on one of the appointments -- I think it

was the second -- I'm not sure if it was the first or

second -- he had a whole tray of food in front of him and said

that that was not his menu and that was wrong.  I checked with

the nurse and she said that was, in fact, his correct menu.

I was concerned about it because he just seemed -- his

mouth was dry, you know, he didn't seem well, and I knew that

he was taking good nutrition at the hospital, and I asked him

a number of times if he could -- there was a little container

1   of orange juice on the tray, if he could at least take that,

2   and he hesitated a few times and said, no, no, he didn't want

3   it.  I sort of insisted.  I would really like you to take it

4   because you need some calories and fluid and nutrition, and he

5   drank it and he actually -- it was helpful for me to see that

6   he drank it without any difficulty, and then we met for an

7   hour or more and he kept it down and didn't reflux back up.

8   So, I think that eating and keeping food down has been

9   difficult for him and, in my opinion, has also been a way that

10  he has been trying to keep himself sick and avoid this whole

11  process.

12  Q.   Could you explain that?

13  A.   Starting back at Plymouth in 2014, he was -- they were

14  using words "hunger strike" and saying, you know, he was

15  refusing food and fluid, and they were concerned about him.

16  He made at least one trip to the Boston Medical Center for

17  intravenous fluids for dehydration.  MGH saw the food refusal

18  as part of his not -- you know, not being well and --

19       MR. DENNER:  Your Honor, I object to what MGH saw it

20  as.  What the doctor sees it as is one thing.  If it's in the

21  medical records and -- in the medical records I don't believe

22  it is that way, but I don't think the doctor's --

23       THE COURT:  Are they not in evidence, too?

24       MR. DENNER:  The MGH records are in evidence, yes.  I

25  think they're in evidence, yes.

```
1              THE COURT:  So, she can opine concerning what she
2    learned from them, can she not?
3              MR. DENNER:  She can if those things are in there
4    like that, yes, but if it's her opinion based on --
5              THE COURT:  Well, that's what she's talking about.
6              MR. DENNER:  Well, her opinion based -- if what she's
7    saying is that the Mass General people felt a certain way and
8    it's in there, then I would agree with the Court.  I'm not
9    remembering the Mass General people saying that at any point
10   that he was not eating to make himself ill.  I remember them
11   saying in a variety of records that we have that he was
12   vomiting quite frequently every time he ate.  That's one of
13   the reasons that he was hospitalized in the first place and,
14   clearly, when you're vomiting all the time, it doesn't make
15   you want to eat solid food.  If it's in the report and it says
16   Mass General has said that he is trying to make himself ill by
17   not eating, then I would say that's proper comment, but for
18   her to surmise that's what they're thinking is not, and I --
19   my objection --
20             THE COURT:  Tell us what you found in the report and
21   not your view of what they were thinking, please.  We want
22   your view, your thinking.
23             THE WITNESS:  Yes.
24             THE COURT:  But based on the facts, not other
25   people's opinions.
```

1            THE WITNESS:  Okay.

2      A.    So, what I observed and what the nurses when I visited

3    Dr. Mashali told me was that -- and this is in the Mass

4    General record -- that when Dr. Mashali was being observed, he

5    would tend not to eat.  When he was -- when he didn't think he

6    was being observed by staff and on a couple of occasions such

7    as when family brought him food, his affect was brighter.  He

8    was engaged and he ate the food brought in by family without

9    any difficulty.

10           He was also observed -- and I believe that this is in

11   the record -- that at times he would -- and this is also

12   documented in other records.  At times he would overeat and

13   would vomit from overeating.

14           One provider -- and I'm not going to remember where in

15   the record, but it's in one of the medical records -- wondered

16   about whether or not Dr. Mashali had an eating disorder.  I

17   don't believe that that was ever pursued beyond that.  That's

18   what I recall.

19     Q.    During the two-hour meeting or so with Fathalla Mashali

20   at MGH, did he fall asleep at any time with you?

21     A.    He didn't fall asleep.  He would close his eyes and --

22   my experience of it was that he was disinterested, irritable

23   and not at all happy that I was there.

24     Q.    Did he ever not understand questions that you were

25   asking him?

1    A.   He -- no.   He understood the questions.

2         MR. DENNER:   Again, your Honor, I object to that

3    question and I move to strike the answer unless there's a

4    better foundation of how she understands what he understands

5    and doesn't understand.

6         THE COURT:   Well, she can tell us that based on her

7    observation and the responses that she -- that he gave to her

8    questions.

9         MR. DENNER:   I agree, and that would be the

10   foundation based on --

11        THE COURT:   But she's entitled to give us her

12   conclusion based upon the entire experience and I think that's

13   what she's doing.

14   Q.   Did you have another meeting with Fathalla Mashali at

15   MGH in mid April of 2016?

16   A.   I did.

17   Q.   Do you recall the exact date?

18   A.   I would have to look.   I think it was April 10th, but

19   let me just -- actually, it may have been the 15th.   Let me

20   check.   (Examining) April 15th.

21   Q.   All right.   Now, what prompted you to meet with Fathalla

22   Mashali for the third time?

23   A.   Well, I think it's important to see people -- oftentimes

24   it's important to see people more than once in an evaluation

25   like this.   There are times where I feel like I can do what I

1    need to do with one meeting, but every situation is different.

2    Every case is different.  I think this case is among the more

3    complicated and it's -- in some ways and because the first

4    meeting was so brief and, essentially, a non-meeting, although

5    there was some data to gather from there.  I wanted to see how

6    he was doing after he had been in the hospital for a period of

7    time and to see just how he would respond to me and if I could

8    get any more information.

9              THE COURT:  When was the third meeting?

10             THE WITNESS:  It was April 15th, 2016.

11             THE COURT:  Thank you.

12   Q.   How long did this meeting last?

13   A.   About two hours.

14   Q.   And will you describe that meeting for the Court.

15   A.   It was very much -- it was similar to the first meeting,

16   although I think Dr. Mashali was a little bit more alert for

17   that meeting.  He was a bit more talkative.  He seemed a bit

18   less irritated with me and my questions.  His answers were

19   very much the same as they had been, as I previously

20   described.

21        I think one of the most notable things from that meeting

22   was -- again, I didn't -- I wasn't able to get from him

23   anything more sort of what I thought as accurate in terms of

24   the roles of people in the courtroom because he had his own

25   views of what people do and why they do it, as I had described

1   earlier.

2        When I tried to talk to him a bit more about working

3   with Attorney Denner, which I understood from Attorney Denner

4   had been very, very difficult in terms of him not

5   participating, he perked up quite a bit and this was toward

6   the end of the meeting and got angry at me, I thought.  At

7   least was expressing anger, perhaps at my question and not at

8   me.  When I asked him about reviewing documents and what it

9   would take, you know, to participate in his defense with his

10  attorney and -- you know, he said to me something like, you

11  know, "What do you expect me to do, read millions of pages of

12  documents."  And it was very sarcastic, bitter tone that to me

13  felt like -- you know, he felt not only very overwhelmed by

14  that, but also bothered by that.

15      Q.   By what?

16      A.   By having to potentially read, these were his words,

17  "millions of pages of documents."  I think that's -- in the

18  first interview he had said to me, "thousands of pages of

19  documents," and this one, perhaps for emphasis, maybe there

20  are millions, but he said, "millions of pages of documents."

21  And he, I think, was trying to communicate to me that that was

22  an impossible task for him to do.

23      Q.   Did he have an opinion as to why he was being

24  prosecuted?  Did he express that to you, why he was in the

25  criminal system?

1          MR. DENNER:  Your Honor, I object to this, your

2     Honor.  I think it's been asked and answered, for one thing,

3     but I also think it is leading.

4          THE COURT:  I thought the question was did he say

5     anything on that particular issue.

6          MR. GRINBERG:  Yes.

7          THE COURT:  She can have that.

8      A.   Well, Dr. Mashali had expressed in the first interview

9     -- well, the second -- the first being at my office, which

10    abbreviated -- during the second and during the third, some

11    ideas, beliefs that he had that he was being prosecuted

12    because he was Muslim, and in the third interview -- at the

13    third and final interview -- I've got to refer to my notes

14    because I don't want to misspeak in terms of how it came up.

15          (Pause.)

16     A.   He talked not only about being Muslim, but -- and I

17    don't actually have my question here to know how it came up,

18    but he shared with me that he is African-American, and I kind

19    of looked at him, I think a little bit surprised.  And I said,

20    "You're African-American?" or, "You're black?"  And he said,

21    "Well, Egypt is in Africa."  And I'm saying this because it

22    was Dr. Mashali's tone to me and way of communicating with me

23    is data for me in terms of how he is experiencing this

24    process, which I think is that he has a view that he is being

25    -- potentially being prosecuted for reasons other than he is

1    being prosecuted.

2        Q.   Now, did you learn anything about the neuropsych testing

3    done, test conducted at MGH?

4        A.   Yes.

5        Q.   So, explain that.

6        A.   MGH performed two tests, one called the MOCA, which is

7    M-O-C-A.  It stands for the Montreal Cognitive Assessment.

8    It's a very brief question -- questionnaire where you can

9    score up to 25 points, very simple test, answering orientation

10   questions, drawing a figure, short-term memory, those sorts of

11   things.  The maximum score that you can produce is a 25.  Dr.

12   Mashali scored, I think, a five, which basically invalidated

13   the test because to score that low, you would, you know,

14   really have to have very, very severe illness, such as sort of

15   end stage Alzheimer's or something of that nature.  It's

16   almost not participating to score that low.  Dementia patients

17   score maybe in the 13, 14, 15 range.  So, MGH in their records

18   opined that it was not a valid test, thought that he had

19   deliberately made it invalid.

20            They also -- they also administered something called --

21   attempted to administer something called the PAI, Personality

22   Assessment Inventory.  That's a measure of personality

23   characteristics and psychopathology and, as with the MOCA, Dr.

24   Mashali -- well, not just as with the MOCA.  He invalidated

25   the test, but he invalidated it in a different way.  He

1    invalidated by overproducing symptoms.  So, scoring so high on

2    psychopathology scores, that the test wasn't valid.

3              THE COURT:  So, both tests were not -- showed

4    nothing?

5              THE WITNESS:  It's not that they showed nothing.

6    It's that they were invalidated.  So, the MOCA wasn't useful

7    as an orientation mental status test because his effort was so

8    low, and the PAI was invalid because his effort -- he appeared

9    to -- he tried to make himself appear much more

10   psychiatrically ill than he is -- or was, you know, sitting in

11   front of them.  So, they couldn't be reliably scored.

12   Q.   Did MGH prescribe -- do you know whether Fathalla

13   Mashali was released from MGH?

14   A.   He was.

15   Q.   And do you know what he was diagnosed with at MGH?

16   A.   Yes.

17   Q.   What was he diagnosed with?

18   A.   He was diagnosed with a mood disorder --

19             THE COURT:  With a mood disorder?

20             THE WITNESS:  A mood disorder.

21   A.   (Continuing) Depression.  He was diagnosed with a mood

22   disorder with psychotic features.  I discussed that part with

23   Dr. Beck because I hadn't seen any evidence of psychosis,

24   which is an abnormal thinking pattern, and it was explained to

25   me that they added that piece because of Dr. Mashali's

1   presentation at times of things that I described, that the

2   government is the way it is, and things of that nature, but

3   that they didn't -- they thought that that was more kind of a

4   personal belief system.

5        They prescribed -- I think it's important to note that

6   because they prescribed a medication called Risperdal, which

7   is an antipsychotic medication at a very low dose, but they

8   prescribed that, and I verified this with Dr. Beck because it

9   can also be used for mood.

10        MR. DENNER:  Your Honor, if I may.  Dr. Beck is here

11   today.  Rather than get this hearsay, I would rather get it

12   from Dr. Beck, if the Court please.

13        THE COURT:  Okay.  You said a mood disorder.  And

14   then the second diagnosis was what?

15        THE WITNESS:  Well, they diagnosed mood disorder with

16   psychotic features, and then the second diagnosis --

17        THE COURT:  I think there was something in between.

18   Mood disorder and then something and then mood disorder with

19   psychotic --

20        THE WITNESS:  No.  Mood disorder with psychotic

21   features.

22        THE COURT:  Okay.

23   A.   (Continuing) They also diagnosed narcissistic

24   personality disorder, and they diagnosed antisocial

25   personality disorder and they diagnosed malingering.

1    Q.   Before we get the narcissistic disorder --

2         THE COURT:  I'm sorry?

3    Q.   Before we get to the narcissistic disorder and the

4    malingering, what is the difference between having psychotic

5    features and being psychotic?

6         MR. DENNER:  Objection, your Honor.

7         THE COURT:  She can tell us.  I don't know what it

8    means in the context of this case, but I will allow her to say

9    so.

10        MR. DENNER:  Just simply, is there a difference and

11   if there is, what it is.  He's suggesting there is a

12   difference.  I would like her -- there's not a foundation for

13   that question.

14        THE COURT:  Yes, there is.  I'll allow it.

15   A.   Could you repeat the question?

16   Q.   Yes.

17        THE COURT:  What's the difference between a mood

18   disorder --

19   Q.   No.  What is the difference between having psychotic

20   features and being psychotic, if there is a difference?

21   A.   Psychotic -- so, people can report psychotic symptoms

22   that sound paranoid to the sort of general population or

23   treaters.  They can report that they hear things or see

24   things.  So, those would be psychotic features.  Those can

25   also be observed in patients who can deny having them.  So,

1    people can be responding as if they were looking like they are

2    responding to voices or they're seeing things by their body

3    language and how they're acting in the world, and someone may

4    observe, I think that person is experiencing psychosis, but

5    they may deny it.  A psychotic disorder is when it's actually

6    been diagnosed, that we have a significant amount of data over

7    a period of time to substantiate that diagnosis.

8    Q.   Okay.  What is a narcissistic disorder?  What does that

9    mean?

10         THE COURT:  What is a what?

11   Q.   Narcissistic disorder, what is that?

12   A.   So, a narcissistic personality disorder is a combination

13   of personality characteristics.  Personality disorders, in

14   general, no matter which one they are, which combination, are

15   described as and observed to be chronic, maladaptive

16   personality traits that interfere with the individual's

17   social, occupational, family life, functioning in the world.

18   So, patterns of behavior, patterns of responding, patterns of

19   getting along with people or not that create chronic

20   difficulties in that person's life over time.

21        The narcissistic disorders are the ones referring to

22   individuals who are very self-centered and self-oriented as

23   opposed to more compassionate, empathic, oriented to others.

24   So, the person from -- the Greek Mythology of Narcissus,

25   looking in the image of -- kind of seeing the image of one's

1    self and that being the most kind of important thing.

2    Q.   Do you agree or disagree with the MGH's conclusion that

3    Fathalla Mashali suffers from narcissistic personality

4    disorder?

5    A.   I tend to agree.

6    Q.   Why?

7    A.   My interactions with Dr. Mashali and from everything

8    I've read -- you know, I don't want to say that -- and this is

9    true of people with narcissistic disorder.  It's not as though

10   they don't care about anybody or anything other than

11   themselves.  So, they certainly can care about family and

12   things like that, but the prime kind of motivator for that

13   person is what they get for themselves, kind of above other

14   people, and in some ways regardless of consequences.  In that

15   way it runs with -- meaning it often is seen with antisocial

16   characteristics, because someone who has that type of

17   personality structure where they come first, we tend to see

18   those individuals -- also, antisocial is just what it sounds.

19   It's against society -- are at risk and tend to live in the

20   world in such a way that it's more about them than potentially

21   following the rules or doing things as they should be done,

22   whether they kind of like it or not.

23   Q.   How did this narcissistic personality disorder manifest

24   itself with Fathalla Mashali?

25   A.   In my meetings with him, I found his presentation very

1    much about himself, what -- and I don't want to discredit his

2    suffering with his medical illnesses.  Those are real, but

3    really to the extent of sort of anybody else.  When I asked

4    about family or about colleagues or about other people, you

5    know -- and, again, also keeping in mind that some of this

6    could be depression, but to me it had more the feeling of, I'm

7    the one hurting, I'm in trouble, you know, give me what I

8    want, and -- and Dr. Mashali said to me multiple times, you

9    know, "They'll all be fine," just -- "they'll just all be

10   fine.  Just never mind about them."  I was particularly, you

11   know, concerned about the children and the family for that

12   reason.

13   Q.   How does this disorder relate to a determination of

14   Fathalla Mashali's competence to stand trial?

15   A.   It doesn't interfere with any of the intellectual

16   capacities to be competent to stand trial.  It may make Dr.

17   Mashali -- it may -- I don't want to say it always does

18   because there are lots and lots of people who are narcissistic

19   and antisocial who very much want to participate with their

20   attorney and put forth their own views of their situation.

21        In this situation, my sense of Dr. Mashali is that he --

22   and I think he is a very bright man and he's highly educated,

23   and I think it's -- in some ways he -- and this is just my

24   opinion and impression -- you know, can kind of feel like the

25   smartest person in the room and not particularly interested in

1    what other people think or their opinions.

2           MR. DENNER:  Your Honor, may I assume that the

3    doctor's opinions that she's rendering are all held to a

4    requisite degree of medical certainty?

5           THE COURT:  I'm sorry?

6           MR. DENNER:  May I agree that every opinion that she

7    has is to a requisite degree of medical certainty?

8           THE COURT:  Oh, yes.

9           MR. DENNER:  Okay.

10          THE COURT:  That is, she doesn't have to tell us each

11   time she gives an opinion, yes, we agree with that.

12          MR. DENNER:  Okay.

13   Q.   Fathalla Mashali was also diagnosed with malingering at

14   MGH.  Do you agree with that diagnosis?

15   A.   I do.

16   Q.   First of all, what does that term mean?  What is

17   malingering?

18   A.   Well, psychiatrists like to use a lot of terms.  So,

19   malingering is simply a term that means, you know, not being

20   truthful.  So, it could be fabrication of symptoms.  It could

21   be outright not telling the truth about certain things.

22          In this situation, I agree with the diagnosis.  I think

23   that a significant portion of what Dr. Mashali has been doing

24   since 2014 and even a little bit before that, has been, along

25   with his legitimate medical illness, the intentional

1    production of symptoms.  So that he is unwell and then unwell

2    enough, that he will appear to be not competent to stand

3    trial.

4       Q.   So, you've talked about a condition of gastroparesis in

5    this case.  Does that factor determination -- the fact that he

6    suffers from that condition, affect your determination that

7    he's competent to stand trial?

8       A.   No.  I think it's something that he struggles with and

9    he has to be very careful with what he eats and follow his

10   doctor's recommendations.  His weight has been quite low for a

11   long time.  I reviewed them in preparation for today again

12   and, you know, he was in the 120-, 130-pound range back at

13   Plymouth in 2014, which is a very low BMI, body mass index,

14   for his height.  He is also, though -- along the way over

15   years since then, he's been recorded as having weights in the

16   130's and 140's.  So, there are times where he does get better

17   nutrition than others, but I think hunger strikes -- and I

18   don't want to overuse that word because of the length.  I'm

19   not making kind of a medical or legal definition of that, but

20   I think not eating has been a way of keeping himself weak and

21   ill.

22      Q.   Did you see that he was diagnosed with the condition of

23   sarcoidosis?

24      A.   Yes.

25      Q.   What is that condition?

A.   So, that's an inflammatory illness.  It causes things
called granulomas in various parts of the body, and Dr.
Mashali has been diagnosed with that.  He was diagnosed
apparently some matter of years ago.  I didn't see the
original medical records.  The biopsy at Beth Israel did show
granulomas and he was treated with steroids for quite a long
while.  When I saw him at Mass General, he was taken off
steroids.  From the records I just received yesterday from
your office from Care Center in Lexington where he had been
admitted for a few days, I noted that he had been recently put
back on Prednisone for -- I believe for that reason.  It
actually could be for something else, but -- so, yes, the
sarcoid has been there for a long time and has been stable.

Q.   Does that condition affect his capacity to stand trial?

A.   In my opinion, no.

Q.   Why not?

A.   I don't think it affects his mental state at all.  I
think it affects his overall physical health, but not to a
degree that he cannot understand the nature of the charges and
participate with his attorney.

Q.   Having reviewed extensive medical records, how long has
Fathalla Mashali experienced these conditions of gastroparesis
and sarcoidosis?

A.   They've been for years.  They were for years before his
difficulties.

1    Q.   What do you mean by "difficulties"?

2    A.   Legal situation.

3    Q.   Okay.  And from your review of the medical records, has

4    anything changed -- medically changed to make these conditions

5    worse in the past two years?

6    A.   Not necessarily the conditions worse.  I think that his

7    -- the feeding pattern has certainly made him at times more

8    weak.  He has a problem with low blood pressure from lack of

9    taking enough fluids.  I did note in the most recent record

10   from the Lexington facility, that that has improved, and he's

11   been prescribed some medication by a cardiologist -- I don't

12   want to misspeak.  I thought it was at BI, but I'm not sure

13   about that -- very recently to improve his blood pressure.  He

14   also takes an antihypertensive.  So, he has hypertension and

15   takes high blood pressure medicine, and he doesn't drink

16   enough fluids.  So, he drops his blood pressure.  Certainly

17   seeing Dr. Mashali today, he looks significantly better than

18   when I saw him in March.

19   Q.   Have you heard from opposing counsel in this case that

20   Mashali wasn't engaging with counsel?  Have you heard that in

21   the past from Mr. Denner?

22   A.   Was not engaging with Attorney Denner?

23   Q.   Yes.

24   A.   Yes.

25   Q.   So, what do you make of that?

1  A.   I think, my opinion, after observing all of this, is I

2  don't think -- I think Dr. Mashali is overwhelmed by these

3  charges.  I think this has been a huge loss for him, of his

4  medical license and his practice.  It's been -- I think it's

5  been devastating to him and I think to his family as well.  I

6  think, you know, facing that is an enormous task that would be

7  difficult for anybody.  I think it's difficult for Dr.

8  Mashali, and I think with that amount of stress, to say the

9  least, being faced with reading, whether there are thousands

10 or millions of pages of documents, and reviewing this very

11 difficult material, whatever it is, with Attorney Denner is

12 probably quite a daunting task.

13 Q.   You mentioned in your report that, in your opinion,

14 Fathalla Mashali has the capacity to aid his defense and that

15 he makes -- he makes -- it's almost an unconscious decision

16 not to participate in the defense; is that correct?

17       MR. DENNER:  Objection, your Honor.

18 Q.   Is that what your report says?

19       THE COURT:  Well, if it's in the report, she can

20 point out where in the report it is.

21 Q.   The last page of your report, which is Page 11, it's Tab

22 2, the middle paragraph, which begins, "It is also my opinion

23 that Dr. Mashali is choosing not to demonstrate his capacities

24 to stand trial, specifically by not working with his attorney

25 on his defense, so as to avoid a trial.  He is doing this both

1    through deliberate and ongoing poor self care, including poor

2    oral intake of food and taking to bed so as to become

3    deconditioned and weak."  Do you see that?

4    A.   I do.

5    Q.   All right.  So, can you elaborate on this?

6         THE COURT:  I don't know what elaboration it needs.

7    It's perfectly clear to me.

8    Q.   All right.  Let me ask you this.  Could somebody make --

9    you say that he makes, essentially, a conscious effort not to

10   participate in preparation for trial.  Could somebody say that

11   what you call a choice was not a choice, that it's part of his

12   underlying condition that he is suffering?  How do you refute

13   that argument?

14        MR. DENNER:  Your Honor, I object.

15        THE COURT:  Sustained.

16        MR. DENNER:  Could someone say how do you refute the

17   argument that someone --

18        THE COURT:  I sustained it.

19   Q.   Let me show you Exhibit No. 4 -- actually, if you would

20   turn to tab No. 4.  We'll go through these very quickly.  Do

21   you have it in front of you?

22   A.   The Plymouth County Correctional facility?

23   Q.   Right.  Is that something that you reviewed?

24   A.   Yes.

25   Q.   Is this at the time that Fathalla Mashali was initially

 1   detained after arrest in this case?

 2    A.   Yes.

 3    Q.   Do you see -- do you see the very first line, which

 4   says, "M.O. on this shift stated that above inmate Mashali" --

 5   oh, I'm sorry.  You should be looking at the page which is

 6   marked Page 47 at the bottom, and I think the pages are

 7   reversed --

 8    A.   Yes.

 9    Q.   So, we're now on the right page?

10    A.   Yes.

11    Q.   Okay.  So, the first sentence says that, "M.O. on" -- I

12   can't quite read this -- "on this shift stated that above

13   inmate Mashali, Fathalla refused to sign an ROI for all of his

14   medical complaints stated," quote, "You can call Walgreen's

15   and get my meds."  Do you see that?

16             THE COURT:  What are you reading, Page -- Bates

17   number --

18             MR. GRINBERG:  47, your Honor.

19             THE COURT:  47?

20             MR. GRINBERG:  Right.  The pages are reversed.

21             THE COURT:  From the top or where?

22             MR. GRINBERG:  Yes, the very first line.

23             MR. DENNER:  Bottom right corner, your Honor.

24             MR. GRINBERG:  It's the top -- it's the very top of

25   the page, your Honor, the first sentence on Page 47.

1              THE COURT:  Okay.  At 1930 hours, right?

2              MR. GRINBERG:  Yes, that is correct.

3              THE COURT:  It says M.O. or M.D.?

4              MR. GRINBERG:  Actually, it probably says, "M.D."

5      Q.   So, do you see this purported refusal to sign off on all

6      indications and asking staff to call Walgreen's to find out

7      what his prescriptions are?

8      A.   Yes.

9      Q.   Okay.  Let's turn to Tab 5.  In the middle of that page,

10     there's a sentence that begins with the word, "reports."

11     "Report" -- "reports refusal to drink water."  It looks like

12     it says, "based on taste."  Do you see that?

13     A.   Yes.

14     Q.   "Then asked if he understands that not drinking fluids

15     will lead to his death, patient responses that it will be this

16     provider's fault if he dies, not his."  Do you see that?

17     A.   Yes.

18     Q.   Let's turn to Tab No. 6.  All right.  Tab 6, in the

19     second -- in the bottom half of the page, where it begins

20     with, "9/14/2015 and 16:36."  Do you see that?

21     A.   Yes.  Yes, I do.

22     Q.   And the second sentence there begins with, "Patient

23     states that he was eating the hospital food, but decided

24     against it on Thursday.  He states since that time his wife

25     has been bringing him meals.  He states that now he has asked

1   his wife to not bring his meals, as this is something the

2   hospital should be able to provide.  He states that unless the

3   kitchen is Kosher or Halal, he will not eat from it.  He

4   states that he doesn't want his wife involved.  He states that

5   we don't want him to eat or we wouldn't be doing this."  Do

6   you see that?

7   A.   Yes.

8   Q.   And then at the very bottom of that page, the last

9   paragraph, it begins with, "I went to check on the patient

10  after speaking with MD and Admin, and patient stated he would

11  no longer accept any visits or food from his wife, and due to

12  no longer accepting food from family, the hospital would now

13  have to provide him with a Hala Muslim diet.  Multiple calls

14  made to kitchen to try to accommodate this request.  Patient

15  ultimately refusing to accept any food from the hospital

16  kitchen as it is not a Hala kitchen."

17       MR. DENNER:  Respectfully, your Honor, shouldn't we

18  get some context, where this is, what hospital, what is going

19  on?

20       MR. GRINBERG:  That's a good point.

21  Q.   And this is Norwood Hospital.  Would you agree with

22  that?

23  A.   Yes.

24  Q.   And the date is September 13th of 2015?

25  A.   Yes.

1   Q.   Okay.  So, the next page, which is the page that ends on

2   "90."  It goes on.  "States he will eat from Sabb's Market and

3   another kitchen in Norwood, but refused to call his wife to

4   ask her to bring something in.  He had not eaten all day.  So,

5   I called the nursing supervisor Colleen to ask for a voucher

6   or petty cash to obtain this patient at least one meal today,

7   and was told that none existed, but it was okay to use my own

8   money since I could be reimbursed by management.  I offered to

9   patient to go pick him up some food if he wanted to call and

10  order it and he adamantly refused to let me use my own money,

11  stating he would only accept meal if paid for by the

12  administration or by Dr. Robinson."  Do you see that?

13  A.   Yes.

14  Q.   "As I wanted the patient to eat, I spent well over an

15  hour trying to convince him that I would certainly get

16  reimbursed by my manager.  So, it was no problem for me to get

17  the food.  Patient continued to refuse."  Do you see that?

18  A.   Yes.

19       MR. DENNER:  Your Honor, if your Honor is finding

20  this valuable, I won't object, but it seems to me that this

21  simply indicates that he is a very sick individual, antisocial

22  personality and narcissistic personality, and I don't really

23  see it being material to what we're talking about here.

24       THE COURT:  I think he is trying to emphasize the

25  unwillingness to eat, but I'm not sure why we have to read

1    into the record what is already in the record.

2            MR. GRINBERG:  Well, at some point I need to

3    highlight it, and I'm going to ask Dr. Fife if this is

4    consistent with observations that he's malingering.

5            THE COURT:  Well, let's have the question then and be

6    done with it.

7            Is that consistent with your observation and

8    diagnosis?

9            THE WITNESS:  It is.

10           THE COURT:  Thank you.

11   Q.   May we turn to Tab No. 7.  So, this is a record from

12   MGH, correct?

13   A.   Oh, sorry.  You're on the next one?

14   Q.   Yes.

15   A.   My apology.  Yes, from MGH.

16   Q.   And the date here is November 17th, 2015?

17   A.   Yes.

18   Q.   So, we're moving along.  And right in the middle -- so,

19   this is signed by Sean Glass, M.D., correct, on the top?

20   A.   Yes.

21   Q.   Do you know if he's a psychiatrist at MGH?

22   A.   He is.

23   Q.   So, in the middle of that page, it says, "States that

24   his memory is poor and that he was" -- "and that he has felt,"

25   quote, "confused, but when I attempted to do further cognitive

1    testing, there was," plus sign, presumably plus,

2    "confabulation and avoidance of participating in testing."  Do

3    you see that?

4    A.    Yes.

5    Q.    Okay.  Let's turn to Page 8 -- Tab 8.  I'm sorry.

6          So, now we're to January 6 of 2016.  This is another

7    record from MGH?

8    A.    It is.

9    Q.    If you go to the middle of the page, there's a paragraph

10   which begins with, "M.S."  Do you see that?

11   A.    Mental status, yes.

12   Q.    "Awake and alert" --

13         THE COURT:  Who is writing this?

14   Q.    Do you see on top it says, "David L. Perez, M.D." from

15   MGH?

16   A.    This is a neurology consult.

17   Q.    So that section states, "Awake and alert.  Throughout

18   the interview, he was attentive, able to give a thorough and

19   comprehensive review of his workup to date at both BWH and

20   BID, was able to name MGH and inquired about

21   neuropsychological care here."  What is BWH?

22   A.    Brigham and Women's Hospital, Beth Israel Deaconess

23   Hospital.

24   Q.    "However, on formal tested he was oriented to self, was

25   unsure if he was at MGH, though knew hospital, gave the date

```
 1   as a Monday in December 2017 (rather than Tuesday, January
 2   2016).  He gave a jumbled answer to the days of the week
 3   backwards.  Speech was fluent and he named a watch, ring and
 4   stethoscope.  He followed commands easily."  Do you see that?
 5   A.   Yes.
 6   Q.   Now, are these observations consistent with your
 7   diagnosis of malingering?
 8   A.   Yes.
 9   Q.   On April 27th you wrote a letter to the Court, correct?
10   A.   Yes.
11   Q.   And that was after you submitted your competency report?
12   A.   Yes.
13   Q.   What was the purpose of you writing this letter to the
14   Court?
15   A.   I was very concerned after Dr. Mashali was discharged
16   from Mass General, that if he returned home, he would -- I was
17   concerned on a number of levels.  I was concerned that if he
18   returned home, he would not take in adequate food and fluids
19   and continue down this path, which would have potentially very
20   dire consequences.  I was concerned that he would not be
21   adherent with his medications.  He had been prescribed an
22   antidepressant at Mass General and that deserved a good number
23   of weeks trial before we could -- the people treating him
24   could see that there was any benefit from it.
25        My primary concern was nutrition.  I also had very
```

1    serious concerns and I talked with the MGH social worker and

2    attending about this, about Dr. Mashali being at home, given

3    that my understanding and knowledge was that his wife is a

4    periodontist, was working outside the home as much as she

5    could.  Therefore, children at home with quite a wide age

6    range from a young -- late toddler to a high school student,

7    and that the care of the children was being placed in the care

8    of the older children and the younger children, not that Dr.

9    Mashali's wife was not caring for the children.  I'm not

10   saying that, but I was just concerned about the level of

11   stress that the family was under, and I was also very

12   concerned for the psychological welfare of the children,

13   seeing their father in the condition that he was.

14        Now, as I said earlier, Dr. Mashali looks significantly

15   better today -- I have not spoken with him -- than when I saw

16   him in the hospital back the last time in April.  Some of that

17   may be because he has a nice haircut and he shaved a very long

18   beard.  His hair was very long and was really very disheveled,

19   was wearing the same clothes that were stained and had food

20   all over them, and he looks to me -- I don't know his weight

21   today, but he's put on some weight.  His complexion looks

22   better.  He just looks significantly better to me.

23        Now, I also understand that he was recently in another

24   hospital after taking too much medication and being then at a

25   rehab.  So, having another episode, and I just thought in the

1   totality of it, that I was worried about his safety.  I was

2   worried about the exposure to the children and the stress of

3   the family.

4    Q.   So, let's go to that hospitalization.  I would ask you

5   to turn to Tab 10.

6        THE COURT:  You realize, Mr. Grinberg, that we cannot

7   take the recess until you're done.

8        MR. GRINBERG:  I realize that, your Honor.

9        THE COURT:  And we're in desperate need of a recess.

10        MR. GRINBERG:  I also realize that I said I would go

11   for half an hour and I did not do that, but I'm getting very

12   close.

13        THE COURT:  Are you about to finish?

14        MR. GRINBERG:  I think I have about ten minutes, at

15   most.

16        THE COURT:  Three minutes?

17        MR. GRINBERG:  Maybe -- well, let me ask her this.

18    Q.   So, this is in evidence.  You reviewed the records from

19   his recent hospitalization at Norwood Hospital?

20    A.   Yes.

21    Q.   Did you see anything there about Fathalla Mashali not

22   accepting treatment or food?

23        MR. DENNER:  Your Honor, other than "recent

24   hospitalization," could we get a date and have --

25        MR. GRINBERG:  Well, let me just -- I think it would

1    just be faster, your Honor, if I just show the record to the

2    witness.  We'll get through it really fast.

3        Q.  Let's just skip to Tab 11.  Okay.  Do you see a document

4    from Norwood Hospital there?

5        A.  Yes.

6        Q.  Do you see a date of May 5th, 2016?

7        A.  May 5th, yes, 2016.

8        Q.  I would direct you to -- on the second page there is a

9    paragraph numbered three.  Do you see that?

10       A.  Yes.

11       Q.  All right.  Kind of in the first third of that Paragraph

12   3 --

13       A.  I'm sorry.  What page are you on, again?

14       Q.  So, do you see Paragraph No. 3 on the second page?  It

15   begins with, "Possible overdose and history of severe

16   depression."

17       A.  So, is this Page 498?

18           THE COURT:  It's a document at Tab 11.

19       Q.  So, it's a document at Tab 11.  Turn to the second page

20   of that document --

21       A.  I'm sorry, I had the wrong --

22           MR. DENNER:  Can we have the number on the bottom

23   right of the page?

24       A.  Is it 515 on the bottom?

25       Q.  Yes -- 516.

1    A.   Thank you.

2    Q.   And do you see Paragraph No. 3?

3    A.   Yes.

4    Q.   It begins, "With possible overdose and history of severe

5    depression"?

6    A.   Yes.

7    Q.   All right.  "The patient was seen in consultation by Dr.

8    Tabroff who recommended inpatient admission."

9    A.   Yes.

10   Q.   "The patient is medically cleared for discharge to

11   psychiatric unit.  The patient originally was seen by Dr.

12   Tabroff in ICU when he was in unresponsive state.  He was also

13   seen him today" --

14          MR. DENNER:  Your Honor, if --

15          THE COURT:  Why do we need to read this into the

16   record, Mr. Grinberg?

17          MR. GRINBERG:  Well, I'm going to ask her a question.

18   Q.   Do you see --

19          THE COURT:  Well, then point her to the specific

20   piece of this and ask the question.

21   Q.   Do you see where it states that, "He got upset about

22   possible admission to inpatient psychiatric unit and requested

23   to be comfort measures only.  He refused all treatment.  He

24   wanted his IV to get removed."  Do you see that?

25   A.   Yes.

1    Q.   "He requested to sign the form that he wants to be

2    comfort measures only" --

3            MR. DENNER:  Your Honor --

4            MR. GRINBERG:  If I may finish my question.

5            MR. DENNER:  Your Honor, I'm objecting to the

6    question.  She can review it and he can ask her a question, is

7    there anything in there that X, Y or Z, but reading this into

8    the record is -- respectfully, I'm objecting to it.

9            THE COURT:  Can we do it without reading it?

10   Q.   Is that statement that I've now read, but should not

11   have, consistent with your diagnosis of malingering?

12   A.   I'm going to go back, if I can, and just review the

13   first page, first.

14           He was -- he was diagnosed -- he was admitted with

15   sepsis, which is an infection, probably due to aspiration

16   pneumonia.  They questioned a drug overdose because he was

17   unresponsive, and they note his history.  So, they didn't

18   completely know what was going on, and admitted him to the

19   ICU, and then Dr. Mashali wanted to refuse treatment.  Have

20   his IV removed.  Wanted comfort measures only, and did not

21   want to be transferred to a psychiatric unit.

22           So, this was both my concern coming true when I wrote

23   the letter to the Court after the discharge from MGH, that I

24   was extremely concerned that something like this was going to

25   happen again and that he was going to not take care of himself

1    at home, not get enough care at home, or some combination

2    thereof, and land back in the hospital.

3         He was diagnosed here with severe protein-calorie

4    malnutrition.  So, still not getting enough proper nutrition,

5    which is likely at the base of a lot of his issues because

6    many people do live with sarcoid and other things --

7         MR. DENNER:  Your Honor, if I may.  Is there a

8    question in front of the witness?  I've forgotten what the

9    question is.

10        THE COURT:  The question is whether she agrees with

11   the -- whether she -- what it means -- what this diagnosis

12   means to her opinion.  I think that was, in essence, the

13   question.

14        THE WITNESS:  About malingering.  So, I'm getting

15   there, about the malingering.

16   A.   (Continuing) So, I think that -- this to me was not --

17   it was -- I wasn't happy to hear this, but I wasn't surprised

18   to hear this, and I think it is consistent with how Dr.

19   Mashali has been not caring for himself since his legal

20   troubles began, not -- inadequate nutrition, food and fluids,

21   inadequate care, telling doctors what he'll take, what he

22   won't take, no consistent that I'm aware of at home being sure

23   that he is taking adequate fluids and nutrition, and then

24   lands back in the hospital, and I think is achieving the same

25   goal, which is to say comfort measures only, don't give me any

1   treatment.  I don't want any part of this.

2   Q.   And Tab 12 -- and I will not read anything from Tab 12,

3   but this is a document from Care One.  Have you had a chance

4   to look at that document?

5   A.   I just looked at it yesterday, yes.

6   Q.   All right.  What is Care One?  What kind of facility is

7   that?

8   A.   I believe it's a skilled nursing facility.

9   Q.   And are you aware of the date that he was admitted and

10  released from that facility, approximate dates?

11  A.   5/19/2016.  I'd have to look at the discharge date.

12  Q.   Is that June, approximately?

13  A.   I don't want to guess.

14  Q.   Okay.  Have you -- having reviewed this, does this

15  document change your opinion as to whether Fathalla Mashali is

16  competent to stand trial?

17  A.   No.

18  Q.   Why not?

19  A.   I think it's more of the same.  Actually, I think he

20  looks a little bit better during the stay.  I think this rehab

21  skilled nursing facility, they seem to have been beneficial to

22  him.  He worked with occupational therapy, physical therapy,

23  seems like they did some work.  His weight was up to 129

24  pounds, which is still not adequate for him, but better than

25  it was.  And they note that he, you know, needs support with

```
 1    walking, and things like that, but really looked pretty good
 2    and it didn't surprise me that being in a skilled nursing or
 3    rehab was providing him with the kind of support that he
 4    needs.
 5              MR. GRINBERG:  That's all I have for this witness,
 6    your Honor.
 7              THE COURT:  We'll take the morning recess now and
 8    resume in about 15 minutes.
 9              COURTROOM DEPUTY CLERK URSO:  All rise, please.
10              (Recess taken.)
11              THE COURT:  Please be seated.
12              Dr. Fife, you're still on.  Please be seated.
13              MR. DENNER:  If I may, your Honor.
14                        CROSS-EXAMINATION
15     BY MR. DENNER:
16     Q.   Good morning, Dr. Fife.
17     A.   Good morning.
18     Q.   We know each other.  I don't have to introduce myself.
19    And I want to thank you for truly --
20              THE COURT:  Mr. Denner, I really need you to speak
21    louder.
22     Q.   I want to thank you --
23              THE COURT:  -- not organizing my papers and making a
24    lot of noise.
25     Q.   I want to thank you for all of the hard work that you've
```

1    put into this case.

2        Now, in terms of your understanding of Dr. Mashali's

3    sequence of hospitalizations, be fair to say that the first

4    significant hospitalization that we're discussing here

5    happened at Beth Israel Deaconess Medical Center in

6    approximately July or August of 2015, yes?

7    A.   The first significant?

8    Q.   Significant in the sense that if you recall the time

9    when he had liver toxicity and was found unconscious,

10   unresponsive at his home and transported to the hospital, yes?

11   A.   Yes.

12   Q.   You recall that?

13   A.   Yes.

14   Q.   And did you have an opportunity to review what is in

15   evidence -- or will be in evidence, to review the medical

16   records in that case?

17   A.   Yes.

18   Q.   And would it be fair to say that when he was found and

19   at the hospital, that he was mumbling incoherently?

20   A.   Yes.

21   Q.   Would it be fair to say he was diagnosed with major

22   depression?

23   A.   Yes.

24   Q.   And would it also be fair to say that there were a

25   variety of physical illnesses that they also diagnosed him

1    with, correct?

2     A.   Yes.

3     Q.   At that point sarcoidosis was one of the main ones, yes?

4     A.   Yes.

5     Q.   Now, when we're talking about sarcoidosis -- you have

6    given an explanation to the Court about what sarcoidosis is.

7    Do you recall that?

8     A.   Yes.

9     Q.   Now, there are different kinds of sarcoidosis, are there

10   not?   There's pulmonary, which I guess is the most common, and

11   nonpulmonary?

12    A.   Pulmonary is by far the most common and then it can be

13   nonpulmonary.

14    Q.   And I have seen -- strike that.

15         Would it be fair to say that at a -- the different

16   sarcoidosis diagnoses that have been made in this case, they

17   are usually referring to nonpulmonary sarcoidosis?

18    A.   In this case?

19    Q.   In this case.

20    A.   No.

21    Q.   You think it's pulmonary sarcoidosis?

22    A.   He has been diagnosed -- the biopsy at the Beth Israel

23   had diagnosed granulomas in the lung.   So, presumed pulmonary.

24   He's had studies that show some potential lesions in the liver

25   and the spleen, but to the best of my knowledge, those were

1   never biopsied to prove that they were sarcoid.

2   Q.   But it is possible to have both pulmonary sarcoidosis

3   and nonpulmonary at the same time, correct?

4   A.   Correct.

5   Q.   And is there anything that's usually termed

6   neurosarcoidosis as well?

7   A.   Yes.

8   Q.   What does neurosarcoidosis generally suggest?

9   A.   It's sarcoid that exists in the brain.

10  Q.   And that, of course, can affect the brain and affect

11  functioning and affect behavior, correct?

12  A.   Yes.

13  Q.   With regard to the hospitalizations that came after the

14  BIDMC hospitalization in July, August of 2015, be safe to say

15  that the next hospitalization was probably in September when

16  he was discharged and went to the Norwood psychiatric unit?

17  A.   Yes.

18  Q.   And that was the first visit to Norwood Hospital,

19  correct?

20  A.   Yes.

21  Q.   And he was in the inpatient psychiatric unit, locked

22  unit, correct?

23  A.   Correct.

24  Q.   And you recall what they diagnosed him with there?

25  A.   Not off the top of my head.

1    Q.   Did you review those records for today?

2    A.   Yes.

3    Q.   If I suggested that they diagnosed him with severe

4    depression, major depression, would that refresh your memory?

5    A.   Yes.

6    Q.   And then after that, is it your understanding that in

7    the early part of 2016, probably January of 2016, he went to a

8    place called EPOCH, correct?

9    A.   Yes.

10   Q.   And EPOCH is a rehab hospital that he would have been

11   discharged to at some point or gone to?

12   A.   Correct.

13   Q.   And did you review those records as well?

14   A.   I believe so.

15   Q.   And do you recall what he was diagnosed with there?

16   A.   Not without seeing them, no.

17   Q.   If I suggested to you again it was severe depression and

18   a level of dementia, would that refresh your memory?

19   A.   Yes.

20   Q.   Now, after the EPOCH visit, do you recall that in

21   January, February of 2016, that he had another serious

22   incident that had him going to the Brigham -- to the Beth

23   Israel Deaconess Medical Center again?

24   A.   Yes.

25   Q.   And do you recall what that incident was?

1    A.   I believe that was for a presumed seizure.

2    Q.   And when you say "seizure," would it be fair to say that

3    they found him non-responsive at his home actually seizing,

4    having a seizure?  When I say "they," I'm talking about his

5    family at that point.

6    A.   Yes.  And that's why when I say "presumed," you know,

7    that it's a family observation.

8    Q.   Would it be fair to say that in the records, there were

9    also observations of his seizure later in the hospital as well?

10   A.   It was.

11   Q.   So, that's not presumed because those are medical

12   professionals looking at him actually having a seizure,

13   correct?

14   A.   Correct.

15   Q.   It's not your contention that that seizure in any way,

16   shape or form was being faked, correct?

17   A.   That's correct.

18   Q.   It's not your contention that the non-responsiveness

19   where he's unconscious and in great jeopardy as being fake,

20   correct?

21   A.   Correct.

22   Q.   It's your contention that he is doing this on some level

23   in a deliberate fashion by not eating and not taking fluids?

24   A.   That particular seizure, I don't know that they

25   identified exactly the ideology.  It could have been from

1    inadequate fluids, some electrolyte disturbances.  It could

2    have been medication related.  I don't know.

3      Q.   But in all of these non-responsive moments and seizures,

4    all they really have are possible reasons it happened.  No one

5    says he is malingering.  They say possible malingering,

6    correct?  No one is saying he's overdosing.  They're saying

7    possible overdose.  Have you seen one place in the medical

8    record where it says anything other than "possible" overdose

9    rather than overdose?

10     A.   If I'm wrong, correct me.  I think there were about

11   three questions in there or there were different parts of --

12     Q.   Let's start with the overdose.  Does the term "overdose"

13   suggest to you that someone took some kind of medication or

14   some substance and took too much of it deliberately?

15     A.   Not always.

16     Q.   So, you can overdose without doing it deliberately?

17     A.   Correct.

18     Q.   Is it your thought that he, in fact, overdosed anywhere,

19   that he did it deliberately?

20     A.   It depends on which hospitalization you're talking

21   about.

22     Q.   I'm asking any hospitalization.  Do you believe that he

23   deliberately overdosed in order to get sick and to present

24   himself in a certain way to the world?

25     A.   I don't know that he ever overdosed deliberately.

1    Q.   And with regard to the seizures that he had, are you

2    suggesting at any one of these points, that he purposefully

3    took some kind of medication to make himself sick because as a

4    doctor, he said, Aha, I will have a seizure and they will look

5    at me in a different way and I can avoid trial?

6    A.   No.

7    Q.   Now, in 2016 we're talking about the Beth Israel

8    Deaconess Medical Center hospitalization for -- for this

9    non-responsive incident, correct?  I asked you a question

10   about he was taken to BIDMC initially relative to him being

11   unresponsive and having a seizure, correct?

12   A.   In 2016?

13   Q.   2016.

14   A.   This is before or after the MGH hospitalization?

15   Q.   This is before the MGH hospitalization.

16   A.   Yes.

17   Q.   He was discharged later to MGH --

18   A.   Yes.

19   Q.   -- after you and I had a discussion where he should go,

20   correct?

21   A.   Correct.

22   Q.   You asked if he could please go to Blake 11, and I was,

23   with the government's help, able to arrange it, correct?

24   A.   Correct.

25   Q.   So, at the initial -- the initial January being in Beth

1    Israel, do you recall what he was diagnosed with there?

2    A.   Not specifically without looking at the record.

3    Q.   Okay.  If I suggested to you that -- if I suggested to

4    you that on March 17th, the record would indicate that they

5    diagnosed him with significant cognitive impairment, dementia

6    and hallucinations, would that refresh your memory?

7    A.   Yes.

8    Q.   Cognitive impairment, dementia and hallucinations,

9    correct?

10   A.   Yes.

11            THE COURT:  This was at the BI?

12            MR. DENNER:  This was at the BI in March at this

13   point of 2016.

14   Q.   And at some point they discharged him from there, did

15   they not?

16   A.   Yes.

17   Q.   And that's when they discharged him to Blake 11 at Mass

18   General Hospital, yes?

19   A.   Yes.

20   Q.   And do you know how long he stayed at Massachusetts

21   General Hospital?

22   A.   Stayed for, I think, approximately two weeks or so.

23   Q.   If I suggested to you that he was there from March 24th

24   to April 15th, would that refresh your recollection, of 2016?

25   A.   Yes.

1    Q.   Approximately about a three-week period?

2    A.   Three-week, okay.

3    Q.   And do you recall reading the medical records relative

4    to this hospitalization in Mass General during that time

5    period?

6    A.   Yes.

7    Q.   And would it be fair to say that the doctors that were

8    essentially responsible for his care -- that's an inpatient

9    psychiatric unit, yes?

10   A.   Yes.

11   Q.   It's a locked unit?

12   A.   Yes.

13   Q.   And I believe that Dr. -- Dr. Beck is here today?

14   A.   Yes.

15   Q.   And he was basically the doctor who was essentially his

16   attending, dealing with him when he was there, correct?

17   A.   He was his attending, yes.

18   Q.   And there's a Dr. Hoffmann there as well?

19   A.   He's the unit director.

20   Q.   He's the unit director there?

21   A.   Yes.

22   Q.   And would it be fair to say that both of them were

23   involved in his care while he was there?

24   A.   I don't know the extent to which Dr. Hoffmann was

25   involved directly.

1    Q.   Well, do you recall seeing a petition to involuntarily

2    commit Dr. Mashali to mental hospitals because he posed a

3    danger to himself or others because of serious psychiatric

4    illness?  Do you recall that petition that was filed by Dr.

5    Hoffmann and by Dr. Beck while he was there?

6    A.   Yes.

7    Q.   So, certainly -- Dr. Hoffmann, who was the head of the

8    inpatient unit there, certainly he participated in the

9    decision to involuntarily commit --

10             MR. GRINBERG:  I object to the question, your Honor.

11             THE COURT:  I don't know how she would know that.

12   Q.   Well, you indicated --

13             THE COURT:  You can argue from --

14   Q.   You indicated a moment ago that you don't know what the

15   extent of his participation was, correct?

16   A.   Right.  And what I'm trying to say is that I don't know

17   in terms of the logistics of the unit and who has to sign when

18   there's a petition for commitment.  If Dr. Hoffmann as the

19   medical director of the unit has to also put his signature on

20   a form in addition to the attending and if that means that

21   he's putting his signature on the form or if he's by some

22   regulatory standard or if he's also caring directly for the

23   patient.  That I just don't know.

24   Q.   Again, did you hear me ask you -- I'm not asking you if

25   you understand whether he cared directly for the patient.

1    Would it be fair to say that if Dr. Hoffmann was required to

2    sign off on the petition for involuntary commitment, that he

3    would not do that without apprising himself of the facts of

4    the case?  Would that be the ordinary standard?

5              THE COURT:  I don't know how she can know that.

6              MR. DENNER:  I'm asking if she does know the

7    procedures in Massachusetts or at Mass General Hospital.

8    A.   I think that he would certainly know the situation of

9    the case.  I just don't feel I'm qualified to say to what

10   level.  That's all I'm saying.

11   Q.   So, he certainly wouldn't have signed without having

12   some sense that his signature was authentic and valid and

13   there was a reason for it, correct?

14             MR. GRINBERG:  Objection, your Honor.

15             THE COURT:  Sustained.

16   Q.   Okay.  But Dr. Beck was the attending and he signed the

17   -- do you recall he signed the petition of involuntary

18   commitment as well, correct?

19   A.   Correct.

20   Q.   Okay.  And do you recall also that while Dr. Mashali was

21   hospitalized there, they also were bringing a petition for

22   involuntary guardianship for him?  Do you recall that?

23   A.   Yes.

24   Q.   And would it be fair to say that a petition for

25   involuntary guardianship suggests that some level of

1  substituted judgment has to come into play because he is not

2  competent to make decisions that are good for himself?

3     A.   Yes.

4     Q.   And they brought that petition, too, didn't they?

5     A.   Yes.

6     Q.   Now, with regard to electroconvulsive therapy.  What is

7  electroconvulsive therapy, ECT?

8     A.   ECT is a procedure whereby the brain -- a seizure is

9  induced in the brain under a controlled situation with

10 anesthesia to treat severe depression and other situations.

11    Q.   And it's a fairly intrusive -- fairly intrusive

12 treatment regimen protocol that you would not suggest were it

13 not a fairly serious case, correct?

14    A.   Correct.

15    Q.   Would it be fair to say that's usually reserved for

16 situations where there's a severe depression and other lesser

17 intrusive modalities have been employed and didn't work,

18 correct?

19    A.   Often that's the case, yes.

20    Q.   And be fair to say that you were aware of the fact that

21 Dr. Beck wanted and asked permission from the family, from his

22 family, to perform ECT on him, correct?

23    A.   Yes.

24    Q.   Electroconvulsive therapy?

25    A.   Yes.

1    Q.   So, they moved to involuntarily commit him because he

2    was at least a danger to himself, correct?

3    A.   Yes.

4    Q.   They moved to have a guardianship where they or someone

5    else would be making all the judgments in his life, correct?

6    A.   Yes, with regard to medical situations, yes.

7    Q.   Guardianship is not just medical situations.  There are

8    guardianships that deal with a far broader variety of events;

9    isn't that true?

10   A.   Yes.  I just thought you were asking about a medical

11   guardianship, not necessarily a fiduciary --

12   Q.   And they were looking -- excuse me, I didn't mean to

13   interrupt, I'm sorry.

14        And they were looking to employ ECT, electroconvulsive

15   therapy, essentially, which basically puts electric currents

16   through his mind and in a last-ditch effort to break up a

17   severe depression, correct?  Strike the term, "last-digit

18   effort."

19   A.   Yes.

20   Q.   A serious effort to basically deal with a very serious

21   psychiatric situation, right?

22   A.   They were considering it, yes.

23   Q.   Well, they asked for permission, did they not?

24   A.   Well, I think to consider it, you have to ask for

25   permission.  It doesn't mean that the decision has been made.

1    Q.   But in this case there was a decision made.   They wanted

2    to do it.   They were prepared to do it on the Friday -- on a

3    certain Friday when they were --

4         MR. GRINBERG:   Objection.

5         THE COURT:   You're asking her about the state of mind

6    of the doctors who did what they did, and now you're arguing

7    with her about it.

8    Q.   No.   Were we not talking about this, about the ECT at

9    the time ourselves, too?

10   A.   Yes.   Although I'm reticent to speak for Dr. Beck in

11   terms of how far down the road they got to actually performing

12   the ECT versus other things that were going on.

13   Q.   Are you -- do you have any idea how -- yourself

14   personally, how far they got down the road in wanting the ECT?

15   A.   Not specifically.

16   Q.   Do you recall the conversation you and I had, just yes

17   or no, about the ECT?

18   A.   I know that we had a conversation.   I'm just not

19   recalling the conversations between Dr. Mashali -- well, I

20   think between his wife and Dr. Beck about continuing

21   medication versus trying ECT, how is he going to do, this sort

22   of thing.

23   Q.   If I suggested to you that the dialogue was that his

24   wife wanted to try more medication first --

25        MR. GRINBERG:   Your Honor, I object.

1          THE COURT:   The objection is sustained.

2     Q.   You're not familiar with whatever conversations they

3     had, correct?

4     A.   I think in a general sense, but I don't want to speak

5     for them.

6     Q.   Okay.   That's fine.

7          With regard to what the diagnoses were that arose out of

8     his hospitalization at Mass General Hospital, are you aware of

9     what they were?

10    A.   Yes.

11    Q.   If I suggested to you that they diagnosed him with

12    dementia, would that be accurate?

13    A.   From MGH?

14    Q.   From MGH.

15    A.   As a discharge diagnosis?

16    Q.   As a -- I don't know if it was a discharge diagnosis or

17    it was diagnosed within notes going through it.  I'll check

18    the report again, but do you remember reading the report that

19    they said he had dementia?

20    A.   No, I don't recall a diagnosis of dementia being made.

21    Q.   Okay.   Do you -- just being discussed?

22    A.   Very well it was discussed, questioning about his

23    cognitive capacities.

24    Q.   I want to get through this, but I'll go back to that in

25    a moment and find it in the report.

1      Do you remember discussions about he was suffering from

2  hallucinations?

3   A.   Discussions --

4        MR. GRINBERG:   Discussions with whom?   Who was doing

5  these discussions?

6        MR. DENNER:   Dr. Beck, Dr. Beck and his staff at Mass

7  General Hospital.

8   Q.   Do you remember -- do you remember if you read the

9  records -- if the records say that he was suffering from

10  hallucinations?

11   A.   That he was reporting that he had some types of

12  hallucinations, that was recorded.

13   Q.   But is there any way that a practitioner ever hears

14  anything but reported hallucinations?   Can they get inside the

15  person's head to see what they're seeing?

16   A.   I think what I -- the only thing I can say is that a

17  patient can report hallucinations of any variety of type, but

18  that doesn't -- and that will be recorded in a record as an

19  observation, and then there will be other observations and

20  discussions and then an assessment made about whether or not

21  they are hallucinations and if they are, what type they are.

22      So, I do know that there were reports from Dr. Mashali

23  of hallucinations that, to the best of my knowledge, the Mass

24  General team discounted and did not think he had psychotic --

25  the psychotic symptom of a hallucination.

1    Q.   Well, they did, in fact, diagnose him with severe

2    recurrent major depression with psychotic features, did they

3    not?

4    A.   Yes.

5    Q.   And you've indicated that psychotic features are

6    different than a psychotic episode?

7    A.   Yes.

8    Q.   Or psychosis, correct?

9    A.   Correct.

10   Q.   Psychotic features in some way were transient, correct?

11   A.   They can be, yes.

12   Q.   And if someone were saying that they had hallucinations

13   in this case, a vision that was recurring they were seeing,

14   would that be considered a psychotic feature or could that be

15   considered a psychotic feature?

16   A.   It could be.

17   Q.   So, when you get a diagnosis of severe recurrent major

18   depression with psychotic features, that could well be

19   referring to the hallucinations that he said he had, correct?

20   A.   It could be.

21   Q.   And you would expect before they were going to move his

22   involuntary commitment, petition for that, or petition for his

23   guardianship or employ electroconvulsive therapy, you would

24   assume that they would think that whatever he was suffering

25   from was severe and some kind of major depression, not just

1   some dysemic interlude?

2       MR. GRINBERG:  Your Honor, I would object to how this

3   goes to the competency determination.  It sounds like we are

4   trying MGH.

5       THE COURT:  I'm sorry, I didn't hear.

6       MR. GRINBERG:  I would object to this line of

7   questioning because it goes to the standard of care at MGH and

8   not to a competency determination.

9       MR. DENNER:  Your Honor, with all respect, I don't

10  care about the standard of care there.  I'm suggesting that

11  the people that Dr. Fife wanted us to send him to, which we

12  did, were finding that he had dementia --

13      THE COURT:  Well, they find whatever they find and

14  it's in the record, but you're asking this witness now, in a

15  sense, to take pieces of that record and suggest some outcome.

16      MR. DENNER:  Your Honor, with all respect, I'm not

17  suggesting an outcome.  I'm suggesting that she corroborated

18  that they -- that the psychiatric unit --

19      THE COURT:  No, I don't think you're entitled to do

20  that.  She's not corroborating anything.  She's doing -- she

21  uses that record for her own opinion, which is not a

22  corroboration of theirs.

23      MR. DENNER:  Well, your Honor, I think the government

24  this morning took pieces of every record that everyone else

25  had and asked her what she thought about it and asked her if

1    that, in fact, had happened.  I think the fact -- and I'll get

2    this through Dr. Beck, too.  So, I'll stop answering now, but

3    I think the fact that he was in a major psychiatric hospital

4    that wanted to commit him and wanted to use electroconvulsive

5    therapy suggests the level of the mental illness he was

6    suffering.

7              THE COURT:  Okay.  You can argue that.

8              MR. DENNER:  And I will, your Honor.  Thank you.

9    Q.  Do you recall also that in the diagnosis, they also

10   called it progressive cognitive decline?  Do you recall that

11   term?

12   A.  I don't recall it as a discharge diagnosis.

13   Q.  Do you recall it as a working operative diagnosis while

14   he was there, they were talking about that?  Do you recall

15   that?

16             MR. GRINBERG:  Who is "they"?  Who is "they"?

17             MR. DENNER:  The staff, Dr. Beck and his team that

18   were working on the case that wrote the notes that I have that

19   I will show you in a minute.

20   A.  So, I think I might be used to just a little bit

21   different language as a physician, that there are -- there's

22   something called a differential diagnosis.  So that when a

23   patient comes into the hospital, there are all kinds of things

24   considered to explain certain symptoms.

25             So that the best way I think I can answer your question

1    is to say, yes, the MGH in their differential diagnosis, among

2    the hundred things or more that could cause Dr. Mashali's

3    presentation, alone or in concert, a dementing illness could

4    be among those.  I just -- I'm having a little bit of trouble

5    with the way you're phrasing it.  That's not a criticism, but

6    -- that the MGH was -- you know, had diagnosed a dementing

7    illness.  I think it's more accurate to think about a

8    differential diagnosis than a team of doctors considering

9    every possible thing so that they don't miss anything.

10   Q.   Doctor, all due respect, you don't know this as a

11   differential diagnosis.  A differential diagnosis, if I'm

12   correct, I'm asking you, is something that we state as a

13   differential diagnosis with some kind of rule-out provision,

14   correct?

15   A.   Not always.

16   Q.   But that's what usually happens, isn't it?

17   A.   Not always, no.  Things get written all the time in

18   medical records --

19   Q.   Can you review your medical records right now and show

20   me in those medical records from MGH where it says this is a

21   differential diagnosis that we have to -- that we have to

22   consider versus a diagnosis that they were making?

23           MR. GRINBERG:  Objection to the form.

24           THE COURT:  I understand the witness only to be

25   telling us that when you asked her whether she -- whether they

1    made a diagnosis of whatever, that she treats as a diagnosis

2    only the discharge diagnosis and the other amounts to, as I

3    think you're saying, the discussion among the physicians to

4    try to understand what is going on.

5         MR. DENNER:  I understand that, too.

6    Q.   Doctor, do you have the discharge diagnosis in front of

7    you from Mass General?

8    A.   Not in front of me.

9    Q.   Okay.  He was there several times between March 24th and

10   the April 15th period he was in there after he had been

11   discharged to them from Beth Israel.  Do you recall what the

12   -- do you recall what the discharge diagnosis was at that

13   point?

14   A.   From all of those visits or just the inpatient?

15   Q.   No.  There was a March 24th to April 15th.  The April

16   15th discharge diagnosis, do you recall that at this point?

17   A.   I would certainly want to look at it now to be sure.

18   Q.   Okay.  With the Court's permission, can you take a look

19   at it?

20   A.   I don't have it in front of me.

21        THE COURT:  Which document is it?

22        MR. DENNER:  It is not a document that you have

23   there.  It is a document that I have here, and I will get back

24   to you.

25        MR. GRINBERG:  I think I can help, maybe.  It's not

1  something we should introduce into evidence yet, but --

2          THE COURT:  I'm sorry?

3          MR. GRINBERG:  I think I can help Mr. Denner with the

4  document.  It's not a document that has been introduced into

5  evidence, but I think I have it.  So, may I provide it to

6  counsel?

7          MR. DENNER:  Well, he can get it faster than I can.

8  I have a pile over here.  So, if you can do that, that would

9  be fine.

10         MR. GRINBERG:  I'm happy to provide it.  I think

11 we're talking about the same thing.

12         MR. DENNER:  We'll come back to that.

13         MR. GRINBERG:  Here.

14         (Discussion off the record.)

15         MR. DENNER:  Your Honor, if I may have one moment and

16 I'll be quick.

17         (Pause.)

18         MR. DENNER:  All right.  I'll get back to this in a

19 moment.

20  Q.  The medications that he was taking at the time and under

21 the discharge, do you recall what they were, the psychoactive

22 medications?

23  A.  At the time of discharge?

24  Q.  Yes.

25  A.  Yes.

1    Q.   And what would they be?

2    A.   Cymbalta.

3    Q.   One at a time.  So, Cymbalta is usually used for

4    depression, correct?

5    A.   It's an antidepressant.

6    Q.   Okay.  And what else?

7    A.   He was taking 90 milligrams a day.  He was taking a

8    medication called lorazepam, also known as Ativan.

9    Q.   Ativan, that would be for anxiety?

10   A.   I think they were using it for sleep at night.

11   Q.   Is it generally used for anxiety as well?

12   A.   Yes, it is an antianxiety medication.

13   Q.   And the third one was Risperdal?

14   A.   Risperdal, yes.

15   Q.   And fair to say that Risperdal is an antipsychotic?

16   A.   It is.

17   Q.   When -- I believe in the discharge it talks about using

18   it for rumination.  What does "rumination" mean?

19   A.   Rumination is a pattern of thought where certain

20   thoughts are repeated over and over in a person's mind and you

21   have a hard time getting off a certain line of thinking.

22   Q.   And do you remember -- do you remember with regard to --

23   to the -- the document that they filed to have the

24   guardianship put in.  It was a document called, "Factors

25   supporting finding of competency."  Do you recall seeing that?

```
 1    A.   I'm not recalling it right now.  I did review the whole

 2   record.

 3          MR. GRINBERG:  I'm sorry, I don't know what you're

 4   referring to now.  I haven't seen this document.  May I?

 5          (Discussion off the record.)

 6          MR. DENNER:  Your Honor, I will move to have this --

 7          MR. GRINBERG:  I'm sorry.  I just need a second --

 8          MR. DENNER:  No.  No.  I will move to have this put

 9   into evidence before we leave today, but I would like to just

10   get through this now to save time.

11    Q.   In any event, the last one we talked about, Risperdal,

12   is an antipsychotic?

13    A.   Yes.

14    Q.   So, would it be fair to say that antipsychotic suggests

15   that it's being used to combat some kind of at least psychotic

16   features?

17    A.   It can be used for that.  It's also used in depressive

18   disorders when rumination and other things are present and it

19   helps decrease those symptoms.

20    Q.   And what exactly does rumination -- you mentioned a

21   minute ago, but as a practical matter, how does that manifest,

22   present itself?

23    A.   When individuals are -- have kind of loops of thought or

24   worries that are so intrenched and can't kind of get off a

25   topic at all and can't sort of get out of their own way.
```

1    There's probably also an anxiety component with it and it

2    helps with that as well.

3      Q.   So, somebody who simply can't get out of their own way

4    because they have almost an OC -- would there be an OCD

5    component to that, obsessive compulsive disorder?

6      A.   It can be used in obsessive compulsive spectrum

7    disorders, not in this particular case, in low dose, which is

8    what it was used for in this case, a very low dose.  It's not

9    particularly an antipsychotic dose, but more of a dose of

10   providing some -- sometimes it's thought of as providing some

11   glue to kind of help people kind of decrease anxiety.  It also

12   has some mood-enhancing properties.  So, it can also improve

13   mood a little bit.

14     Q.   So, I think that -- would it be fair to say that we

15   agree that what he was suffering from, at least during this

16   time period and probably further on and before, was severe

17   depression, severe major depression, right?

18     A.   Yes.

19     Q.   With psychotic features, correct?

20     A.   I know that's what MGH diagnosed.  I didn't think of

21   them so strongly as psychotic features, although I understand

22   the use of Risperdal in that situation.

23     Q.   And we also were talking about narcissistic personality

24   disorder, right?

25     A.   Yes.

1   Q.   And antisocial personality disorder?

2   A.   Yes.

3   Q.   Now, I think they were -- would it be fair to say they

4   were presented in the medical records as different Axis I, II

5   through VI issues, correct?

6   A.   Through V, I think, but, yes.

7   Q.   Through V, okay.  Through V.

8   A.   Yes.

9   Q.   And when we read the term "axis," what we're talking

10  about is the multiaxial model of the Diagnostic and

11  Statistical Manual, yes?

12  A.   Yes.

13  Q.   And major depression, particularly with psychotic

14  features, would be considered an Axis I disorder?

15  A.   Yes.

16  Q.   And would it be fair to say that the Axis I disorders

17  are generally the more serious disorders that would normally

18  be considered more serious mental illnesses?

19  A.   Some, yes, although the Axis II disorders can get people

20  into a significant amount of trouble.

21  Q.   They can, can't they?  And he had two Axis II disorders,

22  yes?

23  A.   Yes.

24  Q.   That was the narcissistic personality disorder.  And you

25  agree that he has that?

1    A.   Yes.

2    Q.   That would be your opinion as well?

3    A.   Yes.

4    Q.   And the antisocial personality disorder?

5    A.   Yes.

6    Q.   And they can be very severe if they're in extreme --

7    extreme example of an Axis II disorder, that can greatly

8    interfere with someone's function as well, can't it?

9    A.   Yes.

10   Q.   With regard to narcissistic personality disorder, where

11   everything revolves around him, be fair to say that as a

12   spectrum type of illness, it was significant -- a significant

13   example of narcissistic personality disorder, would be sitting

14   right there, correct?

15   A.   Yes.

16   Q.   And with regard to antisocial personality disorder,

17   would it be fair to say he's kind of a poster child for that

18   as well?  I don't mean to be flip, but he's a very good

19   example of a fairly severe antisocial personality disorder as

20   well, isn't he?

21   A.   I don't know that I'm comfortable answering that

22   question.  I don't know that I can answer it.  I appreciate

23   that you discarded the "poster child," and I think that's

24   good.  All of these disorders are spectrum disorders and

25   people can move up and down on that spectrum.

1    Q.   They can cycle in and out of situations?

2    A.   Well, I don't know about cycle, but people who have

3    antisocial behaviors or tendencies can be more or less

4    antisocial and can present as more or less antisocial,

5    depending on what situation there is, and that's part of the

6    disorder, part of the manipulation, part of the sort of

7    getting what they want when they want it, but at other times

8    saying, oh, that's not me.  I didn't do that or I'm not like

9    that, I'm a, you know --

10   Q.   So, depending upon the external stressors?

11   A.   On the what?

12   Q.   External stressors, stresses the world is putting on

13   them, perhaps internal stressors as well that can -- that can

14   spike, exacerbate a person with that disorder or can it lessen

15   it, correct?

16   A.   Well, I think the narcissistic antisocial personality

17   disorders are more apt to cause people to interpret the world

18   and things around them as being, you know, sort of against

19   them when, in fact, they're behaving and acting in a way in

20   the world that is making it difficult for themselves.

21   Q.   But people who suffer from major depression, personality

22   disorders, such as antisocial disorder and such as

23   narcissistic disorder, basically, those are DSM cognizable

24   mental illnesses that can really affect someone's ability to

25   function, correct?

```
1     A.   Yes.
2     Q.   Okay.  And that can either get better or worse,
3   depending upon a set of circumstances?
4     A.   Yes.
5     Q.   And it can vary.  Sometimes it can be worse if the
6   situations that trigger these things are worse and sometimes
7   it can get better if those stressors are not there, correct?
8     A.   Correct.
9     Q.   And we are talking about his capacity to be -- capacity,
10  essentially, to function in a competent way, and you're
11  stressing the term "capacity," yes?
12    A.   To function in a competent way?
13    Q.   In a competent fashion, yes, in the legal sense.
14    A.   In the legal sense here, yes.
15    Q.   Would it be fair to say -- I think you defined what you
16  thought -- what you thought that meant earlier for the Court.
17  Do you remember that?
18    A.   Yes.
19    Q.   You said there's basically two factors, two prongs.
20  Prong number one would be that the person has to be able to
21  kind of understand the general terrain, what it means to be
22  prosecuted, what you're charged with, what the judge does,
23  what the Court does, and so forth, correct?
24    A.   Yes.
25    Q.   And it is your opinion held to a requisite degree of
```

1    medical certainty that he understands that?

2    A.   Yes.

3    Q.   He certainly intellectually can understand that, right?

4    A.   Yes.

5    Q.   He has the capacity to intellectually understand that?

6    A.   Yes.

7    Q.   And with regard to the second prong of this, you said he

8    has to be able to assist counsel, correct?

9    A.   He has to have the capacity to assist.

10   Q.   The capacity to assist counsel.  And would -- if I

11   suggest to you he doesn't have the capacity to effectively

12   assist counsel, would you accept that amendment, modification?

13   A.   Yes.

14   Q.   So, he has to be able, you say, to have the capacity to

15   assist counsel, yes?

16   A.   Yes.

17   Q.   On some level in a theoretical way, his brain is

18   physiologically working in a way that he can assist counsel,

19   yes?

20   A.   Yes.

21   Q.   Okay.  And what if somebody's brain has the capacity to

22   do stuff, but some kind of mental illness is interfering with

23   that capacity?  Do you take that into consideration as well?

24   A.   Yes.

25   Q.   So, if someone were suffering from severe major

1    depression to the point where they need electroconvulsive

2    therapy, combined with a fairly severe narcissistic

3    personality disorder and combined, again, with an antisocial

4    personality disorder, is it theoretically possible that that

5    -- that combination of mental illnesses could adversely affect

6    his ability to effectively assist me, not the capacity, but

7    the practical matter of whether he can overcome his mental

8    illness issues to assist me, yes?

9    A.   The point at which they were considering ECT.  So that I

10   think it's important to know that the ECT was taken off the

11   table.

12   Q.   Well, let's take ECT away for a second.

13   A.   Okay.

14   Q.   We know that they at one point -- or at least Dr. Beck

15   at one point, signed off by Dr. Hoffmann, wanted to

16   involuntarily commit him because he had a serious mental

17   illness that as far as they were concerned had been -- rose to

18   the level of putting himself or someone else at risk, correct?

19   A.   Yes.

20   Q.   We also know that they felt he was incompetent in the

21   sense that his judgment no longer counted because he had to

22   get a substituted judgment to make basic decisions for

23   himself, correct?  At least medical decisions from your

24   perspective?

25   A.   Well, no, I don't think they thought it was

1    incompetence.  I think they were considering whether or not a

2    guardianship would be helpful, and then elected not to pursue

3    it.

4      Q.  Are you aware of the fact that they signed off on that,

5    that they actually had a petition that was signed by both of

6    them for both of these things?

7      A.  Yes, but it didn't go to court.  It didn't go through.

8    So that was --

9      Q.  Are you aware of the fact that he had lawyers appointed

10   for him by the state authorities to represent him in these

11   matters?

12     A.  I was aware of that, yes.

13     Q.  Do you know why they chose not to go forward, yes or no?

14     A.  Yes.

15     Q.  Okay.  Why did they choose not to go forward?

16     A.  My understanding, it was a number of factors, that Dr.--

17          MR. GRINBERG:  I'm going to object for the same

18   reasons as before.

19          THE COURT:  I'm sorry?

20          MR. GRINBERG:  I will object for the same reasons as

21   before.

22          MR. DENNER:  I'll withdraw the question and I'll talk

23   to Dr. Beck.  That's fair.

24     Q.  But you do understand that there can be a great

25   difference between the capacity -- intellectual capacity to

1     effectively assist counsel and the practical ability to do so,

2     given what some -- what the mental illness is afflicting an

3     individual can be at a particular time, correct?

4     A.   Yes.  Now I think I can address that question.  So --

5     Q.   There's no question pending.  That's a yes or no answer.

6     A.   Oh, do I understand?

7     Q.   Yes.

8     A.   Yes, I understand.

9     Q.   You talked about a food strike that Dr. Mashali went on

10    that you read about in the records, correct, when he was at

11    the Plymouth House of Correction?

12    A.   Well, I think there had been multiple times where he

13    refuses food.

14    Q.   That's not my question.  My question is, you made

15    reference to a food strike --

16    A.   Yes.

17    Q.   -- that he went on?

18    A.   Yes.

19    Q.   Do you know what the circumstances of that were?  Did

20    you ask him about it?

21    A.   Not specifically.

22    Q.   Did you ask him generally about it?

23    A.   No.

24    Q.   Do you know when the food strike was?

25    A.   My recollection of the records is that there were

1    multiple times while at Plymouth that he rejected certain

2    foods.

3     Q.   And do you consider every time that he suggests that he

4    would have rejected certain foods as a food strike?

5     A.   No.

6     Q.   So, let's talk about the time you said there was a food

7    strike.  Do you know the circumstances of that?

8     A.   Not without looking at the records right now.

9     Q.   If I suggested to you that he had been thrown naked into

10   a room for four or five days --

11        MR. GRINBERG:  Objection.

12    Q.   -- in a very cold room with a blanket as a result of a

13   dialogue between he and the people down there and that led to

14   the food strike, did you know that?

15    A.   I'm not recalling that now, no.

16    Q.   Do you consider that he's suffering from any kind of

17   eating disorder?

18    A.   No, I have not concluded that.

19    Q.   Do you know if any of the other physicians that have

20   considered that matter have ever decided that he was suffering

21   from a food disorder?

22    A.   I know that it was considered.  I don't know that a

23   diagnosis was made.

24    Q.   Do you recall --

25    A.   I don't know if a diagnosis was made.

1   Q.   Do you know what kind of food disorder they were

2   discussing?

3   A.   They were discussing a binge eating disorder.

4   Q.   That would mean sometimes he would eat and sometimes he

5   wouldn't eat, correct?

6   A.   No.  It would mean that sometimes he would overeat.

7   Q.   I mean, binge, overeat.

8   A.   Yes.

9   Q.   And other times he would under eat?

10   A.   Doesn't necessarily have to under eat.  Binge eating

11   disorder refers to the overeating.

12   Q.   I think you talked about that certain neuropsych tests

13   were -- they attempted to give him --

14        COURT REPORTER:  I'm sorry, I didn't hear the

15   question.

16        THE COURT:  Neither did I.

17   Q.   At some point you had earlier indicated they attempted

18   to give him some neuropsychological testing at Mass General?

19   A.   Yes.

20   Q.   It was the PIA test and the MOCA test, correct?

21   A.   Yes.

22   Q.   The first test he essentially underreported things,

23   because he only scored five out of 25, correct?

24   A.   Yes.

25   Q.   And on the second test he overreported symptoms, right?

1    A.   Correct.

2    Q.   And you're suggesting that that somehow is an indication

3    of malingering?

4    A.   Yes.

5    Q.   Might it not also be an indication of the mental

6    illnesses he is suffering from?

7    A.   I think in this situation, no.

8    Q.   In this situation, no, but, theoretically, it could be,

9    could it not?

10           THE COURT:  Well, we're talking about this situation.

11           MR. DENNER:  Yes, we are.

12   Q.   Why don't you think it is in this situation?

13   A.   Because I think when I spent the time I spent with Dr.

14   Mashali and reviewed all the records, I think his intellect

15   and his thinking capacities were really very intact.

16   Q.   So, we're getting back into the capacity, yes?  The

17   capacity argument versus the practical argument of how -- how

18   his own psychiatric illness is intersecting the process and

19   perhaps short circuiting what his capacity can do, correct?

20   It's the same argument we had before?

21   A.   I don't understand the question.

22   Q.   Well, the question is -- you were saying he has the

23   capacity to do better, correct?

24   A.   Yes.

25   Q.   And I'm suggesting to you, as you answered prior,

1     earlier, can the theoretical capacity be affected by whatever

2     unique combination of mental illness someone is suffering

3     from?

4             MR. GRINBERG:  Objection based on the Court's ruling

5     it's theoretical.

6             THE COURT:  I'm sorry?

7             MR. GRINBERG:  I object because we're talking about

8     this case, not a theoretical case.

9             MR. DENNER:  It is about this case.

10    Q.   We've discussed that he's suffering from several major

11    mental illnesses.  Can that not affect his capacity to

12    cognitively perform?

13    A.   Well, I think what you're asking me -- I'm sure you'll

14    correct me if I am wrong -- that it's my opinion that Dr.

15    Mashali has the cognitive capacity to be competent to stand

16    trial, and that he also has suffered and is now better treated

17    for depression, and he also has two personality disorders that

18    often run together, narcissistic and antisocial.

19            In my opinion, those disorders don't trump his

20    intellect.  In other words, he has the capacity to work with

21    you in support of his own defense.  His personality make-up is

22    such that he is much less inclined to.  Not every person with

23    antisocial personality and narcissistic is less inclined to

24    work with you.  Some are and some aren't.

25            I think in this situation, Dr. Mashali is choosing not

1   to read the documents and work with you or whatever he's -- I

2   don't know exactly that's between you and him, what he's

3   working with you on and what he isn't.  I think it's because

4   he doesn't want to go to trial on this matter and face these

5   charges.  I think it is less because he has antisocial and

6   narcissistic personality.  He has those, but I think the

7   reason he is not -- to whatever extent he is not working with

8   you has to do with not wanting to work with you, perhaps not

9   personally, but for the purpose of this case going forward.

10  Q.  But that's a subjective -- you're speculating.  Fair to

11  say that you are speculating that the way these three diseases

12  affect him, the severe depression with psychotic features and

13  two personal -- Axis II personality disorders, you are

14  speculating that -- of how their affecting him?

15  A.  No, I'm not speculating.  I'm saying that based on my

16  very thorough evaluation, my interviews of him, and my

17  diagnosis of him.  It's not speculation.  I wouldn't

18  speculate.  I don't think it would be appropriate for me to

19  speculate.

20  Q.  Perhaps -- will you excuse me if I use the word

21  "speculate" wrong?  But you're holding that degree -- to a

22  requisite degree of certainty, but if I hypothetically -- if I

23  suggested to you that the vast majority of time I tried to

24  spend with him, he basically falls asleep while we're speaking

25  or looks out into space and can't talk to me, and even his

1    wife's entreaty of him to try and make that change does no

2    good.

3      A.   Right.  And I suspect that's because -- and it's -- I'm

4    not going to say the word.

5           Based on my medical opinion, the reason he's doing that

6    is because of the topic.  If you change topics and talk about

7    Egypt, the United States Government, human rights abuses in

8    China, almost anything else, including his medical condition,

9    he is very bright and can talk at length about.  If he has all

10   of those cognitive capacities, he has the cognitive capacity

11   to not stare out into space and talk with you about whatever

12   you need to talk with him about --

13     Q.   And --

14     A.   If I could just finish.

15          If he is not doing that, it is my medical opinion, based

16   on my evaluation, that he is making that choice for a reason

17   that only he knows.

18     Q.   And, respectfully, if I may, ask you, are we not saying

19   the same thing?

20          THE COURT:  I'm sorry?

21     Q.   Are we not saying the same thing, Doctor?  You're

22   saying --

23          THE COURT:  You're arguing with her again.

24          MR. DENNER:  No argument, respectfully.

25     Q.   May I -- I will ask you again.  If -- you're suggesting,

1    are you not, that if we weren't dealing with legal issues or

2    if the legal issue involved the possession of Egypt, that he

3    would be able to speak to me because he has the capacity to do

4    that, correct?

5     A.   Yes.

6     Q.   But with regard to issues of medical fraud and

7    everything around him, that there's something that stops him

8    from doing that with me, yes or no?  Something -- whether it's

9    choice or not, it's something voluntary, involuntary.  It's

10   something there that makes it impossible for him to discuss

11   things with me, correct?

12    A.   Am I not allowed to say what it is?

13    Q.   Well, I'm asking you.  It's a yes or no question.  Your

14   lawyer --

15         THE COURT:  But if you can't answer it, you may say

16   that, too.

17    A.   Yes, there is something getting in the way of him

18   talking with you about that.

19    Q.   And, Doctor, if I suggested to you that his -- that he

20   has also indicated to me that he has very little memory of

21   what actually occurred, whether that memory is affected by his

22   physical condition or the psychological condition, would that

23   affect your thinking at all?

24    A.   Not at this time because his memory for other things is

25   so intact.  His memory -- and that's part of the malingering,

1    is that his memory for all the other things in his life, when

2    it suits him to talk about it, is spot on, but when it's about

3    his legal case, then I'm not surprised at all to hear that it

4    fades.

5       Q.   But, Doctor, isn't there a huge difference between

6    remembering a huge multitude of very case-specific facts that

7    occurred years ago, a difference between that and his opinion

8    about political opinions, about what prosecutors are, and the

9    like?  Isn't that -- doesn't that call for a whole different

10   cognitive skill?

11      A.   I think he has the cognitive skills to do it.

12      Q.   But doesn't that call for a whole different cognitive

13   skill?

14      A.   No, I don't think so.

15      Q.   You don't remember -- the ability to remember what

16   happened over 5,000 transactions in 10,000 pages, when he has

17   no independent recollection of it, hypothetically speaking,

18   and he reads the stuff and he just can't remember what

19   happened at the time, you think that's the same cognitive --

20   cognitive abilities and capacities that are being used when he

21   remembers that he feels that he's being treated badly as a

22   Muslim and that there's some discrimination going on here

23   against him?  Do you feel that is the same memory that comes

24   into -- that he remembers -- if he can remember --

25              THE COURT:  Can we have just a question.

1          MR. DENNER:  Okay.

2     Q.   If he remembers -- if he can remember that he's being

3     treated -- that he thinks he's being treated badly, he should

4     be able to remember what 5,000 transactions meant?

5     A.   I think you're asking me if there's a small set of data

6     that somebody is asked to talk about or remember, that that's

7     easier to talk about or remember than a large set of data.

8     So, if there's a large set of data, it may be that Dr. Mashali

9     and anybody who does not have cognitive deficits -- and I

10    don't think that he does, of a nature that it would impair his

11    capacity -- might need tools, reminders, just like I did on

12    the stand, can you show me where that page is, and that page

13    is -- none of us -- well, some people have photographic

14    memories, but I don't feel I can speak to what Dr. Mashali

15    remembers or doesn't remember about 5,000 interactions that he

16    may have had in the past.

17    Q.   But can severe depression interfere with someone's

18    memory and someone's basic cognitive skills to communicate, to

19    remember, the basic set of skills that one has if one is

20    severely depressed to the point of perhaps needing

21    electroconvulsive therapy to even --

22         THE COURT:  Mr. Denner, you know, you really are

23    arguing with the witness and if you want a question, have a

24    simple question that doesn't go on for five minutes, please.

25         MR. DENNER:  Okay.

1    Q.   Is there not a huge difference in your mind about having

2    an opinion about something and being able to recall more --

3    far more complex and larger set of facts, yes or no?

4    A.   I don't think I can answer that unless we talk about

5    what opinion -- the opinions that Dr. Mashali and I talked

6    about around ruined human rights abuses and history and

7    politics were really very detailed with a broad knowledge

8    base.

9    Q.   Do you recall what any of them were?

10   A.   They were about incarceration rates in the United States

11   versus other countries.  He gave me percentages and

12   statistics.  I didn't fact check them, but, you know, he had

13   his thoughts about political situations that are shared by

14   other people, and none of them were of a psychotic nature.

15   They were opinions that various people might not share.

16   Q.   My last question, if you don't mind.

17   A.   Okay.

18   Q.   Do you accept the notion that if someone is suffering

19   from a particular set of mental illnesses, there can be

20   certain things that will trigger the adverse effects of the

21   illness and certain things that will not?

22   A.   I'm sorry, I didn't understand the question.

23   Q.   When you have a mental -- is it fair to say that when

24   you're suffering from a mental illness, there are certain

25   emotional things that can trigger a response that increases

1    the effect of the mental illness, whether it's a depression,

2    whether it's an antisocial personality inclination, whether

3    it's a narcissistic personality inclination?

4    A.   You're asking if stress can make mental illness worse?

5    Q.   Certain kinds of stress, certain kinds of stress that

6    kind of hit home to someone, yes.

7    A.   Yes, the answer is yes to that.

8              MR. DENNER:  I have no further questions, your Honor.

9    Thank you.

10             THE COURT:  You don't have any more questions, do

11   you?

12             MR. GRINBERG:  No.

13             THE COURT:  Thank you, Dr. Fife.  You are excused.

14             THE WITNESS:  You're welcome.

15             THE COURT:  We stretch.  And who is next?

16             (Dr. Fife steps down.)

17             MR. GRINBERG:  Dr. Stuart Beck, your Honor.

18             (Stretch break.)

19             THE COURT:  Dr. Beck, if you would kindly step into

20   the witness box and we will swear you and then proceed.

21             STUART BECK, M.D., SWORN.

22             COURTROOM DEPUTY CLERK URSO:  Sir, could you just

23   please speak into the microphone and state your name, please,

24   for the record.

25             DR. BECK:  My name is Stuart Beck, B-e-c-k.

```
1              THE COURT:  Stuart, S-t-u-a-r-t?

2         DR. BECK:  S-t-u-a-r-t.

3              THE COURT:  You may proceed.  How long will you be?

4         MR. GRINBERG:  I really hope to keep it to half an

5    hour or less, and I will do it.

6              Your Honor, before I begin, because Stuart Beck was

7    not appointed by the Court in this case and he was merely

8    Fathalla Mashali's treating psychiatrist --

9              MR. DENNER:  We would waive any privilege of

10   confidentiality, your Honor.

11             MR. GRINBERG:  So, I just want to put it on the

12   record.  And, also, if the Court would just order on the

13   record for Dr. Beck to disclose whatever information I'm

14   asking him about with respect to Mashali, I think that would

15   just help him just to feel more protected.

16             THE COURT:  You do understand that there is a

17   psychiatric privilege that -- where the patient can decline to

18   have you talk about him, but I understand that the patient in

19   this instance is not declining your talking about him and

20   that, therefore, you can talk about anything with respect to

21   his treatment and what he said to you.

22        DR. BECK:  Yes, your Honor.

23             THE COURT:  And that is agreed by the defendant

24   through his counsel?

25             MR. DENNER:  Yes, ma'am.
```

 1           MR. GRINBERG:  Your Honor, may I approach the

 2    witness?

 3           THE COURT:  And I assume that counsel represents the

 4    defendant with respect to this.

 5           MR. DENNER:  I do, your Honor.

 6           THE COURT:  And his views.  Okay.

 7           MR. GRINBERG:  If I may approach the witness with

 8    exhibits?

 9           THE COURT:  Yes.

10           MR. GRINBERG:  Thank you.

11           (Dr. Beck handed exhibits.)

12                     DIRECT EXAMINATION

13    BY MR. GRINBERG:

14    Q.   Dr. Beck, how are you employed?

15    A.   I'm employed by Mass General Hospital.

16    Q.   And is MGH part of that?

17    A.   MGH is Mass General.

18    Q.   I'm sorry.  Is that what you just said?

19         And how long --

20           THE COURT:  Excuse me.  Can I just -- you are a

21    psychiatrist working at Mass General?

22           THE WITNESS:  I'm a staff psychiatrist on the adult

23    inpatient psychiatry unit, Blake 11, at Massachusetts General

24    Hospital.

25           THE COURT:  And you were the physician treating Mr.

1  Mashali?

2          THE WITNESS:  I was one of them.  I was his attending

3  physician.

4          THE COURT:  During what period of time were you

5  treating him?

6          THE WITNESS:  During his three-week admission, end of

7  March through middle of April.

8          THE COURT:  Okay.  I was just trying to get to the

9  gist of this.

10         MR. GRINBERG:  So, I'm just going to get right there.

11  Q.   Do you know why Fathalla Mashali was admitted at MGH?

12  A.   He was admitted for treatment of depression.

13  Q.   And was he treated for that at MGH?

14  A.   Yes.

15  Q.   What was his treatment at MGH?

16  A.   He received treatment for depression.

17  Q.   What did the treatment consist of?

18  A.    It was multimodal.  It included medications, attempts at

19  therapy, nutrition, physical therapy, occupational therapy.

20  Those were the modes we used.

21  Q.   Nutrition, what does that consist of?

22  A.   We have a nutritionist who sees our patients on request.

23  We did ask our nutritionist to see her -- see him.  She saw

24  him on several occasions, if I recollect correctly.  She left

25  recommendations and we implemented those.

Q.   All right.  Were they implemented successfully or not
successfully?

A.   Unsuccessfully.

Q.   Why?

A.   She was -- if I remember correctly, she was hoping to
initiate regular eating and he did not comply.

Q.   In what way?

A.   Again, according to my memory, she was probably
recommending several meals a day, small meals a day, four,
five, six small meals a day, and Dr. Mashali, I think
throughout his whole hospitalization, never actually did that.

Q.   When you say he did not comply, was that a volitional
act or was it that -- like a medical condition prevented
Fathalla Mashali from eating in a way that was suggested by
the nutritionist?

          MR. DENNER:  Objection, your Honor.

          THE COURT:  I'm sorry?

          MR. DENNER:  Objection, your Honor.

          THE COURT:  What's the objection?

          MR. DENNER:  Apart from being a compound question,
it's also --

          THE COURT:  You need to keep your voice up.

          MR. DENNER:  It's leading and it's a compound
question that suggests an answer.

          THE COURT:  No.  You may answer.

1    A.   I think he chose not to comply.

2    Q.   What do you base that opinion on?

3    A.   My personal experience with him in rounds.  We talked

4    about it almost daily.  We made it extremely clear that the

5    best way to manage his gastroparesis, his abdominal pain, and

6    to improve his weight and nutrition, was to eat six -- four,

7    five, six small meals a day, eat the foods recommended, not

8    the ones that were not, and take supplements as recommended,

9    and he did not do that.

10   Q.   Okay.  What about therapy?  What kind of therapy was

11   prescribed in this case?

12   A.   Well, we have access on the unit to individual

13   therapists.  We also have a very robust group program, which

14   includes activities, skill building, et cetera, and we also

15   meet with him individually.  We consider that -- we hope that

16   that's helpful as well in a therapeutic way.

17   Q.   Was that therapy successful or unsuccessful?

18   A.   I think in general it was unsuccessful.  He minimally

19   engaged in our group program.  My memory is that he went to a

20   few groups, but definitely did not go to programs as we

21   recommended.

22   Q.   In your opinion, did any medical condition prevent him

23   from participating in therapy?

24   A.   There were times he was physically uncomfortable, but

25   that would not have prevented him from sitting in a room.

1      Q.   Would you please take a look at Tab No. 13.

2           MR. GRINBERG:  And, your Honor, I will move to

3      admit -- well, let me ask the basic question first.

4           THE COURT:  This is the same material you gave us

5      before?

6           MR. GRINBERG:  No.  These are different.  This is --

7      oh, I'm sorry.  The Court has it.  It's Tab 13, but we have

8      not moved to admit this into evidence.

9           THE COURT:  I have only what I got earlier, which is

10     Tab 1 through -- oh, I see.  It's in a separate clip, okay.

11     Sorry about that.

12          Is there any objection to the admission of any of

13     these documents, Mr. Denner?

14          MR. DENNER:  No.

15          THE COURT:  Okay.  So, 13 through 18 are now in

16     evidence.

17          MR. GRINBERG:  Thank you, your Honor.

18     Q.   What is Tab 13?  What is that document?

19     A.   Tab 13 appears to be the discharge summary.

20     Q.   Are you familiar with this document?

21     A.   Yes.

22     Q.   And how are you familiar with this document?

23     A.   I most likely read through it and signed off on it after

24     discharge.

25     Q.   Would you kindly turn to Page 2.

1    A.   Yes.

2    Q.   All right.  In the middle of that page, there's a

3    paragraph that begins with, "The OSH psych consultant was

4    concerned..."  Do you see that?

5    A.   Yes.

6    Q.   Would you read that paragraph -- well, let me just read

7    it.  "The OSH psych consultant was concerned Dr. Mashali has

8    depression as well as an underlying neurocognitive disorder

9    such as Lewy Body dementia.  The patient reported a

10   questionable history hypomania, where he spent huge sums of

11   money (million of dollars) and that he channeled extra energy

12   into his work at that time.  They recommended inpatient

13   hospitalization and neuropsych testing," correct?

14   A.   Correct.

15   Q.   First of all, what is OSH psych consultant?

16   A.   "OSH" is an acronym that's used at Mass General

17   Hospital.  It means, "outside hospital."

18   Q.   And what does that mean?

19   A.   Any hospital that's not MGH is called OSH.

20   Q.   I see.  So, it was a consultant who was not from MGH?

21   A.   Yes.

22   Q.   Okay.  And what is Lewy Body dementia?  What is that?

23   A.   It is a type of dementia that -- there are many types of

24   dementia.  Lewy Body dementia has a particular feature of

25   visual hallucinations.

1   Q.   So, there's a concern here -- was Fathalla Mashali also

2   diagnosed with dementia at MGH?

3   A.   No.

4   Q.   Why not?

5   A.   We didn't see any signs of it, nor could we test for it.

6   Q.   Nor can you?  I'm sorry.

7   A.   Test for it.

8   Q.   Well, can you generally -- is there a test for the

9   dementia or you could not test in this case?

10  A.   In this case we could not test for dementia.

11  Q.   Why?

12  A.   He didn't cooperate.

13  Q.   Well, what does that mean?  Explain that.

14  A.   We generally start with a screen evaluation.  In this

15  case we used the Montreal Cognitive Assessment or MOCA.  He

16  scored five out of 30.  The scoring was very internally

17  inconsistent.  Nevertheless, we asked for a neuropsychologist

18  to see him.  They did meet with him on the day prior to the

19  official testing to start.  They felt that he was reasonable

20  to be tested.  Sometimes they don't, but he was apparently by

21  their assessment able to go forward with the testing.  So,

22  they attempted to test.  Gave him the PAI, and the scores were

23  invalid.

24  Q.   What does it mean, the scores were invalid?

25  A.   There's different internal questions that allow a

1    trained neuropsychologist to determine if the reports -- the

2    report that the patient gives on the exam is valid.

3       Q.   And what does it mean for the test result to be invalid

4    in the sense that -- like just as a practical matter, what

5    does the patient do to make it invalid?  What actually

6    happens?

7       A.   What --

8       Q.   In lay person's terms, explain that to us.

9       A.   What happens is that they show patterns in their answers

10   that are either overreporting, underreporting or both.

11      Q.   Now, you did not administer the -- I'm sorry, I did not

12   mean to interrupt you.  Did you finish your answer?

13      A.   Yes, sir.

14      Q.   Were you the one who administered these tests?

15      A.   No.

16      Q.   Were these tests administered on your order?

17      A.   Yes.

18      Q.   Okay.  And so, why did you order these tests?

19      A.   Well, the first test was the MOCA, as I mentioned, and

20   that's to screen for any cognitive deficits.  That's an exam

21   we do almost for everybody that comes through the hospital.

22   If it comes positive or there's a concern, we ask for further

23   testing by people who are trained to do that.  And so, that

24   was what we were doing.

25          We also had an admission note which had some concern

1    about a dementing process.  We wanted to follow up on that as

2    part of our differential diagnosis and see what we could

3    understand about Dr. Mashali.

4        Q.   Okay.  So, did these test results affect your treatment

5    of Fathalla Mashali at MGH?

6        A.   Yes.

7        Q.   In what way?

8        A.   Number one, we could not fully assess his cognitive

9    abilities through testing.  Number two, because of the

10   internal inconsistencies and our experience on doing the MOCA,

11   we began to develop the idea of malingering.  That made it --

12   made the whole formulation of his presentation and our

13   treatment plan.  It suggests both the treatment plan and our

14   formulation.

15       Q.   All right.  Going back to this paragraph, the next thing

16   it states is, "The patient reported a questionable history of

17   hypomania, where he spent huge sums of money (millions of

18   dollars) and that he channeled extra energy into his work at

19   that time."  What does that mean?  Did you see that -- do you

20   see that sentence?

21       A.   I have read that.

22       Q.   Do you understand the meaning of this?

23       A.   I understand what it says, but --

24       Q.   Okay.  Could you elaborate on what this means to lay

25   people?

1          MR. DENNER:  Your Honor, could that question be

2    repeated?  I didn't hear the question.

3          THE COURT:  I'm sorry?

4          MR. DENNER:  Could the question be repeated.  I did

5    not hear the question.

6          THE COURT:  He wants the doctor to tell us what it

7    means.

8          MR. DENNER:  But I didn't hear what "what" means.

9          THE COURT:  That sentence.

10   A.   I can describe what this sentence is -- what the terms

11   are in there, but it wasn't my information.  It came from

12   outside the hospital.

13         THE COURT:  Well, that would help.

14   Q.   So, you did not write this?

15   A.   Okay.  So, "a questionable history of hypomania."

16   Hypomania is a lower form of mania.  It's a term that's used

17   in the diagnosis of bipolar disorder for -- people can go from

18   extremes of mood elevation and depression.  So, the mania is a

19   slight amount of mania, and it's part of a bipolar, typically

20   Type II diagnosis.  During that time people do spend a lot of

21   money.  They do impulsive behavior.  They don't sleep.  They

22   talk a lot.  They have upsets.  They do very expansive

23   thinking, racing thoughts, rapid speech.

24   Q.   Now -- but it says "questionable history of hypomania."

25   So, what does that qualifier "questionable" mean?

1    A.   It means they're not sure.

2    Q.   Okay.  Now, do you actually know why somebody wrote this

3    sentence in this report?  In other words, do you understand

4    the basis for somebody to write this in their report?

5    A.   My understanding would be that the person who wrote this

6    admission note was collecting information from the outside

7    hospital and this was probably documented in their report.

8    Q.   Okay.  In the following paragraph, which begins, "Upon

9    interview on Blake 11..."  Do you see that?

10   A.   Yes, sir.

11   Q.   There's a sentence towards the end.  It's the third line

12   from the end in that paragraph, which begins with, "Weight

13   doesn't matter to me, only comfort."  Do you see that?

14   A.   Yes.

15   Q.   "He denies feelings of hopelessness or guilt, only

16   states that he wants to be comfortable."

17        And then, actually, the next paragraph says, "My life

18   has already ended.  I want to be on hospice, for pain meds.  I

19   don't care if I die.  I just want to be comfortable.  He

20   denies having any suicidal plans."  Do you see that?

21   A.   Yes.

22   Q.   Now, did you write these statements or no?

23   A.   No.

24   Q.   But having read these statements, are they consistent or

25   inconsistent with your interactions with Fathalla Mashali

1    during his stay at MGH?

2        A.   They're very consistent.

3        Q.   In what way?

4        A.   He in different forms said the same thing daily during

5    the first part of the hospitalization, at least.

6        Q.   So, when he says he wants to be comfortable, asking for

7    hospice, what does it mean to you as a -- what is it that he's

8    actually asking for, what kind of care?

9        A.   In our conversations, I took that to mean that he wanted

10   to be placed in a facility or at home, perhaps, with hospice

11   care, and hospice care is usually given to people with end-of-

12   life illness who are dying.  He wanted comfort care because he

13   perceived that he was dying.

14       Q.   So, typically, does hospice care provide care that would

15   get somebody better and make them leave the facility?

16       A.   No.

17            THE COURT:  Does this aspect of his condition tell us

18   anything about whether he was very sick, truly very sick, and,

19   therefore, incompetent to stand trial or whether he was

20   competent?

21            THE WITNESS:  With all due respect, we were not in

22   any position to determine competency.

23            THE COURT:  No, but I'm asking now.  You see that --

24   you agreed that he was in a particular condition at the time,

25   apart from what it says here.  To you was he making it up?  I

```
1    mean, does it have any effect on any view that one might have

2    of whether he was malingering?

3            THE WITNESS:  To me and then and now?

4            THE COURT:  Yes.

5            THE WITNESS:  It reflects the severity of his

6    depression, the injury he suffered to a sense of self when he

7    lost his function as a physician.  It speaks to his deep level

8    of pain and it also reflects his perception about himself in

9    the world.

10           THE COURT:  Thank you.

11           (Pause.)

12           THE COURT:  We might as well stretch while we wait.

13           (Stretch break.)

14           THE COURT:  Ready?

15           MR. GRINBERG:  I'm ready.  I'm almost done.

16           THE COURT:  We will proceed.

17           MR. GRINBERG:  So, we will -- the rest of the

18   exhibits are admitted.  We will skip all of them, except the

19   last one, which is Tab 18.

20           THE COURT:  I'm sorry?

21           MR. GRINBERG:  The rest of the exhibits have been

22   admitted.  We'll not go through them in detail, but we'll just

23   skip to the very last exhibit, and I want to ask the doctor

24   some questions about the very last exhibit here, which is Tab

25   18.
```

1          THE COURT:  Are you going to read all this stuff into

2     the record again?

3          MR. GRINBERG:  No, I'm not reading anything.  I'm

4     saying they've been admitted.  I won't ask the doctor any

5     questions about them.  We will just skip to the last exhibit

6     and I have some questions about that, if I may.

7          THE COURT:  Okay.

8     Q.   So, Tab 18, please.

9     A.   Yes, sir.

10    Q.   If you would kindly turn to -- there are numbers at the

11    bottom of the page on the right-hand side.  Do you see that?

12    A.   Yes.

13    Q.   They begin with Page 110 and then it says Page 111.

14    Would you kindly go to Page 112.

15    A.   Yes.

16    Q.   Okay.  Would you go to the top paragraph of Page 112.

17    A.   Yes.

18    Q.   And do you see a sentence that begins with, "The patient

19    continues with depression and thought distortion, related to a

20    depressive disorder and significant narcissistic injury."  Do

21    you see that?

22    A.   Yes.

23    Q.   It goes on, "He also appears to be malingering in order

24    to avoid outside court situation given inconsistent

25    presentation, poor compliance, elaboration of medical

1    problems, and overt disdain for the legal process."  Do you

2    see that?

3     A.   Yes.

4     Q.   "He appears to have capacity to make decisions about his

5    basic recovery plan, but he continues to avoid getting better

6    through poor compliance and active sabotage of treatment

7    plans."  Do you see that?

8     A.   Yes.

9     Q.   Who wrote this, if you know?

10    A.   This was a progress note which we did on a daily basis.

11   The note is written by a multitude of people throughout the

12   day, but I sign it at the end of the day.

13    Q.   Okay.  But do you know -- for example, if you go to the

14   very first page here, which is Page 109, in the middle, where

15   it says, "Progress notes," there's a line and under there it

16   says, "Author:  Stuart Beck, M.D."

17    A.   Yes.

18    Q.   Okay.  Does that give you an indication whether you are

19   the one who wrote this particular paragraph that I just read?

20    A.   It's an indication if I signed the note?

21    Q.   Well, all I'm saying is I'm seeing it says, "Author:

22   Stuart Beck."  And I'm asking you whether you wrote this note

23   or whether you merely signed it.

24    A.   On Page 113?

25    Q.   Yes.

A.   It says, "Scribed by Elizabeth Madva."  She was my
intern at the time.

Q.   Okay.

A.   She wrote much of the note, but everything that's in
there I read through and approved of and signed it.

Q.   So, did you approve this statement that I just read?

A.   Yes, I did.

Q.   What does it mean that, "He appears to be malingering in
order to avoid outside court situation," and then it goes on,
what does that mean?

A.   It was our perception and impression that he was not
wanting to face up or go through or deal with outside issues.
Malingering, as I'm sure you're aware, is a disorder that --
in which patients do things or produce things for secondary
gain.  Secondary gain can be the absence of something or to
get something.  In the -- he had no other stress that we were
aware of in his life, nothing else that was problematic
besides the court process he was to face.  So, we -- and also
in our conversations, that's what he got upset about.

Q.   So, the reference to, "outside court situation," does
that refer to this federal criminal case?

A.   Yes.

Q.   So, does this -- I mean, it's here.  So, there's a term
called, "overt disdain for the legal process."  What does that
come from?

1    A.   I remember that well, actually.  I don't remember which

2    day it was.  It was during rounds.  Actually, several times.

3    Of course, we brought up this topic.  It was the major

4    stressor in his life.  That's when he came alive and was very

5    angry, expressed lots of anger towards the government for

6    destroying his life, threatening his family, the family's

7    well-being and livelihood, taking his career away.  So, that's

8    what I meant by "overt disdain."  He thought it was egregious

9    that these things were happening to him.

10   Q.   How did this topic come up?

11   A.   We would talk to him about it.  I would bring it up.

12   Q.   Okay.

13   A.   Generally with patients, we talk about the stresses,

14   what's going on in their lives, what's bothering them as part

15   of our daily due process.

16   Q.   Okay.  So, let's go to the next paragraph, and I'll ask

17   you a few questions about that.  "He is medically stable, but

18   continues to eat inappropriately and refuses to engage in" --

19            COURT REPORTER:  I'm sorry.  I cannot hear you.

20            MR. GRINBERG:  My apologies.  I will slow it down and

21   speak up.

22   Q.   "He is medically stable, but continues to eat

23   inappropriately and refuses to engage in functional recovery."

24   Do you see that sentence?  It's on Page 114.

25   A.   Yes.

1    Q.   But then it says, "He has relinquished his capacity to

2    make decisions about ECT.  So, will defer to wife's

3    preferences as his HCP."  Do you see that?

4    A.   Yes.

5    Q.   "HCP" is healthcare proxy?

6    A.   Healthcare proxy.

7    Q.   So, here's my question:  The paragraph above states

8    that, "He appears to have capacity to make decisions about his

9    basic recovery plan."  Do you see that?

10   A.   Yes.

11   Q.   And then a few sentences later it says, "He has

12   relinquished his capacity to make decisions about ECT."  Did

13   you reconcile these two statements?

14   A.   They're not inconsistent to me.  Capacity is a fluid

15   spectrum.  It can change over time.  So, capacity to make a

16   decision about one thing doesn't mean they lack capacity to

17   make a decision about another thing.

18           MR. GRINBERG:  Okay.  That's all I have of the

19   witness, your Honor.

20           THE COURT:  Any cross?

21           MR. DENNER:  Very briefly, your Honor.

22                        CROSS-EXAMINATION

23   BY MR. DENNER:

24   Q.   Sir, good afternoon.

25   A.   Good afternoon.

1    Q.   You just said that the capacity to make a decision about

2    one thing does not necessarily mean you can make a -- you have

3    the capacity --

4            THE COURT:   Could you also please keep your voice up.

5    Thank you.

6            MR. DENNER:   Yes, your Honor, I will.   Thank you.

7    Q.   You indicated that the capacity to make a decision about

8    one thing doesn't necessarily mean you have a capacity to make

9    decisions about everything else, correct?

10   A.   It's related to a specific question and a specific time

11   for a specific person.

12   Q.   And if you're suffering from a combination of mental

13   illnesses and a question might trigger an emotional response

14   in the context of those illnesses, would it be fair to say

15   that one -- that would affect one's capacity to answer that

16   question, to deal with that issue?   It could?

17   A.   It could.

18   Q.   And you had indicated that he relinquished the right to

19   make a decision about ECT.   That's electroconvulsive therapy,

20   yes?

21   A.   To question --

22   Q.   To relinquish -- did you want to go ahead with -- it's

23   fair to say that you wanted -- you felt that ECT would be a

24   productive protocol for him to get, correct?

25   A.   No.

1    Q.   You did not?

2    A.   No.

3    Q.   Who suggested the ECT, to begin with?

4    A.   I believe it's an admission note.  It started from

5    admission.

6    Q.   Did you discuss with his wife that you would like to do

7    ECT?

8    A.   Yes.

9    Q.   Did you suggest to his wife that ECT could be a good

10   thing for him to do, given his condition?

11   A.   It could have been, yes.

12   Q.   You also brought a petition, did you not, even -- and

13   Dr. Hoffmann, for involuntary commitment, correct?

14   A.   Yes.

15   Q.   And they actually went as far as scheduling a hearing

16   for that involuntary commitment, correct?

17   A.   He was scheduled.

18          MR. DENNER:  I have no further questions, your Honor.

19          THE COURT:  Any redirect?

20          MR. GRINBERG:  No, your Honor.

21          THE COURT:  Thank you, Dr. Beck.  You're excused.

22   Who is next?

23          (Dr. Beck steps down.)

24          MR. DENNER:  Noha Mashali -- I'm sorry.

25          MR. GRINBERG:  The government rests, I guess.

```
 1              MR. DENNER:  Dr. Noha El-Khadry, the wife of Dr.
 2    Mashali.
 3              THE COURT:  Okay.
 4              COURTROOM DEPUTY CLERK URSO:  Can I ask you to please
 5    raise your right hand, please.
 6              NOHA EL-KHADRY, M.D., SWORN.
 7              COURTROOM DEPUTY CLERK URSO:  Can I please ask you to
 8    speak in the mic and state your name for the record, please.
 9              DR. EL-KHADRY:  My name is Noha El-Khadry Mashali.
10    First name is N --
11              THE COURT:  "Noha" is spelled how?
12              DR. EL-KHADRY:  I'm going to spell it out.
13              THE COURT:  Okay.
14              DR. EL-KHADRY:  My first name is N-o-h-a.  My maiden
15    name is E-l-K-h-a-d-r-y.  Mashali, M-a-s-h-a-l-i.
16              COURTROOM DEPUTY CLERK URSO:  Thank you.
17              MR. DENNER:  May I inquire, your Honor?
18              THE COURT:  You may proceed.
19                        DIRECT EXAMINATION
20     BY MR. DENNER:
21     Q.   Good afternoon.
22     A.   Hi.
23     Q.   What is your relationship to Dr. Mashali?
24     A.   He's my husband.
25     Q.   How long have you been married to him?
```

1    A.   I think 23 years.  22, 23 years.

2    Q.   And briefly describe your family, how many children you

3    have.

4    A.   We have four children.  My oldest is 18.  He's a boy.  I

5    have a daughter who is 16 years old.  I have a son who is 14

6    years old, and I have my daughter who is five years old.

7    Q.   How are you employed?

8    A.   I'm a periodontist.

9    Q.   Is that in Massachusetts?

10   A.   Yes.

11   Q.   A licensed periodontist?

12   A.   Yes, I'm a board certified periodontist and I have a

13   practice in Winchester, Massachusetts.

14   Q.   And at some point did you become aware of the fact that

15   your husband was, in fact, changing, yes or no?

16   A.   Yes.

17        THE COURT:  Was, in fact, what?

18        MR. DENNER:  Changing, personality was changing.

19   A.   Yes.

20   Q.   And when would that have been?

21   A.   In retrospect, it's been the last few years, when I

22   think back on it.  He goes through phases where his decision

23   making has not been good.  He's very unorganized.  I'm not a

24   psychiatrist so I can't say mania, but in terms of

25   overspending, it's true, quick decisions, opens many

1    businesses.  I've gone through bankruptcy where things were

2    unorganized and he wasn't able to control everything, thinking

3    back.  So, it's been some time.

4        Q.   Did he seem to be more or less in control than he had

5    been earlier in your relationship?

6        A.   Over the last few years, much less in control, more

7    things going on, always doing something, very active, thinking

8    back on it for the last several years.

9        Q.   Can you speak up a little bit in the microphone.

10           When you say, "the last several years," when would you

11   say -- well, strike that.

12           You heard people testify that he has sarcoidosis,

13   correct?

14       A.   He was diagnosed with sarcoidosis in 2002.

15       Q.   And was he receiving medication for that going forward?

16       A.   Yes, he's been on steroids for -- since 2002 until it

17   was discontinued in 2014, and every time he tried to stop or

18   reduce the dose of Prednisone, which is what he was on, it

19   would recur, and then he would -- sarcoidosis for many people,

20   when they do have sarcoidosis --

21           MR. GRINBERG:  Objection.  She's not an expert on

22   this.

23       A.   I'm not an expert.  Just my knowledge from what's been

24   happening with my husband.

25       Q.   Well, until the Court says you can't answer --

1          THE COURT:  You may tell us what you observed and how

2     you saw him rather than telling us in general what medical

3     says about it.

4     A.   What I observed is every time they tried to withdraw him

5     from his medications, the sarcoidosis would recur.

6     Q.   And what was the effect, if anything, of the sarcoidosis

7     recurring?

8     A.   He would have fever, chills.  He has joint and muscle

9     aches, and he was generally unwell.

10    Q.   Did it seem at all to affect his cognition, working of

11    his mind, his ability to focus?

12    A.   I'm not sure if there's a direct relationship, but I

13    know because he was on the steroids for so long, he had many

14    medical side effects from the steroids, including heart

15    issues, stomach issues, pain when he -- muscle and joint pains

16    if he was not on the steroids.  He had, again, steroid-induced

17    diabetes.  So, tachycardia where the heart was beating very

18    fast.  So, from the result of the sarcoidosis and the

19    medication for it, he ended up having many, many medical

20    issues.

21    Q.   And what was the point at which you actually perceived

22    that his personality was changing?

23    A.   I think it finally hit me with the loss of his license,

24    to be honest.

25    Q.   And when would that have been?

1    A.   He lost his license in August 2013.

2    Q.   You're talking about his medical license?

3    A.   Yes, his medical license, yes.

4    Q.   And do you know why he lost his medical license, what

5    the allegations were?

6    A.   Thinking back on what I read, they were concerned about

7    deaths in the -- I think six patient deaths that happened a

8    couple of years before.  Although they said it was not

9    directly caused by him, they were concerned about the

10   practice --

11        MR. GRINBERG:  I object to that.

12   Q.   That was in connection --

13   A.   That's what I read in the --

14        MR. GRINBERG:  I object to that being the truth...

15        THE COURT:  Well, it's being offered only for her

16   perception of what was going on at the time.

17        MR. GRINBERG:  That's fair enough.

18   Q.   That was in connection with his medical practice,

19   correct?

20   A.   Yes, his medical practice.

21   Q.   And the loss of license was in the State of Rhode

22   Island?

23   A.   It was in the State of Rhode Island, and then --

24   Q.   Did anything occur relative to his license in

25   Massachusetts?

1    A.   His attorney at the time had recommended that he

2  voluntarily relinquish his medical license and -- so he can

3  defend himself.

4    Q.   And at that point, it would be fair to say that his

5  medical businesses began to -- no longer existed without a

6  medical license?

7    A.   He tried very hard to have other physicians work and

8  keep the practice going, but the FBI started investigating and

9  people became intimidated, weren't comfortable working.

10   Q.   And at some point he was arrested; is that correct?

11   A.   He was.

12   Q.   Yes or no.

13   A.   Yes.

14   Q.   Do you recall when that was?

15   A.   Yes.  It was February 11th, 2014.

16   Q.   And prior to him being arrested, did he attempt to leave

17  the country?

18   A.   Yes.  He was actually arrested in the airport while he

19  was trying to travel to Egypt.

20   Q.   And do you know why he said -- did he tell you why he

21  was going to Egypt, yes or no?

22   A.   Yes.

23   Q.   And what was that reason?

24   A.   There was a couple of reasons.  One of them was to help

25  raise funds from land that we had, and the other reason, I

1    believe, is he -- he thought -- I mean, he thought he could go

2    and help the U.S. Government fight terrorists and work with

3    the government to --

4    Q.   Would it be fair to say that he had in his head that he

5    could go see someone he knew 35 years ago and have access to

6    the head of Al-Qaeda?

7    A.   Yes.  He went to school with the current head of

8    Al-Qaeda, al-Zawahiri, and he had talked about going -- trying

9    to re-connect with him so he can help the U.S. Government

10   capture him and to work in terrorist activities in Egypt and

11   in Saudi Arabia.

12   Q.   Does that seem normal or bizarre to you?

13   A.   It was very strange and I didn't know because we really

14   -- I don't know where that came from.  I don't understand it.

15   It didn't make sense to me, and that's when I started

16   realizing there was something very wrong.  We thought he was --

17   Q.   Your husband is an honorably discharged United States

18   Army captain; is that correct?

19   A.   Yes, he is.

20   Q.   And you haven't seen Mr. al-Zawahiri in 30-some years?

21   A.   I never met him.  We are very close in our family.  We

22   don't socialize a lot.  We don't really -- we work and we take

23   care of our family.  I don't know any of those people.  I

24   never heard him talk about anybody before.  So, I don't know

25   where that came from and where that idea came from, but I

1    think he was trying to show his loyalty to the United States

2    because he felt the FBI was after him and he had to prove that

3    he was a good person and that he was on their side, and I

4    don't know where the link with terrorism came in and I don't

5    know where that thought process came in, but that was the

6    first time that something was -- he was not thinking clearly

7    because it didn't make sense at all.

8    Q.   And at that point he got taken into custody, yes?

9    A.   Yes.

10   Q.   And was detained for a period of three or four months?

11   A.   Yes, four months.  He was released in June.

12   Q.   Did anything happen in the jail he was being detained in

13   that in any way, shape or form affected his health from your

14   perspective going forward?

15   A.   Yes, I think there was a lot of things that happened.

16   He wasn't eating well.  I think a lot of his medical

17   conditions, even though I noticed his depression started --

18   Q.   Can you talk a little slower.

19   A.   Sorry.  I think he got more depressed.  Even though I've

20   seen the depression earlier on, it became more significant.  I

21   think he started having his physical ailments become more

22   apparent where I don't know if he was being given the correct

23   medications.  He started not eating, had started to have

24   stomach aches, vomiting.  There was a point where I think he

25   was -- he was not agreeing to take sugar pills or not agreeing

1    with -- I think it was in the medical ward most of the time.

2    He was -- it was recommended for him to take medicine, or

3    something, which he didn't.  So, they put him in a cement cell

4    where he was thrown in naked --

5              MR. GRINBERG:  Objection.  What's the foundation for

6    her knowing that?

7    Q.   Let me be -- let me ask you more specific --

8              THE COURT:  I'm sorry?

9              MR. DENNER:  I will try to establish foundation for

10   which she's talking about.

11             THE COURT:  Go ahead.

12   Q.   You say that he got thrown into a cement cell.  You're

13   talking about your husband being thrown --

14             THE COURT:  Well, we don't want to repeat it in order

15   to lay the foundation.

16   Q.   Are you --

17             THE COURT:  I am assuming -- hold it, Mr. Denner.

18             It is very clear that she cannot tell us what

19   happened in the jail when she wasn't there.

20   Q.   You were not at the jail; is that correct?

21   A.   I was not, but I heard.

22   Q.   Where did you learn what happened to your husband?

23   A.   I had gone to visit him on Sunday, which is visiting

24   hours for family, and they wouldn't let me see him.  And so, I

25   called Mr. Denner and I said they're not letting me see him

1    and they're not letting me know where he is.  They wouldn't

2    tell me where he was.  So, your associate, Joseph Keller, went

3    to see Fathalla that same day, and that's where he found him.

4                MR. GRINBERG:  Objection.

5                THE COURT:  So far so good.

6    Q.   And Mr. Keller reported to me and I -- how did you

7    ultimately learn --

8                THE COURT:  Well, it's all hearsay.  I mean, now it's

9    triple hearsay.

10                MR. DENNER:  Well, yes, your Honor, it is, but I --

11   in this proceeding I, respectfully, heard a lot of hearsay

12   today, but if at this point it's hearsay and it doesn't come

13   in, that's fine.

14   Q.   Without saying what you learned, did his health have any

15   ramifications from -- over the next weeks and months?

16   A.   Yes.

17   Q.   And what was that?

18   A.   His physical conditions deteriorated.  When he was

19   released, he would be having nightmares and anxiety and

20   paranoia, and he continued to deteriorate and his medical

21   condition continued to deteriorate.

22   Q.   And how did that present itself to you?

23   A.   He would have nightmares and he would be talking in his

24   sleep and agitated --

25                MR. GRINBERG:  Objection -- well, never mind.

1          THE COURT:  You can continue, please.

2     A.   That's how I knew -- I mean, that it was distressing.

3   He started saying that he's seeing his parents, who are

4   deceased, and started talking in a very depressed way.

5     Q.   When you say, "talking in a depressed way," could you be

6   more specific, please?

7     A.   He thought he was dying pretty much, is what he thought,

8   and he really believed it, and that he was going to go join

9   his parents.

10    Q.   And at some point did this lead to some kind of medical

11  intervention, yes or no?

12    A.   For that not so much, but for -- his physical health

13  deteriorated as well.  So, he started getting medical

14  attention at the Brigham and Women's Hospital.

15          THE COURT:  I'm sorry, when was that?

16    Q.   Approximately when?

17    A.   So, he started going to the Brigham and Women's when he

18  was released and -- in the summer and the fall of 2014.

19          THE COURT:  Okay.  So, now he's no longer at

20  Plymouth?

21          THE WITNESS:  He's no longer -- this is after he's

22  been released, yes.

23    Q.   And in terms of just summary fashion, could you please

24  tell the Court about the hospitalizations he had thereafter,

25  and then I'll ask you some more questions based on that.

A.   Okay.  So, for the last couple of years, he has been in and out of hospitals.  It started off with him complaining to me about numbness in his arms and his legs.  And so, he was seeing, I believe, Dr. Young at Brigham and Women's at that time.

Q.   And would that have been in 2015?

A.   That was in 2014, I believe.

Q.   Please continue.

A.   And she took him off the Prednisone and said the Prednisone was causing a lot of side effects.

MR. GRINBERG:  Your Honor, I'm objecting.  I was trying to be flexible, but now we are hearing hearsay.

THE COURT:  Side effects can be observed.

MR. GRINBERG:  Well, what the doctor --

THE COURT:  She can tell us what she saw.

MR. GRINBERG:  That's fine.

A.   So, he went through a very long phase, starting from last year, 2015, in the winter and spring, starting to complain more that whenever he ate, he felt bad, his stomach hurt, he had nausea, and then around April or May of 2015, he started actually vomiting whenever he ate and feeling bad, and due to that he started losing a lot of weight.  He became dehydrated.  When I would encourage him to eat, he would say his stomach hurts.  He didn't want to eat anything.

MR. GRINBERG:  Your Honor, I don't object to

1    observations, but I do object to things that Fathalla Mashali

2    is telling the wife.

3         THE COURT:  What difference does it really make?  I

4    mean, seriously.  Go ahead.

5    A.   So, I can be more specific.  He was admitted into the

6    hospital.  Several times we were taking him to different

7    physicians and when they saw his weight loss, they recommended

8    that he go to the hospital in the ER.  So, in June of 2015, he

9    was admitted, I think, twice -- two or three times into Beth

10   Israel Needham, because it was near our house, and they would

11   admit him.  They would give him fluids and they would release

12   him, and when he was in the hospital, he was doing well and

13   when he got out -- the insurance wasn't covering any rehab for

14   him at the time -- he would continue not eating.  They did

15   diagnosis to see if he had gastric paresis, but at the time he

16   was on medicine because of -- Ritalin, I believe, because --

17   so, when they did the first studies, they missed the diagnosis

18   of gastric paresis because he wasn't on the medication enough.

19   Later he was diagnosed with severe gastric paresis.  In July --

20        THE COURT:  We're still in 2015?

21        THE WITNESS:  Yes, this is 2015.

22   A.   (Continuing) I came down and found him on the floor and

23   I called -- I called 911, and they took him to Beth Israel

24   Needham, and they said he was in liver failure and they

25   transferred him to Beth Israel in Boston where he spent -- he

1    was in complete liver failure.  He spent a week in the ICU.

2    He was unconscious probably three or four days.  We thought he

3    was going to die.  They were talking about doing a liver

4    transplant at that time.  They were amazing.  They saved his

5    life, and he was -- so, one week in the ICU and then I believe

6    he spent another two weeks on the general floor, and he --

7    they did recommend to put him in rehab and he went to EPOCH

8    Rehab and that was, I believe, in August 2015.  He spent about

9    two weeks there for physical rehab after being in the

10   hospital.  They became concerned because he was -- continued

11   to talk about not wanting to live and he had lost the will to

12   live, and they became concerned.  So, they transferred him to

13   Norwood Hospital in the inpatient psych where he spent two

14   weeks there.

15        When he got out of there, from 2015 to 2016, I think he

16   switched primary care to someone in Mass General Hospital.  He

17   would have -- he continued to lose weight.  His stomach hurt

18   every time -- every time he would eat -- or I would encourage

19   him to eat, he says, no, my stomach hurts.  I can't eat.  He

20   continued to think he was dying and believed that was a

21   reality.  Didn't mind if he died, and he -- he started having

22   seizures.  I don't know if they're seizures or not, but he --

23   several times we found him unresponsive.  The first one is

24   before he went to Mass General, Blake 11.  He became

25   unresponsive and started vomiting, and I called 911 and --

```
 1              THE COURT:  This was at your home?

 2              THE WITNESS:  At my home.  I was with him.

 3      A.   (Continuing) And they took him to Beth Israel Hospital

 4      in Needham, and the doctor in the ER and -- at the time I

 5      didn't think it was a seizure.  I just knew he wasn't

 6      answering me.  He was vomiting.

 7          When I went into the hospital, the ER doctor told me

 8      that he had witnessed a seizure for about a minute and had he

 9      done that at home -- and when I thought about it -- his legs

10      were shaking, but the doctor is the one who actually

11      documented it and made me realize it was a seizure.

12          They transferred him to Boston where he stayed for about

13      two weeks, and I was at a point where -- he was so depressed,

14      that I had requested -- he was in the neurology department.  I

15      had requested that he have inpatient evaluation because he was

16      so depressed.  The other thing I --

17              THE COURT:  So, this was when?

18              THE WITNESS:  This is March 2016.

19              THE COURT:  So, this was the hospitalization at the

20      Beth Israel initially?

21              THE WITNESS:  Yes, it's one of -- it's the second big

22      one, I think.  The first one was --

23              THE COURT:  We're not yet at Mass General?

24              THE WITNESS:  No.  This is the one where he was

25      transferred from Beth Israel to Blake 11, which is in Mass
```

1    General.  He was in the neurology department --

2         THE COURT:  Why don't we stop here and take the lunch

3    break and we'll come back at 2 o'clock.  Will we finish this

4    today?

5         MR. GRINBERG:  Yes.

6         MR. DENNER:  I would say that I only have about

7    another 10 or 15 minutes with this witness.

8         THE COURT:  Are there any other witnesses?

9         MR. DENNER:  No.

10        THE COURT:  Okay.  All right.  See you at 2:00.

11   Thank you.

12        COURTROOM DEPUTY CLERK URSO:  All rise, please.

13        (Recess taken.)

14        THE COURT:  Please be seated.

15        Ms. Mashali, would you please return to the witness

16   stand.  You may proceed.

17        MR. DENNER:  Thank you, your Honor.

18   Q.  (By Mr. Denner) Good afternoon.

19   A.  Hi.

20        THE COURT:  We were in March or April of 2016.

21        MR. DENNER:  Yes.

22   Q.  Redirecting your attention to March or April of 2016,

23   there was an incident that occurred that caused your husband

24   to be brought back to Beth Israel Deaconess Hospital in

25   Needham; is that correct?

1      A.   Yes.

2      Q.   I think you were discussing that.  Could you please pick

3      that up?

4      A.   Yes.  So, in March 2016 he had a seizure.  He was taken

5      to Beth Israel Needham where the ER doctor witnessed the

6      seizure, and then he was transferred to Beth Israel in Boston

7      under the care of the neurology department.  There had been

8      unconscious, I think, for I think two days, a day or two.

9      When he woke up, he was delirious.  They suspected a seizure.

10     When they did a brain scan, they said there was slowing of the

11     waves, nonspecific slowing of his brain waves, and they had

12     said it was encephalopathy, which when I looked it up --

13          THE COURT:  I think we need to stick to what she

14     observed and knows, not what the medical records show.  I

15     understand that Ms. Mashali is, in fact, a doctor of a

16     different discipline, but I think we should -- she's a fact

17     witness about her observations of her husband.

18     Q.   If you could discuss what you observed of your husband,

19     please.

20     A.   So, when he was transferred to Beth Israel in Boston, he

21     was unconscious for, again, I think a day, maybe two.  He woke

22     up the next morning and he was delirious.  He was reaching out

23     for things.  As he woke up, he would be talking.  My son was

24     with my sister and he would keep asking for him.  I would say

25     no, he's not here.  And he was talking nonsense and behaving

1    very strangely and that lasted for a few days.

2              THE COURT:  What language did he speak?

3              THE WITNESS:  It was a combination.  We usually speak

4    English and I don't recall now.  Sometimes we mix in Arabic as

5    well.

6    A.   (Continuing) But he was saying things that were unusual.

7    He was asking for -- because we had gone to visit him in the

8    hospital.  He kept asking for one of the kids who was -- I

9    told him was away.  When he got better -- he spent a week or

10   two in Beth Israel Boston.

11             I had talked to them about -- that I was concerned about

12   his health and that I did want him to be placed in an

13   inpatient psychiatric, which was, I think, also recommended by

14   the Court and by Dr. Fife, and I did agree with that and,

15   apparently, without my knowing some of the things he had said

16   worried them as well.  And so, they had actually voluntarily

17   committed him at that point as well, and I guess they call it

18   sectioned him at that point and he stayed in the hospital

19   until they found a place for him in Mass General where he was

20   admitted into Blake 11, which is where Dr. Beck is, and that's

21   the locked inpatient psychiatric ward.  He was there for three

22   weeks for evaluation.

23             At that point they were concerned -- they were concerned

24   about severe depression.  When I asked Dr. Beck what the

25   diagnosis was, he had told me it was severe depression with

1   elements of psychosis, and he did mention to me that Fathalla

2   is not eating well, and he told me that he kept saying, I

3   can't eat.  My weight, 80 pounds, is normal, is healthy.  If I

4   eat, it hurts.

5    Q.   Doctor, with regard to your conversations with Dr. Beck,

6   did you have any discussions about your husband's grasp for

7   reality with him?

8    A.   Yes.

9    Q.   And what would they have been?

10   A.   He told me --

11          THE COURT:  Are you asking her for conversations with

12   Dr. Beck?

13          MR. DENNER:  Well, only because Dr. Beck -- I think

14   it will impeach something that Dr. Beck --

15          THE COURT:  Well, I understand that, but --

16          MR. DENNER:  It will impeach something Dr. Beck said

17   today.

18          THE COURT:  You're asking this witness to impeach him?

19          MR. DENNER:  For one thing, yes, for one aspect.

20          THE COURT:  I don't think that is proper.  You can't

21   ask her to impeach Dr. Beck.

22          MR. DENNER:  I asked -- with a prior statement that

23   he would have made, and so forth?

24          THE COURT:  I don't think so.

25          MR. DENNER:  If one person makes -- if I ask Dr. Beck

1    if, for instance, he was in favor of the --

2         THE COURT:  Normally the impeachment has to be with

3    the witness.  You can't use collateral evidence to attack his

4    credibility.

5         MR. DENNER:  But he made a prior -- he made a prior

6    statement to --

7         THE COURT:  No, I won't allow that.

8         MR. DENNER:  Okay.

9    Q.  Please continue, then.

10        THE COURT:  Tell us what you observed once he got to

11   Mass General, what you saw and how you found your husband to

12   be.

13   A.  My husband was generally in bed.  He wasn't leaving the

14   room.  He -- whenever they had him eat -- they wanted him to

15   eat, he would say his stomach hurt.

16        THE COURT:  Were you able to converse with him?

17        THE WITNESS:  Yes, I'm able to converse with him.

18   A.  (Continuing) When I would come, I was able to encourage

19   him out of his bed.  He did.  I had the kids come visit him as

20   well.  There's a family area that's outside the ward where the

21   children are able to visit him.

22        I would try to bring him food, and he really -- he

23   really wasn't eating even what I brought him at that point.

24   It was my daughter's birthday, so we got a cake and he had --

25   I made him have a small piece of cake, but the one thing that

1   they were doing that was really nice and really very good is

2   they found that he was able to tolerate the smoothies.  I

3   don't know what you call it, but it was cold shakes.  And so,

4   he was drinking those, but he was not eating solids.  So,

5   that's what I found.  I don't know if I'm allowed to discuss

6   what the recommended treatment was or not.

7           THE COURT:  No.

8           THE WITNESS:  That's fine.

9    A.   So, that's what I saw and that's what I found.  He -- I

10   know in terms of --

11   Q.   Let me ask you a question.

12          With regard to the observations you made of your husband

13   from 2015 on through March of 2016 -- until today in terms of

14   his cognitive abilities, either in the hospital or when you're

15   home with him, can you please tell the Court what observations

16   you would have made relative to those.

17   A.   Yes.  Do you know -- Fathalla was a very smart, bright,

18   intelligent person.  He had a photographic memory.  Very

19   smart, very savvy, and that slowly faded over the last few

20   years, and his memory is not as clear as it used to be.

21          Many times if the kids come home and they say, Hi, dad,

22   and they'll go do their homework, and he'll ask about the kids

23   and not realize they were home.  At times when my parents came

24   to visit him, he didn't remember that they had come to visit

25   him.  When he talks to Mr. Denner and when Mr. Denner has

1   tried to kind of have conversations with him about the case,

2   and I ask him, you know, what it was about, he doesn't recall,

3   and my understanding from Mr. Denner is he is -- he doesn't

4   recall the case, and when I ask him about it, he doesn't have

5   a memory also about it.  So, his memory is declined.  Things

6   he was able to do easily, he is kind of slow moving now and

7   fumbles with things.

8    Q.   If you could quantify on some level what percent you

9   feel, for instance, in the last six months even his memory has

10  deteriorated.

11   A.   I think in general it's been a steady decline.  I think

12  he's withdrawn.  He doesn't focus.  I tend to repeat myself.

13  He tends to repeat himself.  He is basically home sleeping or

14  he'll watch like sports shows and baseball and doesn't do a

15  lot of --

16   Q.   Is there any particular reason he would watch a sport

17  show versus some other kind of show?

18   A.   He's expressed to me that he can't follow the movie,

19  like the plot of a movie.  He's not able to follow it.  He

20  doesn't have a concentration for it.

21          THE COURT:  But he can follow baseball?

22          THE WITNESS:  He watches the action and he looks at

23  the score.  That's one thing he does.  He watches that almost

24  on a nightly basis.

25   Q.   Does it have anything to do with the plot line of

1   movies?

2   A.   No.   He sits quietly.   We don't converse about what he's

3   watching.   He's generally withdrawn.

4   Q.   What percentage of the day on a normal day would he be

5   sleeping?

6   A.   He's sleeping most of the day.   He's either sleeping

7   upstairs in bed or he is lying down on the couch downstairs.

8   Q.   You have observed me coming over to speak to him, have

9   you not, relative to his case?

10   A.   Yes, I have.

11   Q.   Do you have any opinion as his wife as to how the memory

12   that he has of the conversations he has with me or his ability

13   to assist me?

14   A.   In general, he doesn't remember a lot of the

15   conversations that he has.   When I try to ask him about it,

16   he's not sure.   He does have times of confusion that I'm aware

17   of.   He says funny things sometimes, but then sometimes he has

18   clarity as well.   So, it goes back and forth.

19   Q.   Do you have any opinion as to the quality of his memory

20   of the events that occurred in his medical practice that are

21   the subject matter of this case three or four years ago?

22   A.   When I try to talk to him about the case, he really

23   doesn't recall specifics.   He has a general sense of what's

24   happening.   He tells me, I didn't do anything, but when I try

25   to ask him about specifics, he doesn't recall.

1    Q.   Any other -- any other cognitive abilities that you have

2    noticed that deteriorated in any way, shape or form?

3    A.   He used to be very good with numbers and names and,

4    again, he had a photographic memory.  Dr. Beck mentioned that,

5    and I laughed because that was Fathalla.  He doesn't remember

6    many of his -- the doctors' names.  He doesn't remember

7    numbers.  If I ask him specific things, he says he doesn't

8    know.

9         So, what I've started doing is before he was taking the

10   ride to get to the doctors and I found that he was getting

11   lost, he wasn't remembering things, he had confusion.  So, I

12   started -- he stopped doing the ride.  I take him to his

13   doctor's appointment.  I make sure that his appointments are

14   set up so that I can be there, that I'm the one who is talking

15   to the doctor so I understand what's happening, because when I

16   tried to ask him, at times he doesn't understand or he doesn't

17   remember, and he's not able -- I'm not able to get -- and

18   there's times where also there's confusion in terms of what

19   was said to him.  So, I started for several months now making

20   sure that I'm there, and even if he tells me something, I make

21   sure I hear it from the doctor because what he remembers is

22   different sometimes than what was said.  So, I've become much

23   more involved where initially I wasn't doing that, and I

24   realize there's so much confusion sometimes, that if I wasn't

25   -- unless I hear it from the doctor, unless I hear it from Mr.

1    Denner, it's not clear to me what's happening.

2    Q.   You heard testimony this morning about hallucinations --

3    A.   Yes.

4    Q.   -- that he apparently had indicated to different

5    hospital personnel and doctors that he had experienced.   Do

6    you remember that testimony, yes or no?

7    A.   Yes, I do.

8    Q.   Have you ever been in his presence and observed what

9    appeared to be him having hallucinations, yes or no?

10   A.   Yes.

11   Q.   Could you describe that to the Court?

12   A.   He seems -- it feels like the TV is on when it's not or

13   there's a computer screen on when it's not.   So that was one

14   of the things.   He talks about seeing his parents when they're

15   not there.   One time when he was confused and got lost on the

16   way to a doctor's appointment with a ride, he said he was

17   seeing the kids, but the kids were in school.   They weren't

18   with him, but it was a day he had to leave very early in the

19   morning and he felt that the children were with him in the

20   ride going to the doctor with him, and they weren't because

21   they were in school, and things like that.   He says funny

22   things sometimes, but the most vivid is the TV screen, because

23   I was -- you know, at the time he was in the hospital, the TV

24   was off and he thought it was on, and he reported it to the

25   nurse as well, and I said there's nothing on.

1    Q.   And you recall testimony about a Tylenol so-called

2    overdose that led to his liver toxicity that led to the one

3    2015 hospitalization where he was in the ICU for a week, and

4    so forth, and so on, yes?

5    A.   Yes.

6    Q.   Can you describe to the Court what the nature of him

7    taking Tylenol was and how that --

8    A.   Yes.  So, he's had for over a couple of years pain and

9    numbness in his arms and legs, and it started off as numbness

10   to begin with, and then it developed into pain, and he would

11   have joint pain in the major joints, usually the shoulder, the

12   hips.  His range of motion wasn't there, and he had pain, and

13   he was taking Tylenol.  Advils were going to upset his

14   stomach.  I didn't want him on any kind of narcotics because I

15   -- and he didn't want to be on narcotics, because I think

16   they're potentially, especially when used chronically, can

17   cause other problems.  And so, we didn't want to do that.  So,

18   he was taking Tylenol whenever he had pain.  And also at the

19   time, I think the doctors were not prescribing anything for

20   him as well.  So, that's what he had at home and he was taking

21   Tylenol, and it's unclear whether it was confusion that he

22   took too much Tylenol.  It's unclear if, because he wasn't

23   eating and had lost a lot of weight, that the Tylenol had

24   more -- the usual dose had more of an effect on him.  It's

25   unclear as well -- so, those are the two things that -- I

1    believe that the sarcoidosis had affected his liver.  So, his

2    ability to process the Tylenol wasn't as good as it used to

3    be.  So, I'm not sure what happened, but the Tylenol -- and

4    chronic use as well, I think they told me put him in a

5    position where he went into complete liver failure, and that's

6    when -- that was July 2015, and that's when he spent the week

7    in the ICU at the hospital and rehab after.

8    Q.   And do you relate the pain he was having to the

9    sarcoidosis that he had had since 2002 or did the doctors

10   relate that pain to it, if you know?

11   A.   Yes.  I had -- yes.  They call it neuropathy, which is

12   kind of nerve pain, and he's on medications for that now, and

13   they suspect sarcoidosis.  He did have a thoracic biopsy and

14   before he had the seizure, he did that in April to confirm if

15   he had -- because there had been asymmetric like nodules on

16   one side of his chest on x-ray, on CAT scan.  So, it was

17   recommended to do a biopsy to determine -- to rule out

18   lymphoma and to confirm sarcoidosis, and they were not able to

19   go in from the front because he had that biopsy in 2002 to

20   confirm his sarcoidosis at the time.  So, they came in through

21   the chest, and based on what the rheumatologist told me, is

22   that he had granulomas in his tissue, which is basically --

23            MR. GRINBERG:  I object to this portion.

24   Q.   With regard to binge eating -- strike that.

25            THE COURT:  I'm sorry?

1           MR. DENNER:  Strike that.

2      Q.  With regard to the sarcoidosis pain related to

3   neuropathy, for a period of time was that dealt with with

4   steroids?  Is that how that was controlled?

5      A.  Yes, he was on steroids for many, many years.

6      Q.  And at some point that had to stop, correct?

7      A.  It had to stop because they thought it was causing a lot

8   of his medical conditions.

9      Q.  And was it after that point that he started using the

10  Tylenol versus opioids?

11     A.  Yes, because the --

12     Q.  You heard testimony this morning about binge eating at

13  hospitals?

14     A.  Yes.

15     Q.  And that he would under eat sometimes and other times he

16  would binge eat, perhaps, when he didn't think people were

17  watching him.  Do you remember that testimony?

18     A.  Yes, I do remember.

19     Q.  Can you describe what his eating habits were at home?

20     A.  At home when it first -- for a couple of years he would

21  always complain about pain, and then after more recently,

22  whenever he eats, his stomach hurts so he would avoid eating,

23  and then there would be points after not eating for several

24  days -- I don't know if he's so hungry or what happens, but

25  then he'll start eating a lot, and I would tell him, You

1  shouldn't be doing that, and then he would feel sick, wouldn't

2  eat for days, and then he'd eat.  He would binge eat at home.

3  That's why I was surprised that they mentioned it, because he

4  does that at home as well, and his stomach hurts and he would

5  stop eating.  So, it was a bad cycle that he was doing.

6    Q.   Over what period of time was the gas -- what is it

7  called?

8    A.   Gastric paresis.

9    Q.   What period of time was that actually causing him to

10 vomit when he was eating?

11   A.   The vomiting started spring of 2015, and initially they

12 gave him -- they did studies where they did not find gastric

13 paresis, but it's because they had given his medicine for the

14 vomiting and for the paresis.  Later when he actually went

15 into complete liver failure and they were trying to -- one of

16 their concerns was he had a lot of underlying medical

17 conditions.  They were trying to determine what those

18 conditions were and how it affected his weight loss and the

19 liver failure.  So, they had done a study, I believe, in July

20 of 2015 where they found gastric paresis.  I think at the time

21 it was moderate, and during, I believe, the fall of 2015, a

22 gastroenterologist, a person for the stomach, did another

23 study where he took him off all his medications for

24 gastroparesis for over two weeks so he can get an accurate

25 study, and at that time he was diagnosed with severe gastric

1    paresis, and when he went to Blake 11, they were concerned

2    because he was complaining about pain in his stomach.  They

3    did another study when he was in Blake 11, because he was --

4    he was having psychiatric care, but because they're in a

5    medical hospital, he was also doing medical care.  They did

6    workups as well --

7              MR. GRINBERG:  Your Honor, we're getting past that.

8    We're just way past that and I move to strike all the

9    testimony prior to this that did not have to do with the

10   witness' --

11             THE COURT:  Maybe we should have the next question

12   that relates to her observations as opposed to diagnosis and --

13             MR. GRINBERG:  May the testimony be stricken, your

14   Honor, that came in and didn't have to do with observations?

15             THE COURT:  It may be stricken.

16             MR. GRINBERG:  Thank you.

17             THE COURT:  I'm not sure I can wipe it from my

18   memory.

19             MR. DENNER:  I was going to say there's no jury.

20             MR. GRINBERG:  The First Circuit, then.

21   Q.   Doctor, at some point were you -- yes or no, were you

22   asked to agree to electroconvulsive therapy for your husband

23   when he was at Blake 11 at Mass General Hospital, yes or no?

24   A.   Yes.

25   Q.   And what was your response to that?

1    A.   I was concerned, but I told them I was going to look it

2    up online, and he gave me information to read up on it.

3    Q.   When you say "he," who are you referring to?  Without

4    saying what that person said, who are you referring to?

5         MR. GRINBERG:  Your Honor, again, my objection to the

6    hearsay and just generally --

7         THE COURT:  We're not quite there yet.  So, keep

8    going.

9    A.   Dr. Beck gave me information.

10   Q.   And you said you were looking up stuff online.  What

11   were you looking up online?

12   A.   I went into sites that were considered good information

13   and I was looking to see if there was any complications that

14   are associated with ECT.

15   Q.   And did you find some --

16   A.   I did.

17   Q.   -- that you thought applied to Dr. Mashali?

18   A.   Yes, I did.

19   Q.   And what would that have been?

20   A.   They said although it's generally safe --

21        THE COURT:  That's hearsay, too.

22        MR. DENNER:  Excuse me?

23        THE COURT:  That's hearsay, too.

24        MR. DENNER:  Well...

25   Q.   You went online and you got some information, correct?

```
1    A.   Yes.

2    Q.   And as a result of the information you received, did you

3    have a response about whether you were going to agree to ECT,

4    yes or no?

5    A.   Yes.

6    Q.   And what was your response?

7    A.   I --

8    Q.   Just yes or no.  Did you say, yes, we'll do it or, no,

9    we won't do it?

10   A.   I said no.

11   Q.   And as a result of that, did you hear anything more

12   about it after that, yes or no?

13   A.   Yes.

14        MR. GRINBERG:  Hear from whom?

15   Q.   Okay.  Who did you hear from?

16   A.   Dr. Beck.

17   Q.   Okay.  What did he tell you?

18        MR. GRINBERG:  No, nobody can tell -- objection to

19   that.

20   Q.   Okay.  And was Dr. Beck still trying -- without saying

21   what he said, still trying to convince you to agree to the

22   ECT?

23        MR. GRINBERG:  Objection.

24        THE COURT:  It's kind of a back door way in, isn't it?

25        MR. DENNER:  Well, I wasn't even mentioning Dr. Beck
```

1    until he said, "From whom?"  I don't think we're asking for

2    hearsay.

3             THE COURT:  Without Dr. Beck saying, you couldn't ask

4    what he said either.  So, here we are.  The objection is

5    sustained.  She can tell us what she did, what she said.

6    Q.   With regard to -- at some point did someone request that

7    you assent to an involuntary commitment for your husband to a

8    psychiatric facility, so-called sectioning, during the time

9    period at Mass General, Blake 11, yes or no?

10   A.   Yes.

11   Q.   And did you have a response to that, yes or no?

12   A.   Yes.

13   Q.   And what was your response?

14   A.   I used my healthcare proxy to make decisions.

15   Q.   Would it be fair to say you were against him being

16   involuntarily committed at that point to the mental health

17   system or had you not made up your mind at that point?

18   A.   He was already involuntarily committed.  What the

19   question had been is if I agreed to, I believe, a competency

20   hearing that he was going to be -- that was going to be had.

21   Q.   Did the same question arise with regard to a

22   guardianship where it substituted someone else's judgment for

23   his, yes or no?

24   A.   Yes.

25   Q.   Did you have a position on that?

```
 1      A.   I was his healthcare -- my position was I was his

 2   healthcare proxy and I wanted to make the decisions.

 3      Q.   And the guardianship wouldn't have been necessary?

 4      A.   The guardianship would have taken too long.  He needed

 5   treatment.  They wanted to provide immediate treatment.

 6              MR. DENNER:  I have no further questions.

 7              Your Honor, could we have a five-minute break?  I

 8   left my briefcase downstairs and just realized it and it's

 9   eating me up when I came in through --

10              THE COURT:  Go get it.

11              MR. DENNER:  Thank you.

12              MR. GRINBERG:  May I begin, your Honor?

13              THE COURT:  I'm sorry?

14              MR. GRINBERG:  May I begin while Mr. Denner is

15   getting the briefcase?  No, I'm kidding.

16              (Pause.)

17              THE COURT:  How long will you be?

18              MR. GRINBERG:  It shouldn't really take more than 20

19   minutes.

20              THE COURT:  I'm sorry?

21              MR. GRINBERG:  It should not take more than 20

22   minutes.

23              THE COURT:  20 minutes?

24              MR. GRINBERG:  Yes, I think so.

25              (Pause.)
```

1            THE COURT:  I think you had concluded your

2    examination?

3            MR. DENNER:  Yes, I had.

4            THE COURT:  Okay.  Mr. Grinberg says he will be 20

5    minutes, no more.

6            MR. GRINBERG:  I'll speak fast.

7            THE COURT:  What?

8            MR. GRINBERG:  I'll speak fast, your Honor.

9            THE COURT:  No, no, don't do that.

10           (Discussion off the record.)

11                         CROSS-EXAMINATION

12    BY MR. GRINBERG:

13    Q.    Good afternoon, Ms. El-Khadry.

14    A.    Hello.

15    Q.    Ms. El-Khadry, do you understand that if your husband is

16    convicted in this case, there's going to be a substantial

17    financial hit to your assets?  Do you understand that?

18    A.    Yes, I do.

19    Q.    And you understand that most of your assets as they are

20    today have been encumbered in some fashion in connection with

21    his criminal case, correct?

22    A.    Yes.

23    Q.    Now, your husband opened a laboratory in 2011, right?

24    A.    Yes.

25    Q.    And when that happened, the income that you were

```
 1    getting, your family was getting, increased exponentially,
 2    correct?
 3      A.   Most of the income was coming from the lab.
 4      Q.   But it increased a lot dramatically, didn't it, from
 5    that time?
 6      A.   I'm not sure where the -- my understanding was it was
 7    from the lab.
 8      Q.   Do you recall testifying at a bail hearing that it
 9    increased exponentially when the lab opened?
10      A.   I remember saying that most of the income was coming
11    from the lab.
12      Q.   The income changed significantly from the time -- from
13    before the lab opened until it opened, correct?
14      A.   I assume that's the case because when the...
15      Q.   Okay.  And then your husband lost his license in the
16    fall of 2013, correct?
17      A.   Yes, August 2013.
18      Q.   But up until that point, he was able to operate New
19    England Pain Associates, correct?  That was his clinic at the
20    time?
21      A.   Yes.
22      Q.   And he was deriving most of the money from this
23    laboratory, correct?
24      A.   From both, but most of the income, I believe, was from
25    the lab.
```

Q.   Actually, you mentioned before on your direct that you
had -- you still have a dentist office in Winchester, correct?

A.   Yes, I do.

Q.   And it's also true that that office served as one of the
locations for your husband to practice pain management, didn't
it?

A.   Yes.

THE COURT:   What does this have to do with his
capacity to assist his counsel?

MR. GRINBERG:   So, your Honor, I will move on, but I
do want to establish what his capacity was before and what Ms.
El-Khadry claims the capacity is today.   So, I want to
establish what the baseline is from which we're going.

Q.   So, you've testified that your husband had been
diagnosed with a sarcoid condition, correct?

A.   Yes.

Q.   And he has had that diagnosis since early 2002 or so?

A.   Yes.

Q.   He also has suffered from gastroparesis for some time,
correct?

A.   It was diagnosed 2015.

Q.   But he's had that condition before, do you think?

A.   That's the first time I heard that term.

Q.   Okay.   But even after your husband lost his license,
which was in the fall 2013, you were hoping that he would

1    eventually get the license back and be able to practice at

2    that time, correct?

3      A.   Of course.

4      Q.   So, at that time you believed he had the capacity to

5    continue practicing medicine the way he had in the past?

6      A.   Yes.

7      Q.   So, then approximately in February of 2014, your husband

8    was arrested in connection to this case, correct?

9      A.   Yes.

10     Q.   And that's when, according to you, the drastic change

11   took place, right?

12     A.   No.

13     Q.   Well, let's take a look at your affidavit.

14     A.   Yes.

15     Q.   In fact, let's take a look at your prior testimony.

16          MR. DENNER:  Your Honor, I think if we're going to be

17   looking to impeach something --

18          THE COURT:  I can't hear you.

19          MR. DENNER:  I think if we're looking to impeach

20   something she would be saying, I would like to know if we're

21   talking about drastic change in financial circumstances, a

22   drastic change in his medical --

23          THE COURT:  Okay.

24          MR. GRINBERG:  That's a fair question, and maybe I

25   was not clear.  I'm sorry.

1    Q.   His medical -- his mental state, his medical condition

2    changed drastically after his arrest in 2014; is that true?

3    A.   The most significant depression happened then, but, as I

4    mentioned earlier --

5         MR. DENNER:  Wait.

6         (Discussion off the record at the Bench.)

7    A.   So, what I was saying is the most significant depression

8    happened after he lost his license, but, as I said earlier

9    today, in retrospect, when I think back, I think I --

10   Q.   That wasn't my question.  My question was, at the time

11   that -- did you observe drastic changes in his cognitive

12   function and in his physical health at the time that he was

13   arrested or shortly thereafter in February of 2014?

14   A.   His depression started after he lost his license.

15   Q.   Okay.

16   A.   And I mentioned --

17   Q.   Did you testify that he had lost a lot of weight right

18   after he was arrested?

19   A.   He lost a lot of weight.

20   Q.   So, that change took place after his arrest, correct?

21   A.   Most of the weight loss was after his arrest.

22   Q.   All right.  That there was a loss of cognitive function

23   after his arrest, correct?

24   A.   There was a decline, yes.

25   Q.   You testified that he used to call three times a day

1    from jail, then it went down to calling you one time a day

2    from jail, correct?

3    A.   I don't recall that, but that's also --

4    Q.   Is that accurate?

5    A.   Yes, it is.

6    Q.   Maybe that's how I should be asking you these questions.

7        So -- and would you say -- you just testified that your

8    husband's condition continued to decline after that?

9    A.   Yes.

10   Q.   That included the lack of recall, correct?

11   A.   Yes.  Yes.

12   Q.   His cognitive capacities, correct?

13   A.   Yes.  Based on what I observed, yes.

14   Q.   Let me show you a document which was filed in this Court

15   -- let me put it on the projector -- on September 23rd of

16   2014.  Do you see the screen before you and do you see this

17   document?

18   A.   Yes, I do.

19   Q.   The title of this document is, "Motion to Amend

20   Conditions of Release."  Do you see that?

21   A.   Yes, I do.

22   Q.   Now, I want you to look at the bottom of the first page,

23   and it says, "This certification would also" -- "This

24   certification would also enable Dr. Mashali to transport his

25   children to their various school activities and appointments

1    and to accomplish basic tasks necessary for his family."  Do

2    you see that?

3     A.   Yes, I do.

4     Q.   Now, by the way, from -- the money at stake here, the

5    money at stake if your husband is convicted, part of that is

6    your family house in Dover, correct?  Your family home in

7    Dover?

8     A.   Yes.  Yes.

9     Q.   So, you purchased that property for about $2.2 million;

10   is that right?

11    A.   Yes.

12    Q.   And that was in 2011, right?

13    A.   Yes.

14    Q.   And then you embarked on substantial improvements to the

15   property, did you not?

16    A.   We had invested in a business.

17    Q.   No.  To that property in Dover.  You --

18    A.   Yes.  That business is in the property --

19    Q.   Okay.  Fair enough.  But that included -- you had added

20   a four-car garage, correct?

21         THE COURT:  What does this have to do with the issue

22   before us today?

23    Q.   Do you understand that there's -- again, there's a lien

24   on that...

25         MR. GRINBERG:  It goes to the bias of the witness,

1    your Honor, because if the case is lost for the government,

2    they get to keep the money.

3            MR. DENNER:  Your Honor, if I may --

4            THE COURT:  I don't think so.  I think we want to

5    talk about capable of participating in his defense.

6            MR. GRINBERG:  Okay.

7    Q.   Let me ask you this question:  I'm showing you a

8    document filed in this Court, Docket No. 179.1.  It appears to

9    be your affidavit.  Do you see that?

10   A.   Yes, I do.

11   Q.   And there's a signature in the back, the second page of

12   the document.  Do you see that?

13   A.   Yes, that's mine.

14   Q.   Okay.  So, look at -- so, there's Paragraph 6 here --

15           MR. DENNER:  Excuse me, your Honor.  If I might,

16   could I get a copy of the document just to look at?  I can't

17   see the --

18           THE COURT:  You can see it on the screen.

19           MR. DENNER:  It is, but he's not showing the whole

20   thing.

21           MR. GRINBERG:  First of all, it's an exhibit -- I'm

22   sorry.  I should have said it's Exhibit No. 3 that's been --

23           THE COURT:  Your screen isn't working?

24           MR. DENNER:  Well, yes, it is, but he's showing half

25   of it on the screen rather than the whole thing, and I would

1     just like to see --

2          MR. GRINBERG:  It's Exhibit 3 on your desk.

3     A.   Could I look at the date of that again, please?

4     Q.   Yes, absolutely.

5     A.   Yes.  So, that's accurate.

6     Q.   Right.  And this was filed in connection with the motion

7     to seek a competency hearing, correct?

8     A.   Yes.

9     Q.   All right.  So, looking at the Paragraph 6, there's a

10    statement there, "He is unable to manage his own affairs and

11    I'm looking into making an application to the Court to be

12    appointed his guardian or conservator to manage his affairs."

13    Do you see that?

14    A.   Yes.

15    Q.   You did not obtain that guardian or conservator status

16    with the Court, have you?

17    A.   No, because I'm managing his affairs now.

18    Q.   But the question is -- the answer is you have not?

19    A.   I have not.

20    Q.   And, in fact -- so, with -- after being -- you mentioned

21    there was a recent episode where your husband was found

22    unresponsive at that -- at your home, correct?

23    A.   Yes.

24    Q.   And he was transferred to Norwood Hospital?

25    A.   That was the most recent one.

1    Q.   That's right.  And then he was transferred to the rehab

2    facility in Lexington called Care One?

3    A.   Yes, after -- he went to St. Elizabeth first.  Then went

4    into rehab from there.  So, he went to Norwood and then he

5    went to St. Elizabeth Hospital, then he went to Care One Rehab

6    in Lexington.

7         THE COURT:  Is that where he is now?

8         THE WITNESS:  He was just discharged, but they're

9    looking in terms of putting him in again because he is weak.

10   So, we're seeing a doctor tomorrow to see if he needs another

11   couple of weeks, because they're not able to do physical

12   therapy while he's in a wheelchair, and the wheelchair -- am I

13   allowed to?  The wheelchair is because he has -- his blood

14   pressure drops and he gets dizzy.

15        THE COURT:  Okay.  Thank you.

16   Q.   All right.  And the paperwork that -- the paperwork

17   that's -- there was some paperwork that was signed there for

18   treatment, for example.  That paperwork at Care One was

19   actually signed by your husband, not you, correct?

20   A.   Yes.  He signs when I'm not there.

21   Q.   Okay.  And since we are on Care One, you were present in

22   court here, I believe, on May -- correct me if I'm mistaken,

23   but I believe on May 10th of 2016, there was a status

24   conference where we initially scheduled the competency

25   hearing.  I think you were here, correct?

1   A.   Yes, I was here for --

2   Q.   All right.  Do you recall Judge Zobel stating something

3   to the extent that, look, you know, if Mr. Mashali is not in

4   an appropriate facility being treated, then there was a real

5   risk that he could be incarcerated on this case -- not

6   incarcerated, but placed in custody.  Do you recall that?

7        MR. DENNER:  Objection, your Honor.

8        THE COURT:  I don't recall it, although the question

9   is for the witness.

10  Q.   Do you recall that?

11  A.   I recall a discussion that at the time I believe he was

12  actually in the hospital.

13  Q.   Okay.  So, what do you recall the Court stating on that

14  issue?

15       THE COURT:  What's the relevance of that?

16       MR. GRINBERG:  I'm about to get there.

17       MR. DENNER:  Your Honor, I object.

18       THE COURT:  I will take it de bene.

19  Q.   So -- and then let me show you --

20       MR. DENNER:  Your Honor, what is the question being

21  taken de bene?  I apologize.  What is the question being taken

22  de bene?

23       THE COURT:  I think we've gone on to the next

24  question, I think.

25       MR. DENNER:  Okay.

1    Q.   So, I'm showing you Exhibit No. 12 that's in evidence,

2    and I'll just put it up on the screen, and these are progress

3    notes from Care One and, again, they are -- they're not just

4    on the screen.  Counsel has them.  The Court has them as well.

5    But is it fair to say that your husband's condition seemed to

6    have improved once he was in Care One?

7              MR. DENNER:  Objection, your Honor.

8              THE COURT:  Well, she can tell us what her impression

9    of that is.

10             MR. DENNER:  Okay.

11             THE COURT:  I don't know why we need these documents.

12             MR. GRINBERG:  We may not.  So, let me ask that

13   question.

14             THE COURT:  If the question is whether his condition

15   had improved --

16             MR. DENNER:  If we're not tying it into someone

17   else's documents, I have no objection.  I'm confused as to

18   what we're doing.

19             MR. GRINBERG:  It's in evidence.

20             THE COURT:  I know it's in evidence, but the issue is

21   what she observed, not what the document says.

22             MR. GRINBERG:  Right.  Let me --

23             THE COURT:  The document says what it says and it's

24   in evidence, but I thought you were questioning her about her --

25             MR. GRINBERG:  And I probably should not have put the

1    document up on the screen before I ask the question.  So, let

2    me ask the question.

3    Q.  Was your husband doing much better in Care One?

4         MR. DENNER:  Your Honor, I object again.  "Much

5    better" in terms of physical strength, "much better" in terms

6    of his mental cognitive abilities?

7         THE COURT:  Okay.  He will fix it.

8    Q.  Was he doing much better in terms of his physical

9    strength?

10        MR. DENNER:  I object to the term "much."  If he

11   wants to -- respectfully, I would object to that.  If he wants

12   to ask an open-ended question, how would you characterize --

13        THE COURT:  It's okay.  I heard you have an

14   objection.  Tell us whether he was better.

15   A.  Technically, no, because he was actually diagnosed while

16   he was in Lexington Care One Rehab with autonomic neuropathy

17   because his blood pressure was so low in terms of his weight.

18   Q.  Okay.  You just testified for 45 minutes about your

19   observations of your husband over the past two years, correct?

20   A.  Yes.

21   Q.  On a daily basis you were able to convey to the Court

22   what his demeanor was like and whether he was hallucinating

23   and whether he had nightmares.  You were able to convey that?

24        MR. DENNER:  Objection.

25        THE COURT:  What's the question?

1   Q.   So, my question to you is, did he appear physically --

2   his appearance -- did he appear physically better to you while

3   he was being treated at Care One?

4            MR. DENNER:   Better than when, your Honor?   I object.

5            THE COURT:   She can tell us that.

6   A.   If you ask about his physical appearance --

7   Q.   Yes.

8   A.   -- his physical appearance is better than when he was at

9   his worse, that's true, but --

10  Q.   Did he gain weight at Care One?

11  A.   Despite the amount he eats, he gained some weight, but

12  not a lot.   He was still very low.

13  Q.   Was he more engaged at Care One?

14  A.   He was sleeping in bed when I came.   Whenever I came, he

15  was sleeping in bed.

16  Q.   So, every time you found him, he was sleeping in bed?

17  A.   Yeah, most of the time, yes.

18  Q.   Did he eat better at Care One?

19  A.   He did eat better.

20  Q.   Was his mood better at Care One than what you had

21  observed in the past two years?

22  A.   That's hard to say.   I feel that he was better than at

23  his worst.

24  Q.   He was better than at his worst?

25  A.   Yes.

1    Q.   You feel at least that much?

2    A.   Yes.  Can I just clarify something?

3              THE COURT:  (Indicating).

4              THE WITNESS:  No?  Sorry.  Okay.

5    Q.   I don't have a question for you.  I'm sorry.

6    A.   No.  She told me no.  So, I'm not going to say anything.

7              THE COURT:  I sometimes make rulings that don't show

8    up on the record.

9    Q.   Was he compliant with medications at Care One?

10   A.   He actually was, yes.

11   Q.   Right.  Did he participate in activities at Care One?

12   A.   He participated with his physical therapy, yes.

13   Q.   And you just observed your husband staying awake, now,

14   close to six hours, correct -- I'm sorry.  Close to -- has it

15   been that long?  Yes, it has.  Close to six hours, correct?

16   A.   I was sitting behind him, so I don't know if he was

17   napping or not.

18   Q.   But he appears to be awake to you now?

19   A.   Yes.

20             MR. GRINBERG:  That's all I have, your Honor.

21             THE COURT:  No redirect?

22             MR. DENNER:  Nothing, your Honor.

23             THE COURT:  Thank you.  Ms. Mashali, you are excused.

24   Who is next?

25             (Dr. El-Khadry steps down.)

1        MR. DENNER:  That's it for us, your Honor.

2        THE COURT:  Any rebuttal?

3        MR. GRINBERG:  No, your Honor.

4        THE COURT:  Okay.  So, where does this leave us?  How

5   do counsel wish to proceed from here on in?

6        MR. DENNER:  I had earlier asked for some time -- I

7   think I mentioned a week -- to write a post hearing memo.  I

8   somehow forgot that July 4th was in the middle of it and I was

9   going away.  Could I have two weeks for that, your Honor?  If

10  we could have -- today is --

11       THE COURT:  May I see counsel at the sidebar for a

12  moment.

13  **AT SIDEBAR:**

14       THE COURT:  I know that the defendant has a right to

15  be here, but I wanted to ask in his absence, purposely in his

16  absence, what is it you're advocating here, that he is

17  incompetent?

18       MR. DENNER:  Yes, I am advocating that he is

19  incompetent to properly assist me, effectively --

20       THE COURT:  Well, you know the result of that is that

21  I have to incarcerate him.

22       MR. DENNER:  I understand.

23       THE COURT:  The statute is absolutely clear.

24       MR. DENNER:  I understand he'll be incarcerated for a

25  period of time.  I just don't --

1          THE COURT:  Until he is competent.

2          MR. DENNER:  Well, I don't think that's really what

3    the statute says.  I think at some point if it's not going to

4    do any good anymore to have him in there, but I'm in a

5    difficult position and he is, too, because I can't talk to him

6    about his case and he's my key to this case.  He simply is.  I

7    can't defend the case with him like this.

8          I go to see him and I get nowhere, and whenever -- he

9    sleeps most of the time and he -- and when he reads something,

10   he doesn't remember 60 seconds later.  I don't want him in

11   prison.  I don't want him incarcerated, but I also don't want

12   to go to a trial and lose -- lose because he was always going

13   to be the main witness explaining things that happened and

14   also explain to them what he was doing.  I don't know how else

15   to do this because he just can't assist me.

16         THE COURT:  Okay.  So that I just understand -- I

17   want to understand what it is that --

18         MR. DENNER:  If we go to trial and he's convicted,

19   with the amount of money, I guess, they're talking about as

20   the anticipated loss, he could be sentenced to multi-years in

21   prison and he wouldn't have had a constitutionally-effective

22   defense.  I don't think this is a good position for anybody to

23   be in.  I just don't know what else to do.

24         THE COURT:  Okay.

25         (End of sidebar conference.)

1          THE COURT:  Mr. Denner -- first of all, do counsel

2    wish to have closing argument?  You just want to submit more

3    papers?

4          MR. DENNER:  I would, actually -- if both are

5    possible, what I would like to do, if we could do it, is

6    supply -- excuse me -- provide the -- by, say, July 12th

7    provide a --

8          THE COURT:  Couple of weeks?

9          MR. DENNER:  Yes, that would be about twelve days or

10   -- twelve days.  So, twelve days from July 12th, I would

11   like --

12         THE COURT:  What would you propose to submit,

13   proposed findings, or what?

14         MR. DENNER:  I would -- probably findings of fact and

15   rulings of law with a memorandum attached to it, and I would

16   ask for an opportunity at that -- within a couple of days

17   thereafter, perhaps, to argue to the Court or we could do the

18   12th and argue on the 14th, something along those lines.

19         THE COURT:  What would you like to do?

20         MR. GRINBERG:  Your Honor, I have no objection to

21   proceeding this way.  I just simply want you to know that I am

22   away for the whole week of July -- July 17th.  So, a

23   submission on the 12th, there's only like three days left.

24   I'll try to respond as fast as I can.  I just don't know how --

25         THE COURT:  How long will you be away?

1            MR. GRINBERG:  I'll be away the week of -- from July

2   17th through July 23rd.  So, I'll be happy to respond by the

3   end of the week when I come back, July 29th, which is a

4   Friday.  I could certainly do that.

5            THE COURT:  July 12th is a Tuesday.

6            MR. DENNER:  It is.

7            THE COURT:  That's when you want to submit your

8   stuff?

9            MR. DENNER:  Well, if we're not going to --

10           THE COURT:  So, in order for you to get it done

11  before the weekend, you only have three days.

12           MR. GRINBERG:  Right.  So, what I'm suggesting is --

13  if I could have the week after I get back to --

14           THE COURT:  To the 29th?

15           MR. GRINBERG:  Yes.

16           THE COURT:  Well, in that case, Mr. Denner doesn't

17  have to kill himself to get it done.

18           MR. GRINBERG:  He can have extra time.

19           MR. DENNER:  If I could have the 15th --

20           THE COURT:  Why don't you get it done by the 15th.

21           MR. DENNER:  That would be fine, your Honor.

22           MR. GRINBERG:  I mean, the week will be sufficient

23  for the government to respond.

24           THE COURT:  And then you give us yours by the 29th.

25           MR. GRINBERG:  That's fine, yes.

```
1              THE COURT:  And then should we determine whether we

2     have argument -- well, maybe we should have argument the week

3     after that, which would be the first week of August, but I'm

4     not sure I'm going to be here.  I don't know what my schedule

5     is going to be yet -- no.  First week of August I will be

6     here.  So, let's just do it then.

7              COURTROOM DEPUTY CLERK URSO:  Okay.  So, we could do

8     -- how long is argument going to be?

9              THE COURT:  No more than 15 minutes apiece.

10             COURTROOM DEPUTY CLERK URSO:  August 4th, at 2:30.

11             MR. DENNER:  That's the only day that week I can't do

12    it.

13             THE COURT:  You cannot?

14             MR. DENNER:  I cannot.

15             THE COURT:  Well, why don't we skip oral argument,

16    just do it on the papers.

17             MR. DENNER:  Okay.

18             MR. GRINBERG:  That's fine, your Honor.

19             THE COURT:  So, I'll have it on the submission as of

20    the 29th of July.

21             MR. GRINBERG:  Yes, your Honor.

22             THE COURT:  Okay.  And then whatever the result is,

23    we probably need to have another meeting after that.

24             MR. DENNER:  Yes, your Honor.

25             THE COURT:  Okay.  Thank you all.
```

```
 1              MR. DENNER:  Thank you, your Honor.
 2              THE COURT:  Court is in recess until...
 3              COURTROOM DEPUTY CLERK URSO:  Next week, Wednesday.
 4              THE COURT:  Wednesday, right.  And the only documents
 5    in evidence are 1 through 18, correct?
 6              MR. DENNER:  Your Honor, what I was going to ask you
 7    to do is may I by the time which we have to file rulings of
 8    law, and whatever, provide for some further documents --
 9              THE COURT:  Well, you need to run it by Mr. --
10              MR. DENNER:  Well, they're all part of what we've
11    agreed can come in.  I don't have unmarked copies right now
12    that I can put in.  I'm going to get some unmarked copies.
13              THE COURT:  But you still need to run it by him --
14              MR. DENNER:  Well, of course, I will.
15              THE COURT:  -- because it wasn't part of the
16    documents before.  So, if he agrees, fine.  If not, then you
17    need to work out something.
18              MR. DENNER:  Of course, I will.
19              THE COURT:  Without my help.  Thank you.
20              MR. GRINBERG:  Thank you, your Honor.
21              (Adjourned, 3:02 p.m.)
22
23
24
25
```

1               C E R T I F I C A T E

2           I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 196, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of Criminal Action No.

7    14-10067-RWZ, United States of America versus Fathalla Mashali.

8

9

     July 10, 2016        /s/Catherine A. Handel
10   Date                 Catherine A. Handel, RPR-CM, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25