UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
vs.                                )     NO. 14-10067-RWZ
                                   )
FATHALLA MASHALI                   )

GOVERNMENT'S POST-HEARING MEMORANDUM ON THE DEFENDANT'S COMPETENCY

The United States, by and through Assistant U.S. Attorney Maxim Grinberg, hereby opposes petitioner Fathalla Mashali's ("Mashali") position that he is "unable to understand the nature and consequences of the proceeding against him or to assist properly in his defense." *See* 18 U.S.C. § 4241(d).  Under § 4241, it is Mashali's burden to establish by a preponderance of the evidence that he lacks mental competency to stand trial.  Mashali fell well short.  On the contrary, as opined by Dr. Alison Fife, a court-appointed psychiatrist,

> [] Mashali is choosing not to demonstrate his capacities to stand trial, specifically by not working with his attorney on his defense, so as to avoid trial.  He is doing this both through deliberate and ongoing poor self care, including poor oral intake of food and taking to bed so as to become deconditioned and weak . . . . Mashali's records since his arrest illustrate progression of weight loss and malnutrition resulting in failure to thrive, physical deconditioning from low activity, and avoidance of the legal process.

1

(Competency Report at 11)[1].   The evidence presented at the competency hearing on June 30, 2016, amply supports her conclusion.   It demonstrates Mashali's persistent attempts at manipulating his medical providers, counsel, and the Court to avoid the trial in this case.

I.    **FACTS**

    **A.    BACKGROUND AND ARREST**

The Honorable Leo T. Sokorin made findings of facts in connection with Mashali's bail conditions in two separate memoranda and orders.[2]   Some of these findings are relevant to set the context for Mashali's competency motion and to properly evaluate Mashali's and his wife's credibility for the determination of Mashali's mental competency.

Mashali is an Egyptian national and a permanent U.S. resident with a medical degree from Cairo University.   (First Bail Order at 1).   He is married to Noha El-Khadry ("E-Khadry") and has four

---

[1] "Competency Report" refers to the Competency Report issued by Dr. Alison Fife, Exhibit 2.   "Exhibit___" refers to the exhibit number presented at the competency hearing.

[2] In the first order (hereinafter, "First Bail Order"), dated February 19, 2014, the court detained Mashali [D.13]; in the second order, (hereinafter "Second Bail Order"), dated May 6, 2014, the court released Mashali on "strict conditions and a [$5M] secured bond," with "home detention twenty four hours per day, seven days a week, enforced by electronic monitoring" [D. 48].

children.  (First Bail Order at 1; Second Bail Order at 2).  In the early 2000s, Mashali began operating a pain management practice. (First Bail Order at 2).  In 2008, Mashali filed for bankruptcy, listing $12M in debt, owing $6M of that amount to the U.S. Department of Labor for "sums [he] withheld from his employees, but failed to pay over to the United States." (First Bail Order at 3).[3]

Shortly after the debt discharge in June 2011, the Mashalis launched a multi-million dollar life-style spending spree, which comprised the purchase of a $2.2M home in Dover, MA, and approximately $2M in "substantial improvements of the property" that included a "four car garage, carriage house with a squash court and twenty-seat theater, pool with patio and kitchen, heated driveway, finished basement, and gate." (First Bail Order at 3).[4]  The Mashalis also kept four luxury vehicles, "all of which [were] model year 2011 or newer." (First Bail Order at 3).  Between February 2009 and May 2013, "during and after the bankruptcy," the Mashalis wired $1.7M to Egypt and Cypress. (First Bail Order at 5).

---

[3] The U.S. Department of Labor has a pending federal civil case against Mashali in the District of Massachusetts.  *See Perez v. Mashali*, 10-cv-11943-GAO.  It is the undersigned counsel's understanding that the civil case is essentially on hold pending the outcome of the competency determination in this matter.

[4] El-Khadry testified that "most of the income was coming from the lab," (Comp.Tr.:177), which is the subject of the Second Superseding Indictment.

In July 2012, Mashali's four employees, "each either a Physician Assistant or Registered Nurse," alleged that Mashali was engaged in unlawful practices, consisting of overprescribing narcotics to his patients and fraudulent billing.  (First Order at 3).  In the summer of 2013, the Rhode Island Board of Medicine revoked Mashali's medical license, concluding that he had provided "substandard care" to seven of his patients who died, and Mashali voluntarily surrendered his Massachusetts medical license.  (First Bail Order at 4).  In September 2013, the FBI searched Mashali's medical offices in Rhode Island and Massachusetts.  (First Bail Order at 4).

On February 7, 2014, Mashali was arrested at Logan Airport, attempting to board a plane to Egypt on a one-way ticket.  (First Bail Order at 5).  On his person, Mashali had, among other items, "a general medical job reference letter written by his nephew." (First Bail Order at 5).  The nephew was a practicing physician in Michigan, but the letter was addressed from Medical Care Specialists in Hawaii.  (Second Bail Order at 2).  The letter stated, "I highly recommend Dr Mashali without reservation for consultant position in Anesthesia, Critical Care Medicine and Intervention Pain Management." (Second Bail Order at 2).   In response to questions from law enforcement, Mashali said that he was going to Egypt "to see his sick sister" and that he "wanted to die in Egypt and be buried

4

with his parents." (First Bail Order at 5).

At the detention hearing, Mashali took the position that he did not attempt to flee the United States and reside in Egypt.  El-Khadry testified that Mashali was going to Egypt to obtain some kind of social security funds supposedly owed to the Mashalis in Egypt and that the letter was merely a supporting document.  (Second Order at 2).  The Court found that the wife's "explanations [were] wholly incredible and I reject them."  (Second Bail Order at 2).  The Court also noted that Mashali kept evolving the purported purpose of the letter he carried, at one point taking the position during the hearing that "the letter was a reference letter to obtain patients for an on-line videoconferencing medical consulting service he intended to operate from the United States to serve patients in Egypt."  (Second Order at 3).  The Court found that "[t]he letter is plainly a job reference letter" and that Mashali "attempted to go to Egypt in order to obtain employment overseas and twice pressed a contrary position before the Court."  (Second Order at 3).

The Court also noted that although at the bail hearing El-Khadry testified that she had not been involved in the details of Mashali's medical business, at the earlier bankruptcy deposition Mashali testified that the wife "r[an] all entire [sic] company . . . [a]dministrative functions, payroll, payables, everything."

(Second Order at 3).  The Court found "the testimony of [Mashali] incredible and presumably motivated by a desire to avoid responsibility or liability.  This is not the only instance of such conduct by Defendant."  (Second Order at 4).

Finally, although El-Khadry testified that the multi-million dollar transfers to Egypt were to cover legitimate business expenses, the Court concluded that "the finances of Defendant and his wife [were] not transparent.  (Second Order at 5).

### B.  POST-ARREST HISTORY AND COMPETENCY EVALUATION

On June 30, 2016, the Court conducted a competency hearing.  Dr. Alison Fife, a court-appointed psychiatrist, offered her opinion, with a reasonable degree of medical certainty, that Mashali was competent to stand trial and provided the basis for her opinion by relying on her review of thousands of pages of Mashali's medical records and her three meetings with him.  Dr. Stuart Beck, an attending psychiatrist at Massachusetts General Hospital ("MGH"), who observed and treated Mashali while he was hospitalized at a psychiatric ward at MGH, was a witness for the government.  Dr. Beck testified that Mashali had invalided two cognitive assessment tests, was malingering, and overstated his symptoms to avoid the trial. El-Khadry testified for the defense about her personal observations of Mashali's purported lack of cognitive function and recall, and

thus his inability to meaningfully assist in his defense.

Below is the timeline of Mashali's pertinent medical treatment subsequent to his arrest, interposed with Dr. Fife's and Dr. Beck's commentary on the treatment, and El-Khadry's testimony, where appropriate.

### 1.   Plymouth County Correctional Facility

According to El-Khadry, Mashali had the capacity to continue practicing medicine even after his medical licenses were revoked in the fall of 2013.  (Comp.Tr.:179).  Before his arrest, according to El-Khadry, Mashali "used to be very good with numbers and names and . . . had a photographic memory."  (Comp.Tr.: 165).  El-Khadry testified that it was only after Mashali's arrest and detention at PCCF that "[h]e started not eating, had started to have stomach aches, vomiting . . . he was not agreeing to take sugar pills" and declined to take medication.  (Comp.Tr:150).  "Most of the weight loss was after his arrest," she added, with "a decline" in his cognitive function.  (Comp.Tr.:180).

After the arrest, Mashali remained at the Plymouth County Correctional Facility ("PCCF") between February 10 and approximately June 5, 2014. [*See* D.52 (June 5, 2014 order releasing Mashali)]. According to the PCCF physical assessment dated February 13, 2014, Mashali was 5'8" tall, weighing 150 lbs.   (Attachment 1,

7

PLYM-USAO-000068).[5]  By April 21, 2014, Mashali was down to 118 lbs. (Attachment 2, PLYM-USA-000035).

PCCF records show that immediately after his booking, Mashali was uncooperative in accepting medical treatment and food.  As early as February 11, 2014, "Mashali [] refused to sign an ROI for all of his medical complaints" and was "non-compliant with his [med]ications."  (Exhibit 4, PLYM-USA-000047).  Mashali told a PCCF doctor: "You can call Walgreens & get my meds."  (Exhibit 4, PLYM-USA-000047).  When the doctor called Walgreens, he discovered that one of Mashali's medications was prescribed by Mashali's nephew—the same nephew who had authored Mashali's job reference letter.  (See Exhibit 4, PLYM-USA-000047-48).  A PCCF note on May 1, 2014, indicates that Mashali had been declining all food other than fruit.  (See Exhibit 4, PLYM-USA-000047-48).  Mashali

---

[5] The government relies primarily on the exhibits introduced at the June 30, 2016 competency hearing, labeled Exhibits 1-18.  The parties, however, agreed that they could supplement these exhibits, without objection, from Mashali's voluminous medical records obtained by the government pursuant to the Court's orders. (Comp.Tr.:13) (defense stipulating to "any of the medical records that we got by subpoena, which are basically all of them, we have agreed they will go in for what they're worth, whether I present them or [the government] presents them").  The attachments, marked 1-5, are unobjected-to supplemental medical records and will be submitted in hard copies (and not placed on the public docket as they contain medical information).  The defense separately stipulated to the admission into evidence of Dr. Beck's CV, Attachment 6 (which is docketed).

"admit[ted] [with] some sarcasm that he [was] depressed . . . [but] refused to acknowledge how his current behavior [was] purposeful and harmful." (Exhibit 5, PLYM-USAO-000023). Mashali "refuse[d] to drink water based on taste" and stated that if he died it would "be this provider's fault," while acknowledging that "not drinking will cause kidney failure." (Exhibit 5, PLYM-USAO-000023).

Dr. Fife testified that she had reviewed PCCF medical records and that "[s]tarting back at Plymouth in 2014 – they were using words 'hunger strike'" to describe Mashali's refusal of food and fluids. (Comp.Tr:42)[6]. She stated that PCCF transported Mashali on at least one occasion to the Boston Medical Center to treat him for dehydration. (Comp.Tr:42; *see* Attachment 2, PLYM-USAO-000035).

El-Khadry testified that after Mashali's release from PCCF, "[h]is physical condition continued to deteriorate" (Comp.Tr:151), and his cognitive abilities and recall continued to decline (Comp.Tr.:181). Although on prior occasions Mashali was "taking the ride to get to the doctors," Mashali "was getting lost, [] wasn't remembering things, [and] had confusion." (Comp.Tr.:165). El-Kahdry began driving Mashali to his medical appointments.

---

[6] "Comp.Tr:__" refers to the transcript of the competency hearing on June 30, 2016 and the corresponding page number.

(Comp.Tr.:165)[7].   In her affidavit, filed on November 29, 2015, El-Khadry stated under the penalties of perjury that "my husband's mental state, including his memory, his ability to understand information, and his ability to make good judgments, have been compromised for the past several years and has been deteriorating more rapidly the last couple of years."   (Exhibit 3, D.179-1). "More particularly, in the past 12 months, his memory and ability to process information accurately (as well as recall it) has even more dramatically declined."  (Exhibit 3, D.179-1).

### 2.    Motion to Amend Conditions of Release

Yet, On September 24, 2014, Mashali filed a motion to relax the conditions of his release, which the Magistrate Judge granted on October 16, 2014, to allow him "to transport his children to their various school activities and appointments and to accomplish basic tasks necessary for his family." (Comp.Tr.:182; D.91, 99).

### 3.    First Superseding Indictment

On October 16, 2014, Mashali was charged in a First Superseding Indictment with additional counts of health care fraud.   (D.97).   In a joint status reports dated December 5, 2014, and March 9, 2015, the parties indicated that the automatic discovery had been provided

---

[7] It is not clear from the hearing transcript exactly when El-Khadry began to drive Mashali to his doctors' appointments.

by the government in connection with the First Superseding Indictment. (D.114, 127).

### 4.   Second Superseding Indictment

The Second Superseding Indictment issued on April 16, 2015, charging Mashali with additional counts of health care fraud, mail fraud, money laundering, with a total of 44 counts, and forfeiture. (D.131). Mashali was arraigned on April 22, 2015. (D.135). Represented by counsel, Mashali presumably understood the nature of the charges and entered what should have been a knowing and intelligent plea of not guilty. *See Robidoux v. O'Brien*, 643 F.3d 334, 338-39 (1st Cir. 2011) ("[w]here there are substantial indications that the defendant is not competent to stand trial, counsel is [] faced with . . . a settled obligation . . . to raise the issue with the trial judge").

### 5.   Evaluation for Social Security Disability Benefits

On May 21, 2015, less than a month after Mashali's arraignment on the Second Superseding Indictment, Mashali was evaluated by Richard Stellar, ED.D., P.C., in connection with his application for Social Security Disability Benefits ("SSDI"). (Exhibit 3, D.179-1). Stellar's report indicates that Mashali was diagnosed with

sarcoidosis as far back as 2002[8], yet, according to Mashali, he was able to manage a successful medical practice. (Exhibit 3, D.179-1). According to Stellar's report, based on Mashali's statements and presentation, Mashali displayed "major memory impairment" and depression (apparently even months before Mashali's liver failure and hospitalization at Beth Israel Deaconess Hospital). (Exhibit 3, D.179-1). Mashali claimed not to remember the year he graduated high school and college, or names, or the day of the month or week, or even whether he had eaten. (Exhibit 3, D.179-1). Mashali claimed not to be able to count serially by threes and supposedly remembered only three numbers going forward and two in reverse. (Exhibit 3, D.179-1). Mashali claimed not to be able to follow a story line or remember what he had just drawn. (Exhibit 3, D.179-1).

On the other hand, Mashali denied having "hallucinations or delusions." (Exhibit 3, D.179-1). Mashali did not "display evidence of psychotic thought process." (Exhibit 3, D.179-1).

The report states that Mashali told Stellar that he had stopped working in 2013 "because of his increasing problems in memory, depression, and general functioning." (Exhibit 3, D.179-1). There is nothing in the report indicating that Mashali had informed Stellar

---

[8] The year of diagnosis is corroborated by El-Khadry. (D.263-1 [counsel's affidavit]).

about the revocation of his medical licenses and the pending criminal case or his detention at PCCF or the Second Superseding Indictment and arraignment just a week before.   (Exhibit 3, D.179-1).

The U.S. Social Security Administration does not test applicants' "statements regarding their symptoms and intensities" for "malingering in disability evaluations" despite a "consensus" in "medical literature and national neuropsychological organizations" that such testing is "useful" "when used in conjunction with other evidence in the case file." CONGRESSIONAL RESPONSE REPORT, THE SOCIAL SECURITY ADMINISTRATION'S POLICY ON SYMPTOM VALIDITY TESTS IN DETERMINING DISABILITY CLAIMS (OIG, Office of the Inspector General, Social Security Administration, September 2013).[9]   For example, The Department of Veterans Affairs and the Railroad Retirement Board, which also administer disability benefits, permit malingering testing in their disability determinations.   (*Id.*).   "The literature indicates that malingering and symptom exaggeration may occur in as few as 7.5 to over 50 percent of disability claims." (*Id.*).

---

[9] Available at
https://oig.ssa.gov/sites/default/files/audit/full/pdf/A-08-13-23094.pdf

### 6.   Tylenol Overdose, Beth Israel Hospital

Dr. Fife testified that in August 2015, Mashali was treated at Beth Israel Deaconess Hospital in Boston ("BI Hospital") for overdosing on Tylenol, which caused liver failure. (Comp.Tr.:26, 77; *see also* Competency Report at 5). According to Dr. Fife, BI Hospital successfully treated Mashali, and he "fully recovered." (Comp.Tr.:26-27). Mashali's "liver function returned to normal. His kidney function returned to very close to normal." (Comp.Tr.:27).

### 7.   Norwood Hospital

In September 2015, Mashali spent time in a psychiatric unit at Norwood Hospital for passive suicidal ideation and "safety and stabilization." (Comp.Tr.:64, 155; Exhibit 6, NOWROOD-USAO-000489). There, according to the medical record, Mashali declined to eat, stating that "unless the kitchen [was] Kosher or Halal" he will not eat from it." (Exhibit 6, NOWROOD-USAO-000489). Mashali also declined to drink. (Exhibit 6, NOWROOD-USAO-000489). Mashali declined to give a Norwood Hospital doctor consent to speak with his wife. (Exhibit 6, NOWROOD-USAO-000489). Mashali declined the offer for his wife to bring him food. (Exhibit 6, NOWROOD-USAO-000489). Mashali also declined a staff member's offer to buy him acceptable food outside the hospital premises. (Exhibit

14

6, NOWROOD-USAO-000490).   Mashali stated that "he often [ate] zero to one meal a day and [was] fine." (Exhibit 6, NOWROOD-USAO-000490).

Dr. Fife stated that Mashali's behavior at Norwood Hospital was consistent with her conclusion that Mashali was malingering. (Comp.Tr.:66).

### 8.   Follow Up Appointments at MGH

On November 17, 2015, Mashali was seen by Dr. Glass at MGH. (Exhibit 7).  Mashali reported confusion and poor memory.  (Exhibit 7).  When Dr. Glass attempted to validate these symptoms, however, he noted "confabulation and avoidance of participating in testing." (Exhibit 7).

On January 1, 2016, Dr. Glass referred Mashali to MGH emergency room because Mashali reported being unable to answer basic questions and name basic objects; Mashali appeared to be reaching for something on the ground that was not there.  (Attachment 3, MGH-SAO-000169). The MGH discharge note indicates that Mashali was

> hospitalized because of confusion and cognitive decline which could be more likely from severe depression.   Neurology were consulted and could not find any pathological lesions.   Brain MRI has no changes.

(Attachment 4, MGH-USAO-000023).

On January 6, 2016, Mashali was seen by Dr. Perez at MGH. (Exhibit 8).  Dr. Perez's report notes that

15

> "[t]roughout the interview, [Mashali] was
> attentive, able to give a thorough and
> comprehensive review of his workup at both BWH
> [Brigham and Womes Hospital] and BID [BI
> Hospital], was able to name MGH and inquired
> about Neuropsychological care here. However,
> on formal testing he was oriented to self, was
> unsure if he was at MGH, though knew hospital,
> gave the date as a Monday [i]n December, 2017
> (rather than Tuesday, January 2016). He gave
> a jumbled answer to the days of the week
> backwards.

(Exibit 8).

Dr. Fife opined that Mashali's testing avoidance and performance
with Drs. Glass and Perez were consistent with her diagnosis of
malingering. (Comp.Tr.:67-68).

### 9.  First Meeting with Dr. Fife

On March 7, 2016, Dr. Fife attempted to evaluate Mashali at her
office, but was unable to do so. (Comp.Tr.:21-22; D.210 at 3, 211).
Mashali was "evasive with poor effort for every question, except his
name and the name of his attorney," who was also present.
(Competency Report at 7). Mashali claimed he did not know why he
was there. (Competency Report at 7). Mashali appeared "sleepy,
irritable, and bothered." (Competency Report at 7). On the other
hand, Dr. Fife noted, Mashali "ambulated independently, in and out
of my office with a walker, and to Attorney Denner's car, including
opening the door, seating himself, and buckling his seatbelt." Dr.
Fife testified that she "could get a sense of sort of how [Mashali]

16

was ambulating and how he was doing outside of the office when he wasn't being asked these direct questions, and he did . . . quite a bit better than I expected based on how sleepy and drowsy he appeared in the chair." (Comp.Tr.:22).

Based on Dr. Fife's review of Mashali's medical records, and specifically Mashali's history of "withholding of food, fluids and medication of his own volition," she recommended that Mashali be admitted at MGH, Blake 11, for a neuropsychiatric evaluation. (Comp.Tr.:23-24). Dr. Fife was also concerned that Mashali was receiving "incomplete diagnoses" because he was "giving different information to different providers. So, not all of the providers necessarily had the same history consistently." (Comp.Tr.:28). Dr. Fife was particularly concerned with Mashali's food and fluid refusal. Mashali, however, declined to comply with Dr. Fife's recommendation for inpatient commitment at Blake 11. (D.206 [Government's status report, dated March 8, 2016, *under seal*]).

The government informed the Court on March 22, 2016 that Mashali still had not followed through with Dr. Fife's recommendation for inpatient commitment at a suitable facility. (D.210 at 4) ("Thus, about three and a half months after the defendant moved to be evaluated, no meaningful evaluation has taken place up to this point. Moreover, more than two weeks after an agreed upon proposal that the

defendant would voluntarily commit himself to an appropriate facility [approved by Dr. Fife] he has not done so").

### 10. BI Hospitalization

In the meantime, on March 15, 2016, El-Khadry found Mashali unresponsive, apparently experiencing a seizure, and called 911. (Attachment 5, BIDMC-USAO-001941; Comp.Tr.:31, 81, 155-56). Mashali was brought to BI Hospital, Needham, where a seizure was observed. (Attachment 5, BIDMC-USAO-001941; Comp.Tr.:81). Mashali presented with "poor nutritional status." (Attachment 5, BIDMC-USAO-001947). He stayed there for two weeks. (Comp.Tr.:156). Inpatient psychiatry was recommended upon his discharge on March 24, 2016. (Attachment 5, BIDMC-USAO-001948-49). According to El-Khadry's testimony, Mashali "continued to lose weight" during this time. (Comp.Tr.:155).

Dr. Fife indicated in her competency report that at the BI Hospital Mashali "had neurological studies," including an MRI and CT of the brain. (Competency Report at 6). She noted that "[a]ll studies were unremarkable." (Competency Report at 6). Dr. Fife also testified that Mashali's seizure was relevant to her determination of Mashali's competency to stand trial and malingering because it was related to "Mashali's malnutrition," which "had a profound effect on his health and well-being." (Comp.Tr.:32).

18

### 11.  MGH Hospitalization

It was only after this seizure and the hospitalization at the BI Hospital that Mashali transferred to MGH, Blake 11, on March 24, 2016, where he remained until April 15, 2016.  (Exhibit 13, MGH-USAO-000304; Comp.Tr.:156).  His attending physician was Stuart Beck, who testified.[10]  (Attachment 6 [Beck's CV]).

The MGH discharge summary contains a number of statements by Mashali made to the medical team declining treatment and food and only seeking "comfort."  (Exhibit 13, MGH-USAO-000304).  The MGH assessment indicates that Mashali "has had significant weight loss and poor nutritional status (low B12, vitamin D) and is at high risk for failure to thrive and self-neglect."  (Exhibit 13, MGH-USAO-000304).  Mashali presented as "apathetic about living (I dont [sic] care if I die)."  (Exhibit 13, MGH-USAO-000304).  Upon admission, Mashali requested palliative care.  (Exhibit 13, MGH-USAO-000307).  Mashali initially declined to speak with the chronic pain team, threatening a "'hunger strike'" if palliative care staff did not see him. (Exhibit 13, MGH-USAO-000307).

MGH attempted to administer two cognitive assessments tests to Mashali, which he sabotaged because he "over-reported his symptoms,"

---

[10] According to the defense, Dr. Beck provided "the last and arguably most comprehensive psychiatric evaluation done of the defendant." (D.263 at 7).

made a "poor effort," and "likely malinger[ed]." (Exhibit 13, MGH-USAO-000307; Comp.Tr.:49-50). Dr. Fife explained that to score as low on these tests as Mashali did "you would . . . really have to have very, very severe illness, such as sort of end stage Alzheimer's or something of that nature. It's almost not participating to score that low." (Comp.Tr.:49). Mashali's score was well below typical scores by dementia patients. (Comp.Tr.:49).

MGH diagnosed Mashali with Unspecified Mood Disorder with Psychotic Features, Malingering, Anti-Social and Narcissistic Personality Disorders, Gastroparesis, and Sarcoidosis, as well as Malnutrition. (Exhibit 13, MGH-USAO-000313; Comp.Tr.:50-58).

### a) Dr. Beck's Assessment

Dr. Beck testified that Mashali intentionally failed to comply with the prescribed nutrition regimen of eating multiple small meals pet day to help him with gastroparesis and malnutrition. (Comp.Tr.:124-25). Dr. Beck ruled out the diagnosis of dementia. (Comp.Tr.:128). In his view, Mashali's invalidation of the two cognitive assessment tests pointed to malingering. (Comp.Tr.:130). Dr. Beck testified that Mashali's apparent apathy toward living "reflect[ed] the severity of his depression, the injury he suffered to a sense of self when he lost his function as a physician." (Comp.Tr.:134).

Dr. Beck signed off on a progress note, which stated that Mashali

> appears to be malingering in order to avoid
> outside court situation given inconsistent
> presentation, poor compliance, elaboration of
> medical problems, and over disdain for the legal
> process. He appears to have capacity to make
> decisions about his basic recovery plan, but he
> continues to avoid getting better through poor
> compliance and active sabotage of treatment
> plans. He is medically stable, but continues
> to eat inappropriately and refuses to engage in
> functional recovery.

(Comp.Tr.:135-36; Exhibit 18, MGH-USAO-000414). Dr. Beck

elaborated on this statement at the competency hearing, testifying

that the phrase "outside court situation" referred to "this federal

criminal case." (Comp.Tr.:137). At the mention of his case Mashali

"came alive and was very angry, expressed lots of anger toward the

government for destroying his life, threatening his family, the

family's well-being and livelihood, taking his career away."

(Comp.Tr.:138).

### b)   Dr. Fife's Two Meetings with Mashali at MGH

Dr. Fife interviewed Mashali twice at MGH, Blake 11, on March 26,

2016, and April 15, 2016. (Comp.Tr.:32, 45). She spent about two

hours with Mashali on each occasion. (Comp.Tr.:32, 46). Mashali

stayed fully awake through both meetings. (Comp.Tr.:44).

Dr. Fife testified that Mashali was "disinterested and bothered

and irritated by questions that had to do specifically with what I

21

was charged with, which is understanding his capacities to stand trial, understand the charges against him, understand the potential consequences, understanding the participants in the courtroom, the roles of the attorneys and the Judge." (Comp.Tr.:33). On the other hand, when she asked him more general questions that did not appear to be directed at his competency to stand trial, Mashali "would open his eyes, would look right at me and would answer very clearly." (Comp.Tr.:34; *accord* Comp.Tr.:46-47). Mashali expressed strong views that the government and the prosecution was unfair to him and that Europe had a much more civilized criminal justice system. (Comp.Tr.:35; Competency Report at 9). In her report, Dr. Fife wrote that Mashali "complained that he might not live long enough to recoup what the Government owes him in terms of how much he paid into the system over his working years in taxes." (Competency Report at 9). Dr. Fife observed that Mashali was able to answer questions of this sort "in a clear and coherent way." (Comp.Tr.:35). Mashali's "overall tenor was to stay away from anything that had to do with the question at hand and he would be very sleepy and passive and non-participatory, but then when it was away from that topic, it was [] really like talking to a different person." (Comp.Tr.:35). Yet, Mashali could not provide Dr. Fife with the definition of a trial or explain the charges against him, while, at the same time, stating

something to the effect of "I didn't overbill Medicare" even though Dr. Fife had not brought up Medicare. (Comp.Tr.:37; Competency Report at 8-9).   With respect to assisting his counsel, Mashali said something to the effect of "What do you expect me to do, read millions of pages of documents?"   (Comp.Tr.:47).   Dr. Fife noted that Mashali's "language abilities and fluency betray his efforts to appear confused and fatigued."   (Competency Report at 9).   She further noted that "[t]here was no evidence of a thought disorder including no flight of ideas, auditory or visual hallucinations, [nor] paranoid ideation."   (Competency Report at 10).

Dr. Fife explained that none of the conditions diagnosed at MGH prevented Mashali from being competent to stand trial.   She explained that Mashali's mood disorder was a type of depression and that the term "psychotic features" was a term of art that reflected on Mashali's "personal belief system," for example, his thinking that the government had conspired against him because he was a Muslim, as contrasted with the term "psychosis," which would reflect "abnormal thinking pattern."   (Comp.Tr.:48, 50-51; Competency Report at 9 ("Of course it is because I am a Muslim").   And although MGH had prescribed Rispedral, an anti-psychotic medication, the dose was too low to treat psychosis (as Mashali did not have psychosis) and was indicated merely to address Mashali's "mood."

(Comp.Tr.:51).

According to Dr. Fife, Mashali's narcissistic personality disorder did not "interfere with any of the intellectual capacities to be competent to stand trial." (Comp.Tr:53-56). She testified that "a significant portion of what Dr. Mashali has been doing since 2014 and even a little bit before that, has been, along with his legitimate medical illnesses, the intentional production of symptoms." (Comp.Tr.:57).

Dr. Fife explained that the term "malingering" meant "not being truthful," a "fabrication of symptoms." (Comp.Tr:56).

Dr. Fife explained that gastroparisis was a partial paralysis of the stomach and that Mashali refused to follow up on the treatment of eating multiple small meals. (Comp.Tr.: at 39-42). She noted, from her review of Mashali's medical records, how Mashali would decline food when he knew he was being observed, yet, when he thought he was not being observed by the staff, "he was engaged and he ate the food . . . without difficulty." (Comp.Tr.:44). Dr. Fife explained that "I think not eating has been a way of keeping himself weak and ill." (Comp.Tr.:57).

Dr. Fife also testified that sarcoidosis is an "inflammatory illness . . . [which] causes things called granulomas in various parts of the body," which does not "affect[] [Mashali's] mental state at

all." (Comp.Tr.:57-58).

Finally, Dr. Fife explained that Mashali had experienced gastroparesis and sarcoidosis for years, long before the instant criminal case. (Comp.Tr.:58-59).

In sum, Dr. Fife testified that Mashali's "disorders don't trump his intellect." (Comp.Tr.:113). On cross examination, she told counsel: "[H]e has the capacity to work with you in support of his own defense. His personality make-up is such that he is much less inclined to." She went on, "I think in this situation, Dr. Mashali is choosing not to read the documents and work with you . . . I think it is because he doesn't want to go to trial on this matter and face these charges." (Comp.Tr.:114).

### 12. April 27, 2016 Letter by Dr. Fife

On April 27, 2016, shortly after Mashali's discharge from MGH, Dr. Fife wrote an urgent letter to the Court, stating:

> Dr. Mashali has been on a path of extremely poor-self care, and self-imposed starvation since his arrest. If he remains at home, as he has awaiting trial, we cannot be assured he will follow his treatment plan . . . I have little to no doubt that he will deteriorate at home.
>
> ***
>
> [I]n my medical and psychiatric opinion Dr. Mashali would be best served in a monitored setting where his safety, nutrition and medication adherence can be observed around the clock.

25

(Comp.Tr: 68; Exhibit 9).

Based on that letter, and in conjunction with the corroborating evidence of Mashali's malingering and intentional avoidance of food and medication that presented as a high suicide risk, on April 27, 2016, the government filed a motion seeking Mashali's detention under 18 U.S.C. § 3142. (D.230).  The Court did not rule on the motion.

### 13.  Norwood Hospital Hospitalization

On May 5, 2016, a week and a half after Dr. Fife's letter to the Court, Mashali was admitted into the emergency room at Norwood Hospital "due to unresponsive state."  (Exhibit 11, NORWOOD-USAO-000515).  Mashali remained unresponsive despite the administration of Narcan.  (Exhibit 11, NORWOOD-USAO-000515).  The medical records state that upon regaining consciousness, Mashali

> Got upset about possible admission to inpatient psychiatric unit and requested [] comfort measures only.  He refused all treatment.  He wanted his IV to get removed.  He requested to sign the form that he wants [] comfort measures only.

(Exhibit 11, Norwood-USAO-000516).  The attending physician, Dr. Tabroff, determined that Mashali was "not competent to make decision[s]" about his treatment and presented as a "high risk for suicide."  (Exhibit 11, Norwood-USAO-000516).   Mashali was involuntarily committed.  (Exhibit 11, Norwood-USAO-000516).

26

Mashali's diagnoses were, among others, "Hypernatremia, probably due to dehydration, resolved with hydration," "Acute renal failure, which resolved with hydration," "Severe protein-calorie malnutrition," and "[p]ossible overdose."   (Exhibit 11, Norwood-USAO-000516).

Dr. Fife testified that it was her "concern coming true when [she] wrote the letter to the Court after the discharge from MGH." (Comp.Tr.:73).   She explained that the diagnosis of "severe protein-calorie malnutrition" is "not getting enough proper nutrition, which is likely at the base of a lot of [Mashali's] issues because many people do live with sarcoid and other things." (Comp.Tr.:74).   She stated further that Mashali's behavior at Norwood Hospital was

> consistent with how Dr. Mashali has not been caring for himself since his legal troubles began . . . inadequate nutrition, food and fluids, inadequate care, telling doctors what he'll take, what he won't take, no consistent [monitoring] that I'm aware of at home being sure that he is taking adequate fluids and nutrition and then lands back in the hospital.

(Comp.Tr.:74).

Mashali was discharged from Norwood Hospital on May 11, 2016.  (Exhibit 11, NORWOOD-USAO-000515).

### 14.  May 10, 2016 Status Conference

On May 10, 2016, the Court held a status conference, but did

27

not rule on the government's motion to detain Mashali.  (*See* D.241 (status conference on May 10, 2016).  Instead, being made aware of Mashali's latest hospitalization at Norwood Hospital, the Court informed counsel in the presence of El-Khadry, who attended the hearing: "I think he needs to understand, Mr. Denner, that if he doesn't do what he's told to do, he's going to end up at Devens or Buttner or the place in Missouri." (St.Conf.Tr.:19).[11]   Counsel responded, "[H]is wife will do the best to explain it to him, I'll do my best to explain it to him."  (St.Conf.Tr.:19).

### 15.  Mashali's Treatment at CareOne

From May 19, 2016, until June 16, 2016, Mashali was placed at a skilled nursing facility in Lexington, MA, called CareOne. (Exhibit 12, CareOne-USAO-00087-95; Comp.Tr.:75). The progress note for the date of admission states: "No current conditions/diagnoses that are likely to lead to pain or discomfort."  (Exhibit 12, CareOne-USAO-00095).  The note for May 21, 2016, describes Mashali as "very pleasant and cooperative" and indicates that Mashali "stated he wants to have fluid." (Exhibit 12, CareOne-USAO-00095).  The note for May 23, 2016, indicates that Mashali "denies pain/discomfort, ate dinner with a good appetite, tolerated all meds well."  (Exhibit

---

[11] "St.Conf.Tr.:__" refers to the transcript of the May 10, 2016 status conference and the corresponding page number.

12, CareOne-USAO-00093).   Similar comments continue into June.   The note for June 6, 2016, states: "Patient is alert, pleasant, and cooperative." (Exhibit 12, CareOne-USAO-00090).   It describes how Mashali came to a nursing station at 3:00 AM requesting medication because he was about to start fasting and did not want to miss his medications. (Exhibit 12, CareOne-USAO-00090).   The progress note for June 7, 2016, states: "Fathalla is very pleasant and friendly. Fathalla said that he had worked as a physician.   Fathalla said that he mainly enjoys reading, TV, music, etc." (Exhibit 12, CareOne-USAO-00089).   The note for June 10, 2016, states that Mashali is "[c]ompliant with medications and tolerating them well." (Exhibit 12, CareOne-USAO-00088).

El-Khadry acknowledged that at CareOne Mashali's "physical appearance [was] better," that "he gained some weight," that "he [ate] better," and that he was complaint with medications. (Comp.Tr.:189-90).

Mashali stayed awake through the entire competency hearing, which lasted about six hours, including lunch.   At a sidebar, however, counsel informed the Court that Mashali "sleeps most of the time and [] when he reads something, he doesn't remember 60 seconds later." (Comp.Tr.:192).

## II. <u>DISCUSSION</u>

**A.   Mashali Must Establish Incompetency by a Preponderance of the Evidence.**

Section 4241(d) states:

> If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d).

The government does not have the burden under § 4241(d) to show that the defendant is incompetent.  The statute, on its face, states that if a preponderance of the evidence burden is met, the defendant is to be found incompetent and "shall" be committed.  In other words, the defendant will remain free and adjudicated competent unless someone comes forward with sufficient evidence that the defendant is incompetent.  That someone cannot be the government, because it is typically the defense that seeks a finding of incompetency in the face of the government's opposition.  In this case, for example, the government cannot possibly be tasked with carrying the burden to establish Mashali's incompetency when it is claiming that he is, in fact, competent.  Thus, it would be illogical for the government to be tasked with proving the defendant's incompetency.

Similarly, it would be incongruent with § 4241(d) to place the

30

burden on the government to prove that the defendant is competent to stand trial, because under § 4241(d) the "preponderance of the evidence" burden is tied to the Court's finding of *incompetency* rather than competency.  In other words, the "evidence" that must be presented to the Court by a preponderance standard must necessarily be that of incompetency.  Consequently, the government bears no burden under § 4241 to establish the defendant's competency or incompetency.  Under the plain reading of the statute, the burden is on the defendant to establish incompetency by a preponderance of the evidence.

The Supreme Court, albeit in dicta, stated this rule succinctly and unequivocally: "Congress has directed that the accused in a federal prosecution must prove incompetency by a preponderance of the evidence."  *Cooper v. Oklahoma*, 517 U.S. 348, 361 (1996), citing 18 U.S.C. § 4241.  The question before the *Cooper* Court was whether Oklahoma's mental competency statute, which placed the burden on the defendant to show incompetency by *clear and convincing* evidence rather than by a preponderance of the evidence, was unconstitutional.  *Id.* at 350.  The Court held that it was, because, while a state could require the defense to meet its burden by a preponderance of the evidence, the *clear and convincing* evidence burden "impose[d] a significant risk of an erroneous determination that the defendant

31

is competent." *Id.* at 363, citing *Medina v. California*, 505 U.S. 437, 449 (1992).   Specifically, the Court was concerned with a situation where a defendant who met the more likely than not proof of incompetency, but nevertheless fell short of the clear and convincing burden of proof, would still face a trial.   *Id.* at 363-64.

This Court is bound by *Cooper*.   "[F]ederal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . a dictum is of a recent vintage and not enfeebled by any subsequent statement." *McCoy v. Massachusetts*, 950 F.2d 13, 19 (1st Cir. 1991).   That *Cooper* did not wrap its unequivocal placement of the burden on the defense in some form of statutory exploration is irrelevant here, because the statute's meaning is plain and leads to only one result.   *See Colon-Marrero v. Velez*, 813 F.3d 1, 11 (1st Cir. 2016) ("[t]he plain meaning of a statute's text must be given effect 'unless it would produce an absurd result or one manifestly at odds with the statute's intended effect,'" quoting *Arnold v. United Parcel Serv., Inc.*, 136 F.3d 854, 858 (1st Cir. 1998)).   And that result is not only logical, but, as the Supreme Court held in *Medina*, entirely permissible.   505 U.S. at 449 ("we perceive no basis for holding that due process further requires the State to assume the burden of vindicating the defendant's constitutional right by persuading the trier of fact that

the defendant is competent to stand trial"). In *Medina*, the Supreme Court explained that

> [t]he main concern of prosecution, of course, is that a defendant will feign incompetency in order to avoid trial. If the burden of proving competence rests on the government, a defendant will have less incentive to cooperate in psychiatric investigations, because an inconclusive examination will benefit the defense, not the prosecution . . . . The potentially greater overall access to information provided by placing the burden of proof on the defense may outweigh the danger that, in close cases, a marginally incompetent defendant is brought to trial . . . . [P]lacing the burden of proof on the government will not necessarily increase the reliability of the proceedings.

*Id.* at 455.[12]

While there is a Circuit split on whether the dicta in *Cooper* is binding on lower courts, it is irrelevant here: all of the

---

[12] The Supreme Court's foresight in that a defendant lacking the burden of proof will be less likely to cooperate with the psychiatric assessment rings especially true in this case. While Mashali's counsel indicated in the December 2, 2015 motion seeking a competency hearing that "[t]he Defendant will also be obtaining a complete record of all medical/psychological treatment for any such hearing[]," (D.179 at 3), of the thousands of pages of Mashali's medical records that the government ultimately obtained pursuant to numerous government's motions and court orders, not a single one was provided by the defense. (D.179). Mashali's apparent obfuscation of the competency evaluation, inclusive of his sabotage of the cognitive assessment tests at MGH, buttresses the Supreme Court's policy considerations in *Medina* absolving the government from having to carry a burden of proof in the face of a defendant's attempts at circumventing the process.

appellate case law that places the burden on the government predates *Cooper*, while all appellate decisions that post-date *Cooper* place the burden squarely on the defense. *Compare United States v. Whittington*, 586 F.3d 613, 617-18 (8th Cir. 2009) (identifying the circuit split and relevant appellate cases; the burden is on the defense, *citing* Cooper); *Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005) (burden on the defense, citing *Cooper*); *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005) (same, citing *Cooper*); *United States v. Smith*, 521 F.2d 374, 377 (10th Cir. 1975) (same, but pre-*Cooper*), with *United States v. Teague*, 956 F.2d 1427, 1431 n.10 (7th Cir. 1992) (pre-*Cooper*, dicta that the burden is on the government); *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991) (pre-*Cooper*, the burden is on the government); *United States v. Velaquez*, 885 F.2d 1076, 1089 (3rd Cir. 1989) (same); *United States v. Hutson*, 821 F.2d 1015, 1018 (5th Cir. 1987) (same). The Second Circuit declined to address the question. *United States v. Nichols*, 56 F.3d 403, 410 (2nd Cir. 1995) (pre-*Cooper*, "We decline [] to reach the issue today").[13]

---

[13] In *United States v. Patel*, the court declined to follow *Cooper*, but without any analysis, other than recognizing the Circuit split (but not the fact that the decisions placing the burden on the government predated *Cooper*), and simply holding that "[t]his court adopts the view of the Third, Fifth, and Ninths Circuits." 524 F. Supp. 2d 107, 112-14 (D. Mass. 2007).

In any event, the determination of who bears the burden of proof in this case is immaterial, because whether the burden is on the government or the defense, the evidence clearly establishes that the defendant is competent.  *See Medina*, 505 U.S. at 449 ("the allocation of the burden of proof . . . will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent").

### B.    Standard for Incompetency

The test for competency is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (internal quotations omitted).  "A defendant may have serious mental illness while still being able to understand the proceedings and rationally assist his counsel." *United States v. Widi*, 684 F.3d 216, 220–21 (1st Cir. 2012) (citation omitted).  In evaluating a defendant's ability to assist counsel, the court must focus on whether the defendant is "able" to assist counsel, not on whether the defendant is in fact assisting counsel; the defendant's "unwilling[ness]" to assist counsel does not suffice. *United States v. Vachon*, 896 F.2d

653, 655 (1st Cir. 1989).   A qualified expert's opinion that a defendant is competent is a significant factor favoring the government.  *See United States v. Bruck*, 152 F.3d 40, 46 (1st Cir. 1998), quoting *United States v. Lebron*, 76 F.3d 29, 32 (1st Cir. 1996) ("[I]f a qualified mental health professional has determined that a defendant is competent, 'a court is not required to hold a further evidentiary hearing absent extenuating circumstances'").

### C.   Mashali is Competent

The testimony of the court-appointed psychiatrist, Dr. Fife, who observed Mashali on three occasions, is unequivocal: Mashali is competent to stand trial and is malingering to avoid it.  The medical records and the competency hearing testimony, including by El-Khadry, establish that Mashali has suffered from sarcoidosis since at least 2002, and that it was only after his arrest in February 2013 that his health began a precipitous decline.  The medical records and testimony establish that Mashfali's rapid deterioration was due primarily to his self-imposed malnutrition and non-compliance with medication.  The first instance of such non-compliance occurred while he was being held at PCCF, just a few days after his arrest.  In about two months' time at PCCF, Mashali lost over 30 lbs, even though there was no change in the status of his medical condition of sarcoidosis then or thereafter.  All

Mashali's lab results came back negative for any adverse medical developments to his medical and mental health conditions.  Over the next two years, Mashali continued to refuse food, water, and medication, often berating his providers; yet, throughout, he maintained the capacity to consume it and get better.  When, at the hearing on May 10, 2016, the Court finally instructed Mashali, through his wife and counsel, that he had to comply with treatment or face incarceration, Mashali did comply with treatment at CareOne, began eating, gained weight, had a pleasant demeanor with his providers, and appeared better physically to Dr. Fife and El-Khadry. On June 30, 2016, Mashali stayed awake through the entire six hour competency hearing.

There is no evidence that impeaches Dr. Fife's qualifications or credibility.  Mashali's counsel interviewed Dr. Fife prior to her appointment, and she held conference calls during the competency evaluation process updating both counsel on the progress and answering follow-up questions.[14]  (Comp.Tr.:12-13).  She reviewed

---

[14] In his brief, Mashali states improperly that "Doctor[] Allison Fife . . . testified for the Government." In fact, Dr. Fife was not a government witness.  As Mashali's counsel acknowledged at the competency hearing, "I don't think that Dr. Fife is anyone's witness but the Court's witness, and I have no difficulty with relaxing" the government's "ability to cross-examine her and my ability to cross-examine her." (Comp.Tr.:9).  Mashali also stipulated to Dr. Fife's qualifications.  (Comp.Tr.:13).  Dr. Fife testified that she

thousands of pages of Mashali's medical records.  (Comp.Tr.:20).
She recognized that she was in no position to evaluate Mashali the
first time she met him, and requested that he be institutionalized,
but Mashali refused.   Mashali's declining health due to his
self-starvation ultimately led him to MGH, where Dr. Fife could
finally observe him for a period of time.   She met him there not once,
but twice more, each time for over two hours, although both El-Khadry
and counsel claimed that Mashali was unable to stay awake for more
than minutes at a time.   Not only did Mashali stay awake, but,
contrary to El-Khadry's and counsel's assertions, he carried
conversations with Dr. Fife for the entire length of the meetings,
expressing frustration with the criminal justice system, his
prosecution, the volume of discovery, and discussing other topics.

    The genesis of Mashali's health troubles has been his refusal
to accept treatment and nutrition and not any particular chronic
physical or mental health condition.   The government does not mean
to understate Mashali's diagnoses of sarcoidosis and gastroparesis,
or his apparent depression, nor the condition of narcissistic
personality disorder.   On the other hand, Dr. Fife testified in
detail how none of these maladies affected Mashali's competency to

---

understood that she was "court appointed" and that her "appointment
was also agreed upon by Attorney Denner."  (Comp.Tr.:11-12).

stand trial.  This expert testimony stands uncontroverted on the record before the Court.

In concluding that Mashali was a malingerer, Dr. Fife relied on more than just her own observations and experience.  She saw that Mashali invalidated, that is, he intentionally sabotaged, two cognitive assessment tests administered at MGH under Dr. Beck's supervision.  Dr. Fife was also privy to the fact that other providers, such as Drs. Glass and Perez, had observed in January 2016 that Mashali overstated his symptoms during formal examinations while presenting a higher cognitive capacity during informal conversations.  MGH staff observed the same, with Mashali declining food in their presence, but eating it when they were not looking.  Dr. Fife was aware, going back further in time, that during Mashali's 2015 evaluation for SSDI he falsely told the evaluator, Richard Stellar, that he had stopped working because he was unwell rather than because he lost his medical licenses, was indicted, and, less than a month before, was arraigned for the third time.  As the record shows, there were other, well documented instances, of Mashali's less than forthcoming behavior with providers.

Dr. Beck, Mashali's physician at the "renowned psychiatric ward" at MGH (Def.Mem. at 4) with "estimable" credentials and experience" (Def.Mem. at 7), stated unequivocally that Mashali was

a malingerer, overstating his symptoms to avoid the legal process. Dr. Beck did not conceive this opinion at the competency hearing; he had approved this observation and included it in Mashali's medical records months before when Mashali was still at MGH.  Even defense counsel recognizes that Dr. Beck provided "the last and arguably most comprehensive psychiatric evaluation" of Mashali.  (Def.Mem. at 7).

In light of this overwhelming evidence, and despite Mashali's recognition of the two experts' unquestioned thoroughness and qualifications, Mashali calls Drs. Beck's and Dr. Fife's opinions that he is a malingerer "troubling and insulting."[15]  (Def.Mem. at 9).  Mashali argues that Dr. Beck's application (although not carried through) to involuntarily commit Mashali, and some

---

[15] A number of factual assertions in Mashali's brief are unhinged from the record; and none contains a citation to the record.  For example, the brief states, without any record support: "[p]rior to the loss of his medical licenses in the 2011-2012 time period, Mashali was not well, often falling asleep while seeing patients at work, acting generally disorganized with poor decision-making and exhibiting depressive interspersed with hypomanic behavior, all reflecting, in hindsight, the beginning of precipitous cognitive decline." (Defense Memo, 3).  In another example, Mashali's brief states that El-Khadry "testified that Dr. Beck tried to convince her [to treat Mashali with Electroconvulsive therapy ("ECT")], telling her that Mashali was very sick, psychotic, and exhibited with distorted thinking and reality testing."  In fact, the Court sustained the government's objections to Mashali's counsel's attempts to elicit from El-Khadry what Dr. Beck had supposedly told her. (Comp.Tr.:171-74).  The brief also accuses Dr. Beck, without any basis, of trying "to force" ECT on Mashali. (Def.Mem. at 8).  All of these allegations are baseless.

consideration by MGH (also not carried through) to treat Mashali with Electrocompulsive therapy, is inconsistent with Drs. Beck's and Fife's diagnosis of malingering. (Def.Mem. at 5, 9).

The very evidence Mashali cites contradicts his assertion. The notice of hearing on MGH's petition to involuntarily commit Mashali under Mass. Gen. Laws ch. 123, §§ 7 and 8, contained this statement:

> Dr. Mashali has the means to take care of himself and the ability to accept medical care in the hospital at home. However, he is refusing to do so. He requests palliative care and long-term placement, both of which are *not indicated and not commensurate* with his medical problems. He has stopped grooming himself, refuses to get out of bed, and declines to eat solid food. He needs ongoing medical and nursing care to maintain his basic needs.

(Def.Mem., Ex. C. [D.263-1]) (emphasis added). In other words, Mashali's medical problems did not prevent Mashali from taking care of himself or assisting his counsel; instead, Mashali intentionally starved himself and refused treatment to avoid the trial and the potential financial ruin for his family. Under these circumstances, it was Dr. Beck's obligation to consider involuntary commitment (also not followed through) to prevent Mashali from harming himself, even though Mashali maintained the ability, but chose not to exercise it, to follow treatment and consult with his attorney. This is also the essence of Dr. Fife's opinion that "Mashali is choosing not to demonstrate his capacities to stand trial," (Competency Report at

41

11), and her April 27, 2016 letter to the Court.  In any event, it is clear from the recent CareOne records and Mashali's alertness during the competency hearing, that he is not only able to comply with prescribed treatment and nutrition, but in fact has done so. The idea that Mashali is unable to stay awake and intelligently converse with counsel when he has done so for hours with Dr. Fife dating back to April 2016 rings fictitious.

Mashali places undue emphasis on El-Khadry's testimony about Mashali's lack of cognitive capacity and recall.  El-Khadry profited handsomely from Mashali's unorthodox billing exploits at the expense of his patients, residing comfortably for years in a multi-million dollar house in Dover, MA, with a heated driveway, a squash court, a movie theater, and with parking for multiple luxury vehicles--all despite the bankruptcy in 2011--while almost $2M suspiciously funneled out of the government's reach to Cypress and Egypt.  On April 19, 2016, the Court allowed the government's application to freeze the Mashalis' children's college savings funds, which the government asserted were tied to Mashali's fraudulent billing. (D.223, 224).  If Mashali were to be convicted, El-Khadry stands to lose her lifestyle, her kids' college savings, Mashali's future earnings, and even Mashali, who will be subject to removal from the United States as an aggravated felon.  *See* 8 U.S.C.

42

§ 1101(a)(43)(M)(i)(fraud or deceit in excess of $10,000). (Comp.Tr.:182). Given El-Khadry's heavily vested interest in keeping Mashali away from a conviction by any means, and the prior finding by the Honorable Leo T. Sorokin that El-Khadry's bail hearing testimony was "wholly incredible," this Court should have little confidence in her assertions.

The credibility of El-Khadry's testimony is further undermined by objective medical records wholly contradicting her claims. El-Khadry's alleged observations of Mashali's inability to stay awake, and his significant cognitive and memory deficits, stand in stark contrast with the observations made by the two medical professionals, Dr. Fife and Dr. Beck, who have specialized training and lengthy experience diagnosing and treating mental health issues on the one hand, and recognizing malingering on the other. Mashali's intentional invalidation of cognitive assessment tests at MGH, overstatement of symptoms with at least two other providers, false presentation to Richard Stellar during the SSDI evaluation, and sudden compliance with treatment and change in demeanor at CareOne after the Court referenced incarceration, speak volumes to El-Khadry's and Mashali's stratagem to avoid the trial in the instant matter and to preserve their well-appointed lifestyle.

The genesis of Mashali's alleged malady is the arrest in the

instant case and his unwillingness to go to trial, not his pre-existing medical conditions. El-Khadry acknowledged that, even after Mashali had lost his license in the fall of 2013, he was well enough to get his license back and continue the practice of medicine:

> Q:   Okay.   But even after your husband lost his license, which was in the fall 2013, you were hoping that he would eventually get the license back and be able to practice at that time, correct?
>
> A:   Of course.
>
> Q:   So, at that time you believed that he had the capacity to continue practicing medicine the way he had in the past?
>
> A:   Yes.

(Comp.Tr.:179).   On cross-examination, El-Khadry conceded that "[m]ost of [Mashali's] weight loss was after his arrest," as well as the alleged loss of cognitive function and recall. (Comp.Tr.:180).   And yet, although El-Khadry painted Mashali's mental health decline at PCCF in the winter of 2014 and shortly thereafter in most dire terms, in September 2014, incredulously, Mashali filed a motion to amend the conditions of his release to "enable [him] to transport his children to their various school activities and appointments and to accomplish basic tasks necessary for his family." (Comp.Tr.:182).   Either El-Khadry did not care for the welfare of her children or her testimony about Mashali's cognitive function was less than forthcoming.

**CONCLUSION**

It was Mashali's burden to show by a preponderance of the evidence that he was incompetent to stand trial.  He failed.  The evidence overwhelmingly supports Dr. Fife's opinion that Mashali had, and continues to retain, the ability to understand the charges against him and to assist his counsel.  That Mashali has decided not to exercise this ability is of no legal consequence.  Therefore, the government requests the Court to find that Mashali is competent to stand trial and to set a status conference to schedule the course of this case toward a trial date.

                              Respectfully submitted,
                              CARMEN M. ORTIZ
                              United States Attorney

                    By:     /s/ Maxim Grinberg
                            MAXIM GRINBERG (667521)
                            Assistant U.S. Attorney


                    CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                              /s/ Maxim Grinberg
                              MAXIM GRINBERG
                              Assistant U.S. Attorney

August 16, 2016