UNITED STATES OF AMERICA    )
                           )
          v.           )    CRIMINAL NO: 14-CR-10067
                           )
FATHALLA MASHALI         )
                           )

## <u>GOVERNMENT'S TRIAL BRIEF</u>

The United States of America, by and through Assistant U.S. Attorneys Maxim Grinberg and Abraham R. George, hereby submits this trial brief. The purpose of this brief is to set forth and explain a subset of pertinent evidence to aid the Court's understanding of the government's case-in-chief presentation and to evaluate the admissibility of relevant exhibits. Although the brief touches upon admissibility of exhibits most likely to be contested by the defense, the government will submit separate *motions in limine*, if necessary.

The trial is set to commence on March 20, 2017. The Court indicated that the trial should last up to three weeks. The government believes, given all the different facets of Mashali's offenses calling for numerous witnesses, that a four-week trial is more appropriate.

## I. BACKGROUND

### A. Offenses Charged in the Indictment.

As set forth in the indictment, Mashali operated a pain management clinic, called New England Pain Associates ("NEPA"), with three locations in Massachusetts and one location in Rhode Island. (Indictment ¶¶21-23). Mashali also had employees in a satellite office in Cairo, Egypt. (Crim. No. 16-10278, Indictment ¶16).[1] Mashali prescribed powerful narcotics and tested patients' urine for drugs. Many of Mashali's patients were low-income individuals with significant histories of drug addiction and abuse.

Between 2010 and 2013, Mashali orchestrated a multi-million-dollar fraud scheme against government and private insurance programs. The fraudulent scheme had three overarching components.

First, Mashali falsely billed insurance companies CPT codes 99213 and 99214 for extensive medical services he and his physician assistants supposedly performed during face-to-face interactions with new and follow-up patients, such as full physical examinations and lengthy treatment discussions-- services which in fact did not take place. (Indictment ¶¶ 35-37; Counts 1-9, in violation of 18 U.S.C. § 1347).

---

[1] The reference is to the indictment against Moustafa Aboshady, who was Mashali's nephew and employee at NEPA.

Second, Mashali falsely billed insurance companies CPT code 80102 for confirmatory urine drug testing, which he did not conduct or even possess the equipment to conduct, and which, in any event, would have been neither medically reasonable nor necessary and contrary to applicable federal regulations. (Indictment ¶ 38; Counts 10-27, in violation of 18 U.S.C. § 1347). For example, Mashali ran drug tests on laboratory equipment which had not been validated (Indictment ¶39(b)); tested urine weeks and up to three months after the urine was collected from patients and sat unrefrigerated, decomposing in a sunlit room (Indictment ¶39(b)); and hid the illegally stored urine from a state inspector who accessed the laboratory for compliance with federal regulations (Indictment ¶39(c)).

Third, to justify these false billing practices, Mashali coordinated fraudulent documentation of non-existent medical services into patients' medical files as though these services had, in fact, been performed. The fabrication of patient medical files spanned the years 2010 through 2013, the entire time period of the conduct charged in the indictment. (*See, e.g.,* Indictment ¶32, referring to October 13, 2010 through March 2, 2013). The indictment expressly identifies one such instance, in March and April 2013, where Mashali sent falsified patient files in response to an audit conducted by a Medicare contractor, StrategicHealthSolutions. (Indictment ¶¶ 42-50;

Count 28, in violation of 18 U.S.C. § 1349). In response to the audit, Mashali, with the help of his nephew, Moustafa Aboshady, and other employees in the Cairo office, added false information into patients' encounter notes, such as full, detailed physical examinations and lengthy face-to-face encounters, and created fake urine drug test results, where, among other things, he backdated the dates on which the tests were done by weeks and sometimes even months to conceal the impermissibly lengthy storage of urine without refrigeration and delays in testing. (Indictment ¶¶ 47-49).

The evidence will show that Mashali's lust for exuberant wealth and luxury severely compromised the care and safety of his vulnerable patients. Mashali treated his urine drug test machines like personal ATMs, which churned out money at a bewildering speed in the form of useless drug test results. Mashali used the fraudulent proceeds from Medicare and insurance companies to support his and his wife's swanky lifestyle at their residence in Dover, MA, which contained a heated driveway and tennis court, a movie theater, an outdoor kitchen, and a squash court under construction, while, at the same time, complaining about his supposed lack of money to timely pay his bills for the necessary chemical reagents to run the urine drug tests, worsening the already reprehensible months-long backlog of untested stinking and decomposing urine specimens.

In addition to fraud, Mashali is charged with money laundering arising from spending funds derived from fraudulent billing for confirmatory 80102 urine drug testing listed in Counts 10-27. (Indictment ¶¶51-53, Counts 29-44, in violation of 18 U.S.C. § 1957.

Finally, Mashali faces forfeiture allegations. (Indictment ¶¶54-58). Mashali can elect to try the forfeiture allegations in the same or a bifurcated trial.

Before addressing specific evidence, the government explains the genesis of some of the evidence which, on its face, may not be entirely obvious.

**B.    Electronic Medical Records**

NEPA maintained two categories of medical records pertinent to the indictment. The first category involves patient encounter notes, which issued for every date of service a patient was seen at NEPA, and include the patient's chief complaint, medical history, interactions with, and the services performed by, the provider that day. The second category involves urine drug test results printed by NEPA's urinalysis machines.

Mashali electronically stored patient records through two providers, CompuGroup and HealthFusion. These companies allowed a medical provider, such as Mashali, to enter encounter notes directly from a desktop, by typing or clicking on certain

information, and to scan and upload urine drug test results. A provider could search the electronic patient file database for any patient and review any encounter note and test results for any date of service.

Mashali maintained an account with CompuGroup dating back to at least 2010. Around June 2012, Mashali began to use the services of HealthFusion, but continued to maintain his account with CompuGroup. Once NEPA moved to HealthFusion, however, NEPA attempted to transition CompuGroup medical records into HealthFusion by printing CompuGroup medical records and scanning them into HealthFusion. If one were to make a change to a CompuGroup patient file after it was scanned into HealthFusion, the up-to-date CompuGroup Cloud file would reflect the change, while the version scanned into HealthFusion would be static and reflect what that file looked like before the change was made. This concept allowed the government to compare altered files with their original versions.

The government, as well as the defense, have direct access to up-to-date patient files stored on the servers of CompuGroup and HealthFusion. Specifically, both CompuGroup and HealthFusion provided the government and defense with login credentials, which allow the parties to access patient files in native environment from their desktop computers. This interface is virtually identical to what Mashali and his staff would have

experienced when NEPA was in business. These up-to-date patient files will be referred to as CompuGroup Cloud and HealthFusion Cloud files, with the term "Cloud" referring to the fact the patient files still exist on these companies' servers.

Apart from having direct access to current CompuGroup Cloud and HealthFusion Cloud patient files by remote access, the government also obtained patient files from CompuGroup and HealthFusion pursuant to search warrants executed approximately at the end of March 2012. The patient files obtained pursuant to the warrants reflect what the files looked like prior to the warrants' execution. For example, if one were to make a change to a patient file stored with CompuGroup after March 2012, the change would be reflected in the current version of the file stored in CompuGroup Cloud. The same file obtained pursuant to the search warrant, however, would show what it looked like before the change was made after March 2012. This is another way in which the government is able to compare altered files with their original versions. Because of the discrepancy between the medical records the government obtained via search warrants in March 2012 and the records NEPA sent in response to the Medicare audit request in April 2012, the government is able to see different versions of one patient's file for a single date of service (Count 28).

In short, NEPA's scanning of older CompuGroup patient files into HealthFusion created a snapshot of the files at the time they were scanned. Similarly, the government's execution of the warrants in March 2012 created another snapshot of patient files. Both mechanisms preserved the originals and permitted the government to compare them with any subsequent modifications in CompuGroup and HealthFusion.

The government proposes that the defense stipulate to the authenticity of (1) medical files obtained from HealthFusion and CompuGroup pursuant to the search warrants, and (2) medical files obtained from HealthFusion Cloud and CompuGroup Cloud.

### C.    NEPA Emails

The government obtained emails of pertinent NEPA employees by executing search warrants with AOL and Google. Mashali had an "aol.com" email account, while the rest of the employees maintained "gmail.com" accounts. These emails show (1) that physician assistants and insurance providers put Mashali on notice about illegal billing; and (2) that Mashali, in conjunction with Aboshady and his employees in the Cairo office, generated false patient files in connection with third party record requests.

The government proposes that the defense stipulate to the authenticity of emails obtained from AOL and Google as true records maintained by those service providers.

**D. Witnesses**

Multiple NEPA employees, from receptionists and medical assistants to nurses and physician assistants, will testify that patients waited for hours to see Mashali; that the actual interactions with Mashali frequently lasted five minutes or less; that while Mashali saw patients he also took personal phone calls and browsed the internet; that he did not touch patients, let alone conduct physical examinations; and that, during the relevant time period, he did not have an examination table or other medical equipment, such as an otoscope or even a thermometer, in the space where he saw patients.

Various patients, many suffering from addiction, will testify that they waited for hours to see Mashali only to be seen for just a few minutes and issued a new prescription.

NEPA employees will testify how third-party requests for medical records had to go through Aboshady. NEPA employees, who were responsible for handling document records requests, will testify how patient notes were virtually empty, devoid of any services, and how, after Aboshady authorized their release, the same records contained extensive medical services, such as lengthy physical examinations.

A Massachusetts State Police Trooper, acting undercover as a "patient," audio- and video- recorded three encounters with Mashali, documenting short, cursory encounters. Mashali's

corresponding encounter notes, however, contained full physical exams, along with other false information.

The laboratory technicians responsible for testing urine specimens will testify that Mashali directed the testing of urine to commence in November 2011, even though the laboratory supervisor, Eleanor Kern, had informed Mashali that the machines were not properly validated and could not be relied upon for accurate results. The laboratory technicians will also testify that Mashali did not even have laboratory equipment to run confirmatory 80102 tests (Counts 10-27). They will testify how Mashali's urine machines could not keep up with the volume of patients and how Mashali failed to timely pay his bills for chemical reagents that were necessary to test urine, resulting in urine stacking up in a sunlit, unrefrigerated room for months before being tested. Mashali directed his lab technicians to test the urine in any event. Finally, the lab technicians and other employees will testify how they hid the urine from a state inspector on Mashali's orders.

Other witnesses will include two experts in their respective fields, Dr. Christopher Gillian, a pain management physician, and Dr. James Flood, the laboratory director at Massachusetts General Hospital; various witnesses who put Mashali on notice about the improper storage of urine and fraudulent billing for 80102 and 99213/4 CPT codes; third

parties, who received falsified patient medical files, including the contractor for Medicare, as well as the Rhode Island Office of the Medical Examiner and the Rhode Island Board of Medical Licensure and Discipline, who requested multiple files for NEPA's deceased patients who died from an overdose. With respect to the deceased patients, NEPA staff generated a list of CPT codes that NEPA had billed; NEPA then falsified the requested encounter notes with lengthy face-to-face encounters and full physical examinations to justify the billing codes it had already charged, in an apparent effort to hide the lack of medical services from the government and private payers.

## II. HEALTH CARE FRAUD, COUNTS 1-27, 18 U.S.C. § 1347

### A. Law and Elements of the Offense

#### 1. Statute

Title 18, United States Code, Section 1347 provides, in pertinent part:

Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice –

(1) to defraud any health care benefit program; or
(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

## 2. Elements of the Offense

The government must prove the following three elements:

**First**: a scheme, substantially as charged in the indictment, to defraud a health care benefit program, or to obtain by false or fraudulent pretenses, representations, or promises any money owned by or under the custody or control of such a program;

**Second**: a defendant's knowing and willful participation in this scheme with the intent to defraud;

**Third**: the scheme was in connection with the delivery of, or payment for, health care benefits, items or services.

Medicare is a health care benefit program for the purposes of § 1347. *See* 18 U.S.C. § 24(d); *United States v. McGovern*, 329 F.3d 247, 248-49 (1st Cir. 2003) (collecting cases). UnitedHealthCare, listed in Counts 24-27, is a national insurer, easily satisfying the interstate commerce requirement.

"A 'scheme' includes any plan, pattern or course of action." Hornby's, §4.18.1347. To "defraud" "means to deceive in order to obtain money or other property by misrepresenting or concealing a material fact." *Id.* "'False or fraudulent pretenses' means any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth, and that were made with the intent to defraud. They include actual, direct false statements as well as half-truths and the knowing concealment of facts." *Id.*

In the health care fraud context, each execution or attempted execution of the charged scheme to defraud constitutes a separate, indictable offense.

**B.    Counts 1-9, Health Care Fraud CPT Code 99213 & 99214.**

CPT codes 99213 and 99214 are defined by the Current Procedural Terminology (CPT) Manual, as cited in the indictment. (Indictment ¶¶ 5, 8).  These billing codes reflect medical services that involve a combination of expanded/detailed patient history, an expanded problem-focused/detailed examination of a patient; and/or medical decision-making of low to moderate complexity.  The amount of time spent with a patient is also a factor.

Mashali did not meet CPT 99213 and 99214 billing requirements, but nevertheless billed for those codes.

Mashali employed a number of physician assistants, nurses, and support staff during the charged time period who will testify to the lack of medical services at NEPA.

**1.    Jamie Russo-DiGeorge, Physician Assistant**

Mashali employed Jamie Russo from approximately January to July 2012 as a physician assistant.  Like all the other physician assistants employed by Mashali, she had only recently obtained her physician assistant certificate, and NEPA was her first foray into the practice of medicine.

Mashali interviewed her in his Worcester office, while he was with a patient. Mashali sat at a desk in front of a computer, in a hallway area of the office. The patient sat in a chair. There was no examination table. Mashali asked the patient a few questions, while also emailing, texting, talking on the phone, and interviewing Russo.

Once Russo was hired, she was trained by two other physician assistants: Haley Riggs, who left shortly thereafter; and Nishi Patel. Mashali did not personally train Russo.

Prior to June 2012, Mashali saw all new patients and some patients for follow-up appointments. Mashali also performed spinal injections. The physician assistants only saw patients for follow-up appointments, generally on a monthly basis. The physician assistants saw approximately 30-35 patients per day. They readily admit that they spent little time with patients, mostly 5-15 minutes, due to the high volume of patients, and did not perform physical examinations.

Russo documented her patient encounters directly in CompuGroup and HealthFusion. Like the other physician assistants, she did not separately keep a shorthand memo for each encounter; CompuGroup and HealthFusion were the sole and complete repositories of their notes.

Russo documented only the things she observed without touching her patients, such as gate, speech, and mood. She

never listened to a patient's heart or lungs, examined eyes, ears, genitalia, or abdomen, and she never touched a patient, let alone conducted a thorough head-to-toe physical examination. She simply did not have the time to perform these services. Nevertheless, despite the obvious lack of medical services, Russo was instructed to bill CPT code 99214.

Russo observed Mashali with patients many times during her tenure at NEPA. Mashali generally spent 5 minutes or less with his patients and took personal phone calls during appointments. He never touched patients and, prior to June 2012, when the physician assistants directly confronted him about illegal billing, he had never even worn a stethoscope. Mashali came to work hours late, sometimes as late as 1:00 PM, when some patients had been waiting since 9:00 AM, resulting in overcrowded, standing-only waiting areas at NEPA offices, with patients spilling out onto the stairwell and parking lot areas.

In May 2012, Russo observed that someone had gone into one of her prior encounter notes and falsely added a full physical exam she had never performed. On June 7, 2012, she wrote an email, signed by two other physician assistants, to Mashali and Mashali's nephew, Moustafa Aboshady, stating that someone had falsely altered her encounter note without her permission and that it was illegal to do so:

| | |
|---|---|
| From: | jamie russo <jamie.leigh.russo@gmail.com> |
| To: | james voyer <jamesvoyer@gmail.com>; |
| | "dr. fathalla mashali" <fmashali@aol.com>; heather white |
| | <hlfletcher85@gmail.com>; moustafa aboshady |
| | <tifaaboshady@gmail.com>; nishi patel <nishi312@gmail.com> |
| | rachel mcneil <rmcneil0562@gmail.com> |
| Cc: | |
| Bcc: | |
| Subject: | Notes |
| Date: | Thu Jun 07 2012 13:53:50 EDT |
| Attachments: | |

Staff Members,

I am writing because I have recently noticed there are some notes written under my name that have been changed/edited without my knowledge (Ex. M███ M██████ from Worcester yesterday, my note I created on 5/9/12). I know exactly what I write in my notes so it is very easy for me to see when a note has been edited. This has happened to the other PAs notes as well. From our understanding, editing takes place when certain patients records are requested for legal purposes. It is Illegal to change/edit a note under someone else name. For example, it holds me responsible for a physical exam that I did not do, if the notes says that I have. I purposely do not include portions of the physical exam in my note that I did not do. If editing needs to take place to a note for whatever reason, it needs to be done through an addendum and signed by the person who edited it. I noticed that the EMR only records that the "System Manager" made an edit on such date at such time, it does not specify what in the note the "System Manager" changed. Nishi and Rachel both have notes that this has occurred with, it is very unsettling for us to see this being done because it puts our licenses in jeopardy. This needs to be resolved immediately as it is a serious offense. Please inform us of the actions taken to correct this.

Thank you,

Jamie Russo-DiGeorge
Nishi Patel
Rachel McNeil

**Exhibit 2**.[2]  Neither Mashali nor Aboshady responded to Russo's email, either by email or in person.

Russo will testify that the encounter note for M.M., dated May 9, 2012 (**Exhibit 9**) and the subject of her June 7, 2012

[2] "Exhibit ___" refers to the exhibit number the government intends to admit at trial, with an actual exhibit attached to this trial brief. Due to the volume of the referenced exhibits and personal identifiers contained herein, the government submits these exhibits separately and directly to the Court's Clerk, with a copy provided to the defense.

email, contains false information.  For example, the note documents a full physical exam, including cardiac, pulmonary, gastrointestinal, genitourinary, and musculoskeletal exams.  The note falsely contains a lengthy treatment plan, including Russo's purported discussion with the patient, information which she did not enter.  The same note also shows that Russo created it on May 9, 2012, the date she saw M.M., and that it was subsequently edited on May 29, 2012 by "System Administrator."[3]

In fact, on May 24, 2012, Nancy Gorton, a NEPA employee responsible for handling third party requests, emailed Aboshady, stating, "[W]e need you to view and make any updates to provide proof of a 99214 . . . in the following encounter notes.  [A NEPA biller] would then print them down and mail them all with Dr. Mashali's original signature."  (**Exhibit 7**).  One of the listed patients was M.M., for the date of service May 9, 2012. (*Id.*).  On May 29, 2012, Aboshady responded, including Mashali in the email: "All these DOS [date of service] are all set." (*Id.*).  Thus, not only did Russo point out to Mashali that someone falsified M.M.'s encounter note, but Mashali himself was

---

[3] The last page of the note contains the history of individuals who entered additional comments into the note, including "System Administrator," and the corresponding dates.  CompuGroup software maintained this information automatically.  It is available both through direct access to CompuGroup Cloud data and in the data provided in response to the execution of the search warrants.

part of the email chain with Aboshady that resulted in M.M.'s false encounter note.

Russo will testify to what her unaltered encounter notes looked like. For example, she will testify about M.M.'s encounter note for March 14, 2012, which, for the physical exam section, merely provides: "alert, oriented, well appearing male in no apparent distress, well-developed, well, nourished," describing "normal gate and station," among a few other cursory observations. (**Exhibit 10**). The encounter history shows that she created this note on March 14, 2012, and does not reflect any subsequent edits by "System Administrator." (*Id.*). This note is pristine.

In June 2012, the physician assistants, and specifically Rachel Placzek (McNeil at the time), confronted Mashali with three general allegations: (1) that he inappropriately billed for expansive and lengthy face-to-face encounters with patients, including physical examinations that did not take place; (2) the encounter notes were being falsely altered; and (3) that he billed for physician assistants' time as though they were MDs, obtaining approximately 15% more in payment. Mashali responded that, from then on, he would personally see every single patient after the patient was seen by a physician assistant.

On June 15, 2012, Mashali sent an email instructing the physician assistants that, starting immediately, he would see

every single patient, "review what ever [sic] is done[,] perform physical exam,[and] concur with the assessment and plan." (**Exhibit 51**).

Russo will testify that starting in June 2012 Mashali began to see every single patient, including patients already seen by a physician assistant. Russo estimated that the physician assistants saw 20-30 patients each per day, and that Mashali saw the same 90 or so patients who had already been seen by the physician assistants, in addition to the new patients, his own follow-up patients, and the patients on whom he performed spinal injections, which took 40 minutes to an hour each. Mashali also arrived to work up to four hours late. The result was cataclysmal: patients waited for hours to see Mashali, sometimes as late as 11:00 PM or midnight, yelling and threatening NEPA's staff in frustration, standing for hours with no place to sit, occupying stairwells and spilling outside the building; tension was palpable. The physician assistants still did not have the time to perform physical examinations, and Mashali even less so.

Russo observed that Mashali was "with it" in the sense that he intelligently carried conversations and properly responded to questions and surrounding circumstances.

### 2. Rachel Placzek and Nishi Patel, Physician Assistants

Placzek and Patel, both newly minted physician assistants at the time of joining NEPA, will provide testimony similar to Russo's. Placzek worked in NEPA between March and September 2012. Patel worked at NEPA from August 2011 through September 2012. During their tenure, they did not perform physical examinations and did not observe Mashali perform any physical examination, either. NEPA offices lacked such basic tools as a blood pressure cuff, a thermometer, an otoscope (to examine ears), or an examination table in the rooms they or Mashali saw patients.

On June 11, 2012, Placzek confronted Mashali in his Rhode Island office about the lack of physical examinations, improper billing, the false alteration of encounter notes, and the fact that she had never seen Mashali with a stethoscope. Mashali was initially defensive, stating he understood the regulations, but ultimately stated that he would do it her way. On June 15, 2012, as discussed above, Mashali instructed physician assistants by email that he would personally see every single patient.

Mashali retaliated against Placzeck by taking away her physician assistant duties and offering her a $12,000 severance package in August 2012, with the provision that "Employee

further agrees not to disclose any information regarding the operation concerning any aspect of Employer's business (except to the extent required by law)." Concerned that the proposed settlement would prevent her from disclosing billing and other improprieties to law enforcement, Placzeck declined to execute the agreement. When, in September 2012, she was relegated to receptionist duties, she quit.

According to Placzek, Mashali did not appear to suffer from any mental illness. He always understood questions posed to him and responded appropriately. He appeared to understand the rules for billing.

### 3. Christine Ramaci, Receptionist

Ramaci worked at NEPA's Holbrook office from February 2011 through August 2013, mainly as a receptionist. Ramaci will testify (along with other medical assistants/receptionists) that Mashali booked, and saw, over a 100 patients per day, and booked multiple patients per 20-minute time slots. Mashali always made space for new patients. Mashali never complained about the volume of patients, while the physician assistants insisted that only one of their patients be booked per each 20-minute time slot. Ramaci observed Mashali with patients multiple times per day because she handed him prescriptions for signature. Mashali would sit at his desk in front of a computer. She observed him

on the internet, browsing through emails and non-work related websites.  She never saw him touch or examine patients.

### 4.  Heather White, Registered Nurse

White began employment at NEPA as a fresh nursing school graduate.  She worked at multiple NEPA locations as a registered nurse from November 2010 through July 2012, mainly assisting Mashali with spinal injections.  She never saw Mashali touch a patient, other than for a spinal injection, or conduct a physical examination.

She was aware of the standing policy that no medical file could be released to a patient or a third party without Aboshady's approval.  She never saw Aboshady, who mainly worked out of the Rhode Island office, with patients.  Aboshady sat in a space without a door.  She saw Aboshady with patient files and looking at CompuGroup and HealthFusion files on his computer screen.  She observed that the majority of the notes she entered into patient files had been changed.  She also observed that the changes often occurred in connection with patient or third party requests for medical records.

Typically, White interacted with Mashali once or twice an hour.  She spent significantly more time with him during the injection procedures, which lasted 40 minutes to an hour.  She held vials for Mashali from which he drew medicine.  The procedure required Mashali to monitor the insertion point in the

spine in real-time through x-ray equipment. Mashali typically sedated patients before the procedure, while monitoring blood pressure and oxygen levels. The procedure required Mashali to perform, and keep track of, a number of complicated steps. She never observed Mashali nodding off. Mashali always appeared coherent and of sound mind. Mashali knew, and spoke about, current events, was aware which celebrity was having a baby, and discussed sports and his children. When the time came to pick a new provider for electronic medical records, Mashali appeared to rationally balance the positives against the negatives with respect to the competing products, and ultimately settled on HealthFusion.

### 5. Hollis Crowley, Massachusetts State Police Trooper

Trooper Crowley acted in an undercover capacity as a "patient," using the pseudonym "Nicole Casey." She saw Mashali on December 7, 2012; January 18, 2013; and February 15, 2013 as "Casey," while audio- and video- recording her encounters. These recordings show that Mashali did not perform services that were later documented in "Casey's" HealthFusion encounter notes. For example, each one of "Casey's" encounter notes contains a full physical examination and states, "I spent more than 20 minutes with the patient," while the recordings show that Mashali did not touch "Casey" even once during the encounters.

Similarly, the claims data for "Casey's" visits show that Mashali billed CPT code 99213.

### 6. Patients: Ds.C.; P.C., J.M., and others

The government intends to call patients to testify that they waited for hours to see Mashali; that Mashali's appointments lasted just a few minutes to issue new prescriptions for powerful narcotics; and that Mashali did not touch them or perform physical examinations. Some of the patients the government intends to call at trial—Ds.C., P.C., and J.M., are expressly listed in Counts 1-27 for the executions of the scheme, while others are not.

Ds.C. and P.C. are married. They will testify that Mashali saw them at the same time in the same office. Mashali never touched or examined them. Nevertheless, NEPA false encounter notes for Ds.C. and P.C. document lengthy encounters and physical exams.

On February 25, 2012, Aboshady sent an email to Nancy Gorton, responsible for releasing medical records to third parties and patients, stating: "[Ds.C.'s] chart is all set and pls find the attached the [sic] DOS that I fixed." (**Exhibit 215**). Attached to the email were five encounter notes for Ds.C. (*Id.*). They documented extensive services, including physical examinations, and stated that the provider, a physician assistant by the name of Haley Riggs, had spent "more than 25

minutes with the patient," "more than 35 minutes with the patient," and "more than 40 minutes with the patient." (*Id.*). However, the corresponding real encounter notes for Ds.C., which reside in CompuGroup Cloud, do not contain any of these services. (*See, e.g.,* **Exhibit 215.4**, encounter note for January 18, 2012). First, the real encounter note has Nishi Patel, and not Haley Riggs, as the provider. Second, the note is in a completely different format. Third, the physical exam section only refers to things one could observe without touching the patient. Fourth, the history of the note shows that it was not altered, as Patel created the note on January 18, 2012 with no subsequent edits by "System Administrator." A similar email from Aboshady with altered notes exists with respect to Ds.C.'s husband, P.C.[4]

### C. Counts 10-27, Health Care Fraud CPT Code 80102

Mashali improperly billed CPT code 80102 for confirmatory urine drug testing for every drug for every single patient because (1) he did not run any confirmatory tests whatsoever and lacked the necessary lab equipment to do so; (2) even if he had

---

[4] For the reasons alluded to in subsequent footnotes, these emails are admissible under the conspiracy and agency principles under Rule 801(d)(2). Mashali, for example, was clearly aware of the changes to M.M.'s May 9, 2012 encounter note, as he was copied on the email chain with Aboshady; and Russo, along with Placzek, clearly identified the problem to Mashali. Other evidence of agency and conspiracy becomes clear through the rest of this brief.

the proper lab equipment, a second, confirmatory test regardless of the initial test result would not have been medically necessary for every single initial test result for every single patient; (3) he billed for confirmatory testing before the initial test even took place; and (4) whatever urine testing was done had no value in any event, because (a) the urine specimens sat unrefrigerated, decomposing, for weeks and months before being tested; and (b) were tested on equipment which had not been validated.

### 1. Jandira Gomes, Eleanor Kern, Lab Technicians; Claire Abdelahad, State Inspector.

Gomes' first post-graduate job was at NEPA, after she obtained her medical assistant certificate in 2010. She worked there from 2010 until the end of February 2012. Although she had no formal training on lab equipment, Mashali assigned her to test urine for drugs in his Rhode Island office on the Siemens Dimension XPAND chemical analyzer. At that time, Mashali tested urine on the Dimension, and then sent it to outside company, LabUSA, for additional testing.

In November 2011, Mashali opened a new laboratory in the Holbrook office and purchased a second analyzer, from Carolina Liquid Chemistries, called Biolis24i. He hired a more experienced technician, Eleanor Kern, to run the Biolis, working alongside Gomes, who continued to run the Dimension.

Prior to testing urine specimens, both machines had to be validated for accuracy, precision, and consistency. (*See* Indictment ¶12, citing 42 C.F.R. § 493.1253). The laboratory also had to comply with the slew of other federal regulations geared toward patient safety, such as minimizing contamination of patient specimens, maintaining sufficient volume of chemical reagents to test urine, establishing and adhering to standard policies and operating procedures to ensure integrity of patient specimens, and, where applicable, complying with manufacturers' instructions. (Indictment ¶12).

One Friday in late October or early November 2011, Mashali unexpectedly called Kern and instructed her to start testing patients' urine the following Monday. Kern informed Mashali that she had not yet validated the Biolis machine.[5] Mashali overrode Kern and ordered her to start testing on Monday. Kern complied.

Mashali ordered the laboratory technicians to always test each patient's urine for all the drugs on the two machines, Dimension and Biolis, regardless of the results of the initial test. It did not matter which machine ran the first test. Kern and Gomes complied.

Both machines, Biolis and Dimension, used what is known as an enzyme-immunoassay method to discern the presence of drugs in

---

[5] The Dimension had never been validated, either.

urine.  While the two machines were obviously different, in that they were from two different manufacturers, their testing methodology was the same for purposes of compliance with Medicare regulations.  Each machine, using the immunoassay method, simply informed the provider whether the urine tested positive or negative for a particular drug. (*See* Indictment ¶¶12-13, 26-27).  That type of a result is called qualitative, because it is only capable of telling the provider whether the concentration of the measured substance exceeds a pre-programmed concentration threshold: in other words, whether the result is positive or negative.[6]  The tests on the Dimension and Biolis were unnecessarily redundant, because the testing method was the same.  The test results from both machines were scanned into CompuGroup and HealthFusion.

The Dimension tested urine for 10 drugs, and the Biolis tested urine for 15 drugs. (**Exhibit 21:** the smaller slip is the result from the Dimension, while the larger slip, with purported concentration values, is the result from the Biolis).  Prior to

---

[6]  The Biolis machine was advertised by Carolina Liquid Chemistries as being able to provide semi-quantitative results, in that while the Biolis, like the Dimension, could not measure the exact concentration value, it purported to provide an estimate.  Carolina Liquid Chemistries, however, made it very clear the test was not confirmatory and told the providers, in no uncertain terms, that if the provider wanted to confirm Biolis's test results, they had to use a different method, and strongly suggested the method should be a GC/MS- or LC/MS-type method, discussed below.

each test, the technicians entered into each machine each patient's biographical information and the date of urine collection, and the machines printed tests results incorporating this information. The machines automatically printed the date and time the test was run on the test result. For example, for the Biolis, the collection date is called "Draw Date" and is "12-06-11"; and the date of the test is called "Run Date" and is 03-13-12. (**Exhibit 21**). Thus, this urine sat for over three months before it was tested. Similarly, for the Dimension, the collection date is listed to the right of the patient's name as "12/5/11" and the test date is listed at the very top as "Mar 14, 2012," again showing a delay of over three months. (*Id.*).

The volume of urine specimens generated by NEPA's patients quickly overwhelmed the technicians, the laboratory machines, and the two lab refrigerators. Urine sat for months, unrefrigerated, turning dark, and permeating the laboratory space with a stale stench. Kern and Gomes placed 8x11 pieces of paper on the wall with the name of the month on which a particular batch of urine arrived at the lab. Kern took photographs of improper storage conditions before these conditions deteriorated even further. (**Exhibits 22 and 23**).

Mashali constantly fell behind paying for chemical reagents that were necessary to test urine. His failure to pay caused the manufacturers to place credit holds on the accounts and to

stop shipping the reagents until the credit holds cleared. The lack of timely payments exacerbated the backlog of urine. Mashali was well aware of this problem.

As far back as June 2011, before Mashali opened the lab in Holbrook, he was on notice that the lack of regents caused the urine to pile up. On June 13, 2011, Melinda Harris, one of the billers at NEPA, sent this email to Mashali:

| | |
|---|---|
| From: | melinda harris <msharris8585@gmail.com> |
| To: | fmashali@aol.com |
| Cc: | diane pimentel <dpimentel79@gmail.com>; ja.gomes88@gmail.com |
| Bcc: | |
| Subject: | Urine specimens |
| Date: | Mon Jun 13 2011 11:52:28 EDT |
| Attachments: | |

Hello,

We have been informed, there are specimens that have not been tested since 6/4/11 and still no reagents in yet. The last date they were run was 6/8/11. Jandhira spoke with Henry Shein's this morning and was told they would be going out this week. As you know, all of those have already been billed by us which is one problem. Next is what to do with these "old urines". Jandhira says the refridgerator is full.

(**Exhibit 30**). Harris specifically informed Mashali that the tests were "billed for" before any testing was even done.

On January 4, 2012, Mashali was put on notice again. James Voyer, the Office Administrator, forwarded Mashali an email from Gomes, dated January 4, 2012, that she had "placed a[n] order for reagents on [D]ecember 29, and [] ha[d]'t got them back yet." (**Exhibit 35**). Gomes expressed concern about getting

"backed up with urines." (*Id.*). In response, Mashali complained to Voyer that he did not have sufficient funds "without medicare payments." (*Id.*).[7]

Mashali also knew of these deplorable lab conditions because he dropped off the urine in the Holbrook laboratory from his other office locations and continually asked Kern when she would catch up with testing. Moreover, the space where he saw patients in Holbrook was just down the hall from the lab.

On February 7-8, 2012, a state laboratory inspector, Claire Abdelahad, inspected the Holbrook laboratory for compliance with federal regulations. Mashali instructed Voyer to move the urine to the basement. On the morning of the inspection, Voyer and Gomes did so. Abdelahad did not see the hidden urine during her inspection. After Abdelahad left, the new urine quickly began to accumulate in the laboratory space and surpassed in volume the amount of backlogged urine prior to the inspection. Mashali saw the backlog of urine prior to the inspection, the lack of backlogged urine during the inspection, and the new, significant urine pile-up after the inspection. Mashali continued to instruct his lab technicians to test all the urine. Gomes felt traumatized by the experience and left NEPA by the end of February 2012.

---

[7] Yet, in 2012 Mashali wired over a $1M to Egypt and spent tremendous sums on renovating his luxurious Dover property.

Even without seeing the decomposing, backlogged urine, Abdelahad failed the laboratory for very serious violations, listing lengthy and troubling findings of noncompliance with numerous regulations, including the lack of equipment validation. Mashali did not correct the clearly listed lab conditions, and the Center for Medicare and Medicaid Services (CMS) shut the lab down on November 30, 2012 and upheld its "[c]ancellation of the laboratory's approval to receive Medicare and Medicaid payments effectuated May 7, 2012." (**Exhibit 88**).

Aside from the lack of equipment validation, Mashali did not conduct, nor had the equipment to conduct, confirmatory testing in the first place. Kern will testify, based on her lengthy experience in the field (and consistent with the government's retained expert and CPT Manual defining CPT code 80102) that neither the Biolis nor the Dimension produced confirmatory results. A confirmatory test had to be done using a different methodology from the original test, typically using a far more superior method called GC/MS or LC/MS.[8]  In fact, the

---

[8]    Gas Chromotography/Mass Spectrometry and Liquid Chromotography/Mass Spectrometry each consist of two stages. The first stage isolates the molecules of the drug to be tested, while the second measures the exact concentration of the molecules and, hence, of the drug in urine.  These testing methods are the gold standard in the industry for not only confirming urine test results, but for producing the exact measurement of any chemical compound in clinical and non-clinical settings.  The lab equipment that utilizes a GC/MS or LC/MS method is significantly more expensive than the

manufacturer's instructions for the Biolis reagents specifically stated:

> The assay provides only a preliminary analytical result. A more specific alternative chemical method must be used in order to obtain a confirmed analytical result. Chromotography/Mass Spectrometry (GC/MS or LC/MS) is the preferred confirmatory method.

The manufacturer's instructions for the Dimension reagents contained the same information.

Mashali was keenly aware that he did not have the equipment to conduct, and bill for, confirmatory testing. Throughout the second half or 2011 and through 2012, Mashali contemplated purchasing an LC/MS-type machine, and then purchased, but never used, one such machine manufactured by Shimadzu. Sometime in the spring of 2012, Mashali purchased another LC/MS-type machine, manufactured by Waters Technologies. The Waters machine was the only LC/MS machine on which Mashali's laboratory tested patient urine specimens, but only during a very limited time period from October 2012 until sometime in December 2012, when CMS shut down the laboratory. All urine prior to October 2012 was tested only on the Dimension and the Biolis machines,

---

immunoassay machines such as the Dimension and Biolis, which merely screen for the presence of drugs.

which provided initial screening results using the same immunoassay method.[9,10]

## 2. Lisa Manfredi, Sales, Agilent Technologies

Lisa Manfredi was in sales at Agilent Technologies. In 2011, Mashali attempted to purchase from her an LC/MS machine for urine drug testing. Manfredi will testify that Mashali was conversant in LC/MS technology and understood that it was used for confirmatory testing. Although Mashali did not ultimately purchase an LC/MS machine from her, she had multiple conversations with him face-to-face and over email in 2011 and 2012 about LC/MS technology. For example, as early as July 22,

---

[9] The government will call two experts in its case-in-chief: Dr. Christopher Gillian, who is an expert in pain management; and Dr. James Flood, the laboratory director at the Massachusetts General Hospital, who is an expert in clinical testing and compliance. Dr. Gillian will establish the baseline for treating patients in the chronic pain management setting, such as the type and frequency of examinations the provider would typically conduct; the importance of maintaining integrity of patient medical records; the necessity, requirements, and frequency of urine drug testing, including performing confirmatory testing; and whether Mashali has met this baseline based on Dr. Gillian's review of pertinent records. Dr. Flood will opine that Mashali did not have the equipment to perform confirmatory testing; that even if he had such equipment, automatic confirmations for all positive and negative results were not medically necessary; and that, in any event, Mashali's tests were pointless because they were performed on stale, decomposing urine using lab equipment that had not been validated.

[10] The allegations in the indictment for fraudulent billing for CPT code 80102 end in October 2012 and do not overlap with the time period the Waters LC/MS machine was operational.

2011, in an email to Malfredi, Mashali demonstrated his keen understanding that MS technology was used to confirm the results of an immunoassay test: "As we discussed earlier today[,] I am looking for a mass spec system that would confirm drugs of abuse results obtained by immunoassay as required by regulations . . . ." **(Exhibit 31)**.

      **D.   OTHER EVIDENCE FOR COUNTS 1-27.**

           **1.   Melinda Harris and Diane Pimentel, Billers**

Mashali employed Melinda Harris as the head biller from 2007 through December 2011. Diane Pimentel[11] worked for Mashali between 2007 until NEPA shut down in the fall 2013, first in data entry and then as the head biller. Mashali directed Harris and Pimentel as to exactly what to bill and incessantly reviewed and discussed the explanations of benefits sent by insurers that indicated either the declination of payment or the allowance of payment and the amount.

Pimentel and Harris will testify that Mashali had a nuanced understanding of billing codes and micromanaged billing at NEPA. Prior to NEPA, Mashali owned and operated his own billing company in East Providence, Rhode Island, where he billed for anesthesiologists, pain management, and critical care doctors, and where Pimentel first worked for Mashali. In that capacity, according to Pimentel, Mashali employed numerous billing

---

[11] Pimentel will testify pursuant to a letter of immunity.

personnel with whom he had constantly conversed about payments received from or declined by the insurers.

According to Pimentel and Harris, Mashali approved charging for 99213, 99214, and 80102 codes at NEPA and understood what those codes meant. In her office, Pimentel had hung on the wall a handwritten list of codes that Mashali had approved, and which Mashali had seen. (**Exhibit 16**). The codes are 99214 for face-to-face encounters, with the rest of the codes comprising urine testing. [12]

Mashali instructed Pimentel and Harris to bill for urine when it was collected and not when the tests were actually done; moreover, Mashali overruled Pimentel's suggestion to the

---

[12] G0431 is a code for a high-complexity urine drug screening test. Presumably Mashali billed G0431 for the Dimension machine. However, neither the Dimension nor the Biolis machine was of high complexity, and the proper code should have been G0434, which provided a smaller reimbursement. Per CPT Manual, codes 82520, 82145, and the rest of the codes starting with an "8" listed in **Exhibit 16** are for quantitative testing (that is, where the measurement of the drug is exact) by LC/MS and GC/MS-type technology. Presumably Mashali attributed these "8"-series codes to the Biolis machine. Finally, Mashali billed the confirmatory code 80102, for which he lacked the equipment entirely. To put it another way, Mashali conducted only two tests, one on the Dimension and the other on the Biolis machine. Although these two tests were utterly useless for the reasons described, Mashali can at least establish that two tests were done, seemingly covering G0431 and "8"-type quantitative codes. Significantly, however, Mashali billed code 80102 for a third, and entirely separate, test. Yet, there was no third test at all done by his lab. Thus, Mashali billed code 80102 for a test that simply did not exist, and, for the reasons that follow, he knew that he billed for a non-existent test.

contrary, when he ordered her to bill confirmatory code 80102 before any screening tests were even run.  As early as March 8, 2011, Harris forwarded Mashali an email from a reimbursement specialist at Siemens informing Mashali that confirmatory code 80102 was appropriate for "positive screens"[13] and that "[t]he facility would need to be able to perform the necessary confirmatory testing which is usually by a different methodology from the original screen." (**Exhibit 29**).

According to Pimentel, Mashali instructed her to bill certain codes just to see if insurance companies would pay for them, including code 80102.  On November 16, 2011, when the Holbrook lab just went live, Harris emailed Mashali, copying Pimentel: "Now do you want the 80102 still billed?  James [Voyer] was unsure." (**Exhibit 33**).  Mashali responded:

---

[13] She probably meant "positive screens" for street drugs.  There is rarely a reason to confirm a positive result for a medication the patient is prescribed.

| | |
|---|---|
| From: | melinda harris <msharris8585@gmail.com> |
| To: | fmashali@aol.com |
| Cc: | dpimentel79@gmail.com |
| Bcc: | |
| Subject: | Re: Fusion / Alteer |
| Date: | Thu Nov 17 2011 07:48:24 EST |
| Attachments: | |

Will do!!

On Thu, Nov 17, 2011 at 12:13 AM, <fmashali@aol.com> wrote:

> My understanding from Vince is that those codes replace G0431 ,still we
> bill confirmation by mass spec under 80102,I believe we should try those
> codes combined with 80102 on mass health web site ,see if they pay ,also
> try few medicare patients and different insurance patients and see what
> happens ,if we get paid ,then we use it on all patients.
> In essence try it on  1 or 2 patients from different insurances ,if it
> works then go ahead .
> thx
> fathalla

(*Id.*).[14]   When Mashali said, "bill confirmation by mass spec

under 80102," he clearly knew that (1) code 80102 was tied to a

MS-type test; and that (2) he did not have a running LC/MS or

GC/MS-type machine.   He was merely testing the waters to see if

insurance companies would bite without checking the equipment he

---

[14] "Vince" is Vincent Schettino, a sales reprehensive from
Carolina Liquid Chemistries, who sold the Biolis machine to
Mashali.   Schettino will testify at trial.   Mashali asked
Schettino to review the explanation of benefits on numerous
occasions, and Schettino on multiple occasions told Mashali that
he illegally billed code 80102.   Mashali said he would take care
of it but never did.   Schettino also handled credit holds for
Biolis reagents.   Mashali refused to send a check, so once a
month Schettino drove from New York to one of Mashali's offices
to pick up the check in hand and drop it off into a mailbox just
around the corner.   When he dropped the checked into the
mailbox, he called Carolina Liquid Chemistries to release the
reagents.

was using. They did bite, to the tune of over $600,000 for Medicare alone.

In October 2012, Mashali finally had an operating LC/MS machine from Waters. On October 24, 2012, in response to an email from Pimentel that he should not have been billing for 80102 confirmatory tests, Mashali responded: "now we have 3 machines biolis, Olympus,[] and LCMS which is confirmation 80102[,] so let us talk tomorrow." (**Exhibit 37**). Once again, Mashali showed his keen awareness that the confirmation code 80102 was tied to LC/MS-type method and that he did not have such a machine prior to October 2012; now that he did have such a machine, he tried justifying the 80102 charge to Pimentel going forward, but did not suggest that NEPA conduct a self-audit and return the 80102 overpayment back to the insurers.

Pimentel and Harris were aware of, and communicated with, Mashali's staff in Cairo, Egypt. The Cairo office was responsible for billing and had access to CompuGroup and HealthFusion records. One employee from the Cairo Office, known as "Joseph" Ashraf, came to the U.S. NEPA offices for months at a time to help with billing.

Both Pimentel and Harris knew that Aboshady was responsible for releasing medical records to patients and third parties and for adding information into patient files. Pimentel heard Aboshady complain that he did not know what to write in a

patient's encounter note because he never saw that patient. Harris observed stacks of patient medical records four feet high in Aboshady's office even though he did not see or treat any patients.[15] Aboshady told Harris that he had to update the notes because that is what he was told to do. Aboshady completed information for the dates of service and entered prior history. Harris knew that editing often took place in response to the request for patient records by outside parties. Harris knew that Mashali had instructed the NEPA staff that no patient records could leave the office until Aboshady approved their release.

Pimentel knew that Mashali's and physician assistants' encounter notes were essentially empty, because, she thought, they had no time to enter the necessary information given the volume of patients. Pimentel informed Mashali that the notes appeared blank, and he responded that that was why he had the Cairo office. Pimentel specifically recalled communicating with Karim in the Cairo office, who was a neurologist and worked with medical notes. There were instances where the notes clearly did not reflect the charges sent to insurance companies, and Pimentel contacted Karim. When the Cairo office finished

---

[15] There is evidence that Aboshady occasionally saw patients applying for SSDI to help them with their application. Aboshady was a medical resident at the time at Roger Williams University in Providence, RI, and was prohibited from treating patients.

editing the notes, they sent an email to Pimentel stating that the notes were done.

### 2. Christine Ensko, Fraud Investigation, BCBS MA

In the spring of 2012, Christine Ensko, Fraud Investigator for Blue Cross Blue Shield Massachusetts, participated in the audit process of NEPA's claims. On May 31, 2012, Ensko issued a lengthy list of findings for improper billing, inclusive of codes 99213, 99214, and 80102. (**Exhibit 39**). Prior to sending this letter to Mashali, she met him in person at her office. Mashali's attorney was present. During the meeting, Ensko covered and explained in detail to Mashali every one of her findings. Under the finding "2.1 Misuse of Electronic Medical Records Templates," she informed Mashali that NEPA's notes were mere clones from one patient visit to another. Under the finding "2.2 Lack of Sufficient Documentation for E/M Services," she informed Mashali that the "electronic medical records did not contain sufficient information to support the level of service billed on any given claim" and that, even when certain information for physical examinations was present, it "was an exact duplicate of the previous encounter." Under the finding "9. Unwarranted Urine Drug Screen Confirmation Testing (CPT 80102)," she wrote that it was "inappropriate to bill confirmation testing at the same frequency as the qualitative [] method regardless of result," and that "[i]t is inappropriate to

bill a confirmation test with a quantitative testing as quantitative testing produces the specific numerical amount of an analyte in a specimen."[16] BCBS MA identified the overall overpayment at $449,480.46, which it reduced slightly at a later date, but it kept the overpayment for urine drug testing at 100%.[17]

---

[16] Ensko denied confirmatory 80102 codes without even being made aware that Mashali had no equipment to conduct confirmatory tests in the first place. She indicated that one cannot bill for confirmatory and quantitative testing together every single time because, by definition, a quantitative test, such as by an LC/MS or a GC/MS method, will separate out the chemical compound in question and measure it precisely; there is nothing to confirm and no point of doing a lesser precision test at the same time, every single time.

[17] The government will also call one witness (Jean Stone) from CMS and one witness from UnitedHealthCare, the two entities named in the indictment, to briefly explain (but not restate each other's testimony) the CPT codes in question and how their payments to NEPA would have been affected had they known the truth about the services or the lack of services at NEPA.

3. **Falsification of Records for Patient J.Z., Named in Counts 24-27: "Joseph" Ashraf[18], Nancy Gorton, Record Keeper from the RI Office of the Medical Examiner, Record Keeper from the Rhode Island Board of Licensure and Discipline.**

Mashali had a contingent of employees in the Cairo office responsible for creating fake medical records in response to third party requests and also on an ongoing basis. On December 28, 2012, in connection with audits by multiple insurance companies, Ashraf received an email generated by an employee of the Cairo office, with the subject line "Action Plan," which identified the Cairo office employees and their responsibilities for generating patient charts. (**Exhibit 150**). "Medical Team A" was dedicated to "[c]learing medical history June to date." (*Id.*). Considering the date of the email was December 28, Team A was going after medical records that were six months old. "Medical Team B" worked on "[d]aily notes." (*Id.*). Medical Team A had to complete "75" notes per day, while Team B had to complete "60" notes per day. (*Id.*). Karim was "[i]n [c]harge."

---

[18] Ashraf is a national of Egypt. He intends to travel to the United States to testify at this trial. Even without Ashraf, however, the emails cited below are admissible because the key emails involve Mashali. *See* Fed. R. Evid. 801(d)(2)(A-B) (statement made or adopted by a party opponent). For the remainder of the emails, independent evidence exists that the individuals were Mashali's employees who acted within the scope of their employment, *see* Fed. R. Evid. 801(d)(2)(C-D); and that Mashali, Aboshady, and the staff in the Cairo office conspired to falsify patient records, in violation of 18 U.S.C. § 1035, and that the statements were in furtherance of the conspiracy, *see* Fed. R. Evid. 801(d)(2)(E).

(*Id.*).  Mohamed was assigned to "Med[ical] Task Force" to perform "sp[ecial] [p]r[o]j[e]cts." (*Id.*).

On December 28, 2012, Karim emailed a version of the "action plan" to Mashali, with the subject line, "MEDICAL TEAM PLAN." (**Exhibit 151**).  It stated, "Please kindly find the attached file for medical team plan [] Cairo office."  (*Id.*). The attached chart listed Teams A, B, and C.  (*Id.*).[19]

Mashali, Aboshady, and the Cairo office created false encounter notes and urine drug test results when they released medical records for patient J.Z., listed in Counts 24-27 for confirmatory code 80102.[20]  On November 1, 2012 J.Z. died from an overdose.  Just after J.Z.'s death, UnitedHealthCare, listed in the indictment as the victim, conducted an audit of the claims submitted on her behalf.  On November 28, 2012, Karim, a neurologist employed in the Cairo office and "[i]n charge" of its Medical Teams, emailed Aboshady and Mashali, asking Aboshady to "review the following charts for UHC project," including a chart for J.Z.  (**Exhibit 128**).  On November 30, 2012, Ashraf emailed Aboshady and Mashali the list of "All Medical Records done by Karim."  (**Exhibit 129**).  The attached chart listed the

---

[19] **Exhibits 150 and 151** are both admissible under Rule 801(d)(2) (statement/adaptation by party opponent; and statement by a servant within the scope of employment).

[20] This evidence is admissible because it goes to the proof of the charged scheme to defraud and to establish the consciousness of guilt.

patients, dates of service, and stated for each patient: "Notes Done." On December 2, 2012, consistent with Gorton's and Pimentel's testimony, Aboshady emailed Gorton (but not Mashali) that "All Those DOS are all set in Health Fusion," again attaching every patient's date of service and the status of the notes as "Notes Done." (**Exhibit 130**). J.Z. is listed as one of the patients. (*Id.*).[21]

On Friday, January 18, 2013, Gorton emailed Aboshady (but not Mashali), stating that the Rhode Island Medical Examiner had requested J.Z.'s medical files. (**Exhibit 131**). Aboshady forwarded the request to Karim in the Cairo office, stating the records had "to be done on Monday in alteer [another name for CompuGroup] and health fusion." (*Id.*). On Monday, January 21, 2013, Karim emailed Aboshady and Mashali, asking Aboshady to "review the following charts," including for J.Z. (**Exhibit 132**). Karim also stated that "[M]ohamed finished urine for 8 patients." (*Id.*). Certain comments in the email indicate the clear lack of any knowledge by the Cairo office employees about the patients themselves and the medical services actually provided to them. For example, the comments include: "written

---

[21] These email exchanges show that Mashali knew that the Cairo office was editing notes in response to audits to justify the charges and bear on the admissibility of similar email exchanges, even where Mashali is not part of the email chain, under Rule 801(d)(2)(conspiracy/agency).

testicular hypofunction, please note that the patient is a female"; and "wrong, pt is female and written received testo[sterone] inj[ection]." (*Id.*).[22]

On February 8, 2013, Mashali emailed Aboshady J.Z.'s death certificate. (**Exhibit 133**).

In the meantime, the Rhode Island Board of Medical Licensure and Discipline ("the Board") began an investigation into overdose deaths of NEPA patients. On Thursday, April 4, 2013, Ashraf forward to Karim, Mashali, and Aboshady a subpoena from the Board seeking the deceased patients' records, including for J.Z. (**Exhibit 134**). Ashraf wrote:

| | |
|---|---|
| From: | joseph jp <ashraf505@gmail.com> |
| To: | mehdawy <mohamekarim@gmail.com> |
| Cc: | moustafa aboshady <tifaaboshady@gmail.com>; fmashali@aol.com |
| Bcc: | |
| Subject: | Medical to be verified ASAP |
| Date: | Thu Apr 04 2013 15:12:08 EDT |
| Attachments: | 208282182575_2013.04.04_15.07.40.pdf |

Hi Karim,

Per Dr Mashali's request, please verify the Medical Notes for the attached Pt's list ASAP as we need them by tomorrow's noon. and send back to Moustafa when you done.

(*Id.*).[23]

---

[22] "Mohamed" was listed in the Action Plan under special projects and was responsible for backdating urines. This again bears on the admissibility of other similar emails under Rule 802(d)(2)(conspiracy/agency), even if Mashali is not on the email.

[23] This again bears on the admissibility of other similar emails without Mashali under Rule 802(d)(2)(conspiracy/agency).

On Friday, April 5, 2013, Ashraf emailed Aboshady all the claims that NEPA had submitted for the deceased patients, including for J.Z. (**Exhibit 137**). The claims for J.Z. included 99214 and 80102 codes, along with the other urine test codes. (*Id.*). Thus, Mashali clearly was concerned about releasing J.Z.'s and other deceased patients' medical files if they did not reflect medical services for which Mashali already billed.

Still on Friday, April 5, 2013, Karim emailed Mashali and Aboshady that certain files for the deceased patients were "all done and ready to be reviewed." (**Exhibit 138**). Less than five hours later, Aboshady forwarded this email to Mashali, joking: "Karim wants to treat depression with Colace. DOS 4/18/2011."[24] (*Id.*). Twenty-one minutes later, Mashali sent this flippant reply: "And constipation with Prozac." (*Id.*).[25]

---

[24] Colace is indicated to relieve constipation.

[25] The Board was investigating the causes of death of NEPA's patients. The accuracy of the deceased patients' medical records was obviously of paramount importance. The jocular banter between Mashali and Aboshady reflects not only their awareness that the encounter notes were fraudulently altered, but also their callous disregard for patient safety and the professional medial oath to do no harm. The fraudulent alteration of J.Z.'s medical records, in connection with the defendant's obvious concern for the codes for which Mashali billed for the deceased patients, is part and parcel of the scheme to defraud and the mail fraud conspiracy charged in the indictment. Moreover, this particular email exchange again justifies the admission into evidence of other similar emails under Rule 802(d)(2)(conspiracy/agency).

Late into the evening, on Friday, April 5, 2013, Ashraf, who at the time was in Mashali's Rhode Island office working alongside Aboshady, sent an email with the subject line "Urgent Work To Be Done" to the Cairo office, directing that two deceased patients, J.Z. and B.J., had "to be done by Saturday or Sunday," and that "the most important [thing] is to call Moustafa [Aboshady] at his cell . . . before working in the charts." (**Exhibit 139**).

On Saturday, April 6, 2013, an employee from the Cairo office named "Doha" emailed Aboshady a supposed patient chart for J.Z. for May 27, 2011, under the subject line "sample." (**Exhibit 140**). This chart contained a full physical examination and claimed that Mashali had "spent more than 60 minutes with the patient." (*Id.*). The patient chart lacked CPT code 80102, even though NEPA had charged for it. (*Id.*). Later that day, Doha sent Aboshady additional patient encounter notes for J.Z., from May 2011 through May 2012. (**Exhibits 141, 142**). These encounter notes similarly documented extensive services and face-to-face interactions with the patient.

J.Z.'s original patient encounter note for January 12, 2012, had been scanned into HealthFusion. (**Exhibit 169.06**). It does not contain any medical services, let alone a full physical examination and a lengthy face-to-face discussion. (*Id.*). It

does, however, contain claims for CPT codes 99214, 80102, and the quantitative urine drug test codes. (*Id.*).

J.Z.'s patient encounter note for January 12, 2012, residing in CompuGroup Cloud—that is, the up-to-date version of the encounter note—shows that it was created on January 1, 2012, and subsequently edited a year later, on January 21, 2013, corresponding with the email from Karim on January 21, 2013 that J.Z.'s notes were done in connection with the Medical Examiner's request. (*Id.*). The CompuGroup Cloud version of the note, after being edited by Karim and reviewed by Aboshady, contains a full-fledged physical examination and the statement that Mashali "spent more than 30 minutes with the patient." (*Id.*). The version of J.Z.'s note provided to the Medical Examiner's Office reflects the falsified version in CompuGroup Cloud (**Exhibit 169.14**) and stands in stark contrast with the original note scanned into HealthFusion prior to January 21, 2013, which lacked a single medical service (**Exhibit 169.06**).

The version of J.Z.'s note provided to the Board reflects what Aboshady received from Doha in the Cairo Office on April 6, 2012. (**Exhibit 169.09**). It differs drastically from what NEPA had provided to the Medical Examiner and from J.Z.s' original version of the note stored in HealthFusion. It also lacks the confirmatory code 80102 as well as the quantitative codes.

The urine test results for J.Z. were also falsified. J.Z's original urine test results for January 12, 2012, obtained from CompuGroup Cloud, show that her urine was tested on March 9, 2012, almost two months later. (**Exhibits 169.04**). The urine test results that NEPA provided to the Board, on the other hand, state that the test happened on the Dimension the same day the urine was collected on January 12, 2012, and the next day on the Biolis. (**Exhibits 169.10 & 169.11**). Significantly, the altered test results contain Mashali's handwritten notes (stating "consistent & compliant," among other things), suggesting he had reviewed these (fake) test results at the time of the test and supposedly identified the drugs for which J.Z. tested positive.[26]

---

[26] There are obvious discrepancies between the real and fake test results. For example, AMPH is "2171H" on the real result (**Exhibit 169.04**) and "2017H" on the fake one (**Exhibit 169.10**); OP300 is "250" (low) on the real result and "456H" (high) on the fake one; the street address on the real test result is "169 North Franklin Street," while it is "168 North Franklin Street" on the fake one; J.Z.'s dates of birth mismatch between the results; the time of the sample collection is "9:23 AM" on the real test and "9:16 AM" on the fake test, yet the time of the test has stayed the same, "10:36 AM," even though the test date itself was backdated from March 9, 2012 to January 13, 2012. This evidence again points to Mashali's direct knowledge of the Cairo office's function and heavily favors admitting any emails into evidence bearing on the Cairo office's falsification of medical records under Rule 802(d)(2).

**III. MAIL FRAUD CONSPIRACY, COUNT 28, 18 U.S.C. § 1349**

   **A. Law and Elements of the Offense**

   The government must show that:

   **First**: two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit mail fraud under 18 U.S.C. § 1341; and that

   **Second**, the defendant knew the unlawful purpose of the plan and willfully joined in it.

   There is no requirement that the government must prove an overt act.

   To prove mail fraud, in violation of 18 U.S.C. § 1341, the government must establish the following elements:

   **First**, that there was a scheme, substantially as charged in the indictment, to defraud or to obtain money or property by means of false or fraudulent pretenses;

   **Second**, that the scheme to defraud involved the misrepresentation or concealment of a material fact or matter or the scheme to obtain money or property by means of false or fraudulent pretenses involved a false statement, assertion, half-truth or knowing concealment concerning a material fact or matter;

   **Third**, that the defendant knowingly and willfully participated in this scheme with the intent to defraud; and

   **Fourth**, that for the purpose of executing the scheme or in furtherance of the scheme, the defendant caused the United States mail to be used, or it was reasonably foreseeable that the United States mail would be used, on or about the date alleged.

**B. EVIDENCE**

    **1.    Ashraf, Gorton, Pimentel, and Keeper of Records from StrategicHealthSolutions**

By a letter dated March 8, 2013, StrategicHealthSolutions, LLC, located in Omaha, Nebraska, acting on behalf of CMS, informed Mashali that it was retained by CMS to conduct a post-payment medical review of the past claims he had submitted to Medicare for evaluation and management CPT code 99214. The letter identified 40 Medicare claims Mashali had submitted in the years 2011 and 2012 and requested him to provide supporting information for each claim, including "[m]edical records documentation from the treating physician or nonphysician practitioner to support the evaluation and management services for the date of services billed" and "[a]ny and all other documentation to support the level of evaluation and management service billed (i.e., review of laboratory, radiology.")  The letter informed MASHALI that "[f]ailure to comply with this request could result in potential denial and recoupment of payment previously issued."  Among the 40 claims were patients K.B. and J.M.

On March 13, 2013, Pimentel forwarded the audit letter to Mashali and Aboshady, with the subject line, "CMS AUDIT RECEIVED 03/13/13 AND DUE APRIL 5TH THE LATEST." (**Exhibit 64**).  Later that day, Aboshady forwarded the audit letter to Karim in the

Cairo office, stating, "Let us create a list for this audit and plan to finish it on time."

On March 15, 2013, Karim emailed Aboshady and Mashali, stating, "[D]ear Moustafa[,] plz kindly review the following charts for today." (**Exhibit 65**). The list included a number of patients "From CMS" audit and "CMS PROJECT" audit. (*Id.*).[27]

On April 1, 2013, Aboshady emailed Pimentel and Gorton, stating, "The whole audit is all set except" a few listed patients. (**Exhibit 66**). Aboshady continued, "They are looking for the visit, urine test and radiology. Please make sure you print the urine and have him sign it." (*Id.*).[28]

Also on April 1, 2013, Aboshady emailed Ashraf and Mohamed (special projects) in Egypt, "Can you please start doing the urine for those patient [sic]. The audit is due on april 5th and we have to get it out. There is no need to do the order sheets."[29] (**Exhibit 69**). On April 3, 2013, Mohamed from the

---

[27] This once again bears on the admissibility of similar emails under Rule 802(d)(2).

[28] In conjunction with Mashali's signatures on fake urine test results and other similar emails where Mashali was copied, this email should also be admissible under Rule 802(d)(2).

[29] Sometimes the Cairo office also created fake requisition sheets, something that Mashali should have submitted to his laboratory technicians with each request for a urine drug test, identifying the exact drugs to test for, as opposed to having a standing policy that the lab would test every single urine specimen for every drug regardless of the history of the patient or the medication the patient was on. For example, in response

Cairo office emailed Aboshady 30 sets of false urine drug reports, each consisting of what appeared to be a printout from the Dimension and another printout from the Biolis machine. (*Id.*).

Ashraf was present in Mashali's Rhode Island office at the time of the audit and worked with Aboshady in coordinating the response to StrategicHealthSolutions with fake encounter notes and urine test results. Ashraf delivered the fake urine test results to Mashali for his signature.

On April 8, 2013, StrategicHealthSolutions received a package from NEPA with documents allegedly supporting the 40 audited claims. StrategicHealthSolutions provided the mailing label on the envelope, which shows the package was sent by certified mail via United States Postal Service, postmarked April 4, 2013. The label bore the sender address as Fathalla Mashali, 10 Converse Place, Suite 4, Winchester, MA 01890 (NEPA Winchester location) and the recipient address as StrategicHealthSolutions, LLC, 11808 Grant St, 2nd Floor, Omaha,

---

to the audit conducted by the Neighborhood Health Plan, Mohamed emailed Aboshady not only the fake urine test results (***.doc files), but also the corresponding, and fake, requisition sheets (***.pdf files). (**Exhibit 13**). The lab technicians will testify that the requisition sheets in Exhibit 13 did not exist at NEPA. Exhibit 13 also demonstrates the sheer volume of fraudulent documents generated by the Cairo office to cover up the lack of proper and compliant medical services at NEPA.

NE 68164-3602, Attn: Supplement Medical. (*See, e.g.*, **Exhibit 74**).

### 2.    Patient K.B.

NEPA produced fake encounter notes and urine test results for the 40 claims requested by StrategicHealthSolutions.  For example, for patient K.B., the government has the original urine drug tests stored from CompuGroup, with one test on the Dimension, in July 2011, and a follow-up test by LabUSA. (**Exhibit 80**).

Before Mashali opened a laboratory in Holbrook and purchased the Dimension, he had Gomes conduct one test on the Dimension, in the Rhode Island office, and another by a third-party, LabUSA.  LabUSA test results looked very different from the results obtained from the Biolis.  First, a LabUSA result states "LabUSA" right at the top. (*Id.*).  Second, the layout of the LabUSA test result is very different from the layout of the Biolis test result.  Third, the LabUSA result contains an admonition at the bottom, stating, "A confirmation by GC/MS is recommended to verify positive results.  Confirmation testing is available upon request."[30]  (*Id.*).

---

[30] This is yet another indication that months before Mashali opened his laboratory in Holbrook and started billing the confirmatory code 80102, he knew the confirmation should have been by GC/MS-type equipment, which he also knew he lacked.

The test results that NEPA produced to StrategicHealthSolutions, however, differed drastically from the originals. (**Exhibit 74**). First, in its haste to create fake urine test results, the Cairo office mistakenly produced a false test result for the Biolis machine and not for LabUSA; yet, back in July 2012, Mashali was months away from even purchasing the Biolis.[31] Second, the fake test results contained inaccurate information that would have been material to the provider. For example, the real test result from LabUSA (**Exhibit 80**) has cannabis at "148" and "positive," while the fake Biolis result has THC at "0" (**Exhibit 74**). Significantly, Mashali signed the fake Biolis urine test result for release to StrategicHealthSolutions, falsely suggesting he had reviewed this result when it supposedly issued (it did not issue at all— there was no Biolis machine, and Mashali knew that). (*Id.*).

Moreover, as K.B. will testify, the encounter note produced to StrategicHealthSolutions contained a false physical examination and other medical services that did not take place.[32]

---

[31] There was no real reason not to submit the real urine test results for July 2012 from LabUSA. At the time, the urine was tested on time, but in their haste to create and produce fake urine test results, Mashali and his Cairo office did not pay attention to what information the real patient files actually contained.

[32] The government has not been able to obtain the original encounter note for K.B. for this date of service.

(*Id.*).   Incredulously, K.B.'s note, created by a physician assistant way back in July 2011, was edited almost two years later by the Cairo office, by people who had absolutely no information to go on as to what happened two years ago when the encounter took place.  (*Id.*).

### 3. Patient J.M.[33], Christopher Hughes, CBP

The government executed a search warrant with CompuGroup at the end of March 2012, right before NEPA altered patient files in response to the CMS audit.  The search warrant records preserved, in many instances, the original encounter notes.

J.M.'s CompuGroup encounter note for March 14, 2012, obtained pursuant to the search warrant, shows a complete lack of medical services: there is no physical examination or discussion with the patient.  (**Exhibit 81**).  J.M.'s note produced to StrategicHealthSolutions, however, contains a complete, detailed physical examination, treatment plan, and patient discussion, along with the statement, "I spent more than 30 minutes with the patient."  (**Exhibit 75**).  The note also states that Mashali reviewed the physician assistant's plan and "reviewed and discussed the plan with the patient." (*Id.*).

The note also contains a fake electronic signature by Mashali "on 03/14/2012 at 5:12 PM."  (*Id.*). Christopher Hughes, from CBP, will testify to travel records that show Mashali

---

[33] The government does not expect that J.M. will testify.

traveling to the Bahamas between approximately March 10 and March 18, 2012. Mashali was not even in the United States when he purportedly saw J.M. and electronically signed the note.

The urine test results, not included here, are similarly fraudulent, with backdated urine test dates, and contain Mashali's handwritten comments falsely suggesting he had reviewed the results when they issued.

## IV. MONEY LAUNDERING, COUNTS 29-44

### A. Law

#### 1. Statute

18 U.S.C. § 1957 provides, in pertinent part:

> Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished . . .
>
> (f) As used in this section—
>
> (1) the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . .
>
> (2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; and
>
> (3) the terms "specified unlawful activity" and "proceeds" shall have the meaning given those terms in section 1956 of this title.

#### 2. Elements

The elements of 18 U.S.C. § 1957 are:

(1) The defendant withdrew or exchanged more than $10,000 of funds from a financial institution affecting interstate commerce on the date specified;

(2) The defendant knew that the funds came from some kind of criminal offense;

(3) The money was in fact criminally derived from a specified unlawful offense; and

(4) The specified unlawful activity took place in the United States.

Section 1956(c)(7)(F) includes health care fraud within the definition of "specified unlawful activity" (SUA). "Proceeds" are defined as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9).

While the traditional money laundering statute, 18 U.S.C. § 1956, requires proof of intent to conceal the monetary transaction, §1957 is merely a "money spending statute" and concealment is not an element of the crime. See, e.g., U.S. v. Brown, 186 F.3d 661, 670-71 (5th Cir. 1999); U.S. v. Ghilarduci, 480 F.3d 542, 551 (7th Cir. 2007).

The government need not prove that the defendant knew that the predicate offense was a SUA. See 18 U.S.C. § 1957(c); see also Benjamin, 252 F.3d at 7. With respect to the interstate commerce element, the transaction need only have a "de minimis effect on commerce." Benjamin, 252 F.3d at 9 (bank's certificate

of insurance issued by the FDIC satisfies the interstate commerce element).

When an account is commingled with criminal proceeds and "clean" funds, the circuits are split regarding the applicable rule. In the Ninth Circuit, and, perhaps, the Fifth Circuit, the government cannot presume that a transaction satisfies the $10,000 threshold where the amount of clean money exceeds the amount of tainted money in an account. See, e.g., U.S. v. Rutgard, 116, F.3d 1270, 1292 (9th Cir. 1997); U.S. v. Loe, 248 F.3d 449, 467 (5th Cir. 2001); but see U.S. v. Davis, 226 F.3d 346, 357 (5th Cir. 2000) (where the aggregate amount withdrawn from a commingled account exceeds the amount of clean funds, any individual withdrawal can be deemed to be tainted). In the Third, Fourth, Seventh, Eighth, Tenth, and D.C. Circuits, the government need not trace particular transactions to tainted funds, even though there is enough clean money in the account to cover the transaction. See, e.g., U.S. v. Mooney, 401 F.3d 940, 946 (8th Cir. 2005); U.S. v. Braxtonbrown-Smith, 278 F.3d 1348, 1353-54 (D.C. Cir. 2002) (criticizing Rutgard rule as the "minority view" which "would come close to rendering money laundering invulnerable."); U.S. v. Johnson, 971 F.2d 562, 570 (10th Cir. 1992). This is particularly true where the vast majority of funds in the account are tainted. See U.S. v.

Haddad, 462 F.3d 783, 792 (7th Cir. 2006). The First Circuit has not weighed in on this issue.

Finally, even if the jury acquits on the underlying unlawful activity, the defendant can still be convicted of money laundering. See Richard, 234 F.3d at 769; U.S. v. Whatley, 133 F.3d 601, 605-06 (8th Cir. 1998) (upholding money laundering conviction where jury acquitted defendant of bankruptcy fraud, which was the predicate offense, finding that there was sufficient evidence to support the money laundering conviction).

**B.    EVIDENCE OF MONEY LAUNDERING**

Counts 29-44 list transactions exceeding $10,000 from the NEPA operating account tied to the fraudulent proceeds from confirmatory code 80102.

**1.    Elizabeth Keating, S/A IRS**

IRS Special Agent Elizabeth Keating traced all fraudulent confirmatory code 80102 deposits from Medicare[34], amounting to $671.747.16, into NEPA's operating account at Bank of America, account xxxxxxxxx8135. (**Exhibit 54**). She then identified 16 separate transactions, each exceeding $10,000, aligning with the 16 charged Counts 29-44. (**Exhibit 55**). Transactions 2, 3, 6, 9, 11, 12, and 14 are to Mashali's wife's Bank of America account,

---

[34] Private insurers also paid for fraudulent 80102 claims. The government did not link these to the charged money laundering counts, but these payers will be eligible for restitution as the harm for them was foreseeable and falls within the charged scheme to defraud.

account xxxxxxxxxx2404. Transactions 1, 4, 5, 7, 8, 10, 13, 15, 16 are to the contractors who were renovating Mashali's expansive residential property in Dover, MA. The "Running Balance" and "Account Balance" columns show that Mashali had sufficient fraudulent 80102 balance in NEPA's operating account to cover the charged transactions.

Keating also traced the flow of code 80102 money from Mashali's wife's account. (**Exhibit 56**). The money went to pay for the mortgage on the Dover and Florida properties, tied to the forfeiture allegations; the two wires, each exceeding $185,000, to Egypt; luxury vehicles, such as "PORSCHE PAYMENT"; and, approximately $80,000, to a college savings account, now frozen pursuant to the Court's order. (**Exhibits 56, 63**).

### 2. Marc Conrad, Contractor

Marc Conrad will testify about the work he and other contractors performed on the house, including the payments received from Mashali that are part of the money laundering counts.

### V. DIMINISHED CAPACITY DEFENSE

Mashali indicated that he will seek to rebut the government's evidence of his intent to defraud by relying on the testimony of his expert, Dr. Roger H. Gray. The government filed a motion *in limine* seeking to preclude Dr. Gray's testimony on various bases, including that Dr. Gray, in fact,

did not offer an opinion on whether Mashali lacked the capacity to form a specific intent to defraud.

Nevertheless, if the Court allows Dr. Gray to testify, the government expects to call its own expert, Dr. Martin Kelly, who examined Mashali in connection with Mashali's notice of insanity defense, to establish that Mashali had the capacity to form the requisite intent to defraud. The government also expects to call Dr. Stuart Beck, who evaluated and treated Mashali at the Massachusetts General Hospital from March 24 to April 15, 2016 and testified at Mashali's competency hearing on June 30, 2012 that Mashali manipulated medical staff and intentionally sabotaged two cognitive assessments, conclusively establishing that Mashali was malingering and overstated his symptoms to avoid trial. The government reserves the right to call other witnesses to rebut Dr. Gray's testimony.

## CONCLUSION

The trial brief contains the crux of the evidence the government will seek to present at trial. It is highly likely the government may call over 40 witnesses in its case-in-chief. Given the scope of fraud charged in the indictment, the government estimates it may take up to four weeks to try this case. The government submits this brief to assist the Court with understanding the evidence and any evidentiary issues. The

government will supplement this brief with evidentiary motions *in limine*, if necessary.

Respectfully submitted,

William D. Weinreb,
Acting United States Attorney

*/s/ Maxim Grinberg*
Maxim Grinberg, BBO# 667521
Abraham R. George, BBO# 668949
Assistant U.S. Attorneys
U.S. ATTORNEY'S OFFICE
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, Massachusetts 02110
(617) 748-3152
(617) 748-3287
abraham.george@usdoj.gov
maxim.grinberg@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). The government will produce the attached exhibits in paper form to the Court's Clerk and will deliver them to defense counsel by a courier.

*/s/ Maxim Grinberg*
MAXIM GRINBERG
Assistant United States Attorney

Date: February 14, 2017