# Martin J. Kelly, M.D.
BOYLSTON CONSULTATION CENTER

Associate Professor of
Psychiatry
Harvard Medical School

Senior Psychiatrist,
Brigham and Women's
Hospital

February 10, 2017

AUSA Maxim Grinberg
AUSA Abraham George
U.S. Attorneys Office, District of Massachusetts
John Joseph Moakley U.S. Court House
1 Court House Way, Suite 9200
Boston, MA 02210

**RE:** The U.S. vs. Fathalla Mashali

Dear Attorney Grinberg:

At your request, I have conducted a psychiatric consultation concerning Fathalla Mashali for the purpose of rendering an opinion concerning psychiatric conditions which might have a bearing on the court's determination in criminal charges currently before the court. The psychiatric evaluation has consisted of:

1. Psychiatric interviews on January 17 and January 24, 2017.
2. Review of various legal documents concerning the alleged offences.
3. Review of the records of the Massachusetts General Hospital.
4. Review of the report of Allison Fife, M.D.
5. Review of the report of Roger Gray, M.D.
6. Review of the records of Keith Ablow, M.D., psychiatrist.
7. Review of the records of the Beth Israel Deaconess Medical Center.
8. Review of the records of the Brigham and Women's Hospital.
9. Review of the records of Norwood Hospital.
10. Review of the records of John Baldwin, Ph.D.
11. Review of the records of the Plymouth County House of Correction
12. Review of videotape of visits of undercover agent.

> **N.B. To the degree these records are based on the representations and history given by Dr. Mashali, they should be carefully evaluated as he appears to give differing accounts depending on setting and circumstance. In my opinion, Dr. Mashali is not a reliable historian.**

Dr. Fathalla Mashali is a 62-year-old physician who formerly practiced anesthesia

Page 2
**Re:** The U.S. vs. Fathalla Mashali
February 10, 2017

and pain medicine prior to giving up his licenses in Rhode Island and Massachusetts in 2013. He is facing multiple charges in Federal Court arising out of his practice in 2010 through mid-2013. It is alleged that he billed Medicare alone for professional and laboratory services over $3 Million Dollars in that period  The counts he faces include multiple charges of Healthcare Fraud, Mail Fraud, Conspiracy, and Money Laundering.

A psychiatrist retained by the defendant, Dr. Roger Gray, has submitted a report that Dr. Mashali has a psychiatric condition, Bipolar Disorder, formerly known as Manic Depressive Disorder, that could have a bearing on the court's determinations in the charges he faces. Dr. Gray claims that, though his mental condition does not rise to the level to meet Federal criteria for the lack of criminal responsibility, it might have a bearing on his decision making in the alleged charges. The claim is that during the years in question he was manic or "hypomanic".

In the current interviews Dr. Mashali gave an account of his history during the years that encompassed the activities that resulted in the federal charges. He stated that in 2009-2010 he began essentially a new practice of outpatient pain management, starting in an office that was previously part of a company he owned that provided anesthesia services to a local Rhode Island Hospital. He took over the premises and equipment and began to see patients in the Woonsocket area. As the practice grew, he decided that to expand to Massachusetts, eventually opening 3 offices in Weymouth-Holbrook, Winchester, and Worcester. He stated that he opened these additional offices because he knew that there would be a larger patient population base.

In his account, it was essentially a solo operation and that he would alternate days at various sites. He claimed he was very busy at these locations regularly seeing 60 or 70 patients per day. He claimed that the offices were opened well into the evening and on occasion until 2 A.M due to the large patient load he saw. Repeatedly through both interviews he claimed he was so busy taking care of patients that he could not be attentive to, or even aware of, the aspects of the practice that resulted in the federal charges.

In addition to the clinical offices, he also operated a laboratory. The standard procedure in practices prescribing opiates is to conduct a screening test done at the time of the visit, and to collect a urine sample for later definitive testing for the presence or absence of opiates and/or street drugs. He stated that he delegated the laboratory operation to others and in 2012 State inspectors found it to be below standards. He claimed that by the time he had hired new people to rectify the situation, the authorities had shut down the laboratory and he was no longer able to bill for these confirmatory tests. The laboratory portion of his operation apparently stopped in 2012.

The loss of the income from the laboratory he stated was critical to his operation. "At [just] $50 bucks a patient", he could not afford to meet his expenses.

The investigation into his professional activities was initiated in July 2012. At that time, four employees of his practice, including nurses and physician assistants, wrote to the Massachusetts Board of Medicine, the DEA and the FBI stating that Dr. Mashali was engaging in "unprofessional, unethical, and unlawful behavior". In the letter, they mentioned his prescribing high doses of narcotics to patients they felt were obviously drug seeking, fraudulently billing for examinations that did not take place and altering patient records to support his fraudulent billing.

Dr. Mashali was also registered to practice medicine in Rhode Island. In 2013, Rhode Island initiated an investigation into the deaths of 7 (seven) patients under his care in that state. This resulted in the loss of his license to practice medicine in Rhode Island in August 2013. Shortly thereafter he gave up his license to practice medicine in Massachusetts, and closed his offices.

In the current interview, Dr. Mashali asserts that the very expansion of his practice to 4 offices 2010-11 is proof essentially of the presence of "hypomania", a term he repeatedly used. He cited the long hours, the travel to multiple offices, little sleep, high energy, and the very high volume of patients as supportive of a mental condition. He also stressed that an earlier phase of his professional life also was reflective of such a condition. He was referring to the years 2001-2009.

In 2001, he was on the staff of the Veterans Hospital in Boston. In addition he also did occasional temporary work covering other hospitals on an as needed basis. In 2001, one of the hospitals in Rhode Island asked him to take over the anesthesia services. He set up a corporation to provide these services. This was a successful model and he decided to pursue similar opportunities, mostly in smaller community hospitals in Massachusetts.

He negotiated with several hospitals and set up separate corporations to provide anesthesia at as many as nine or so hospitals in Massachusetts. He explained that he set up separate corporations so that, if any one of them failed, the other companies would not be affected.

In the records reviewed and in his personal account, this was a very large operation; he stated that he employed many, possibly hundreds, of anesthesiologists and nurse practitioners as well as other support staff. He stated he had as many as 40+ employees who did billing alone. Ultimately these businesses failed in 2009 and he filed for bankruptcy.

He claims that the root cause of the failure was the continuous demands of the doctors and his other employees for additional raises. At the time he filed for bankruptcy he owed $6 million to the Department of Labor alone.

During these years (2001-2009), he brought expensive homes in the Lincoln-Dover area, leased multiple luxury automobiles, and had other substantial personal expenditures. He claims this too was proof of his "hypomania".

It was after filing for bankruptcy in 2009 that he began the outpatient pain management practices. In the interview he stressed repeatedly that he entrusted all the business related matters of his practice to others. Also, that a transcription operation in Egypt apparently "added some things" which ultimately resulted in the charges. In the interview he said he was, even at present, uncertain exactly what had been added to his records; he had a second billing operation in Egypt as well.

He repeatedly returned to the theme that he was so busy devoting his time to taking care of patients that he was taken advantage of by individuals to whom he delegated business aspects of his operation. He also repeatedly stressed his innocence and that he was unaware of any problem with his practice until authorities became involved and that it was never his intention to defraud the government nor did he mean to engage in any fraudulent activity.

## PSYCHIATRIC INTERVIEWS:

Dr. Mashali was interviewed on two occasions. The first interview was for approximately 2 hours, and a second interview a week later lasted approximately 2-1/2 hours. Each interview began with a review of the circumstances and conditions of the evaluation. It was specifically mentioned that the interview was at the request of the United States Attorney and related to psychiatric issues that might have a bearing on the court's determinations in his upcoming trial. He was advised that it was not a doctor/patient situation, and thus he could not tell me anything in confidence. He was informed that matters we discussed might be included in my reports. He was also told that he could stop at any time and confer in private with his attorney or with his wife who accompanied him to the office. In my opinion, Dr. Mashali had a full appreciation of the circumstances and conditions of the evaluation.

As mentioned, Dr. Mashali was accompanied to the office by his wife, though the interviews themselves took place in private. He arrived with a wheeled walker with a seat in it and walked into the office and seated himself on a nearby couch. He appeared approximately his stated age and took reasonable care in his presentation and appearance. He generally was somewhat soft spoken and on occasion I had to

Page 5
Re: The U.S. vs. Fathalla Mashali
February 10, 2017

ask him to repeat certain comments. He was alert and sustained concentration through both of the extended interviews.

He appeared to be of superior intelligence and seemed quite aware of his self interest in his current circumstances. His responses were careful and generally responsive. At times they were at variance, however, with other information in the records, and other accounts he had given in different circumstances. He was not confused, and his memory seemed excellent.

Throughout the interview he was unusually conversant with psychiatric terminology. He repeatedly used the word "hypomanic" and "hypomania" as he described his activities and the reasons why the court and jury might take this into consideration in their deliberations. Though soft spoken and subdued, he did not appear particularly depressed, though he was distressed about his current legal situation that he regarded as unfair and inappropriate. He clearly was motivated to protect his self-interest and displayed no self-defeating behaviors or comments.

There was no objective evidence of any difficulties with insight and judgment. As mentioned, he was likely of superior intelligence. There was no evidence of a major mental illness during the interviews such as hallucinations, delusions, thought disorder, or flight of ideas.

**OPINION:**

On the basis of the extended psychiatric interview and review of the extensive records cited above, it is my opinion that in 2009-2013 Dr. Fathalla Mashali had no psychiatric condition that resulted in the lack of the capacity to understand the difference between right and wrong, to make knowing and intelligent decisions, to weigh the pros and cons of decisions, to freely exercise his will and to exercise reasonable control over his actions. In my opinion he had no mental disorder or psychiatric condition that interfered with the capacity for knowing and willful actions.

**BASIS FOR THE OPINION:**

Specifically considered was the opinion of Dr. Roger Gray that, in the years 2010 through 2013, Dr. Mashali suffered from a Bipolar Disorder. Though I am skeptical about that diagnosis, but even if present, it was not at the level that substantially affected his capacity to understand and make decisions in what he perceived to be his self-interest at the time. He engaged in a series of complicated activities that were to his substantial financial benefit until confronted by the authorities.

Page 6
**Re:** The U.S. vs. Fathalla Mashali
February 10, 2017

There is no history of any psychiatric problems or treatment history prior to the discovery of his activities by authorities. He stated that he first saw a psychiatrist in the fall of 2013 at the request of his Rhode Island attorney in response to the inquiry into the deaths of 7 patients under his care. He stated that there was some consideration of introducing it in disciplinary hearings, but that this was ultimately not pursued.

The next psychiatric encounter was with Dr. Keith Ablow on referral by his defense attorney in late December 2013. He had some contact with Dr. Ablow who prescribed medication for him in early 2014. The treatment was interrupted when Dr. Mashali was arrested in February 2014 and spent 3+ months at the Plymouth County House of Correction. While at Plymouth some medications were continued for medical and other problems. Throughout that period there was no evidence of significant psychiatric disturbance, though he was occasionally noncompliant and entitled.

After his release he saw Dr. Ablow on a couple of occasions in the summer 2014, but broke treatment with Dr. Ablow in September 2014. The records of Dr. Ablow show an engaged, concerned individual who was considering various possible resolutions of his legal dilemma. Subsequently he had outpatient counseling with a psychologist, Dr. John Baldwin, starting in 2015. Those records do not indicate the presence of any condition that would interfere with the capacity to understand and make decisions in his own interest.

In 2015 he had medical admissions for serious liver toxicity and received some medical attention for other conditions, including a possible diagnosis of sarcoidosis. That diagnosis is questioned by some of the doctors he had seen. At any rate, no psychological, emotional or cognitive conditions possibly related to that condition have been found in repeated testing at the Beth Israel Deaconess Medical Center, Brigham and Women's Hospital, and the Massachusetts General Hospital.

In the fall 2015, his attorney and his wife raised questions about his ability to cooperate with counsel and his competency to stand trial. The court appointed Dr. Allison Fife to evaluate Dr. Mashali. In addition, he was hospitalized at the Massachusetts General Hospital (MGH). The net of those evaluations was that he was found competent to stand trial in June 2016. It was the opinion of several doctors that he was malingering a psychiatric condition in order to be found not competent to stand trial.

Since his discharge from MGH and the determination that he was competent to stand trial, Dr. Mashali has only been seen in monthly 30 minute visits for medication management as an outpatient.

Page 7
**Re:** The U.S. vs. Fathalla Mashali
February 10, 2017

Dr. Mashali's account of a Bipolar Disorder and "hypomania" in 2010-2013 is not convincing professionally. When his specific claims of hypomania are explored in detail, they are not generally characteristic of that disorder and internally contradictory.

For example, he cited an occasion during which he worked "on call 24 hours day for 7 days in a row!" As I explored that with him and asked why he did not have someone else cover for him so he did not work 7 straight days, his response was that his company was so strapped for cash that he could not afford to pay someone else to cover. This essentially was a financial explanation for being on call 7 straight days and not a psychiatric symptom. As we discussed it, Dr. Mashali did not appear particularly distressed by the apparent inconsistency and contradiction.

Since he also claimed to be hypomanic in the years 2001-2009, I explored how it was that he could convince the Chiefs of several hospitals to hire him to provide anesthesia services. His response, with a small smile, was "when you're manic you can be a good salesman"

It is also relevant that he had no history of psychiatric history prior to 2013. At that point Dr. Mashali was 59 years of age. Individuals with a genuine bipolar disorder typically have shown signs of that disorder extending back to early adulthood and sometimes adolescence. Typically there would be a history of the need for psychiatric treatment and possibly hospitalizations. That history is not present.

There is a claim that he received some antidepressant medication from a primary care doctor, possibly in the 1980s-1990s, but no records have been produced to support that allegation. Even if he were to have received some medications from a PCP, that would not be conclusive of a bipolar disorder; the circumstances alleged to have been present at that time were situational matters such as back surgery and disruption of his medical training.

In Dr. Gray's report Dr. Mashali's treatment with Prednisone for possible sarcoidosis was raised as a possible contributor to his psychological state. That diagnosis was explored in 2003-2004 at the Brigham and Women's Hospital. He was started on Prednisone which is ordinarily curative. By 2004, Dr. Christopher Fanta, his pulmonologist at the Brigham and Women's Hospital, felt the condition had responded and prescribed a tapering off of prednisone.

However, in the interview, he mentioned that he continued to be treated for sarcoid with Prednisone. I inquired who was his doctor from 2004 until 2013. Dr. Mashali told me that he did not remember the name of the doctor he was seeing in

Page 8
Re: The U.S. vs. Fathalla Mashali
February 10, 2017

those years. I then asked where he got his prescriptions filled since the pharmacy would have a record of the doctor and I could find who was treating him during those years. When I investigated the pharmacy records, it was clear who was prescribing the Prednisone. It was Dr. Mashali.

Significantly, he wrote the prescriptions for Prednisone on his Rhode Island license, not his Massachusetts license, but had the prescriptions filled in Massachusetts. Prescribing medication for oneself is essentially automatic grounds for suspension of your medical license in most states.

The videotape of the visit of the undercover agent to his office is also supportive of the view that he does not have a mental disorder or hypomania. In that visit there is no evidence of elevated mood, pressured speech, agitation, flight of ideas or distractibility. If anything he appears somewhat subdued, very careful and somewhat wary of the presentation of the undercover agent.

In summary, Dr. Fathala Mashali has superior intellectual abilities and no mental condition that would interfere with his capacity for meaningful and willful actions. He engaged apparently in a series of sophisticated actions that resulted in substantial financial benefit until it was discovered by authorities on a tip from his employees. He clearly understands his legal jeopardy and has been active throughout the legal process in pursuing his self-interest. Though I am skeptical of his having a Bipolar Disorder or hypomania, if present during the years in question, it was not at the level that interfered with the capacity to conform his conduct to his self-interest and to intend the actions in which he engaged. In effect, he is now simultaneously claiming he did nothing wrong, but if the jury finds otherwise, they should find that he didn't mean to.

Thank you for requesting my opinion in this matter.

Sincerely,

*[signature]* M.D.

Martin J. Kelly, M.D.