**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA        )
                                )
          v.                    )      CRIMINAL NO: 14-CR-10067
                                )
FATHALLA MASHALI                )

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through Assistant U.S. Attorneys Maxim Grinberg and Abraham R. George, hereby submits its sentencing memorandum, recommending that the Court impose a sentence of 292 months, followed by 3 years of supervised release, and order restitution in the amount of $8,725,120.39,[1] and forfeiture of the defendant's assets as set forth in the government's Motion for Preliminary Order of Forfeiture [D.334].

The defendant's years-long fraud on insurance carriers and his patients is breathtaking in its audacity, scope, execution, and resulting harm. The fraud cost insurance carriers millions of dollars, while causing unmeasurable, but very real damage, to the defendant's patients. This memorandum focuses on the defendant's deliberateness and premeditation in executing his scheme and exposes the falsity of his oft-repeated and ill-conceived claim

---

[1] This amount is subject to revision if victims submit, and the Court approves, additional amounts of restitution.

that his criminal conduct is attributable to supposed mental health conditions.

## I. THE COURT SHOULD REJECT THE DEFENDANT'S CLAIM THAT HIS MENTAL HEALTH MITIGATES HIS CRIMINAL RESPONSIBILITY.

### A. *Purported Diagnosis Of Bipolar II Disorder And Prednisone Prescription.*

Throughout this case, the defendant has unsuccessfully attempted to link his offense and post-indictment conduct to his ostensible hypomania associated with Bipolar II Disorder and ingestion of the steroid Prednisone. [*See, e.g.*, Dr. Roger H. Gray's expert report at 2-5 (**Attachment A**)].[2,3]   During the

---

[2] The Court is well-versed in the facts of the defendant's offense conduct and the issues surrounding his physical and mental health, which the government incorporates herein. [*See* PSR ¶¶9-106, 165-175; government trial brief (D.302); expert report of the government's forensic psychiatrist Dr. Martin Kelly (**Attachment B**); government's motion in limine to exclude the testimony of the defendant's forensic psychiatrist Dr. Roger H. Gray (D.300) and the Court's order allowing that motion (D.320); in-court deposition of undercover Massachusetts State Police Trooper Hollis Crowley (D.305); the Court's order finding the defendant competent to stand trial (D.276) and the government's motion in support of that finding, summarizing the defendant's pertinent medical records and the testimonies of court-appointed psychiatrist Dr. Alison Fife and the defendant's treating psychiatrist at Massachusetts General Hospital Dr. Stuart Beck (D.267); as well as other various information bearing on the defendant's health provided to the Court during the pendency of these proceedings].

[3] Dr. Gray appears to have accepted and relied upon the defendant's representations about his mental health history without verifying it against the defendant's medical records. Dr. Gray did not mention multiple findings by psychiatrists, including by the defendant's treating psychiatrist at Massachusetts General Hospital, Dr. Stuart Beck, that the defendant was malingering to avoid the legal process in this case.

defendant's pre-trial evaluation by the government's forensic psychiatrist, Dr. Martin Kelly, the defendant "repeatedly used the word 'hypomanic' and 'hypomania' as he described his activities and the reasons why the court and jury might take this [condition] into consideration." [Dr. Kelly's expert report at 5]. The defendant told Dr. Kelly that his purchase of "expensive homes in the Lincoln-Dover area, leas[ing] multiple luxury automobiles, and [other] substantial personal expenditures" were "proof of his 'hypomania.'" [*Id.* at 4].

Similarly, the defendant told his expert forensic psychiatrist, Dr. Roger H. Gray, that he suffered from "episodes of severe depression and hypomania." [Dr. Roger H. Gray's expert report at 2]. According to Dr. Gray's report, the defendant stated that his "hypomanic episodes often last 5-6 months and are typified by extravagant and unnecessary spending," among other things. [*Id.*].

The defendant also informed Dr. Gray that he was on "high doses of Prednisone which can cause multiple physical and mental problems." [*Id.*]. According to Dr. Gray, the defendant did not remember the name of the physician who had prescribed him Prednisone. [*Id.* at 7-8]. According to Dr. Kelly, however, who reviewed the relevant medical records, the defendant's prescribing

---

physician had tapered off Prednisone by 2004, and it was the defendant who continued to prescribe it to *himself* for the next decade.  [Dr. Kelly expert report at 7-8].

After a four-hour evaluation, Dr. Gray concluded that the defendant suffered from Bipolar II Disorder.  [Dr. Gray expert report at 5).  Although Dr. Gray stated that the defendant's "mental illness does not rise to the [level] meet[ing] the full Federal criteria for lack of criminal responsibility in so far as he can discern right from wrong," he also opined that the defendant's mental illness "profoundly impaired and diminished his capacity to conform his behavior to the requisites of the law." [*Id.* at 5].

Dr. Kelly concluded that the defendant "had no psychiatric condition that resulted in the lack of the capacity to understand the difference between right and wrong, to make knowing and intelligent decisions, to weigh the pros and cons of decisions, to freely exercise his will and to exercise reasonable control over his actions." [Dr. Kelly expert report at 5].  Dr. Kelly expressed significant doubts that the defendant has Bipolar II Disorder. [*Id.* at 5].  But even presuming that diagnosis, Dr. Kelly opined that "it was not at the level that substantially affected [the defendant's] capacity to understand and make decisions in what he perceived to be his self-interest at the time."  [*Id.*].

### B.   *Bipolar II Disorder Is Episodic.*

Bipolar II Disorder involves "a current or past hypomanic episode" and additional "criteria for a current or past major depressive episode." AMA, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 132 (5th ed. 2013)("DSM-V").  "The major depressive episode must last at least two weeks, and the hypomanic episode must last at least 4 days, to meet the diagnostic criteria." *Id.* at 135.  According to the DSM-V, "[t]ypically, the hypomanic episodes themselves do not cause impairment.  Instead, the impairment results from the major depressive episodes or from a persistent pattern of unpredictable mood changes and fluctuating, unreliable interpersonal or occupational functioning." *Id.*  "A common feature of bipolar II disorder is impulsivity, which may contribute to suicide attempts and substance use disorders." *Id.* at 136.  The "average age at onset is the mid-20s." *Id.*

Dr. Gray appears to agree on the episodic nature of Bipolar II Disorder described in DSM-V. [Dr. Gray's expert report at 2 (referring to "depressive periods" and "hypomanic episodes")]. Dr. Gray accepted the defendant's representation of experiencing "depressive periods [that] typically last 2-3 months" and "hypomanic episodes [that] often last 5-6 months." [*Id.*].

### C. The Defendant's Uninterrupted Years-Long Offense Conduct Defeats The Suggestion That His Conduct Resulted From Hypomanic And Depressive Episodes.

Even assuming (without conceding) that the defendant had Bipolar II Disorder during the relevant period, the nature of that condition and the facts of this case belie any suggestion that it precipitated his conduct or diminished his criminal responsibility.   Specifically, the defendant's concerted, uninterrupted, and well-thought-out multi-year fraud in the face of repeated warnings by his own physician assistants and insurance carriers, his well-documented post-arrest malingering in 2014, and the lack of any documented mental health conditions and treatment before his arrest, entirely defeat his bid to rely upon supposed mental health conditions to undermine his criminal responsibility.

As the Court is aware, the defendant's fraud generally consisted of intentional fraudulent billing for (1) urine drug testing, consisting of submitting claims for (a) tests the defendant conducted on chemical analyzers that had not been calibrated or validated; (b) an expensive confirmatory test (CPT code 8102) that the defendant did not perform or have equipment to perform; (c) unnecessarily redundant tests on urinalysis machines that used the same chemical immunoassay method; and (d) tests of decomposing urine that he stored unrefrigerated for weeks and months at a time; and (2) extensive face-to-face encounters with

patients, including lengthy and involved physical examinations that did not occur.

1.   Uninterrupted Illegal Billing For Urine.

On June 13, 2011, about five months before the defendant opened his own laboratory in Holbrook, MA, his head biller told him in no uncertain terms that there were urine "specimens that ha[d] not been tested since 6/4/11 and still no reagents in yet . . . . As you know, all of those have already been billed by us which is one problem. Next is what to do with these 'old urines'. Jandhira [lab analyst] says the refrigerator is full." [PSR ¶51]. On a Friday in early November 2011, as the defendant was about to start operating his own laboratory in Holbrook, MA, the defendant's head lab technician told the defendant that she had not validated the Biolis urinalysis machine and thus could not yet test human specimen. [*Id.* ¶45]. The defendant ordered her to start testing the urine anyway the following Monday. [*Id.*]. On January 4, 2012, two months after the defendant started to operate his laboratory, his office administrator told him that the laboratory was being "backed up with urines" and that the lack of reagents prevented testing. [*Id.* ¶53]. The defendant's response appeared measured and non-impulsive: he claimed he could not afford the reagents because he had not been paid by Medicare. [*Id.*]. At the same time, however, he was making extravagant multi-million dollar improvements to his Dover, MA property and wiring over a million

7

dollars to Egypt.  At no time did the defendant express concern to any of his staff, including multiple technicians in the laboratory, about the urine storage conditions and testing urine on equipment that was not validated.  Instead, the defendant pestered his lab technicians to catch up with testing old, stale urine, and forced them to work in unsanitary conditions.  [*See id.* ¶54].

The defendant clearly understood and appreciated the wrongfulness of his actions when, for example, he orchestrated hiding the old urine in the basement during an inspection of his laboratory on February 7-8, 2012, for compliance with federal regulations.  [*Id.* ¶55].  The defendant had seen the accumulated old urine before the inspection, as he often delivered it to the lab from the locations of his other clinics, and after the inspection.  [*Id.* ¶56].  He also knew of the significant urine backlog from the test dates (which he later backdated) that appeared on patient urine test results. [*Id.*].

The defendant additionally well understood that he needed sophisticated urine testing technology to bill for confirmatory tests (CPT code 80102) and that he lacked such confirmatory testing equipment.  [*Id.* ¶62].  For example, as early as July 22, 2011, he told an Agilent Technologies sales representative that "[a]s we discussed earlier today[,] I am looking for a mass spec system that would confirm drugs of abuse results obtained by immunoassay as required by regulations." [*Id.*].  The defendant ultimately did

not purchase a confirmatory urinalysis machine until about spring 2012 and did not use it to test urine until October 2012. [*Id.* ¶¶60-61]. Yet, in November 2011, he made a conscious choice to bill CPT code 80102 to see if insurance carriers would pay claims billed under that code notwithstanding its inapplicability. [*Id.* ¶66]. Just as his laboratory started to test urine in November 2011, the defendant instructed his billers: "still we bill confirmation by mass spec under 80102,[]I believe we should try those codes combined with 80102 on mass health web site ,see if they pay ,also try few medicare patients and different insurance patients and see what happens ,if we get paid ,then we use it on all patients. In essence try it on 1 or 2 patients from different insurances ,if it works then go ahead ." [*Id.*] (spacing in the original). In these instructions, the defendant expressly linked CPT code 80102 to the "mass spec" technology, which he knew he did not have. [*Id.* ¶67]. These instructions are a product of the defendant's deliberate attempt to defraud insurance carriers and patients and not the result of episodic hypomania.

When the defendant finally began testing urine on the mass spectrometry machine in October 2012, he expressed his awareness that he had been billing CPT code 80102 for equipment he did not have. [*Id.* ¶68]. Yet, the defendant never conducted a self-audit nor attempted to contact insurance carriers and patients to inform

them of the hundreds of thousands of dollars that he had improperly billed.

These facts establish the defendant's calculated and thoughtful determination to defraud insurance carriers and his patients to satisfy his greed and undermine any claim that bouts of uncontrollable hypomania supposedly stripped him of his ability to appreciate the wrongfulness and consequences of his actions.

2.   The Defendant's Cover-Up Of Fraud.

The defendant's years-long, uninterrupted, and dogged cover-up of his fraud only highlights his all-too-real understanding that his billing for non-existent services was wrong and fraudulent and further undermines any suggestion that his actions were impulsive.

The defendant employed teams of doctors in Egypt to falsify his patients' medical records. [*Id.* ¶¶27-28]. Each team had to meet daily targets for the number of false patient records they were to create. [*Id.* ¶27].

On June 7, 2012, the defendant's physician assistants informed the defendant by email that someone had been fraudulently altering their notes in their patients' electronic medical records to reflect extensive services they did not in fact perform. [*Id.* ¶29]. The physician assistants told the defendant that these actions put their "licenses in jeopardy" and were "illegal." [*Id.*]. Later that month, at least one physician assistant

10

confronted the defendant to his face, telling him that patients'
notes had been falsely altered and that he had inappropriately
billed for lengthy face-to-face encounters with patients and
expansive physical examinations when he in fact did not perform
these services. [*Id.* ¶33.]. The defendant demonstrated keen
awareness that his conduct was illegal when he subsequently
informed his physician assistants that he would start seeing every
patient and perform physical examinations. [*Id.* ¶34]. Around the
same time, a fraud investigator from Blue Cross Blue Shield of
Massachusetts met the defendant and explained to him his numerous
improper billing practices, including improper billing for urine,
face-to-face encounters with patients, and "duplicate" provider
notes. [*Id.* ¶69]. Yet, until the loss of his medical license in
the fall of 2013, the defendant continued the same fraudulent
billing and creation of false encounter notes to cover up his
fraud.

Count 28 of the indictment, for example, specifically
describes how the defendant orchestrated the creation of false
patient files and urine test results in response to an audit
conducted by Medicare. [*Id.* ¶¶89-103]. The defendant was
intimately involved in and oversaw the note creation scheme. [*Id.*
¶¶89-91 (multiple emails), ¶¶94, 98, 101-03 (signing off on
fraudulent records before sending them to Medicare, including for
a date of service when he traveled to the Bahamas].

These facts again underscore the defendant's full appreciation of the wrongfulness and consequences of his actions.

3.   The Defendant's Cover-Up Of Fraud For Deceased Patients.

The defendant's creation of false medical files in response to the requests and subpoenas issued by the Rhode Island Medical Examiner's Office and the Rhode Island Board of Medical Licensure and Discipline for patient files of the defendant's patients who died from overdoses places the perverseness of his fraud in high relief. [*See id.* ¶¶70-82]. Email correspondence involving the defendant highlights his understanding of the import of the requests and the need to provide the authorities with a timely response that would conceal his lack of medical services and fraudulent billing.

In reviewing one such fraudulent record created by a doctor in Cairo, Egypt for a deceased patient, the defendant's nephew, Moustafa Aboshady, made light of the fact that the doctor "want[ed] to treat depression with Colace." [*Id.* ¶77]. The defendant, unfazed, responded with a joke of his own: "And constipation with Prozac." [*Id.*]. The defendant's crude "joke" in this exchange is not a rant of someone in the throes of hypomania. The defendant personally signed the deceased patients' false encounter notes and fabricated and backdated urine test results. [*See, e.g.*, *Id.* ¶82]. Some of the medical records the defendant provided to the

authorities conspicuously lacked CPT code 80102, suggesting he did not want the authorities to know that he had billed for tests he did not perform.  [*Id.* ¶81].

### 4.   Undercover Recordings.

The Court had a unique opportunity to observe the defendant's interactions with a patient through the undercover recordings of Massachusetts State Police Trooper Hollis Crowley, who acted as a patient in an undercover capacity and was more than six months pregnant at the time. [*See id.* ¶40].   Dr. Kelly opined that the recording "is also supportive of the view that [the defendant] does not have a mental disorder or hypomania . . . . there is no evidence of elevated mood, pressured speech, agitation, flight of ideas or distractibility." [Dr. Martin Kelly's expert report at 8)].   As the Court may recall, no staff, including the defendant, so much as touched Crowley during her visits or asked whether she was pregnant.   Yet, the defendant's notes for Crowley's encounters documented extensive physical examinations and lack of pregnancy. [*See* D.302 at 23-24].   Nothing in these recorded encounters suggests the defendant was under the spell of hypomania.   To the contrary, they establish the defendant's deliberate fraud.

### 5.   Malingering.

The defendant had not only misled and manipulated the insurance carriers and patients during the offense conduct, but he also attempted do the same with his medical providers, mental

health experts, and the Court after his arrest.  According to the DSM-V, the "average age of onset [of Bipolar II Disorder] is the mid-20s."  DSM-V at 136.  Yet, as Dr. Kelly pointed out in his report, the defendant has "no history of any psychiatric problems or treatment history prior to the discovery of [the defendant]'s activities by authorities."  [Dr. Martin Kelly's expert report at 6].  The Government's Post-Hearing Memorandum On The Defendant's Competency [D.267] recites in detail the defendant's numerous concerted efforts to malinger after the government executed search warrants at his multiple offices in the fall of 2013 and he became aware of the investigation.  The germane facts are summarized below:

- During his pretrial detention at the Plymouth County Correctional Facility ("PCCF"), the defendant refused medical treatment and food [D.267 at 7-9];

- On September 24, 2014, the defendant sought and obtained permission from the Court to relax conditions of his release "to transport his children to their various school activities and appointments and to accomplish basic tasks necessary for his family." [*Id.* at 10]. Yet, at the competency hearing on June 30, 2016, the defendant's wife testified that after the defendant's release from PCCF "[h]is physical condition continued to deteriorate."  [*Id.* at 9, quoting competency hearing transcript].  She stated that the defendant was getting lost, [] wasn't remembering things, [and] had confusion."  [*Id.*]. In an affidavit she filed with the Court on November 29, 2015, she stated that "my husband's mental state, including his memory, his ability to understand information, and his ability to make good judgments, have been compromised for the past several years and has been deteriorating more rapidly the last couple of years."  [*Id.* at 10].

14

- On May 21, 2015, in his application for Social Security Disability Benefits ("SSDI"), the defendant falsely claimed that he had stopped working because of "increasing problems in memory, depression, and general functioning," but did not inform the SSDI evaluator of his arrest in February 2014 and the pending criminal case. [*Id.* at 12-13]. During the evaluation for SSDI benefits, the defendant claimed not to remember the year he graduated high school and college, or names, or the day of the month or week, or even whether he had eaten. [*Id.* at 12]. Although the SSDI evaluator accepted the defendant's representations at face value, he nevertheless observed that the defendant did not "display evidence of psychotic thought process." [*Id.*].

- On November 17, 2015, Dr. Glass, the defendant's treating doctor at the Massachusetts General Hospital ("MGH") observed that the defendant reported "confusion and poor memory." [*Id.* at 15]. According to Dr. Glass, however, when he attempted to formally validate these symptoms, he noted the defendant's "confabulation and avoidance of participation in testing." [*Id.*].

- On January 6, 2015, Dr. Perez, the defendant's other treating doctor at MGH, observed that although during an informal conversation the defendant appeared "attentive [and] able to give a thorough and comprehensive review of his workup" at two other hospitals, "on formal testing . . . [the defendant] was unsure if he was at MGH . . . [and] gave the date as a Monday [i]n December, 2017 (rather than Tuesday, January 2016). He gave a jumbled answer to the days of the week backwards." [*Id.* at 16].

- During his stay at the psychiatric ward at MGH, Blake 11, between March 24 and April 15, 2016, the defendant's treating physician, Dr. Stuart Beck, ordered two cognitive assessment tests. [*Id.* at 19]. The defendant sabotaged these tests because, according to MGH, he "over-reported his symptoms," made a "poor effort," and "likely malinger[ed]." [*Id.* at 19-20].

Dr. Fife, the court-appointed forensic psychiatrist, testified that to score as low on these tests as the defendant did "you would . . . really have to have very, very severe illness, such as sort of end stage Alzheimer's or something of that nature.  It's almost not participating to score that low."  [*Id.* at 20, quoting transcript of competency hearing].  She stated that the score was well below typical scores by dementia patients.  [*Id.*].  Dr. Beck had signed off on contemporaneous notes of the defendant's treatment-- before he learned he might have to testify at a competency hearing and months before his testimony-- that the defendant "appears to be malingering in order to avoid outside court situation given inconsistent presentation, poor compliance, elaboration of medical problems, and over disdain for the legal process." [*Id.* at 21].

- Dr. Fife evaluated the defendant over two visits, for about two hours each, while he was at MGH.  Despite counsel's repeated claims that the defendant would not engage with him and could not stay awake, the defendant stayed awake and alert throughout the entire evaluation.  [*Id.* at 21-22].  Although the defendant was conversant on general topics, he appeared bothered and irritated when the discussion turned to his case. [*Id.* 21-22].  Dr. Fife reported that the defendant's "overall tenor was to stay away from anything that had to do with the question at hand and he would be very sleepy and passive and non-participatory, but then when it was away from that topic [of his case], it was [] really like talking to a different person."  [*Id.* at 22].

- Dr. Fife opined that the defendant's narcissistic personality disorder did not "interfere with any of the intellectual capacities to be competent to stand trial" and that "a significant portion of what [the defendant] has been doing since 2014 and even a little bit before that, has been, along with his legitimate medical illnesses, the intentional production of symptoms."  [*Id.* at 24, quoting transcript of the competency hearing].  She further explained that the term "malingering" meant "not being truthful," a "fabrication of symptoms."  [*Id.*].

16

Thus, for the aforementioned reasons, the defendant's repeated suggestions that his purported diagnosis of Bipolar II Disorder and hypomania should mitigate his criminal responsibility are not credible and lack any merit.

**II.    SENTENCING GUIDELINE CALCULATION.**

The Sentencing Guideline calculation pursuant to USSG §2B2.1 is generally driven by the defendant's pecuniary harm to the insurance carriers, the number of affected victims, the extraterritorial location of a substantial portion of the fraud, and the defendant's role in the offense as a physician in charge of multiple employees involved in the charged offense conduct. [PSR ¶¶123-132].   The U.S. Probation Department calculated approximately $8,725,120.39 in restitution [*Id.* ¶207] and $45,366,050.98 in intended loss [*Id.* ¶124], resulting in the Total Offense Level 40 [*Id.* ¶136], Criminal History Category I [*Id.* ¶141], and the Guideline Sentencing range of 292-365 months [*Id.* ¶193].[4]

**III. THE GUIDELINE SENTENCE OF 292 MONTHS IS APPROPRIATE UNDER 18 U.S.C. §3553 FACTORS.**

The aforementioned Guidelines Sentencing factors attributable to the defendant do not expressly capture the seriousness of his conduct and the resulting harm to his many patients. *See* 18 U.S.C.

---

[4] The defendant did not object to the Sentencing Guidelines calculation.

§3553(a) (courts must "consider . . . the nature and circumstances of the offense), §3553(b)(mandating that the court "shall impose a sentence of the kind, and within the range, [of the Guideline Sentencing range] unless the court finds there exists an aggravated or a mitigating circumstance), and §3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence").

The defendant prescribed powerful narcotics and supposedly evaluated and treated his patients, many of whom were low-income individuals with significant histories of drug abuse and addiction. Monitoring patients' urine for drugs of abuse was supposed to inform the defendant whether his patients were compliant with prescribed medication instead of disposing it on the street and whether they tested positive for street drugs, such as cocaine, heroin, methadone, and amphetamine, among others, which would mandate closer supervision and modification of the dosage and treatment. Instead, the defendant's lust for exuberant wealth and luxury severely compromised the care and safety of his vulnerable patients. The defendant treated his urine drug test machines like personal ATMs, which churned out money at a bewildering speed in the form of useless urine drug test results. He used the fraudulent proceeds from Medicare and insurance

companies to support his and his wife's swanky lifestyle at their residence in Dover, MA, which contained a heated driveway and tennis court, a movie theater, an outdoor kitchen, and a squash court under construction.  Meanwhile, the defendant complained about his supposed lack of money to timely pay his bills for the necessary chemical reagents to run the urine drug tests, which only worsened the already reprehensible months-long backlog of untested, stinking, and decomposing urine specimens.

While it is hard to quantify the harm the defendant caused to his patients, the independent report from the Rhode Island Board of Medical Licensure and Discipline gives the Court a chilling glimpse into how the defendant's fraudulent conduct, expressly charged in the indictment, directly affected the care of the defendant's patients who died from overdoses.

For one patient, the report states in part:

> [The patient] was pronounced dead.  She was noted to be very underweight.  Her toxicology testing was positive for alcohol, Morphine, Phenylproponalamine, Amphetamine, Diazepam and its metabolite . . . . There is no evidence that vital signs, even weights, were monitored in any fashion.  No pill counts were performed.  There was no explanation of the aberrations in the results of toxicology screens.  It's not even clear that it was perceived that there were aberrations in the toxicology screen results.
>
> Of all questionable behaviors demonstrated by Dr. Mashali in the care of this patient, the most egregious is his continuing to prescribe huge doses of stimulants to a patient without

19

a verified diagnosis, without monitoring her
blood pressure or vital signs, apparently
without even looking at her to see that she
was cachectic. In the course of forty days,
from 6/10/11 to 7/20/11, a total of 312
Adderall 30 mg pills were prescribed.

In my opinion, it can be stated with a
reasonable degree of medical certainty that
the medical care provided by Dr. Mashali was
substantially below the standard of care. His
prescribing practices were dangerous. It is
not clear whether or not he understood the
degree of risk he placed his patient in, which
generates concern as to whether or not he
would repeat this behavior and place other
patients at risk. In this patient's case, it
would seem that all he would have had to do
was look at his patient to understand that he
was overprescribing Adderall.

[PSR ¶84].

For another patient, the report states in part:

Despite toxicology screens that suggested non-
compliance with the 'narcotic contract', Dr.
Mashali continued to prescribe opioid
medication for the patient, giving her a
month's worth of medication at a time . . . .
Both the 'in house' testing and the
'confirmatory' testing in this case were
immune assays. These are not considered
reliable, definitive tests as demonstrated by
the difference in results between the two
assays.

In my opinion, it can be said with a reasonable
degree of certainty that this patient's
medical care by Dr. Mashali was below the
standard expected of a pain clinician. The
physical exam was cursory at best, the
psychiatric comorbidity was virtually
ignored, the toxicology screen results were
either ignored or not understood . . . .

[*Id.* at ¶83].

20

Again, for another deceased patient, the report states in
part:

>   The physical exam is cursory and repeated
>   identically at nearly every visit . . . . The
>   patient's initial tox screen is positive for
>   Amphetamines and Cocaine.   There isn't any
>   documentation in the chart that the
>   recreational use[]of these medications was
>   discussed other than writing on the tox report
>   that the patient would be discharged if he was
>   positive for Cocaine again.  It seems unlikely
>   that any pain clinician (or any clinician of
>   any specialty) would prescribe opioids for a
>   patient on the same day that a tox screen came
>   back positive for both Amphetamine and Cocaine
>   . . . .
>
>   Knowing that the patient had a history of
>   illicit drug use, Dr. Mashali gave the patient
>   a month's worth of MS Contin and Percocet on
>   9/8/2010.  A week later, he gave him a month's
>   worth of Oxycontin and Xanax.  It's not clear
>   what happened to the remaining MS Contin, but
>   I suspect that it didn't go to waste . . . .
>   The reason that high-risk patients are
>   referred to pain clinicians is because they
>   have to be very closely monitored by someone
>   with the knowledge to do so.   Dr. Mashali
>   dispensed vast amounts of opioids and
>   Benzodiazepines to a patient with multiple
>   urine toxicology screens suggesting that he
>   was not taking the medication as prescribed
>   and/or violating his contract.  There is no
>   effort to count his pills.  There was no follow
>   up on the issue of Cocaine abuse.  There was
>   no attempt to identify the reason for the
>   patient's absence or what he was prescribed
>   during that period.   He even prescribed
>   opioids to the patient after he had had an
>   entirely negative tox screen . . . . I must
>   conclude that [Dr. Mashali]'s continued
>   practice will put more patients at risk for
>   inadvertent overdose.

[*Id.* at ¶85].

For another patient, the report states in part:

> It is not clear how the medical examiner was aware that the patient had a history of multiple suicide attempts, but Dr. Mashali did not seem to have the same information.  There was no effort to communicate with her therapist, and there was no mention of the patient's support system or living situation . . . .
>
> There were several instances in which her toxicology screens were negative for medications she was prescribed or positive for those she wasn't.  Dr. Mashali continued to write prescriptions despite having evidence in front of him that suggested the patient was non-compliant.  His confirmatory toxicology screen, like his 'in house' tox screen, was an immunoassay.  It simply makes no sense to use an unreliable assay to confirm the results of another unreliable assay.  The confirmatory toxicology screens should have been sent as gas chromatography/mass spectrometry tests.

[*Id.* at ¶86].

For another patient, the report states in part:

> This case is particularly disturbing since it was repeatedly documented that the patient had a long history of opioid, Cocaine, and alcohol abuse  .  .  .  .  Despite [Dr. Mashali]'s awareness that she had a long history of drug and alcohol abuse, he continued to give increasing doses of opioids with a month's worth of pills at a time . . . .  Toxicology screens repeatedly showed an[] absence of prescribed drugs or the presence of those not prescribed, despite which he continued to give her medication.  No pill counts were performed . . . .  Dr. Mashali's physical examination of the patient was cursory and replicated in each office note.  It is not clear that he made any

> effort to identify the source of her pain . .
> . .

[*Id.* at ¶87].

> For another patient, the report states in part:

>> The deceased's serum toxicology was positive
>> for Methadone, Diphenhydramine Oxycodone,
>> Carisprodal, Bupropion, and Promethazine. The
>> toxicology screen results were essentially
>> ignored. The patient was repeatedly given a
>> month's supply of opioids despite results that
>> suggested overt breach of the narcotic
>> contract between Dr. Mashali and his patient.
>> I cannot explain why he continued to prescribe
>> medication in the face of multiple screens
>> positive for Ecstasy or Methadone (when she
>> wasn't prescribed Methadone) . . . . His
>> physical exam was cursory, his regard for the
>> patient's comorbidities was non-existent, and
>> his prescribing habits were lavish in the face
>> of very frightening, if inaccurate, toxicology
>> screen results.

[*Id.* at ¶88].

The last conclusion bears repeating: the defendant's "physical exam was cursory, his regard for the patient's comorbidities was non-existent, and his prescribing habits were lavish in the face of very frightening, if inaccurate, toxicology screen results." [*Id.*]. This and other above-quoted conclusions by the Rhode Island Board of Licensure and Discipline go hand in hand with the criminal charges against the defendant: billing for non-existent toxicology and other patient services. At the time of the defendant's "lavish . . . prescribing habits" and lavish billing of carriers for non-existent toxicology confirmatory tests

and existent, but useless and needlessly redundant toxicology tests of months'-old stale urine on machines that had not even been calibrated or validated, the defendant and his wife lived, and continue to live, a lavish lifestyle in an 8,000-square-foot home with five bedrooms, six bathrooms, a fully furnished game room in the basement, a five-car garage, and a pool in the backyard, in an upscale neighborhood in Dover, Massachusetts. [*Id.* at ¶160].

The defendant's wife indicated to the U.S. Probation Department that the defendant "fell into a deep depression since he could no longer practice medicine." [*Id. at* ¶161]. The defendant may indeed find the prospect of losing millions in illicit gains and potential jail time depressing. Conspicuously, however, the defendant did not appear to be depressed, mentally ill, or challenged throughout the years-long brazen fraud he perpetuated on thousands of his patients and dozens of insurance carriers, despite multiple explicit warnings by his own physician assistants and Blue Cross Blue Shield, Massachusetts. Despite the episodic nature of hypomania, even assuming the defendant's dubious diagnosis with Bipolar II Disorder, not once during his supposedly months-long periods of "lucidity" did the defendant appear to contemplate and correct his horrific actions. Throughout the period of the offense, his conduct was premeditated, deliberate, and willful. It was not only an assault on the purses

of private and public insurance carriers, but on public safety as well.  It was only once the defendant was caught that he started to bring up his supposed mental health issues, but even then he lied to his providers and the forensic psychiatrists about the most rudimentary facts, such as his arrest, his symptoms, and his self-prescribing of Prednisone for over a decade.

The diagnosis of malingering, according to the court-appointed psychiatrist Dr. Fife, literally means "not being truthful" and a "fabrication of symptoms." [D.267 at 24, quoting transcript of the competency hearing].  Setting aside some of the defendant's legitimate physical ailments that are not at issue, the defendant's post-arrest conduct amounts to nothing more than malingering.

Incredulously, the defendant informed the U.S. Probation Department that upon his release from custody he plans to practice medicine in Guam because he believes "they are more forgiving with respect to doctors with criminal and/or license suspension issues." [PSR ¶183].  The defendant unapologetically continues and will continue to be a threat to public safety.  One of the Court's core sentencing concerns is "to protect the public from further crimes of the defendant."  18 U.S.C. §3553(a)(1)(C). "Protect[ing] the public from further crimes of the defendant," is a pressing concern in this case. *Id.*

It is impossible to discuss the defendant's criminal conduct without briefly addressing the much-publicized opioid addiction crisis in Massachusetts. *See* 18 U.S.C. §3553 (the Court "shall consider . . . the need for . . . adequate deterrence to criminal conduct"). According to the Massachusetts Department of Public Health, "[s]ince 2000, opioid-related deaths have increased in Massachusetts by 350%. The recent rate of increase is several times faster than anything seen before in every community in Massachusetts impacted by the current opioid epidemic." DEPARTMENT OF PUBLIC HEALTH, AN ASSESSMENT OF OPIOID-RELATED DEATHS IN MASSACHUSETTS 2013-2014 at 8 (Sep. 2016).[5] "[T]here were at least 1,379 confirmed opioid-related deaths in Massachusetts during 2015." *Id.* at 13. "In 2013-2014, opioid-related deaths occurred in two-thirds of the communities in Massachusetts." *Id.*

The defendant thrust himself into the eye of the storm by relying on the endless supply of patients that this public safety calamity produced. He processed over one hundred patients per day, claiming to have conducted extensive evaluations and physical examinations of each one, and claiming to have spent forty minutes to an hour with each patient, when he in fact arrived hours late to his practice and did not even have such basic tools as an

---

[5] Available at http://www.mass.gov/eohhs/docs/dph/stop-addiction/dph-legislative-report-chapter-55-opioid-overdose-study-9-15-2016.pdf.

examination table, an otoscope, a stethoscope, blood pressure cuffs or a thermometer.  [PSR ¶¶35-36].  The patients kept coming. They waited for hours, as late as midnight to get their prescriptions from the defendant, yelled and screamed at the defendant's staff in frustration, had no room to sit down, and spilled out onto stairwells and outside the building.  [*Id.* ¶35]. Some brought beach chairs.  [*Id.*].  The defendant cared only about the patient body count to bill the maximum amounts possible for what should have been essential, but were in fact non-existent, services.  Despite the horrific conditions and treatment at the defendant's clinic, the patients kept on coming.  The defendant must have understood what drove these patients to his clinics and, instead of treating them, he prayed upon them.  The Medicare and MassHealth claims data alone capture approximately 1,800 unique patients during the period charged in the indictment.

The defendant did not practice medicine.  He stomped all over the Hippocratic Oath and tossed aside all moral and ethical obligations to his patients and to public health in service of his avarice.  His efforts to blame his fraud on mental illness are meritless.  The damage he caused to insurance carriers and the public is enormous.  The Sentencing Guidelines range accurately captures his culpability.  The government's sentencing recommendation is appropriate under the factors enumerated in 18 U.S.C. §3553.

**CONCLUSION**

WHEREFORE, the government recommends that the Court impose the Guideline sentence of 292 months, followed by 3 years of supervised release, and order restitution in the amount of 8,725,120.39, and forfeiture of the defendant's assets as set forth in the government's Motion for Preliminary Order of Forfeiture [D.334].

Respectfully submitted,

WILLIAM D. WEINREB
Acting United States Attorney

By: /s/ Maxim Grinberg
MAXIM GRINBERG, BBO#667521
Abraham R. GEORGE, BBO#668949
Assistant U.S. Attorneys
617-748-3287

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Maxim Grinberg
MAXIM GRINBERG
Assistant United States Attorney

Date: July 13, 2017