# EXHIBIT 1

Roger H. Gray, M.D.
112 Sargent Street
Newton, MA 02458
(617) 332-0901

July 19, 2017

Forensic Psychiatric Evaluation
Re: Fathalla Mashali

I have been asked by Attorney Jeffrey Denner, who represents Dr. Mashali in the
pending criminal matter in the United States District Court for the District of
Massachusetts to assist in the sentencing phase of the case.  In connection
therewith, I have consulted regularly with Mr. Denner over the past months and
recently re-interviewed the Defendant, Fathalla Mashali and his wife Noah.
Additionally, I have reviewed more recent medical records from the Massachusetts
General Hospital including evaluations by a neurologist, geriatric psychiatrist, and
have read the Pre-Sentence Report and the Government's Sentencing Memorandum
herein.

Dr. Mashali has deteriorated remarkably since I last interviewed him.  He is
dramatically more confused, intermittently believes that he has done nothing
wrong, and generally is incapable of accurately perceiving the realities of his life and
of his actions.  He reports visual hallucinations of seeing men around him in his
bedroom and hears auditory hallucinations of these men telling him to not believe,
trust, or cooperate with his attorneys, with his doctors, or with his wife.  His
reporting of these hallucinatory experiences appears genuine to me.   His physical
appearance shows significant deterioration as well.    His gait is more impaired, and
there is now marked drooping of both eyelids.  He is 61 years old but has the
physical presentation of a decrepit man decades older.  In my opinion, Dr. Mashali
suffers with a psychiatric disorder best characterized as Bipolar Disorder, Type II,
which vacillates between deep depression and hypomanic activity.  He suffers with
organic conditions, all of which significantly contribute to impairment of cognition,
judgment, insight, mood, and capacity for rational thinking.  These conditions
include neurosarcoidosis, B 12 deficiency (pernicious anemia), gastroparesis
syndrome/malabsorption, past treatment with high doses of steroid medication,
and steroid induced diabetes.  Dr. Mashali's impairments of insight and judgment
were compounded by self-medication with steroids and oral hypoglycemic
medication.  The sum total of all of the foregoing has resulted in a progressive and
substantial dementia which has been deepening over time.  It is also important to
note that both his parents died relatively young from early onset Alzheimer's.  From
an epidemiologic/statistical viewpoint, this increases the likelihood that he may
have this disease as well.  Although Dr. Mashali has not been formally diagnosed
with Alzheimer's Disease, the combination of genetics, i.e. his family history, and his

current presentation and progressive decline, must raise that as a diagnosis to be seriously considered.

In my opinion, Dr. Mashali is clearly unable to assist his attorney in this case, particularly at this crucial sentencing phase (and has apparently been in this state for at least the several recent past months); therefore, in my opinion, held to a reasonable degree of medical/psychiatric certainty, Dr. Mashali lacks the sufficient present ability to effectively consult with his lawyer with a reasonable degree of rational understanding and does not possess the capacities necessary for competent participation in further judicial proceedings, including the sentencing process,  at this time.

Respectfully Submitted,

Roger H. Gray, M.D.

Curriculum Vitae


Roger H. Gray, M.D.
112 Sargent Street
Newton, Massachusetts
(617) 965-2713
DOB: January 14, 1945


I.    Education
      A. University of Minnesota, B.A., English Literature, 1968
      B. University of Minnesota, School of Architecture, 1967-69
      C. Tufts University, School of Medicine, M.D. Boston, MA 1973-77


II.   Post-Graduate Training: Tufts –New England Medical Center and Affiliates
      A. Medical Internship: July 1977-June 1978 at the Shattuck, Faulkner, and
         Jamaica Plain V.A. Hospitals
      B. Psychiatric Training:
              1. Jamaica Plain V.A. Hospital: July 1978-June 1979
              2. New England Medical Center: July 1979-June 1980
              3. Jamaica Plain V.A. Hospital: July 1980-June 1981, Chief Resident,
                 Ward 12 C (In-Patient Service)
              4. New England Medical Center: July 1980-June 1981


III.  Work Experience:
      A. Private Practice: July 1981 to present.  Psychotherapy and pharmacotherapy
      with adults, adolescents, and couples.  Extensive treatment and
      evaluation of victims and perpetrators of abuse and trauma
      Psychotherapy supervision and consultation, forensic evaluations

      B. Medical Director, Adult Psychiatric Unit, Caritas Norwood Hospital: October
      1999 to February 2006
          Responsibilities included: direct patient care, supervision of other psychiatrists,
      Oversight and supervision of milieu staff, program development, Peer Review
      Committee, Quality Assurance Committee, Utilization Review, development
      and implementation of Suicide Risk Assessment Protocol, ECT Practice
      Committee, Restraint Reduction Committee, Performance Improvement
      Committee, consultation-liaison services to general medical/surgical
      Service, consultation to Substance Abuse Treatment Program, and Emergency
      Department Staff.

1

C.  Associate Medical Director, Adult Psychiatric Unit, Southwood Community
    Hospital: April 1994-October 1999.  Duties as described above.
D.  Associate Medical Director, Geropsychiatric Unit, Southwood Community
    Hospital: January 1992-October 1994  Duties as described above.

E.  Medical Director, Partial Hospital Program, Southwood Community Hospital

F.  Medical Director, Psychiatric Service, Northeastern University Student
    Health Service  April 1992-  April 1994.  Duties included: direct patient
    care, collaboration with Counseling Dept., consultation to teaching and
    administrative staff, development of managed care protocol, consultation
    to and instruction of staff of resident halls, supervision of other mental health
    providers.

G.  Medical and Clinical Director, American Geriatric Services, Inc.: November
    1988-December 1991.  Duties included development and administration of
    inpatient medical-psychiatry services and out-patient mental health services
    for elderly patients, direct services to patients, training and supervision of
    of multi-disciplinary teams, development of Utilization Review and Quality
    Assurance Programs.  Patient cohort over 3,000.

H.  Staff Psychiatrist, Consultation-Liaison Service, and Supervisor of Psychiatry
    Residents, Beth Israel Hospital, Boston, MA and Harvard Medical School
    July 1988-1990

I.  Psychiatric Consultant, St. Margaret's Hospital, Dorchester, MA: September
    1987-January 1989

J.  Carney Hospital, Dorchester, MA: December 1983-June 1988
        1. Director of Psychiatric Consultation-Liaison Service. Duties included
        providing and coordinating psychiatric services to medical/surgical
        services, instructing primary care residents, formulation of policies,
        consultation to staff of coronary care unit.
        2. In-Patient Attending Psychiatrist: December 1983-September 1986
        3. Teaching primary care residents and directing house officers' group
        1984-1987
        4. Psychotherapy supervision of nursing graduate students 1984-1986
        5. Grand Rounds for Departments of Psychiatry and Medicine

K.  Attending Psychiatrist, Cambridge Hospital In-Patient Psychiatry Service,
    Cambridge, MA.  Duties included supervision of psychiatric residents,
    psychology interns, and medical students. July 1981- December 1983

L.  Medical Director, 735 Inc., Melrose, MA  Outpatient Mental Health Clinic
    July 1981-December 1983

2

    M.   Forensic consultations: 1983- present

    N.   Adolescent Psychiatry Unit, Boston State Hospital 1969-1973
         Director, Sheltered Workshop and Vocational Training
         Activities Supervisor

IV.    Massachusetts License, Board of Registration and Discipline in Medicine, #43790
       Issued February 21, 1979
       American Board of Psychiatry and Neurology, #28364, issued November 1986

V.     Professional Affiliations
       Massachusetts Medical Society
       Massachusetts Psychiatric Society
       American Psychiatric Association
       American Academy of Psychiatry and the Law

VI.    Community Activities:
       Member, Dedham Board of Health, March 1985-March 1988

VII.   Publications
       A. Attleboro Sun Chronicle, columnist on mental health issues, October 1994-
       September 1997
       B. "Filming Adolescent Activities" Hospital and Community Psychiatry,
       August 1971
       C. "The Role of the Library in an Adolescent Service" Hospital and Community
       Psychiatry, May 1972 (with Anton O. Kris, M.D.)

VIII.  Teaching

       Psychology Colloquium: Coping with Death and Dying, University of Puget
       Sound, October 30, 2007

       Guest Lecturer, Sargent College of Allied Health Sciences at Boston University,
       1997-2004

       Presentation to Community Service Board at Rome Memorial Hospital,
       Rome, NY May 2, 2001

       Early Intervention – Suicide Prevention and Depression Among College Students,
       Northeastern University, October 2, 1993

       "Juggling the Generations" – issues in geriatrics, Women's Seminar,
       Neponset Valley Health Systems, September 30, 1993

Workshop: Psychotherapy with Elderly Patients in Long Term Care Settings
Presented at the Northeastern Gerontological Society, Annual Conference,
Albany, NY, April 19, 1991

Workshop: Psychotherapy of Nursing Home Residents with Character
Disturbances, presented at the American Psychological Association,
1991 Annual Convention, San Francisco, California, August 20, 1991

Workshop: Psychotherapy with the Elderly
Conference: Treatment of the Behaviorally Disturbed Geriatric Patient,
Co-sponsored by Fuller Memorial Hospital, American Geriatric Services, and
Human Services of Southeastern Massachusetts, Mansfield, MA October 25, 1991

Workshop: The Wolf in Sheep's Clothing: Medical Illness and Psychiatric
Symptoms, presented at the Massachusetts School of Professional Psychology,
Dedham, MA, November 15, 1991

Faculty/Panelist, Massachusetts Continuing Legal Education
August 2008 – Forensic Psychiatry and the Vicissitudes of Memory
January 2009 – Psychiatric Issues in Restraining Order Enforcement

Guest Lecturer, Suffolk Law School, January, 2014 – False Confessions

Lecturer, Committee for Public Counsel Services, Certification Training –
Clinical Aspects of Mental Health Litigation/Treatments for Mental Disorders
Worcester, MA, November 21, 2014

Lecturer, Second Annual Boston Symposium on Psychology and the Law –
Use of Psychotropic Medications for Sexually Inappropriate Behavior
Boston, MA, December 6, 2014

Forensic Experience

A. Criminal
    1. Commonwealth v. Fraser  (Dedham District Court)
    2. Bridgewater State Hospital evaluations:
        a. assault and battery
        b. sexual offenses
        c. attempted murder
        d. murder
        Issues: competence to stand trial, criminal responsibility, dangerousness,
        parole applications, transfers to less restrictive settings, medications and
        treatment plans
    3. U.S. v. DelaCruz  (United States District Court, District of Massachusetts)
    4. U.S. v. Kelly (United States District Court, District of Massachusetts)
    5. Knipfer v. State of New Hampshire

4

6. State of New Hampshire v. Hilchey
7. State of New Hampshire v. LaBarre
8. Commonwealth of Massachusetts v. Bishop
9. Testimony before Sexual Offender Registration Board, Commonwealth of Massachusetts
10. Commonwealth v. Dell'Isola (Middlesex Superior Court)
11. Elghorfi v. Bridgewater State Hospital (Plymouth Superior Court)
12. Psychiatric Evaluations re Internet Sex Crimes

B. Civil
1. Commitments (approximately 250)
2. Psychiatric Damages (approximately 15)
3. Independent Medical Evaluations (approximately 500)
4. Medical Malpractice (5)

C. Training
American Academy of Psychiatry and the Law:
Board Review Course, October 2002
Conference, October 2006
Courses: Challenges in Correctional Psychiatry
Insanity Defense
Perspectives on Malingering
False Allegations
Two Views of Insanity
Risk Assessment
The Internet and Child Pornography
NGRI Re-offending
Conference, October 2007
Courses: Assessment of Child Pornography Offenders
Conceptual History of Psychopathy
Forensic Evaluation of Problematic Internet Use
Violent Offenders
Treating Pedophilia
Asperger Psychopathology and Internet Sexual Crimes
The Treatment of Incarcerated Sex Offenders
Forensic Applications of Video Game and Internet Addiction

D. Faculty of MCLE

1. Panelist, Forensic Psychiatric & Legal Perspectives on Law & Memory (August, 2008)

2. Panelist, Domestic Abuse/Enforcement of Restraining Orders (January, 2009)

E. Committee for Public Counsel Services

5

1.Faculty/Panelist, CPCS Guardianship Seminar, Southeast Region (January, 2013)

F. Guest Lecturer at Suffolk Law School (January 2014)
   Topic: False Confessions

G. Guest Lecturer at Pilgrim Advocates conference (October 2015)
   Topic: Criminal Responsibility and Mental Illness

# EXHIBIT 2

**Leslie Rita Vogel, M.D.**
**55 Hatchetts Hill Road**
**Old Lyme CT  06371**
**(617) 804-2890**

**July 20, 2017**

**Psychiatric Report/Competency**
**Re: Fathalla Mashali, M.D.**

I am a licensed psychiatrist in New York and Massachusetts who has actively practiced psychiatry for the past 26 years. My *Curriculum Vitae* is attached hereto.

Attorneys Jeffrey Denner and Joseph Keller, counsel for the Defendant, Dr. Fathalla Mashali have requested my assistance in the sentencing phase of this case. I met with Dr. Mashali and his wife, Noah multiple times over the past weeks and months, most recently on July 18th. I have read the Presentence Report, the Government's Sentencing Memorandum, reviewed multiple medical records from hospitals, which include various psychiatric, neurologic, and medical evaluations. I have also reviewed legal documents filed in connection with the prior competency proceedings as well as legal documents relating to the criminal charges brought.

In combination, all of the foregoing paint a multi-factorial picture of severe psychiatric and neurologic co-morbidity. But before those disorders surfaced, Dr. Mashali was a high-functioning anesthesiologist. He evidently displayed reasonably good judgement, intact memory, physical stamina, and the ability to plan and facilitate. There was no evidence of entrenched sociopathic behaviors. A turning point occurred. In 2002, he became ill with Sarcoidosis. The severity of the disease required powerful steroids. One problem led to another: steroid-induced diabetes, gastroparesis with vomiting and weight loss; nutrient deficiencies with known neuropsychiatric effects, joint pain, and orthostatic hypotension. Accompanying those events over time was an increasing and striking deterioration in insight, judgment and physical capability. The cognitive and physical deterioration appeared too severe to have arisen from psychiatric issues alone (e.g., affective disorder/depression). Whatever the root cause, Dr. Mashali's neuropsychiatric deficits have steadily intensified: Gait impairment, memory loss, poor insight/judgment, possible seizures, hallucinations, vision problems, severe depression eliciting repeated recommendations for ECT and involuntary psychiatric commitment. In addition, neuropathy, gastroparesis and orthostatic hypotension impede his most basic functions and physical comfort.

Currently, Dr. Mashali continues to deteriorate. Even in comparison to three weeks ago, he is markedly worse. He cannot follow thought processes. He perseverates. He can neither receive, nor process, information critical to his own case. On exam, he looked particularly confused and genuinely frightened. He described "seeing men", whose voices instructed him not to cooperate with his attorneys and physicians. He denied that the voices directed him to hurt himself or others. He could immediately register 3 out of 3 words, but could not recall them 3 minutes later. Dr. Mashali had briefly attempted a few weeks earlier to provide medication history; he stated he was taking Propulsid, but confused Pantoprazole with Propulsid – not seeming to understand that they were completely different categories of medication. Now he seemed unable to even make an effort to participate. Correspondingly, his physical status has also declined; his gait seemed more unstable (he had fallen badly at home; a large cut was visible on his forehead); (with the possibility of

intracranial bleed,)[1] his eye movements (upward gaze) were impaired, which generally indicates neurologic dysfunction.

Dr. Jennifer Gatchel at MGH, in records I have reviewed well-describes the complexity of Dr. Mashali's neuropsychiatric issues. She raises the issue of the currently noted features playing a role in the judgement which he had exercised during previous years. His mental status, pre-Sarcoidosis, certainly appeared unremarkable, but steadily declined after multiple neurologic insults, and have only worsened substantially to date. But while many diagnostic questions remain, there is no doubt that Dr. Mashali's mental status has deteriorated dramatically in recent weeks. In addition, the above mentioned recent fall where he hit his head, and which could result in further neurologic damage, must be assessed carefully. The "Bipolar-Type" features that Dr Mashali manifests – whether they be a primary psychiatric disorder, a secondary mania, or a multi-factorial encephalopathic condition - render him incapable of understanding what he is facing legally, or of constructively participating in assisting his attorney. It is, therefore, my opinion, held to a reasonable degree of medical certainty, that Dr. Mashali lacks the cognitive ability to work productively with his attorney, or to sufficiently understand the principles and consequences involved to defend himself adequately. The additional new finding of visual and auditory hallucinations directing him not to cooperate with his legal team – only further robs him of any chance to adequately participate in his case. The current confusion is supported by multiple physician notes-related to past cognitive deterioration as stated above, and again, he moreover appears markedly worse over the past months and acutely over the past few weeks.

Therefore Dr. Mashali does not demonstrate the requisite 'competency' at this time to meaningfully participate in the remainder his judicial proceedings.

Respectfully, he should be evaluated thoroughly, on an inpatient basis, perhaps at a federal prison hospital facility, to formally determine his level of present cognitive deficit and disability and the etiology of his decline.

Parenthetically, it is also my opinion that he is no longer capable of remaining home alone, unsupervised, due to his physical and mental limitations.

Respectfully Submitted,

_M.D._

Leslie Vogel, M.D.

---

[1] I have been informed today by the Defendant's wife that he has been admitted to an MGH medical ward to deal with the medical issues arising from the fall. She apparently has been told that he has a "hematoma on his brain" and has additionally been "sectioned" psychiatrically, which means he is at least temporarily in state custody and will be transferred to a psychiatric ward if and when he is medically cleared. As an aside, while he is in the medical ward there is a hospital aide sitting with him constantly because he is in state custody as a result of his sectioning, and he now requires monitoring due to his diminished neuropsychiatric state. Additionally, the team had discussed a round of Electro Convulsive Therapy (ECT) for his mental state as well, which would have to be on hold until his intracranial and neurological state is clarified.

Curriculum Vitae

**Leslie R. Vogel, M.D.**
55 Hatchetts Hill Road
Old Lyme ,CT  06371
Tel:  617 804-2890

## Personal Data:

Born                             Brooklyn, NY
Citizenship                  United States of America

## Education:

| Year | Degree | Field | Institution |
|------|--------|-------|-------------|
| 1978 | B.A. | English | Cornell University |
| 1983 | | Pre-Med | CUNY Hunter |
| 1987 | M.D. | Medicine | Yale Medical School |

## Postdoctoral Training:

## Internships and Residencies:

| | |
|---|---|
| 7/1/87 – 6/30/88 | *Intern* in Medicine/Psychiatry Program, Hospital of the University of Pennsylvania, Philadelphia PA |
| 7/1/88-6/30/91 | *Resident* in Psychiatry Program, University Texas at San Antonio Health Sciences Center, San Antonio TX |

## Clinical and Research Fellowships:

| | |
|---|---|
| 7/1/92-6/30/93 | *Clinical Fellow* in Consultation-Liaison Psychiatry, Columbia University College of Physicians and Surgeons, New York NY |
| 7/1/93-6/30/95 | *Research Fellow* in Developmental Psychobiology, Columbia University College of Physicians and Surgeons, New York NY |

## Licensure and Certification:

| | |
|---|---|
| 6/91 | New York State License # 185584 |
| 1991 | DEA BV2275344 |
| 1/94 | The American Board of Psychiatry and Neurology, Cert # 39025 |
| 11/14 | Massachusetts Medical License #259286 |

**Academic Appointments:**

| | |
|---|---|
| 7/91-7/95 | Instructor, Clinical Psychiatry, Columbia University College of Physicians and Surgeons |
| 7/95-12/97 | Assistant Clinical Professor, Psychiatry, Columbia University College of Physicians and Surgeons |
| 7/98-7/00 | Clinical Assistant Professor, Psychiatry, Cornell University Medical College |
| 3/00-3/04 | Assistant Clinical Professor, Psychiatry and Behavioral Sciences, New York Medical College, |

**Hospital Appointments:**

| | |
|---|---|
| 7/91-7/93 | Assistant, Psychiatry Service, Columbia Presbyterian Hospital, New York NY |
| 7/93-7/95 | Assistant in Clinical Psychiatry/Postdoctoral Clinical Fellow, Columbia Presbyterian Hospital, New York NY |
| 7/95-12/97 | Assistant Attending, Psychiatry, Columbia Presbyterian Hospital, New York NY |
| 7/99-7/01 | Attending Psychiatrist, Psychiatry Consultation Service (On-Call), Beth Israel North Hospital, New York NY |
| 3/99-3/00 | Attending Psychiatrist, Psychiatry Consultation Service, Coler-Goldwater Hospital, Roosevelt Island NY |
| 3/00-3/03 | Attending Psychiatrist, Geriatric Psychiatry Service, Westchester Medical Center, Valhalla NY |
| 6/09-10/09 | Attending Psychiatrist, Part-time, Consultation-Liaison Service, New York University Medical Center, New York NY |
| 1/13-12/13 | Attending Psychiatrist, Consultation-Liaison Service, Staten Island University Hospital North, Staten Island NY. |
| 4/1/15-7/16 | Riverside Community Care/Emergency Services/Attending Psychiatrist, Psychiatry Consultation Service, Milford Hospital, Milford MA. |

**Awards and Honors:**

| | |
|---|---|
| 1977 | Writing and Teaching Award, Cornell University |
| 1978 | Distinguished Honors in All Subjects, Cornell University |
| 1983-84 | Student Editor Competition, Yale Journal of Biology and Medicine |
| 1987 | Medical Writer Award, American Medical Association |
| 1989 | Young Investigator Travel Grant Award, EASD, Lisbon Portugal |
| 1991 | The American College of Psychiatrists/Laughlin Fellowship Award, Ft. Lauderdale Florida. |
| 1991 | Association for Academic Psychiatry/Mead Johnson Fellowship Award Tampa, Florida |
| 2010 | America's Top Psychiatrists, Consumers Research Council of America, Washington D.C. |
| 2011 | American's Top Physicians, Consumers' Research Council of America, Washington D.C. |

**Memberships in Professional Societies**
2017          Academy of Psychosomatic Medicine

**Editorial Positions:**
1983-85       Student Editor, Yale Journal of Biology and Medicine

**Principal Clinical and Hospital Service Responsibilities:**

| | |
|---|---|
| 7/91-7/92 | Attending, Psychiatry Emergency Room, Columbia Presbyterian Hospital, NY NY |
| 2/92-2/94 | Liaison Psychiatrist, Functional Rehabilitation Unit/Geriatrics/Alternative Level of Care, Columbia Presbyterian Hospital, NY NY |
| 7/92-7/93 | Fellow, Consultation-Liaison Psychiatry Service, Columbia Presbyterian Hospital, NY NY |
| 7/93-7/95 | Assistant in Clinical Psychiatry, Consultation-Liaison Psychiatry Service, Columbia Presbyterian Hospital, NY NY |
| 7/95-6/97 | Director, Primary Care/Psychiatry Liaison Consult Service, Columbia Presbyterian Hospital, NY NY |
| 3/00-3/03 | Director, Geriatric Psychiatry Service, Westchester Medical Center, Valhalla NY |
| 6/09-10/09 | Attending, Part-time, Consultation-Liaison Psychiatry Service, New York University, NY NY. |
| 1/13-12/13 | Attending, Consultation-Liaison Psychiatry Service, Staten Island University Hospital North, Staten Island NY |
| 4/15-7/16 | Attending, Psychiatry Consult Service. Consultation Service, Milford Hospital, Milford MA |
| 9/16-Present | Attending Psychiatrist, Psychiatry Consultation Service/Medoptions of Massachusetts, Marian Manor Skilled Nursing and Rehabilitation Center, Boston MA. |

**Teaching Experience:**

| | |
|---|---|
| 7/91-7/92 | Supervision and teaching of medical students and psychiatry residents in Emergency Room, Columbia Presbyterian Hospital, NY NY |
| 7/92-7/96 | Supervision and teaching of medical students and psychiatry residents on Consultation-Liaison Service, Columbia Presbyterian Hospital, NY NY |
| 3/00-3/03 | Teaching of medical students, residents and fellows on assessment of delirium in geriatric patients, New York Medical College, Valhalla NY |
| 6/09-10/09 | Supervising Consultation-Liaison Psychiatry Fellows, NYU, NY NY |
| 1/13-12/13 | Supervising and teaching Internal Medicine and Family Practice Residents, Psychiatry Residents, Staten Island NY. |
| 4/15-7/16 | Supervision and teaching of students, social workers, Milford Hospital, Milford MA. |
| 9/16-Present | Supervision and teaching of Nurse Practitioners and Nursing Staff, Marian Manor Skilled Nursing and Rehabilitation Center. |

**Major Clinical and Research Interests:**

Effect of Psychotropic Medications on Heart Rate Variability and Autonomic Activity; Delirium; Autoimmune Disease and Neuropsychiatric Manifestations; Movement Disorders/Tourette's; Capacity Issues in Geriatrics; Nutritional Deficiencies and Neurologic Impairment in Alcoholics and Bariatric Surgery Patients.

**Military Service:**

None

**Bibliography:**

**Original Reports:**

Vogel, L.R., E. Klein-Robbenhaar, and A. Giaccari. Effect of Combined Lithium and Vanadate Therapy on Insulin Sensitivity in Diabetic Rats. *Diabetes* 38:353A, 1989.
Rossetti, L., A. Giaccari, E. Klein-Robbenhaar, and L.R. Vogel. Insulinomimetic Properties of Trace Elements: Characterization of the In Vivo Mode of Action in Diabetic Rats. *Diabetes* 39:1243-1250, 1990.
Choi, S.B., and L.R. Vogel. Effects of Lithium and Insulin on Skeletal Muscle cyclic AMP Concentration. *Diabetes* 39:276A, 1990.
Vogel, L.R., P.R. Muskin, E.D. Collins, and R.P. Sloan. Lorazepam Reduces Cardiac Vagal Modulation in Normal Subjects. *Journal of Clinical Psychopharmacology*, 16(6):449-453, 1996 .

**Reviews, Books and Book Chapters:**

Vogel, L.R. and P.R. Muskin. Anxiety Disorders, in *Essentials of Psychiatry*. Eds. Marcus E and J Cutler, First Edition. W.B. Saunders Company, New York, NY. 1998

Franklin R. Schneier, Hilary B. Vidair, Leslie R. Vogel, and Philip R. Muskin. Anxiety Disorders, in *Psychiatry*: Cutler JL, Marcus ER: Psychiatry, Second Edition, Oxford University Press, New York, NY, USA, 2010.

Franklin R. Schneier, Hilary B. Vidair, Leslie R. Vogel, and Philip R. Muskin. Anxiety Disorders, in *Psychiatry*: Cutler JL: Psychiatry, Third Edition, Oxford University Press, 198 Madison Avenue, New York, NY, USA, *2014.*

Vogel, L.R. What Caregivers Need to Know About Medication. *New Choices, Reader's Digest Publications, Inc.*, Pleasantville, New York, March 2002.

## Abstracts:

Vogel, L.R., A. Giaccari and L. Rossetti. Lithium Improves Post-Meal Plasma Glucose and Insulin Action in Diabetic Rats. l42nd Annual Meeting, American Psychiatry Association, San Francisco, CA May 1989. *New Research Programs and Abstracts*: NR 63.

Vogel, L.R., A. Giaccari, S. Frontoni, and S.B. Choi. Lithium Potentiates Insulin's Effect on Skeletal Muscle cAMP. l43rd Annual Meeting, American Psychiatry Association, New York, NY May 1990. *New Research Programs and Abstracts:NR* l5.

Vogel, L.R. Lithium and Carbohydrate Metabolism. 38th Annual Meeting of The Academy of Psychosomatic Medicine, Atlanta GA, October 1991. *Consultation-Liaison Research Abstracts*: 28.

Vogel, L.R., P.R. Muskin, E.D. Collins, and R.P. Sloan. Vagolytic Effects of Lorazepam on Cardiac Autonomic Control. 33rd Annual Meeting, American College of Neuropsychopharmacology, San Juan, PR December 1994. *Abstracts of Panels and Posters*: p. 192.

Vogel, L.R., P.R. Muskin, E.D. Collins, and R.P. Sloan. Effect of Lorazepam on Cardiac Autonomic Control in Stressed vs Unstressed States in Normal Subjects. l48th Annual Meeting, American Psychiatric Association, Miami Florida May l995. *New Research Programs and Abstracts*: NR156.

Vogel, L.R., P.R. Muskin, E.D. Collins, E Petkova, and R.P. Sloan. Diurnal Variation in Vagolytic Response to Lorazepam in Normal Subjects. 149th Annual Meeting, American Psychiatric Association, New York NY May 1996. *New Research Programs and Abstracts*: NR181.

# EXHIBIT 3

Affidavit of Noha Elkadry Mashali, DMD

I , Noha Elkadry Mashali, do say under oath:

1. I am the wife of the defendant Fathalla Mashali, MD, having been married December 31, 1992. We reside at 153 PineStreet, Dover.
2. In an earlier affidavit, I indicated that my husband's mental state, including memory, understanding, ability to communicate, and ability to make sound judgements have been compromised for the past several years.
3. In the past month or two his mental state has dramatically deteriorated as has his physical strength.
4. He sleeps for a good deal of every day, falls repeatedly when he is awake and has become so confused and disoriented that he is almost unrecognizable to us for a great deal of the time.
5. Last week in response to a question asked by Attorney Denner to my son Dean, who is 19 years old, about his father's state of mind, my son looked down and answered "my dad is no longer with us most of the time."
6. In addition to becoming more confused and disoriented, the way he acts and the way he thinks have become increasingly bizarre. He often can't give a responsive answer to basic questions he is asked or his answers are off topic.
7. Most recently it is clear he is interacting with imaginary people who do not exist. He has admitted to me he sees and speaks with a group of men who are his only friends, who are the only people who can help and protect him and have warned him to not speak with or cooperate with his lawyers, with his doctors and even with me, as none of us wish him well. He has also mentioned to me that many times he believes I am sitting with him and he is talking to me but when he turns around, I am not there.
8. He has most recently told me that there are also a second group of men who are speaking to him and advising him as well.
9. As a result of the foregoing, in addition to the neuropsychological and reasoning deficits and my husband's inability to assist Mr. Denner, he seems convinced by his hallucinations he should not even be trying.
10. Several mornings ago my husband and I were at Mr. Denner's office meeting with Mr. Denner and Mr. Keller as well as with two psychiatric experts. It was very clear that my husband had no clue to what was going on and seemed to be suffering from some sort of dementia in the way he interacted with the group.
11. They were also very concerned about the cut on my husband's forehead which he had incurred in a fall a couple of nights before. My husband shared with everyone the story of the imaginary men (but very real to him) he had been seeing and speaking to.
12. For some time Mr. Denner has been trying to have my husband explain to him certain aspects of what Mr. Denner calls the offense conduct, with particular attention to what amounts of the billing to the insurance company were legitimate and which were fraudulent , as my husband always maintained before, that many of the billings were legitimate and not false.

13. At this point as well as for the past couple of months my husband has no recollection of the billing process, which bills were accurate and which bills were not, and can't even begin to discuss the subject with him.

14. While the situation has dramatically deteriorated over the last several months, even over the past couple of years in varying degrees my husband has simply been unable to explain to Mr. Denner this and various other aspects of what happened.

15. When he was able to plead guilty on the second try he was able to accept the fact that he had done something wrong but was really unable to remember any of the specifics even then and his condition has worsened appreciably since the change of plea, with him really hitting rock bottom in confusion and disorientation in the past two or three weeks

16. Mr. Denner told me he was very reluctant to renew the motion for competence but told me he felt that there were very important parts of the sentencing of this case that required my husband to explain things to him which he was simply unable to do. Mr. Denner and I both hope that somehow my husband's mind will clear up so he would be able to properly defend himself in the sentencing hearing. Mr. Denner explained that he may need to stay in custody until that point but we all agree that he is just not well enough to participate in a sentencing at this point. He is a very weak shadow of his former self.

17. My husband has been receiving psychiatric and medical care constantly since the change of plea, having multiple appointments with psychiatrists, psychologists, his rheumatologist, having infusions, having Transmagnetic Stimulation Therapy, physical therapy since the change of plea, none the less, the state of mind and state of body have simply diminished continuously.

18. At the doctor's appointments he had two days ago, the doctors felts that for his own protection he should be sectioned and put back into the hospital for his own safety, and based on what Fathalla told me, he would be given ECT (Electo Convulsive Therapy) as soon as he could be medically cleared to receive it.

Signed under the penalties of perjury on this 20th day of July 2017

7-20-17

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                          No. 14CR 10067 RWZ

FATHALLA MASHALI,
　　　　　　　Defendant.

## AFFIDAVIT OF JEFFREY A. DENNER IN SUPPORT OF THE DEFENDANT'S MOTION TO SEEK A COMPETENCY EVALUATION

I, Jeffrey A. Denner, being duly sworn, do say and depose:

1.  I am the attorney of record for the Defendant, Fatalla Mashalli, MD.

2.  I have spent significant time with the Defendant since the change of please hearing in the USDC.

3.  I have noted that his capacity to assist in his defense has dramatically again diminished over this period of time, particularly with regard to cognitive processes related to memory function, as well as his overall general, mental acuity and reasoning.

4.  More specifically, over the approximately 4-5 weeks, he sleeps almost constantly, occasionally nods off while we're speaking, is unable to converse responsively, apparently has very little or no memory or understanding of the specifics of the offense conduct herein and seems weakened to the point of virtual exhaustion, mental and physical.

5.  Most recently at a meeting at my office on July 18, 2017 with the Defendant, his wife, and two expert psychiatric witnesses, we learned that the Defendant is experiencing auditory and visual hallucinations, seeing groups of men who do not exist who tell him in directive voices not to interact with his lawyers and doctors and to disregard them, as

they are not helping him; claiming that the only help he is going to get is from this group or groups of men.

6. He is virtually unable to recall the subject conduct which serves as the basis for the indictments pending herein. More specifically, he has not been able to recall matters vital to his sentencing relating to "loss calculation" which involve discerning between "legitimate" and "fraudulent" billings to insurance companies. Not only does he not recall them, for the past weeks he has seemingly been unable to even understand their significance, or what is actually being asked of him to do.

7. Thus, any "loss calculation" number arguably cannot be properly presented to the Sentencing Court as same as impossible without the effective assistance of the Defendant, which he clearly is unable to provide. As an aside, all other members of this criminal enterprise who might be able to assist your undersigned in separating the "legitimate" and "fraudulent" billings are either legally, or practically, unavailable as they are either government witnesses or a defendant in a related case.

8. It is your Affiant's expectation should the Court grant the motion for a competency evaluation, either with or without an evidentiary hearing and said evaluation is performed either inpatient or outpatient, and if inpatient whether or not in a federal prison hospital setting, the Defendant will be found not to be competent (i.e. not able to effectively assist his counsel in this critical sentencing phase- as "loss calculation" for purposes of guideline range determination, is by far the key element).

9. Until literally two to three days ago when we learned that the Defendant was actually hallucinating and delusional, perhaps had suffered some sort of brain bleed by yet one more time falling down and cutting his forehead and were confronted by an obviously demented Defendant unable to converse with either the lawyers or the expert psychiatrists, and that further, later that day he was admitted and/or sectioned psychiatrically at a local hospital (MGH), it became obvious that I had no choice but to move for this evaluation. This was reinforced by my reluctant acknowledgement that in this state of mind he was simply not going to be able, even at the last moment, to assist

me in determining a net "loss calculation" number which factors in a reduction for the substantial legitimate billing charges that I know exist in this matter. In point of fact, we were reluctant to file the motion until we felt that we had no other choice.

Signed under the penalties of perjury this 20th day of July 2017.

Jeffrey A. Denner
Jeffrey A. Denner

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 14CR 10067 RWZ |
| FATHALLA MASHALI, Defendant. | |

### AFFIDAVIT OF JOSEPH G. KELLER JR. IN SUPPORT OF THE DEFENDANT'S MOTION TO SEEK A COMPETENCY EVALUATION.

I, Joseph G. Keller Jr., depose and state:

1. I am Co-Counsel on the above entitled action.

2. I have met with Dr. Mashali on two occasions in the last month to consult with him about the loss calculation for the sentencing memo and hearing.

3. Dr. Mashali was unable to assist me or meaningfully communicate with me at either visit and on the last visit on July 18, 2017 was basically incoherent.

4. At both visits, I noticed a significant deterioration in his appearance and health.

5. On July 18, 2017, Dr. Mashali was unable to communicate any facts about his situation and appeared disoriented to time and place.

6. In my opinion, Dr. Mashali is unable to meaningfully assist his Counsel in preparing for his sentencing.


   /s/ *Joseph G. Keller Jr.*

Joseph G. Keller Jr.

# EXHIBIT 6

# United States Court of Appeals
## For the First Circuit

---

No. 14-2228

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN S. ALPHAS,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

---

Before

Barron, Selya and Stahl,
Circuit Judges.

---

Tracy A. Miner, with whom Megan A. Siddall and Demeo LLP were
on brief, for appellant.
Brian A. Pérez-Daple, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

---

May 7, 2015

---

**SELYA**, **Circuit Judge**.   When a criminal defendant is convicted of a fraud offense, the Sentencing Commission has established amount of loss — generally the higher of actual or intended loss — as a rough proxy for determining the seriousness of the offense and the relative culpability of the offender.  Although this concept is easily stated, its application often has vexed sentencing courts.  As in so many other instances, the devil is in the details.

This appeal requires us to decide two issues of first impression in this circuit.  The first involves the method for calculating the guideline enhancement for amount of loss in an insurance fraud context.   The second involves the method for calculating the amount of statutory restitution in that context.  Concluding, as we do, that the court below erred in adopting its calculation methods, we vacate the appellant's sentence and remand for resentencing.

**I.   BACKGROUND**

Because this sentencing appeal follows a guilty plea, we distill the pertinent facts from the plea agreement, the change-of-plea colloquy, the undisputed portions of the presentence investigation report (PSI Report), and the transcript of the disposition hearing.  See United States v. Almonte-Nuñez, 771 F.3d 84, 86 (1st Cir. 2014).

Defendant-appellant John S. Alphas owns and operates The Alphas Company, a wholesale produce distributor located in Chelsea, Massachusetts. During the relevant time frame, the appellant purchased large quantities of produce, often from distant purveyors. To protect his investment, the appellant routinely obtained insurance on these produce shipments.

In or around March of 2007, the appellant devised a scheme to defraud. Over the next four and one-half years, he submitted at least ten fraudulent claims to his insurers for lost, stolen, or damaged produce.[1] The appellant sought reimbursement for the value of allegedly lost, stolen, or damaged produce, together with disposal expenses, shipping fees, and the cost of procuring replacement stock. These claims were largely bogus: in each instance, the appellant either invented fictitious losses or artificially inflated legitimate losses. To make matters worse, he supported his submissions with documents that had been fraudulently altered or, in some cases, constructed out of whole cloth. He compounded his mendacity by making false and misleading statements to insurance adjusters.

The insurance policies at issue contained void-for-fraud clauses. A representative clause stated:

---

[1] Nine of these claims were submitted to Zurich North American and the final claim to Selective Insurance Company. Though all of the claims were submitted in the name of The Alphas Company, the sentencing context requires us to attribute those claims and the underlying losses to the appellant.

> This Coverage Part is void in any case of
> fraud by you as it relates to this Coverage
> Part at any time. It is also void if you or
> any other insured, at any time, intentionally
> conceal or misrepresent a material fact
> concerning:
>
> 1. This Coverage Part;
> 2. The Covered Property;
> 3. Your interest in the Covered Property; or
> 4. A claim under this Coverage Part.

Four of the appellant's claims were never paid: three
were withdrawn after suspicions surfaced and the lone claim
submitted to Selective Insurance Company was thwarted by early
detection of the fraud. The other six claims were paid, but mostly
in amounts less than their face value. In sum, the ten claims
totaled over $490,000, yet the appellant received payments totaling
only $178,568.41.

The appellant's persistent pattern of chicanery sparked
a federal criminal investigation. In May of 2014, the government
filed an information charging the appellant with a single count of
wire fraud. See 18 U.S.C. § 1343. Waiving prosecution by
indictment, the appellant pleaded guilty to the charge. In an
accompanying plea agreement, the parties stipulated to a base
offense level of 7. See USSG §2B1.1(a)(1).

The parties could not agree, however, as to the amount of
loss — a necessary step in determining the guideline sentencing
range (GSR). To fill this void, the PSI Report recommended
boosting the appellant's offense level by 14 levels based on an

-4-

intended loss of approximately \$480,000. See id. \$2B1.1(b)(1)(H)-(I) (increasing offense level by 14 for losses exceeding \$400,000 but not greater than \$1,000,000). This calculation derived from the probation officer's conclusion that intended loss should be measured by the face amount of the appellant's claims, less a \$1000 per claim deductible.

The appellant objected to the recommendation. He argued that the loss figure should exclude legitimate losses embedded in the fraudulent claims. In conjunction with this argument, he submitted a competing set of calculations that purported to show which component amounts were legitimate. This set of calculations yielded an intended loss amount of roughly \$178,000 which corresponded to an increase of 10 (rather than 14) in his adjusted offense level. See id. \$2B1.1(b)(1)(F).

The PSI Report also dealt with restitution. It recommended an award of \$178,568.41 (the aggregate amount actually paid out on the claims). The appellant objected to this recommendation, envisioning a finding of actual loss (and, therefore, a restitution amount) of \$58,931.36. Once again, the appellant attributed the reduced figure to the fact that a portion of the claims paid corresponded to legitimate losses.

The probation officer stood by her calculations regarding both the guideline enhancement and restitution. Although she conceded that the appellant may have incurred legitimate losses,

-5-

she maintained that the appellant's fraud rendered the claims altogether illegitimate.

The disposition hearing was held on November 6, 2014. The district court concluded as a matter of law that where, as here, insurance policies contain void-for-fraud clauses, intended loss is equal to the aggregate face value of the claims submitted. Starting with this premise, the court overruled the appellant's objections; enhanced his offense level by 14 levels; deducted 3 levels for acceptance of responsibility, see id. §3E1.1; placed the appellant in Criminal History Category I; and set the GSR at 27 to 33 months, see id. Ch.5, Pt.A, sentencing table. The court then varied sharply downward, sentencing the appellant to an incarcerative term of 12 months and 1 day. In addition, the court fined the appellant $60,000; attached a 36-month term of supervised release; and ordered payment of restitution to Zurich North American in the amount of $178,568.41.

This timely appeal ensued. The district court refused to stay the appellant's sentence pending appeal. This court, however, granted a stay. See United States v. Alphas, No. 14-2228 (1st Cir. Dec. 31, 2014) (finding that appeal presented "'substantial question' within the meaning of 18 U.S.C. § 3143(b)(1)(B)").

## II. ANALYSIS

The appellant assigns error to the district court's determination of the amount of loss with respect to both the

-6-

guideline enhancement and the award of restitution. Because these determinations are controlled by different authorities, we bifurcate our analysis.

### A.  **The Guideline Enhancement**.

The appellant first contends that the sentencing court used an improper method of calculating intended loss and, thus, erred in enhancing his offense level by 14 levels. This contention is met at the threshold by the government's assertion that we need not reach the merits because any calculation error was harmless. We begin with that assertion and then proceed to the merits.

1.  **Harmlessness**. The government's argument for harmlessness rests on the district court's imposition of a below-the-range sentence coupled with the court's later remark, made while denying the appellant's motion to stay the sentence pending appeal, that a recalculation of the GSR would be unlikely to result in a lower sentence. This argument flies in the teeth of conventional wisdom, which teaches that the improper calculation of a defendant's guideline range comprises a significant procedural error. See Gall v. United States, 552 U.S. 38, 51 (2007). Such an error ordinarily requires resentencing. See United States v. Ramos-Paulino, 488 F.3d 459, 463-64 (1st Cir. 2007). Indeed, a defendant normally can appeal from an error in calculating his GSR even though the district court imposed a sentence beneath the

-7-

bottom of the GSR.  See United States v. Paneto, 661 F.3d 709, 715 (1st Cir. 2011).

To be sure, an appellate court may deem such an error harmless if, after reviewing the entire record, it is sure that the error did not affect the sentence imposed.  See Williams v. United States, 503 U.S. 193, 203 (1992).  In other words, resentencing is required if the error either affected or arguably affected the sentence.  See Ramos-Paulino, 488 F.3d at 463.

The case at hand does not fit within these narrow confines.  Although the court below imposed a sentence beneath the bottom of the GSR, there is at least a possibility that the court would have imposed an even more lenient sentence had it started with a lower GSR.  See United States v. Foley, ___ F.3d ___, ___ n.13 (1st Cir. 2015) [Nos. 13-1048, 13-1118, slip op. at 31 n.13]. While the court stated that a lower GSR was "unlikely" to result in a different sentence, we have recently reaffirmed that the possibility of a lesser sentence is enough to preclude a finding that an error in calculating the GSR is harmless.  See id.  Such a possibility exists here: saying that an event is unlikely is not the same as a categorical assurance that the event will not come to pass.  It follows that if the court below erred on the high side in fashioning the guideline enhancement for amount of loss (and, thus, the GSR), we cannot regard that error as harmless.

-8-

2.  **Calculating Intended Loss.**  Our rejection of the government's harmlessness argument brings us to the merits of the appellant's claim that the district court committed a calculation error.   We  review  de  novo  the  court's  interpretation  and application of the sentencing guidelines, including the propriety of its loss-computation method.  See United States v. Prange, 771 F.3d 17, 35 (1st Cir. 2014); United States v. Walker, 234 F.3d 780, 783 (1st Cir. 2000).

In fraud cases like this one, the guidelines direct the sentencing court to augment the defendant's offense level based on the amount of loss.  See USSG §2B1.1(b)(1).  For this purpose, loss is defined as "the greater of actual loss or intended loss."  Id. §2B1.1, comment. (n.3(A)).  Here, the district court based its guideline calculation on intended loss.   That term means "the pecuniary harm that was intended to result from the offense."  Id. at n.3(A)(ii).  Intended loss is not synonymous with probable loss. Rather, the term "includes intended pecuniary harm that would have been impossible or unlikely to occur."  Id.  Seen in this light, intended loss "is a term of art meaning the loss the defendant reasonably expected to occur at the time he perpetrated the fraud." United States v. Innarelli, 524 F.3d 286, 290 (1st Cir. 2008). This  standard  focuses  primarily  on  the  offender's  objectively reasonable expectations, see id., though subjective intent may play

-9-

some role, see id. at 291 n.6; United States v. McCoy, 508 F.3d 74, 79 (1st Cir. 2007).

In this case, the sentencing court concluded that the intended loss was equal to the aggregate face value of the claims submitted by the appellant to his insurers, not the aggregate amount by which the appellant fraudulently inflated those claims.[2] The court reasoned that had the insurers known of the fraud when they received the claims, they would have invoked the void-for-fraud clauses and paid nothing. The court did not explain what bearing the void-for-fraud clauses may have had on the amount of loss that the appellant intended to cause. It said only that if intended loss were to be viewed solely as the amount of fraudulent inflation, fraudsters would have an incentive to inflate claims because, if caught in the act, they would be punished only for the inflated amount.

The government applauds this reasoning, but the appellant decries it. He notes that the sentencing guidelines treat loss as a proxy for relative culpability. In his view, basing an intended loss computation on the entire amount of an insurance claim rather than on the amount fraudulently claimed irrationally conflates the

---

[2] We express no opinion on whether any portion of the appellant's claims was legitimate. This is a matter the district court will need to address on remand. See text infra. For present purposes, we assume — as the appellant contends — that he did suffer some legitimate losses.

-10-

culpability of fraudsters who commit significantly different offenses.

Fraud has many manifestations, and calculating the loss associated with a particular scheme is sometimes more art than science. As a result, we have eschewed rigid rules and instead taken "a pragmatic, fact-specific approach" to loss calculation. Prange, 771 F.3d at 35 (internal quotation mark omitted). Such a pragmatic view suggests that loss computation should distinguish between an outright swindler who peddles, say, a forged title to a bridge in Brooklyn and a fraudster who contrives to render some value (albeit less than promised) to the victim. See id. at 36; United States v. Blastos, 258 F.3d 25, 30 (1st Cir. 2001). By any practical measure, the former seems more culpable than the latter.

Applying the degree-of-culpability approach to the insurance fraud context, it is appropriate for the loss-computation method to distinguish between a fraudster who wholly fabricates a non-existent claim and a fraudster who artificially inflates a legitimate claim. A fraudster who has suffered no loss at all but invents a $100,000 claim out of thin air is not the same as a fraudster who has suffered a legitimate $50,000 loss but artificially inflates his claim to $100,000. See United States v. Smith, 951 F.2d 1164, 1167 (10th Cir. 1991).

This gets to the heart of the matter. Under the sentencing guidelines, loss generally does not include sums that a

-11-

victim would have paid to the defendant absent the fraud.  See, e.g., United States v. Evans, 155 F.3d 245, 253 (3d Cir. 1998) (holding that actual loss in insurance fraud case does not include value of legitimate claims); United States v. Parsons, 109 F.3d 1002, 1004 (4th Cir. 1997) (same, in context of government benefits fraud); see also United States v. Miller, 316 F.3d 495, 498-99 (4th Cir. 2003) (applying this principle to intended loss).  Given this rule, the question reduces to whether the presence of a void-for-fraud clause makes a dispositive difference when calculating loss under the sentencing guidelines.

In resolving this question, we find instructive the line of cases involving government benefits fraud.  When a person fraudulently obtains government benefits, the United States typically is entitled to recover all sums paid (in a civil forfeiture proceeding) even though some benefits would have been paid anyway (that is, absent the fraud).  See, e.g., 5 U.S.C. § 8148(a); 28 U.S.C. § 2514.  But when the same fraudulent conduct undergirds a criminal conviction, courts have steadfastly refused to equate the amount of loss under the sentencing guidelines with the amount recoverable by the government through civil forfeiture. That is because "[f]orfeiture is a penalty imposed on a criminal independent of any loss to the crime victim."  Parsons, 109 F.3d at 1005.  Consequently, "[t]he loss itself (whether the actual or intended loss) is limited to the tangible economic loss of the

-12-

victim."  Id. at 1004.  The forfeitable amount does not count toward the government's loss, which is measured by the amount of benefits that was (and, in the case of intended loss, would have been) paid as a result of the fraud.  See United States v. Harms, 442 F.3d 367, 380 (5th Cir. 2006); United States v. Dawkins, 202 F.3d 711, 715 (4th Cir. 2000).

To be sure, government benefits fraud is governed by a special application note, which explains that in such cases loss "shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses." USSG §2B1.1, comment. (n.3(F)(ii)).  We believe that this note merely represents a specialized application of the guidelines' general focus on a defendant's relative culpability.  See, e.g., Dawkins, 202 F.3d at 714; Parsons, 109 F.3d at 1004-05.  Since this is so, it makes good sense to transplant the reasoning of the government benefits cases to the analogous context of insurance fraud.

We discern no sound basis for treating a void-for-fraud clause (in the insurance fraud context) differently than a civil forfeiture (in the benefits fraud context).  Both the void-for-fraud clause and the civil forfeiture anodyne afford relief after the fact.  So, too, such a clause, like the sword of Damocles inherent in a threat of civil forfeiture, serves the salutary purpose of encouraging transactional honesty.  And such a clause,

-13-

like a civil forfeiture, imposes a penalty on the fraudster for acting corruptly: if the insurer discovers the fraud, the insured forfeits everything.

The concept of loss under the sentencing guidelines serves a completely different purpose. See United States v. Hamaker, 455 F.3d 1316, 1337 (11th Cir. 2006); Dawkins, 202 F.3d at 715. The guidelines are designed to ensure that the sentence imposed on a defendant "reflect[s] the nature and magnitude of the loss caused or intended by [his] crimes." USSG §2B1.1, comment. (backg'd.). Consonant with this design, the guidelines use amount of loss as the primary metric by which "the seriousness of the offense and the defendant's relative culpability" are measured. Id. Sums forfeited under a void-for-fraud clause (which is really nothing more than an after-the-fact penalty) do not conform naturally to this metric. Cf. id. §2B1.1, comment. (n.3(D)(i)) (providing that "loss" does not include "[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, [and] other similar costs"). It would therefore be anomalous to read the guidelines to distinguish between two fraudsters who fraudulently inflate their claims by exactly the same amount simply because one is covered by an insurance policy that contains a void-for-fraud clause and the

-14-

other is covered by an insurance policy that does not contain such
a clause.[3]

The government resists this reasoning, asseverating that
the appellant intended to deprive his insurers of the entire amount
claimed regardless of whether some portion of that amount
represented legitimate losses.  To achieve this counterintuitive
result, the government asks us to consider what an objectively
reasonable fraudster standing in the appellant's shoes would have
expected to be paid were the fraud discovered.  Because such a
fraudster would be aware of the void-for-fraud clauses and know
that the misrepresentation would relieve his insurers of their
payment obligation, the government's thesis runs, the fraudster
would expect his insurers to suffer losses in the full amount of
the submitted claims.

We reject the government's thesis, which approaches
intended loss from the wrong angle.  Fraudsters do not expect to be
found out but, rather, expect to reap the benefits of their
contrivance.  The relevant inquiry, then, is what the fraudster
reasonably expected to euchre out of his victim, cf. id. at

_____

[3] We base this conclusion on the language and purpose of the
sentencing guidelines, not the language of the particular policies
at issue.  Whether and to what extent an insurance contract is void
or voidable is often a thorny issue and we do not need to resolve
that issue here.  For the reasons discussed above, an insurer's
loss for guideline purposes is distinct from any recovery to which
it might be entitled under a void-for-fraud clause in a civil
proceeding.

-15-

n.3(A)(ii) (defining "intended loss" as "the pecuniary harm that was intended to result from the offense" (emphasis supplied)), not what would have slipped through his fingers had he been caught in the act.

That amount necessarily excludes any sums that the fraudster would have been paid absent the fraud. See Burrage v. United States, 134 S. Ct. 881, 887-88 (2014) (explaining that the phrase "results from" implies "a requirement of actual causality," which typically "requires proof that the harm would not have occurred in the absence of — that is, but for — the defendant's conduct" (internal quotation marks omitted)). The sentencing court, then, should have determined whether and to what extent legitimate claims were embedded in the fraud.

Structuring "intended loss" in this way makes good sense. After all, loss is meant to serve as a proxy for the seriousness of the crime and the relative culpability of the offender. The best way to gauge the seriousness of a fraud offense is to determine how much the fraudster set out to swindle — and no fraudster sets out to swindle sums that he would have been paid anyway. That is also the best way to gauge a fraudster's culpability.

The best case for the government's contrary position is United States v. Torlai, 728 F.3d 932 (9th Cir. 2013) — but Torlai

-16-

cannot carry the weight that the government loads upon it.[4]  Torlai
involved a defendant who had obtained crop insurance policies from
private insurers through a federal program.  See id. at 935-36.
Those policies and their application documents included void-for-
fraud clauses.  See id. at 940 & n.8.  The defendant made a number
of misrepresentations both when he procured the policies and when
he submitted claims under them.  See id. at 936, 941-43.

Appealing his sentence, the defendant argued that the
district court erred in calculating loss by failing to determine
which portions of his indemnity claims were legitimate.  The Ninth
Circuit disagreed, noting that the case involved a government
benefits program and, therefore, loss constituted "the value of the
benefits obtained by unintended recipients."  Id. at 938 (emphasis
omitted) (quoting USSG §2B1.1, comment. (n.3(F)(ii))).  The court
stated that "[b]y virtue of his fraud, [the defendant] was not
eligible for any government benefit under the crop insurance
program, and therefore, he was not an 'intended beneficiary.'"  Id.
at 943.

Certain  facts  underlying  the  court's  "unintended
beneficiary" rationale help to distinguish Torlai from this case.
First, the Ninth Circuit found sufficient evidence that the

_____

    [4] The government's citation to United States v. Ostrom, 80 F.
App'x 67 (10th Cir. 2003), need not detain us.  That decision lacks
precedential force even in the circuit of its origin.  See 10th
Cir. R. 32.1(A).

-17-

defendant had suffered no reimbursable losses, see id. at 941-43, so he would not have received anything absent his fraudulent claims. Second, the defendant made material misrepresentations to procure the crop insurance policies, see id., making it unlikely that the insurer would have issued the policies had it been told the truth. This latter fact indicates that, regardless of the legitimacy vel non of the claimed losses, the insurer would not have been obliged to pay. Cases in which an insurer would have paid nothing absent the fraud are materially different from those in which the insurer would have paid something (but less than the full amount claimed) absent the fraud. See United States v. Sharma, 703 F.3d 318, 324-25 (5th Cir. 2012).[5]

To recapitulate, we conclude that the district court erred in calculating the amount of intended loss attributable to the fraud and, thus, in fashioning the guideline enhancement. We are, therefore, constrained to remand for resentencing. On remand, the district court should compare what the appellant sought to bamboozle his insurers into paying with what they would have paid had the appellant submitted only bona fide claims.

We add a coda. It is apodictic that the government bears the burden of proving the applicability of a sentencing enhancement by preponderant evidence. See Paneto, 661 F.3d at 715. But in a

---

[5] To the extent that Torlai can be read to support the position advocated by the government here, we decline to adopt its reasoning.

-18-

case such as this — where a defendant's claims were demonstrably rife with fraud — a sentencing court may use the face value of the claims as a starting point in computing loss. See United States v. Campbell, 765 F.3d 1291, 1304-05 & n.13 (11th Cir. 2014); United States v. Hebron, 684 F.3d 554, 562-63 (5th Cir. 2012). The burden of production will then shift to the defendant, who must offer evidence to show (if possible) what amounts represent legitimate claims. See Hebron, 684 F.3d at 563; United States v. Jimenez, 513 F.3d 62, 86 (3d Cir. 2008). After the record is fully formed, the sentencing court must determine the amount of loss that the government (which retains the burden of proof) is able to establish. The court, however, "need only make a reasonable estimate of the loss." USSG §2B1.1, comment. (n.3(C)); see Blastos, 258 F.3d at 30. Depending on the defendant's offer of proof, the court might well conclude that the amount of loss is equal to the face value of the submitted claims.

## B. **The Restitution Order**.

The appellant further contends that the district court erred in calculating restitution. The government counters both that this claim is waived and that it is impuissant.

**1. Purported Waiver**. Waiver typically occurs when a party intentionally relinquishes a known right. See United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002). In the sentencing context, an appellant may waive an issue when he initially raises

-19-

it as an objection to the PSI Report but later explicitly withdraws the objection. See United States v. Eisom, 585 F.3d 552, 556 (1st Cir. 2009); Rodriguez, 311 F.3d at 437. Once an issue is waived, there is nothing for an appellate court to review. See Rodriguez, 311 F.3d at 437.

Here, the appellant challenged the loss computation both in objections to the PSI Report and in his sentencing memorandum. His objection was directed to the calculation of both the guideline enhancement and the restitution award. A common thread ran through both halves of his argument: loss simply does not include amounts that the victim would have paid absent the fraud.     At the disposition hearing, the appellant's trial counsel forcefully presented this argument in connection with the calculation of the guideline enhancement.     The court rejected it.     Later on, the appellant's counsel was asked whether he wanted the court to consider any other modifications to the PSI Report.     Counsel responded in the negative.

The sentencing proceeding continued.     At one point, the court remarked that it did not understand the amount of restitution to be disputed and asked defense counsel whether he was looking at the same set of numbers.     Counsel responded that he was.

The government urges us to find that these (and similar) statements amounted to an intentional relinquishment of the right to contest the amount of restitution.     This exhortation has some

-20-

superficial appeal: taken in a vacuum, the sentencing colloquy can be read as an acknowledgment that the appellant was not pressing any arguments about the amount of restitution. It surely would have been better practice for counsel to have clarified that he had no objections to the restitution amount save for the method of calculation (that is, the court's announced unwillingness to deduct any legitimate portions of the claims from the loss calculation). But reading the sentencing transcript as a whole, we do not think that defense counsel's statements clear the high bar needed for a finding of waiver.

Waivers are strong medicine, see Pike v. Guarino, 492 F.3d 61, 72 (1st Cir. 2007), and that medicine should not be dispensed in criminal cases where ambiguity lurks, see United States v. Bradstreet, 207 F.3d 76, 79-80 (1st Cir. 2000). On this scumbled record, defense counsel's statements, taken in the context of the sentencing hearing as a whole, were ambiguous. The main event at sentencing was the battle over the method of calculating loss.[6] Having lost that battle after a full airing, counsel's statements can fairly be read as an acknowledgment that the court's arithmetic (though not its method of calculation) was correct with respect to restitution. Any other reading would be illogical: it

---

[6] Although the district court specifically addressed the method of calculation only in connection with the guideline enhancement, its reasoning plainly encompassed restitution as well. Indeed, the government, both before us and in the court below, has made identical arguments concerning the two issues.

would have been odd for the appellant to press his computational argument to the bitter end with respect to the guideline enhancement and then impliedly abandon the very same argument with respect to restitution.

The short of it is that there was no waiver. Defense counsel's statements are most sensibly read as a recognition that the critical issue already had been decided against his client, not as a concession of that issue.

As a fallback, the government suggests that the appellant forfeited the restitution issue by not raising it at the disposition hearing, thus engendering review for plain error. See Rodriguez, 311 F.3d at 437. This argument is fruitless: the appellant raised the issue in written objections to the PSI Report and in his sentencing memorandum, and his attorney presented a legal basis for the argument to the sentencing court. No more was exigible to avoid a finding of forfeiture. See United States v. Theodore, 468 F.3d 52, 58 (1st Cir. 2006).

2. **Amount.** The district court ordered restitution pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. Since the appellant's challenge to the restitution order is based on an alleged error of law, our review is plenary. See United States v. Cutter, 313 F.3d 1, 6 (1st Cir. 2002); see also Walker, 234 F.3d at 783 (explaining that proper method of loss computation is "a prototypical question of legal interpretation").

-22-

The MVRA authorizes a court to award restitution only in the amount of a victim's actual loss. See Innarelli, 524 F.3d at 294-95. Thus, the question boils down to whether the presence of the void-for-fraud clauses in the insurance policies converts the entire amount paid in response to the appellant's claims into an actual "loss."

The answer depends, in relevant part, on the MVRA's definition of a victim as a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."[7]  18 U.S.C. § 3663A(a)(2).  Mindful of this definition, we have held that, under the MVRA, a court may only order restitution for losses that have an adequate causal link to the defendant's criminal conduct. See Cutter, 313 F.3d at 7.

Importantly, we have made it pellucid that "restitution should not be ordered if the loss would have occurred regardless of the defendant's misconduct." Id. This means that the government must establish a but-for connection between the defendant's fraud and the victim's loss. See United States v. Vaknin, 112 F.3d 579, 590 (1st Cir. 1997) (interpreting parallel provision in Victim and Witness Protection Act, 18 U.S.C. § 3663). Our case law on this

---

[7] Because the appellant's offense of conviction involves, as an element, a "scheme or artifice to defraud," 18 U.S.C. § 1343, victims include those "directly harmed by the defendant's criminal conduct in the course of the scheme," id. § 3663A(a)(2). This language does not alter the direct causation requirement. See United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996).

-23-

point is consistent with the weight of authority under the MVRA. Actual loss is widely (and correctly) thought to be limited to pecuniary harm that would not have occurred but for the defendant's criminal activity. See, e.g., Sharma, 703 F.3d at 324; United States v. Petruk, 484 F.3d 1035, 1038 (8th Cir. 2007); United States v. Feldman, 338 F.3d 212, 220-21 (3d Cir. 2003); Dawkins, 202 F.3d at 715.

Applying the MVRA and the case law interpreting it, we think it evident that the district court erred in ordering restitution in the full amount paid to the appellant simply because the insurance policies included void-for-fraud clauses. While such clauses may suffice to ground claims for disgorgement in civil proceedings, an insurer's recoverable loss for MVRA purposes is confined to the amount the insurer would not have paid but for the fraud. See United States v. Chalupnik, 514 F.3d 748, 754 (8th Cir. 2008); Petruk, 484 F.3d at 1038-39.

This gets the grease from the goose. The appellant has contended all along that some portion of his claims represented legitimate losses. This remains to be proven. But if it is true, Zurich North American presumably would have reimbursed him for those losses had he presented them without embellishment. The district court must, therefore, reconsider its restitution order, taking into account the extent (if at all) to which the appellant's

claims encompassed legitimate losses.[8]   The district court need only make "a reasonable determination of appropriate restitution by resolving uncertainties with a view towards achieving fairness to the victim."  United States v. Burdi, 414 F.3d 216, 221 (1st Cir. 2005) (internal quotation marks omitted).

### III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we vacate the appellant's sentence (including the restitution order) and remand for resentencing consistent with this opinion. On remand, the only issues open to consideration shall be the appropriate amount of intended loss for purposes of the guideline enhancement, the appropriate amount of actual loss for purposes of restitution, and, of course, the dimensions of the sentence to be imposed.

**Vacated and Remanded.**

---

[8] The appellant alternatively suggests for the first time on appeal that if the void-for-fraud clauses dictate the amount of loss, the restitution award should be offset by the amount of premiums paid.  Given our holding, we do not have any occasion to consider this alternative suggestion.