# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| |
|---|---|
| **UNITED STATES OF AMERICA** | \| |
| | \| |
| **v.** | \| |
| | \| |
| **FATHALLA MASHALI,** | \|     **No. cr-14-10067-RWZ** |
|     Defendant. | \| |
| | \| |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Fathalla Mashali ("Mashali" or "the Defendant"), by and through undersigned counsel, hereby respectfully submits this Memorandum to assist this Honorable Court in making a determination of the appropriate sentence[1].    Nothing in this Memorandum is intended to excuse the conduct of the defendant.  He pled guilty because he was guilty. He committed the crimes contained in the 44-Count Indictment.    Rather, he contends that the Guideline Imprisonment Range contained in the Presentence Report Investigation (PSR) is inaccurate, particularly with regard to the "Proof of Loss" calculation. See, PSR Response, attached hereto as Exhibit 1,   And further, that whatever the ultimate Guideline Imprisonment Range is determined to be accurate, it should be reduced because of the existence of various applicable grounds for "departure" (or, alternatively, for "variance"), (including USSG §5H1.1 (Age), §5H1.3 (Mental and Emotional Condition), § 5H1.4 (Physical Condition), § 5K1.11 (Military Service), §5L2.13 (Diminished Capacity).

---

[1] It is noted that on July 20, 2017, the Defendant filed a renewed Motion to Determine Competence and Incorporated Memorandum of Law, which is presently pending.   Nothing in this Memorandum is intended to waive any of the relief requested in this "Competency" motion.

For the reasons set forth below, the Defendant, requests that he be sentenced to a period of 4 months, CAG actual incarceration, deemed served by his pre-trial confinement, two years home confinement, an appropriate period of supervised release with special conditions of psychiatric and other medical treatment.   On behalf of the Defendant, undersigned counsel respectfully suggests that this sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), reflecting the seriousness of the offense, while promoting respect for the law, and providing a just punishment within the context of his offense conduct and consideration of his personal characteristics.   This recommendation is predicated upon the mitigation provided by the Defendant's personal history, characteristics, and state of mind at the time of the offense, and present physical and psychological conditions, all of which will be more fully discussed *infra*.   Additionally, while his behavior was not "aberrant" as that term is understood in the U.S.S.G. model, it certainly represents a significant departure from an otherwise law-abiding life which he had led.   In support of this recommendation, various documents are attached hereto.   Exhibit 2 is the Psychological Evaluation of Dr. Roger Gray; Exhibit 3, the Psychological Evaluation of Dr. Leslie Vogel; Exhibit 4, copy of the Defendant's recently filed renewed Motion for Competency Evaluation which also includes various Psychological Reports and affidavits relevant to the requested recommendation contained in this Sentencing Memorandum as well as, Exhibit 5a-i which are comprised of various letters from individuals who have an understanding of the Defendant Mashali and the offense conduct.

**PROCEDURAL HISTORY**

On February 8, 2014, Fathalla Mashali was arrested and detained in federal custody.   On June 5, 2014, he was released on a partially secured $5,000,000. bond, including home detention,

after a lengthy detention hearing.  On November 17, 2014, an additional $68,000 unsecured bond was signed and executed.  On March 15, 2017, the Defendant pled guilty to all counts of a 44-count Second Superseding Indictment charging Health Care Fraud (Counts 1-28), Conspiracy to Commit Mail Fraud (Counts 29-44) and Money Laundering (Counts 29-44). He remained released pending sentencing.

Throughout his release period, the Defendant was periodically hospitalized for various serious medical and/or psychiatric reasons.  At one point last year, the Defendant moved to have a competency evaluation, which occurred, and which after a hearing, hewas declared to be competent to stand trial.

There is no plea agreement in this case although at one point, the Government proposed that the Defendant plead guilty to all counts in return for an sentence, to the best of my current recollection, of not less than 4 years nor more than 7 years, CAG, to be determined by the Court. The Defendant rejected this proposal.[2]

A lengthy presentence investigation report ("PSR") was prepared by the U.S. Probation Department on May 22, 2017, which suggests a TOL of 40 and an advisory guideline range of incarceration for 292-365 months.  As noted in the defendant's objections to the PSR, fully setout herein, infra, the Defendant denies that the TOL is 40, that the Guideline Sentence Imprisonment Range is 272-365 months, and states that the correct numbers can only be determined when inter alia, a correct "loss" amount is ascertained, which arguably cannot

---

[2] It is respectfully suggested that for the approximately past 3 ½ years, the Defendant has effectively been in custody - 4 months in a very difficult situation at Plymouth House of Corrections, then confined at home and various hospitals, intermittently in serious and/or critical condition.

happen until the Defendant is competent to assist in its computation, which he at present is not. See renewed Competency Motion attached hereto as Exhibit 4, as well as argument, infra.[3]

## BACKGROUND OF DEFENDANT AND OFFENSE CONDUCT

The defendant is a 62 year old married physician (to Dr. Noah El-Khadry, DMD) with four-children, who have been living in Dover, Massachusetts.  Born in Egypt, he retained Egyptian citizenship and is a permanent resident of the United States, and was honorably discharged from the U.S. Army Medical Corps.  He received his M.D. in Egypt and came to the United States where he completed a prestigious residency at the University of Pennsylvania, became Board Certified in Anesthesia, directed hospital anesthesia departments, was an assistant Professor at the Boston University Medical School, and generally established a successful medical career without a blemish until the present offense conduct.   See Gray Report, at p.2[4]

## ARGUMENT

The Defendant respectfully suggests that an appropriate application of 18 U.S.C. 3553 (a) factors and the applicable provisions of the United States Sentencing Guidelines (USSG) to the circumstances of his case should result in the requested recommendation of time served with special conditions of Supervised Release, infra, including Home Confinement for 2 years and extensive psychiatric treatment.   The §3553(a) factors generally include (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for

---

[3] There are also other objections to the PSR as contained in the attached objections which also affect the TOL. Additionally, as more fully discussed, infra, as well, the Defendant contends that whatever the ultimate TOL Guideline Imprisonment Range is should be substantially reduced by the grounds for the "departure" which we discuss, infra.
[4] We assume that all expert reports will be read and considered carefully by the Court so we will not be repeating their substance extensively in the body of  the Memorandum

the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, to afford adequate deterrence, to protect the public, and to provide the defendant with needed educational or vocational training or medical care, (3) the kinds of sentences available, (4) the kinds of sentence and the sentencing range established by the United States Sentencing Guidelines, (5) any pertinent policy statement, (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victim of the offense. 18 U.S.C. §3553(a).

 With regard to the United States Sentencing Guidelines, the district court, while not bound by them, still must consult and consider them when imposing sentence. United States v *Booker*, 543 U.S. § 20 at 264.  Courts of Appeals cannot disturb a district court's sentence unless the appellate court finds that sentence unreasonable. *See id.* The United States Supreme Court clarified post-*Booker* sentencing procedure in *Gall v. United States*, 128 S. Ct. 586. The *Gall* Court indicated that when sentencing a defendant,

> The District Court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

128 S. Ct. at 596-597 (internal citations and quotations omitted).  The Supreme Court re-emphasized the point stating, "[T]he sentencing court does not enjoy the legal presumption that

the Guidelines sentence should apply." *Nelson v. United States*, 129 S.Ct. 890 (2009), *quoting,*

*Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456 (2007).

While the various Circuit Courts of Appeal have noted that sentencing courts must

employ "an increased degree of justification commensurate with an increased degree of

variance" from the advisory sentencing guideline range, it has also held that under a post-*Gall*

rubric, "there is no stringent mathematical formula that cabins the exercise of the sentencing

court's discretion. Indeed, after *Gall,* the sentencing inquiry-once the court has duly calculated

the GSR-ideally is broad, open-ended, and significantly discretionary.  At that point, sentencing

becomes a judgment call, and a variant sentence may be constructed based on a complex of

factors whose interplay and precise weight cannot even be precisely described." See eg.  *United*

*States v. Martin*, 520 F.3d 87, 91-92 (1st Cir. 2008) (internal citations and quotations omitted)

(affirming a 91-month downward deviation from the advisory sentencing guideline range).

Here, the defendant asks the Court to exercise its significant discretion and sentence him

to time served with special conditions of Supervised Release, which include a significant period

of home confinement and psychological treatment.    In requesting this sentence, the Defendant

offers no excuses for his conduct.  He is an elderly man suffering from a long standing

combination of progressively deteriorating cognitive and physical function.   Again, this is not

offered as excuse but as context to understanding the offense and the offender.  Given his

infirmities and vulnerabilities, an incarceration sentence would present very real risk to his

material well-being.  And, other aspects of the defendant's life stands in stark contrast to his

crime of conviction.   An honorably discharged veteran of the United States Army, he was a

good husband, father, and productive, grateful resident of the United States.  While

acknowledging that the Court should punish him for his crime, the defendant also asks the Court
to temper its sentence to reflect these mitigating factors.

Again trying not to simply reiterate what Drs. Gray and Vogel have written extensively
and to which Dr. Gray will testify, the Defendant, assuming solely arguendo, competence to
participate in the sentencing phase of this case, committed the offense(s) while suffering from a
significantly reduced mental capacity, which contributed substantially to the commission of the
offense.   U.S.S.G. §5k2.13.  The reduced mental capacity was a result of the progressive and
debilitating psychiatric and medical conditions with which he was afflicted, as described in more
detail in the Gray Report and Vogel Report.  His condition declined after 2002 when he was first
diagnosed with Sarcoidosis, ultimately but inexorably reducing and diminishing Dr. Mashali
dramatically – a precipitous descent in stages, from a relatively brilliant, successful,
physician/entrepreneur with multiple medical clinics and up to a thousand employees, at times,
to a doddering, incompetent defendant in what is ironically both an extremely serious and at the
same time, absurd case.

There are also several other grounds for departure or variance herein.  USSG 5H1.1
(Age) suggests that a more advanced age may be relevant in determining a proper sentence.
When a defendant is elderly and infirm and where a punishment of home confinement might be
equally efficient, less costly, and, as I suggest, more just for such a vulnerable Defendant.  The
Sentencing Court may factor this into the sentencing calculus, either individually or for a
combination with other factors.

Also, USSG 5H1.3 – (Mental and Emotional Conditions) may be relevant, either
individually or in combination with other factors for a downward departure as well,  particularly
if it can serve a specific treatment purpose  too – such as home confinement combined with

intensive psychological or  physical therapy, psychoactive medication or eletroconvulsive therapy, (ECI) etc.  See also, USSG §5C1.1 Application Note 6.

USSG 5H1.4 (Physical Condition) provides inter alia, that Home Confinement Detention may be as effective as, and less costly, than imprisonment for extraordinary physical impairment in the case of a seriously impaired defendant.   With all respect, I respectfully request that Dr. Mashali is the "poster child" for such a departure.

USSG 5H1.11 (Military Service) provides, again, individually or in combination with other factors, a reason to depart downward, particularly where as here, our Egyptian National chose to serve honorably in the United States Army Medical Corps. for a period of years.

The evidence introduced at the Competency Hearing indicated that the Defendant was diagnosed with Sarcoidosis in 2002, and his mental and physical health declined thereafter, to some extent because of the extensive and long term regimen of steroids used to treat it. Prior to the loss of his medical licenses in the 2011-2012 time period, Mashali was not well, often falling asleep while seeing patients at work, acting generally disorganized with poor decision-making, and exhibiting depressive interspersed  with hypomanic behavior, all reflecting, in hindsight, the beginning of precipitous cognitive decline.

Prior to the Defendant's arrest and detention, he began to exhibit even more irrational, out-of-control behavior. For instance, the arrest herein occurred while he was under federal investigation for major healthcare fraud, was advised not to leave the state or country, yet bizarrely decided to fly to Egypt to confront the head of Al Quaeda, with whom he had been acquainted in Medical School some thirty years earlier, and trick him into surrendering to American authorities. His thought was that once he had demonstrated his loyalty to the United

States Government, they would drop their investigation against him. He was very lucky to be arrested before being killed.

While being detained in jail after said arrest, the Defendant's health deteriorated dramatically. He became significantly more depressed, manic, disorganized, was losing weight, was perpetually nauseous, and vomiting. He was sent to an outside hospital on an emergency basis at least twice while at the jail. According to his wife's testimony, this started an accelerated destruction of his health, which had already been deteriorating for years. He experienced numbness in arms and legs, with significantly decreased cognitive abilities. After his release from detention on GPS monitoring, his health nevertheless continued to decline. By June of 2015, he was vomiting after every meal (later diagnosed with gastroparesis) was very weak, and fraught with disorganized thought and increasing depression. He was brought to various hospital emergency rooms. In July of 2015, he was rushed to the Beth Israel Deaconess Medical Center (BIDMC) Intensive Care Unit after being found virtually unconscious, unresponsive and mumbling incoherently. He was in the ICU for seven days, four of which he was in a coma and experiencing renal and heart failure. He stayed at BIDMC for a month, then went to a rehabilitation hospital for two weeks, and was subsequently discharged to the Norwood Hospital where he was involuntarily committed in a locked psychiatric ward.

For several months, he was in and out of various emergency rooms for medical and psychiatric treatment. He had no appetite, couldn't keep food down, lost considerable weight, and because increasingly befuddled.

In January and February of 2016, he was taken again to BIDMC, then to Massachusetts General Hospital (MGH), where he was initially treated in a medical ward, (March 15-March 24 2016) and then transferred, largely at the request of Dr. Allison Fife, to Blake II, a renowned

psychiatric ward, where he stayed from March 24 to April 15 2016 under the care of Dr. Stuart Beck (treating psychiatrist) who testified at the Competency Hearing, and Dr. Jeffrey Huffman (chief of Blake II) who did not. Some of the Massachusetts General Hospital records are already part of a Government Exhibit admitted into evidence at the Competency Hearing Certain other MGH records from the same grouping of records, relating to a Petition for Involuntary Commitment of the Defendant is now proffered as Defense Exhibit C, at the Hearing, and a Petition for Guardianship/Substituted Judgement is proffered as Defense Exhibit D, at the Hearing. The MGH records in evidence there already reflected that Mashali was variously suffering from hallucinations, dementia, severe recurrent depression with psychotic features (alternatively, mood disorder with psychotic features,) and progressive cognitive decline. The records now proffered as Defense exhibits C and D, there also expressly demonstrate that during this period of hospitalization (from March 24 to April 15, 2016) both Dr. Beck, treating psychiatrist and Dr. Huffman, chief of the unit, actually petitioned to involuntarily commit the Defendant to a state mental hospital for an indefinite period, (and actually had a hearing scheduled and a lawyer appointed to represent him), actually petitioned to have a guardian appointed for the Defendant (Substituted Judgement Petition) which Petition also asserted that Mashali was incompetent to manage his own affairs, attempted to have a healthcare proxy chosen for Mashali and and endeavored to convince Mashali (and his wife, Dr. El-Khadry) that his mental illness was so severe that Electroconvulsive Therapy (ECT), a very serious and intrusive treatment modality with significant, potential side effects and risk, only would suffice to treat him effectively and successfully.

Apart from the foregoing being evident from the MGH records now in evidence, Dr. El-Khady testified to the above at the Competency Hearing as well. As did Dr. Beck who conceded

that the Petitions for Involuntary Commitment, and the Petition for Guardian/Substituted Judgement the request for the appointment of a healthcare proxy, as well as the recommendation for immediate utilization of ECT, are only employed in cases of serious mental illness. Dr. Fife ultimately reluctantly conceded this as well, at the Hearing. Also indicative of the perceived seriousness of the Defendant's mental disease were the multiple "anti" scheduled drugs prescribed to him- anti- psychotics- anti- depressives, anti- anxieties, anti- pain, and sleeping pills. Other treating hospitals and physicians generally diagnosed and medicated Mashali in a similar fashion. The MGH records introduced as Exhibits herein collectively demonstrate that for a significant period of time MGH doctors considered Mashali to be a very depressed, intermittently psychotic, anxious, demented, and otherwise cognitively impaired individual in need of serious and long term mental health intervention and psychopharmacological support.

Subsequent to MGH, the Defendant was re-hospitalized between May 5 and May 20, 2016 at Norwood Hospital (2d Norwood hospitalization) where, as Dr. El-Khady testified to, and the records corroborate, that he was suffering from major depression, dementia, cognitive decline and suicidality. This hospitalization was occasioned by the Defendant again being found unresponsive at his home- he ultimately was transferred from the medical ward to a locked psych ward, where they also recommended involuntary commitment to a state hospital, for an indefinite period of time.

Thereafter, the Defendant was sent to various rehabilitation hospital facilities and, as of today, remains at home, as Dr. El-Khadry has testified, largely asleep, confused, depressed, deeply and increasingly cognitively challenged with little ability to remember or retain information and utterly unable to communicate effectively with your undersigned, his attorney in the instant federal criminal case.

Records from the Massachusetts Rehabilitation Commission (Richard Stellar, Ed D, Dr. John Baldwin, psychologist, and Beth Israel Deaconess Medical Center, are attached hereto and proffered into evidence as Defense Exhibits E, F, and G at the Hearing respectively. Collectively, they painted a picture of a seriously mentally ill and frail individual, also afflicted with serious medical problems as well, which cumulatively are ravaging his body and mind in a rapidly deteriorating, oddly symbiotic, downward trajectory.

Dr. Allison Fife, the Court appointed designated forensic psychiatrist herein, with estimable credentials and experience, has opined, to a reasonable of psychiatric certainty, that the Defendant, while not then offering any assistance to your undersigned defense counsel, has the "capacity" to do so and chooses not to, and is therefore "competent". Dr. Stuart Beck, the treating psychiatrist at MGH Blake II in March and April of 2016, who performed a more comprehensive psychiatric evaluation of the Defendant in March and April of 2016, (and Dr. Fife essentially referred Mashali to Blake II and Dr. Beck for in-hospital evaluation) testifying at the Competency Hearing that he believed Mashali is malingering,  faking or posturing himself in a certain way which, as will be more fully discussed below, is astoundingly at odds with virtually the totality of Dr. Beck's prior analysis and treatment direction which resulted in his (Dr. Beck's) Petition for Involuntary Commitment, Petition for Substituted Judgement/Guardianship, request for healthcare proxy, immediate Electro Convulsion Therapy (ECT) treatment, prescription of powerful anti- psychotic, anti-depressive, anti-anxiety, anti-pain, sleep pills etc. And completely inconsistent with the conversations which occurred at the several treatment meetings he had with Dr. El-Khadry relative to her husband's treatment plan and overall condition.

Dr. Beck's actions in March and April 2016, wherein, as the individual tasked by Dr. Fife, among others, to assess the Defendant's mental status, diagnosed Mashali, and treated

Mashali, as <u>inter alia</u> , as suffering from a severe depression with psychotic features (and with various DSM Axis II serious personality disorders), and found it appropriate if not necessary to commence an Involuntary Commitment Petition, a Guardianship/Substituted Judgement Petition, (which expressly declared Mashali to be incompetent). On cross examination at the first Competency hearing, both he (and Dr. Fife) conceded that the above treatment modalities are reserved for the most seriously mentally ill and after less intrusive/excessive treatment protocols fail. And if that were not enough, Dr. Beck also tried to force Mashali to undergo a regimen of ElectroConvulsive Therapy (ECT) which both Beck and Fife agreed during cross examination was also reserved for the more seriously mentally ill individuals. Which I respectfully suggest is understatement, if not hyperbole.   And then of course there was the healthcare proxy request and the "anti-everything" psychopharmacological prescription package, as well.

Dr. Noha El-Khadry, refused to agree to the ECT for her husband, telling Dr. Beck that his heart, and general health, was far too fragile to withstand ECT. She also testified that Dr. Beck tried to convince her otherwise, telling her that Mashali was very sick, psychotic, and exhibited with distorted thinking and reality testing.

Dr. Beck, and his superior, Dr. Huffman, well knew that Mashali was very sick and needed serious intervention. This information was contained in their own MGH reports, as well as in the records within possession from a half-dozen other healthcare providers, and is reflected in the treatment choices they made, or tried to make for him. Dr. Beck apparently tried to back off of his more serious diagnoses and treatment plans for Mashali. Perhaps we will never know what actually occurred in the face of overwhelming and repetitive evidence to the contrary of the true depth of Mashali's mental illness and obvious overall frailty.

13

Since the initial competency hearing, as the affidavits and psychological reports contained in the recently filed renewed Motion for Competency Evaluation indicate that the Defendant's condition has deteriorated significantly, providing further corroboration of the progressive nature of his underlying psychopathy and lending even more corroboration for its existence serveral years earlier in a sufficient strength to contribute substantially to the offense conduct in 2010-2013, as contended by Dr. Gray and Dr. Vogel.

Additionally, it is abundantly clear that his present condition renders him incompetent to effectively (or even ineffectively) assist counsel at sentencing, especially with the important task of "loss computation", as the case of U.S. v. Alphas (attached as part of the Renewed Competency Motion) directs that only "fraudulent" billings constitute "loss" for "sentence enhancement" and "restitution" purposes, and it customarily might well be expected that the Defendant provide an "offer of proof" for the alleged legitimate billings, which should be subtracted from the gross billings to compute the net acceptable "loss" for sentencing purposes. This, the Defendant is unable to do[5]

In fact, the First Circuit has summarized the central principles of the post-Booker and – Gall sentencing procedure described above, as follows.

In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent of that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief  that substantial variances from the guidelines

---

[5] It is the Defendant's position that the Government, in any event, bears the burden of proof relative to which billings expressly are "fraudulent" generally – but should the Court shift the burden to Defendant for such an "offer of proof", that is only more indicative of why the Defendant should be adjudged "incompetent" at this point, as he is clearly unable to assist in this endeavor.

are always beyond pale.  Rather, the court "should consider every convicted person as an individual and ever case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue".

United States v. Martin, 520 F. 3d 87, 91 (1st Cir. 2008) (quoting Gall, U.S. at 52).

In the instant case, the statutory purpose of deterring crime would not be furthered by a sentence greater than the recommended one.  In United States v. Haynes 557 F. Supp. 2d 200, 207 (D. Mass. 2008).  Former Massachusetts Federal Judge Nancy Gertner observed that deterrence is a complicated concept in our society.

> It is clear that punishment plays an important role in deterring crime, but the nature of that relationship is not so clear-cut.  There is significant downside to what has been called the American experiment in mass incarceration.  Large numbers of people reenter communities that have little or no ability to absorb them, resulting in a constant shuffling and reshuffling of neighborhood residents. And while prisoners are obviously not committing crime in their communities while they are incarcerated, they also are not functioning as parents, workers, consumers, or neighbors…There is growing evidence that the coerced removal of residents from poor and disadvantaged neighborhoods – even of those thought to be involved in criminal activity – may, in some case, undermine a community's ability to self-regulate and exercise informal social control over crime by further disrupting the creation of social and familial bonds.  . . . To be sure, these concerns should not lead to wholesale leniency, no matter the facts.  Rather, they suggest that courts should tread extremely cautiously when deciding whether and how long to incarcerate nonviolent drug offenders.

While Judge Gertner is here speaking of minority (racial) communities, and primarily non-violent drug offenders, the logic of her message is far more inclusive, particularly to a situation, where as here, a defendant suffering serious and debilitating medical and psychiatric conditions with a wife,  and four children, who honorably served his country as an office in the United States Army Medical Core and who lived an exemplary life for so long, and whose criminal enterprise was fundamentally an outrageous, absurd scheme which clearly was going to come to the attention of the authorities, as it did; scores of abused and antagonized employees,

arrogantly treated by a perpetually out-of-control, cognitively challenged, Dr. Mashali being repeatedly told to do patently unlawful things which would only generate criminal and civil liability for them, forced to deal with a 100 patients a day often simply milling around until midnight often either dealing drugs or waiting to obtain new prescriptions, with Dr. Mashali often while frequently not showing up  until noon, and all with a doctor billing out $36 million USD plus by sending out often altered bills  for thousands of patient events even though the original billing description which had been rejected for payment, were still in the possession of the insurance company for comparison purposes, all in a universe of literally innumerable decaying urine stored for weeks/months in a basement which would be ultimately billed out after being tested by using invalidated lab equipment or by, non-existent lab equipment, for multiple unnecessary confirmatory tests for every patient.  With Dr. Mashali utilizing a work force or the part of the workforce that hadn't yet quit) which had already begun to report him to the licensing authorities or were threatening to do so regularly – and much more.  He had been a very successful doctor prior to the downward trajectory arising out of his illnesses.  His actions began to look very much like an outtake from a Three Stooges' Film.  Unfortunately, he was the principle stooge.

## **CONCLUSION**

For the foregoing reasons, Fathalla Mashali respectfully asks the Court to impose the requested sentence.  In light of the facts and circumstances of the case, and considering the Defendant's personal circumstances, the proposed sentence is the most fair and just resolution of all competing interests.  The loss computation and corresponding sentence enhancement are invalid, arising out of a very flawed methodology, and certainly, in any event, grossly overstate the seriousness of the Defendant's conduct.   And the requested downward departures /variances

should be granted as well, particularly relative to his diminished capacity, and extreme

vulnerability to a Prison setting in  light of the availability of better and more appropriate

methods of punishment, affording protection and more effective medical and psychiatric

treatment and intervention for an elderly infirm man in a home confinement context.


Dated: July 21, 2017                          Respectfully submitted,
                                              FATHALLA MASHALI
                                              By and through his attorneys,

                                               /s/ *Jeffrey A. Denner*
                                              Jeffrey A. Denner, BBO#120520
                                              JEFFREY DENNER ASSOCIATES, PC.
                                              Four Longfellow Place, 35th Floor
                                              Boston, Massachusetts 02114
                                              Tel.    617.227.2800
                                              Fax.    617.973.1562
                                              jdenner@dennerpellegrino.com


### Certificate of Service

I, Jeffrey A. Denner, hereby certify that on this the 21ST day of July 2017, I caused a true copy of the foregoing *Defendant's Memorandum in Aid of Sentencing* to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

                                               /s/ *Jeffrey A. Denner*
                                              Jeffrey A. Denner