# EXHIBIT 1

# JEFFREY DENNER ASSOCIATES, P.C.

### COUNSELLORS AT LAW

July 17, 2017

**SENT VIA ELECTRONIC MAIL/** Martha_Victoria@map.uscourts.gov

Martha C. Victoria
U.S. Probation Officer
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 1200
Boston, MA 02210

Re: **United States vs. Fathalla Mashali**
   **Docket No. 1:14-cr-10067-RWZ**

Dear Ms. Victoria:

  Thank you very much for your efforts and thoroughness on the Presentence Investigation Report completed in the above matter.

  The Defendant, Fathalla Mashali, by and through undersigned counsel, hereby responds to the Presentence Investigation Report ("PSR") as follows:

  Unless stated below, the Defendant has no further objections to the "PSR".

## Objections

1. With regard to ¶¶11-14, the Defendant states that not all of the amounts billed to government and private insurance companies were fraudulent, and calls upon the Prosecution to delineate with specificity, the fraudulent transactions.

2. With regard to the allegations in ¶15, the Defendant states that there was no tennis court and that the movie room and squash court were never completed.

3. With regard to the allegations in ¶21, the Defendant states than at most, there were six to seven physician assistants, not five and two physicians by fall of 2002.

4. With regard to ¶124, the Defendant denies that the 22-level increase is appropriate, as the methodology in computing the intended loss of $36,760,058.11 is flawed at best.

5. With regard to ¶126, the Defendant denies that the 4-level increase is appropriate, as the loss was not more than $20,000,000.00.

6. With regard to ¶129, the Defendant denies that a 2-level increase for abuse of a position of public or private trust" is appropriate.

7. With regard to ¶130, the Defendant claims that a 4-level increase an "organizer" or "leader" of a criminal activity which included five or more participants is not appropriate as arguably, the said participants need be knowingly participating in a criminal scheme and herein were not.

8. With regard to ¶132, given the objections above, the Adjusted Offense Level is not 43.

9. With regard to ¶136, the Total Offense Level is not 40.

10. With regard to ¶153, the Defendant married his present wife in 1992, not 1993.

11. With regard to ¶163, the Defendant states that he continues to receive infusions and physical therapy.

12. With regard to ¶170, the Defendant continues to see Dr. Trista Balderis, who has not diagnosed him with malingering.

13. With regard to ¶173, as the record indicates, the Defendant has been hospitalized at McClean Hospital as well.

14. With regard to ¶187, the Defendant states that he is not an owner of 153 Pine Street, Dover, which is in foreclosure, that the Florida property was sold in 2014, and that 160 Dedham Street was also foreclosed in 2014.

15. With regard to ¶191, the Rhode Island property is immediately going into foreclosure as well, with no further rental income therefore available.

16. With regard to ¶193, as the Defendant denies that the TOL is 40, the Guideline Imprisonment Range is not 292-365 months.

17. With regard to ¶¶207, 208, the Defendant denies that the total amount of restitution is 7,098,223.27, as the methodology in computing same is flawed, and such restitution should not be ordered.

18. With regard to ¶¶209-211, the Defendant, by Sentencing Memorandum, will argue that there are significant psychiatric factors which warrant a departure, or other variance downward, relative to whatever presumptive guideline sentencing range is determined.

Respectfully Submitted,

*Jeffrey Denner*

Jeffrey A. Denner

Cc:   Maxim Grinberg, Assistant U.S. Attorney (via email)

# EXHIBIT 2

Roger H. Gray, M.D.
112 Sargent Street
Newton, MA 02458
(617) 332-0901

July 20, 2017

Forensic Psychiatric Evaluation
Re: Fathalla Mashali
DOB: 11/19/54

I have been asked by Attorney Jeffrey A. Denner, who represents Dr. Fathalla Mashali, to provide the Court with a psychiatric report as an aid in sentencing. The particular questions are whether, to a reasonable degree of medical/psychiatric certainty, at the time of the offense conduct, Dr. Mashali suffered with a significant mental disease or defect which substantially contributed to the offense conduct.

I have prepared this report after interviewing Dr. Mashali for almost 5 hours on 12/2/16, 12/6/16, 12/8/16 and 7/18/17, and interviewing his wife, Dr. Noha Mashali. I have reviewed the forensic psychiatric evaluations by Drs. Allison Fife and Martin Kelly, psychiatric records from (MGH)Massachusetts General Hospital, neurology and geriatric evaluations by MGH physicians, Disability Evaluation by Dr. Richard Stellar, grand jury testimony, psychiatric competency evaluation by Dr. Leslie Vogel, the Government's Sentencing Memorandum and Presentence Report, psychiatric reports from McLean Hospital, and numerous additional medical records including records from the Beth Israel Deaconess Hospital. I have discussed his case extensively with Attorneys Denner and Joseph Keller and Dr. Vogel. Please refer to my report of 12/8/16 for additional information.

Conclusion:

In my opinion, to a reasonable degree of medical/psychiatric certainty, at the time of the offense conduct, Dr. Mashali suffered with a severe combination of psychiatric and medical conditions and that these conditions profoundly reduced his mental capacity and directly contributed to the offense conduct. The following report will document the progression of mental diseases which most likely began around 2001-2 when he was first diagnosed with sarcoidosis and now present with evidence of a disabling dementia and psychotic depression.

1

Dr. Mashali is a 62 year old physician, born and medically trained in Egypt. He is married to Dr. Noha Mashali, and they have 2 daughters and 2 sons, ages 6-19. When Dr. Mashali was 28 years old, he moved to the United States for residency training in anesthesia. He suffered a back injury requiring surgery, became quite depressed, and sought mental health treatment including psychotherapy and antidepressant medication. He recovered and developed a successful career in medicine which included a prestigious residency at the University of Pennsylvania, Board Certification in Anesthesia, directed hospital anesthesia departments, an Assistant Professorship at Boston University Medical School from 1998-2002, and a successful career without any known blemish. He has no known history of illegal or antisocial behavior prior to the offense conduct.

In 2002 Dr. Mashali was diagnosed with sarcoidosis. The disease presented with extreme fatigue. He was treated with high dose steroid medication (Prednisone) which resulted in significant side effects including diabetes, gastroparesis (a disabling disease involving a paralysis of the stomach muscles resulting in vomiting, weight loss, inability to absorb nutrients/food, severe pain among other problems), pernicious anemia, and iron deficiency anemia. In addition, Prednisone contributed to significant mood fluctuations between depression and hypomania. He experienced a continuing cascade of medical problems including seizure, a history of life-threatening liver failure (now resolved), cardiac arrhythmia, and hypercholesterolemia. His condition worsened as the medical problems and associated treatment combined with the underlying psychiatric vulnerabilities of a mood disorder. As the sarcoid disease progressed, he developed symptoms of neurosarcoidosis.

Around the time that the sarcoidosis was diagnosed, he began to develop his own medical business. He describes, and his wife confirms, that he began to have difficulty managing his business and the associated finances. He had to declare bankruptcy around 2007. He decided to start another business in 2009, determined to not repeat his past mistakes. Around the same time, both of his parents died of probable Alzheimer's Disease. There is no known evidence of financial or medical malfeasance during that time; however, there is a history of marked fluctuations of mood with periods of time when he would go without sleep for a day or two at a time, working excessively and then alternating with periods when he became quite depressed and would sleep for almost 24 hours at a time. Dr. Mashali made a series of business and financial decisions consistent with a mood disorder. He made extravagant purchases, began projects that he did not finish, and demonstrated grandiosity typical of manic episodes. During the depressive phases, he slept excessively as noted, was unable to function at work or home, and was profoundly withdrawn. These symptoms gradually worsened. The available data indicates that the offense conduct began after approximately 8 years of deteriorating mental function. The Government's Sentencing Memorandum notes (p.4) that Dr. Mashali was tapered off of Prednisone in 2004, but he continued to treat himself with Prednisone. As Dr. Kelly notes, this behavior would be grounds for suspension of

his medical license. In Massachusetts it would also have most likely resulted in a psychiatric evaluation and referral to services for impaired physicians. Compounding the problem further, Dr. Mashali also self-treated his diabetes, including prescribing hypoglycemic medication for himself and failing to monitor his blood sugar or other laboratory studies essential to good diabetic care. His physical and mental health deteriorated with progression of these diseases and his failures to care for himself appropriately.

Dr. Mashali's medical records note that he has fallen a number of times, is incontinent of urine, has an unsteady gait, orthostatic hypotension (significant drop in blood pressure when changing position), memory difficulties, hallucinations, visual problems, and depression of sufficient severity that his psychiatrists have recommended ECT (electro-convulsive therapy). As of this writing, Dr. Mashali is psychiatrically hospitalized at MGH.

I interviewed Dr. Mashali on 7/18/16, not having seen him since December of 2016. I was struck by the degree of deterioration in both physical and mental condition. He perseverated on describing visual hallucinations of "men trying to help me" and hearing their voices telling him not to trust his attorneys or his doctors. He denied that the voices were commanding him to harm himself or others. He appeared as a decrepit old man, decades older than his stated age. Dr. Kelly noted in his report of 02/10/17 that Dr. Mashali appeared approximately his stated age, demonstrated good cognitive functioning, and wanted to attribute his legal problems to his psychiatric symptoms. The issue of malingering has been raised by Dr. Kelly and Dr. Fife, as well as some of the physicians at MGH. I concur that Dr. Mashali is motivated by self-interest and exaggerates some of his problems in the hopes of ameliorating the consequences of his actions; however, even his malingering behavior is inept and symptomatic of the underlying neurologic and psychiatric deterioration.

The offense conduct is described succinctly in the Government's Sentencing Memorandum. It is a litany of outrageous behaviors which are also puzzling and fascinating failures. In an effort to "make money," he made essentially stupid and blatantly self-defeating decisions over and over again. His failure to heed warnings by his staff and the insurance investigator could be understood as narcissism and sociopathy; however, there is no earlier history of sociopathy and no history to suggest that narcissism interfered with his professional functioning. He allowed urine to putrify, tested it, altered records; however if he were in his "right mind" and intent on getting away with fraud – he would have taken careful action to hide his behavior. To the contrary, he maintained these behaviors as well as many others, all of which resulted in his demise. He ignored reality repeatedly. He still insists that he did nothing wrong, despite being confronted with damning evidence by many people, including his attorneys and me. The Government states mostly accurately that his fraudulent behavior was "breathtaking in its audacity, scope, and execution, and resulting harm." (p1) I believe the error is in the word "execution." The attempts to defraud were so poorly executed as to provide easy detection. These

3

decisions are evidence of failures in executive functioning, i.e. the capacity to effectively complete tasks. There was evidence prior to the offense conduct that executive functioning and sound judgment were impaired: poor business decisions, poor financial decisions, failure to seek proper treatment for himself, difficulty completing tasks. Dr. Kelly opines that a diagnosis of Bipolar Disorder Type II would not, in and of itself, explain his behavior. I agree; however, the presence of multiple insults to Dr. Mashali's brain, superimposed on an underlying vulnerability for a mood disorder, clarifies the problem. To restate the problem: how does a highly intelligent man with no record of illegal or antisocial behavior, demonstrably capable of managing very complex professional challenges, with a successful professional and academic career, suddenly- at the age of 55 - engage in the offense conduct and do so with utter ineptitude?

Dr. Mashali's history includes diagnoses of the following non-psychiatric causes of impaired cognition and judgment:

1. neurosarcoidosis is a disease of the brain and/or cranial nerves which can cause confusion, disorientation, dementia, dizziness, vertigo, decreased hearing, facial palsies, etc.

2. corticosteroids, which include Prednisone, are well known to cause depression, mania, aggressiveness, rage attacks, impaired judgment, impaired reality testing, etc.

3. Vitamin B 12 deficiency, which is often the result of malnutrition secondary to problems with diet, inability to absorb essential nutrients, recurrent vomiting, etc. can result in symptoms of dementia including impaired judgment, cognition, executive functioning etc.

The medical records demonstrate that many of his physicians are uncertain of the causes of his deterioration over the past 15 years, and the records refer to a "differential diagnosis" – considerations of other diseases which could also cause the impairment and dementia which Dr. Mashali now presents. These include possible diagnoses of:

1. Thiamine deficiency, also known as Vitamin B 1 deficiency or Beriberi, results from malnutrition, malabsorption (consequences of gastroparesis) and can result in potentially irreversible brain damage as seen in Wernicke's encephalopathy and later Korsakoff's psychosis. Dr. Mashali has evidence of this disorder in terms of ataxia (impaired gait), confusion, visual disturbance, auditory and visual hallucinations, cognitive impairment, and confabulation.

2. Alzheimer's Disease, to which both of his parents succumbed, add to the genetic risk/likelihood that Dr. Mashali may also have this disorder. Although it is not

4

known if his parents were diagnosed with Alzheimer's (a final diagnosis being dependent on brain biopsy), it is statistically likely.

In my opinion, we have had the unfortunate opportunity of examining the 15 year deterioration of a once successful physician. The data shows a progressive decline in judgment and cognitive functioning resulting from complex – and not fully understood – neuropsychiatric disorders which were clearly in evidence at the time of the offense conduct. If these disorders were not present, and if Dr. Mashali was simply a smart and dishonest man intent on committing terrible medical practices and fraud, then he could have easily done this successfully and without detection. At the same time, one must also raise the possibility that if he had never suffered these neurologic disorders superimposed on the vulnerability to a mood disorder, Dr. Mashali could still be a law-abiding citizen, good physician, and happily engaged with his family.

In my opinion, to a reasonable degree of medical/psychiatric certainty, at the time of the offense conduct, Dr. Mashali suffered with a significant and life-changing combination of neurologic, medical, and psychiatric disorders which directly diminished his mental capacities and  substantially contributed to the offense conduct.

Respectfully submitted,

Roger H. Gray, M.D.

CONFIDENTIAL – WORK PRODUCT

5

Roger H. Gray, M.D.
112 Sargent Street
Newton, MA 02458
(617) 965-2713

December 8, 2016

Forensic Psychiatric/Criminal Responsibility Evaluation
Re: Fathalla Mashali
DOB: 11/19/54

I have been asked by Attorney Jeffrey A. Denner, who represents Dr. Mashali, to perform a psychiatric evaluation of Dr. Mashali to assess whether, to a reasonable degree of medical/psychiatric certainty, at the time of the alleged offense conduct Dr. Mashali suffered with a mental disease or defect which resulted in a lack of substantial capacity to know right from wrong.

I have prepared this report after interviewing Dr. Mashali for approximately 4 hours on 12/2/16, 12/6/16, and 12/8/16. I have spoken with his wife, Dr. Noha Elkadry Mashali, and reviewed her affidavit. I have reviewed the psychiatric evaluation by Dr. Allison Fife regarding the question of competence to stand trial, psychiatric records from Massachusetts General Hospital which includes psychiatric records by Drs. Stuart Beck and Jeff Huffman, MGH medical records to the present, Beth Israel Deaconess Medical Center records documenting bipolar disorder and seizure, Disability Evaluation by Dr. Richard Stellar, grand jury testimony, and discussing my findings with Attorney Denner and Dr. Mashali.

Dr. Mashali is charged with multiple counts of Health Care Fraud and Aiding and Abetting, Conspiracy to Commit Mail Fraud, and Money Laundering. The indictments indicate alleged offense conduct beginning February of 2011. Dr. Mashali has entered pleas of not guilty to all charges.

Brief History:

Dr. Fife's report includes information regarding Dr. Mashali's family of origin, current family, education, work experiences, and health. Rather than repeat that information, I will simply highlight particular aspects which I believe are important in the context of this evaluation. Dr. Mashali graduated Cairo Medical School and came to the U.S. for residency training in anesthesia. Soon after arriving in the U.S. at the age of 28, he suffered a significant back injury, required surgery, and by his description was extremely depressed. Unable to work or pursue residency training, he sought mental health treatment with a psychologist (a Dr. Parkash in Irving, Texas) and was prescribed anti-depressant medication by his primary care

1

physician. He recovered and was able to continue medical training in anesthesia. He met his wife and married in 1992. He pursued a successful career, apparently free of legal, professional, or personal problems. Dr. Mashali describes mental health problems prior to 2002 which involved episodes of severe depression and hypomania. Nonetheless, he did well and was able to maintain his practice and family life until being diagnosed with sarcoidosis in 2002 and beginning treatment with high doses of Prednisone which can cause multiple physical and mental problems. He describes starting a medical company in 2001, during a period of high energy, little need for sleep, and grandiosity. He told me, "I was in over my head....I started small and grew too rapidly...I couldn't keep up...I filed for bankruptcy in 2007 and 2008." During that period of time he was treated with Prednisone and continued to have episodes when he slept for several hours a day, felt unable to concentrate or function, felt extremely depressed (though not suicidal), and then would rather abruptly shift into a hypomanic state in which there was little need for sleep and he would work 18 or more hours a day. He said that the bankruptcy was both personal and corporate. After that company dissolved, and he began to "get back on my feet," he started another medical business in 2009.

In the course of taking this history, Dr. Mashali did not indicate difficulties in his personal life other than to describe the severe mood fluctuations between depression and hypomania; however, in my most recent interview with him, and at my inquiries, he indicated that both of his parents died of early onset Alzheimer's disease. His mother died in 2009, about 6 months after his father died. She had been diagnosed with Alzheimer's in 2005 or 2006, and his father was similarly diagnosed shortly thereafter. He said that due to his mental condition and professional difficulties (the bankruptcy of his first company), he was unable to attend their funerals.

As noted, he began another medical business in 2009 and says that he was determined to not repeat his previous errors and decided to keep the company small. Nonetheless, "I got in over my head again." He reports periods of not sleeping for a few days at a time, buying expensive cars ("6 luxury cars – I didn't need them"), working "24 hours a day," and then deciding to start a "high end audio-visual company." He notes that the company began in a building on his property but never produced anything and "it's empty." This failed project appears to have been initiated during a period of hypomania.

Dr. Mashali said that the depressive periods typically last 2-3 months and are typified by sleeping "sometimes 23 hours a day," loss of appetite with attendant weight loss, inability to think clearly, concentrate, or function at home or work, and extremely depressed mood. The hypomanic episodes often last 5-6 months and are typified by extravagant and unnecessary spending, starting projects he cannot complete (eg. the audio-visual business), working over 20 hours a day, and being irritable and angry.

2

Dr. Mashali's medical history is significant for sarcoidosis, treatment with Prednisone and now Remicade (methotrexate has been recently proposed), seizure, history of visual hallucinations (none currently), Vitamin B12 deficiency, gastroparesis, iron deficiency anemia, hypercholesterolemia, cardiac arrhythmia (atrial fibrillation), non-insulin dependent Diabetes Mellitus, a history of liver failure (now resolved), gastro-esophogeal reflux disorder, and cachexia.

Mental Status Examination:

Dr. Mashali arrived on time, neatly and professionally attired, with appropriate hygiene, using a walker for stability.  We began interviews with the clarification that the purpose was forensic rather than for treatment, that any information he shared could be included in a report which would be submitted to the Court if he and his attorney so wished, that questions could be answered selectively if he wished, that he could terminate the interview at any time, and that he was not required to participate. He indicated that he understood these conditions, and in my clinical opinion he did understand them. He agreed to proceed and answered all questions openly.

His speech was clear, soft spoken, and of somewhat slower than normal rate. Speech was not pressured and prosody was within normal limits.  His thinking was linear and logical.  His major concerns involved his wish to prove his innocence of the charges against him.  He denied thoughts of suicide, self-harm, homicide, or harm towards others.  Dr. Mashali acknowledged struggling with episodes of depression and hypomania for about 3 decades, and described the impact of his physical deterioration, particularly resulting from having (and receiving treatment for) sarcoidosis with multiple compounding problems such as urinary and fecal incontinence, liver failure, weight loss, and generalized weakness, among others.  He reported difficulty with sleep, appetite, energy, and concentration.  (He has previously acknowledged to multiple individuals including medical personnel that he experienced vivid visual and auditory hallucinations.)  He denied current hallucinations of any type, and there was no evidence of delusions; however, he acknowledged a life-long struggle with "paranoia" which he explained meant a persistent mistrust of others.  He described first identifying this problem when he began psychiatric treatment about 30 years ago in Texas.  This mistrust did not rise to the level of flagrant delusional beliefs in organized conspiracies, but his mistrust is quite deep, pervasive, and resistant to reasonable challenge.  Dr. Mashali described his current mood as depressed and anxious.  His affect was mood congruent and appropriate to content.  His cognition was grossly intact in terms of immediate recall, abstraction, and fund of knowledge; however, there were times that some impairment of recent and remote memory was evident.  During the interviews, there were times when he appeared to have difficulty with concentration, especially related to feelings of tiredness and lethargy.  Insight was adequate in terms of his understanding of the charges against him and the need of mounting a defense.  Judgment was adequate in that context; he insisted on his

3

innocence and minimized the extent and import of evidence against him. Additionally, his judgment, vis-à-vis his decision to travel to Egypt and attempt to facilitate either a capture of or a peace making confrontation with a former medical school classmate and now member of Al Queda, would indicate significantly impaired judgment, at least episodically. [Please note later discussion regarding the matters of insight and judgment related to Dr. Mashali's understanding of the evidence against him.]

Discussion:

Dr. Fathalla Mashali is a 61 year old physician who faces extensive and serious charges which are alleged to have taken place beginning in 2011. He has no known history of prior legal charges or antisocial behavior. He is married and has 4 children ranging in age from 5 to 18. Dr. Mashali has a lengthy history of mental illness, best described as Bipolar Type II although he has also been diagnosed with Major Depressive Disorder and Bipolar Disorder Type I with psychotic features. Symptoms of depression alternating with periods of hypomania began about 30 years ago. By his own description, that of his wife, and the various medical/psychiatric records, there have been significant fluctuations in mood, functioning, cognition, and capacities to manage activities of daily living. He first sought and received psychological treatment from a Dr. Prakash in Irving, Texas over 30 years ago, at which time he was prescribed medication for depression by his primary care physician. After treatment of about 2 years, he was able to return to work and was ultimately able to pursue a profession in medicine, having originally earned his medical degree in Egypt with the subsequent need to meet U.S. requirements, including completion of a residency program.

Dr. Mashali's mental health fluctuated over many years; however, he appeared able to manage, despite these challenges, until his physical health deteriorated in 2002-3. Since that time, there have been multiple challenges to both physical and mental health and capacity to meet the demands of personal and professional functioning. He has been psychiatrically and medically hospitalized, treated with antipsychotic medication, mood stabilizing medication, anticonvulsant medication, treated with medications such as Prednisone (a steroid medication prescribed for sarcoidosis), has experienced life-threatening liver failure, at least one seizure, diabetes, cardiac arrhythmia, and polyneuropathy. The several medical factors which could impair his mental functioning include sarcoidosis, treatment with Prednisone, B12 deficiency, cachexia, and anemia. It is significant that his parents were diagnosed with early onset Alzheimer's disease and died from that disease shortly before the alleged offense conduct.

I have discussed Dr. Mashali's history and current case with Attorneys Jeffrey Denner and Joseph Keller. They indicate that there are thousands of pages of documentation and witness statements which are often adverse to Dr. Mashali. I

4

have seen a portion of this information and appreciate the enormity of the task they and Dr. Mashali face if he chooses to challenge the validity of the evidence.


Conclusion:

In my opinion, Dr. Fathalla Mashali suffers with a mental disorder best characterized as Bipolar Disorder, Type II, severe (DSM-V # 296.89) which is severely compounded by multiple medical conditions, particularly (though not exclusively) sarcoidosis with its accompanying treatment. Furthermore, I believe that Dr. Mashali has suffered with these conditions for several years prior to the alleged offense conduct, during the time of the alleged offense conduct, and continues to the present time. In my opinion, his mental illness does not rise to meet the full Federal criteria for lack of criminal responsibility in so far as he can discern right from wrong; however, it is also my opinion his mental illness and the mental components of medical illnesses at the time of the alleged offense conduct profoundly impaired and diminished his capacity to conform his behavior to the requisites of the law, as per McHoul criteria. Finally, I am concerned that both his mental and medical illnesses presently impair his ability to make realistic assessments of the defense options available to him, particularly options involving plea bargaining. Although he understands the charges against him, the roles of the participants in the legal system, and intellectually understands that he has defense options, he appears incapable of appreciating the extent of evidence against him; therefore, I believe that his competence or capacity to effectively and realistically assist his attorneys in his own defense is, as a practical matter, virtually non-existent at this time.


Respectfully submitted,

Roger H. Gray, M.D.

5

# EXHIBIT 3

Leslie Rita Vogel, M.D.
55 Hatchetts Hill Road
Old Lyme CT 06371
617-804-2890

July 21, 2017

Psychiatry Report: Re: Fathalla Mashali, M.D.

I have been asked by Jeffrey Denner and Joe Keller, the attorneys for Dr. Mashali in the pending criminal matter in the United States District Court for the District of Massachusetts, to assist in the sentencing phase of this case.   I have done a competency evaluation, and am attaching that report.   I have interviewed Dr. Mashali three times, have talked to his wife Dr. El-Khadry as well, for approximately 5 to 6 hours total.  I have had extensive conversations with Mr. Denner and Mr. Keller, have reviewed prior reports from a variety of physicians, including medical records over the last three years.   I have procured extensive medical history from both Dr. Mashali and his wife Noha as well as from my conversations with Dr. Roger Gray.  Dr. Gray and I have had several conversations centering around the complex interface between the multiple neuropsychiatric issues which have affected Dr. Mashali and the correlating behaviors.  I have also read reports from Dr. Roger Gray, Dr. Alison Fife and Dr. Martin Kelly.  I have reviewed the pertinent legal documents and filings in the case.

To characterize Dr. Mashali's capacity to act with sound insight and judgement during the time of the offense conduct, requires a meticulous assessment of the neuropsychiatric context during that period.  Additionally, foreshadowing events from previous years (2002 to 2009), and subsequent patterns afterward (2014-present) must all fit reasonably into a cohesive underlying process.  Dr. Gatchel, MGH, alludes to this concept in 2015: "*It is unclear if judgments and decisionmaking leading up to this are related to current presentation.*"  She then proceeds with a differential diagnosis to cohesively explain the trajectory of his cognitive and physical deterioration, including a broad spectrum of autoimmune, neurologic, and other medical processes.   Her diagnoses of Depressive Disorder NOS (Not otherwise specified) and Cognitive Disorder NOS (Not otherwise

specified) are consistent with a neuropsychiatric presentation  still seeking explanation; that is because the pattern of  Dr. Mashali's  deterioration in judgement, cognition, and physical capacity suggests an organic process hitting multiple functions at once.  Dr. Gatchel makes it clear that the severity of his cognitive and physical aberrations would not be attributable solely to his psychiatric process (e.g, depression).

I have already spelled out in my July 20, 2017 Report the cascade of events which began with Dr. Mashali's Sarcoidosis diagnosis in 2002.  Prior to that, he appeared highly functional in all domains, and able to withstand the stressors and challenges of an anesthesia position, the sleep deprivation that would often accompany being on call, and handling the interpersonal challenges inherent in high-stress medical environments.   His status today is the end point of that incipient Sarcoidosis process which triggered a gradual, insidious, multi-domain disintegration in judgment, insight, memory and physical capacity.

In reconstructing the disease processes dating back to 2002, there were some that were established (among others, sarcoidosis, steroid use/toxicity; gastroparesis; orthostasis; weight loss; B-vitamin deficiency (B12).    Certainly the steroids alone, or a B-12 deficiency, would be sufficient to trigger a significant mental status decline.  Part of the problem during the offense conduct period was – Dr. Mashali, having taken high-dose steroids, was already exercising poor judgment by self-prescribing without having his physician assess him – i.e., he had already developed a manic-like syndrome, or  "secondary mania" either from the steroids or the sarcoidosis itself, or both,  with consequent grandiosity, impaired judgment, confusion, mood lability – leading to a vicious cycle of steroids, high blood sugars, and lack of physician monitoring.

However, these were just the disease processes that were identified and confirmed. In my discussions with Dr. Gray, and as echoed in multiple medical records, there are several postulated diagnoses which would have worsened Dr. Mashali's insidiously intensifying neuropsychiatric co-morbidity.  In addition to  the multiple possible explanations for his behavior which appear in his chart notes (e.g., rule-out Multiple Sclerosis, Vasculitis, Dementia, Malignancy, TB, toxic exposures),  there were other possible diagnoses which should have been ruled out or further pursued and treated  as possible bases for his aberrant and deteriorating behavior but, to my

knowledge, were not:  Those included:  Wernicke's Encephalopathy:  Classically brought on by thiamine deficiency frequently seen in alcoholism, Wernicke's can also occur following weight loss, starvation, bariatric surgery, and malabsorption syndromes, with increased risk if Magnesium is low.  The classic triad presentation is encephalopathy, unsteady gait, and oculomotor (eye muscle) dysfunction. According to history provided, Dr. Mashali has had all three, after a documented severe weight loss due to gastroparesis and vomiting.  His mental status would have waxed and waned depending on what thiamine or magnesium supplementation he may have received.

Page | 3

Other possibilities to be explored include those mentioned in records (other autoimmune diseases, Alzheimers or atypical dementias; incipient Parkinsons disease (he has this diagnosis per Noha); Myasthenia Gravis (he has drooping eyelids and weakness currently); Normal Pressure Hydrocephalus (triad of Dementia, Gait Disturbance, Incontinence (Dr. Mashali has urinary and fecal incontinence), though no known evidence is noted from imaging).  Any of these disease processes, particularly on top of what was already diagnosed, were sufficient to deliver a multi-domain, across-the-board devastating neurologic insult to impact every level of functioning including cognition, judgment, memory, and even basic physical functions including a "working" stomach with adequate motility, and adequate blood pressure to maintain upright posture.

Drawing on this barrage of neuropsychiatric vulnerability in a sequential trajectory which continues to deteriorate to this day, it is my conclusion that Dr. Mashali had overt and undeniable organic factors compromising his judgment, beginning in 2002, and persisting through today.  By the period of the offense conduct (2010-2013), Dr. Mashali's condition had clearly reached the tipping point, with his neuropsychiatric pathology contributing heavily to his offense conduct.  Following along on this trajectory several years later, he has deteriorated to the point where he is no longer the person he was, and has even become incapable of participating in assisting counsel.  Therefore, over time, the pathology that had initially led him to commit the offense conduct – has now entered its second phase and has rendered him incompetent even to participate in his own sentencing.  His continuing deterioration is consistent with a progressive process which has not been "cured" by any psychotropic treatment, presumably because the etiology is a complex physiologic one.  It would be unrealistic to postulate that – during the time of offense conduct –

Dr. Mashali somehow overcame these organic factors for periods of time to coolly plan his schemes... then returning to his existent confusional state in between.    In fact, his "planning abilities" were so compromised that his "solutions" to solve his problems:  hiding the urine rather than working out a system, yelling at his employees rather than working cooperatively with them; altering patient notes rather than maintaining consistent records... reflect a complete inability to plan, process, or recognize what would have been a productive, reasonable way to proceed.   Even his attempts at "malingering are overly obvious and unsuccessful, and more in the line of his grandiosity.  More importantly, his misguided malingering attempts in no way detract from the profound seriousness of his actual disease process; and in fact support it.

Therefore it is my conclusion, to a reasonable degree of medical certainty, that Dr. Mashali's capacity at the time of the offense conduct was significantly reduced and substantially contributed to the offense conduct.  The barrage of neurologic insults was relentless and widespread.  Suspicions of his "faking his symptoms" were directly countered by medical testing, confirming gastroparesis and orthostatic hypotension.  These tangible neurologic dysfunctions – in addition to incontinence, memory impairment, gait disturbance - were part and parcel of a pathologic process which destroyed his longstanding capacity for judgment, modulation, insight, and appropriate interpersonal behavior.

It would be impossible to separate Dr. Mashali's neuropsychiatric co-morbidities at the time of the offense conduct – from his actions in the crimes alleged.  This is because organic etiologies must first be ruled out in order to establish primary psychologic or primary psychiatric causes.  Not only have such organic etiologies not been fully ruled out; the timeline of Dr. Mashali's neurologic decline suggests that the medical team is still missing a unifying diagnosis which would account for his downward spiral.   And there are some diagnostic possibilities which still warrant further explanation, either as causative or contributing to his impaired mental status between the years of 2002 and the present.

There is little question – based on the extensively documented complexity of Dr. Mashali's medical status – that his neuropsychiatric pathology directly contributed to the offense conduct.   Had this been a primarily characterologic endeavor, it would have been managed with careful planning and sophisticated problem-solving

corresponding with his intelligence level.  And the overt physical decline would also raise suspicion of an underlying organic disorder which overrides the psychological. But instead the "schemes" were irrational, child-like at times, destined-to-fail, and reminiscent of the perseveration seen in dementia where no rational input can permeate the rigid, demented mind, or alter its irrational course.[1]  We return to the fundamental issue raised by Dr. Gatchel, as to how Dr. Mashali's current neuropsychiatric disease relate to his past behaviors.    Based upon the medical facts, the most plausible basis for Dr. Mashali's behavioral and cognitive decline during the offense conduct - was his pervasive neuropsychiatric pathology.

Page | 5

Respectfully Submitted,

Leslie Vogel, M.D.

---

[1] During my fellowship at Columbia Presbyterian Hospital, I had numerous competency cases where guardianship was pursued for highly intelligent patients whose dementing processes rendered them severely judgment-impaired.  They retained impressive vocabularies and intact remote memories, but were dramatically incapable of any insight, planning, or executive function.  Oftentimes the first "symptoms" would be impaired judgement and manic-like behaviors; the organic etiology would often not surface until years later.

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| |
UNITED STATES OF AMERICA |
|
v.                         |        Criminal No. 14-10067-RWZ
|
FATHALLA MASHALI,          |
        Defendant,          |
|

## DEFENDANT'S MOTION TO DETERMINE COMPETENCE AND INCORPORATED MEMORANDUM OF LAW

The Defendant, Fathalla Mashali ("the Defendant"), by and through undersigned counsel, respectfully requests that this Honorable Court, Zobel, J, order, pursuant, *inter alia*, to the Due Process Clause of the Fourteenth Amendment, 18 U.S.C. §4241, and relevant decisional law – e.g. Godnez vs. Moran, 509 U.S. 396 (1993)[1], and Medina vs. California, 505 U.S. 437 (1992)[2] and United States vs. Patel, 524 F. Supp. 2d 107, (DMASS, 2007)[3] a hearing to determine the mental competence of the Defendant, Fathalla Mashali. The Defendant, through counsel, contends that reasonable cause exists to believe that he is suffering from a mental disease or defect rendering him mentally incompetent in that he is either no longer able to understand the nature and consequences of the proceedings against him or to effectively assist in his defense, or both. In support hereof, the Defendant attaches as Exhibit 1 the "Forensic Psychiatric Evaluation of Dr. Roger Gray, M.D. as Exhibit 2 the Psychiatric Report of Dr. Leslie Vogel, Exhibit 3 an affidavit recently authored by the wife of the defendant, Dr. Noha Elkadry Mashali, and as Exhibits 4 & 5 the affidavits of your undersigned counsels, Jeffrey Denner and Joseph Keller.

---

[1] Godinez holds that a criminal defendant must be competent when tried.
[2] Medina holds that a criminal trial of an incompetent defendant violates due process.
[3] Patel holds that a hearing must be held, where requested and where reasonable cause therefore exist, to determine competence.

Considered together, they present a Defendant with significant and deteriorating cognitive abilities, underlying psychopathology, and progressive dementia, in conjunction with a severe organic dysfunction/debilitating medical illness, all of which collectively have ravaged his mind (and body) to a point of incompetenc to proceed to the sentencing phase of his case[4].

It is respectfully submitted, that all of the forgoing clearly establishes the requisite "reasonable cause" to believe that the Defendant "may presently be suffering from a mental disease or defect rendering him mentally incompetent", here with particular regard to the Defendant's capacity to effectively assist defense counsel in the conduct of his sentencing phase and perhaps any ultimate sentencing appeal. That is particularly true, where as here, the issues surrounding the "proof of loss", which in a fraud case triggers enhancements which effectively drive the Guideline Sentencing Range, utterly require this Defendant's ability to separate the "legitimate" billings from the "fraudulent" billings to determine a valid "loss" for "enhancement" and "restitution" purposes. See, e.g., *US vs. Alphas Opinion, #2014, 1st Cir. 2015)*, attached hereto as Exhibit 6. Put in another way, only the fraudulent billings may be used to determine "loss" for "sentencing enhancement" and "restitution", not the entire amount billed as "intended loss", as the Government, utilizing a flawed methodology, as done here. And this

---

[4] Your undersigned counsel has periodically entertained mounting doubts over the approximately last two years at least of the Defendant's capacity to assist in his own defense. His apparent ability to recall events relevant to the subject indictment, to focus on the questions I have been asking him, and at times to even stay awake during our meetings, is problematic at best. He continues to sleeps almost continuously at home, awakening to be taken to outpatient, medical and psychological appointments, is in a state of confusion for the majority of his waking time; is unable to walk unaided by a walker or wheelchair; and seems to remember very little of what he has just been told or of his more distant past life. He recently has begun to repeatedly fall and injure himself, and apparently, per the attached Affidavits, has been involuntarily hospitalized for medical and psychological reasons, again.

Defendant, at this time, is clearly and utterly unable to do this and must therefore be held to be incompetent.[5]

Accordingly, the Defendant respectfully requests that such a hearing be ordered by this Honorable Court and for any other relief or order as may be deemed appropriate. And, further, it is suggested that should an evaluation be deemed necessary, it be done inpatient at either an appropriate civilian hospital or at such a federal prison hospital facility, for as long as is required to ascertain competence[6].

Dated: July 20, 2017

Respectfully submitted,
FATHALLA MASHALI
By and through his attorneys,

 /s/ Jeffrey A. Denner
Jeffrey A. Denner, BBO#120520
Jeffrey Denner Associates, P.C.
Four Longfellow Place, 35th Floor
Boston, Massachusetts 02114
Tel.:   (617) 227-2800
Fax:   (617) 973-1562
jdenner@dennerlaw.com

Certificate of Service

I, Jeffrey A. Denner, hereby certify that on this the 20th day of July 2017, I caused a true copy of the foregoing *Defendant's Motion to Determine Competence and Incorporated Memorandum of Law* to be served upon all necessary parties by virtue of electronically filing the same via the CM/ECF system.

 /s/ Jeffrey A. Denner
Jeffrey A. Denner

---

[5] Ironically, other individuals who perhaps could have helped us in the determination of a valid "loss calculation" are unavailable – either because they are Government witnesses in this case or a defendant in a related pending criminal case arising out of the subject matter of this indictment.

[6] Your undersigned was reluctant to bring this motion at such a late date, but the Defendant's condition deteriorated so dramatically over the past weeks, particularly this week, that I lost all hope that he would be able to assist us in determining a valid loss amount, culling the legitimate billings from the fraudulent ones, or otherwise be able to comprehend the proceedings.

# EXHIBIT 1

Roger H. Gray, M.D.
112 Sargent Street
Newton, MA 02458
(617) 332-0901

July 19, 2017

Forensic Psychiatric Evaluation
Re: Fathalla Mashali

I have been asked by Attorney Jeffrey Denner, who represents Dr. Mashali in the
pending criminal matter in the United States District Court for the District of
Massachusetts to assist in the sentencing phase of the case.    In connection
therewith, I have consulted regularly with Mr. Denner over the past months and
recently re-interviewed the Defendant, Fathalla Mashali and his wife Noah.
Additionally, I have reviewed more recent medical records from the Massachusetts
General Hospital including evaluations by a neurologist, geriatric psychiatrist, and
have read the Pre-Sentence Report and the Government's Sentencing Memorandum
herein.

Dr. Mashali has deteriorated remarkably since I last interviewed him.  He is
dramatically more confused, intermittently believes that he has done nothing
wrong, and generally is incapable of accurately perceiving the realities of his life and
of his actions. He reports visual hallucinations of seeing men around him in his
bedroom and hears auditory hallucinations of these men telling him to not believe,
trust, or cooperate with his attorneys, with his doctors, or with his wife.  His
reporting of these hallucinatory experiences appears genuine to me.    His physical
appearance shows significant deterioration as well.     His gait is more impaired, and
there is now marked drooping of both eyelids. He is 61 years old but has the
physical presentation of a decrepit man decades older.  In my opinion, Dr. Mashali
suffers with a psychiatric disorder best characterized as Bipolar Disorder, Type II,
which vacillates between deep depression and hypomanic activity. He suffers with
organic conditions, all of which significantly contribute to impairment of cognition,
judgment, insight, mood, and capacity for rational thinking.  These conditions
include neurosarcoidosis, B 12 deficiency (pernicious anemia), gastroparesis
syndrome/malabsorption, past treatment with high doses of steroid medication,
and steroid induced diabetes. Dr. Mashali's impairments of insight and judgment
were compounded by self-medication with steroids and oral hypoglycemic
medication. The sum total of all of the foregoing has resulted in a progressive and
substantial dementia which has been deepening over time.  It is also important to
note that both his parents died relatively young from early onset Alzheimer's. From
an epidemiologic/statistical viewpoint, this increases the likelihood that he may
have this disease as well.  Although Dr. Mashali has not been formally diagnosed
with Alzheimer's Disease, the combination of genetics, i.e. his family history, and his

current presentation and progressive decline, must raise that as a diagnosis to be seriously considered.

In my opinion, Dr. Mashali is clearly unable to assist his attorney in this case, particularly at this crucial sentencing phase (and has apparently been in this state for at least the several recent past months); therefore, in my opinion, held to a reasonable degree of medical/psychiatric certainty, Dr. Mashali lacks the sufficient present ability to effectively consult with his lawyer with a reasonable degree of rational understanding and does not possess the capacities necessary for competent participation in further judicial proceedings, including the sentencing process, at this time.


Respectfully Submitted,

Roger H. Gray, M.D.

Curriculum Vitae


Roger H. Gray, M.D.
112 Sargent Street
Newton, Massachusetts
(617) 965-2713
DOB: January 14, 1945


I.     Education
       A. University of Minnesota, B.A., English Literature, 1968
       B. University of Minnesota, School of Architecture, 1967-69
       C. Tufts University, School of Medicine, M.D. Boston, MA 1973-77


II.    Post-Graduate Training: Tufts –New England Medical Center and Affiliates
       A. Medical Internship: July 1977-June 1978 at the Shattuck, Faulkner, and
          Jamaica Plain V.A. Hospitals
       B. Psychiatric Training:
              1. Jamaica Plain V.A. Hospital: July 1978-June 1979
              2. New England Medical Center: July 1979-June 1980
              3. Jamaica Plain V.A. Hospital: July 1980-June 1981, Chief Resident,
                 Ward 12 C (In-Patient Service)
              4. New England Medical Center: July 1980-June 1981


III.   Work Experience:
       A. Private Practice: July 1981 to present.  Psychotherapy and pharmacotherapy
       with adults, adolescents, and couples.  Extensive treatment and
       evaluation of victims and perpetrators of abuse and trauma
       Psychotherapy supervision and consultation, forensic evaluations

       B. Medical Director, Adult Psychiatric Unit, Caritas Norwood Hospital: October
       1999 to February 2006
          Responsibilities included: direct patient care, supervision of other psychiatrists,
       Oversight and supervision of milieu staff, program development, Peer Review
       Committee, Quality Assurance Committee, Utilization Review, development
       and implementation of Suicide Risk Assessment Protocol, ECT Practice
       Committee, Restraint Reduction Committee, Performance Improvement
       Committee, consultation-liaison services to general medical/surgical
       Service, consultation to Substance Abuse Treatment Program, and Emergency
       Department Staff.

1

C. Associate Medical Director, Adult Psychiatric Unit, Southwood Community Hospital: April 1994-October 1999.  Duties as described above.

D. Associate Medical Director, Geropsychiatric Unit, Southwood Community Hospital: January 1992-October 1994  Duties as described above.

E. Medical Director, Partial Hospital Program, Southwood Community Hospital

F. Medical Director, Psychiatric Service, Northeastern University Student Health Service  April 1992- April 1994.  Duties included: direct patient care, collaboration with Counseling Dept., consultation to teaching and administrative staff, development of managed care protocol, consultation to and instruction of staff of resident halls, supervision of other mental health providers.

G. Medical and Clinical Director, American Geriatric Services, Inc.: November 1988-December 1991.  Duties included development and administration of inpatient medical-psychiatry services and out-patient mental health services for elderly patients, direct services to patients, training and supervision of of multi-disciplinary teams, development of Utilization Review and Quality Assurance Programs.  Patient cohort over 3,000.

H. Staff Psychiatrist, Consultation-Liaison Service, and Supervisor of Psychiatry Residents, Beth Israel Hospital, Boston, MA and Harvard Medical School July 1988-1990

I. Psychiatric Consultant, St. Margaret's Hospital, Dorchester, MA: September 1987-January 1989

J. Carney Hospital, Dorchester, MA: December 1983-June 1988
   1. Director of Psychiatric Consultation-Liaison Service. Duties included providing and coordinating psychiatric services to medical/surgical services, instructing primary care residents, formulation of policies, consultation to staff of coronary care unit.
   2. In-Patient Attending Psychiatrist: December 1983-September 1986
   3. Teaching primary care residents and directing house officers' group 1984-1987
   4. Psychotherapy supervision of nursing graduate students 1984-1986
   5. Grand Rounds for Departments of Psychiatry and Medicine

K. Attending Psychiatrist, Cambridge Hospital In-Patient Psychiatry Service, Cambridge, MA. Duties included supervision of psychiatric residents, psychology interns, and medical students. July 1981- December 1983

L. Medical Director, 735 Inc., Melrose, MA  Outpatient Mental Health Clinic July 1981-December 1983

2

M.   Forensic consultations: 1983- present

N.   Adolescent Psychiatry Unit, Boston State Hospital 1969-1973
Director, Sheltered Workshop and Vocational Training
Activities Supervisor

IV.   Massachusetts License, Board of Registration and Discipline in Medicine, #43790
Issued February 21, 1979
American Board of Psychiatry and Neurology, #28364, issued November 1986

V.   Professional Affiliations
Massachusetts Medical Society
Massachusetts Psychiatric Society
American Psychiatric Association
American Academy of Psychiatry and the Law

VI.   Community Activities:
Member, Dedham Board of Health, March 1985-March 1988

VII.   Publications
A. Attleboro Sun Chronicle, columnist on mental health issues, October 1994-
September 1997
B. "Filming Adolescent Activities" Hospital and Community Psychiatry,
August 1971
C. "The Role of the Library in an Adolescent Service" Hospital and Community
Psychiatry, May 1972 (with Anton O. Kris, M.D.)

VIII.   Teaching

Psychology Colloquium: Coping with Death and Dying, University of Puget
Sound, October 30, 2007

Guest Lecturer, Sargent College of Allied Health Sciences at Boston University,
1997-2004

Presentation to Community Service Board at Rome Memorial Hospital,
Rome, NY May 2, 2001

Early Intervention – Suicide Prevention and Depression Among College Students,
Northeastern University, October 2, 1993

"Juggling the Generations" – issues in geriatrics, Women's Seminar,
Neponset Valley Health Systems, September 30, 1993

Workshop: Psychotherapy with Elderly Patients in Long Term Care Settings
Presented at the Northeastern Gerontological Society, Annual Conference,
Albany, NY, April 19, 1991

Workshop: Psychotherapy of Nursing Home Residents with Character
Disturbances, presented at the American Psychological Association,
1991 Annual Convention, San Francisco, California, August 20, 1991

Workshop: Psychotherapy with the Elderly
Conference: Treatment of the Behaviorally Disturbed Geriatric Patient,
Co-sponsored by Fuller Memorial Hospital, American Geriatric Services, and
Human Services of Southeastern Massachusetts, Mansfield, MA October 25, 1991

Workshop: The Wolf in Sheep's Clothing: Medical Illness and Psychiatric
Symptoms, presented at the Massachusetts School of Professional Psychology,
Dedham, MA, November 15, 1991

Faculty/Panelist, Massachusetts Continuing Legal Education
August 2008 – Forensic Psychiatry and the Vicissitudes of Memory
January 2009 – Psychiatric Issues in Restraining Order Enforcement

Guest Lecturer, Suffolk Law School, January, 2014 – False Confessions

Lecturer, Committee for Public Counsel Services, Certification Training –
Clinical Aspects of Mental Health Litigation/Treatments for Mental Disorders
Worcester, MA, November 21, 2014

Lecturer, Second Annual Boston Symposium on Psychology and the Law –
Use of Psychotropic Medications for Sexually Inappropriate Behavior
Boston, MA, December 6, 2014

Forensic Experience

A. Criminal
   1. Commonwealth v. Fraser  (Dedham District Court)
   2. Bridgewater State Hospital evaluations:
         a.  assault and battery
         b.  sexual offenses
         c.  attempted murder
         d.  murder
      Issues: competence to stand trial, criminal responsibility, dangerousness,
      parole applications, transfers to less restrictive settings, medications and
      treatment plans
   3. U.S. v. DelaCruz  (United States District Court, District of Massachusetts)
   4. U.S. v. Kelly (United States District Court, District of Massachusetts)
   5. Knipfer v. State of New Hampshire

4

6. State of New Hampshire v. Hilchey
7. State of New Hampshire v. LaBarre
8. Commonwealth of Massachusetts v. Bishop
9. Testimony before Sexual Offender Registration Board, Commonwealth of Massachusetts
10. Commonwealth v. Dell'Isola (Middlesex Superior Court)
11. Elghorfi v. Bridgewater State Hospital (Plymouth Superior Court)
12. Psychiatric Evaluations re Internet Sex Crimes

B. Civil
1. Commitments (approximately 250)
2. Psychiatric Damages (approximately 15)
3. Independent Medical Evaluations (approximately 500)
4. Medical Malpractice (5)

C. Training
American Academy of Psychiatry and the Law:
Board Review Course, October 2002
Conference, October 2006
    Courses: Challenges in Correctional Psychiatry
            Insanity Defense
            Perspectives on Malingering
            False Allegations
            Two Views of Insanity
            Risk Assessment
            The Internet and Child Pornography
            NGRI Re-offending
Conference, October 2007
    Courses: Assessment of Child Pornography Offenders
            Conceptual History of Psychopathy
            Forensic Evaluation of Problematic Internet Use
            Violent Offenders
            Treating Pedophilia
            Asperger Psychopathology and Internet Sexual Crimes
            The Treatment of Incarcerated Sex Offenders
            Forensic Applications of Video Game and Internet Addiction

D. Faculty of MCLE

1. Panelist, Forensic Psychiatric & Legal Perspectives on Law & Memory (August, 2008)

2. Panelist, Domestic Abuse/Enforcement of Restraining Orders (January, 2009)

E. Committee for Public Counsel Services

1.Faculty/Panelist, CPCS Guardianship Seminar, Southeast Region (January, 2013)

F.  Guest Lecturer at Suffolk Law School (January 2014)
       Topic: False Confessions

G.  Guest Lecturer at Pilgrim Advocates conference (October 2015)
       Topic: Criminal Responsibility and Mental Illness

# EXHIBIT 2

**Leslie Rita Vogel, M.D.**
**55 Hatchetts Hill Road**
**Old Lyme CT  06371**
**(617) 804-2890**

**July 20, 2017**

### Psychiatric Report/Competency
### Re: Fathalla Mashali, M.D.

I am a licensed psychiatrist in New York and Massachusetts who has actively practiced psychiatry for the past 26 years. My *Curriculum Vitae* is attached hereto.

Attorneys Jeffrey Denner and Joseph Keller, counsel for the Defendant, Dr. Fathalla Mashali have requested my assistance in the sentencing phase of this case. I met with Dr. Mashali and his wife, Noah multiple times over the past weeks and months, most recently on July 18th. I have read the Presentence Report, the Government's Sentencing Memorandum, reviewed multiple medical records from hospitals, which include various psychiatric, neurologic, and medical evaluations. I have also reviewed legal documents filed in connection with the prior competency proceedings as well as legal documents relating to the criminal charges brought.

In combination, all of the foregoing paint a multi-factorial picture of severe psychiatric and neurologic co-morbidity. But before those disorders surfaced, Dr. Mashali was a high-functioning anesthesiologist. He evidently displayed reasonably good judgement, intact memory, physical stamina, and the ability to plan and facilitate. There was no evidence of entrenched sociopathic behaviors. A turning point occurred. In 2002, he became ill with Sarcoidosis. The severity of the disease required powerful steroids. One problem led to another: steroid-induced diabetes, gastroparesis with vomiting and weight loss; nutrient deficiencies with known neuropsychiatric effects, joint pain, and orthostatic hypotension. Accompanying those events over time was an increasing and striking deterioration in insight, judgment and physical capability. The cognitive and physical deterioration appeared too severe to have arisen from psychiatric issues alone (e.g., affective disorder/depression). Whatever the root cause, Dr. Mashali's neuropsychiatric deficits have steadily intensified: Gait impairment, memory loss, poor insight/judgment, possible seizures, hallucinations, vision problems, severe depression eliciting repeated recommendations for ECT and involuntary psychiatric commitment. In addition, neuropathy, gastroparesis and orthostatic hypotension impede his most basic functions and physical comfort.

Currently, Dr. Mashali continues to deteriorate. Even in comparison to three weeks ago, he is markedly worse. He cannot follow thought processes. He perseverates. He can neither receive, nor process, information critical to his own case. On exam, he looked particularly confused and genuinely frightened. He described "seeing men", whose voices instructed him not to cooperate with his attorneys and physicians. He denied that the voices directed him to hurt himself or others. He could immediately register 3 out of 3 words, but could not recall them 3 minutes later. Dr. Mashali had briefly attempted a few weeks earlier to provide medication history; he stated he was taking Propulsid, but confused Pantoprazole with Propulsid – not seeming to understand that they were completely different categories of medication. Now he seemed unable to even make an effort to participate. Correspondingly, his physical status has also declined; his gait seemed more unstable (he had fallen badly at home; a large cut was visible on his forehead); (with the possibility of

intracranial bleed,)[1]his eye movements (upward gaze) were impaired, which generally indicates neurologic dysfunction.

Dr. Jennifer Gatchel at MGH, in records I have reviewed well-describes the complexity of Dr. Mashali's neuropsychiatric issues.  She raises the issue of the currently noted features playing a role in the judgement which he had exercised during previous years.  His mental status, pre-Sarcoidosis, certainly appeared unremarkable, but steadily declined after multiple neurologic insults, and have only worsened substantially to date.  But while many diagnostic questions remain, there is no doubt that Dr. Mashali's mental status has deteriorated dramatically in recent weeks.  In addition, the above mentioned recent fall where he hit his head, and which could result in further neurologic damage, must be assessed carefully.  The "Bipolar-Type" features that Dr Mashali manifests – whether they be a primary psychiatric disorder, a secondary mania, or a multi-factorial encephalopathic condition - render him incapable of understanding what he is facing legally, or of constructively participating in assisting his attorney.  It is, therefore, my opinion, held to a reasonable degree of medical certainty, that Dr. Mashali lacks the cognitive ability to work productively with his attorney, or to sufficiently understand the principles and consequences involved to defend himself adequately.  The additional new finding of visual and auditory hallucinations directing him not to cooperate with his legal team – only further robs him of any chance to adequately participate in his case.   The current confusion is supported by multiple physician notes-related to past cognitive deterioration as stated above, and again, he moreover appears markedly worse over the past months and acutely over the past few weeks.

Therefore Dr. Mashali does not demonstrate the requisite 'competency' at this time to meaningfully participate in the remainder his judicial proceedings.

Respectfully, he should be evaluated thoroughly, on an inpatient basis, perhaps at a federal prison hospital facility, to formally determine his level of present cognitive deficit and disability and the etiology of his decline.

Parenthetically, it is also my opinion that he is no longer capable of remaining home alone, unsupervised, due to his physical and mental limitations.

Respectfully Submitted,

M.D.

Leslie Vogel, M.D.

---

[1] I have been informed today by the Defendant's wife that he has been admitted to an MGH medical ward to deal with the medical issues arising from the fall.  She apparently has been told that he has a "hematoma on his brain" and has additionally been "sectioned" psychiatrically, which means he is at least temporarily in state custody and will be transferred to a psychiatric ward if and when he is medically cleared. As an aside, while he is in the medical ward there is a hospital aide sitting with him constantly because he is in state custody as a result of his sectioning, and he now requires monitoring due to his diminished neuropsychiatric state.  Additionally, the team had discussed a round of Electro Convulsive Therapy (ECT) for his mental state as well, which would have to be on hold until his intracranial and neurological state is clarified.

Curriculum Vitae

**Leslie R. Vogel, M.D.**
55 Hatchetts Hill Road
Old Lyme ,CT  06371
Tel:  617 804-2890

**Personal Data:**

Born                    Brooklyn, NY
Citizenship             United States of America

**Education:**

| Year | Degree | Field | Institution |
|------|--------|-------|-------------|
| 1978 | B.A. | English | Cornell University |
| 1983 | | Pre-Med | CUNY Hunter |
| 1987 | M.D. | Medicine | Yale Medical School |

**Postdoctoral Training:**

**Internships and Residencies:**

| | |
|---|---|
| 7/1/87 – 6/30/88 | *Intern* in Medicine/Psychiatry Program, Hospital of the University of Pennsylvania, Philadelphia PA |
| 7/1/88-6/30/91 | *Resident* in Psychiatry Program, University Texas at San Antonio Health Sciences Center, San Antonio TX |

**Clinical and Research Fellowships:**

| | |
|---|---|
| 7/1/92-6/30/93 | *Clinical Fellow* in Consultation-Liaison Psychiatry, Columbia University College of Physicians and Surgeons, New York NY |
| 7/1/93-6/30/95 | *Research Fellow* in Developmental Psychobiology, Columbia University College of Physicians and Surgeons, New York NY |

**Licensure and Certification:**

| | |
|---|---|
| 6/91 | New York State License # 185584 |
| 1991 | DEA BV2275344 |
| 1/94 | The American Board of Psychiatry and Neurology, Cert # 39025 |
| 11/14 | Massachusetts Medical License #259286 |

**Academic Appointments:**

| | |
|---|---|
| 7/91-7/95 | Instructor, Clinical Psychiatry, Columbia University College of Physicians and Surgeons |
| 7/95-12/97 | Assistant Clinical Professor, Psychiatry, Columbia University College of Physicians and Surgeons |
| 7/98-7/00 | Clinical Assistant Professor, Psychiatry, Cornell University Medical College |
| 3/00-3/04 | Assistant Clinical Professor, Psychiatry and Behavioral Sciences, New York Medical College, |

**Hospital Appointments:**

| | |
|---|---|
| 7/91-7/93 | Assistant, Psychiatry Service,   Columbia Presbyterian Hospital, New     York NY |
| 7/93-7/95 | Assistant in Clinical Psychiatry/Postdoctoral Clinical Fellow, Columbia Presbyterian Hospital, New York NY |
| 7/95-12/97 | Assistant Attending, Psychiatry, Columbia Presbyterian Hospital, New York NY |
| 7/99-7/01 | Attending Psychiatrist, Psychiatry Consultation Service (On-Call), Beth Israel North Hospital, New York NY |
| 3/99-3/00 | Attending Psychiatrist, Psychiatry Consultation Service, Coler-Goldwater Hospital, Roosevelt Island NY |
| 3/00-3/03 | Attending Psychiatrist, Geriatric Psychiatry Service, Westchester Medical Center, Valhalla NY |
| 6/09-10/09 | Attending Psychiatrist, Part-time, Consultation-Liaison Service, New York University Medical Center, New York NY |
| 1/13-12/13 | Attending Psychiatrist, Consultation-Liaison Service, Staten Island University Hospital North, Staten Island NY. |
| 4/1/15-7/16 | Riverside Community Care/Emergency Services/Attending Psychiatrist, Psychiatry Consultation Service,  Milford Hospital, Milford MA. |

**Awards and Honors:**

| | |
|---|---|
| 1977 | Writing and Teaching Award, Cornell University |
| 1978 | Distinguished Honors in All Subjects, Cornell University |
| 1983-84 | Student Editor Competition, Yale Journal of Biology and Medicine |
| 1987 | Medical Writer Award, American Medical Association |
| 1989 | Young Investigator Travel Grant Award, EASD, Lisbon Portugal |
| 1991 | The American College of Psychiatrists/Laughlin Fellowship Award, Ft. Lauderdale Florida. |
| 1991 | Association for Academic Psychiatry/Mead Johnson Fellowship Award Tampa, Florida |
| 2010 | America's Top Psychiatrists, Consumers Research Council of America, Washington D.C. |
| 2011 | American's Top Physicians, Consumers' Research Council of America, Washington D.C. |

**Memberships in Professional Societies**
2017          Academy of Psychosomatic Medicine

**Editorial Positions:**
1983-85       Student Editor, Yale Journal of Biology and Medicine

**Principal Clinical and Hospital Service Responsibilities:**

| | |
|---|---|
| 7/91-7/92 | Attending, Psychiatry Emergency Room, Columbia Presbyterian Hospital, NY NY |
| 2/92-2/94 | Liaison Psychiatrist, Functional Rehabilitation Unit/Geriatrics/Alternative Level of Care, Columbia Presbyterian Hospital, NY NY |
| 7/92-7/93 | Fellow, Consultation-Liaison Psychiatry Service, Columbia Presbyterian Hospital, NY NY |
| 7/93-7/95 | Assistant in Clinical Psychiatry, Consultation-Liaison Psychiatry Service, Columbia Presbyterian Hospital, NY NY |
| 7/95-6/97 | Director, Primary Care/Psychiatry Liaison Consult Service, Columbia Presbyterian Hospital, NY NY |
| 3/00-3/03 | Director, Geriatric Psychiatry Service, Westchester Medical Center, Valhalla NY |
| 6/09-10/09 | Attending, Part-time, Consultation-Liaison Psychiatry Service, New York University, NY NY. |
| 1/13-12/13 | Attending, Consultation-Liaison Psychiatry Service,  Staten Island University Hospital North, Staten Island NY |
| 4/15-7/16 | Attending, Psychiatry Consult Service. Consultation Service, Milford Hospital, Milford MA |
| 9/16-Present | Attending Psychiatrist, Psychiatry Consultation Service/Medoptions of Massachusetts, Marian Manor Skilled Nursing and Rehabilitation Center, Boston MA |

**Teaching Experience:**

| | |
|---|---|
| 7/91-7/92 | Supervision and teaching of medical students and psychiatry residents in Emergency Room, Columbia Presbyterian Hospital, NY NY |
| 7/92-7/96 | Supervision and teaching of medical students and psychiatry residents on Consultation-Liaison Service, Columbia Presbyterian Hospital, NY NY |
| 3/00-3/03 | Teaching of medical students, residents and fellows on assessment of delirium in geriatric patients, New York Medical College, Valhalla NY |
| 6/09-10/09 | Supervising Consultation-Liaison Psychiatry Fellows, NYU, NY NY |
| 1/13-12/13 | Supervising and teaching Internal Medicine and Family Practice Residents, Psychiatry Residents, Staten Island NY. |
| 4/15-7/16 | Supervision and teaching of students, social workers, Milford Hospital, Milford MA. |
| 9/16-Present | Supervision and teaching of Nurse Practitioners and Nursing Staff, Marian Manor Skilled Nursing and Rehabilitation Center. |

**Major Clinical and Research Interests**:

Effect of Psychotropic Medications on Heart Rate Variability and Autonomic Activity; Delirium; Autoimmune Disease and Neuropsychiatric Manifestations; Movement Disorders/Tourette's; Capacity Issues in Geriatrics; Nutritional Deficiencies and Neurologic Impairment in Alcoholics and Bariatric Surgery Patients.

**Military Service**:

None

**Bibliography**:

**Original Reports**:

Vogel, L.R., E. Klein-Robbenhaar, and A. Giaccari. Effect of Combined Lithium and Vanadate Therapy on Insulin Sensitivity in Diabetic Rats. *Diabetes* 38:353A, 1989.
Rossetti, L., A. Giaccari, E. Klein-Robbenhaar, and L.R. Vogel. Insulinomimetic Properties of Trace Elements: Characterization of the In Vivo Mode of Action in Diabetic Rats. *Diabetes* 39:l243-l250, 1990.
Choi, S.B., and L.R. Vogel. Effects of Lithium and Insulin on Skeletal Muscle cyclic AMP Concentration. *Diabetes* 39:276A, 1990.
Vogel, L.R., P.R. Muskin, E.D. Collins, and R.P. Sloan. Lorazepam Reduces Cardiac Vagal Modulation in Normal Subjects. *Journal of Clinical Psychopharmacology*, 16(6):449-453, l996 .

**Reviews, Books and Book Chapters**:

Vogel, L.R. and P.R. Muskin. Anxiety Disorders, in *Essentials of Psychiatry*. Eds. Marcus E and J Cutler, First Edition. W.B. Saunders Company, New York, NY. 1998

Franklin R. Schneier, Hilary B. Vidair, Leslie R. Vogel, and Philip R. Muskin. Anxiety Disorders, in *Psychiatry*: Cutler JL, Marcus ER: Psychiatry, Second Edition, Oxford University Press, New York, NY, USA, 2010.

Franklin R. Schneier, Hilary B. Vidair, Leslie R. Vogel, and Philip R. Muskin. Anxiety Disorders, in *Psychiatry*: Cutler JL: Psychiatry, Third Edition, Oxford University Press, 198 Madison Avenue, New York, NY, USA, *2014.*

Vogel, L.R. What Caregivers Need to Know About Medication. *New Choices, Reader's Digest Publications, Inc.*, Pleasantville, New York, March 2002.

**Abstracts:**

Vogel, L.R., A. Giaccari and L. Rossetti. Lithium Improves Post-Meal Plasma Glucose and Insulin Action in Diabetic Rats. 142nd Annual Meeting, American Psychiatry Association, San Francisco, CA May 1989. *New Research Programs and Abstracts*: NR 63.

Vogel, L.R., A. Giaccari, S. Frontoni, and S.B. Choi. Lithium Potentiates Insulin's Effect on Skeletal Muscle cAMP. 143rd Annual Meeting, American Psychiatry Association, New York, NY May 1990. *New Research Programs and Abstracts:NR* 15.

Vogel, L.R. Lithium and Carbohydrate Metabolism. 38th Annual Meeting of The Academy of Psychosomatic Medicine, Atlanta GA, October 1991. *Consultation-Liaison Research Abstracts*: 28.

Vogel, L.R., P.R. Muskin, E.D. Collins, and R.P. Sloan. Vagolytic Effects of Lorazepam on Cardiac Autonomic Control. 33rd Annual Meeting, American College of Neuropsychopharmacology, San Juan, PR December 1994. *Abstracts of Panels and Posters*: p. 192.

Vogel, L.R., P.R. Muskin, E.D. Collins, and R.P. Sloan. Effect of Lorazepam on Cardiac Autonomic Control in Stressed vs Unstressed States in Normal Subjects. 148th Annual Meeting, American Psychiatric Association, Miami Florida May 1995. *New Research Programs and Abstracts*: NR156.

Vogel, L.R., P.R. Muskin, E.D. Collins, E Petkova, and R.P. Sloan. Diurnal Variation in Vagolytic Response to Lorazepam in Normal Subjects. 149th Annual Meeting, American Psychiatric Association, New York NY May 1996. *New Research Programs and Abstracts*: NR181.

# EXHIBIT 3

Affidavit of Noha Elkadry Mashali, DMD

I , Noha Elkadry Mashali, do say under oath:

1. I am the wife of the defendant Fathalla Mashali, MD, having been married December 31, 1992. We reside at 153 PineStreet, Dover.
2. In an earlier affidavit, I indicated that my husband's mental state, including memory, understanding, ability to communicate, and ability to make sound judgements have been compromised for the past several years.
3. In the past month or two his mental state has dramatically deteriorated as has his physical strength.
4. He sleeps for a good deal of every day, falls repeatedly when he is awake and has become so confused and disoriented that he is almost unrecognizable to us for a great deal of the time.
5. Last week In response to a question asked by Attorney Denner to my son Dean, who is 19 years old, about his father's state of mind, my son looked down and answered "my dad is no longer with us most of the time."
6. In addition to becoming more confused and disoriented, the way he acts and the way he thinks have become increasingly bizarre. He often can't give a responsive answer to basic questions he is asked or his answers are off topic.
7. Most recently it is clear he is interacting with imaginary people who do not exist. He has admitted to me he sees and speaks with a group of men who are his only friends, who are the only people who can help and protect him and have warned him to not speak with or cooperate with his lawyers, with his doctors and even with me, as none of us wish him well. He has also mentioned to me that many times he believes I am sitting with him and he is talking to me but when he turns around, I am not there.
8. He has most recently told me that there are also a second group of men who are speaking to him and advising him as well.
9. As a result of the foregoing, in addition to the neuropsychological and reasoning deficits and my husband's inability to assist Mr. Denner, he seems convinced by his hallucinations he should not even be trying.
10. Several mornings ago my husband and I were at Mr. Denner's office meeting with Mr. Denner and Mr. Keller as well as with two psychiatric experts. It was very clear that my husband had no clue to what was going on and seemed to be suffering from some sort of dementia in the way he interacted with the group.
11. They were also very concerned about the cut on my husband's forehead which he had incurred in a fall a couple of nights before. My husband shared with everyone the story of the imaginary men (but very real to him) he had been seeing and speaking to.
12. For some time Mr. Denner has been trying to have my husband explain to him certain aspects of what Mr. Denner calls the offense conduct, with particular attention to what amounts of the billing to the insurance company were legitimate and which were fraudulent , as my husband always maintained before, that many of the billings were legitimate and not false.

13. At this point as well as for the past couple of months my husband has no recollection of the billing process, which bills were accurate and which bills were not, and can't even begin to discuss the subject with him.

14. While the situation has dramatically deteriorated over the last several months, even over the past couple of years in varying degrees my husband has simply been unable to explain to Mr. Denner this and various other aspects of what happened.

15. When he was able to plead guilty on the second try he was able to accept the fact that he had done something wrong but was really unable to remember any of the specifics even then and his condition has worsened appreciably since the change of plea, with him really hitting rock bottom in confusion and disorientation in the past two or three weeks

16. Mr. Denner told me he was very reluctant to renew the motion for competence but told me he felt that there were very important parts of the sentencing of this case that required my husband to explain things to him which he was simply unable to do. Mr. Denner and I both hope that somehow my husband's mind will clear up so he would be able to properly defend himself in the sentencing hearing. Mr. Denner explained that he may need to stay in custody until that point but we all agree that he is just not well enough to participate in a sentencing at this point. He is a very weak shadow of his former self.

17. My husband has been receiving psychiatric and medical care constantly since the change of plea, having multiple appointments with psychiatrists, psychologists, his rheumatologist, having infusions, having Transmagnetic Stimulation Therapy, physical therapy since the change of plea, none the less, the state of mind and state of body have simply diminished continuously.

18. At the doctor's appointments he had two days ago, the doctors felts that for his own protection he should be sectioned and put back into the hospital for his own safety, and based on what Fathalla told me, he would be given ECT (Electo Convulsive Therapy) as soon as he could be medically cleared to receive it.

Signed under the penalties of perjury on this 20ᵗʰ day of July 2017

7-20-17

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 14CR 10067 RWZ |
| FATHALLA MASHALI,<br>Defendant. | |

### AFFIDAVIT OF JEFFREY A. DENNER IN SUPPORT OF THE DEFENDANT'S MOTION TO SEEK A COMPETENCY EVALUATION

I, Jeffrey A. Denner, being duly sworn, do say and depose:

1. I am the attorney of record for the Defendant, Fatalla Mashalli, MD.

2. I have spent significant time with the Defendant since the change of please hearing in the USDC.

3. I have noted that his capacity to assist in his defense has dramatically again diminished over this period of time, particularly with regard to cognitive processes related to memory function, as well as his overall general, mental acuity and reasoning.

4. More specifically, over the approximately 4-5 weeks, he sleeps almost constantly, occasionally nods off while we're speaking, is unable to converse responsively, apparently has very little or no memory or understanding of the specifics of the offense conduct herein and seems weakened to the point of virtual exhaustion, mental and physical.

5. Most recently at a meeting at my office on July 18, 2017 with the Defendant, his wife, and two expert psychiatric witnesses, we learned that the Defendant is experiencing auditory and visual hallucinations, seeing groups of men who do not exist who tell him in directive voices not to interact with his lawyers and doctors and to disregard them, as

they are not helping him; claiming that the only help he is going to get is from this group or groups of men.

6. He is virtually unable to recall the subject conduct which serves as the basis for the indictments pending herein. More specifically, he has not been able to recall matters vital to his sentencing relating to "loss calculation" which involve discerning between "legitimate" and "fraudulent" billings to insurance companies. Not only does he not recall them, for the past weeks he has seemingly been unable to even understand their significance, or what is actually being asked of him to do.

7. Thus, any "loss calculation" number arguably cannot be properly presented to the Sentencing Court as same as impossible without the effective assistance of the Defendant, which he clearly is unable to provide. As an aside, all other members of this criminal enterprise who might be able to assist your undersigned in separating the "legitimate" and "fraudulent" billings are either legally, or practically, unavailable as they are either government witnesses or a defendant in a related case.

8. It is your Affiant's expectation should the Court grant the motion for a competency evaluation, either with or without an evidentiary hearing and said evaluation is performed either inpatient or outpatient, and if inpatient whether or not in a federal prison hospital setting, the Defendant will be found not to be competent (i.e. not able to effectively assist his counsel in this critical sentencing phase- as "loss calculation" for purposes of guideline range determination, is by far the key element).

9. Until literally two to three  days ago when we learned that the Defendant was actually hallucinating and delusional, perhaps had suffered some sort of brain bleed by yet one more time falling down and cutting his forehead and were confronted by an obviously demented Defendant unable to converse with either the lawyers or the expert psychiatrists, and that further, later that day he was admitted and/or sectioned psychiatrically at a local hospital (MGH), it became obvious that I had no choice but to move for this evaluation. This was reinforced by my reluctant acknowledgement that in this state of mind he was simply not going to be able, even at the last moment, to assist

me in determining a net "loss calculation" number which factors in a reduction for the substantial legitimate billing charges that I know exist in this matter.  In point of fact, we were reluctant to file the motion until we felt that we had no other choice.

Signed under the penalties of perjury this 20th day of July 2017.

Jeffrey A. Denner
Jeffrey A. Denner

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | **No. 14CR 10067 RWZ** |
| **FATHALLA MASHALI,**<br>Defendant. | |

### AFFIDAVIT OF JOSEPH G. KELLER JR. IN SUPPORT OF THE DEFENDANT'S MOTION TO SEEK A COMPETENCY EVALUATION.

I, Joseph G. Keller Jr., depose and state:

1. I am Co-Counsel on the above entitled action.

2. I have met with Dr. Mashali on two occasions in the last month to consult with him about the loss calculation for the sentencing memo and hearing.

3. Dr. Mashali was unable to assist me or meaningfully communicate with me at either visit and on the last visit on July 18, 2017 was basically incoherent.

4. At both visits, I noticed a significant deterioration in his appearance and health.

5. On July 18, 2017, Dr. Mashali was unable to communicate any facts about his situation and appeared disoriented to time and place.

6. In my opinion, Dr. Mashali is unable to meaningfully assist his Counsel in preparing for his sentencing.


   /s/ Joseph G. Keller Jr.

Joseph G. Keller Jr.

# EXHIBIT 6

# United States Court of Appeals
## For the First Circuit

No. 14-2228

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN S. ALPHAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Barron, Selya and Stahl,
Circuit Judges.

Tracy A. Miner, with whom Megan A. Siddall and Demeo LLP were on brief, for appellant.
Brian A. Pérez-Daple, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

May 7, 2015

**SELYA, Circuit Judge.** When a criminal defendant is convicted of a fraud offense, the Sentencing Commission has established amount of loss — generally the higher of actual or intended loss — as a rough proxy for determining the seriousness of the offense and the relative culpability of the offender. Although this concept is easily stated, its application often has vexed sentencing courts. As in so many other instances, the devil is in the details.

This appeal requires us to decide two issues of first impression in this circuit. The first involves the method for calculating the guideline enhancement for amount of loss in an insurance fraud context. The second involves the method for calculating the amount of statutory restitution in that context. Concluding, as we do, that the court below erred in adopting its calculation methods, we vacate the appellant's sentence and remand for resentencing.

## I. BACKGROUND

Because this sentencing appeal follows a guilty plea, we distill the pertinent facts from the plea agreement, the change-of-plea colloquy, the undisputed portions of the presentence investigation report (PSI Report), and the transcript of the disposition hearing. See United States v. Almonte-Nuñez, 771 F.3d 84, 86 (1st Cir. 2014).

-2-

Defendant-appellant John S. Alphas owns and operates The Alphas Company, a wholesale produce distributor located in Chelsea, Massachusetts. During the relevant time frame, the appellant purchased large quantities of produce, often from distant purveyors. To protect his investment, the appellant routinely obtained insurance on these produce shipments.

In or around March of 2007, the appellant devised a scheme to defraud. Over the next four and one-half years, he submitted at least ten fraudulent claims to his insurers for lost, stolen, or damaged produce.[1] The appellant sought reimbursement for the value of allegedly lost, stolen, or damaged produce, together with disposal expenses, shipping fees, and the cost of procuring replacement stock. These claims were largely bogus: in each instance, the appellant either invented fictitious losses or artificially inflated legitimate losses. To make matters worse, he supported his submissions with documents that had been fraudulently altered or, in some cases, constructed out of whole cloth. He compounded his mendacity by making false and misleading statements to insurance adjusters.

The insurance policies at issue contained void-for-fraud clauses. A representative clause stated:

---

[1] Nine of these claims were submitted to Zurich North American and the final claim to Selective Insurance Company. Though all of the claims were submitted in the name of The Alphas Company, the sentencing context requires us to attribute those claims and the underlying losses to the appellant.

> This Coverage Part is void in any case of
> fraud by you as it relates to this Coverage
> Part at any time. It is also void if you or
> any other insured, at any time, intentionally
> conceal or misrepresent a material fact
> concerning:
>
> 1. This Coverage Part;
> 2. The Covered Property;
> 3. Your interest in the Covered Property; or
> 4. A claim under this Coverage Part.

Four of the appellant's claims were never paid: three were withdrawn after suspicions surfaced and the lone claim submitted to Selective Insurance Company was thwarted by early detection of the fraud. The other six claims were paid, but mostly in amounts less than their face value. In sum, the ten claims totaled over $490,000, yet the appellant received payments totaling only $178,568.41.

The appellant's persistent pattern of chicanery sparked a federal criminal investigation. In May of 2014, the government filed an information charging the appellant with a single count of wire fraud. See 18 U.S.C. § 1343. Waiving prosecution by indictment, the appellant pleaded guilty to the charge. In an accompanying plea agreement, the parties stipulated to a base offense level of 7. See USSG §2B1.1(a)(1).

The parties could not agree, however, as to the amount of loss — a necessary step in determining the guideline sentencing range (GSR). To fill this void, the PSI Report recommended boosting the appellant's offense level by 14 levels based on an

-4-

intended loss of approximately $480,000. See id. $2B1.1(b)(1)(H) - (I) (increasing offense level by 14 for losses exceeding $400,000 but not greater than $1,000,000). This calculation derived from the probation officer's conclusion that intended loss should be measured by the face amount of the appellant's claims, less a $1000 per claim deductible.

The appellant objected to the recommendation. He argued that the loss figure should exclude legitimate losses embedded in the fraudulent claims. In conjunction with this argument, he submitted a competing set of calculations that purported to show which component amounts were legitimate. This set of calculations yielded an intended loss amount of roughly $178,000 which corresponded to an increase of 10 (rather than 14) in his adjusted offense level. See id. $2B1.1(b)(1)(F).

The PSI Report also dealt with restitution. It recommended an award of $178,568.41 (the aggregate amount actually paid out on the claims). The appellant objected to this recommendation, envisioning a finding of actual loss (and, therefore, a restitution amount) of $58,931.36. Once again, the appellant attributed the reduced figure to the fact that a portion of the claims paid corresponded to legitimate losses.

The probation officer stood by her calculations regarding both the guideline enhancement and restitution. Although she conceded that the appellant may have incurred legitimate losses,

she maintained that the appellant's fraud rendered the claims altogether illegitimate.

The disposition hearing was held on November 6, 2014. The district court concluded as a matter of law that where, as here, insurance policies contain void-for-fraud clauses, intended loss is equal to the aggregate face value of the claims submitted. Starting with this premise, the court overruled the appellant's objections; enhanced his offense level by 14 levels; deducted 3 levels for acceptance of responsibility, see id. §3E1.1; placed the appellant in Criminal History Category I; and set the GSR at 27 to 33 months, see id. Ch.5, Pt.A, sentencing table. The court then varied sharply downward, sentencing the appellant to an incarcerative term of 12 months and 1 day. In addition, the court fined the appellant $60,000; attached a 36-month term of supervised release; and ordered payment of restitution to Zurich North American in the amount of $178,568.41.

This timely appeal ensued. The district court refused to stay the appellant's sentence pending appeal. This court, however, granted a stay. See United States v. Alphas, No. 14-2228 (1st Cir. Dec. 31, 2014) (finding that appeal presented "'substantial question' within the meaning of 18 U.S.C. § 3143(b)(1)(B)").

## II. ANALYSIS

The appellant assigns error to the district court's determination of the amount of loss with respect to both the

-6-

guideline enhancement and the award of restitution.  Because these determinations are controlled by different authorities, we bifurcate our analysis.

### A.  **The Guideline Enhancement**.

The appellant first contends that the sentencing court used an improper method of calculating intended loss and, thus, erred in enhancing his offense level by 14 levels.  This contention is met at the threshold by the government's assertion that we need not reach the merits because any calculation error was harmless. We begin with that assertion and then proceed to the merits.

1.  **Harmlessness**.  The government's argument for harmlessness rests on the district court's imposition of a below-the-range sentence coupled with the court's later remark, made while denying the appellant's motion to stay the sentence pending appeal, that a recalculation of the GSR would be unlikely to result in a lower sentence.  This argument flies in the teeth of conventional wisdom, which teaches that the improper calculation of a defendant's guideline range comprises a significant procedural error.  See Gall v. United States, 552 U.S. 38, 51 (2007).  Such an error ordinarily requires resentencing.  See United States v. Ramos-Paulino, 488 F.3d 459, 463-64 (1st Cir. 2007).  Indeed, a defendant normally can appeal from an error in calculating his GSR even though the district court imposed a sentence beneath the

-7-

bottom of the GSR.  See United States v. Paneto, 661 F.3d 709, 715
(1st Cir. 2011).

To be sure, an appellate court may deem such an error
harmless if, after reviewing the entire record, it is sure that the
error did not affect the sentence imposed.  See Williams v. United
States, 503 U.S. 193, 203 (1992).  In other words, resentencing is
required if the error either affected or arguably affected the
sentence.  See Ramos-Paulino, 488 F.3d at 463.

The case at hand does not fit within these narrow
confines.  Although the court below imposed a sentence beneath the
bottom of the GSR, there is at least a possibility that the court
would have imposed an even more lenient sentence had it started
with a lower GSR.  See United States v. Foley, ___ F.3d ___, ___
n.13 (1st Cir. 2015) [Nos. 13-1048, 13-1118, slip op. at 31 n.13].
While the court stated that a lower GSR was "unlikely" to result in
a different sentence, we have recently reaffirmed that the
possibility of a lesser sentence is enough to preclude a finding
that an error in calculating the GSR is harmless.  See id.  Such a
possibility exists here: saying that an event is unlikely is not
the same as a categorical assurance that the event will not come to
pass.  It follows that if the court below erred on the high side in
fashioning the guideline enhancement for amount of loss (and, thus,
the GSR), we cannot regard that error as harmless.

-8-

2.   **Calculating Intended Loss**.   Our rejection of the government's harmlessness argument brings us to the merits of the appellant's claim that the district court committed a calculation error.   We review de novo the court's interpretation and application of the sentencing guidelines, including the propriety of its loss-computation method.   See United States v. Prange, 771 F.3d 17, 35 (1st Cir. 2014); United States v. Walker, 234 F.3d 780, 783 (1st Cir. 2000).

In fraud cases like this one, the guidelines direct the sentencing court to augment the defendant's offense level based on the amount of loss.   See USSG §2B1.1(b)(1).   For this purpose, loss is defined as "the greater of actual loss or intended loss."   Id. §2B1.1, comment. (n.3(A)).   Here, the district court based its guideline calculation on intended loss.   That term means "the pecuniary harm that was intended to result from the offense."   Id. at n.3(A)(ii).   Intended loss is not synonymous with probable loss. Rather, the term "includes intended pecuniary harm that would have been impossible or unlikely to occur."   Id.   Seen in this light, intended loss "is a term of art meaning the loss the defendant reasonably expected to occur at the time he perpetrated the fraud." United States v. Innarelli, 524 F.3d 286, 290 (1st Cir. 2008). This standard focuses primarily on the offender's objectively reasonable expectations, see id., though subjective intent may play

-9-

some role, see id. at 291 n.6; United States v. McCoy, 508 F.3d 74, 79 (1st Cir. 2007).

In this case, the sentencing court concluded that the intended loss was equal to the aggregate face value of the claims submitted by the appellant to his insurers, not the aggregate amount by which the appellant fraudulently inflated those claims.[2] The court reasoned that had the insurers known of the fraud when they received the claims, they would have invoked the void-for-fraud clauses and paid nothing.  The court did not explain what bearing the void-for-fraud clauses may have had on the amount of loss that the appellant intended to cause.  It said only that if intended loss were to be viewed solely as the amount of fraudulent inflation, fraudsters would have an incentive to inflate claims because, if caught in the act, they would be punished only for the inflated amount.

The government applauds this reasoning, but the appellant decries it.  He notes that the sentencing guidelines treat loss as a proxy for relative culpability.  In his view, basing an intended loss computation on the entire amount of an insurance claim rather than on the amount fraudulently claimed irrationally conflates the

---

[2] We express no opinion on whether any portion of the appellant's claims was legitimate.  This is a matter the district court will need to address on remand.  See text infra.  For present purposes, we assume — as the appellant contends — that he did suffer some legitimate losses.

-10-

culpability of fraudsters who commit significantly different offenses.

Fraud has many manifestations, and calculating the loss associated with a particular scheme is sometimes more art than science. As a result, we have eschewed rigid rules and instead taken "a pragmatic, fact-specific approach" to loss calculation. Prange, 771 F.3d at 35 (internal quotation mark omitted). Such a pragmatic view suggests that loss computation should distinguish between an outright swindler who peddles, say, a forged title to a bridge in Brooklyn and a fraudster who contrives to render some value (albeit less than promised) to the victim. See id. at 36; United States v. Blastos, 258 F.3d 25, 30 (1st Cir. 2001). By any practical measure, the former seems more culpable than the latter.

Applying the degree-of-culpability approach to the insurance fraud context, it is appropriate for the loss-computation method to distinguish between a fraudster who wholly fabricates a non-existent claim and a fraudster who artificially inflates a legitimate claim. A fraudster who has suffered no loss at all but invents a $100,000 claim out of thin air is not the same as a fraudster who has suffered a legitimate $50,000 loss but artificially inflates his claim to $100,000. See United States v. Smith, 951 F.2d 1164, 1167 (10th Cir. 1991).

This gets to the heart of the matter. Under the sentencing guidelines, loss generally does not include sums that a

-11-

victim would have paid to the defendant absent the fraud.   See,
e.g., United States v. Evans, 155 F.3d 245, 253 (3d Cir. 1998)
(holding that actual loss in insurance fraud case does not include
value of legitimate claims); United States v. Parsons, 109 F.3d
1002, 1004 (4th Cir. 1997) (same, in context of government benefits
fraud); see also United States v. Miller, 316 F.3d 495, 498-99 (4th
Cir. 2003) (applying this principle to intended loss).  Given this
rule, the question reduces to whether the presence of a void-for-
fraud clause makes a dispositive difference when calculating loss
under the sentencing guidelines.

          In resolving this question, we find instructive the line
of cases involving government benefits fraud.   When a person
fraudulently obtains government benefits, the United States
typically is entitled to recover all sums paid (in a civil
forfeiture proceeding) even though some benefits would have been
paid anyway (that is, absent the fraud).   See, e.g., 5 U.S.C.
§ 8148(a); 28 U.S.C. § 2514.  But when the same fraudulent conduct
undergirds a criminal conviction, courts have steadfastly refused
to equate the amount of loss under the sentencing guidelines with
the amount recoverable by the government through civil forfeiture.
That is because "[f]orfeiture is a penalty imposed on a criminal
independent of any loss to the crime victim." Parsons, 109 F.3d at
1005.   Consequently, "[t]he loss itself (whether the actual or
intended loss) is limited to the tangible economic loss of the

victim." Id. at 1004. The forfeitable amount does not count toward the government's loss, which is measured by the amount of benefits that was (and, in the case of intended loss, would have been) paid as a result of the fraud. See United States v. Harms, 442 F.3d 367, 380 (5th Cir. 2006); United States v. Dawkins, 202 F.3d 711, 715 (4th Cir. 2000).

To be sure, government benefits fraud is governed by a special application note, which explains that in such cases loss "shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses." USSG §2B1.1, comment. (n.3(F)(ii)). We believe that this note merely represents a specialized application of the guidelines' general focus on a defendant's relative culpability. See, e.g., Dawkins, 202 F.3d at 714; Parsons, 109 F.3d at 1004-05. Since this is so, it makes good sense to transplant the reasoning of the government benefits cases to the analogous context of insurance fraud.

We discern no sound basis for treating a void-for-fraud clause (in the insurance fraud context) differently than a civil forfeiture (in the benefits fraud context). Both the void-for-fraud clause and the civil forfeiture anodyne afford relief after the fact. So, too, such a clause, like the sword of Damocles inherent in a threat of civil forfeiture, serves the salutary purpose of encouraging transactional honesty. And such a clause,

-13-

like a civil forfeiture, imposes a penalty on the fraudster for acting corruptly: if the insurer discovers the fraud, the insured forfeits everything.

The concept of loss under the sentencing guidelines serves a completely different purpose.  <u>See</u> <u>United States</u> v. <u>Hamaker</u>, 455 F.3d 1316, 1337 (11th Cir. 2006); <u>Dawkins</u>, 202 F.3d at 715.  The guidelines are designed to ensure that the sentence imposed on a defendant "reflect[s] the nature and magnitude of the loss caused or intended by [his] crimes."  USSG §2B1.1, comment. (backg'd.).  Consonant with this design, the guidelines use amount of loss as the primary metric by which "the seriousness of the offense and the defendant's relative culpability" are measured. <u>Id.</u> Sums forfeited under a void-for-fraud clause (which is really nothing more than an after-the-fact penalty) do not conform naturally to this metric.  <u>Cf.</u> <u>id.</u> §2B1.1, comment.  (n.3(D)(i)) (providing that "loss" does not include "[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, [and] other similar costs").  It would therefore be anomalous to read the guidelines to distinguish between two fraudsters who fraudulently inflate their claims by exactly the same amount simply because one is covered by an insurance policy that contains a void-for-fraud clause and the

-14-

other is covered by an insurance policy that does not contain such a clause.[3]

The government resists this reasoning, asseverating that the appellant intended to deprive his insurers of the entire amount claimed regardless of whether some portion of that amount represented legitimate losses. To achieve this counterintuitive result, the government asks us to consider what an objectively reasonable fraudster standing in the appellant's shoes would have expected to be paid were the fraud discovered. Because such a fraudster would be aware of the void-for-fraud clauses and know that the misrepresentation would relieve his insurers of their payment obligation, the government's thesis runs, the fraudster would expect his insurers to suffer losses in the full amount of the submitted claims.

We reject the government's thesis, which approaches intended loss from the wrong angle. Fraudsters do not expect to be found out but, rather, expect to reap the benefits of their contrivance. The relevant inquiry, then, is what the fraudster reasonably expected to euchre out of his victim, cf. id. at

---

[3] We base this conclusion on the language and purpose of the sentencing guidelines, not the language of the particular policies at issue. Whether and to what extent an insurance contract is void or voidable is often a thorny issue and we do not need to resolve that issue here. For the reasons discussed above, an insurer's loss for guideline purposes is distinct from any recovery to which it might be entitled under a void-for-fraud clause in a civil proceeding.

-15-

n.3(A)(ii) (defining "intended loss" as "the pecuniary harm that was intended to result from the offense" (emphasis supplied)), not what would have slipped through his fingers had he been caught in the act.

That amount necessarily excludes any sums that the fraudster would have been paid absent the fraud. See Burrage v. United States, 134 S. Ct. 881, 887-88 (2014) (explaining that the phrase "results from" implies "a requirement of actual causality," which typically "requires proof that the harm would not have occurred in the absence of — that is, but for — the defendant's conduct" (internal quotation marks omitted)). The sentencing court, then, should have determined whether and to what extent legitimate claims were embedded in the fraud.

Structuring "intended loss" in this way makes good sense. After all, loss is meant to serve as a proxy for the seriousness of the crime and the relative culpability of the offender. The best way to gauge the seriousness of a fraud offense is to determine how much the fraudster set out to swindle — and no fraudster sets out to swindle sums that he would have been paid anyway. That is also the best way to gauge a fraudster's culpability.

The best case for the government's contrary position is United States v. Torlai, 728 F.3d 932 (9th Cir. 2013) — but Torlai

-16-

cannot carry the weight that the government loads upon it.[4]  Torlai involved a defendant who had obtained crop insurance policies from private insurers through a federal program.  See id. at 935-36. Those policies and their application documents included void-for-fraud clauses.  See id. at 940 & n.8.  The defendant made a number of misrepresentations both when he procured the policies and when he submitted claims under them.  See id. at 936, 941-43.

Appealing his sentence, the defendant argued that the district court erred in calculating loss by failing to determine which portions of his indemnity claims were legitimate.  The Ninth Circuit disagreed, noting that the case involved a government benefits program and, therefore, loss constituted "the value of the benefits obtained by unintended recipients."  Id. at 938 (emphasis omitted) (quoting USSG §2B1.1, comment. (n.3(F)(ii))).  The court stated that "[b]y virtue of his fraud, [the defendant] was not eligible for any government benefit under the crop insurance program, and therefore, he was not an 'intended beneficiary.'"  Id. at 943.

Certain facts underlying the court's "unintended beneficiary" rationale help to distinguish Torlai from this case. First, the Ninth Circuit found sufficient evidence that the

---

[4] The government's citation to United States v. Ostrom, 80 F. App'x 67 (10th Cir. 2003), need not detain us.  That decision lacks precedential force even in the circuit of its origin.  See 10th Cir. R. 32.1(A).

-17-

defendant had suffered no reimbursable losses, see id. at 941-43, so he would not have received anything absent his fraudulent claims. Second, the defendant made material misrepresentations to procure the crop insurance policies, see id., making it unlikely that the insurer would have issued the policies had it been told the truth. This latter fact indicates that, regardless of the legitimacy vel non of the claimed losses, the insurer would not have been obliged to pay. Cases in which an insurer would have paid nothing absent the fraud are materially different from those in which the insurer would have paid something (but less than the full amount claimed) absent the fraud. See United States v. Sharma, 703 F.3d 318, 324-25 (5th Cir. 2012).[5]

To recapitulate, we conclude that the district court erred in calculating the amount of intended loss attributable to the fraud and, thus, in fashioning the guideline enhancement. We are, therefore, constrained to remand for resentencing. On remand, the district court should compare what the appellant sought to bamboozle his insurers into paying with what they would have paid had the appellant submitted only bona fide claims.

We add a coda. It is apodictic that the government bears the burden of proving the applicability of a sentencing enhancement by preponderant evidence. See Paneto, 661 F.3d at 715. But in a

---

[5] To the extent that Torlai can be read to support the position advocated by the government here, we decline to adopt its reasoning.

-18-

case such as this — where a defendant's claims were demonstrably rife with fraud — a sentencing court may use the face value of the claims as a starting point in computing loss. See United States v. Campbell, 765 F.3d 1291, 1304-05 & n.13 (11th Cir. 2014); United States v. Hebron, 684 F.3d 554, 562-63 (5th Cir. 2012). The burden of production will then shift to the defendant, who must offer evidence to show (if possible) what amounts represent legitimate claims. See Hebron, 684 F.3d at 563; United States v. Jimenez, 513 F.3d 62, 86 (3d Cir. 2008). After the record is fully formed, the sentencing court must determine the amount of loss that the government (which retains the burden of proof) is able to establish. The court, however, "need only make a reasonable estimate of the loss." USSG §2B1.1, comment. (n.3(C)); see Blastos, 258 F.3d at 30. Depending on the defendant's offer of proof, the court might well conclude that the amount of loss is equal to the face value of the submitted claims.

### B.  **The Restitution Order**.

The appellant further contends that the district court erred in calculating restitution. The government counters both that this claim is waived and that it is impuissant.

1.  **Purported Waiver**. Waiver typically occurs when a party intentionally relinquishes a known right. See United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002). In the sentencing context, an appellant may waive an issue when he initially raises

-19-

it as an objection to the PSI Report but later explicitly withdraws the objection.  See United States v. Eisom, 585 F.3d 552, 556 (1st Cir. 2009); Rodriguez, 311 F.3d at 437.  Once an issue is waived, there is nothing for an appellate court to review.  See Rodriguez, 311 F.3d at 437.

Here, the appellant challenged the loss computation both in objections to the PSI Report and in his sentencing memorandum. His objection was directed to the calculation of both the guideline enhancement and the restitution award. A common thread ran through both halves of his argument: loss simply does not include amounts that the victim would have paid absent the fraud.  At the disposition hearing, the appellant's trial counsel forcefully presented this argument in connection with the calculation of the guideline enhancement.  The court rejected it.  Later on, the appellant's counsel was asked whether he wanted the court to consider any other modifications to the PSI Report.  Counsel responded in the negative.

The sentencing proceeding continued. At one point, the court remarked that it did not understand the amount of restitution to be disputed and asked defense counsel whether he was looking at the same set of numbers.  Counsel responded that he was.

The government urges us to find that these (and similar) statements amounted to an intentional relinquishment of the right to contest the amount of restitution.  This exhortation has some

-20-

superficial appeal: taken in a vacuum, the sentencing colloquy can be read as an acknowledgment that the appellant was not pressing any arguments about the amount of restitution. It surely would have been better practice for counsel to have clarified that he had no objections to the restitution amount save for the method of calculation (that is, the court's announced unwillingness to deduct any legitimate portions of the claims from the loss calculation). But reading the sentencing transcript as a whole, we do not think that defense counsel's statements clear the high bar needed for a finding of waiver.

Waivers are strong medicine, see Pike v. Guarino, 492 F.3d 61, 72 (1st Cir. 2007), and that medicine should not be dispensed in criminal cases where ambiguity lurks, see United States v. Bradstreet, 207 F.3d 76, 79-80 (1st Cir. 2000). On this scumbled record, defense counsel's statements, taken in the context of the sentencing hearing as a whole, were ambiguous. The main event at sentencing was the battle over the method of calculating loss.[6] Having lost that battle after a full airing, counsel's statements can fairly be read as an acknowledgment that the court's arithmetic (though not its method of calculation) was correct with respect to restitution. Any other reading would be illogical: it

---

[6] Although the district court specifically addressed the method of calculation only in connection with the guideline enhancement, its reasoning plainly encompassed restitution as well. Indeed, the government, both before us and in the court below, has made identical arguments concerning the two issues.

-21-

would have been odd for the appellant to press his computational argument to the bitter end with respect to the guideline enhancement and then impliedly abandon the very same argument with respect to restitution.

The short of it is that there was no waiver. Defense counsel's statements are most sensibly read as a recognition that the critical issue already had been decided against his client, not as a concession of that issue.

As a fallback, the government suggests that the appellant forfeited the restitution issue by not raising it at the disposition hearing, thus engendering review for plain error. See Rodriguez, 311 F.3d at 437. This argument is fruitless: the appellant raised the issue in written objections to the PSI Report and in his sentencing memorandum, and his attorney presented a legal basis for the argument to the sentencing court. No more was exigible to avoid a finding of forfeiture. See United States v. Theodore, 468 F.3d 52, 58 (1st Cir. 2006).

2. **Amount**. The district court ordered restitution pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. Since the appellant's challenge to the restitution order is based on an alleged error of law, our review is plenary. See United States v. Cutter, 313 F.3d 1, 6 (1st Cir. 2002); see also Walker, 234 F.3d at 783 (explaining that proper method of loss computation is "a prototypical question of legal interpretation").

The MVRA authorizes a court to award restitution only in the amount of a victim's actual loss. See Innarelli, 524 F.3d at 294-95. Thus, the question boils down to whether the presence of the void-for-fraud clauses in the insurance policies converts the entire amount paid in response to the appellant's claims into an actual "loss."

The answer depends, in relevant part, on the MVRA's definition of a victim as a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."[7]  18 U.S.C. § 3663A(a)(2).  Mindful of this definition, we have held that, under the MVRA, a court may only order restitution for losses that have an adequate causal link to the defendant's criminal conduct. See Cutter, 313 F.3d at 7.

Importantly, we have made it pellucid that "restitution should not be ordered if the loss would have occurred regardless of the defendant's misconduct." Id. This means that the government must establish a but-for connection between the defendant's fraud and the victim's loss. See United States v. Vaknin, 112 F.3d 579, 590 (1st Cir. 1997) (interpreting parallel provision in Victim and Witness Protection Act, 18 U.S.C. § 3663). Our case law on this

---

[7] Because the appellant's offense of conviction involves, as an element, a "scheme or artifice to defraud," 18 U.S.C. § 1343, victims include those "directly harmed by the defendant's criminal conduct in the course of the scheme," id. § 3663A(a)(2). This language does not alter the direct causation requirement. See United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996).

-23-

point is consistent with the weight of authority under the MVRA. Actual loss is widely (and correctly) thought to be limited to pecuniary harm that would not have occurred but for the defendant's criminal activity.  See, e.g., Sharma, 703 F.3d at 324; United States v. Petruk, 484 F.3d 1035, 1038 (8th Cir. 2007); United States v. Feldman, 338 F.3d 212, 220-21 (3d Cir. 2003); Dawkins, 202 F.3d at 715.

Applying the MVRA and the case law interpreting it, we think it evident that the district court erred in ordering restitution in the full amount paid to the appellant simply because the insurance policies included void-for-fraud clauses.  While such clauses may suffice to ground claims for disgorgement in civil proceedings, an insurer's recoverable loss for MVRA purposes is confined to the amount the insurer would not have paid but for the fraud.  See United States v. Chalupnik, 514 F.3d 748, 754 (8th Cir. 2008); Petruk, 484 F.3d at 1038-39.

This gets the grease from the goose.  The appellant has contended all along that some portion of his claims represented legitimate losses.  This remains to be proven.  But if it is true, Zurich North American presumably would have reimbursed him for those losses had he presented them without embellishment.  The district court must, therefore, reconsider its restitution order, taking into account the extent (if at all) to which the appellant's

-24-

claims encompassed legitimate losses.[8]   The district court need only make "a reasonable determination of appropriate restitution by resolving uncertainties with a view towards achieving fairness to the victim."   United States v. Burdi, 414 F.3d 216, 221 (1st Cir. 2005) (internal quotation marks omitted).

## III.   CONCLUSION

We need go no further.  For the reasons elucidated above, we vacate the appellant's sentence (including the restitution order) and remand for resentencing consistent with this opinion. On remand, the only issues open to consideration shall be the appropriate amount of intended loss for purposes of the guideline enhancement, the appropriate amount of actual loss for purposes of restitution, and, of course, the dimensions of the sentence to be imposed.

**Vacated and Remanded.**

---

[8] The appellant alternatively suggests for the first time on appeal that if the void-for-fraud clauses dictate the amount of loss, the restitution award should be offset by the amount of premiums paid.  Given our holding, we do not have any occasion to consider this alternative suggestion.

-25-

# EXHIBIT 5a

Dear Honorable Judge Zobel,

I would like to take this opportunity to tell you about Fathalla Mashali because the man sitting in front of you is not the Fathalla Mashali I know, who is the loving husband, devoted father and brilliant physician we all love and care about.

Fathalla and I have been married almost twenty five years. We have been together through good times and bad. I know Fathalla as a hard working person, who came to America alone and with nothing. He worked very hard to pass his medical boards, working any job to support himself until he was accepted into his anesthesiology residency program and who went on to complete a critical care fellowship in University of Pennsylvania. He successfully completed both anesthesia and critical care specialty boards and became a double Board Certified Anesthesiologist and Critical Care Specialist.

Fathalla was a brilliant physician treating patients in the operating room, emergency room and in the intensive care unit. The hospital setting he worked in required fast thinking and excellent intuitive skill and knowledge, everything Fathalla had. He would come home and tell me about his day and the satisfaction he felt when he was successful in saving a patient's life and the gratitude patient's families expressed to him on behalf of their loved ones. Fathalla had achieved his American dream.

To give back to his country, Fathalla joined the Army Reserve as a captain. He was proud of his service to his country and felt he was a true American, although he never made it official by getting his American citizenship. It was a mistake but life was busy and he already felt he was an American.

Fathalla was a devoted husband and father. Everything he did was for the benefit of his family and his children. He would take time out of his day to go to the children's baseball games and activities. Many times he had us go on vacation without him, he would join us briefly at the end. Fathalla would stay behind to work and make sure everything was going well in the various hospitals he was responsible for.

Because of his hard work and devotion to his work, Fathalla was offered anesthesia contracts to provide anesthesiology services for the hospitals. This included providing services in the operating rooms, in the intensive care units and pain managements offices. He, over a relatively short period of time, had a very large anesthesia group that provided anesthesiology services to twelve hospitals and had pain management offices to provide chronic pain management services for each community. At one point Fathalla had over a thousand employees working for him including physicians, nurse anesthetists, physician assistants, nurses, medical assistants, billing staff, and office staff. Fathalla was

very generous with his employees. He compensated them very well and in return wanted them to work as hard as he did.

As I look back, the business grew too fast. Fathalla was getting contract after contract. He was continuously opening offices and related businesses without stabilizing and securing them. Fathalla was overwhelmed and unable to keep up with the demands of managing such a large business. I understand now and truly believe this was the first manifestations of Fathalla's bipolar disease that I witnessed. Fathalla was constantly on the phone working on new projects and businesses that he was unable to handle. He was in his manic phase.

Despite Fathalla's best efforts and due to poor judgement I believe resulted from his illness, the company started crumbling and eventually went into bankruptcy. Only the pain management offices remained but all the pain management doctors quit abruptly. With full schedules and patients waiting to be treated, Fathalla stepped in and started treating the patients himself. With his anesthesia and critical care knowledge and expertise, Fathalla was able to provide interventional injection procedures and drug therapy to provide care to the patients with chronic pain.

During this same time period, Fathalla got sick. In 2002 Fathalla was diagnosed with Sarcodosis, an autoimmune disease that ultimately affected his whole life. Fathalla went undiagnosed for months, experiencing body aches, lowgrade fever, loss of appetite and fatigue, until the doctors were able to finally diagnose him, after a thoracic biopsy. Fathalla was placed on high doses of systemic steroids which he stayed on for years and subsequently resulted in many other medical complications and side effects.

As I think of the Fathalla I knew, I clearly missed the signs that were always there that explained his complete physical, mental and emotional collapse after the loss of his license and the charges he faces. His underlying psychiatric and medical illness manifested for years before he was actually diagnosed with bipolar disease and neurological Sarcodosis. I did not see it at the time because I was busy keeping my family going during and after the bankruptcy, and did not understand the changes in his behavior dating back easily 10 years ago. I think back, Fathalla's poor decision making, the fast growth and sudden collapse of his businesses, the long irregular hours, the overbooking of patients, constantly opening new businesses, and the uncontrolled overspending, were a manifestation of his bipolar disease particularly the manic phase. Fathalla would do things in extremes and in excess and this was not only true for his business life but his personal life as well. Fathalla would have mood changes and go through times where he would sleep for only four hours a night to times he seemed depressed, fatigued and withdrawn.

I truly believe his undiagnosed underlying psychiatric condition contributed to his strange behavior as well as the offensive behavior. I had hoped that with

treatment and therapy Fathalla would improve and be able to assist his attorneys, but he has continued to decline mentally and physically despite all his medical and psychiatric care. His confusion and disorientation have only increased as well as his physical health.

I respectfully ask you to consider being lenient in your sentencing of my husband. His actions are inexcusable but I do feel they were out of his control. I hope that in the future there will be a treatment or medication that will allow him to live a normal life again but worry that it is not possible. I fear he will deteriorate even more dramatically if incarcerated again. My children have suffered greatly and have been irreversibly affected by what has happened to their father. They have witnessed first hand his collapse and fall from grace but they truly love and respect him and are fearful they will finally and definitively loose him if he is incarcerated.

I thank you for taking the time to read my long letter. I felt it is important to tell you about the man and father we know, and we hope in your wise judgement you take this into consideration when making your decision.

Sincerely,

Noha Elkadry Mashali

# EXHIBIT 5b

Dear Judge Zobel,

My name is Dean Mashali, a rising sophomore at Boston University and Fathalla Mashali's oldest son. In light of the recent events that have taken place in not only my life, but my family's life, I am going to share with you my father's upsides and current physical as well as mental condition. It is very clear that the events that have taken place over the past three or so years have significantly affected my father's well being.

I am not going to reiterate the hardships that we, as a family, have gone through over the past three years, but I would like to go over the key turning points. My father was a tough man who was capable of working long hours to sustain his family before this ordeal unraveled, but after he served four months in jail during 2014, he has never been the same. He came out of that experience physically and mentally wounded. After his incarceration, my father lost a significant amount of weight as a result of this significant hardship and became mentally detached from the world around him. But this was just the start of his hardships, as the following years took my family by full force, his health quickly began to deteriorate.

In the summer of 2015 my father was rushed to the emergency room and later put into critical care at Beth Israel Deaconesses in Boston. He remained unconscious in the Intensive Care Unit, only sustained by a machine for one week and spent another two to three weeks in the hospital. There were times in the hospital room where I thought I would never be able to talk to my dad again. After his recovery, my father spent the following couple of in and out of various hospitals and saw a plethora of different doctors to help him fight his physical and mental health issues.

Obviously these past few years have greatly affected myself, my family and most importantly my father. He is a different man today then he was 4 years ago, weighed down by the harsh prosecution that he has faced. He may be physically with us, but I can see it when I look in his eyes and try to have a normal conversation with him, he is no longer mentally with us. As I write this, it saddens me to inform you that these past years have mentally killed my father, I will do the best I can now to prevent him from being taken from us completely. So now I would like to respectfully address you Judge Zobel, my father will not survive prison and he will certainly not survive any of the other harsh punishments that the prosecution has in mind. I don't know if my father actually committed the crimes that he ended up pleading guilty to and that is beside the point to me; I am asking you directly to please help a family that has been wounded by the consequences of its father's actions. He may have made a mistake, but please do not take it out on an innocent family. I thank you for your time and attention.

Kindly,

Dean Mashali

# EXHIBIT 5c

Dear Judge Zobel,

My name is Mira Mashali, and my father is Fathalla Mashali. I wrote a letter once before asking you to let my father out of jail so that he could stay with us. This letter has the same purpose, but will be a bit different. My father is an imperfect man, but he is constantly trying to right the wrongs that he has caused, and bring peace where he can.

First I want to speak to his character, because it is an area that seems to be misunderstood. My father has always been kind hearted, and while sometimes it is hard to see behind his aloof persona it is true. He taught us to be kind to people and to help people. An example of this is how much charity he liked to do. Every summer when we went to Egypt, as a family we would help the needy. I remember one time in particular, we went to a small village and we brought with us money and fresh beef. We spent the whole day walking around the village giving money and food to every family, because for them meat is a luxury that they often can't afford. Even when we got tired my dad wanted us to stay and help. I am glad he did because the people were amazing, and the kindness that they gave back to us took my breath away. The experience taught me why it was so important to always give back to people who aren't as fortunate as us, and the happiness I saw in my fathers eyes showed me how much it meant to him to be in a position where he could give back to the people in his home town.

That is who my dad really is, and when I hear all the bad things that people say about him I just remember these stories of kindness that he showed to others, and I feel sad that his mental illnesses shadowed his kindness so much. Now, I want to speak a little to his illnesses, mentally and physically. Over the years, I have been forced to watch him deteriorate. He sleeps all day, because he is often too weak to get out of bed or move, and when he walks he needs the assistance of a walker, and on bad days, a wheelchair. I have heard people say that he is faking it, but those people obviously don't know anything about his situation. I was there when my father spent a week in the ICU, when the doctors wouldn't look me in the eyes, and the nurses told me all I could do was pray. I had to come to terms with the fact that my father could die any second. I heard the nurses tell me after he got better that they believed he wasn't going to make it. I was there in the house crying over his body while he was having a seizure. I was there for all of those times, and each time it tore me apart, so when I hear people say that he is faking I want to say that you weren't there, I was. As for his mental illnesses, it has effected his life for a long time, and I blame myself for not noticing it earlier. His emotions have never really been normal, and he doesn't respond to things like most people would. He worked a lot and only took Sunday off so I never really saw much of him while he was still working, but I can remember a time when I was in the fifth grade, we were in Egypt and something happened that completely set him off and he went into an inexplicable rage. The event in no way justified his response and I can look back now and see that there were times like that a lot where small things would make him go into a rage or into a depression. Those are times where, even though he tries to fight it, his manic sides take over and make him do things that are not normal. And sometimes his reality just doesn't match what is in front of him. It is like he is living in this other world. Recently, though, he just wears a glazed over express and seems to be empty inside, as if there is nothing left inside of him. It makes me sad, but I also see him fighting every day to get better. I can't say he is winning this fight because he isn't but every day I see him pray, and I see him ask for forgiveness. My father may not be a perfect man, but he is trying to make things better, and right now that is all I can ask of him.

He wants to be part of our lives, and I hope he will be. I want him to come to my high school and college graduations. I want him to walk me down the isle, and I want him to be there for all the little things too. I want him to be present in my sisters life. She's only six, and she needs her

father in her life. I know that he might have to leave for a little bit, but I beg of you please don't take him away from us forever. We love him so much. We all love him. I love him, and I am scared that he will leave and never come back. I am scared that I am going to have to say good bye to my father at the age of 17. We have lost so much over these past few years, and I couldn't care less about anything that you take, as long as you bring my father back to me.

Sincerely,


Mira Mashali

Mira Mashali

# EXHIBIT 5d

Dear Judge Zobel,

I am Ameer Mashali. My father is Fathalla Mashali and thirteen days from now he will stand in front of you hoping for a merciful sentence, knowing that any time spent in prison could be a life sentence. I am not writing this hoping to gain your sympathy, but to gain your understanding of how impactful my father and this case has been in my life.

When I was younger my father was always at work and I did not have the opportunity to develop a relationship with him, yet all of the distance that seemed to be between us began to disappear when I was 12. He began picking me up from school almost everyday and he spent more time at home than he ever had. My brother and sister noticed the same trend and as time went by we asked my mom to tell us what was happening. All she said was that we shouldn't worry and that everything was going to be okay, but my dad said that he could take me to Saudi Arabia with him and he would work with the government as a way of repaying whatever it was he had done. His plan was irrational nonsense and life continued with my brother, sister and I at this point begging my mom to tell us what was happening. After my father's arrest, we learned that the federal government was after my dad for money laundering, cheating Medicare, and over prescribing medications to his patients.

This information crushed me. I couldn't stand to read about how my dad was a "mentally unstable old man who cheated for all of the things he has". I understood that my dad was not right in the mind but it is still very painful. And things were not okay. My dad seems to just get worse.

Through these hard times, all parts of my life collapsed except for my newfound relationship with my father. We watched the World Cup, countless Red Sox games and had a weekly movie night, even if he is constantly falling asleep, he is with us. This relationship is the only good thing that has came out of this case and out of these several hard years of suffering. I beg you to let me keep the relationship with my father because without him in my life, I will be devastated.

I appreciate you reading this letter.

Ameer Mashali

Ameer Mashali

# EXHIBIT 5e

July 20, 2017

Dear Honorable Judge Zobel,

We are writing on behalf of Fathalla Mashall and to share our observations of his health over the years. We have known him for over 20 years as his sister in law and brother in law. We have noted that he has always worked long hours, weekdays and weekends. He often worked late into the evening. He was diagnosed with sarcoidosis about 15 years ago which has been treated medically. Since that time there has been a steady decline in his health, especially in the last 10 years. Although we do not know the details of his medical issues, it had been apparent that he experienced sleep disturbances with periods of sleeplessness and periods of time when he could not stay awake. His health issues predated the circumstances of the last few years and seemed to affect his judgement and mood. In the last 2 years, he has been hospitalized multiple times and needed ICU support. He has not returned to baseline after these events and in fact continues to functionally deteriorate requiring significant support. Thank you for your consideration.

Sincerely yours,

Eman Elkadry and Hani Ibrahim

# EXHIBIT 5f

Dear Honorable Judge Rya Zobel,

We are Ekbal Elkadry and Anan Elkadry, Mother and father in law of Fathalla Mashali. We have know Fathalla for the past twenty five years, when he married our daughter Noha. He used to visit us on a weekly bases with the whole family.

We have noticed in the past few years that his health has deteriorated and he tends to fall asleep whenever he was visting us. We noticed this for years but it has increased as his health gets worse. Also we have noticed that many of his decisions did not make sense. We noticed the change in his judgment for many years prior to the charges he faces. His decision making was not correct. Some of his decisions made us wonder if it is related to his health situation. He looked always tired and exhausted. The last few years we have seen that physically and mentally he is not the same person.

We hope you are able to take into consideration his increasingly poor health, when considering his sentence.

Thank you for your consideration.

Anan and Ekbal Elkadry

# EXHIBIT 5g

Mr. Peter F. Duquette, ARNP, CRNA
474 Shore Drive
North Kingstown, Rhode Island
       02852

May 28th, 2017

RE: Dr. Fathalla Mashali

To Whom It May Concern:

I am writing this letter in support of Dr. Fathalla Mashali, an anesthesiologist and colleague that I have know since 2001. I am a Certified Registered Nurse Anesthetist (CRNA), and have practiced in the anesthesia profession since 1978. I was a CRNA staff member of the professional corporation, owned by Dr. Mashali, Northern Rhode Island Anesthesia (NRIA) from its inception in 2001 until 2010.

My practice has been much diversified, having frequently worked as a "Per Diem" contractor in a large number of practice setting and a variety of practice models. I believe this has allowed me to be a fair judge of the character of members of our profession and I feel that a 9 year commitment to a particular professional group speaks well of its leadership.

I was a member of a small anesthesia practice at Landmark Medical Center in Woonsocket, Rhode Island when Dr. Mashali acquired it in 2001 and practiced under his guidance in a number of institutions that he acquire in Massachusetts over the following years. In this time he proved to be one of the fairest and hard working physicians I have worked with. The time that I was a member of this group was one of the most satisfying of my career because of his fairness, open-mindedness and professional expertise. Dr. Mashali is a man of his word, he appreciated and rewarded hard work and dedication within our group and treated me very fairly as well as encouraging my professional growth. In the realm of anesthesia groups this is a rare and unique situation. I have gone on to a very satisfying profession career and credit Dr. Mashli a great deal for this.

As an anesthesiologist he was highly intelligent and skillful as well as a progressive thinker. He was also very approachable and listened with respect and responsiveness to me and my CRNA colleagues, again, an attribute that was rare for a physician in his position.

Because of the time I was a member of NRIA and the attributes of this gentleman that I have listed above, I strongly feel that I should speak in Dr. Mashali's behalf. Although I know he has had professional failings, I believe in all fairness that his many positive attributes should be taken into consideration when evaluating him as a man and I want to fully support him as a professional, as a man and as someone I consider a friend.

Very Sincerely,
Mr. Peter F. Duquette, ARNP, CRNA
Vice President, Nantucket Anesthesia Associates, PC

# EXHIBIT 5h

# *NANTUCKET ANESTHESIA ASSOCIATES, PC*
## *57 PROSPECT STREET; NANTUCKET, MA 02554*
### *16 May, 2017*

RE: Dr. Fathalla Mashali

Dear Honorable Judge Zobel,

My name is Wayne Wilbur and I am a Certified Registered Nurse Anesthetist (CRNA). I have been practicing anesthesia for forty years, starting in 1977. During this time I have provided anesthesia care in every type of location that anesthesia services are needed. This has ranged from large teaching hospitals in Boston and Providence to one doctor physician and dental offices in Rhode Island and Massachusetts. I have also worked in all types of business arrangements; being paid by the hour, by the procedure or being salaried to my present arrangement of co-owning my own contracted practice with a hospital to provide all the anesthesia services. During this time I worked with Dr. Mashali for nine years, being employed by his professional corporation Northern Rhode Island Anesthesia (NRIA) from its inception in 2001 until 2010.

As an employer Dr. Mashali was one of the best and fairest I have had in the last forty years. He always treated me and the other CRNAs at NRIA as valued and respected professionals. To this day, we were financially compensated well above the average salaries for CRNAs in Rhode Island. The benefits offered were the best and the pension plan was more than generous. The paid time off was also very generous and unheard of because it was same as our physician colleagues at NRIA. An example of what a great employer he was, when one of my fellow CRNAs was diagnosed with terminal brain cancer and died within few months, Dr. Mashali personally went out of his way to help him and his family through that very difficult time.

As an anesthesiologist clinician Dr. Mashali is above average with his technical skills and medical knowledge. As the department chief he set a practice model that allowed the CRNAs to administer anesthesia to the full scope of the practice guidelines set by American Association of Nurse Anesthetists. We were not hobbled by the restrictive political practice agenda of the American Society of Anesthesiology that is followed in most institutions locally. This practice model allowed the CRNAs in our group to become more skilled, better, safer and more versatile practitioners of anesthesia. We were always treated fairly and respected as important members of the anesthesia care team by Dr. Mashali. Most importantly our anesthesia group that he led delivered patient care that had patient outcomes and satisfaction that were well above the national average.

The skills I was able to hone and the knowledge I gained while working with Dr. Mashali gave me the ability and qualifications to hold the position I have today. Since 2010 I have been president and co-owner of Nantucket Anesthesia Associates, PC. It is the anesthesia practice group that renders all the anesthesia services for the Nantucket Cottage Hospital.

In closing, a good employer for me is one that treats their employees with fairness, honesty and respect. A good friend to me needs to be a person who treats their family and friends with those same qualities and also will always offer a helping hand without reservation when the other is in need. To me, Dr. Mashali was a good employer and I regard him as the good friend that he has always been.

Regards,
Wayne Wilbur, APRN, CRNA
President, Nantucket Anesthesia Associates, PC

# EXHIBIT 5i

# Islamic Institute of Boston

**liBoston.net**  Serving the Muslim Community



Honorable Rya Zobel
US District Judge
1 Courthouse Way
Boston, MA 02210

May 30, 2017

Honorable Judge Zobel,

### Re: Letter of Support for Fathalla M. Mashali

I am writing as the Imam and Director of the Islamic Center of Greater Toledo in Ohio, www.icgt.org, serving the Muslim community at large since 2015. I am also the founder of the Islamic Institute of Boston, www.iiboston.net. I previously served the Muslim community in the Greater Boston from 1982-2015. In addition, I was a chaplain for several years at Brandeis University, Massachusetts General Hospital, and Brigham and Women's Hospital. I have a "Doctor of Theology" and "Master of Theological Studies" from Harvard University in addition to my religious training as an Imam from Al-Azhar University of Cairo, Egypt. I was appointed by President George W. Bush as a Commissioner for the United States Commission on International Religious Freedom, www.uscirf.gov, from May 14, 2007 to June 7 of 2011.

I seek your kind attention and ask that you grant leniency to Fathalla Mashali, who is presently before you and due to be sentenced shortly. I am shocked by his case as I have known him to be a good human being with a kind and loving personality. I am aware that what he did was wrong and that although one cannot change the past, I am certain he would if he could. The regret and remorse is ever present and that I find to be crucial in one's rehabilitation. I am indeed aware that people make mistakes in life. It may be due to their disturbing past, poor life decisions, or possibly circumstances accumulating and overwhelming an individual into an isolated, despairing downward spiral. My purpose is not to diminish the significance or seriousness of his offence, rather it is to introduce Fathalla to your honor, for what I strongly believe to be the reality of this human being; that he, Fathalla, is deserving of your just and kind consideration as you put an end to his case.

I have known Fathalla for over 25 years as a member of my congregation. Throughout these years, he was an active member in the community and a successful medical doctor who was always eager to help people. I officiated at his marriage and later performed blessings for all his children. I have only ever known him to be honest, sincere, and a dedicated and loving husband and father. He attended our religious feasts and prayers with his children and wife, Dr. Noha Elkadry. He would take note of whatever needed attention in the mosque and tend to it himself. He participated in leadership roles at many community events, and displayed dedication, sincerity and honesty. His interaction with members of the community brought him much respect and admiration and I have only heard praise and appreciation from others for his work.

52 Rogers Street, Quincy, MA 02169, USA
c: 617.365.7427 • e: info@iiboston.net

 **Islamic Institute of Boston**
**IIBoston.net**    Serving the Muslim Community



Fathalla has always exemplified many of the traits of a good citizen. I have known him to be one of the most forthright and articulate members of the community: a family man, a hard worker, and a dedicated father. I came to know that it was his joy to help people, both financially and morally. Throughout the years, he has been very generous in providing for others, time and time again. One of the many heartwarming examples of Fathalla's generosity was when he demonstrated incredible compassion and empathy in the case of a young blind woman, finishing her college education. She was in great need of technology to aid her learning deficiencies as well as housing to accomplish her goals. Fathalla, being the generous person he is, was monumental in aiding me to, not only collect the appropriate funds, but also contributed; to the extent we were able to put her in a position to be highly successful. I can still remember the expression on his face that displayed to me his beautiful soul, and made it clear in my eyes that he was a truly special human being that had a unique passion for helping others.

I remember visiting with Fathalla two years ago at the beginning of his ordeal. During the visit, it seemed to me that he was pondering deeply his situation and doing a great deal of soul searching. I could sense his frustration and confusion. It was only shortly after that when I learned about the deterioration of his health and his serious illness. With this in mind, I pose the question, "of what benefit is it to society to have a person with severe bipolar disorder and neurosarcoidosis be imprisoned when he is in need of continuous critical care"? I can only come to the conclusion that in such a case, a sentence involving a long imprisonment would be lacking in purpose, and potentially wasteful of government resources and tax revenue.

In addition, I strongly believe that an extended prison term will in fact further burden his wife and again will not accomplish the objective of justice. She will be responsible for raising the necessary funds to cover court expenses and restitution. This responsibility as well as her need to make regular visits to prison to spend whatever time remains with her ailing husband will ultimately force her to neglect her children who are already suffering. This tremendous hardship, the result of a long prison sentence, would in the end be punishing his wife and children to a far greater extent than it will Fathalla at this point in his life.

I thus humbly pray for your leniency for Fathalla Mashali. May you have the Wisdom of Solomon to make a decision that will be the right one. I am thankful to you for reading my letter, and with due respect I fully appreciate your kind consideration. May God inspire your decision.

*Imam Dr. Jalal Eid*

Islamic Institute of Boston
52 Rogers Street, Quincy, MA 02169
Email: imamtalal@post.harvard.edu

52 Rogers Street, Quincy, MA 02169, USA
c: 617.365.7427 • e: info@iiboston.net



# Islamic Center of Greater Toledo





**Imam Talal Y. Eid**
Th.D. (Doctor of Theology)

Imām Dr. Talal Eid is the Imam & Director of Religious Affairs of the Islamic Center of Greater Toledo since June 2015, & founder of Islamic Institute of Boston. Previously, Imam Eid has served the Muslim community in the greater Boston, MA since 1982, first as the Imam and Religious Director of the Islamic Center of New England, 1982-2005, & later as the founder and the Executive Director of the Islamic Institute of Boston, 2005-2015. He was also the Muslim chaplain at Brandeis University, the Massachusetts General Hospital & the Brigham and Women Hospital in Boston. He is Adjunct Professor of Arts of Ministry at Hartford Seminary.

- Over 40 years of experience as an Imam and marital and family therapist.
- Consultant, specialist, and expert on Islamic law, including issues of youth, Islamic Will and inheritance, marriage, marital dispute and conflict, marital violence and spouse abuse, divorce, divorce abuse, and child custody.
- Besides being a theologian, Imam Eid is an expert on Interfaith Dialogue and Muslims-Christians-Jewish Relations and Issues related to Islamic pastoral care and counseling and International Religious Freedom.

- On May 14, 2007 until June 7, 2011, Imam Eid was appointed by President George W. Bush to serve as a Commissioner at the United States Commission on International Religious Freedom www.uscirf.gov. He completed two terms of his appointment as a Presidential Appointee Commissioner, 1st term (2 years) under President George W. Bush and 2nd term (2 years+) under President Barack H. Obama. During that period, in addition to once/twice monthly meetings in DC, he conducted with colleague Commissioners Diplomatic mission trips related to Religious Freedom and as a US speaker at the request of the State Department to: Afghanistan (as a US Speaker), Bahrain (as a US Speaker), Bangladesh (2015 as a US Speaker), Brussels (Belgium), Bucharest (Romania), Chad (Twice 2012 & 2014 as a US Speaker), Egypt (3 times, one as a US Speaker), Erbil (Iraq), France, Geneva (Switzerland), Indonesia, Jordan, Kuwait (as a US Speaker), Malaysia (as a Presidential Delegate), Mauritania (2016 as a US Speaker), Morocco, Nigeria (4 times), Montenegro (2017 as a US Speaker), Philippines (as a US Speaker & as a Commissioner), Qatar (as a US Speaker), Rome (Italy), Saudi Arabia (twice), South Korea, Sudan (Khartoum and Juba twice), Syria, Cyprus (north and south), Turkey, Turkmenistan, Vienna (Austria), and Vietnam (twice).

## Educational Background:
- Doctor of Theology (Th.D. – 2005) in Comparative Religion. Harvard University, Harvard Divinity School, Cambridge, MA. Thesis titled, "Marriage, Divorce, and Child Custody as Experienced by American Muslims: Religious, Social, and Legal Considerations."
- Master of Theological Studies (MTS – 1991) Harvard Divinity School.
- Bachelor Degree in Islamic Law, al-Azhar University, Cairo, Egypt, School of Islamic Sciences & Law, 1974.

Imam Eid is a well-known Muslim scholar, theologian, activist, and lecturer on Islam and Muslims, and on Christian, Jewish, and Muslim relations in North America and around the globe. He promotes the knowledge of Islam through local and national and international radio and television programs, and through articles published in local and global magazines.

## For Correspondence:
Islamic Center of Greater Toledo, 25877 Scheider Road, Perrysburg, OH 43551
☎ Cell: 617-365-7427 * Email: imamtalal@post.harvard.edu * Web: www.icgt.org